```
 1                   UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
 3                   Case 10-21612-CIV-Altonaga
 4
   PALADIN SHIPPING CO., LTD.,
 5 a Florida corporation, and.
   ANATOLIY CHABAN,
 6
                 Plaintiffs,
 7
                                       MIAMI, FLORIDA
 8    vs.
                                       JUNE 24, 2011
 9 STAR CAPITAL FUND, LLC, a
   Florida Limited Liability
10 company,
11              Defendant.
   _____
12               TRANSCRIPT OF TESTIMONY OF
                       ANATOLIY CHABAN
13                     MADELEINE KOOY
                  NONJURY TRIAL PROCEEDINGS
14          BEFORE THE HONORABLE CECILIA M. ALTONAGA,
                 UNITED STATES DISTRICT JUDGE
15
   APPEARANCES:
16
   FOR THE PLAINTIFF:       GARY S. PHILLIPS, ESQ.
17                          JEFFREY B. SHALEK, ESQ.
                            Phillips Cantor & Berlowitz, P.A.
18                          4000 Hollywood Boulevard,
                            Suite 375-South
19                          Hollywood, FL 33021 - 954.966.1820
                            gphillips@phillipslawyers.com
20                          jshalek@phillipslawyers.com
21 FOR THE DEFENDANT:
22                          CHARLES H. LICHTMAN, ESQ.
                            Berger Singerman
23                          Las Olas Centre II
                            350 East Las Olas Boulevard,
24                          Suite 1000
                            Ft. Lauderdale, FL 33301
25                          954.525.9900
                            clichtman@bergersingerman.com
```

1  REPORTED BY:

2                          BARBARA MEDINA,
                           Official United States Court Reporter
3                          United States Federal Courthouse
                           400 North Miami Avenue, Ste. 12-2
4                          Miami, FL  33128-1810    305.523.5518
                                        (Fax) 305.523.5519
5                          Email:  barbara.medina127@gmail.com
                                    - - - -
6                          TABLE OF CONTENTS

7                                                            Page

8  Anatoliy Chaban ........................................... 4

9      Direct Examination By Mr. Shalek ...................... 4

10 Madeleine Kooy ........................................... 26

11     Direct Examination By Mr. Shalek ..................... 26

12     Cross-Examination By Mr. Lichtman .................... 51

13     Redirect Examination By Mr. Shalek ................... 62

14 Anatoliy Chaban .......................................... 62

15     Cross-Examination By Mr. Lichtman .................... 62

16 Reporter's Certificate ................................... 93

17

18

19

20

21

22

23

24

25

3

INDEX TO EXHIBITS

| Exhibits | Marked for Identification | | Received in Evidence | |
|---|---|---|---|---|
| Description | Page | Line | Page | Line |
| Plaintiff Exhibits A 1 through A 15 ............... | 12 | | | 5 |
| Plaintiff Exhibit 16 ............................. | 16 | | | 19 |
| Plaintiff Exhibits 20, 21, 22, 23, 24 and 27 ...... | 23 | | | 21 |
| Plaintiff Exhibit 28 ............................. | 32 | | | 16 |
| Plaintiff Exhibit 45 ............................. | 48 | | | 17 |
| Plaintiff Exhibit 46 ............................. | 36 | | | 17 |
| Plaintiff Exhibit 48 ............................. | 41 | | | 25 |
| Plaintiff Exhibit 49 ............................. | 39 | | | 21 |

CITATION INDEX

Page

SIDEBAR CONFERENCE INDEX

Descriptions                                        Page

ADMINISTRATIVE CONVENTIONS:

     When counsel does not identify themselves each time they
address the Court during a telephone conference, the
industry-standard speaker identification is indicated by
chevrons, i.e., >>>:

```
 1  *              *               *              *
 2       ANATOLIY CHABAN, PLAINTIFF SWORN THROUGH INTERPRETER
 3                     DIRECT EXAMINATION
 4  BY MR. SHALEK:
 5  Q.  Good morning, Mr. Chaban.  Can you state your name?
 6  A.  My name is Chaban Anatoliy Chaban.
 7            THE COURT:  He doesn't need this on his ears and you
 8  don't need to speak into the microphone when you speak in
 9  Russian.  Please proceed.
10  BY MR. SHALEK:
11  Q.  How old are you Mr. Chaban?
12  A.  Not very good since I'm here.
13  Q.  How old are you, sir?
14  A.  I'm 53.
15  Q.  And where do you live?
16  A.  I live in the city of Odessa, Ukraine.
17  Q.  How long have you lived there?
18  A.  I been living all my life there.
19  Q.  And what is your profession, sir?
20  A.  I have been in shipping business all my life.  I have been
21  in shipping business 15 years.  I've been in ship-building
22  business.  I have three fitness clubs and I have also child
23  entertainment centers.
24  Q.  And, sir, have you done anything special in the shipping
25  business for which you have been recognized or won any awards?
```

Chaban - Direct

1   A.   Yes.   Our company has developed a technology that allows to
2   reduce the cost of ship-building by 30 percent for which I got
3   recognition.
4            I was decorated with a medal, 300 years of Russian
5   Navy that was conferred to me by the Russian government, by
6   Mr. Putin himself.
7   Q.   Now, sir, how many ships have you bought or sold in your
8   career, or built?  I'm sorry.
9   A.   More than 25.
10  Q.   Okay.  Sir, did there come a time when you met the
11  defendant in this case, Leon Goldstein?
12  A.   Yes.
13  Q.   And can you tell the Court how it is that you came to meet
14  Mr. Goldstein?
15  A.   I was introduced to Mr. Goldstein by his cousin 17 or 18
16  years ago.
17  Q.   And was that for business or pleasure?
18  A.   It was for business.
19  Q.   Can you describe the business that you began discussing
20  with Mr. Goldstein at the time?
21  A.   His company was lending money at an interest rate of 10
22  percent monthly or 120 percent annually, or even more, and his
23  company was Duntar (ph.) and our company was Kraible (ph.) and
24  we had been using them several times.
25  Q.   So, you borrowed money from Mr. Goldstein's company.  Did

1    you repay all the money plus the interest you borrowed?

2    A.  Of course.

3    Q.  Now, at some point did Mr. Goldstein get involved with you

4    in the shipping industry?

5    A.  Yes.  Approximately 11 years ago, he called from America

6    and said that there is a hulk of an old steam boat on sale in

7    Odessa.  The cost of it was $100,000.

8            He suggested that we repair the boat and have it --

9    and use it for shipment, obtain all the necessary documentation

10   for it.

11   Q.  Now, what was the name of the boat?

12   A.  The name of the boat was KOMBAT.  The year was in 1968.

13   Q.  And you -- who paid the $100,000 for the boat?

14   A.  I paid $50,000 and $50,000 was paid by Mr. Goldstein.

15   Q.  And was the boat ready for trade?

16   A.  Yes.  We had been repairing for -- over the period of one

17   and a half years, and on May 5th, 2002 it sailed off on its

18   maiden journey.

19   Q.  How do you specifically remember that date, sir?

20   A.  My fourth child was born on that day.

21   Q.  Approximately how much did it cost in upgrades to make that

22   boat trade-ready?

23   A.  All together with the purchase price, roughly $1 million.

24   Q.  And who paid that money?

25   A.  The first 500,000 was paid by us and the remaining, the

Chaban - Direct

 1  last 500,000, by Mr. Goldstein.

 2  Q.  Now, in order to sale a ship, does the ship need a flag,

 3  sir?

 4  A.  Yes, it needs a flag, flag paperwork and register

 5  paperwork.

 6  Q.  Okay.  And what flag did the ship sale under?

 7  A.  It sailed under the flag of Cambodia.

 8  Q.  Is that a good flag?  How is that flag perceived

 9  internationally?

10          MR. LICHTMAN:  Objection.  Relevance.

11          THE COURT:  Overruled.

12  A.  It is black flag.  It's the blackest flag in the world.

13  So, it accepts all the ships that are more than 30-years-old.

14  Q.  Well, I don't understand.  You bought a ship and made $1

15  million worth of repair to it.  Why was it flying a black flag?

16  A.  For it to sail under a white flag, it would have required

17  repairs worth between 7 and $8 million.  To sail under green

18  flag, it would require repairs in the range of $3 million.  It

19  was the absolute minimum repairs that we could invest in it.

20  Q.  Now, you mentioned that the ship needed to be classified.

21  Can you describe to the Court how you got the ship classified

22  and what classification society classified the ship?  And this

23  is in 2002 when the ship first started to sale.

24  A.  We classified it under RAS Register.

25  Q.  And how does RAS Register compare internationally with

Chaban - Direct

1  other registration societies?

2  A.  It's a class that is below average, a little bit under

3  average, below average.

4  Q.  Now, sir, when the ship started sailing, can you describe

5  to the Court whether or not it was profitable and whether or

6  not you and your partner were making money on the ship?

7  A.  Yes, at the beginning the ship was profitable because the

8  safety regulations for sailing were set very low.

9        MR. LICHTMAN:  Can I sit up there so I can hear?

10  Thank you.

11  A.  Yes.  The ship could enter any port and over the first two

12  years Mr. Goldstein has been getting profits in the range of

13  $2,000 per month, the equivalent of 270,000 per year.  So, over

14  two years period, he got back the money that he put into the

15  ship.

16  Q.  Now, can you explain to the Court, in 2002 the vessel was

17  34-years-old.  Correct?

18  A.  Yes.

19  Q.  Okay.  Can you -- over the years can you describe to the

20  Court the effect that aging of the vessel had on the necessity

21  to repair the vessel and the ability of the vessel to make

22  profit?

23  A.  There is a notion that is called the tiredness of metal.

24  So, the metal of the hull is getting tired in time.  It

25  develops cracks, is getting thinner, rusting.  So any crack can

Chaban - Direct

1   make the ship sink.  So that's why the safety of the ship gets

2   lower and lower and the length of each sailing gets shorter and

3   shorter.

4          It requires ongoing repairs.  That's why the outlays

5   on the ship are getting higher and higher.

6   Q.  And what about the ability to earn profit?

7   A.  The ability to generate profit certainly is getting lower

8   and weaker because the expenses, repair expenses are growing.

9   Q.  Now, describe for the Court, if you will, if there's

10  problems going in and out of various ports due to the age of

11  the ship.

12  A.  Yes.  Especially that was true after 2007 when four ships

13  suffered a ship disaster because of this aging problem.  That's

14  why the requirement of entrance into international ports,

15  including Russian ports, got more and more stricter.

16         So, the problems were compounded by several

17  circumstances.  First, the age of the ship.  Secondly, the

18  flag.  The third circumstance the metal, old metal.  That's why

19  it stopped being admitted to the international foreign ports

20  and it was admitted into Russian ports only in the summertime,

21  but not in the wintertime when there is an ice cover.

22  Q.  Now, sir, did there come a time when the RAS refused to

23  continue to certify the CHALSI?

24  A.  Yes.  In 2008 the company, the Society RAS withdrew its

25  certification and because it could not keep a ship that was so

1  old, in such a bad then condition, and banned the ship from

2  leaving the ports.

3          That's why at the end of 2008, at the end of October

4  2008, the ship was quarantined in the port.  It was not able to

5  leave and go for trade.

6  Q.  So, the ship needed repairs in order to be classified

7  again?

8  A.  Yes.  The ship needed repairs, pretty major overall, yes.

9  Q.  Describe to the Court what conversations you had with

10  Mr. Goldstein about the expenses and necessity of repairing the

11  ship at that time.

12  A.  I had approached Mr. Goldstein several times, numerous

13  times, reminding him that we needed to repair the ship in order

14  for the ship to fulfill its purpose of sailing, trading and

15  generating profits, but he explained to me that he went into a

16  new line of business and he had no intention of investing any

17  money into old ships which nobody knows if they're going to

18  sail or not.

19  Q.  Now, you say that Mr. Goldstein explained to you that he

20  was in a new business.  When was the first time that

21  Mr. Goldstein had told you about this new business?

22  A.  In August, approximately a month before he borrowed money

23  from me for the first time.  He suggested that we go into new

24  business.  It was August of 2008.

25  Q.  And did he describe this new business to you?

1   A.   Yes.   He told me that he was lending money.   He told it to

2   me and many other people.   He was lending money to companies

3   that had an acute need of cash at 120 percent annual and even

4   more.

5           He told me that the whole scheme is riskless.   They

6   were finding, allocating companies that needed money very

7   urgently.   For example, if a company had a turnover or sales of

8   $150,000 in four months, so they would lend $100,000 to the

9   company and after four months, the company had to pay back

10  $150,000.

11          As a surety, they would take all the assets of the

12  company and they would set up machines taking the credit cards

13  so all the money would follow or flow into their accounts.

14  Q.   Now, Mr. Chaban, did you invest in that business?

15  A.   No.

16  Q.   So, when you refused to invest in that business, what

17  happened next?

18  A.    In that case, he asked me to lend him money with interest

19  so that he could make money in that way through Star Capital

20  Company.

21  Q.   Now, if you could look -- at the table in front of you is a

22  book of exhibits, Mr. Chaban.   Do you see that?

23          MR. SHALEK:   Your Honor, at this time, rather than lay

24  an evidentiary foundation for that which is agreed to by the

25  parties, I would ask that the Court move into evidence exhibits

Chaban - Direct

```
 1  A 1 through A 15 which are agreed to by the parties.
 2            MR. LICHTMAN:  No objection.
 3            THE COURT:  Those are admitted.
 4    [Plaintiff Exhibits A 1 through A 15 received in evidence at
 5                       11:20 a.m.]
 6            MR. LICHTMAN:  Your Honor, Mr. Goldstein wears a
 7  hearing aid.  Could he sit up here with me, please?
 8            THE COURT:  Sure.
 9  BY MR. SHALEK:
10  Q.  Mr. Chaban, if you could look at Exhibits 14 and 15 in the
11  book in front of you.
12  A.  (Complied.)
13            THE COURT:  Do you have an extra book of exhibits or
14  no?
15            MR. SHALEK:  Yes.
16            THE COURT:  If you could provide my law clerk, that
17  would be helpful.
18            MR. SHALEK:  With pleasure.
19  BY MR. SHALEK:
20  Q.  Now, looking at Exhibit 14, Mr. Chaban, is that the
21  agreement by which you agreed to lend Mr. Goldstein $750,000?
22  A.  Yes.  On September 5th, 2008 under this signed document, he
23  received $750,000.
24  Q.  And how long was the note -- when was the note due?
25  A.  Exactly six months later, on March 5th, 2009.
```

Chaban - Direct

1  Q.  And what was the agreed-upon interest rate?

2  A.  2 percent monthly.

3  Q.  Now, was that enough money for Mr. Goldstein or at some

4  time did he ask you for more?

5          MR. LICHTMAN:  Objection.

6          THE COURT:  Overruled.

7  A.  A few days later he told me that the money was not

8  sufficient for him, so he suggested that I increase the amount

9  of the credit to 1,150,000.

10  Q.  And did you agree to lend the additional $400,000?

11  A.  Yes, I did increase the amount of the credit to 1 million

12  150.

13  Q.  For the same six months at the same interest rate?

14  A.  For the same period, six months, at the same interest rate.

15  Q.  Okay.  What happened next?

16  A.  The international economic crisis began literally three

17  weeks later.  Everything stopped, came to a stop, and

18  everything was scary.  So, we asked Mr. Goldstein to pay us

19  back the money due earlier, either the whole amount or partial

20  amount.

21  Q.  And when did you have this conversation with Mr. Goldstein?

22  A.  Right after the start of the crisis.  So, It would be

23  September, October.  In October, in October.

24  Q.  Let me back up and just try and ask you, the money that was

25  lent, where was the money transferred to?  Do you know?

Chaban - Direct

1    A.   Yes.   The money was transferred to Star Capital to

2    facilitate its activities, to proceed with further lending of

3    that money further down the road.

4    Q.   Who actually provided the money?  Do you know?  Was it

5    yourself or was it Paladin Shipping?

6    A.   I gave my personal money.   It was -- Paladin gave the

7    money, but it was my money.

8    Q.   Okay.   You had these conversations with -- in October --

9    and Mr. Goldstein agreed to return some of the money.

10            Could you, please, look at Exhibit 8 in front of you?

11   A.   Yes.   He agreed to transfer part of the money.  So, my

12   accountant sent him an invoice with all the necessary

13   information where the money was supposed to be sent to.

14   Q.   Did you receive any money at that time, in October?

15   A.   No, not a penny.

16   Q.   So, what did you do next?

17   A.   After that we got in touch with him and asked him to send

18   or transfer at least the interest back.  He agreed to transfer

19   the interest money and we sent him an invoice for the amount of

20   the interest.

21   Q.   Can you look at Exhibit 9, please?

22   A.   Yes.

23   Q.   And what is Exhibit 9?

24   A.   This is the document according to which he was supposed to

25   transfer money for the interest accrued over that period of

Chaban - Direct

1  time.

2  Q.  And did you receive the money for the interest accrued for

3  over that period of time?

4  A.  We haven't received anymore from Leon.  I did not receive

5  the interest.

6  Q.  Now, between September, October and November, describe what

7  was happening with the CHALSI.

8  A.  Since October of that year the ship was docked at the port

9  because it was not able to ship because of its technical

10 condition and because of lack of any documentation.  RAS

11 Society recalled all its documents.

12 Q.  And what type of laid-up charges was the CHALSI incurring?

13 A.  On an average, 30,000 a month including the salary of the

14 crew, the time that is spent in the port, food for the crew,

15 fire safety and the rest of the expenses.

16 Q.  So, at some point did you make a decision that you had to

17 repair the CHALSI?

18 A.  Yes.  In December of 2008 when I figured out that

19 Mr. Goldstein had no intention of paying up and when the ship

20 was incurring more and more expenses and there was a risk of

21 ship turning into scrap metal like in three or four months, I

22 made a decision on my own to repair the ship.

23 Q.  And can you look at Exhibit 16, please?  I'm sorry.

24 Exhibit 18.

25 A.  I see.

Chaban - Direct

1   Q.  Can you identify that document for me, please?

2   A.  It's a contract with a ship-building plant in the city of

3   Kozyn in Ukraine to repair the ship.

4   Q.  And who is Concord Ship Building?

5   A.  It's a shipping company that manages CHALSI.

6   Q.  And is this a true and correct copy of the contract between

7   Concord Shipping and the repair company dated December 15th,

8   2008?

9   A.  Yes.

10  Q.  Is this document kept by you in the regular course of

11  business?

12  A.  Yes.

13       MR. LICHTMAN:  Your Honor, we'll stipulate to its

14  admission.

15       MR. SHALEK:  We ask that be moved into evidence, Your

16  Honor.

17       THE COURT:  Admitted.

18    [Plaintiff Exhibit 16 received in evidence at 11:32 a.m.]

19  BY MR. SHALEK:

20  Q.  Did there come a time in 2009 when you traveled to America?

21  A.  Yes.  Over the last six years, I've been coming every year

22  for one month in January with my family to Miami.

23  Q.  And you come to South Florida?

24  A.  Yes, we come to Miami each year in January.

25  Q.  And you were there in 2009.  Correct?

Chaban - Direct

1   A.  Yes.

2   Q.  And did you have any opportunity to speak with

3   Mr. Goldstein about the CHALSI in 2009 when you were in Miami?

4   A.  Yes.  I've been trying several times to get ahold of him,

5   but he has been trying to avoid, saying -- conversations saying

6   "Later, later," and finally one hour before my plane left, I

7   convinced him to meet and he signed a promissory note with his

8   own signature.

9        MR. LICHTMAN:  Objection.  Move to strike.

10  Nonresponsive.

11       THE COURT:  Overruled.

12  BY MR. SHALEK:

13  Q.  Can you describe the conversation you had with

14  Mr. Goldstein at that time?

15  A.  I asked him to write like a personal note to me and he said

16  "Why do you need such a note from me?  You already have a note

17  that I have telexed to you."

18       I agreed to extend the deadline for the amount of

19  credit that he took from me and in exchange for my extending

20  the deadline, he agreed to put this note as a collateral for

21  CHALSI.

22  Q.  And if you could look, please, at Exhibit 3 -- I'm sorry --

23  Exhibit 1.

24  A.  Yes.

25  Q.  Is that -- Do you recognize that as the document by which

Chaban - Direct

1   he pledged the collateral?

2   A.  Yes, I recognize.

3   Q.  Near the end of the document, it says "If the debt is not

4       timely repaid, Chaban shall have the right to sell my share

5       in the ship, having preliminarily agreed to the selling

6       price of my share in writing."

7   A.  Yes, in writing, yes.

8           MR. SHALEK:  I'm sorry, Your Honor.  Do you not have

9   the English of Exhibit 1?

10          THE COURT:  I do.

11  BY MR. SHALEK:

12  Q.  Can you describe any efforts made to have the selling price

13  at that time preliminarily agreed to in writing?

14  A.  By whom?

15  Q.  By you and Mr. Goldstein.

16  A.  No.

17  Q.  And, in fact, as we sit here today, have you ever reached a

18  written agreement as to what the selling price of the vessel

19  would be?

20  A.  No, it was never reached.  Mr. Goldstein could have sold

21  his shares in the market to whomever.  There was no need for

22  that for my written agreement.  He didn't need something like

23  that.

24  Q.  Now, what happened next?  Did you ever hear again from

25  Mr. Goldstein about selling his interest in the CHALSI?

Chaban - Direct

1  A.  Approximately one week after I went back home -- I was

2  already in Odessa --  he called me over the phone and said that

3  he wanted to buy out my share, and I asked him "When are you

4  intending to transfer money for my share and for the amount you

5  owe?"

6          He said "It depends how it works.  In two months,

7  three months, whenever I come into money."

8  A.  I am not crazy, you know.  He owed me money anyway and what

9  he was asking me to do is to transfer the ship to him without

10 getting any money.

11 Q.  So, did you ever hear from Mr. Goldstein again about that

12 proposal?

13 A.  Say it again, please.

14 Q.  Did he ever send you anything or follow up on that offer

15 with regard to buying the shares?

16 A.  No, never, never.  Not a single piece of paper, not a

17 single letter, nothing in writing that would indicate he wanted

18 to buy the ship.

19 Q.  Okay.  At some point did you come to own Mr. Goldstein's

20 share of the CHALSI?

21 A.  Yes, yes, yes.  Two weeks later I received a letter from

22 him saying that he was transferring his shares to us because we

23 allegedly had ruined some kind of business deal for him and he

24 said that the value of his share is $750,000.

25          We first thought that it might be a joke because it

Chaban - Direct

 1  was like three times higher than the actual value of his share.

 2  But when I called him up and was able to get him on the phone,

 3  he said "Yes, that's how I appraise my share," and when I asked

 4  him "When are we going to get money?" he said "There is no

 5  money as yet," and I asked him "When are you going to be able

 6  or the money will be available?"  He said "When it is

 7  available, then it is available."

 8  Q.  What did you express to Mr. Goldstein about the value of

 9  the CHALSI and its ability to pay off the loan?

10  A.  I told him that the maximum value of CHALSI could be

11  200,000 or 250,000, the very maximum, and that he has to repay

12  me the rest of the money.

13       I told him that $1 million is what it cost nine years

14  ago, but over the period of nine years it sustained all the

15  wear and tear and the value went down, but he said that he

16  didn't have any other option of paying me the money, that he

17  didn't have money, there was a crisis and that his business was

18  very slow and he didn't succeed in his business.

19  Q.  So, in March then, did you receive the shares in the

20  CHALSI?

21  A.  Yes, in March we received $400,000.

22  Q.  No, no, the shares of the CHALSI, sir.

23  A.  Yes, we received the shares in the CHALSI.

24  Q.  If you can look at Exhibit 13, please.  I'm sorry.  Exhibit

25  10.

Chaban - Direct

1   A.   Yes, it's a certificate confirming that our company has

2   received 25,000 shares that used to belong to Mr. Goldstein.

3   Q.   Why is the certificate from a company called Dexter?

4   A.   Because the company -- the registration was transferred to

5   Dexter.

6   Q.   Why was it transferred to Dexter?

7   A.   Because for a long period of time the company had belonged

8   to us, but Mr. Goldstein wanted it to be under a German

9   company, so we transferred it to a German company.

10  Q.   Now, when you received this, was there any indication at

11  the time in a company letter, a phone call, that discussed the

12  value of Mr. Goldstein's interest in the ship?

13  A.   I didn't understand the question.  Say it again.

14  Q.   At the time you received Exhibit 10.

15  A.   No, there was nothing, no letter, no anything.  Nothing has

16  been discussed.

17  Q.   Okay.  What happened in April of 2009?

18  A.   Mr. Goldstein transferred $400,000 to us in April of 2009.

19  Q.   Now, do you know whether the money came from Mr. Goldstein

20  or did it come from Star Capital?

21  A.   The money came from the Star Capital Company.

22         MR. SHALEK:  One moment, Your Honor.

23  BY MR. SHALEK:

24  Q.   Now, when you received the $400,000 from Star Capital, was

25  that sufficient to pay off the debt?

June 24, 2011

Chaban - Direct

1    A.  Of course not.  My accountant got in touch with him because

2    he already refused stay in touch with me and was not in touch

3    with me, and she told him that, "Mr. Goldstein, do you know you

4    still have a lot of money that you owe, that there's a large

5    balance of your debt?" but he said "No."  He believed that he

6    paid his debt off.

7    Q.  Now, Mr. Chaban, could you, please, turn to Exhibits 20,

8    21, 22, 23 and 24?

9    A.  Yes.

10   Q.  Do you recognize those exhibits?

11   A.  Yes.

12   Q.  What are those exhibits?

13   A.  This is the cost estimates of actual costs or expenses of

14   the repairs of the hull of the ship.

15   Q.  I'm sorry.  Because of the translation, is this an estimate

16   or the actual costs?

17   A.  Sorry.  It's actual cost of work done.

18   Q.  Okay  And these were all work done on the CHALSI.  Correct?

19   A.  Work done on the CHALSI.  Correct.

20   Q.  And who paid for that work done?

21   A.  I did.

22   Q.  And this was work that was done as a result of it being

23   laid up in October of 2008.  Correct?

24   A.  Yes.  Otherwise, it would have been condemned to scrap

25   metal.

Chaban - Direct

1   Q.  Looking at Exhibit 18, how much was paid for that repair?

2   A.  Document number 21, according to this document, $217,171

3   has been expended.

4   Q.  Sir, are these true and correct copies of these actual

5   repairs?

6   A.  Yes, true copies of the documents.

7   Q.  Are these records that you keep in the ordinary course of

8   your business?

9   A.  Yes, of course.  It's bookkeeping documents.

10  Q.  Can you tell me if that is the same before I move them in

11  for Exhibit 27?

12  A.  Yes, those were additional works done for the amount of 97,

13  $98,000.  There's a series of documents here as well.

14          MR. SHALEK:  Your Honor, we would ask that Exhibits

15  20, 21, 22, 23, 24 and 27 be admitted into evidence.

16          MR. LICHTMAN:  We object lack of foundation.  Source,

17  relevance.

18          THE COURT:  Overruled.  Admitted.

19          MR. SHALEK:  Thank you, Your Honor.

20    [Plaintiff Exhibits 20, 21, 22, 23, 24 and 27 received in

21                  evidence at 11:53 a.m.]

22  BY MR. SHALEK:

23  Q.  As to Exhibit 20, sir, what was the amount paid?

24  A.  $217,171.

25  Q.  21?

Chaban - Direct

1   A.   217,181

2   Q.   No, no.   21.

3   A.   $9,000.

4   Q.   Can you state the exact amount, please?

5   A.   $9,043.

6          MR. SHALEK:  Your Honor, to save the Court time, if

7   they're moved into evidence, I don't need him to testify as to

8   the amounts of each one.

9   BY MR. SHALEK:

10  Q.   Mr. Chaban, who is Madeleine Kooy?

11  A.   She's from international society or company that deals with

12  appraisal of ships.

13  Q.   How did you locate Ms. Kooy?

14  A.   I wanted to resolve my dispute once and for all with

15  Mr. Goldstein because I was quoting one amount.  He was quoting

16  a different amount.  It was impossible to prove anything to

17  him.  That's why I wanted to find an official source that was

18  going to do it.

19         I had consulted several brokerage companies that deal

20  with the sales of ships.  I wanted them to refer me to the most

21  professional and knowledgeable company out there in the market

22  that would help me with this appraisal, and all of them

23  recommended myself to them because they are the most busiest

24  companies.  They have the most ships under their dealt they

25  appraise for.

Chaban - Direct

1   Q.  Did a lawyer advise you to get an appraisal or was the

2   appraisal done as part of any litigation strategy?

3   A.  No, no.  I just wanted to prove what was the real value of

4   the ship, so to make it clear.

5           MR. SHALEK:  May I have one moment, Your Honor?

6           THE COURT:  Sure.

7   BY MR. SHALEK:

8   Q.  Mr. Chaban, one final question:  When you received the

9   shares of the CHALSI in March of 2009, what did you believe the

10  value of the ship was?

11  A.  In March of 2002, the maximum real value of the shares was

12  $200,000.  I was trying to state it numerous times over the

13  phone.  Even when he refused to pick up the phone, we would try

14  to do it through his friends.

15  Q.  I'm sorry.

16          MR. SHALEK:  I'm sorry.  You translated March 2002.

17  Is that correct, or did you mean to say --

18  A.  No, I'm sorry.  I mixed up the dates.

19  Q.  Can you continue with your answer?

20          The question is in March of 2009 when you received the

21  shares from Mr. Goldstein, what did you believe the value of

22  the CHALSI to be?

23  A.  That's what I meant, 2009.

24  Q.  Okay.

25  A.  So, the maximum value of his shares was $200,000 and he

June 24, 2011

Kooy - Direct

1  knew very well himself.

2  Q.  Do you still consider that Mr. Goldstein owes you money,

3  the difference between the amount of the loan minus the

4  $400,000 paid and your shares that you received of the CHALSI?

5  A.  Of course.

6  Q.  And are you still owed interest?

7  A.  Yes, the interest would include the contract, of course.

8           MR. SHALEK:  No further questions, Your Honor.

9           THE COURT:  Why don't we take a lunch recess at this

10  time?  We'll take an hour and resume at 1:00.  All right?  I'll

11  see everyone at 1:00.

12      [Luncheon recess at 12:00 p.m.]

13  *               *               *               *

14           MADELEINE KOOY, PLAINTIFF'S WITNESS, SWORN

15                DIRECT EXAMINATION

16  [Beginning at 1:07 p.m.]

17  BY MR. SHALEK:

18  Q.  Would you state your name, please?

19  A.  My name is Madeleine Kooy.

20  Q.  And where are you from, Ms. Kooy?

21  A.  I'm from the Netherlands.

22  Q.  And your citizenship?

23  A.  Is Belgium.

24  Q.  Your profession?

25  A.  I'm a sworn sale and purchase broker for seagoing vessels.

1  Q.   And what does it mean to be a sworn broker?

2  A.   That means that I have taken an oath that I have stated an

3  oath and stated in front of the Courts in Rotterdam that I will

4  carry out my work according to the law.

5  Q.   How many sworn brokers are in the Netherlands?

6  A.   There's three sworn ship brokers for seagoing vessels in

7  the Netherlands.

8  Q.   What training do you have in this profession?

9  A.   I started in 1978 as a junior sale and purchase broker and

10  I've worked since then for various companies gaining my work

11  and my profession, and in 1997 I started my own sale and

12  purchase company.

13  Q.   And in your business, do you regularly evaluate and

14  appraise seagoing vessels?

15  A.   Yes, I do.

16        MR. LICHTMAN:  Your Honor, I think that there has

17  already been a ruling by the Court that Ms. Kooy is not going

18  to be serving as an expert witness.  So, to the extent that

19  he's attempting to qualify her as such, I just wanted to make

20  an objection to that on the record now.

21        THE COURT:  He's just telling me about her.

22        MR. SHALEK:  All I'm doing is giving you some

23  background.

24        THE COURT:  Overruled.

25  BY MR. SHALEK:

Kooy - Direct

1  Q.   In the course OF your business, do you regularly value and

2  appraise ships?

3  A.   Yes, I do.

4  Q.   What percentage of your business is valuing and appraising

5  ships?

6  A.   At this moment, about 25 percent.

7  Q.   Approximately how many ships have you valued and appraised?

8  A.   Over 5,000 vessels.

9  Q.   And how many of them are Russian river-type vessels?

10  A.   Approximately 500, 4 to 500 vessels.

11  Q.   Who do you value vessels for?

12  A.   We value vessels for all the large banks in the Netherlands

13  and Belgium, State of Ukraine, a couple of large Turkish ship

14  financed banks, finance companies, insurance companies.

15  Q.   Can you tell me how it came that you were asked to value

16  the CHALSI?

17  A.   In June 2010, I was asked by Mr. Alexander Gorchakov to

18  carry out a valuation for the CHALSI.

19  Q.   Who is Mr. Gorchakov?

20  A.   Mr. Gorchakov is an acquaintance of ours.  We have done

21  valuations for him before and we have assisted him in sale and

22  purchase.

23  Q.   What fee were you paid for your work?

24  A.   350 Euros, which is a standard flat fee for valuations.

25  Q.   Okay.  And did you give a valuation of the CHALSI?

Kooy - Direct

1   A.  I did.

2   Q.  Before you, ma'am, you have an exhibit book.  Ms. Kooy,

3   there should be a big book in front of you.

4   A.  No.

5   Q.  No?  What happened?

6        Ms. Kooy, could you, please, look at Exhibit 28?

7   A.  Yes.

8   Q.  Do you recognize that document?

9   A.  Yes, I do.

10  Q.  Are you the author of that document?

11  A.  Yes, I am.

12  Q.  Is that the signature -- is that your signature on the

13  document?

14  A.  That is correct.

15  Q.  And is this the type of document that you prepare in the

16  regular course of your business?

17  A.  That is correct.

18  Q.  And is this a true and correct copy of the document that

19  you executed?

20  A.  Yes, this is a true and correct copy.

21       MR. SHALEK:  We would ask that this document be moved

22  into evidence.

23       MR. LICHTMAN:  Your Honor, effectively what they're

24  trying to do is back-door in on providing expert testimony for

25  the value of the ship.

Kooy - Direct

 1            There has been no foundation that establishes her as a

 2   lay witness under Federal Rules of Evidence.  They effectively

 3   almost qualified her as an expert by going through the

 4   background of what she did in terms of the number of ships she

 5   has done, who she works for, and now putting in a valuation

 6   certificate.  This is expert testimony.

 7            MR. SHALEK:  Your Honor, it's just not true.

 8   Mr. Chaban already testified that no lawyer or anybody asked

 9   her to give a valuation, that this was done for business

10   purposes to resolve the dispute that he was having with

11   Mr. Goldstein.

12            She was hired outside the scope and course of

13   litigation and in her job in the ordinary course of business,

14   she gave a valuation.

15            I'm going to ask her simply to state her valuation and

16   give the basis for her valuation and I'm going to dismiss her

17   from the stand.

18            MR. LICHTMAN:  Your Honor, Federal Rule of Evidence

19   701 talks about a lay witness giving testimony on inferences,

20   opinions that are rationally based on the perception of a

21   witness to establish the witness' testimony, determination of a

22   fact in issue and not based on scientific, technical or other

23   specialized knowledge.

24            The reason that we filed the motion to strike her as

25   an expert to begin with is because they divulged her in their

1  answers to interrogatories as an expert.

2        They can't put something into pleadings, give it to

3  the Court, have everybody rely on it, not do an expert report,

4  bring her to court with the same document that they gave us at

5  the time of the answers to interrogatories and say it's not an

6  expert opinion.

7        She's here as an expert.  She didn't talk about any

8  testimony with respect to being present in conversations with

9  Mr. Goldstein or trying to help fix that deal.  She's here

10 purely to testify on value.  It's a scientific testimony.

11       MR. SHALEK:  Your Honor, this is the exact argument

12 that -- Mr. Lichtman was not here for the argument.  His

13 partner, Mr. Samuels, made this argument.  Mr. Samuels stood up

14 and said that it's scientific testimony and it didn't come in

15 because we didn't follow the rules or your order.

16       Then we said, "Then how are they going to value the

17 CHALSI?" and Mr. Samuels said "It's not scientific testimony.

18 Anybody can do it.  Mr. Goldstein can provide it.  It's not

19 scientific testimony."

20       Your Honor's exact ruling was, "Well, Mr. Samuels,

21 since you admit that it's not scientific testimony, then the

22 witness can appear as a lay witness."

23       Now we're back here again and again he's arguing under

24 Federal Rule of Evidence 701 that what I'm trying to present is

25 scientific testimony.  So, they're trying to bite both sides of

1    the apple here, Your Honor.

2         THE COURT:  It sounds like a second motion for

3    reconsideration, my initial order on your ore tenus motion.  I

4    addressed these matters last week.

5         You're just preserving it for the record then, your

6    objection?

7         MR. LICHTMAN:  Well, I mean, I legitimately believe

8    what she's providing is expert testimony.  Of course, I always

9    wish to make my record.  I think this is definitely expert

10   testimony.  It's not a close call.

11        THE COURT:  Overruled.

12        MR. SHALEK:  We ask that the document be moved into

13   evidence.

14        THE COURT:  Admitted.

15     [Plaintiff Exhibit 28 received in evidence at 1:16 p.m.]

16   BY MR. SHALEK:

17   Q.  What was your valuation of the CHALSI, Ms. Kooy?

18   A.  I valued the vessel between -- U.S. dollars -- 350 and

19   400,000.

20   Q.  Okay.  Let's talk about how it is that you reached the

21   valuation.  Tell me what consideration, if any, did you give to

22   the flag she was flying?

23   A.  We gave some consideration to the flag she's flying.  The

24   vessel is flying Cambodia flag at the time of the valuation.

25   Q.  And how does that affect your valuation?

1   A.  It affects the valuation to a minus.  So, we put a value on

2   the ship and the vessel would Cambodia flag and puts minus

3   points towards the value.

4   Q.  Did you determine the age of the vessel?

5   A.  Yes, I did.  The vessel is built in 1968 in Rumania.

6   Q.  How did you determine that?

7   A.  We found the vessel is registered in a international

8   register book for ships which is called Lloyd's Register of

9   Ships.  In there it states the vessel was built in 1968.

10  Q.  Ms. Kooy, could you, please, look at Exhibit 46 in the book

11  in front of you?

12  A.  (Complied.)

13  Q.  Do you recognize that document?

14  A.  I do.

15  Q.  What is that document?

16  A.  It's a copy of a page out of the Lloyd's Register.

17  Q.  And is this a list or directory that is used by you or the

18  public in your occupation?

19  A.  That's correct.

20      MR. SHALEK:  Your Honor, we would ask that this

21  document be moved into evidence.

22      MR. LICHTMAN:  It's hearsay, Your Honor, and it's

23  further proof what she's providing is pure expert testimony.

24      MR. SHALEK:  Your Honor, I will note that in --

25      MR. LICHTMAN:  Excuse me.  I'm sorry.

1           This is not a document that she prepared.  It's a

2    third-party source without a foundation, no explanation, just

3    "here's a document.  Let's put it into evidence."

4           MR. SHALEK:  Your Honor, first, in preparing the

5    exhibit list, they never objected to this document as being

6    hearsay.  The only objection that they listed was relevancy.

7           Moreover, Your Honor, under Federal Rule of Evidence

8    803(17), it is totally permissible to have that document come

9    in.

10          MR. LICHTMAN:  803(17) includes market quotations,

11   tabulations, lists, directories or other published compilations

12   generally used or relied upon by the public or persons in

13   particular occupations.  That foundation has not been laid.

14          MR. SHALEK:  I'll lay the foundation.

15          MR. LICHTMAN:  It's still hearsay.  This is not

16   creating an exception to hearsay.

17          MR. SHALEK:  Your Honor, Rule 803 is a list of hearsay

18   exceptions and I will lay a better predicate if the Court

19   requires.

20   BY MR. SHALEK:

21   Q.  What is a Lloyd's Register, ma'am?

22   A.  Lloyd's Register is a register which is used by

23   international since 1700, whereby any vessel which is being

24   built will get a register number, an IMO number, and is

25   registered in this book, and this is a book which is being used

1   by shipping in general all over the world.

2   Q.   How many ships are listed in this register?

3   A.   I think there's over 70,000 vessels listed in these

4   registers.

5   Q.   And this register, is it relied on by the public or persons

6   in a particular occupation?

7   A.   Yes.

8   Q.   And is it specifically relied upon by persons in your

9   occupation?

10  A.   Correct.  It's the only register existing which has all the

11  vessels listed.

12  Q.   And as far as this particular exhibit that's in front of

13  you, ma'am, Exhibit 46, is this an exit that lists the KOMBAT

14  and shows when it was built?

15  A.   It does.

16         MR. SHALEK:   Okay.  We ask again that it be moved into

17  evidence, Your Honor.

18         MR. LICHTMAN:   The witness just said this is a book.

19  It has 70,000 listings.  She's provided one page from the book

20  and that's it.  How can anybody be expected to possibly do an

21  effective cross-examination and understand the contents of the

22  rest of the book if what she has produced is one limited

23  Xeroxed page out of a book.  No sub-title, no cover page,

24  nothing else to authenticate it.  It's unfair.  It's highly

25  prejudicial for this document to come in.

Kooy - Direct

1          MR. SHALEK:  Your Honor, it's so highly not

2     prejudicial.  The rules of evidence create an exception for it.

3     It's the Lloyd's Register and she copied the page that listed

4     the KOMBAT for the sole purpose of telling the year when the

5     vessel was built.

6          MR. LICHTMAN:  If it was the exception, what they

7     would do is produce the book and say "Turn to page" whatever it

8     is of the book.

9          THE COURT:  I'll admit it, subject to having you

10    provide the defense with access to the whole book so they can

11    look at it before we resume next Thursday.

12          I think it's publicly available.  Make sure you make

13    it available to the defendant and that way Mr. Lichtman can

14    look at all of the pages in the Lloyd's Register.

15          THE COURT:  Overruled admitted.

16     [Plaintiff Exhibit 46 received in evidence at 1:22 p.m.]

17    BY MR. SHALEK:

18    Q.  Looking at page 46 in front of you, Ms. Kooy, do you see a

19    listing for the KOMBAT?

20    A.  I do.

21    Q.  Which listing is it?

22    A.  The third -- fourth listing from the top.

23    Q.  According to the Lloyd's Register, what year was the vessel

24    built?

25    A.  1968.

1   Q.   By the way, do you have any other way of determining this
2   vessel was built in 1968?
3   A.   Yes, I do.
4   Q.   What other ways?
5   A.   General information.  This vessel, which is a Russian-type
6   built vessel, on the Internet there are international
7   publications which show that these -- where these vessels have
8   been built and when.
9   Q.   Specifically, is there a ship listing of the Volgo-Don-type
10  vessels that were built?
11  A.   There is.
12  Q.   And can you describe for us what that listing is?
13  A.   It is a listing which shows that -- where all the Volgo-Don
14  vessels have been built and at which dates and at which
15  shipyards because they are over -- a couple of hundred of these
16  vessels have been built and it shows exactly what these vessels
17  have been doing, what their new names are, et cetera.
18  Q.   Ms. Kooy, if you could, would you look at Exhibit 49 in the
19  book in front of you?
20  A.   Yes.
21  Q.   What is Exhibit 49?
22  A.   Exhibit 49 is the ship listing of the type, Volgo-Don.
23  Q.   How did you come to find this list?
24  A.   It's public -- it's on the Internet and if you search for
25  the type, Volgo-Don, it will show up on Internet searches.

Kooy - Direct

1  Q.  Is this a document that's generally available to the

2  public, a list of Volgo-Don vessels that you would use in the

3  course of your occupation?

4  A.  Yes, it is.

5  Q.  Now, can you find for us where this document discusses the

6  KOMBAT?

7  A.  Yes, I will.  There's no problem.  The fourth page of this

8  document.

9  Q.  Okay.

10  A.  It says on the top, the fourth vessel.  It states "KOMBAT,

11  ex-Volgo-Don, 5002."

12  Q.  Can you tell by looking at this where the vessel was built

13  and when it was built?

14  A.  Next to it it states the vessel is built in 1968 and is

15  Rumanian-built.

16  Q.  In looking at this, while we're on this page so we don't

17  have to find it again, do you see a vessel called the

18  ALEXANDRITE?

19  A.  Yes.

20  Q.  Can you tell me what information you can glean from the

21  listing for the vessel the ALEXANDRITE?

22  A.  I can see that the ALEXANDRITE is the same type of vessel,

23  because we talk about Volgo-Don vessels, which had been built

24  in 1970.

25  Q.  Where?

Kooy - Direct

1  A.  Also in Rumania.

2  Q.  What type of vessel?

3  A.  It's a Volgo-Don type vessel.

4  Q.  How do the dimensions of the ALEXANDRITE compare with the

5  KOMBAT?

6  A.  They're the same.

7          MR. LICHTMAN:  Can I just get a clarification.  I

8  don't see where HE'S reading from for THE ALEXANDRITE.

9          MR. SHALEK:  I'll show you.

10 BY MR. SHALEK:

11 Q.  Now, what effect does the fact that the ship was built in

12 1968 have on your valuation?

13         MR. SHALEK:  I'm sorry.  Before I say that, Your

14 Honor, we would ask that Exhibit 46 be moved into evidence.

15         MR. LICHTMAN:  I restate all my prior objections.

16         THE COURT:  You meant Exhibit 49?

17         MR. SHALEK:  I'm sorry.  I thought it was 46.  49.  I

18 apologize.

19         THE COURT:  Very well.  Admitted.

20    [Plaintiff Exhibit 49 received in evidence at 1:26 p.m.]

21 BY MR. SHALEK:

22 Q.  Ms. Kooy, how does -- what effect does the year that the

23 vessel is built have on your valuation of the vessel?

24 A.  The biggest effect.  A vessel built in 1968, that means at

25 the time when the valuation was made, the date for the

1    valuation meant that the vessel was 41-years-old.

2    Q.   Why does that have an effect?

3    A.   A ship of that age is what we call, in shipping terms,

4    overaged.  That means that it's older than 25 years and it's

5    beyond its economical life.

6    Q.   What is the -- what can be done with an overage ship like

7    that?

8    A.   Excuse me.  Can you, please, repeat?

9    Q.   I'm sorry.  What type of service trade can an overage ship

10   like that do?

11   A.   It makes it very difficult for a vessel to earn good money

12   because it's older.  It needs -- it has problems in finding the

13   good cargoes.  Cargoes normally of this age are not good

14   cargoes which are well paid.

15          The vessel has problems in entering the port because

16   of its age and the ports are very protective and are very

17   careful.  Charterers have a lot of choices for younger vessels,

18   so they normally won't even take a vessel which is of this age.

19          Economically speaking, it's not a very -- it brings

20   the value down.

21   Q.   Can you look at Exhibit 48 in the book in front of you?

22   A.   Yes.

23   Q.   Can you describe for the Court what that document is?

24   A.   It's a document -- it's an extract from a website which is

25   called Equasis and the extract is on the vessel called the

1    CHALSI and it states -- it gives very briefly the information

2    on the vessel and all the details of the vessel, whether it's

3    classed and whether it has been visited by Port State Control.

4    Q.   What is Port State Control?

5    A.   Port State Control is an international organization which

6    has been -- which has been organized by the flag states, the

7    countries, and to make sure that vessels comply with the rules

8    and the regulations of its country, the flag it's flying.

9    Q.   Now, is this document a list, directory or other published

10   compilation generally used by the public or persons in your

11   profession?

12   A.   Yes, it is.

13   Q.   In fact, in reaching your valuation, did you rely on this?

14   A.   Yes.

15           MR. SHALEK:  We would ask this Exhibit 48 be moved

16   into evidence.

17           MR. LICHTMAN:  Objection.  Relevance and hearsay.

18           MR. SHALEK:  Well, as to the hearsay, I think we've

19   laid the foundation under 803(17).

20           As to relevance, Your Honor, if you want I'll let her

21   talk about what's relevant on this document.

22           THE COURT:  Overruled.  Admitted.

23           MR. SHALEK:  Thank you.

24      [Plaintiff Exhibit 48 received in evidence at 1:29 p.m.]

25   BY MR. SHALEK:

Kooy - Direct

1   Q.   Ma'am, if you could look at the third page of this

2   document.   It's entitled "List of Port State Control."   Do you

3   see that?

4   A.   Yes, I do.

5   Q.   Can you describe for the Court what Port State Control is?

6   A.   Port State Control is the organization visiting the vessels

7   to see if it's complying with the rules and regulations.

8   Q.   How many times was this vessel visited by Port State

9   Control between 2009 and, let's say five years, 2004?

10  A.   About five times.

11  Q.   Is that unusual?

12  A.   No, that's not usual.   A vessel which is in good condition

13  is only being visited once or twice every four or five years.

14  Q.   Based upon this, does this give you an indication of the

15  condition of the vessel?

16  A.   No, it indicates to me that if there are several

17  inspections from Port State, there is a reason to believe that

18  the vessel is in not very sound condition.

19  Q.   Now, with all that in mind, can you explain to the Court

20  how it is that you arrived at the economic number of 350 to

21  400,000?

22  A.   Yes, I can.

23          MR. LICHTMAN:   Objection.   Now she's, again, providing

24  expert testimony.

25          MR. SHALEK:   It's not skilled or specialized knowledge

1    by them.  She's just going to tell you what these documents

2    mean and how it helped her get to the value that she reached.

3              THE COURT:  Well, I don't know how it's not

4    specialized knowledge or skilled knowledge if it's not

5    knowledge that you and I can have.  Without her explanation of

6    how she put it all together, then it is specialized knowledge.

7              You are, essentially, establishing that her use of all

8    of this information requires a certain specialty because I

9    don't think I would know how to piece all these pieces together

10   and arrive at a figure.

11             That's what you intend on having her testify to and

12   she can't because she wasn't disclosed as an expert.

13             MR. SHALEK:  She was disclosed as an expert.  The

14   argument that we made was that she was a hybrid lay witness and

15   expert who didn't need to make those reports, and as part of

16   that argument, again, it goes back to where we were a week ago.

17   They specifically stated, and the Court held, that it doesn't

18   require specialized skill and you'll hear from her and how she

19   arrived at her testimony.

20             THE COURT:  If it doesn't require specialized skill,

21   why is she going to explain it to me as the fact-finder?

22             MR. SHALEK:  She's just going to put it all together

23   and tell you the basis of her opinion as to the value of the

24   vessel.  We've shown you these things.

25             THE COURT:  Either it is or it isn't specialized.  If

Kooy - Direct

 1  she's going to give me the bases for arriving at a dollar sum,

 2  the basis for an opinion, then you're now changing position and

 3  telling me it is specialized.

 4          MR. SHALEK:  I'll move forward, Your Honor, and we'll

 5  see what we can get to.

 6  BY MR. SHALEK:

 7  Q.  Ms. Kooy, can you, please, take a look at Exhibit 45 in the

 8  book?

 9  A.  Yes.

10  Q.  What is that document?

11  A.  The document is a report, a ship demolition report and

12  market analysis, from a company called Eckhardt Marine.

13  Q.  What is Exkhardt Marine?

14  A.  The document is a report on market conditions specifically

15  for demolition.

16  Q.  Okay.  And this market analysis, who can receive it?

17  A.  Anybody can receive it.  It's published.  It's not

18  specifically for -- let's say, it this way:  Everybody who is

19  in shipping can receive this.  It's sent by email.  It's

20  published openly.

21  Q.  And does this provide market quotations, tabulations or

22  other published compilations generally used by the public or

23  people in your particular profession?

24  A.  Yes, it does.

25  Q.  Now, if you could, please, turn to page 8 of this that

1    document.

2            MR. LICHTMAN:  Your Honor, I object to further

3    testimony on this document.  It's clear that this is yet

4    another document.  It's being provided for her specialized

5    testimony.

6            She has already provided the statement as to what she

7    thought her value was.  This is hearsay.  It's not relevant.

8            THE COURT:  I haven't heard the question yet, though.

9    Is there a pending question?  There was an instruction to turn

10   to page 8.  So, I can't rule on an instruction.  Let's wait for

11   a question.

12           MR. LICHTMAN:  Thank you.  Withdrawn.

13   BY MR. SHALEK:

14   Q.  What does this document tell you about the ALEXANDRITE, the

15   sister ship of the CHALSI?

16           THE COURT:  Is the document in evidence?

17           MR. SHALEK:  I have not asked to move the document

18   into evidence yet, Your Honor.  I'm asking her to look at that

19   page and tell me what knowledge she can obtain from the

20   ALEXANDRITE.

21           MR. LICHTMAN:  Objection, Your Honor.  It's hearsay.

22   She's reading from a document that's hearsay, almost like

23   double hearsay.  It's being provided to support her specialized

24   testimony.  It's not relevant.  This clearly would be within

25   the purview of --

1          THE COURT:  It is relevant, but it's hearsay is what

2     they're saying and, again, it's showing, in fact, she's here as

3     an expert witness.

4          MR. SHALEK:  Your Honor, it's not hearsay because it's

5     admissible under 803(17).

6          Again, they never -- in the pretrial documents they

7     never objected to this document being hearsay.  This is totally

8     new to us.

9          The only objection that I'm aware of that they placed

10    on this document -- if you look on the list in front of you --

11    is a relevancy objection.  If they want to enforce the Court

12    orders, you know, they really should follow them.

13         MR. LICHTMAN:  I don't waive my relevancy objection if

14    I heard it right now -- excuse me -- my hearsay.  I'm hearing

15    for the first time what this is.

16         We didn't have her deposition.  They didn't disclose

17    her as a witness.  So, as I'm hearing what the document is for

18    the first time, I'm entitled to make a hearsay objection.

19         THE COURT:  So you're seeking to introduce it at this

20    time under what rule?

21         MR. SHALEK:  Yes.

22         THE COURT:  Under what rule?

23         MR. SHALEK:  803(17), Your Honor, and relevancy.

24         THE COURT:  Did you establish the predicate under

25    803(17)?

Kooy - Direct

1          MR. SHALEK:  I believe that I asked the questions and

2     she said anyone in the public can get it.  It's published by

3     email to anybody that asks for it, that it's relied upon by the

4     public and people in her profession.

5          MR. LICHTMAN:  Which establishes that it's here as a

6     specialty issue, specialized testimony.

7          THE COURT:  What is your objection to 803(17)?

8          MR. LICHTMAN:  Not every book that's published, all of

9     a sudden, comes in under 803(17).  I've not ever seen that be

10    the case.

11         If somebody says "I have a book that I looked at"

12    doesn't qualify it under 803(17).  Counsel is trying to qualify

13    it under 803(17) to back-door it in under Rule 702.  That's

14    what's going on here.

15         THE COURT:  Lay your predicate under 803(17), if you

16    would, please.

17    BY MR. SHALEK:

18    Q.  Ms. Kooy, this document, it's a market analysis, is it not?

19    A.  Correct.

20    Q.  And a compilation of information provided by Eckhardt

21    marine.  Correct?

22    A.  Correct.

23    Q.  What type of persons use this document?

24    A.  All people in shipping who do valuations, who do sale and

25    purchase, who -- anyone who is in my profession and --

Kooy - Direct

1   Q.   So, brokers use it.  Correct?

2   A.   Correct.

3   Q.   Appraisers use it.  Correct?

4   A.   Yes.

5   Q.   Insurance companies, do they use it?

6   A.   Correct.  Bankers use it.

7   Q.   Bankers use it for collateral purposes.  Correct?

8   A.   Correct.

9   Q.   The industry involved in valuation of boats relies upon

10  these documents?

11  A.   Anyone in shipping could use this document.

12        MR. SHALEK:  Again, we would ask the document be

13  admitted.

14        THE COURT:  Admitted.

15        MR. SHALEK:  Thank you.

16   [Plaintiff Exhibit 45 received in evidence at 1:39 p.m.]

17  BY MR. SHALEK:

18  Q.   If you could look at page 8 and tell me what it is THAT you

19  glean from the ALEXANDRITE.

20  A.   On page 8 it shows that -- it says "China" and it shows

21  that the vessel called the ALEXANDRITE was sold in China for

22  demolition at a price of 215 tons, lightweight ton.

23  Q.   And the lightweight tonnage of the CHALSI?

24  A.   The lightweight tonnage of the CHALSI is approximately

25  2,094.

Kooy - Direct

```
1   Q.  The same as the ALEXANDRITE?
2   A.  It's the same as the ALEXANDRITE because it's the sister
3   vessel of the ALEXANDRITE.
4   Q.  And what does it mean to be the sister vessel?
5   A.  It means a vessel built in the same shipyard and the same
6   dimensions.
7   Q.  Okay.  Then you're telling me the CHALSI should be valued
8   at the exact same price as the ALEXANDRITE?
9   A.  No.
10  Q.  Why not?
11  A.  Because the ALEXANDRITE was sold in China and the CHALSI is
12  trading in the Mediterranean, in the Black Sea, and it's not
13  very likely that CHALSI would sail all the way over to China to
14  sell her there.
15  Q.  And if you could look at page 9 of this document, does it
16  give any comparison as to the value per lightweight ton in
17  China, as opposed to the rest of the world?
18  A.  It does.  What page 9 states is it gives the prices of the
19  various countries, the demolition prices per lightweight ton of
20  the various countries.
21  Q.  Where would this vessel be sold?
22  A.  Turkey.
23  Q.  Why Turkey?
24  A.  Because that's the closest country which is busy with
25  demolition.
```

June 24, 2011

Kooy - Direct

1   Q.   And where was the CHALSI sailing?

2   A.   The CHALSI is sailing the east Mediterranean, Black Sea

3   area.

4   Q.   Is Turkey --

5   A.   Turkey is the country which is right between those two

6   areas.

7   Q.   If it was just being sold by the lightweight ton, how much

8   would the vessel have sold for?

9   A.   If it was only sold -- just then it would have sold for

10  $349,000.

11  Q.   But that's not your valuation.  Correct?

12  A.   No, that's not the valuation.

13  Q.   You think it's worth more than that?

14  A.   That's correct.

15  Q.   Why is it worth more than that?

16  A.   Because the vessel was still trading.  She can be used for

17  very little -- only a handful of people, and for that reason it

18  is common -- it's normal that vessels which has the age of the

19  CHALSI will be sold for demolition prices, plus approximately

20  10 percent on her value.

21  Q.   And based upon the metal price plus the --

22  A.   10 percent.

23  Q.   -- what is its valuation of the CHALSI?

24  A.   That would bring it to about $380,000.

25          MR. SHALEK:   I have no further questions, Your Honor.

1          I'm sorry.  One last question.

2   BY MR. SHALEK:

3   Q.  The paperwork you relied on, is that valuing it as of today

4   or in 2009?

5   A.  That was valued on the date in February 2009.

6   Q.  You can tell that from this last exhibit, from the Eckhardt

7   Marine exhibit?

8   A.  Yes, because the date of the exhibit, of this document, is

9   February 2009.

10          MR. SHALEK:  Thank you.

11          MR. LICHTMAN:  Can I just have two minutes because I

12   thought I'd be taking somebody else's testimony.

13          THE COURT:  Yes.

14                    CROSS EXAMINATION

15   [Beginning at 1:42 p.m., 6/24/11.]

16   BY MR. LICHTMAN:

17   Q.  Good afternoon, Ms. Kooy.  I'm Chuck Lichtman, the lawyer

18   for Mr. Goldstein.

19          Have you met Mr. Goldstein before?

20   A.  No, I've met Mr. Goldstein.

21   Q.  Have you met Mr. Chaban before?

22   A.  No, I did not.

23   Q.  Have you met anybody from Paladin Shipping Company before?

24   A.  No, I never met them before.

25   Q.  Did you ever visibly see the CHALSI?

1   A.  No, I did not.

2   Q.  Okay.  Have you seen any of the ships that you compared to

3   the CHALSI?

4   A.  No, I did not.

5   Q.  Okay.  You have Exhibit 2 -- I think it's 8 -- before you,

6   your valuation certificate?

7   A.  No.

8   Q.  Okay.  Could you get that out, please?

9   A.  (Complied.)  Yes.

10  Q.  Who requested that you prepare this?

11  A.  The request was from Mr. Alexander Gorchakov.

12  Q.  Do you know what his relationship is to Paladin?

13  A.  No, I do not know what his relationship is to Paladin.

14  Q.  Is this valuation certificate the form of what you prepared

15  to determine the value?

16  A.  This is the usual form that we use.

17  Q.  All the other papers in the book were prepared by somebody

18  else.  Correct?

19  A.  That is correct.

20  Q.  Okay.  The value that you assessed was between 350,000 and

21  $400,000 as of February 25th, 2009.  Correct?

22  A.  That's correct.

23  Q.  Okay.  Right underneath where you give the value, there's a

24  sentence that begins with "The figure."  Do you see that, that

25  sentence that starts with "The figure"?

1   A.   "The figure given above."

2   Q.   Would you read that to the Court?

3   A.   "The figure given above relates solely to this vessel as of

4        the 25th of February 2009 and should not be taken to apply

5        to any other vessel or date."

6   Q.   So, this is what you had said is the value for the CHALSI

7   as of February 25, 2009.  Correct?

8   A.   Correct.

9   Q.   Okay.  And if I understand what you wrote, in the next

10  paragraph it says "This opinion is given on the understanding

11       that this vessel would be able to give delivery promptly,

12       free of cargo, free of charter, on normal sales terms

13       between a willing seller and a willing buyer."

14  A.   Correct.

15  Q.   Okay.  Now, do you know back in February 2009, were there

16  any willing buyers or sellers.  Excuse me.  Was there a willing

17  buyer of the CHALSI at the time?

18  A.   There were buyers for these type of vessels at the time.

19  Q.   Do you know if there was a specific buyer for the CHALSI in

20  February 2009?

21  A.   I don't know if there was any specific buyer for the

22  CHALSI.

23  Q.   If there was a specific buyer for the CHALSI, do you think

24  the price that was offered by that buyer would be a better

25  indication as to what the price would be for the boat than your

Kooy - Cross

1    certificate?

2    A.  If that deal had been concluded.

3    Q.  If there was a buyer and they were going to pay whatever

4    that dollar amount is, you would concede that that's the better

5    value.  Right?

6    A.  If it's states willing buyer, willing seller, that would

7    mean the seller would also be willing to agree on that price.

8          MR. LICHTMAN:  Your Honor, I apologize.  I'm having a

9    very hard time hearing the witness along with the -- I couldn't

10   hear the answer.  I would ask the court reporter to repeat it.

11   A.  I will try to speak a little bit louder.

12      [The requested text was read].

13   BY MR. LICHTMAN:

14   Q.  Did you know in or about February of 2009 that

15   Mr. Goldstein had a buyer for the boat for a million two?

16   A.  No, I was not aware about that.

17         MR. SHALEK:  Objection, Your Honor.  States facts not

18   in evidence.

19   BY MR. LICHTMAN:

20   Q.  If Mr. Goldstein HAD a buyer for 1.2 million, would you

21   consider that to be a willing buyer?

22   A.  That would have been a willing buyer, but I was not asked

23   that question at the time.

24   Q.  Did you know that Mr. Goldstein or had you heard that

25   Mr. Goldstein had offered to buy the CHALSI at that time for

Kooy - Cross

1    $1.5 million?

2    A.   No.

3              MR. SHALEK:  Objection, Your Honor.  States facts not

4    evidence.

5    BY MR. SHALEK:

6    Q.   If Mr. Goldstein --

7              THE COURT:  Mr. Lichtman, do you want me to rule on

8    the objection or do you want to rule on them by asking another

9    question?

10             MR. LICHTMAN:  I think I'm going to let you rule on

11   them.

12             THE COURT:  Overruled.

13   BY MR. LICHTMAN:

14   Q.   Would you agree that if Mr. Goldstein was one of the owners

15   of the boat that he would have a pretty good idea as to what he

16   thought the value of the boat would be?

17   A.   Normally speaking, he would be, he would be aware about the

18   value of his vessel.

19   Q.   Are you aware as to whether or not Mr. Goldstein and

20   Mr. Chaban, through Paladin, owned another boat called the

21   CORALL?

22   A.   I'm not aware about it.

23   Q.   Do you know anything about the CORALL?

24   A.   No.

25   Q.   That was a boat that if I was to tell you was in very bad

Kooy - Cross

1  shape, that was smaller than the CHALSI and they sold that for

2  1.6 million, would you have any understanding as to how that

3  happened?

4  A.  I don't know.

5          MR. SHALEK:  Your Honor, objection.  He doesn't state

6  the time the vessel was sold, who it was sold to.

7          MR. LICHTMAN:  I'll add on.

8  BY MR. LICHTMAN:

9  Q.  It was sold in the summer of 2008.

10 A.  Then I can understand that price.

11 Q.  And the price differential is because the market crashed,

12 with the world economy?

13 A.  Correct.

14 Q.  And did the world economy change any since 2009?

15 A.  It did.

16 Q.  And what is the economy like now?

17 A.  Even worse in shipping.

18 Q.  In shipping.  And what about for scrap?

19 A.  The demolition prices came up a little bit since 2009.

20 Q.  Does a boat have more value if it's being used as an

21 ongoing concern?

22 A.  If I would have been asked to value the vessel as an

23 ongoing concern, then that's taken into consideration.  But I

24 normally value the vessels as a willing buyer-willing seller.

25 Q.  You weren't asked to?

1  A.  I was asked to perform a valuation, to do a willing -- a

2  normal valuation.

3  Q.  What are the factors that you consider if a boat is being

4  valued as an ongoing concern?

5  A.  Then we would see what kind of earnings the vessel could

6  possibly make and then we would not state willing buyer/willing

7  seller because then the valuation is solely for the purpose of,

8  for instance, a banker who would give a loan or an insurance

9  company who is willing to do so.

10        Then at that time the purpose of the valuation is

11  specifically being stated.

12  Q.  And if the CHALSI was generating $960,000 a year up to the

13  point of the time where the market crashed, but is now, again,

14  shipping, would that change your view as to what the value of

15  the boat was?

16  A.  Not at the date of 2009 because that's irrelevant.  I made

17  a valuation in 2009.

18  Q.  And what about the value today if the CHALSI is still

19  shipping product?

20  A.  She's even older this year.  She's two years older and

21  there would be very, very small few persons willing to buy a

22  vessel which is built in 1968.

23  Q.  What if Mr. Goldstein wanted to buy it and he was going to

24  pay more?

25  A.  If Mr. Goldstein is willing to buy it, that's fully -- it's

June 24, 2011

Kooy - Cross

1    a decision he can make himself.

2    Q.   Do you have any idea as to whether or not Mr. Chaban or

3    Paladin tried to sell the boat?

4    A.   I'm not aware about it.

5    Q.   Do you think that's relevant?

6    A.   No, not for my valuation.

7    Q.   Okay.  When you do your valuations, your valuation is only

8    of the both itself.  Right?  It's not of the company that owns

9    the boat?

10   A.   Correct.

11   Q.   So, if the company that owns the boat is generating revenue

12   from the use of the boat, would you agree that the company has

13   value?

14   A.   Possibly, depending on how many -- I can't judge about

15   that.

16   Q.   You would expect -- I'm sorry.  I didn't mean to interrupt

17   you.  You would expect that if the company was generating

18   revenue on the boat that that company that owned the boat would

19   be worth something.  Correct?

20   A.   I can't judge about it because I don't know anything about

21   the company or the income of the vessel.

22   Q.   From your years of experience in valuations, giving

23   valuations to banks, are you going to tell me that that doesn't

24   seem like an extremely logical proposition?

25   A.   The way I do valuations, as I said, if someone asked me to

Kooy - Cross

1    take into consideration the income of a vessel, then I'll

2    definitely look into the background, but then I need to know a

3    lot more on the vessel because it's not only the income.  It's

4    also what's important is what the vessel is costing on her

5    crew, on her insurance, on her repairs, et cetera, et cetera.

6    That, on the end of the day, makes it for a ship owner worth

7    while to step into a ship.

8    Q.   How much did Paladin spend on insurance?

9    A.   I don't know.

10   Q.   How much did they spend on repairs?

11   A.   I'm not aware because it's, for my valuation, not

12   important.

13   Q.   You just took some charts and looked at it and came up with

14   a valuation?

15   A.   We're making a valuation on the basis of willing

16   buyer-willing seller based on market information we have

17   available.

18   Q.   In the second to last paragraph of your valuation

19   certificate, there's a sentence starting with "We have not."

20   Would you read that to the Court, please?

21   A.   "We have not undertaken a physical inspection of the

22        vessel.  Nor have we seen the classification records.  Nor

23        have we be been able to compare this vessel with any

24        similar units being available in the sales market or having

25        been sold around the date of this valuation."

1  Q.  Explain what I think is your English to the Court, what you

2  meant by that.

3  A.  What we say is we haven't seen the vessel records.  It

4  states we have not seen the vessel by itself and we haven't

5  seen the vessel -- we haven't seen the records of the vessel.

6  Q.  When you say at the last paragraph, "Furthermore, this

7       valuation is not to be used without prior consent in any

8       public offering in respect of shares or bonds or in any

9       arbitration court proceedings and we would reserve the

10      right" -- what did you mean by that?

11 A.  We have that in -- without our prior knowledge, it's not

12 being used.  It cannot be used in court.

13 Q.  When you prepared this, did you know that it was going to

14 be used in court?

15 A.  No, I did not.

16 Q.  Well, what happened that all of a sudden you came to know

17 that it was going to be used in court and you're present here

18 in court?

19 A.  I was asked if I had an objection whether it was going to

20 be used in court.

21 Q.  Who asked?

22 A.  I was asked earlier this year if there would be an

23 objection for it to use it.

24 Q.  So, normally this would not be used for a court proceeding.

25 A.  Not in general.  It can be used in a court proceeding.  It

Kooy - Cross

1  has been used in the past, but not as far as I know.

2  Q.  At the time that you were retained, did you know you were

3  going to be coming to court to give this?

4  A.  No, I did not.

5  Q.  But you learned that later.

6  A.  I learned a year later, yes, later.

7  Q.  When this lawsuit was filed.

8  A.  I don't know what the date of the lawsuit was, so I can't

9  answer that.

10  Q.  What were you told that you were going to have to do with

11  respect to coming to court?

12  A.  I was asked to come down to clarify my certificate, the

13  valuation certificate.

14  Q.  So, if there was a buyer of the boat today that was willing

15  to pay $1.4 million, would you think -- a willing buyer --

16  would you accept that as being a better sense of what the value

17  of the boat is today than your figure of between 350 to

18  400,000?

19  A.  If someone would be there to pay 1.4, of course, that is a

20  better deal.

21  Q.  I'm sorry.  I couldn't hear you.

22  A.  If someone is there to pay approximately 1.4 for a 1968

23  built vessel, then that, of course, is his idea and if that

24  person feels that he can do a good deal of it, that's solely up

25  to him, of course.  But, in general, and the way I valued this

1    vessel, that would not be the case.

2         MR. LICHTMAN:  Nothing further.

3                    REDIRECT EXAMINATION

4    [Beginning at 1:59 p.m., 6/24/11.]

5    BY MR. SHALEK:

6    Q.  Ms. Kooy, have you ever appeared and testified in court

7    before?

8    A.  No, I have not.

9         MR. SHALEK:  No further questions.

10        THE COURT:  Thank you, ma'am.  Nice meeting you.  Have

11   a safe trip back.

12      [The witness was excused at 1:59 p.m.]

13        THE COURT:  We need Mr. Chaban back on the witness

14   stand.

15        MR. SHALEK:  Your Honor, Ms. Kooy is excused.  She'd

16   just like to sit and watch.

17        THE COURT:  Certainly.

18     ANATOLIY CHABAN, PLAINTIFF,  RESUMED, THROUGH INTERPRETER

19                    CROSS EXAMINATION

20   [Beginning at 2:00 p.m., 6/24/11.]

21   BY MR. LICHTMAN:

22   Q.  Hi, Mr. Chaban.  We haven't met.  I'm Mr. Goldstein's

23   lawyer.

24   A.  (In English):  I know.

25   Q.  Okay.

Chaban - Cross

1  A.  I know.

2  Q.  Up to 2009, how many years were you partners with

3  Mr. Goldstein?

4  A.  For this vessel, you mean?

5  Q.  On any venture.

6  A.  10 years.

7  Q.  Was it a good partnership?

8  A.  Sometimes, yes, sometimes, no.

9  Q.  Made a lot of money together?

10  A.  Yeah, yeah.

11  Q.  How many different ventures were you partners on?

12  A.  We have been partners for COSTA ship and for CHALSI.

13  Q.  I'm sorry.  I couldn't hear.  For what?

14  A.  We have been partners for a ship called COSTA and for

15  CHALSI.

16  Q.  Were you partners in any other ventures?

17  A.  No.

18  Q.  I want to make sure I understand your testimony.  Did you

19  testify earlier that you put up half the money for the CHALSI

20  and Mr. Goldstein put up half the money for the CHALSI?

21  A.  Yes.

22  Q.  Are you sure Mr. Goldstein didn't put up all the $100,000

23  for the CHALSI, including all the repair for the CHALSI?

24  A.  I'm not sure I can tell you more.  We put up the money

25  first and he put up money then after that.

Chaban - Cross

1   Q.   Mr. Goldstein found the CHALSI.   Correct?

2   A.   No.

3   Q.   Who found the CHALSI?

4   A.   Yes, he found the CHALSI.

5   Q.   Okay.   And he's the one that came up with the idea for

6   fixing up the CHALSI and making it seaworthy.   Correct?

7   A.   Yes, he found the vessel and he suggested to us that we fix

8   the vessel.

9   Q.   And, so, the vessel was fixed.   Right?

10  A.   The vessel was fixed.

11  Q.   And for many years it made runs shipping wheat from Russia

12  to mostly Turkey.   Correct?

13  A.   Mainly it was carrying any cargo that it happened to find.

14  Q.   Of late, it started shipping wheat.   Correct?

15  A.   No, on the contrary.   As late, it has been shipping scrap

16  metal, sometimes coal.   It's the kind of merchandise that is

17  not too much damaged or exposed to leaks.

18  Q.   When was it shipping scrap metal and coal?

19          THE INTERPRETER:   I'm sorry.   "When"?

20  BY MR. LICHTMAN:

21  Q.   When was it shipping scrap metal and coal?

22  A.   All the time after it got fixed.

23  Q.   Okay.   So, the ship has been in continuous operation since

24  it got fixed in 2009 -- correct -- 2008 and 2009?

25  A.   Yes, whenever it was possible, whenever we had cargo.   Very

1  often, it was idling because it was chartered very seldom

2  because of the very bad market conditions.

3  Q.  And --

4  A.  It was unable to carry wheat because a moratorium on wheat

5  and -- wheat shipments has been in effect for more than a year

6  in both Russia and Ukraine, and on top of that, you couldn't do

7  it because of its technical condition.

8  Q.  And starting July 1st, you'll be shipping wheat again.  You

9  have a contract for shipping wheat.  Isn't that correct?

10  A.  No, no.

11  Q.  You don't have a contract?

12  A.  Not for this vessel.  The vessel has been chartered already

13  for one month for shipment of coal.  It is not -- it cannot

14  ship wheat.

15  Q.  The company was owned by -- excuse me -- the CHALSI was

16  technically owned by Dexter Limited Lines.  Is that correct?

17  A.  Officially, yes.

18  Q.  Okay.  What does "officially" mean?

19  A.  It was official.  That's how the paperwork was set up.

20  Q.  Was there something that you meant like unofficially it was

21  owned differently?

22  A.  No.

23  Q.  Okay.  And Mr. Goldstein owned 50 percent of Dexter Lines

24  until March 4th, 2009 when he signed over his interest in the

25  company back to Paladin.  Correct?

Chaban - Cross

1   A.  Yes.

2   Q.  Who owned the other 50 percent?

3   A.  25 percent was owned by me and 25 percent by Mr. Sinitsky.

4   Q.  Does Sinitsky still own 25 percent?

5   A.  No.

6   Q.  He went bankrupt.  Correct?

7   A.  Yes, he did.

8   Q.  And how did you get his 25 percent?

9   A.  As a payoff for a debt to the company.

10  Q.  Sinitsky owed the company money?

11  A.  Yes.

12  Q.  How much?

13  A.  I think it's my commercial privilege, my commercial secret.

14  Do I have to disclose it?

15          MR. LICHTMAN:  I submit it's relevant to the value and

16  I don't think that that's confidential.

17          THE COURT:  There's no objection.

18          MR. LICHTMAN:  There was no objection by counsel.

19          THE COURT:  There's nothing for me to rule on.

20  BY MR. LICHTMAN:

21  Q.  Please tell me how much was the debt.

22  A.  It was pretty much one and a half million.

23  Q.  One and a half million?

24  A.  Yes.

25  Q.  So, you took back 25 percent of the company based on a $1.5

June 24, 2011

Chaban - Cross

```
 1  million debt that Sinitsky owed.  Correct?
 2  A.  He transferred as part of one and a half million dollars
 3  half of a new vessel, a ship that was built in 2008, and on top
 4  of it, plus his shares in CHALSI.
 5  Q.  Did the company, Dexter Lines, own anything besides the
 6  CHALSI?
 7  A.  No.
 8  Q.  You operated the ship.  Correct?
 9  A.  When?
10  Q.  At the time the CHALSI became a ship being used for
11  commercial purposes in your partnership with Mr. Goldstein.
12  A.  First, Mr. Sinitsky was operating it.  After the crisis, I
13  began operating it.
14  Q.  Mr. Goldstein has never operated it.  Correct?
15  A.  Correct.
16  Q.  In 2008 who was responsible for making sure the boat was
17  properly maintained?
18  A.  Our company was.
19  Q.  Pardon?
20  A.  Our company was.
21  Q.  And you were technically running the company?
22  A.  Technically I had something to do with the management.
23  Q.  What did you have to do with the management?
24  A.  Mr. Sinitsky managing the company, but I was like
25  monitoring the management of the company.
```

Chaban - Cross

1   Q.   And were you monitoring the management of the CHALSI?

2   A.   Yes.

3   Q.   Okay.  And did you follow the progress of how the CHALSI

4   did from the time that it was one of your assets until present

5   day?

6   A.   Yes.

7   Q.   And, of course, the boat was an old boat from the time that

8   you bought it.  Right?

9   A.   Yes.

10  Q.   And everybody understood that there had to be ongoing

11  maintenance for an old boat.  Isn't that correct?

12  A.   Yes.

13  Q.   In fact, every three years you had to put a lot of money

14  into the boat.  That was understood.  Right?

15  A.   There is a moment here there is no need or it doesn't make

16  sense to invest all the money in the vessel.  It's an old

17  vessel and should be maintained just at the level that would

18  allow it to sail.  Otherwise, the expenses would exceed the

19  profits.

20        It's like a 40-year-old car.  So, you fix whatever

21  gets broken.  So, if you fix everything, it's going to be a new

22  vessel.

23  Q.   And everybody knew that all along.  Riot?

24  A.   Yes.

25  Q.   Because it wouldn't make sense to put too much money into

Chaban - Cross

1   the boat.

2   A.   There was no sense.

3   Q.   You put the money into the boat when you knew it made sense

4   because you were going to have certain shipments of cargo and

5   ultimately you could still be profitable.   Right?

6   A.   We were investing money into the vessel only when the

7   vessel was developing any problems.

8   Q.   Mr. Sinitsky knew that.   Correct?

9   A.   Yes.

10   Q.   And you knew that?

11   A.   Correct.

12   Q.   And Mr. Goldstein knew that?

13   A.   I don't know what did Mr. Goldstein know.

14   Q.   You don't know that he knew that?

15   A.   This is -- of course not.

16   Q.   You didn't talk to him on a regular basis when you owned

17   the ship together?

18   A.   About what?

19   Q.   Pardon?

20   A.   About what?

21   Q.   About the operations of the CHALSI.

22   A.   No.   He didn't care about it at all at that time.   The

23   vessel was bringing good money, so everything was fine with him

24   at the time.

25   Q.   Did you tell him when it needed repairs?

Chaban - Cross

1   A.   No, we just proceeded with the repairs and showed the

2   expense, the cost to him.  Sometimes when he was checking the

3   balance of the books, he would express his outrage about high

4   expenses, but we would explain to him that we cannot do it any

5   lower than that.  But since the profits were in excess of the

6   expenses, it was fine with him.

7   Q.   You knew that Mr. Goldstein had interests in other ships as

8   well not with you.  Correct?

9   A.   Yes.

10  Q.   Okay.  You knew that he understood the shipping industry.

11  Correct?

12  A.   He was not knowledgeable about shipping business.  He was

13  as much knowledgeable about shipping business as somebody who

14  is investing into a house being constructed.  I can cite an

15  example for you.

16  Q.   I didn't ask.  I'd ask that the witness would listen to my

17  questions and just answer my questions, please.

18          You've had no trouble understanding my questions so

19  far.  I just want to make sure.  Correct?

20  A.   I have no problem.

21  Q.   Now, you knew that Mr. Goldstein had interests in other

22  boats?

23  A.   Yes.

24  Q.   And do you know what kind of boats they were?

25  A.   Yes.

Chaban - Cross

1  Q.  What kind?

2  A.  It was ARIAN, a ship called ARIAN.

3  Q.  And what kind of business was ARIAN?

4  A.  It was managed by our company for a few years and then had

5  been managed by Vernal Company (ph.).

6  Q.  How about the CORALL, C-O-R-A-L-L?

7  A.  Yes, there was a CORALL at some point a long time ago.

8  Q.  What kind of business or what was the nature of the

9  business that The CORALL had?  Was it general shipping?  Was it

10  passenger?  Was it pleasure?

11  A.  It's for cargo shipping.

12  Q.  You also knew Mr. Goldstein had a ship in the United States

13  as well.  Correct?

14  A.  No.

15  Q.  That he recently sold.

16  A.  I don't know.

17  Q.  There came a point in time where Mr. Goldstein came to you

18  and asked for a loan.  You talked about that earlier.

19  A.  Yes.

20  Q.  You were getting along well with him at that point in time.

21  Right?

22  A.  A normal relationship, yes.

23  Q.  This is before the economy crashed.  This was around the

24  summer, early fall of 2008.  Right?

25  A.  Yes.

Chaban - Cross

1  Q.  That led to you loaning him $750,000 on September 5th,

2  2008.  Correct?

3  A.  That's correct.

4  Q.  And 400,000 three days later.  Correct?

5  A.  He asked four days later to increase the amount.  He said

6  that 750,000 was not enough for him, so he asked the amount to

7  be increased to 1,150,000.

8  Q.  And you agreed.

9  A.  Yes.

10  Q.  And at the time that you agreed, you did not ask him for

11  collateral, did you?

12  A.  I did not.

13  Q.  You have -- is it 8 or 10 ships?

14  A.  10 ships.

15  Q.  You're used to dealing with contracts.  Right?

16  A.  With shipping contracts, yes.

17  Q.  And if you're loaning money, you would want to make sure

18  that you document your loans correctly.  Correct?

19  A.  At this time I think this is correct.

20  Q.  Okay.  Do you have Exhibit 14 before you, please?

21  A.  Yes.

22          MR. LICHTMAN:  Your Honor has Exhibit 14?

23          THE COURT:  I do.  Thank you.

24          MR. LICHTMAN:  Okay.

25  BY MR. LICHTMAN:

Chaban - Cross

1   Q.  Mr. Goldstein didn't write this contract.  Someone from

2   Paladin or yourself or someone else wrote this contract.

3   Correct?

4   A.  It was prepared by my accountant.

5   Q.  Is that Viktor Kravchuk?

6   A.  No.

7   Q.  Who prepared it?

8   A.  It was drafted by Olena Kozelska, the bookkeeper.

9   Q.  Did you want this contract to be correct and accurate?

10  A.  Of course.

11  Q.  What role did Viktor Kravchuk -- what role did he have with

12  respect to preparing the contract?

13  A.  I don't know.  I don't know.  The bookkeeper drafted it.

14  Q.  What role did he have in negotiating the contract with

15  Mr. Goldstein?

16  A.  The terms of the contract had been negotiated between me

17  and Mr. Goldstein and he just signed whatever had been agreed

18  or stipulated by us.

19  Q.  Why does the agreement say at the first, in the first

20  sentence at the top, that Paladin was represented by Viktor

21  Kravchuk if he had nothing to do with the contract?

22  A.  He's the director of the company, CO of the company.

23  Q.  But you would agree in this instance Mr. Kravchuk had

24  nothing to do with this contract?

25  A.  He was signing as the CO of the company, so he was abreast

1   of everything that was discussed.

2   Q.  I don't see a signature by him on the contract.  Do you see

3   one?

4   A.  I don't know.

5   Q.  The money for the loan, as I understood your testimony,

6   came from you.  Correct?

7   A.  Yes.

8   Q.  Then why is the payee -- strike that.  Then why is the

9   money lender in the contract defined as being Paladin Shipping?

10  A.  Because we sent it through the company.  It was an official

11  document.

12  Q.  What do you mean you sent it through the company?

13  A.  The money was transferred through the Paladin Company.

14  Q.  Oh, so it was your money and you used Paladin as the basis

15  to send the money.  Is that right?

16  A.  The money was my company's money.

17  Q.  Wait, wait, wait.  You said it was your money.  Whose money

18  was it, yours or the company?

19  A.  I believe if the company is mine, then it is my money.

20  Q.  Okay.  You agreed that once Mr. Goldstein got the money

21  that he could use it at his own discretion.  Right?  That was

22  what you agreed to in paragraph 2?

23  A.  Yes.

24  Q.  You did not loan the money to Star Capital, did you?

25  A.  We were lending money to Star Capital at Mr. Goldstein's

Chaban - Cross

1   request because he explained to us that he was the owner of the

2   company.  So, he asked us to transfer to the company to be used

3   for its needs.

4   Q.  You asked that the money be used -- excuse me.  Let me

5   rephrase that.  Mr. Goldstein asked you for the loan

6   personally.  Isn't that correct?

7   A.  He asked to be lent money, but, unfortunately, I don't any

8   personal money.  All my money is invested in the company.

9   Q.  You had no business relationship with Star Capital, a

10  company located all the way in Florida.  Isn't that correct?

11  A.  No business relationship, no.

12  Q.  You didn't want to have a contract with a Florida company.

13  You wanted a contract with Mr. Goldstein who was your partner

14  for 10 years.  Isn't that correct?

15  A.  I didn't want to have business relationship with Star

16  Capital Company.

17  Q.  And, indeed --

18  A.  I identified Star Capital with Mr. Goldstein.  I believe

19  it's the same.  That's how he explained it to me.

20  Q.  He explained it to you that he was an investor.  He was

21  going to be making an investment in the company, in fact.

22  A.  No, he explained to me that he was the boss of the company

23  together with his partner, Oleg, the first name.  I don't

24  remember last name.  He told me that he has partner with full

25  rights.

June 24, 2011

Chaban - Cross

1  Q.  You did not ask for Star Capital to be a signatory on the
2  contract, did you?
3  A.  I did not.
4  Q.  Nor did Star Capital sign any type of other guaranty.
5  Correct?
6  A.  Star Capital didn't sign any guarantees.
7  Q.  Have you heard of accounts receivable financing?
8  A.  I'm not a bookkeeper.
9  Q.  I didn't ask if you were a bookkeeper.  I asked if you
10 heard of accounts receivable financing arrangements.
11 A.  I am not knowledgeable about financial terms.
12 Q.  Did Mr. Goldstein explain to you what Star Capital was
13 doing was working with local companies that needed cash and was
14 financing their business operations on collecting accounts
15 receivables?
16 A.  He explained to me that they were not helping the
17 companies, but they were lending money at a high rate of
18 interest.
19 Q.  The contract of loan required Mr. Goldstein's obligation to
20 be paid back to you when?
21 A.  After six months.
22 Q.  March 8th, 2009.  Correct?
23 A.  The 8th of March 2009.  Yes, March 8th, 2009.
24 Q.  And you didn't ask for a security interest in the CHALSI at
25 the time the contract of loan was signed.  Correct?

Chaban - Cross

1  A.  I did not.

2  Q.  Nor did you ask for a mortgage or a security interest on

3  his ownership interest of the shares in Dexter Lines at that

4  time.  Correct?

5  A.  No.

6  Q.  The economy had not crashed as of the time that

7  Mr. Goldstein asked for the money.  Right?

8  A.  No.

9  Q.  Because, in fact, if the economy had crashed, you would not

10  have loaned him the money.  Right?

11  A.  Of course not.

12  Q.  And, similarly, there was no reason for you at that point

13  in time to have any kind of understanding as to what the value

14  of the CHALSI was because the CHALSI was doing business as

15  usual.  Right?

16  A.  I don't know what would have happened had there not been

17  any crash.  I don't know.

18  Q.  Yes, but at the time -- let me be more specific.  I

19  apologize.

20        In early September 2008, nobody had made any

21  assessment as to what the value of the CHALSI was.  Correct?

22  A.  No.

23  Q.  You might have had your own personal rough ideas because

24  you had both been in the shipping business for a long time, but

25  that would be about it.  Right?

Chaban - Cross

1   A.   Yes.

2   Q.   So, this was a totally unsecured loan.  Right?

3   A.   Correct.

4   Q.   And the same with Exhibit 15, which is the note for the

5   400,000.

6   A.   Correct.

7   Q.   And then, unfortunately, everything changed.  The economy

8   crashed.  Right?

9   A.   Yes.

10   Q.   How did that impact you?

11   A.   In a very negative way.

12   Q.   I couldn't hear.

13   A.   In a very negative way.  Ships were stopped, were not

14   sailing.  My financial possibilities got very limited,

15   restricted.  Cargo shipments stopped.  The ships started

16   spending more money than they were making.  Bankers withdrew

17   their financing right away, which means that the financial

18   situation was pretty desperate.

19   Q.   It would have been really great if you could have gotten

20   the money back from Mr. Goldstein right then and there,

21   wouldn't it?

22   A.   Yeah, it would be great.

23   Q.   But he had already committed that money to the business

24   that he told you about on the phone.

25   A.   From his words, yes.

Chaban - Cross

1   Q.   And you asked him if he could pay you early.  Correct?

2   A.   I asked him, yes.

3   Q.   And he told you that he couldn't pay you early because he

4   had committed the money to the capital infusion he was making

5   in his business.  Right?

6   A.   He said that he could pay me back and he would make his

7   best to pay me back and he asked me to send him invoice where

8   the money should be transferred to.

9   Q.   And he probably wanted to pay you back, too, didn't he?

10  You were his long-time partner.

11  A.   Had he wanted to, probably he would have paid.

12  Q.   There came a point in time after that, though -- excuse me.

13  The money was not owed by Mr. Goldstein at the time that you

14  asked him to pay it back.  Right?

15  A.   It was not owed.  According to the contract, he didn't have

16  to pay, but he promised to pay.

17  Q.   And then there was nothing in writing about that promise.

18  Right?

19  A.   It was not put in writing.  It was a conversation.  As a

20  follow-up of the conversation, we sent him an email and asked

21  him to pay back the money and gave him information where the

22  money should be paid.  The email said "Per your phone

23  conversation with Mr. Chaban and the things you had approved or

24  agreed to, please transfer money to such and such account."

25  Q.   And there came a point in time after that that you asked

Chaban - Cross

1  that he give you some security.  Right?

2  A.  Yes.

3  Q.  Why?

4  A.  Because there was a crisis out there and it was scary.

5  When everything is fine, we don't think about security.  He

6  stopped paying interest.  He didn't pay a penny of interest

7  payment, so I figured out that he's not doing that well.

8  Q.  And when you asked at the time -- excuse me -- at the time

9  that you asked him for the security, he was not obligated to

10  give you the security.

11  A.  I don't know.  Probably, apparently, he hadn't.  He was not

12  obligated.

13  Q.  But he did it because he wanted you to feel comfortable.

14  Correct?

15  A.  No, he didn't.

16  Q.  He didn't give it to you because he wanted you to feel of

17  comfortable?

18  A.  I was able to persuade him -- I extended the deadline, the

19  due date when the money became payable, and I agreed that he

20  would not pay interest until the end of the credit term.  In

21  exchange for that, he wrote me a note with guarantees.

22  Q.  Where is that in writing?

23  A.  I don't know.

24  Q.  Are you going to Exhibit 1?

25  A.  I don't know the number.  I found it.

Chaban - Cross

1  Q.  Is it the pledge?

2  A.  Yes.

3  Q.  The pledge doesn't say anything about an extension, does

4  it?

5  A.  It does.  He was supposed to pay on March 5 and 8 and he

6  had said that he can pay back on the 9th of March.

7  Q.  So, is it your position that for a one-day extension, he

8  was giving you security interest?

9  A.  Not one day.

10  Q.  Well, the note was due on March 8th, March 5th and March

11  8th?

12  A.  Beside that, I let him not to pay back the interest, told

13  him not to pay interest until the deadline, the end of the

14  credit.

15  Q.  You have to forgive me, but I'm looking at Exhibit 1 and

16  the official translation of it doesn't say anything about an

17  extension of interest.

18  A.  We stipulated that and, secondly, it's not for three days.

19  We had stipulated that.  It decreased the amount of the

20  interest.  So, he wouldn't be paying interest for four or five

21  days.  So, he would just pay interest for six months, as it was

22  stipulated.

23  Q.  I'm not sure I understand.  Are you saying that he didn't

24  have to pay interest until the end of the six months?

25  A.  Yes, I allowed him not to pay interest until the end of the

Chaban - Cross

1   term of the loan.

2   Q.  That's not in writing either, is it?

3   A.  There is a lot of things we don't have in writing.  Had we

4   had everything in writing, we wouldn't be sitting now in court.

5   Q.  Okay.  But that's where we are.

6           After that, did you send him an email to clarify

7   Exhibit 1?

8   A.  No, I didn't send anything to him after that.  He sent me

9   an email after that.

10  Q.  Okay.  The contract, Exhibit 1, at that time Mr. Goldstein

11  gave you a pledge of 50 percent of his share in the CHALSI as

12  collateral for the loan.  Correct?

13  A.  You mean, when this paper was prepared?

14  Q.  Yes.

15  A.  Yes.

16  Q.  And where was it that you met Mr. Goldstein, when you had

17  this conversation with him?

18          MR. SHALEK:  Objection, Your Honor.  Could he, please,

19  clarify what conversation he's referring to?

20          MR. LICHTMAN:  You're right.  My apology.

21  BY MR. LICHTMAN:

22  Q.  The conversation where you negotiated the contract, Exhibit

23  1.

24  A.  This conversation was taking place one hour before we were

25  supposed to leave on a flight.  It took place in a cafe and I

Chaban - Cross

1   persuaded him to meet.  So, we met and he signed it in front of
2   my entire family, and after that we went to the airport right
3   away.
4   Q.  Mr. Goldstein and you discussed the fact that if you wanted
5   to get your money earlier, the best, if not the only way to do
6   that, was to immediately sell the CHALSI.  Correct?
7   A.  It was impossible to sell CHALSI at that point.  He didn't
8   have to sell CHALSI.  He can go into the market and put his
9   interest in the market and sell it.  He didn't need me for
10  that.
11  Q.  I'm going to ask you to listen closely to my questions and
12  just, please, answer my questions.
13         I asked you if you talked about that day the best way
14  for Mr. Goldstein to pay you was to sell the CHALSI at that
15  time.  Correct?
16  A.  No, the best way to get the money back would be for him
17  just to pay the money back.
18  Q.  He didn't have to pay you the money until March.  He told
19  you the best way to get you money earlier was to sell the
20  CHALSI then.  Correct?
21  A.  No.
22  Q.  That's why the contract says that "If the debt is not
23  repaid timely, Chaban shall have the right to sell my share in
24  the ship, having preliminarily agreed to selling price of my
25  share in writing," because you had talked about trying to sell

June 24, 2011

1    the boat right then.

2    A.   That's right.

3    Q.   And, in fact, up to that point in time, you had made no

4    effort to sell the CHALSI.  Right?

5    A.   It wasn't possible to sell.  At that time it was impossible

6    to sell anything because even new ships were not sold.  So,

7    everything came to a stop.  Panic and fear swept the market.

8    Q.   Sir, I asked you a specific question.  I'm going to ask

9    that you, please, listen to my questions.  If you don't

10   understand them, let me know.  Okay?

11   A.   Okay.

12   Q.   At that time, January 25th, 2009, you had not made any

13   effort to sell the CHALSI.  Correct?

14   A.   I was not supposed to make any effort to sell CHALSI.

15   Q.   Because it wasn't anticipated up to that point in time.

16   Right?

17   A.   Which point of time?

18   Q.   As of January 25th, 2009 when this was signed.

19   A.   What was not anticipated at that time?

20   Q.   It hadn't even crossed your mind of trying to sell the

21   CHALSI.

22   A.   I would be happy to sell it, but it was impossible.

23   Q.   You hadn't even thought about selling it as of that date.

24   Correct?

25   A.   I don't remember what was going on at that moment on that

Chaban - Cross

1    date.  We were putting it for sale, for sale on the market.  We

2    were offering stock to brokerage companies, but we did not

3    receive a single offer.

4    Q.  By January 25th, 2009, you had not put the CHALSI up for

5    sale.

6    A.  We were offering not only CHALSI, but other vessels as well

7    to companies even before January 25th, but we had not obtained

8    security for a single offer.

9    Q.  Mr. Goldstein told you he thought he could get the CHALSI

10   sold.  Right?

11   A.  He said, yes.

12   Q.  Mr. Goldstein, you know, likes to kind of refer to himself

13   in terms of making deals as the closer.  Right?

14   A.  I don't understand.  What does it mean?

15   Q.  That he regards himself as being good as closing deals.

16   A.  I don't know what he's saying about himself.

17   Q.  You knew that when he was in Florida he had become the

18   general manager of five car dealerships with Bill Lehman and

19   had become very good at selling things.

20             MR. SHALEK:  Objection, Your Honor.  Relevance.

21             THE COURT:  Overruled.

22   A.  What he mentioned to me, at some point he worked in car

23   leasing business or car rental business, but that he was like

24   clerk there.  It was a long time ago.

25   Q.  How about an owner?

1  A.  I don't know.  He never mentioned it to me.

2  Q.  Regardless, Mr. Goldstein told you he thought he could get

3  the CHALSI sold.  Right?

4  A.  He said he had a buyer.

5  Q.  He said he had a buyer for $1.2 million.  Right?

6  A.  He didn't give the amount.  He said that he had a buyer.

7  Q.  He told you he had a buyer for $1.2 million and you turned

8  that offer down.  Right?

9       MR. SHALEK:  Objection, Your Honor.  He said he had a

10  buyer for $1.2 million.  My client said no, he never said that.

11  Then he assumed the fact as evidence that he had a buyer for

12  $1.2 million and my client turned it down.  He said he had a

13  buyer, but was never mentioned a price.

14       THE COURT:  Overruled.

15  BY MR. LICHTMAN:

16  Q.  Then Mr. Sinitsky -- I'm sorry.  Are we out of sequence

17  here?

18  A.  So, what was the question again?  I don't remember the

19  question.

20  Q.  That's two of us.

21       MR. LICHTMAN:  Could I ask the court reporter to help.

22  Oh, I remember.

23  BY MR. LICHTMAN:

24  Q.  You turned down an offer for $1.2 million.

25  A.  I didn't turn down anything.  There was no offer.

Chaban - Cross

1  Q.  And Mr. Sinitsky then offered you 1.4 million for the boat.

2  This is before his bankruptcy.  Correct?

3  A.  I don't know Mr. Sinitsky was offering at that time.  By

4  that time, Mr. Sinitsky was bankrupt, so he could have offered

5  5 million.  I mentioned it to Mr. Goldstein.

6  Q.  And then Mr. Goldstein came to you and said "I'll buy you

7  out for $1.5 million" and you said "No."

8  A.  I asked him "When?"  He told me "Change the registration of

9  the vessel into my name" and then I asked him "When are you

10  going to come up with money?" and he said "I don't know.  Maybe

11  in two or three months" and I told him "Do I look like somebody

12  who is crazy?  You owe me money anyway and now you want me to

13  move the ship registration of the vessel?"

14        I told him "Give me an official offer.  Transfer money

15  and then be my guest."

16  Q.  He told you that he was willing to buy the boat and he

17  could get access to money and pay $1.5 million and you said

18  "No, it wasn't enough."  Isn't that true?

19  A.  I have never said that, never.  I'm not crazy.  He

20  mentioned it to me and I said "When am I going to see the

21  money?"  He said "You know, when somebody is going to give me

22  the money.  Then I'm going to pass it over to you" and I

23  said --

24  Q.  And that ended the conversation, according to you?

25  A.  He hang up on me and he sent an email in which he was

Chaban - Cross

1  transferring the shares.  He didn't talk to me anymore after
2  that. I think he -- I hurt his feelings because of that.
3          MR. LICHTMAN:  Your Honor, we had had some discussion
4  before about going beyond the scope of direct.  I thought I
5  heard somebody also say you were going to stop at 3:00.
6          THE COURT:  You have about another 15 minutes.
7          MR. LICHTMAN:  Am I allowed to go past the scope of
8  direct?
9          MR. PHILLIPS:  Please.
10 BY MR. LICHTMAN:
11 Q.  First, at the time you met Mr. Goldstein before you jumped
12 back on the airplane, you had had a preliminary discussion that
13 the boat could be sold for about 1.5 million.  That was the
14 figure he thought he could get.  Isn't that true?
15 A.  He never mentioned it, no.  So, why then would he write
16 down this stuff?
17 Q.  I don't understand.  I didn't understand your answer.
18 A.  He never mentioned to me -- what was the question again?
19 Q.  Back in January when Mr. Goldstein signed Exhibit 1, he
20 told you that he thought he could sell the boat.  He indicated
21 that he thought it would be worth about 1.5.  Correct?
22 A.  He didn't say that.  He said after he came from America, he
23 said to me he had a buyer.  He gave me a phone call.  He said
24 "I got a buyer."  I said "Wonderful.  So, when is he going to
25 come up with money?"

Chaban - Cross

1      He said "The buyer is going to have money in two or

2 three months, but I want you to transfer the ship or change the

3 registration of the ship to my name."

4 Q.   Indeed, what he told you was that he would buy the ship

5 from you for a million five and you said "No."

6 A.   He said "Yes."  If he had the $1.5 million, why didn't he

7 give me money?

8 Q.   And the million five number was something that had been

9 preliminarily agreed upon back potentially on January 25th,

10 2009?

11 A.   The only agreement that we reached was an agreement that we

12 put down in writing and signed on January 25th.  We had been

13 talking for 15 or 20 minutes.  I convinced him to write down

14 this piece of paper and I happily Left.

15 Q.   And when he came back to you after that and offered the

16 $1.5 million, he called that a -- quote -- shotgun deal.

17 Right?

18 A.   He gave me a phone call and he said that he got buyers.  I

19 said "Very well, but I need an official offer like it's done on

20 market" and he said "No, you don't understand.  I'm not going

21 to show you the buyer.  I'm going to buy it from you myself"

22 and then he's going to pass it on to the buyer because I was

23 the only one he was trusting.

24      I said "Very well.  When I will see the money?" and he

25 said "Maybe in two or three months," when he's going to find

Chaban - Cross

1    the money.

2    Q.  He told you that you buy him out for 1.5 or he buys you out

3    for 1.5 million.  Isn't that correct?

4            MR. SHALEK:  Objection, Your Honor.  Argumentative.

5            THE COURT:  Overruled.

6    BY MR. LICHTMAN:

7    Q.  Take a look at Exhibit 54, please.

8    A.  I see.

9    Q.  Do you remember receiving this letter from Mr. Goldstein?

10   A.  I do.

11   Q.  At that time he reiterated the last potential buyer offered

12   1.5 million under this letter.  Correct?

13   A.  No, I don't agree.

14   Q.  You agree what the letter says, though.  This is

15   Mr. Goldstein's perception.  Correct?

16   A.  In this letter he says that allegedly he had a buyer and

17   that he allegedly backtracked because of my fault.  Those were

18   just his inventions.  My understanding is he did it in order

19   not to pay me my money because there is no way a vessel that is

20   only good for as a scrap is sold for $1.5 million.

21           There was never ever any written offer that anybody

22   wanted to buy, that somebody wanted to buy it.  No written

23   offers at all.

24   Q.  He told you that the people didn't want to waste their time

25   going any further on the transaction.  Thus, he would just

1  provide a written consent that you would accept the transaction
2  at a million five.  Isn't that true?
3  A.  No, it was just the same because how could I have given
4  written consent to something that was not put as an offer in
5  writing?
6  Q.  Well, Sinitsky was already bankrupt and had given up his
7  shares.  Why was he indicated on this letter?
8  A.  Mr. Goldstein was writing it, so you have to ask him.
9  Q.  And the letter also references on February 5th, 2009 he
10 said that he talked to you and offered to buy his shares and
11 the shares of Sinitsky for $750,000 and to transfer the total
12 amount to your account.
13 A.  First of all, I'm not responsible for Sinitsky's shares,
14 first, and he was saying the money would be available in two or
15 three months, but the ship has to be sold right now.  That was
16 his guaranty.
17 Q.  That's not what the letter says.
18 A.  It was he who wrote this letter.  You can ask
19 Mr. Goldstein.
20 Q.  And the result was when you turned him down, he said "The
21 ship is now yours" and he -- quote -- said "and I congratulate
22 you on that fact."
23 A.  Thank you very much.
24 Q.  And you didn't write back to this letter.  Correct?  You
25 didn't write back anything in response to this letter?

Chaban - Cross

1   A.   We did not respond to the letter.  We called him on the

2   phone.  We called him right away and explained to him the value

3   of the vessel is at least three times as low because we were

4   very surprised by the amount he quoted in there, to which he

5   answered at that point he didn't have any other money, that as

6   soon as he'll get a chance, he'll settle the accounts with me

7   because his business is going very bad at Star Capital because

8   people are not paying him either.

9   Q.   But you didn't write him anything back and say "You're

10  letter is absurd" or "I completely disagree," did you?

11  A.   Why write letters?  He doesn't have any letters from me.

12  I'm used to communicating over the phone.

13  Q.   So, the answer is "No."  Correct?

14  A.   What "No"?  "No" to what?

15  Q.   You did not write back and same "I disagree with your

16  letter."

17  A.   I called him back and I was furious over the phone, but he

18  said "What can I do?  There's a crisis.  I don't have money."

19  Q.   I asked you a simple question.  You did not write back.

20  Correct?

21       MR. SHALEK:  Objection, Your Honor.  Your Honor, he's

22  interrupting the witness.  If the witness can just finish his

23  response, he can ask the next question.

24       THE COURT:  Overruled.

25  A.   I did not write back, but I did call him back.  We were

June 24, 2011

1  very irate because we were quoted such a price we couldn't even

2  believe at first, but he said "It's a crisis now.  I'm sorry.

3  People don't pay me back.  So far, there is no money."

4          As a matter of fact, we didn't talk to him anymore.

5  He would not be available to talk to me after that.

6  Q.  So, isn't it inconsistent to write you a letter offering to

7  buy the boat for a million five while at the time saying he has

8  no money?

9  A.  Of course, there's an inconsistency, yes.

10 Q.  I think that Exhibit 54 is already in the record as Exhibit

11 17, isn't it?

12 *                *                  *                    *

13              C E R T I F I C A T E

14          I hereby certify that the foregoing is an accurate

15 transcription of proceedings in the above-entitled matter.

16

17 ___06/25/11_____        _____
        DATE                       BARBARA MEDINA
18                                  Official United States Court Reporter
                                    400 North Miami Avenue, Suite 12-2
19                                  Miami, FL  33128 - 305.523.5518
                                            (Fax) 305.523.5519
20                                  Email:  barbara.medina127@gmail.com

21

22

23

24

25

## A

ability 8:21 9:6,7 20:9
able 10:4 15:9 20:2,5 53:11 59:23 80:18
above-entitled 93:15
abreast 73:25
absolute 7:19
absurd 92:10
accept 61:16 91:1
accepts 7:13
access 36:10 87:17
account 79:24 91:12
accountant 14:12 22:1 73:4
accounts 11:13 76:7,10,14 92:6
accrued 14:25 15:2
accurate 73:9 93:14
acquaintance 28:20
activities 14:2
actual 20:1 22:13,16,17 23:4
acute 11:3
add 56:7
additional 13:10 23:12
address 3:22
addressed 32:4
ADMINISTRATIVE 3:20
admissible 46:5
admission 16:14
admit 31:21 36:9
admitted 9:19,20 12:3 16:17 23:15,18 32:14
  36:15 39:19 41:22 48:13,14
advise 25:1
affect 32:25
afternoon 51:17
age 9:10,17 33:4 40:3,13,16,18 50:18
aging 8:20 9:13
ago 5:16 6:5 20:14 43:16 71:7 85:24
agree 13:10 54:7 55:14 58:12 73:23 90:13,14
agreed 11:24 12:1,21 14:9,11,18 17:18,20 18:5
  18:13 72:8,10 73:17 74:20,22 79:24 80:19
  83:24 89:9
agreed-upon 11:11
agreement 12:21 18:18,22 73:19 89:11,11
ahold 17:4
aid 12:7
airplane 88:12
airport 83:2
Alexander 28:17 52:11
ALEXANDRITE 38:18,21,22 39:4,8 45:14,20
  48:19,21 49:1,2,3,8,11
allegedly 19:23 90:16,17
allocating 11:6
allow 68:18
allowed 81:25 88:7
allows 5:1
ALTONAGA 1:14
America 6:5 16:20 88:22
amount 13:8,11,19,20 14:19 17:18 19:4 23:12
  23:23 24:4,15,16 26:3 54:4 72:5,6 81:19 86:6
  91:12 92:4
amounts 24:8
analysis 44:12,16 47:18
Anatoliy 1:5,12 2:8,14 4:2,6 62:18
annual 11:3
annually 5:22
answer 25:19 54:10 61:9 70:17 83:12 88:17
  92:13
answered 92:5
answers 31:1,5
anticipated 84:15,19
anybody 30:8 31:18 35:20 44:17 47:3 51:23
  90:21
anymore 15:4 88:1 93:4
anyway 19:8 87:12
apologize 39:18 54:8 77:19
apology 82:20
apparently 80:11
appear 31:22
APPEARANCES 1:15
appeared 62:6
apple 32:1
apply 53:4
appraisal 24:12,22 25:1,2
appraise 20:3 24:25 27:14 28:2
appraised 28:7
Appraisers 48:3
appraising 28:4
approached 10:12
approved 79:23
approximately 6:5,21 10:22 19:1 28:7,10 48:24
  50:19 61:22

April 21:17,18
arbitration 60:9
area 50:3
areas 50:6
arguing 31:23
argument 31:11,12,13 43:14,16
Argumentative 90:4
ARIAN 71:2,2,3
arrangements 76:10
arrive 43:10
arrived 42:20 43:19
arriving 44:1
asked 11:18 13:18 14:17 17:15 19:3 20:3,5
  28:15,17 30:8 45:17 47:1 54:22 56:22,25 57:1
  58:25 60:19,22,21 61:12 71:18 72:5,6 75:2,4
  75:5,7 76:9 77:7 79:1,2,7,14,20,25 80:8,9
  83:13 84:8 87:8,9 92:19
asking 19:9 45:18 55:8
asks 47:3
assessed 52:20
assessment 77:21
assets 11:11 68:4
assisted 28:21
assumed 86:11
attempting 27:19
August 10:22,24
authenticate 35:24
author 29:10
available 20:6,7,7 36:12,13 38:1 59:17,24 91:14
  93:5
Avenue 2:3 93:18
average 8:2,3,3 15:13
avoid 17:5
awards 4:25
aware 46:9 54:16 55:17,19,22 58:4 59:11
a.m 12:5 16:18 23:21

## B

B 1:17
back 8:14 11:9 13:19,24 14:18 19:1 31:23 43:16
  53:15 62:11,13 65:25 66:25 76:20 78:20 79:6
  79:7,9,14,21 81:6,12 83:16,17 88:12,19 89:9
  89:15 91:24,25 92:9,15,17,19,25 93:3
background 27:23 30:4 59:2
backtracked 90:17
back-door 29:24 47:13
bad 10:1 55:25 65:2 92:7
balance 22:5 70:3
banker 57:8
Bankers 48:6,7 78:16
bankrupt 66:6 87:4 91:6
bankruptcy 87:2
banks 28:12,14 58:23
banned 10:1
BARBARA 2:2 93:17
barbara.medina127@gmail.com 2:5 93:20
based 30:20,22 42:14 50:21 59:16 68:25
bases 44:1
basis 30:16 43:23 44:2 59:15 69:16 74:14
began 5:19 13:16 67:13
beginning 8:7 26:16 51:15 62:4,20
begins 52:24
Belgium 26:23 28:13
believe 25:9,21 32:7 42:17 47:1 74:19 75:18
  93:2
believed 22:5
belong 21:2
belonged 21:7
Berger 1:22
Berlowitz 1:17
best 79:7 83:5,13,16,19
better 34:18 53:24 54:4 61:16,20
beyond 40:5 88:4
big 29:3
biggest 39:24
Bill 85:18
bit 8:2 54:11 56:19
bite 31:25
black 7:12,15 49:12 50:2
blackest 7:12
boat 6:6,8,11,12,13,15,22 53:25 54:15 55:15,16
  55:20,25 56:20 57:3,15 58:3,9,11,12,18,18
  61:14,17 67:16 68:7,7,11,14 69:1,3 84:1 87:1
  87:16 88:13,20 93:7
boats 48:9 70:22,24
bonds 60:8
book 11:22 12:11,13 29:2,3 33:8,10 34:25,25
  35:18,19,22,23 36:7,8,10 37:19 40:21 44:8
  47:8,11 52:17

bookkeeper 73:8,13 76:8,9
bookkeeping 23:9
books 70:3
born 6:20
borrowed 5:25 6:1 10:22
boss 75:22
bought 5:7 7:14 68:8
Boulevard 1:18,23
briefly 41:1
bring 31:4 50:24
bringing 69:23
brings 40:19
broken 68:21
broker 26:25 27:1,9
brokerage 24:19 85:2
brokers 27:5,6 48:1
Building 16:4
built 5:8 33:5,9 34:24 35:14 36:5,24 37:2,6,8,10
  37:14,16 38:12,13,14,23 39:11,23,24 49:5
  57:22 61:23 67:3
busiest 24:23
business 4:20,21,22,25 5:17,18,19 10:16,20,21
  10:24,25 11:14,16 16:11 19:23 20:17,18 23:8
  27:13 28:1,4 29:16 30:9,13 70:12,13 71:3,8,9
  75:9,11,15 76:14 77:14,24 78:23 79:5 85:23
  85:23 92:7
busy 49:24
buy 19:3,18 54:25 57:21,23,25 87:6,16 89:4,21
  90:2,22,22 91:10 93:7
buyer 53:13,17,19,21,23,24 54:3,6,15,20,21,22
  61:14,15 86:4,5,6,7,10,11,13 88:23,24 89:1
  89:21,22 90:11,16
buyers 53:16,18 89:18
buyer-willing 56:24 59:16
buyer/willing 57:6
buying 19:15
buys 90:2

## C

C 93:13,13
cafe 82:25
call 21:11 32:10 40:3 88:23 89:18 92:25
called 6:5 8:23 19:2 20:2 21:3 33:8 38:17 40:25
  40:25 44:12 48:5 51:20 63:14 71:2 89:16
  92:1,2,17
Cambodia 7:7 32:24 33:2
Cantor 1:17
can't 31:2 43:12 45:10 58:14,20 61:8
capital 1:19 11:19 14:1 21:20,21,24 74:24,25
  75:9,16,18 76:1,4,6,12 79:4 92:7
car 68:20 85:18,22,23
cards 11:12
care 69:22
career 5:8
careful 40:17
cargo 53:12 64:13,25 69:4 71:11 78:15
cargoes 40:13,13,14
carry 27:4 28:18 65:4
carrying 64:13
case 1:3 5:11 11:18 47:10 62:1
cash 11:3 76:13
CECILIA 1:14
centers 4:23
Centre 1:23
certain 43:8 69:4
certainly 9:7 62:17
certificate 2:16 21:1,3 30:6 52:6,14 54:1 59:19
  61:12,13
certification 9:25
certify 9:23 93:14
cetera 37:17 59:5,5
Chaban 1:5,12 2:8,14 4:2,5,6,6,11 11:14,22
  12:10,20 18:4 22:7 24:10 25:8 30:8 51:21
  55:20 58:2 62:13,18,22 79:23 83:23
CHALSI 9:23 15:7,12,17 16:5 17:3,21 18:25
  19:20 20:9,10,20,22,23 22:18,19 25:9 26:4
  28:16,18,25 31:17 32:17 41:1 45:15 48:23,24
  49:7,11,13 50:1,2,19,23 51:25 52:3 53:6,17
  53:19,22,23 54:25 56:1 57:12,18 63:12,15,19
  63:20,23,23 64:1,3,4,6 65:15 67:4,6,10 68:1,3
  69:21 76:24 77:14,14,21 82:11 83:6,7,8,14,20
  84:4,13,14,21 85:4,6,9 86:3
chance 92:6
change 56:14 57:14 87:8 89:2
changed 78:7
changing 44:2
charges 15:12
CHARLES 1:22
charter 53:12

chartered 65:1,12
Charterers 40:17
charts 59:13
checking 70:2
chevrons 3:24
child 4:22 6:20
China 48:20,21 49:11,13,17
choices 40:17
Chuck 51:17
circumstance 9:18
circumstances 9:17
CITATION 3:14
cite 70:14
citizenship 26:22
city 4:16 16:2
clarification 39:7
clarify 61:12 82:6,19
class 8:2
classed 41:3
classification 7:22 59:22
classified 7:20,21,22,24 10:6
clear 25:4 45:3
clearly 45:24
clerk 12:16 85:24
clichtman@bergersingerman.com 1:25
client 86:10,12
close 32:10
closely 83:11
closer 85:13
closest 49:24
closing 85:15
clubs 4:22
coal 64:16,18,21 65:13
collateral 17:20 18:1 48:7 72:11 82:12
collecting 76:14
come 5:10 9:22 16:20,23,24 19:7,19 21:20
   31:14 34:8 35:25 37:23 61:12 87:10 88:25
comes 47:9
comfortable 80:13,17
coming 16:21 61:3,11
commercial 66:13,13 67:11
committed 78:23 79:4
common 50:18
communicating 92:12
companies 11:2,6 24:19,24 27:10 28:14,14 48:5
   76:13,17 85:2,7
company 1:10 5:1,21,23,23,25 9:24 11:7,9,9,12
   11:20 16:5,7 21:1,3,4,7,9,9,11,21 24:11,21
   27:12 44:12 51:23 57:9 58:8,11,12,17,18,21
   65:15,25 66:9,10,25 67:5,18,20,21,24,25 71:4
   71:5 73:22,22,25 74:10,12,13,18,19 75:2,2,8
   75:10,12,16,21,22
company's 74:16
compare 7:25 39:4 59:23
compared 52:2
comparison 49:16
compilation 41:10 47:20
compilations 34:11 44:22
completely 92:10
Complied 12:12 33:12 52:9
comply 41:7
complying 42:7
compounded 9:16
concede 54:4
concern 56:21,23 57:4
Concord 16:4,7
condemned 22:24
condition 10:1 15:10 42:12,15,18 65:7
conditions 44:14 65:2
conference 3:18,22
conferred 5:5
confidential 66:16
confirming 21:1
congratulate 91:21
consent 60:7 91:1,4
consider 26:2 54:21 57:3
consideration 32:21,23 56:23 59:1
constructed 70:14
consulted 24:19
contents 2:6 35:21
continue 9:23 25:19
continuous 64:23
contract 16:2,6 26:7 65:9,11 73:1,2,9,12,14,16
   73:21,24 74:2,9 75:12,13 76:2,19,25 79:15
   82:10,22 83:22
contracts 72:15,16
contrary 64:15
Control 41:3,4,5 42:2,5,6,9
CONVENTIONS 3:20

conversation 13:21 17:13 79:19,20,23 82:17,19
   82:22,24 87:24
conversations 10:9 14:8 17:5 31:8
convinced 17:7 89:13
copied 36:3
copies 23:4,6
copy 16:6 29:18,20 33:16
CORALL 55:21,23 71:6,7,9
corporation 1:5
correct 8:17 16:6,25 22:18,19,23 23:4 25:17
   29:14,17,18,20 33:19 35:10 47:19,21,22 48:1
   48:2,3,6,7,8 50:11,14 52:18,19,21,22 53:7,8
   53:14 56:13 58:10,19 64:1,6,12,14,24 65:9,16
   65:25 66:6 67:1,8,14,15 68:11 69:8,11 70:8
   70:11,19 71:13 72:2,3,4,18,19 73:3,9 74:6
   75:6,10,14 76:5,22,25 77:4,21 78:3,6 79:1
   80:14 82:12 83:6,15,20 84:13,24 87:2 88:21
   90:3,12,15 91:24 92:13,20
correctly 72:18
cost 5:2 6:7,21 20:13 22:13,17 70:2
COSTA 63:12,14
costing 59:4
costs 22:13,16
couldn't 54:9 61:21 63:13 65:6 78:12 79:3 93:1
counsel 3:21 47:12 66:18
countries 4:17 49:19,20
country 41:8 49:24 50:5
couple 28:13 37:15
course 6:2 16:10 22:1 23:7,9 26:5,7 28:1 29:16
   30:12,13 32:8 38:3 61:19,23,25 68:7 69:15
   73:10 77:11 93:9
court 1:1 2:2 3:22 4:7 5:13 7:11,21 8:5,16,20 9:9
   10:9 11:25 12:3,8,13,16 13:6 16:17 17:11
   18:10 23:18 24:6 25:6 26:9 27:17,21,24 31:3
   31:4 32:2,11,14 34:18 36:9,15 39:16,19 40:23
   41:22 42:5,11 43:3,17,20,25 45:8,16 46:1,11
   46:19,22,24 47:7,15 48:14 51:13 53:2 54:10
   55:7,12 59:20 60:1,9,12,14,17,18,20,24 65:2
   61:3,11 62:6,10,13,17 66:17,19 72:23 82:4
   85:21 86:14,21 88:6 90:5 92:24 93:18
Courthouse 2:3
Courts 27:3
cousin 5:15
cover 9:21 35:23
crack 8:25
cracks 8:25
crash 77:17
crashed 56:11 57:13 71:23 77:6,9 78:8
crazy 19:8 87:12,19
create 36:2
creating 34:16
credit 11:12 13:9,11 17:19 80:20 81:14
crew 15:14,14 59:5
crisis 13:16,22 20:17 67:12 80:4 92:18 93:2
CROSS 51:14 62:19
crossed 84:20
cross-examination 2:12,15 35:21
C-O-R-A-L-L 71:6

D

damaged 64:17
date 6:19 39:25 51:5,8 53:5 57:16 59:25 61:8
   80:19 84:23 85:1 93:17
dated 16:7
dates 25:18 37:14
day 6:20 59:6 68:5 81:9 83:13
days 13:7 72:4,5 81:18,21
deadline 17:18,20 80:18 81:13
deal 19:23 24:19 31:9 54:2 61:20,24 89:16
dealerships 85:18
dealing 75:1
deals 24:11 85:13,15
dealt 24:24
debt 18:3 21:25 22:5,6 66:9,21 67:1 83:22
December 15:18 16:7
decision 15:16,22 58:1
decorated 5:4
decreased 81:19
defendant 1:11,21 5:11 36:13
defense 36:10
defined 74:9
definitely 32:9 59:2
delivery 53:11
demolition 44:11,15 48:22 49:19,25 50:19
   56:19
depending 58:14
depends 19:6
deposition 46:16
describe 5:19 7:21 8:4,19 9:9 10:9,25 15:6

17:13 18:12 37:12 40:23 42:5
Description 3:4
Descriptions 3:19
desperate 88:18
details 41:2
determination 30:21
determine 33:4,6 52:15
determining 37:1
developed 5:1
developing 69:7
develops 8:25
Dexter 21:3,5,6 65:16,23 67:5 77:3
didn't 18:22 20:16,17,18 21:13 31:7,14,15 43:15
   46:16,16 58:16 63:22 69:16,22 70:16 73:1
   75:12,15 76:6,9,24 79:9,15 80:6,15,16 81:23
   82:8 83:7,9,18 86:6,25 88:1,17,22 89:6 90:24
   91:24,25 92:5,9 93:4
difference 26:3
different 24:16 63:11
differential 56:11
differently 65:21
difficult 40:11
dimensions 39:4 49:6
direct 2:9,14 3:26:15 88:4,8
director 73:22
directories 34:11
directory 33:17 41:9
disagree 34:17
disaster 9:13
disclose 46:16 66:14
disclosed 43:12,13
discretion 74:21
discussed 21:11,16 74:1 83:4
discusses 38:5
discussing 5:19
discussion 88:3,12
dismiss 30:16
dispute 34:14 30:10
DISTRICT 1:1,1,14
DIVISION 1:2
divulged 30:25
docked 15:8
document 12:22 14:24 16:1,10 17:25 18:3 23:2
   23:2 29:8,10,13,15,18,21 31:4 32:12 33:13,15
   33:21 34:1,3,5,8 35:25 38:1,5,8 40:23,24 41:9
   41:21 42:2 44:10,11,14 45:1,3,4,14,16,17,22
   46:7,10,17 47:18,23 48:11,12 49:15 51:8
   72:18 74:11
documentation 6:9 15:10
documents 15:11 23:6,9,13 43:1 46:6 48:10
doesn't 4:7 43:17,20 47:12 56:5 58:23 68:15
   81:3,16 92:11
doing 27:22 37:17 76:13 77:14 80:7
dollar 44:1 54:4
dollars 32:16 67:2
don't 4:8 7:14 24:7 26:9 38:16 39:8 43:3,9 46:13
   53:21 56:4 58:20 59:9 61:8 65:16 66:16 69:13
   69:14 71:16 73:13,13 74:2,4 75:2,23 77:16,17
   80:5,11,23,25 82:3 84:9,25 85:14,16 86:1,18
   87:3,10 88:17 89:20 90:13 92:18 93:3
double 45:23
drafted 73:8,13
due 9:10 12:24 13:19 80:19 81:10
Duntar 5:23

E

E 93:13,13
earlier 13:19 60:22 63:19 71:18 83:5,19
early 71:24 77:20 79:1,3
earn 9:6 40:11
earnings 57:5
ears 4:7
east 1:23 50:2
Eckhardt 44:12 47:20 51:6
economic 13:16 42:20
economical 40:5
Economically 40:19
economy 56:12,14,16 71:23 77:6,9 78:7
effect 8:20 39:11,22,24 40:2 65:5
effective 35:21
effectively 29:23 30:2
effort 84:4,13,14
efforts 18:12
either 13:19 43:25 82:2 92:8
else's 51:12
email 2:5 44:19 47:3 79:20,22 82:6,9 87:25
   93:20
ended 87:24
enforce 46:11

**English** 18:9 60:1 62:24
**enter** 8:11
**entering** 40:15
**entertainment** 4:23
**entire** 83:2
**entitled** 42:2 46:18
**entrance** 9:14
**Equasis** 40:25
**equivalent** 8:13
**Especially** 9:12
**ESQ** 1:16,17,22
**essentially** 43:7
**establish** 30:21 46:24
**establishes** 30:1 47:5
**establishing** 43:7
**estimate** 22:15
**estimates** 22:13
**et** 37:17 59:5,5
**Euros** 28:24
**evaluate** 27:13
**everybody** 31:3 44:18 68:10,23
**evidence** 3:3 11:25 12:4 16:15,18 23:15,21 24:7
  29:22 30:2,18 31:24 32:13,15 33:21 34:3,7
  35:17 36:2,16 39:14,20 41:16,24 45:16,18
  48:16 54:18 55:4 86:11
**evidentiary** 11:24
**exact** 24:4 31:11,20 49:8
**exactly** 12:25 37:16
**Examination** 2:9,11,13 4:3 26:15 51:14 62:3,19
**example** 11:7 70:15
**exceed** 68:18
**exception** 34:16 36:2,6
**exceptions** 34:18
**excess** 70:5
**exchange** 17:19 80:21
**excuse** 33:25 40:8 46:14 53:16 65:15 75:4 79:12
  80:8
**excused** 62:12,15
**executed** 29:19
**exhibit** 3:6,8,9,10,11,12 12:20 14:10,21,23
  15:23,24 16:18 17:22,23 18:9 20:24,24 21:14
  23:1,11,23 29:2,6 32:15 33:10 34:5 35:12,13
  36:16 37:18,21,22 39:14,16,20 40:21 41:15
  41:24 44:7 48:16 51:6,7,8 52:5 72:20,22 78:4
  80:24 81:15 82:7,10,22 88:19 90:7 93:10,10
**exhibits** 3:2,3,5,7 11:22,25 12:4,10,13 22:7,10
  22:12 23:14,20
**existing** 35:10
**exit** 35:13
**Exkhardt** 44:13
**expect** 58:16,17
**expected** 35:20
**expended** 23:3
**expense** 70:2
**expenses** 9:8,8 10:10 15:15,20 22:13 68:18
  70:4,6
**experience** 58:22
**expert** 27:18 29:24 30:3,6,25 31:1,3,6,7 32:8,9
  33:23 42:24 43:12,13,15 46:3
**explain** 8:16 42:19 43:21 60:1 70:4 76:12
**explained** 10:15,19 75:1,19,20,22 76:16 92:17
**explanation** 34:2 43:5
**exposed** 64:17
**express** 20:8 70:3
**extend** 17:18
**extended** 80:18
**extending** 17:19
**extension** 81:3,7,17
**extent** 27:18
**extra** 12:13
**extract** 40:24,25
**extremely** 58:24
**ex-Volgo-Don** 38:11

**F**

**F** 93:13
**facilitate** 14:2
**fact** 18:17 30:22 39:11 41:13 46:2 68:13 75:21
  77:9 83:4 84:3 86:11 91:22 93:4
**factors** 57:3
**facts** 54:17 55:3
**fact-finder** 43:21
**fall** 71:24
**family** 16:22 83:2
**far** 35:12 61:1 70:19 93:3
**fault** 90:17
**Fax** 2:4 93:19
**fear** 84:7
**February** 51:5,9 52:21 53:4,7,15,20 54:14 91:9

**Federal** 2:3 30:2,18 31:24 34:7
**fee** 28:23,24
**feel** 80:13,16
**feelings** 80:17
**feels** 61:24
**figure** 43:10 52:24,25 53:1,3 61:17 88:14
**figured** 15:18 80:7
**filed** 30:24 61:7
**final** 25:8
**finally** 17:6
**finance** 28:14
**financial** 78:11 78:14,17
**financing** 76:7,10,14 78:17
**find** 24:17 37:23 38:5,17 64:13 89:25
**finding** 11:6 40:12
**fine** 69:23 70:6 80:5
**finish** 92:22
**fire** 15:15
**first** 6:25 7:23 8:11 9:17 10:20,23 19:25 34:4
  46:15,18 63:25 67:12 73:19,19 75:23 88:11
  91:13,14 93:2
**fitness** 4:22
**five** 42:9,10,13 81:20 85:18 89:5,8 91:2 93:7
**fix** 31:9 64:7 68:20,21
**fixed** 64:9,10,22,24
**fixing** 64:6
**FL** 1:19,24 2:4 93:19
**flag** 7:2,4,4,6,7,8,8,12,12,15,16,18 9:18 32:22
  32:23,24 33:2 41:6,8
**flat** 28:24
**flight** 82:25
**Florida** 1:1,5,7,9 16:23 75:10,12 85:17
**flow** 11:13
**flying** 7:15 32:22,23,24 41:8
**follow** 11:13 19:14 31:15 46:12 68:3
**follow-up** 79:20
**food** 15:14
**foregoing** 93:14
**foreign** 9:19
**forgive** 81:15
**form** 52:14,16
**forward** 44:4
**found** 33:7 64:1,3,4,7 80:25
**foundation** 11:24 23:16 30:1 34:2,13,14 41:19
**four** 9:12 11:8,9 15:21 42:13 72:5 81:20
**fourth** 6:20 36:22 38:7,10
**free** 53:12,12
**friends** 25:14
**front** 11:21 12:11 14:10 27:3 29:3 33:11 35:12
  36:18 37:19 40:21 46:10 83:1
**Ft** 1:24
**fulfill** 10:14
**full** 75:24
**fully** 57:25
**FUND** 1:9
**furious** 92:17
**further** 14:2,3 26:8 33:23 45:2 50:25 62:2,9
  90:25
**Furthermore** 60:6

**G**

**gaining** 27:10
**GARY** 1:16
**general** 35:1 37:5 60:25 61:25 71:9 85:18
**generally** 34:12 38:1 41:10 44:22
**generate** 9:7
**generating** 10:15 57:12 58:11,17
**German** 21:8,9
**getting** 8:12,24,25 9:5,7 19:10 71:20
**give** 28:25 30:9,16 31:2 32:21 42:14 44:1 49:16
  52:23 53:11 57:8 61:3 80:1,10,16 86:6 87:14
  87:21 89:7
**given** 53:1,3,10 91:3,6
**gives** 41:1 49:18
**giving** 27:22 30:19 58:22 81:8
**glean** 38:20 48:19
**go** 10:5,23 83:8 88:7
**goes** 43:16
**going** 9:10 10:17 20:4,5 24:18 27:17 30:3,15,16
  31:16 43:1,21,22 44:1 47:14 54:3 55:10 57:23
  58:23 60:13,17,19 61:3,10 68:21 69:4 75:21
  80:24 83:11 84:8,25 87:10,20,21,22 88:4,5,24
  89:1,20,21,22,25 90:25 92:7
**Goldstein** 5:11,14,15,20 6:3,14 7:1 8:12 10:10
  10:12,19,21 12:6,21 13:3,18,21 14:9 15:19
  17:3,14 18:15,20,25 19:11 20:8 21:2,8,18,19
  22:3 24:15 25:21 26:2 30:11 31:9,18 51:18,19
  51:20 54:15,20,24,25 55:6,14,19 57:23,25

  63:3,20,22 64:1 65:23 67:11,14 69:12,13 70:7
  70:21 71:12,17 73:1,15,17 74:20 75:5,13,18
  76:12 77:7 78:20 79:13 82:10,16 83:4,14 85:9
  85:12 86:2 87:5,6 88:11,19 90:9 91:8,19
**Goldstein's** 5:25 19:19 21:12 62:22 74:25 76:19
  90:15
**good** 4:5,12 7:8 40:11,13,13 42:12 51:17 55:15
  61:24 63:7 69:23 85:15,19 90:20
**Gorchakov** 28:17,19,20 52:11
**gotten** 78:19
**government** 5:5
**gphillips@phillipslawyers.com** 1:19
**great** 78:19,22
**green** 7:17
**growing** 9:8
**guarantees** 76:6 80:21
**guaranty** 76:4 91:16
**guest** 87:15

**H**

**H** 1:22
**hadn't** 80:11 84:20,23
**half** 6:17 63:19,20 66:22,23 67:2,3
**handful** 50:17
**hang** 87:25
**happened** 11:17 13:15 18:24 21:17 29:5 56:3
  60:16 64:13 77:16
**happening** 15:7
**happily** 89:14
**happy** 84:22
**hard** 54:9
**haven't** 15:4 45:8 60:3,4,5 62:22
**hear** 8:9 18:24 19:11 43:18 54:10 61:21 63:13
  78:12
**heard** 45:8 46:14 54:24 76:7,10 88:5
**hearing** 12:7 46:14,17 54:9
**hearsay** 33:22 34:6,15,16,17 41:17,18 45:7,21
  45:22,23 46:1,4,7,14,18
**held** 43:17
**help** 24:22 31:9 86:21
**helped** 43:2
**helpful** 12:17
**helping** 76:16
**here's** 34:3
**he'll** 92:6,6
**he's** 27:19,21 31:23 39:8 64:5 73:22 80:7 82:19
  85:16 89:22,25 92:21
**Hi** 62:22
**high** 70:3 76:17
**higher** 9:5,5 20:1
**highly** 35:24 36:1
**hired** 30:12
**Hollywood** 1:18,19
**home** 19:1
**Honor** 11:23 12:6 16:13,16 18:8 21:22 23:14,19
  24:6 25:6 28:8 27:16 29:23 30:7,18 31:11
  32:1 33:20,22,24 34:4,7,17 35:17 36:1 39:14
  41:20 44:4 45:2,18,21 46:4,23 50:25 54:8,17
  55:3 56:5 62:15 72:22 82:18 85:20 86:9 88:3
  90:4 92:21,21
**HONORABLE** 1:14
**Honor's** 31:20
**hour** 17:6 26:10 82:24
**house** 70:14
**hulk** 66:4
**hull** 8:24 22:14
**hundred** 37:15
**hurt** 88:2
**hybrid** 43:14

**I**

**ice** 9:21
**idea** 55:15 58:2 61:23 64:5
**ideas** 77:23
**identification** 3:3,23
**identified** 75:18
**identify** 3:21 16:1
**idling** 65:1
**II** 1:23
**immediately** 83:6
**IMO** 34:24
**impact** 78:10
**important** 59:4,12
**impossible** 24:16 83:7 84:5,22
**include** 84:7
**includes** 34:10
**including** 9:15 15:13 63:23
**income** 58:21 59:1,3
**inconsistency** 93:9

inconsistent 93:6
increase 13:8,11 72:5
increased 72:7
incurring 15:12,20
INDEX 3:2,14,18
indicate 19:17
indicated 3:23 88:20 91:7
indicates 42:14
indication 21:10 42:14 53:25
industry 6:4 48:9 70:10
industry-standard 3:23
inferences 30:19
information 14:13 37:5 38:20 41:1 43:8 47:20 59:16 79:21
infusion 79:4
initial 32:3
inspection 59:21
inspections 42:17
instance 57:8 73:23
instruction 45:9,10
insurance 28:14 48:5 57:8 59:5,8
intend 43:11
intending 19:4
intention 10:16 15:19
interest 5:21 6:1 11:18 13:1,13,14 14:18,19,20 14:25 15:2,5 18:25 21:12 26:6,7 65:24 76:18 76:24 77:2,3 80:6,6,20 81:8,12,13,17,20,20 81:21,24,25 83:9
interests 70:7,21
international 9:14,19 13:16 24:11 33:7 34:23 37:6 41:5
internationally 7:9,25
Internet 37:6,24,25
INTERPRETER 4:2 62:18 64:19
interrogatories 31:1,5
interrupt 58:16
interrupting 92:22
introduce 46:19
introduced 5:15
inventions 90:18
invest 7:19 11:14,16 68:16
invested 75:8
investing 10:16 69:6 70:14
investment 75:21
investor 75:20
invoice 14:12,19 79:7
involved 6:3 48:9
irate 93:1
irrelevant 57:16
isn't 43:25 65:9 68:11 75:6,10,14 87:18 88:14 90:3 91:2 93:6,11
issue 30:22 47:6
it's 7:12 8:2 16:2,5 21:1 22:17 23:9 30:7 31:5,10 31:14,17,18,21 32:10 33:16,22,22 34:1,15 35:10,24,24 36:1,3,12 37:24,24 39:3 40:4,4 40:12,19,24,24 41:2,8 42:2,7,25 43:3,4 44:17 44:17,19,19 45:3,4,7,21,23,24 46:1,2,4,4 47:2 47:3,5,18 49:2,2,12 50:13,18 52:5 54:6 56:20 57:25 58:8 59:3,3,11 60:11 64:16 66:13,15 68:16,20,21 71:11 75:19 81:18 89:19 93:2
I'd 51:12 70:16
I'll 26:10 34:14 36:9 39:9 41:20 44:4 56:7 59:1 87:6
I'm 4:12,14 5:8 15:23 17:22 18:8 20:24 22:15 25:15,16,18 26:21,25 27:22 30:15,16 31:24 33:25 39:13,17 40:9 45:18 46:9,14,17,18 51:1 51:17 54:8 55:10,22 58:4,16 59:5 61:21 62:22 63:13,24 64:19 76:8 81:15,23 83:11 84:8 86:16 87:19,22 89:20,21 91:13 92:12 93:2
I've 4:21 16:21 17:4 27:10 47:9 51:20
i.e 3:24


J

January 16:22,24 84:12,18 85:4,7 88:19 89:9,12
JEFFREY 1:17
job 30:13
joke 19:25
journey 6:18
jshalek@phillipslawyers.com 1:20
judge 1:14 58:14,20
July 65:8
jumped 88:11
June 1:8 28:17
junior 27:9


K

keep 9:25 23:7
kept 16:10

kind 19:23 57:5 64:16 70:24 71:1,3,8 77:13 85:12
knew 26:1 68:23 69:3,8,10,12,14 70:7,10,21 71:12 85:17
know 13:25 14:4 19:8 21:19 22:3 43:3,9 46:12 52:12,13 53:15,19,21 54:14,24 55:23 56:4 58:20 59:2,9 60:13,16 61:1,2,8 62:24 63:1 69:13,13,14 70:24 71:16 73:13,13 74:4 77:16 77:17 80:11,23,25 84:10 85:12,16 86:1 87:3 87:10,21
knowledge 30:23 42:25 43:4,4,5,6 45:19 60:11
knowledgeable 24:21 70:12,13 76:11
knows 10:17
KOMBAT 6:12 35:13 36:4,19 38:6,10 39:5
Kooy 1:13 2:10 24:10,13 26:14,19,20 27:17 29:2 29:6 32:17 33:10 36:18 37:18 39:22 44:7 47:18 51:17 62:6,15
Kozelska 73:8
Kozyn 16:3
Kraible 5:23
Kravchuk 73:5,11,21,23


L

lack 15:10 23:16
laid 22:23 34:13 41:19
laid-up 15:12
large 22:4 28:12,13
Las 1:23,23
late 64:14,15
Lauderdale 1:24
law 12:16 27:4
lawsuit 61:7,8
lawyer 25:1 30:8 51:17 62:23
lay 11:23 30:2,19 31:22 34:14,18 43:14 47:15
leaks 64:17
learned 61:5,6
leasing 85:23
leave 10:5 82:25
leaving 10:2
led 72:1
left 17:6 89:14
legitimately 32:7
Lehman 85:18
lend 11:8,18 12:21 13:10
lender 74:9
lending 5:21 11:1,2 14:2 74:25 76:17
length 9:2
Leon 5:11 15:4
letter 19:17,21 21:11,15 90:9,12,14,16 91:7,9,17 91:18,24,25 92:1,10,16 93:6
letters 92:11,11
let's 32:20 34:3 42:9 44:18 45:10
level 68:17
Liability 1:9
Lichtman 1:22 2:12,15 7:10 8:9 12:2,6 13:5 16:13 17:9 23:16 27:16 29:23 30:18 31:12 32:7 33:22,25 34:10,15 35:18 36:6,13 39:7,15 41:17 42:23 45:2,12,21 46:13 47:5,8 51:11,16 51:17 54:8,13,19 55:7,10,13 56:7,8 62:2,21 64:20 66:15,18,20 72:22,24,25 82:20,21 86:15,21,23 88:3,7,10 90:6
life 4:18,20 40:5
lightweight 48:22,23,24 49:16,19 50:7
likes 85:12
limited 1:9 35:22 65:16 78:14
line 3:4,4 10:16
Lines 65:16,23 67:5 77:3
list 33:17 34:5,17 37:23 38:2 41:9 42:2 46:10
listed 34:6 35:2,3,11 36:3
listen 70:16 83:11 84:9
listing 36:19,21,22 37:9,12,13,22 38:21
listings 35:19
lists 34:11 35:13
literally 13:16
litigation 25:2 30:13
little 8:2 50:17 54:11 56:19
live 4:15,16
lived 4:17
living 4:18
LLC 1:9
Lloyd's 33:8,16 34:21,22 36:3,14,23
loan 20:9 26:3 57:8 71:18 74:5,24 75:5 76:19,25 78:2 82:1,12
loaned 77:10
loaning 72:1,17
loans 72:18
local 76:13
locate 24:13

located 75:10
logical 58:24
long 4:17 12:24 21:7 71:7 77:24 85:24
long-time 79:10
look 11:21 12:10 14:10,21 15:23 17:22 20:24 29:6 33:10 36:11,14 37:18 40:21 42:1 44:7 45:18 46:10 48:18 49:15 59:2 87:11 90:7
looked 47:11 59:13
looking 12:20 23:1 36:18 38:12,16 81:15
lot 22:4 40:17 59:3 63:9 68:13 82:3
louder 54:11
low 8:8 92:3
lower 9:2,2,7 70:5
lunch 26:9
Luncheon 26:12


M

M 1:14
machines 11:12
Madeleine 1:13 2:10 24:10 26:14,19
maiden 6:18
maintained 67:17 68:17
maintenance 68:11
major 10:8
making 8:6 59:15 64:6 67:16 75:21 78:16 79:4 85:13
managed 71:4,5
management 67:22,23,25 68:1
manager 85:18
manages 16:5
managing 67:24
March 12:25 20:19,21 25:9,11,16,20 65:24 76:22,23,23 82:1 85:11,16 90:1,10 83:18
marine 44:12,13 47:21 51:7
Marked 3:3
market 18:21 24:21 34:10 44:12,14,16,21 47:18 56:11 57:13 59:16,24 65:2 83:8,9 84:7 85:1 89:20
matter 93:4,15
matters 32:4
maximum 20:10,11 25:11,25
ma'am 29:2 34:21 35:13 42:1 62:10
mean 25:17 27:1 32:7 43:2 49:4 54:7 58:16 60:10 63:4 65:18 74:12 82:13 85:14
means 27:2 39:24 40:4 49:5 78:17
meant 25:23 39:16 40:1 60:2 65:20
medal 5:4
MEDINA 2:2 93:17
Mediterranean 41:9 50:2
meet 5:13 17:7 83:1
meeting 62:10
mentioned 7:20 85:22 86:1,13 87:5,20 88:15,18 88:11
merchandise 64:16
met 5:10 51:19,20,21,23,24 62:22 82:16 83:1 88:11
metal 8:23,24 9:18,18 15:21 22:25 50:21 64:16 64:18,21
Miami 1:2,7 2:3,4 16:22,24 17:3 93:18,19
microphone 4:8
million 6:23 7:15,17,18 13:11 20:13 54:15,20 55:1 56:2 61:15 66:22,23 67:1,2 86:5,7,10,12 86:24 87:1,5,7,17 88:13 89:5,6,8,16 90:3,12 90:20 91:2 93:7
mind 42:19 84:20
mine 74:19
minimum 7:19
minus 26:3 33:1,2
minutes 51:11 88:6 89:13
mixed 25:18
moment 21:22 25:5 28:6 68:15 84:25
monitoring 67:25 68:1
month 8:13 10:22 15:13 16:22 65:13
monthly 5:22 13:2
months 11:8,9 12:25 13:13,14 15:21 19:6,7 76:21 81:21,24 87:11 89:2,25 91:15
moratorium 65:4
morning 4:5
mortgage 77:2
motion 30:24 32:2,3
move 11:25 17:9 23:10 44:4 45:17 87:13
moved 16:15 24:7 29:21 32:12 33:21 35:16 39:14 41:15


N

name 4:5,6 6:11,12 26:18,19 75:23,24 87:9 89:3
names 37:17
nature 71:8
Navy 5:5
Near 18:3

98

necessary 6:9 14:12
necessity 8:20 10:10
need 4:7,8 7:2 11:3 17:16 18:21,22 24:7 43:15 59:2 62:13 68:15 83:9 89:19
needed 7:20 10:6,8,13 11:6 69:25 76:13
needs 7:4 40:12 75:3
negative 78:11,13
negotiated 73:16 82:22
negotiating 73:14
Netherlands 26:21 27:5,7 28:12
never 18:20 19:16,16 34:5 46:6,7 51:24 67:14 86:1,10,13 87:19,19 88:15,18 90:21
new 10:16,20,21,23,25 37:17 46:8 67:3 68:21 84:6
Nice 62:10
nine 20:13,14
NONJURY 1:13
Nonresponsive 17:10
normal 50:18 53:12 57:2 71:22
normally 40:13,18 55:17 56:24 60:24
North 2:3 93:18
note 12:24,24 17:7,15,16,16,20 33:24 78:4 80:21 81:10
notion 8:23
November 15:6
number 23:2 30:4 34:24,24 42:20 80:25 89:8
numerous 10:12 25:12

O

oath 27:2,3
object 23:16 45:2
objected 34:5 46:7
objection 7:10 12:2 13:5 17:9 27:20 32:6 34:6 41:17 42:23 45:21 46:9,11,13,18 47:7 54:17 55:3,8 56:5 60:19,23 66:17,18 82:18 85:20 86:9 90:4 92:21
objections 39:15
obligated 80:9,12
obligation 76:19
obtain 6:9 45:19
obtained 85:7
occupation 33:18 35:6,9 38:3
occupations 34:13
October 10:3 13:23,23,23 14:8,14 15:6,8 22:23
Odessa 4:16 6:7 19:2
offer 19:14 85:3,8 86:8,24,25 87:14 89:19 90:21 91:4
offered 53:24 54:25 87:1,4 89:15 90:11 91:10
offering 60:8 85:2,6 87:3 93:6
offers 90:23
official 2:2 24:17 65:19 74:10 81:16 87:14 89:19 93:18
officially 65:17,18
Oh 74:14 86:22
Okay 5:10 7:6 8:19 13:15 14:8 19:19 21:17 22:18 25:24 26:25 32:20 35:16 38:9 44:16 49:7 52:2,5,8,20,23 53:9,15 58:7 62:25 64:5 64:23 65:18,23 68:3 70:10 72:20,24 74:20 82:5,10 84:10,11
Olas 1:23,23
old 4:11,13 6:6 9:18 10:1,17 68:7,11,16
older 40:4,12 57:20,20
Oleg 75:23
Olena 73:8
once 24:14 42:13 74:20
one-day 81:7
ongoing 9:4 56:21,23 57:4 68:10
openly 44:20
operated 67:8,14
operating 67:12,13
operation 64:23
operations 69:21 76:14
opinion 31:6 43:23 44:2 53:10
opinions 30:20
opportunity 17:2
opposed 49:17
option 20:16
order 7:2 10:6,13 31:15 32:3 90:18
orders 46:12
ordinary 23:7 30:13
ore 32:3
organization 41:5 42:6
organized 41:6
outlays 9:4
outrage 70:3
outside 30:12
overage 40:6,9
overaged 40:4
overall 10:8

Overruled 7:11 13:6 17:11 23:18 27:24 32:11 36:15 41:22 55:12 85:21 86:14 90:5 92:24
owe 19:5 22:4 87:12
owed 19:8 26:6 66:10 67:1 79:13,15
owes 26:2
owned 55:20 58:18 65:15,16,21,23 66:2,3 69:16
owner 59:6 75:1 85:25
owners 55:14
ownership 77:3
owns 58:8,11

P

page 2:7 3:4,4,15,19 33:16 35:19,23,23 36:3,7 36:18 38:7,16 42:1 44:25 45:10,19 48:18,20 49:15,18
pages 36:14
paid 6:13,14,14,24,25 22:6,20 23:1,23 26:4 28:23 40:14 76:20 79:11,22
Paladin 1:4 14:5,6 51:23 52:12,13 55:20 58:3 59:8 65:25 73:2,20 74:9,13,14
Panic 84:7
paper 19:16 82:13 89:14
papers 52:17
paperwork 7:4,5 51:3 65:19
paragraph 53:10 59:18 60:6 74:22
Pardon 67:19 69:19
part 14:11 25:2 43:15 67:2
partial 13:19
particular 34:13 35:6,12 44:23
parties 11:25 12:1
partner 8:6 31:13 75:13,23,24 79:10
partners 63:2,11,12,14,16
partnership 63:7 67:11
pass 87:22 89:22
passenger 71:10
pay 11:9 13:18 20:9 21:25 54:3 57:24 61:15,19 61:22 79:1,3,6,7,9,14,16,16,21 80:6,20 81:5,6 81:12,13,21,24,25 83:14,17,18 87:17 90:19 93:3
payable 80:19
payee 74:8
paying 15:19 20:16 80:6 81:20 92:8
payment 80:7
payoff 66:9
pending 45:9
penny 14:15 80:6
people 11:2 44:23 47:4,24 50:17 90:24 92:8 93:3
perceived 7:8
percent 5:2,22,22 11:3 13:2 28:6 50:20,22 65:23 66:2,3,3,4,8,25 82:11
percentage 28:4
perception 30:20 90:15
perform 57:1
period 6:16 8:14 13:14 14:25 15:3 20:14 21:7
permissible 34:8
person 61:24
personal 14:6 17:15 75:8 77:23
personally 75:6
persons 34:12 35:5,8 41:10 47:23 57:21
persuade 80:18
persuaded 83:1
ph 5:23,23 71:5
Phillips 1:16,17 88:9
phone 19:2 20:2 21:11 25:13,13 78:24 79:22 88:23 89:18 92:2,12,17
physical 59:21
pick 25:13
piece 19:16 43:9 89:14
pieces 43:9
place 82:24,25
placed 46:9
Plaintiff 1:16 3:5,6,7,8,9,10,11,12 4:2 12:4 16:18 23:20 32:15 36:16 39:20 41:24 48:16 62:18
Plaintiffs 1:6
PLAINTIFF'S 26:14
plane 17:6
plant 16:2
pleadings 31:2
please 4:9 12:7 14:10,21 15:23 16:1 17:22 19:13 20:24 22:7 24:4 26:18 29:6 33:10 40:8 44:7 44:25 47:16 52:8 59:20 66:21 70:17 72:20 79:24 82:18 83:12 84:9 88:9 90:7
pleasure 17:12 18:17 71:10
pledge 81:1,3 82:11
pledged 18:1
plus 6:1 50:19,21 67:4
point 6:3 15:16 19:19 57:13 71:7,17,20 77:12

79:12,25 83:7 84:3,15,17 85:22 92:5
points 33:3
port 8:11 10:4 15:8,14 40:15 41:3,4,5 42:2,5,6,8 42:17
ports 9:10,14,15,19,20 10:2 40:16
position 44:2 81:7
possibilities 78:14
possible 64:25 84:5
possibly 35:20 57:6 58:14
potential 90:11
potentially 89:9
predicate 34:18 46:24 47:15
prejudicial 35:25 36:2
preliminarily 18:5,13 83:24 89:9
preliminary 88:12
prepare 29:15 52:10
prepared 34:1 52:14,17 60:13 73:4,7 82:13
preparing 34:4 73:12
present 31:8,24 60:17 68:4
preserving 32:5
pretrial 46:6
pretty 10:8 55:15 66:22 78:18
price 6:23 18:6,12,18 48:22 49:8 50:21 53:24,25 54:7 56:10,11 63:4 69:13 93:1
prices 49:18,19 50:19 56:19
prior 39:15 60:7,11
privilege 66:13
probably 79:9,11 80:11
problem 9:13 38:7 70:20
problems 9:10,16 40:12,15 69:7
proceed 4:9 14:2
proceeded 70:1
proceeding 60:24,25
proceedings 1:13 60:9 93:15
produce 36:7
produced 35:22
product 57:19
profession 4:19 26:24 27:8,11 41:11 44:23 47:4 47:25
professional 24:21
profit 8:22 9:6,7
profitable 8:5,7 69:5
profits 8:12 10:15 68:19 70:5
progress 68:3
promise 79:17
promised 79:16
promissory 17:7
promptly 53:11
proof 33:23
properly 67:17
proposal 19:12
proposition 58:24
protective 40:16
prove 24:16 25:3
provide 12:16 31:18 36:10 44:21 91:1
provided 14:4 35:19 45:4,6,23 47:20
providing 29:24 32:8 33:23 42:23
public 33:18 34:12 35:5 37:24 38:2 41:10 44:22 47:2,4 60:8
publications 37:7
publicly 36:12
published 34:11 41:9 44:17,20,22 47:2,8
purchase 6:23 26:25 27:9,12 28:22 47:25
pure 33:23
purely 31:10
purpose 10:14 36:4 57:7,10
purposes 30:10 48:7 67:11
purview 45:25
put 8:14 17:20 31:2 33:1 34:3 43:6,22 63:19,20 63:22,24,25 68:13,25 69:3 79:19 83:8 85:4 89:12 91:4
Putin 5:6
puts 33:2
putting 30:5 85:1
P.A 1:17
p.m 26:12,16 32:15 36:16 39:20 41:24 48:16 51:15 62:4,12,20

Q

qualified 30:3
qualify 27:19 47:12,12
quarantined 10:4
question 21:13 25:8,20 45:8,9,11 51:1 54:23 55:9 84:8 86:18,19 88:18 92:19,23
questions 26:8 47:1 50:25 62:9 70:17,17,18 83:11,12 84:9
quotations 34:10 44:21
quote 89:16 91:21
quoted 92:4 93:1

quoting 24:15,15

**R**

R 93:13
range 7:18 8:12
RAS 7:24,25 9:22,24 15:10
rate 5:21 13:1,13,14 76:17
rationally 30:20
reached 18:17,20 32:20 43:2 89:11
reaching 41:13
read 53:2 54:12 59:20
reading 39:8 45:22
ready 6:15
real 25:3,11
really 46:12 78:19
reason 30:24 42:17 50:17 77:12
recalled 15:11
receivable 76:7,10
receivables 76:15
receive 14:14 15:2,4 20:19 44:16,17,19 85:3
received 3:3 12:4,23 15:4 16:18 19:21 20:21,23
   21:2,10,14,24 23:20 25:8,20 26:4 32:15 36:16
   39:20 41:24 48:16
receiving 90:9
recess 26:9,12
recognition 5:3
recognize 17:25 18:2 22:10 29:8 33:13
recognized 4:25
recommended 24:23
reconsideration 32:3
record 27:20 32:5,9 93:10
records 23:7 59:22 60:3,5
Redirect 2:13 62:3
reduce 5:2
refer 24:20 85:12
references 91:9
referring 82:19
refused 9:22 11:16 22:2 25:13
regard 19:15
Regardless 86:2
regards 85:15
register 7:4,24,25 33:8,8,16 34:21,22,22,24 35:2
   35:5,10 36:3,14,23
registered 33:7 34:25
registers 35:4
registration 8:1 21:4 87:8,13 89:3
regular 16:10 29:16 69:16
regularly 27:13 28:1
regulations 8:8 41:8 42:7
reiterated 90:11
relates 53:3
relationship 52:12,13 71:22 75:9,11,15
relevance 7:10 23:17 41:17,20 85:20
relevancy 34:6 46:11,13,23
relevant 41:21 45:7,24 46:1 58:5 66:15
relied 34:12 35:5,8 47:3 51:3
relies 48:9
rely 31:3 41:13
remaining 6:25
remember 6:19 75:24 84:25 86:18,22 90:9
reminding 10:13
rental 85:23
repaid 18:4 83:23
repair 6:8 7:15 8:21 9:8 10:13 15:17,22 16:3,7
   23:1 63:23
repairing 6:16 10:10
repairs 7:17,18,19 9:4 10:6,8 22:14 23:5 59:5,10
   69:25 70:1
repay 6:1 20:11
repeat 40:8 54:10
rephrase 75:5
report 31:3 44:11,11,14
REPORTED 2:1
reporter 2:2 54:10 86:21 93:18
Reporter's 2:16
reports 43:15
represented 73:20
request 52:11 75:1
requested 52:10 54:12
require 7:18 43:18,20
required 7:16 76:19
requirement 9:14
requires 9:4 34:19 43:8
reserve 60:9
resolve 24:14 30:10
respect 31:8 60:8 61:11 73:12
respond 92:1
response 91:25 92:23
responsible 67:16 91:13

rest 15:15 20:12 35:22 49:17
restate 39:15
restricted 78:15
result 22:22 91:20
resume 26:10 36:11
RESUMED 62:18
retained 61:2
return 14:9
revenue 58:11,18
right 13:22 18:4 26:10 46:14 50:5 52:23 54:5
   58:8 60:10 64:9 68:8,14 69:5 71:21,24 72:15
   74:15,21 77:7,10,15,25 78:2,8,17,20 79:5,14
   79:18 80:1 82:20 83:2,23 84:1,2,4,16 85:10
   85:13 86:3,5,8 89:17 91:15 92:2
rights 75:21
Riot 68:23
risk 15:20
riskless 11:5
river-type 28:9
road 14:3
role 73:11,11,14
Rotterdam 27:3
rough 77:23
roughly 6:23
ruined 19:23
rule 30:18 31:24 34:7,17 45:10 46:20,22 47:13
   55:7,8,10 66:19
rules 30:2 31:15 36:2 41:7 42:7
ruling 27:17 31:20
Rumania 33:5 39:1
Rumanian-built 38:15
running 67:21
runs 64:11
Russia 64:11 65:6
Russian 4:9 5:4,5 9:15,20 28:9
Russian-type 37:5
rusting 8:25

**S**

S 1:16
safe 62:11
safety 8:8 9:1 15:15
sail 7:16,17 10:18 49:13 68:18
sailed 6:17 7:7
sailing 8:4,8 9:2 10:14 50:1,2 78:14
salary 15:13
sale 6:6 7:2,6,23 26:25 27:9,11 28:21 47:24 85:1
   85:1,5
sales 11:7 24:20 53:12 59:24
Samuels 31:13,13,17,20
save 24:6
saying 17:5,5 19:22 46:2 81:23 85:16 91:14
   93:7
says 18:3 38:10 47:11 48:20 53:10 83:22 90:14
   90:16 91:17
scary 13:18 80:4
scheme 11:5
scientific 30:22 31:10,14,17,19,21,25
scope 30:12 88:4,7
scrap 15:21 22:24 56:18 64:15,18,21 90:20
Sea 49:12 50:2
seagoing 26:25 27:6,14
search 37:24
searches 37:23
seaworthy 64:6
second 32:2 59:18
secondly 9:17 81:18
secret 66:13
security 76:24 77:2 80:1,5,9,10 81:8 85:8
see 11:22 15:25 26:11 36:18 38:17,22 39:8 42:3
   42:7 44:5 51:25 52:24 57:5 74:2,2 87:20
   89:24 90:8
seeking 46:19
seen 47:9 52:2 59:22 60:3,4,5,5
seldom 65:1
sell 18:4 49:14 58:3 83:6,7,8,9,14,19,23,25 84:4
   84:5,6,13,14,20,22 88:20
seller 53:13 54:6,7 56:24 57:7 59:16
sellers 53:16
selling 18:5,12,18,25 83:24 84:23 85:19
send 14:17 19:14 74:15 79:7 82:6,8
sent 14:12,13,19 44:19 74:10,12 79:20 82:8
   87:25
sentence 52:24,25 59:19 73:20
September 12:22 13:23 15:6 72:1 77:20
sequence 86:16
series 23:13
service 40:9

serving 27:18
set 8:8 11:12 65:19
settle 92:6
Shalek 1:17 2:9,11,13 4:4,10 11:23 12:9,15,18
   12:19 16:15,19 17:12 18:8,11 21:22,23 23:14
   23:19,22 24:6,25 55:7,16 26:8,17 27:22,25
   29:21 30:7 31:11 32:12,16 33:20,24 34:4,14
   34:17,20 35:16 36:1,17 39:9,10,13,17,21
   41:15,18,23,25 42:25 43:13,22 44:4,6 45:13
   45:17 46:4,21,23 47:1,17 48:12,15,17 50:25
   51:2,10 54:17 55:3,5 56:5 62:5,9,15 82:18
   85:20 86:9 90:4 92:21
shape 56:1
share 18:4,6 19:3,4,20,24 20:1,3 82:11 83:23,25
shares 18:21 19:15,22 20:19,22,23 21:2 25:9,11
   25:21,25 26:4 60:8 67:4 77:3 88:1 91:7,10,11
   91:13
She'd 62:15
she's 24:11 31:7,9 32:8,23 33:23 35:19 42:23
   43:1,22 44:1 45:22 46:2 57:20,20
ship 7:2,2,6,14,20,21,22,23 8:4,6,7,11,15 9:1
   9:5,11,13,17,25 10:1,4,6,8,11,13,14 15:8,9,19
   15:21,22 16:3,4 18:5 19:9,18 21:12 22:14
   25:4,10 27:6 28:13 29:25 33:2 37:9,22 39:11
   40:3,6,9 44:11 45:15 59:6,7 63:12,14 64:23
   65:14 67:3,8,10 69:17 71:2,12 83:24 87:13
   89:2,3,4 91:15,21
shipment 65:5 69:4 78:15
shipments 65:5 69:4 78:15
shipping 1:4 4:20,21,24 6:4 14:5 16:5,7 35:1
   40:3 44:19 47:24 48:11 51:23 56:11 57:18 57:14
   57:19 64:11,14,15,18,21 65:8,9 70:10,12,13
   71:9,11 72:16 74:9 77:24
ships 5:7 7:13 9:12 10:17 24:12,20,24 28:2,5,7
   30:4 33:8,9 35:2 52:2 70:7 72:13,14 78:13,15
   84:6
shipyard 49:5
shipyards 37:15
ship-building 4:21 5:2 16:2
shorter 9:2,3
shotgun 89:16
show 37:7,25 39:9 89:21
showed 70:1
showing 46:2
shown 43:24
shows 35:14 37:13,16 48:20,20
SIDEBAR 3:18
sides 31:25
sign 76:4,6
signatory 76:1
signature 17:8 29:12,12 74:2
signed 12:22 17:7 65:24 73:17 76:25 83:1 84:18
   88:19 89:12
signing 73:25
similar 59:24
similarly 77:12
simple 92:19
simply 30:15
Singerman 1:22
single 19:16,17 85:3,8
Sinitsky 66:3,4,10 67:1,12,24 69:8 86:16 87:1,3
   87:4 91:6,11
Sinitsky's 91:13
sink 9:1
sir 4:13,19,24 5:7,10 6:19 7:3 8:4 9:22 20:22
   23:4,23 84:8
sister 45:15 49:2,4
sit 8:9 12:7 18:17 62:16
sitting 82:4
situation 78:18
six 12:25 13:13,14 16:21 76:21 81:21,24
skill 43:18,20
skilled 42:25 43:4
slow 20:18
small 57:21
smaller 56:1
societies 8:1
society 12:22 9:24 15:11 24:11
sold 5:7 18:20 48:21 49:11,21 50:7,8,9,9,19
   56:1,6,6,9 59:25 71:15 84:6 85:10 86:3 88:13
   90:20 91:15
sole 36:4
solely 53:3 57:7 61:24
somebody 47:11 51:12 52:17 70:13 87:11,21
   88:5 90:22
soon 92:6
sorry 5:8 15:23 17:22 18:8 20:24 22:15,17 25:15
   25:16,18 33:25 39:13,17 40:9 51:1 58:16
   61:21 63:13 64:19 86:16 93:2
sound 42:18

**sounds** 32:2
**source** 23:16 24:17 34:2
**South** 16:23
**SOUTHERN** 1:1
**speak** 4:8,8 17:2 54:11
**speaker** 3:23
**speaking** 40:19 55:17
**special** 4:24
**specialized** 30:23 42:25 43:4,6,18,20,25 44:3 45:4,23 47:6
**specialty** 43:8 47:6
**specific** 53:19,21,23 77:18 84:8
**specifically** 6:19 35:8 37:9 43:17 44:14,18 57:11
**spend** 59:8,10
**spending** 78:16
**spent** 15:14
**stand** 30:17 62:14
**standard** 28:24
**Star** 1:9 11:19 14:1 21:20,21,24 74:24,25 75:9 75:15,18 76:1,4,6,12 92:7
**start** 13:22
**started** 7:23 8:4 27:9,11 64:14 78:15
**starting** 59:19 65:8
**starts** 52:25
**state** 4:5 24:4 25:12 26:18 28:13 30:15 41:3,4,5 42:2,5,6,8,17 56:5 57:6
**stated** 27:23 41:17 57:11
**statement** 45:6
**states** 1:1,14 2:2,3 33:9 38:10,14 41:1,6 49:18 54:6,17 55:3 60:4 71:12 93:18
**stay** 22:2
**Ste** 2:3
**steam** 6:6
**step** 59:7
**stipulate** 16:13
**stipulated** 73:18 81:18,19,22
**stock** 85:2
**stood** 31:13
**stop** 13:17 84:7 88:5
**stopped** 9:19 13:17 78:13,15 80:6
**strategy** 25:2
**stricter** 9:15
**strike** 17:9 30:24 74:8
**stuff** 88:16
**subject** 36:9
**submit** 66:15
**sub-title** 35:23
**succeed** 20:18
**sudden** 47:9 60:16
**suffered** 9:13
**sufficient** 13:8 21:25
**suggested** 6:8 10:23 13:8 64:7
**Suite** 1:18,24 93:18
**sum** 44:1
**summer** 56:9 71:24
**summertime** 9:20
**support** 45:23
**supposed** 14:13,24 81:5 82:25 84:14
**sure** 12:8 25:6 36:12 41:7 63:18,22,24 67:16 70:19 72:17 81:23
**surety** 11:11
**surprised** 92:4
**sustained** 20:14
**swept** 84:7
**sworn** 4:2 26:14,25 27:1,5,6

---

**T**

**T** 93:13,13
**table** 2:6 11:21
**tabulations** 34:11 44:21
**take** 11:11 26:9,10 40:18 44:7 59:1 90:7
**taken** 27:2 53:4 56:23
**talk** 31:7 32:20 38:23 41:21 69:16 88:1 93:4,5
**talked** 71:18 83:13,25 91:10
**talking** 89:13
**talks** 30:19
**tear** 20:15
**technical** 15:9 30:22 65:7
**technically** 65:16 67:21,22
**technology** 5:1
**telephone** 3:22
**telexed** 17:17
**tell** 5:13 23:10 28:15 32:21 38:12,20 43:1,23 45:14,19 48:18 51:6 55:25 58:23 63:24 66:21 69:25
**telling** 27:21 36:4 44:3 49:7
**tenus** 32:3
**term** 80:20 82:1

**terms** 30:4 40:3 53:12 73:16 76:11 85:13
**testified** 30:8 62:6
**testify** 24:7 31:10 43:11 63:19
**testimony** 1:12 29:24 30:6,19,21 31:8,10,14,17 31:19,21,25 32:8,10 33:23 42:24 43:19 45:3,5 45:24 47:6 51:12 63:18 74:5
**text** 54:12
**Thank** 8:10 23:19 41:23 45:12 48:15 51:10 62:10 72:23 91:23
**that's** 9:1,4,13,18 10:3 20:3 24:17 25:23 33:19 35:12,20 38:1 42:12 43:11 45:22 47:8,13 49:24 50:11,12,14 52:22 54:4 56:23 57:16,25 58:5 61:24 65:19 66:16 72:3 75:19 82:2,5 83:22 84:2 86:20 91:17
**there's** 9:9 22:4 23:13 27:6 35:3 38:7 52:23 59:19 66:17,19 92:18 93:9
**they're** 10:17 24:7 29:23 31:25 39:6 46:2
**things** 43:24 79:23 82:3 85:19
**think** 27:16 32:9 35:3 36:12 41:18 43:9 50:13 52:5 53:23 55:10 58:5 60:1 61:15 66:13,16 72:19 80:5 88:22 93:10
**thinner** 8:25
**third** 9:18 36:22 42:1
**third-party** 34:2
**thought** 19:25 39:17 45:7 51:12 55:16 84:23 85:9 86:2 88:4,14,20,21
**three** 4:22 13:16 15:21 19:7 20:1 27:6 68:13 72:4 81:18 87:11 89:2,25 91:15 92:3
**Thursday** 36:11
**time** 3:21 5:10,20 8:24 9:22 10:11,20,23 11:23 13:4 14:14 15:1,3,14 16:20 17:14 18:13 21:7 21:11,14 24:6 26:10 31:5 32:24 39:25 46:15 46:18,20 53:17,18 54:9,23,25 56:6 57:10,13 61:2 64:22 67:10 68:4,7 69:22,24 71:7,17,20 72:10,19 76:25 77:4,6,13,18 24:7 78:12,13,25 80:8,8 82:10 83:15 84:3,5,12,15,17,19 85:24 87:3,4 88:11 90:11,24 92:2
**timely** 18:4 83:23
**times** 5:24 10:12,13 17:4 20:1 25:12 42:8,10 92:3
**tired** 8:24
**tiredness** 8:23
**today** 18:17 51:3 57:18 61:14,17
**told** 10:21 11:1,1,5 13:7 20:10,13 22:3 61:10 75:24 78:24 79:3 81:12 83:18 85:9 86:2,7 87:8,11,14,16 88:20 89:4 90:2,24
**ton** 48:22 49:16,19 50:7
**tonnage** 48:23,24
**tons** 48:22
**top** 36:22 38:10 65:6 67:3 73:20
**total** 91:11
**totally** 34:8 46:7 78:2
**touch** 14:17 22:1,2,2
**trade** 6:15 10:5 40:9
**trade-ready** 6:22
**trading** 10:14 49:12 50:16
**training** 27:8
**transaction** 90:25 91:1
**TRANSCRIPT** 1:12
**transcription** 93:15
**transfer** 14:11,18,18,25 19:4,9 75:2 79:24 87:14 89:2 91:11
**transferred** 13:25 14:1 21:4,6,9,18 67:2 74:13 79:8
**transferring** 19:22 88:1
**translated** 25:16
**translation** 22:15 81:16
**traveled** 16:20
**TRIAL** 1:13
**tried** 58:3
**trip** 62:11
**trouble** 70:18
**true** 9:12 16:6 23:4,6 29:18,20 30:7 87:18 88:14 91:2
**trusting** 89:23
**try** 13:24 25:13 54:11
**trying** 17:4,5 25:12 29:24 31:9,24,25 47:12 83:25 84:20
**Turkey** 49:22,23 50:4,5 64:12
**Turkish** 28:13
**turn** 2:2 34:7 44:25 45:9 86:25
**turned** 86:7,12,24 91:20
**turning** 15:21
**turnover** 11:7
**twice** 42:13
**two** 8:11,14 19:6,21 50:5 51:11 54:15 57:20 86:20 87:11 89:1,25 91:14
**type** 15:12 29:15 37:22,25 38:22 39:2,3 40:9 47:23 53:18 76:4

---

**U**

**Ukraine** 4:16 16:3 28:13 65:6
**ultimately** 69:5
**unable** 65:4
**underneath** 52:23
**understand** 7:14 21:13 35:21 53:9 56:10 63:18 81:23 84:10 85:14 88:17,17 89:20
**understanding** 53:10 56:2 70:18 77:13 90:18
**understood** 68:10,14 70:10 74:5
**undertaken** 59:21
**unfair** 35:24
**unfortunately** 75:7 78:7
**United** 1:1,14 2:2,3 71:12 93:18
**units** 59:24
**unofficially** 65:20
**unsecured** 78:2
**unusual** 42:11
**upgrades** 6:21
**urgently** 11:7
**use** 6:9 38:2 43:7 47:23 48:1,3,5,6,7,11 52:16 58:12 60:23 74:21
**usual** 42:12 52:16 77:15
**U.S** 32:18

---

**V**

**valuation** 28:18,25 30:5,9,14,15,16 32:17,21,24 32:25 33:1 39:12,23,25 40:1 41:13 48:9 50:11 50:12,23 52:6,14 57:1,2,7,10,17 58:6,7 59:11 59:14,15,18,25 60:7 61:13
**valuations** 28:21,24 47:24 58:7,22,23,25
**value** 19:24 20:1,8,10,15 21:12 25:3,10,11,21 25:25 28:1,11,12,15 29:7 31:10,16 33:1 40:20 43:2,23 45:7 49:16 50:20 52:15,20,23 53:6 54:5 55:16,18 56:20,22,24 57:14,18 58:13 61:16 66:15 77:13,21 92:2
**valued** 28:7 32:18 49:7 51:5 57:4 61:25
**valuing** 28:4 51:3
**various** 9:10 27:10 49:19,20
**venture** 63:5
**ventures** 63:11,16
**Vernal** 71:5
**vessel** 8:16,20,21,21 18:18 32:18,24 33:2,4,5,7 33:9 34:23 36:5,23 37:2,5,6 38:10,12,14,17 38:21,22 39:2,3,23,23,24 40:1,11,15,18,25 41:2,2 42:8,12,15,18 43:24 48:21 49:3,4,5,21 50:8,16 53:3,5,11 55:18 56:6,22 57:5,22 58:21 59:1,3,4,22,23 60:3,4,5,5 61:23 62:1 63:4 64:7,8,9,10 65:12,12 67:3 68:14 71:17,22 69:6,7,23 87:9,13 90:19 92:3
**vessels** 26:25 27:6,14 28:8,9,10,11,12 35:3,11 37:7,10,14,16,16 38:2,23 40:17 41:7 42:6 50:18 53:18 56:24 85:6
**view** 57:14
**Viktor** 73:5,11,20
**visibly** 51:25
**visited** 41:3 42:8,13
**visiting** 42:6
**Volgo-Don** 37:13,22,25 38:2,23 39:3
**Volgo-Don-type** 37:9
**vs** 1:8

---

**W**

**wait** 45:10 74:17,17,17
**waive** 46:13
**want** 41:20 46:11 55:7,8 63:18 70:19 72:17 73:9 75:12,15 87:12 89:2 90:24
**wanted** 19:3,17 21:8 24:14,17,20 25:3 27:19 57:23 75:13 79:9,11 80:13,16 83:4 90:22,22
**wasn't** 43:12 84:5,15 87:18
**waste** 90:24
**watch** 62:16
**way** 11:19 36:13 37:1,1 44:18 49:13 58:25 61:25 75:10 78:11,13 83:5,13,16,19 90:19
**ways** 37:4
**weaker** 9:8
**wear** 20:15
**wears** 12:6
**website** 40:24
**week** 19:1 32:4 43:16
**weeks** 13:17 19:21
**went** 10:15 19:1 20:15 66:6 83:2
**weren't** 56:25
**we'll** 16:13 26:10 44:4
**we're** 31:23 38:16 59:15
**we've** 41:18 43:24
**what's** 41:21 47:14 59:4
**wheat** 64:11,14 65:4,4,5,8,9,14
**white** 7:16
**willing** 53:13,13,16,16 54:6,6,7,21,22 56:24

57:1,6,9,21,25 59:15 61:14,15 87:16
**wintertime** 9:21
**wish** 32:9
**Withdrawn** 45:12
**withdrew** 9:24 78:16
**witness** 26:14 27:18 30:2,19,21,21 31:22,22
35:18 43:14 46:3,17 54:9 62:12,13 70:16
92:22,22
**won** 4:25
**Wonderful** 88:24
**won't** 40:18
**words** 78:25
**work** 22:17,18,19,20,22 27:4,10 28:23
**worked** 27:10 85:22
**working** 76:13
**works** 19:6 23:12 30:5
**world** 7:12 35:1 49:17 56:12,14
**worse** 56:17
**worth** 7:15,17 50:13,15 58:19 59:6 88:21
**wouldn't** 68:25 78:21 81:20 82:4
**write** 17:15 73:1 88:15 89:13 91:24,25 92:9,11
92:15,19,25 93:6
**writing** 18:6,7,13 19:17 79:17,19 80:22 82:2,3,4
83:25 89:12 91:5,8
**written** 18:18,22 90:21,22 91:1,4
**wrote** 53:9 73:2 80:21 91:18

**X**

**Xeroxed** 35:23

**Y**

**yeah** 63:10,10 78:22
**year** 6:12 8:13 15:8 16:21,24 36:4,23 39:22
57:12,20 60:22 61:6 65:5
**years** 4:21 5:4,16 6:5,17 8:12,14,19 16:21 20:13
20:14 40:4 42:9,13 57:20 58:22 63:2,6 64:11
68:13 71:4 75:14
**younger** 40:17
**you'll** 43:18 65:8
**you're** 32:5 44:2 46:19 49:7 60:17 72:15,17
82:20 92:9
**You've** 70:18

**$**

**$1** 6:23 7:14 20:13
**$1.2** 86:5,7,10,12,24
**$1.4** 61:15
**$1.5** 55:1 66:25 87:7,17 89:6,16 90:20
**$100,000** 6:7,13 11:8 63:22
**$150,000** 11:8,10
**$2,000** 8:13
**$200,000** 25:12,25
**$217,171** 23:2,24
**$3** 7:18
**$349,000** 50:10
**$380,000** 50:24
**$400,000** 13:10 20:21 21:18,24 26:4 52:21
**$50,000** 6:14,14
**$750,000** 12:21,23 19:24 72:1 91:11
**$8** 7:17
**$9,000** 24:3
**$9,043** 24:5
**$960,000** 57:12
**$98,000** 23:13

**1**

**1** 3:5 12:1,4 13:11 17:23 18:9 80:24 81:15 82:7
82:10,23 88:19
**1st** 65:8
**1,150,000** 13:9 72:7
**1.2** 54:20
**1.4** 61:19,22 87:1
**1.5** 88:13,21 90:2,3,12
**1.6** 56:2
**1:00** 26:10,11
**1:07** 26:16
**1:16** 32:15
**1:22** 36:16
**1:26** 39:20
**1:29** 41:24
**1:39** 48:16
**1:42** 51:15
**1:59** 62:4,12
**10** 5:21 20:25 21:14 50:20,22 63:6 72:13,14
75:14
**10-21612-CIV-Altonaga** 1:3
**1000** 1:24
**11** 6:5

**2**

**2** 13:2 52:5 74:22
**2,094** 48:25
**2:00** 62:20
**20** 3:7 22:7 23:15,20,23 89:13
**200,000** 20:11
**2002** 6:17 7:23 8:16 25:11,16
**2004** 42:9
**2007** 9:12
**2008** 9:24 10:3,4,24 12:22 15:18 16:8 22:23 56:9
64:24 67:3,16 71:24 72:2 77:20
**2009** 12:25 16:20,25 17:3 21:17,18 25:20,23
42:9 51:4,5,9 52:21 53:4,7,15,20 54:14 56:14
56:19 57:16,17 63:2 64:24,24 65:24 76:22,23
76:23 84:12,18 85:4 89:10 91:9
**2010** 28:17
**2011** 1:8
**21** 3:7,7,12 22:8 23:2,15,20,25 24:2
**215** 48:22
**217,181** 24:1
**22** 3:7 22:8 23:15,20
**23** 3:7,7 22:8 23:15,20
**24** 1:8 3:7 22:8 23:15,20
**25** 3:11 5:9 28:6 40:4 53:7 66:3,3,4,8,25
**25th** 52:21 53:4 84:12,18 85:4,7 89:9,12
**25,000** 21:2
**250,000** 20:11
**26** 2:10,11
**27** 3:7 23:11,15,20
**270,000** 8:13
**28** 3:8 29:6 32:15

**3**

**3** 17:22
**3:00** 88:5
**30** 5:2
**30,000** 15:13
**30-years-old** 7:13
**300** 5:4
**305.523.5518** 2:4 93:19
**305.523.5519** 2:4 93:19
**32** 3:8
**33021** 1:19
**33128** 93:19
**33128-1810** 2:4
**33301** 1:24
**34-years-old** 8:17
**350** 1:23 28:24 32:18 42:20 61:17
**350,000** 52:20
**36** 3:10
**375-South** 1:18
**39** 3:12

**4**

**4** 2:8,9 28:10
**4th** 65:24
**40-year-old** 68:20
**400** 2:3 93:18
**400,000** 32:19 42:21 61:18 72:4 78:5
**4000** 1:18
**41** 3:11
**41-years-old** 40:1
**45** 3:9 44:7 48:16
**46** 3:10 33:10 35:13 36:16,18 39:14,17
**48** 3:9,11 40:21 41:15,24
**49** 3:12 37:18,21,22 39:16,17,20

**5**

**5** 3:5 81:5 87:5
**5th** 6:17 12:22,25 72:1 81:10 91:9
**5,000** 28:8
**50** 65:23 66:2 82:11
**500** 28:10,10
**500,000** 6:25 7:1
**5002** 38:11
**51** 2:12
**53** 4:14
**54** 90:7 93:10

**6**

**6/24/11** 51:15 62:4,20
**62** 2:13,14,15

**7**

**7** 7:17
**70,000** 35:3,19
**701** 30:19 31:24
**702** 47:13
**750,000** 72:6

**8**

**8** 14:10 44:25 45:10 48:18,20 52:5 72:13 81:5
**8th** 76:22,23,23 81:10,11
**803** 34:17
**803(17)** 34:8,10 41:19 46:5,23,25 47:7,9,12,13
47:15

**9**

**9** 14:21,23 49:15,18
**9th** 81:6
**93** 2:16
**954.525.9900** 1:25
**954.966.1820** 1:19
**97** 23:12

June 24, 2011