```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                        MIAMI DIVISION
 3                  Case 10-21612-CIV-Altonaga
 4
    PALADIN SHIPPING CO., LTD.,
 5  a Florida corporation, and.
    ANATOLIY CHABAN,
 6
                  Plaintiffs,
 7
                                          MIAMI, FLORIDA
 8      vs.
                                          JUNE 30, 2011
 9  STAR CAPITAL FUND, LLC, a
    Florida Limited Liability
10  company,
11                  Defendant.
    _____
12        TRANSCRIPT OF CONTINUED NONJURY TRIAL PROCEEDINGS
                 BEFORE THE HONORABLE CECILIA M. ALTONAGA,
13                  UNITED STATES DISTRICT JUDGE
14  APPEARANCES:
15  FOR THE PLAINTIFF:
16                      GARY PHILLIPS, ESQ.
                        JEFFREY B. SHALEK, ESQ.
17                      Phillips Cantor & Berlowitz, P.A.
                        4000 Hollywood Boulevard,
18                      Suite 375-South
                        Hollywood, FL 33021 - 954.966.1820
19                      gphillips@phillipslawyers.com
                        jshalek@phillipslawyers.com
20
    FOR THE DEFENDANT:
21
                        CHARLES H. LICHTMAN, ESQ.
22                      Berger Singerman
                        Las Olas Centre II
23                      350 East Las Olas Boulevard,
                        Suite 1000
24                      Ft. Lauderdale, FL 33301
                        954.525.9900
25                      clichtman@bergersingerman.com
```

```
1  REPORTED BY:

2                      BARBARA MEDINA,
3                      Official United States Court Reporter
                       United States Federal Courthouse
4                      400 North Miami Avenue, Ste. 12-2
                       Miami, FL  33128-1810    305.523.5518
5                                     (Fax) 305.523.5519
                       barbara.medina127@gmail.com
6
                              - - - -
7                       TABLE OF CONTENTS
```

8                                                      Page

9  Anatoliy Chaban ........................................ 4

10     Cross-Examination By Mr. Lichtman ................... 4

11     Redirect Examination By Mr. Shalek ................. 65

12     Recross-Examination By Mr. Lichtman ................ 69

13  Leon Goldstein ........................................ 70

14     Direct Examination By Mr. Phillips ................. 70

15  Reporter's Certificate .............................. 138

```
16

17                      INDEX TO EXHIBITS

18  Exhibits                    Marked for        Received
                                Identification    in Evidence
19
    Description                 Page    Line    Page    Line
20

21

22                        CITATION INDEX

23                                                      Page

24

25                    SIDEBAR CONFERENCE INDEX
```

1  Descriptions                                          Page

2                    ADMINISTRATIVE CONVENTIONS:

3          When counsel does not identify themselves each time they

4  address the Court during a telephone conference, the

5  industry-standard speaker identification is indicated by

6  chevrons, i.e., >>>:

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  Good morning.  My apologies for keeping

2  you waiting.  Whenever you wish to proceed.

3    MR. LICHTMAN:  Your Honor, may Mr. Goldstein sit up

4  there?

5    THE COURT:  Sure.

6    Be seated.

7    ANATOLIY CHABAN, PLAINTIFF,  RESUMED THROUGH INTERPRETER

8    CROSS EXAMINATION (cont'd)

9  [Beginning at 11:27 a.m., 6/30/11.]

10    MR. LICHTMAN:  Good morning, Judge.

11    THE COURT:  Good morning.

12    MR. LICHTMAN:  For the record, Chuck Lichtman, of

13  Berger Singerman, for the defendants.

14  BY MR. LICHTMAN:

15  Q.  Good morning, Mr. Chaban.

16  A.  (Through Interpreter):  Good morning.

17  Q.  I want to go back to something that you testified about

18  last week in trial.  You said that you had begged or asked

19  Mr. Goldstein for a meeting repeatedly about, talking about the

20  loan.  Correct?

21    MR. SHALEK:  Objection, Your Honor.  Time.

22    THE COURT:  Overruled.

23  A.  Yes.

24  Q.  And that he finally agreed to meet with you an hour before

25  you were going to leave.  Is that right?

5

Chaban - Cross

1  A.  No.  I had a meeting several times, but I didn't get any

2  chance to talk about the subject that is of concern to me.  He

3  kept saying "We're going to discuss it later.  Let's discuss it

4  later."

5  Q.  Indeed, you stayed at his unit at the Pinnacle apartments

6  as his guest.  Isn't that true?

7  A.  I was staying as a guest, not with him, but with his

8  cousin.

9  Q.  And he arranged for you to stay with his cousin.  Is that

10  correct?

11  A.  No.  I was communicating directly with him.  I was in touch

12  with him and we were friends.  It was him that introduced me to

13  Mr. Goldstein.

14  Q.  And during that course of time that you stayed in his

15  cousin's unit, you regularly had dinner with Mr. Goldstein.

16  Right?

17  A.  No.  We met a couple of times at mutual friends' place, but

18  it was very hard for us to have meaningful talk.

19  Q.  A mutual friend's place or Mr. Goldstein's cousin's place?

20  A.  Once Mr. Goldstein came for his personal business.  He had

21  like a case with the owners of the building with regards to

22  their repairs to the unit.  His roof was leaking and he, like,

23  wanted me to help him with that and he wanted to sue the

24  owners, but I said that I'm not going to deal with it.

25          He wanted me to testify that I wanted to buy the unit,

Chaban - Cross

1   but I didn't go ahead with the purchase because of the bad

2   shape the unit was in.

3   Q.   It was you that said to Mr. Goldstein only an hour before

4   you were leaving that you asked for the pledge.  You never

5   asked for it any sooner than that last hour.  Isn't that true?

6   A.   I was asking sooner than that, but we were able to have a

7   meaningful conversation only an hour before I left.

8   Q.   If you were asking sooner, when was it because you just

9   testified you were having difficulty having any meaningful

10  discussion with him.  So, when was it that you were asking for

11  the pledge?

12  A.   He wouldn't let me have a meaningful conversation.  At

13  first, he was mad at me for something.  For a week and a half I

14  had been calling him on the phone suggesting that we meet

15  because it's a serious matter.  But then he came by in his car,

16  so we were able to talk for 5 or 10 minutes in his car.

17       I asked him to sign -- to make a note for me.  It was

18  one day before my departure and we made an arrangement that he

19  will come to me before the departure because allegedly he

20  didn't have any other time to do.

21       He came.  We spoke for maybe 30 or 40 minutes.  He

22  made the pledge, a note for me, and I left.  It was in front of

23  my family, my daughter, who is here.

24  Q.   So, you did talk about it the day before also.  Right?

25  A.   We tried to.  I suggested it to him.  He told me that he's

Chaban - Cross

1  going to think about it.

2  Q.  Now, you stayed at his unit in the Pinnacle, unit 3302,

3  also.  Correct?

4  A.  No, I was staying in the apartment of Mr. Godson (ph.) in

5  another apartment that was rented by another person --

6  Q.  Let me be --

7  A.  -- because although I made an arrangement with his cousin

8  that I'm going to stay there, he put in his friends to stay in

9  the apartment.  That's why I didn't have any other option.  I

10  had to stay for a while in the apartment with his friends.

11  Q.  Let me clarify.  There have been other times you stayed in

12  his unit, 3302.  Correct?  That's a "Yes" or "No" answer.

13  A.  I don't remember the other times I've been staying with

14  Mr. Goldstein.  I mean, with his, with Mr. Goldstein's brother.

15  Q.  Okay.  I wanted to ask about something else now.  I'm

16  unclear.  Exactly how much money did you spend to repair the

17  CHALSI?

18  A.  It is not here?

19  Q.  The book?

20  A.  I'm sorry.  The costs are here.  The rundown, of course, is

21  here.

22  Q.  Well, you tell me.  How much did you spend?

23  A.  You have to add up the costs rundown because it consists of

24  many papers, documents.

25  Q.  Are you telling me here today you don't know how much you

1  personally spent to repair the CHALSI?

2  A.  Approximately.  It's approximately $400,000, even more with

3  all the expenses.

4  Q.  Was it 400 or was it 600?

5  A.  400 or 500.  You have to sit down and make the

6  calculations.  I have 10 vessels.  I am fixing them all the

7  time.  I cannot remember all the numbers.

8  Q.  But you're not in litigation on 10 vessels right now, are

9  you.

10  A.  I cannot remember the number.  I was not asked to remember

11  all the numbers.  Cost rundowns consists of 11 different cost

12  estimates.  The bookkeeper knows the exact amount.

13  Q.  I'd like you to return to Exhibit 18 please.

14  A.  (Complied.)  I looked at it.

15  Q.  This is the contract that you approved for the repair of

16  the ship.  Right?

17  A.  Okay.

18         You see at the top right corner there's a date?

19  A.  Yes, I see the date.

20  Q.  And what is the date?

21  A.  June 10th, 2009.

22  Q.  The exhibit that I have, Exhibit 18, shows December 15th

23  2008.

24         MR. PHILLIPS:  Your Honor, he asked about the top

25  right corner.  There's a fax date.  I think --

1    MR. LICHTMAN:  I don't have the document that even has

2    the fax date.

3    MR. SHALEK:  Your Honor, the Russian copy -- when we

4    gave them a copy of the book both, the Russian copy and the

5    English translation was included.  He's reading -- Mr. Chaban

6    has the Russian copy.

7    MR. LICHTMAN:  Oh.

8    BY MR. LICHTMAN:

9    Q.  All right.  We understand the confusion.

10         The date of the contract is December 15th, 2008.

11   Correct?

12   A.  Yes.

13   Q.  Okay.  Now, you testified last week that the value of the

14   CHALSI was $200,000.  Do you remember that?

15   A.  Yes.

16   Q.  Okay.  If the CHALSI was worth $200,000 --

17   A.  400, 380.

18   Q.  You testified 200,000.

19   A.  My half or his half?

20        MR. LICHTMAN:  Can I have one moment, Your Honor?

21   BY MR. LICHTMAN:

22   Q.  You remember when you were testifying last week?

23   A.  Yes.

24   Q.  Page 25, line 8 of your testimony.

25        Mr. Shalek, your attorney said:

```
 1              "Mr. Chaban, one final question:  When you received
 2         the shares of the CHALSI in March of 2009, what did you
 3         believe the value of the ship was?"
 4              Do you remember the question?
 5    A.   No, I understood it was for the value of shares.  The value
 6    of shares was 200,000.
 7    Q.   You remember the question?
 8    A.   I don't remember the question.
 9    Q.   You answered:  "In March of 2002, the maximum real value of
10         the shares was $200,000."
11   A.   Yes, the shares that were transferred to me.
12   Q.   The shares, not the boat?
13   A.   The vessel belongs to the company.
14   Q.   You attributed the value to the shares or to the boat?
15   A.   50 percent of the shares were transferred as 50 percent of
16   the vessel.
17   Q.   Your lawyer asked you what the value of the CHALSI was.  He
18   didn't ask you what the value of Dexter was, did he?
19              MR. SHALEK:  Your Honor.  Objection.  Argumentative.
20              My question isn't the testimony.  The testimony is
21   very clearly he's estimating the value of the shares.  I don't
22   see the confusion.
23              THE COURT:  Overruled.
24   BY MR. LICHTMAN:
25   Q.   What did you value the boat at?
```

1  A.  The value of the whole vessel was, at most, $400,000.  The

2  shares of Mr. Goldstein were valued at $200,000.

3  Q.  So, the value of the boat was 400,000 and the value of the

4  shares was 200,000 and you attribute the same value total of

5  200,000.  Is that it?

6  A.  I didn't understand the question.

7  Q.  Did you attribute a total value of the boat and the shares,

8  the 50 percent interest, to be $200,000?

9  A.  Yes.

10  Q.  Then on December 15th, 2008, why did you sign a contract to

11  repair the boat where you ultimately spent, at least by your

12  testimony, more than double that to repair the boat?

13  A.  What do you mean more than twice the amount?

14  Q.  You testified that you spent you think that it's about

15  $400,000 in repairs?

16  A.  It's not more than twice.  It's the amount the vessel was

17  worth.

18  Q.  You spent $400,000 in repairs.  Isn't that what your

19  testimony was a couple of minutes ago?

20  A.  Yes, yes, it was $400,000, and the vessel was worth

21  $400,000, according to our estimate.  So, it's equal value, but

22  not more.

23  Q.  So, the maximum you spent -- so, you spent the same amount

24  that you thought the ship was worth to repair the ship.  Is

25  that what you're saying?

```
 1   A.  Yes.
 2   Q.  And you did that --
 3   A.  Maybe even more.
 4   Q.  And you signed the contract to do that on December 15th.
 5   A.  Yes.
 6   Q.  And you had not yet been to Florida to ask Mr. Goldstein
 7   for the pledge of the CHALSI, did you?
 8   A.  He promised to me to give it to me.
 9        MR. LICHTMAN:  Objection.  Move to strike.
10   Nonresponsive.
11   A.  Can I say something?
12   Q.  No.
13   A.  The last question, I wanted to answer it.
14        THE COURT:  Overruled.
15   A.  He kept promising the money is forthcoming, that he's about
16   to pay the debt back, that everything is going to be okay.
17        MR. LICHTMAN:  I restate the objection, Your Honor.  I
18   asked him a very specific question, which was "You knew that
19   you had signed the contract to make the repairs on the ship
20   before you had visited Florida."  I didn't ask him anything
21   about his conversations with Mr. Goldstein.
22        THE COURT:  I understand.  This is a bench trial.  Ask
23   it again.
24        MR. LICHTMAN:  Okay.
25        THE COURT:  I've heard the answer.
```

1    BY MR. LICHTMAN:

2    Q.  Listen closely to my question, Mr. Chaban.  You had signed

3    the contract to repair the ship in December which was a month

4    before you came to Florida to talk with Mr. Goldstein about the

5    pledge of his stock.

6    A.  Before I came to Florida, I didn't have any doubts

7    regarding his pledge.

8    Q.  But you signed the contract to make the repairs before you

9    even came to Florida.

10   A.  Yes, I signed the contract.

11   Q.  And you knew that when you signed the contract to make the

12   repairs, it was going to increase the value of the ship.

13   Correct?

14   A.  Of course.

15   Q.  Well, so, you knew the value of the shares wouldn't have

16   been $400,000, but it would have been a figure, some other

17   figure based on what the value was after the ship was repaired.

18   Right?

19   A.  Of course.

20   Q.  And after the ship was repaired, you continued to use it

21   for commercial purposes.  Correct?

22   A.  That's correct.  Everything is correct.

23   Q.  So, then you came to Florida and Mr. Goldstein and you

24   agreed that Mr. Goldstein would give you the pledge of the

25   shares.  Right?

```
 1  A.  No.  He said -- he just told me that "If I don't give you
 2  the money back, I'll allow you to sell my share in the vessel."
 3  That's what the pledge was about.
 4  Q.  You didn't consider Exhibit 16 to constitute a pledge of
 5  the shares of Dexter and his interest in the boat?  It was
 6  collateral.  Didn't you say that last week?
 7  A.  What is 16?  What is the pledge?  Say it again.
 8  Q.  You have the documents in front of you.  It's the document
 9  titled "Contract" that's signed January 25th, 2009.
10          MR. PHILLIPS:  The Russian version is Exhibit 1.
11  BY MR. LICHTMAN:
12  Q.  Exhibit 1, please.
13  A.  You mean the document was signed --
14  Q.  Exhibit 1, Exhibit 1, Mr. Chaban.  Forgive me.  I'm working
15  off of English and you're are working off of Russian.
16  A.  I'm sorry.  I didn't understand you.  I misunderstood you.
17  Q.  Exhibit 1.
18  A.  Yes, I see it.
19  Q.  You understood that to be a pledge of Mr. Goldstein's
20  interest in the boat.  Correct?
21  A.  It was a document pledged from Mr. Goldstein to pay back
22  the money and only in the case if something doesn't work out, I
23  have the right to sell his interest in the vessel with the
24  stipulation in writing and getting his approval and stipulating
25  preliminarily the price and writing with him.
```

1  Q.  Did you or did you not agree with Mr. Goldstein that you
2  now had a security interest in the boat?
3  A.  So, did I agree that I had a security --
4  Q.  Did Mr. Goldstein agree that he was giving you a security
5  interest in the boat and isn't that what you wanted?  You
6  wanted collateral.
7  A.  He wrote to me that I had the right to sell his share in
8  the vessel.
9  Q.  You don't want to answer that question, do you?  You don't
10  want to answer that question, do you?
11          MR. SHALEK:  Objection.  Argumentative.
12          THE COURT:  Overruled.
13  A.  It's just hard for me to grasp the question.  Could you
14  clarify what you mean by your question?
15  Q.  A security interest.  You know what a security interest is,
16  don't you?
17  A.  I don't know the legal terminology.
18          MR. LICHTMAN:  Could I have one moment?
19  BY MR. LICHTMAN:
20  Q.  Do you know what a mortgage is.
21  A.  Yes.
22  Q.  Do you know what a lien is?
23  A.  Yes, I know.
24  Q.  Tell the Court what your understanding of a lien is.
25  A.  If something is given as a lien, so the liened property is,

1    like, arrested or frozen and cannot be sold, as far as I know.

2    Q.   It serves as protection for the lender.  They have an

3    interest in the property.  You agree with that?

4    A.   Yes.  If the lien is processed officially, is registered,

5    then there is a guaranty, yes.

6    Q.   Did you understand this contract with Mr. Goldstein,

7    Exhibit 1 and Exhibit 16, to be a lien?

8    A.   It was not a lien.  It was just a pledge or a note that I

9    have the right to sell.  Nothing has been registered

10   officially.

11   Q.   Did you think that this was supposed to be collateral?

12   A.   So, I asked him to write it so that I have some kind of a

13   pledge, a note, some kind of a document that obligates

14   Mr. Goldstein to honor his debt because he was asking for the

15   money.  He wrote the pledge while the money had been

16   transferred to Star Capital at his direction.

17   Q.   I asked you if you expected the note to help provide you

18   with collateral.  I didn't ask you anything else.  So, please,

19   just try to answer my questions.

20   A.   I believe that it give me a chance to claim having

21   collateral.

22   Q.   So, the answer is "Yes"?

23   A.   I gave you my answer.  I believe it gave me the right to

24   count on collateral.

25   Q.   A chance for collateral.  Is that what you said?

1  A.  Yes, a possibility, yes.  There was some possibility.  Yes,

2  it arose.

3  Q.  Now, I'm going to be back to your testimony last week.

4      MR. LICHTMAN:  Page 17, counsel.  You have transcript.

5  Right?

6      MR. PHILLIPS:  Yes.

7  BY MR. LICHTMAN:

8  Q.  I need to start at the top to put in context the answer.

9  I'm going to read starting at line 2.

10     "Question:  And did you have any opportunity to speak

11     with Mr. Goldstein about the CHALSI in 2009 when you were

12     in Miami?"

13     Your answer was:

14     "Answer:  Yes, I've been trying several times to get

15     ahold of him, but he is been trying to avoid saying,

16     conversation saying, 'Later, later,' and finally one hour

17     before my plane left, I convinced him to meet and he signed

18     a promissory note with his own signature."

19     I moved an objection to strike, nonresponsive, and the

20  Court overruled the objection.

21     Mr. Shalek continued, line 13, with:

22     "Question:  Can you describe the conversation that you

23     had with Mr. Goldstein at that time?" and you answered --

24     here's where we're starting to get in context -- you

25     answered at line 15:

1          "Answer:  I asked him to write like a personal note to

2      me and he said 'Why do you need such a note from me?  You

3      already have a note that I telexed to you.'

4          "I agreed to extend the deadline for the amount of

5      credit that he took from me and in exchange for my

6      extending the deadline, he agreed to put this note as a

7      collateral for CHALSI."

8          Do you remember that answer?

9   A.  Yes.

10  Q.  So, was it collateral or was it not collateral?

11  A.  It's hard for me to understand the word.  It translates as

12  "collateral."  We don't use this kind of term.

13  Q.  That was your term.  That wasn't my term.

14          MR. PHILLIPS:  Objection, Your Honor.  It was the

15  translator's term.  We have another Russian-speaker here.

16          THE COURT:  Overruled.

17  BY MR. LICHTMAN:

18  Q.  You used the term "collateral" just a few minutes ago

19  yourself, didn't you?

20  A.  I was using the word "lien."  I was using the word "lien."

21          Yes, I considered that I got a chance, some kind of

22  chance of security to go for a collateral or to obtain a

23  collateral.

24  Q.  I used the word "lien."  You didn't use the word "lien."  I

25  used the word "lien."

Chaban - Cross

1  A.  Lien?

2  Q.  You've been in the shipping business for 30 years.

3  A.  I have been 15 years in the shipping business.

4  Q.  You have 10 boats.

5  A.  Yes.

6  Q.  Do you have other business interests, too, I presume?  I'm

7  not going to ask what they are, but do you have other business

8  interests as well?

9  A.  Yes.

10  Q.  And you don't know what the word "collateral" means?

11  A.  We don't have this kind of term.  We use the term "lien."

12  For the first time I hear the word "collateral".  We use the

13  word "lien."

14  Q.  You understand what the word "lien" is?

15  A.  Yes.

16  Q.  Okay.

17       MR. LICHTMAN:  Your Honor, may I have a word with

18  Mr. Firer?  He speaks Russian and he's talking about a problem

19  with the translator.

20       THE COURT:  Yes.

21       MR. LICHTMAN:  Your Honor, I don't know quite how to

22  address this.  I have never had this occur before.

23       Mr. Firer, who speaks Russian, tells me that there's

24  an issue with the translator.  He says that the word that is

25  being used is a Russian word.  I'll pronounce it.  It's called

Chaban - Cross

1  "zalog" (ph.) and "zalog" specifically means collaterally.

2       I'm clueless as to what to do.  Apparently, there's

3  something getting lost in translation here.

4       MR. PHILLIPS:  Your Honor, I would just object.

5       I would object.  Mr. Firer is not a certified

6  translator.  He can testify later, I guess, on the witness

7  stand -- you can't hear me?  I'll try again.

8       I have someone who speaks Russian, too, and she's

9  telling me there's no word for "collateral" in Russian.  So,

10  there's a dispute as to that.

11       THE COURT:  I can't resolve it.  I don't speak Russian

12       MR. LICHTMAN:  I assumed that Mr. Shalek is going to

13  be doing the objections.  He handled the witness.  Right?

14       MR. PHILLIPS:  I apologize.

15  BY MR. LICHTMAN:

16  Q.  Do you understand the word "zalog?"

17  A.  Yes.

18  Q.  What is zalog?

19  A.  So, a lien is when some property is liened, as a lien.

20  We're allowed to sue in the future.  The property is going to

21  be seized through a notary initially.  The person cannot sell

22  the property, and during the court proceedings it turns out to

23  be something -- I don't know how to call it -- some kind of a

24  property that is security.

25  Q.  When you went back to Russia and you had Exhibit 1, I

Chaban - Cross

1  assume you took the original.  Correct?

2  A.  Yes.

3  Q.  And you went back thinking that you had a lien or

4  collateral, whatever, on the CHALSI, you had an interest, a

5  protectable interest in the boat now.  Right?

6  A.  I would like the attorney to understand that it was just a

7  part of the lien, a very small part of the lien, but I was

8  still concerned for the bulk of the amount because I heard Star

9  Capital had some very serious problems.

10        MR. LICHTMAN:  Objection.  Move to strike.

11  Nonresponsive.

12        Your Honor, I understand it's a bench trial, but he

13  clearly evades answers -- questions -- as he wishes.

14        THE COURT:  Ask it again and please answer the

15  question directly.

16  BY MR. LICHTMAN:

17  Q.  Do you understand the Judge's direction to answer the

18  question directly?

19  A.  Yes.

20  Q.  When you went back to Russia, you went back with an

21  understanding that you had some kind of lien or collateral or

22  protectable interest in the boat.  Right?

23  A.  Yes, I had a lien for partial collateral.

24  Q.  And that was important to you because a month earlier you

25  had already started the process of repairing the boat --

Chaban - Cross

1    right -- the contract?

2    A.  I started the repairs even before the conversation with

3    Mr. Goldstein back in December.

4    Q.  So -- exactly.  You started the repairs when you signed the

5    contract.

6    A.  Yes.

7    Q.  And then there came a point in time where you had some

8    negotiations or discussions with Mr. Goldstein about offers to

9    sell the boat.  Right?

10   A.  Yes.

11   Q.  And then there came a point in time where Mr. Goldstein

12   sent you the title.  Right?

13          MR. SHALEK:  Your Honor, there's no title in evidence.

14   BY MR. LICHTMAN:

15   Q.  Let me be more clear.  He sent you the instrument of

16   shares, Exhibit 10.  Right?

17   A.  Yes.

18   Q.  And why did he do that?

19   A.  I didn't have any other option because had I not done that,

20   the vessel would have been scrap.  I wanted to get back at

21   least some part of the amount because the rest of the amount

22   was not even discussed because when I asked Mr. Goldstein when

23   the money is going to be coming, he said "I don't know."

24   Q.  Excuse me.

25          MR. LICHTMAN:  Again, objection.  Move to strike.

 1          Your Honor, he repeatedly does not answer questions

 2  I'm asking.

 3          THE COURT:  I'm not going to be striking testimony

 4  because I am the trier of fact and I will ascertain what is

 5  relevant for purposes of my decision.

 6          MR. LICHTMAN:  Okay.  Thank you.

 7  BY MR. LICHTMAN:

 8  Q.  When Mr. Goldstein tendered to you Exhibit 10, he did that

 9  to honor his word in conjunction with Exhibit 1.  Correct?

10          THE INTERPRETER:  I'm sorry.  Would you, please,

11  repeat the question?

12  BY MR. LICHTMAN:

13  Q.  He did that in conjunction with Exhibit 1.

14  A.  I don't understand the question.

15  Q.  Okay.  Perhaps, I'll break it down.  I'm sorry.

16  A.  Thank you.

17  Q.  Exhibit 1 was the pledge.

18  A.  Yes.

19  Q.  And Exhibit 10 was where he gave you the boat back.  Right?

20  A.  Yes.

21  Q.  And you accepted Exhibit 10.

22  A.  Like I said before, I accepted it because I didn't have any

23  other option.  I asked him to send me money and he just gave me

24  a document instead, a document for the boat.

25  Q.  So, you took the boat, actually.  Correct?

1  A.  Yes.

2  Q.  In fact, you had the boat.

3  A.  Yes, I had the portion of the boat he transferred to me.

4  Q.  You had the physical custody of the boat.

5  A.  Yes.

6  Q.  And you were getting the boat repaired.  Correct?

7  A.  Yes.

8  Q.  And you got the boat repaired?

9  A.  Yes.

10  Q.  And you kept using the boat for commercial purposes.

11  Right?

12  A.  Yes.

13  Q.  You haven't sold the boat.

14  A.  I couldn't sell it.

15  Q.  You never sold the boat, though.  Right?

16  A.  I tried several times, numerous times to do it, but,

17  unfortunately, it didn't work.

18  Q.  Do you have any broker agreements that you brought with you

19  to court?

20  A.  No.

21  Q.  You put money into the boat and that improved its value.

22  Correct?

23  A.  Yes.

24  Q.  How much was the boat worth in the summer of 2009?

25  A.  Nothing, because nobody was giving anything for it so far.

Chaban - Cross

1   Maybe 500, but no money was offered.  We had been putting it

2   numerous times on the brokerage sites, but it wouldn't sell.

3   Q.  Do you have any proof, as you sit here today, that you

4   actually tried to list the boat with a broker?

5   A.  Here, no.  So -- but over there, I do.

6   Q.  So, you took a boat that was worth $400,000 and you put

7   another $400,000 into it and then you say the boat was worth

8   $500,000 in the summer?

9   A.  Nothing was offered.  I think I could have sold it for 500

10  or 600.

11  Q.  Is that --

12  A.  But I was not prepared to sell for the money.

13  Q.  You were not prepared to sell the boat for 500,000?

14  A.  I already said that I had no plans to sell it.

15  Q.  And you certainly weren't prepared to sell the boat for

16  400,000.

17  A.  No.

18  Q.  And the boat was continuing to be used in commerce in the

19  summer of 2009 and thereafter.  Right?

20  A.  Yes.

21  Q.  How much was the boat worth at the end of 2009?

22          MR. SHALEK:  Objection, Your Honor.  Relevance.

23          THE COURT:  Overruled.

24  A.  I did not put an estimate to it at the end of 2009.

25  Q.  Do you know how much the boat is worth today?

1  A.   No.

2  Q.   But it has continued to be used in commerce?

3  A.   Yes.

4  Q.   And it's not listed for sale now.  Correct?

5  A.   At this time, no, because the market is coming up now.

6  Russia finally allows the export of wheat, of grains, and we

7  are anticipating in three or four months the value of the

8  vessel will go up and we're going to try to sell it enough to

9  cover our losses.

10  Q.   Did you prepare any internal documents at Paladin that

11  valued the boat?

12  A.   No.

13  Q.   Did you ever prepare any internal documents with

14  Mr. Sinitsky where you valued the boat?

15  A.   When?

16  Q.   At the point in time when you were negotiating with

17  Mr. Sinitsky over the debt that he owed you.

18  A.   Yes.

19  Q.   What kind of document did you prepare?

20  A.   He just gave to me -- he just gave to me property in lieu

21  of that, and on top of that I covered or paid off other debts

22  for him.

23  Q.   Did you prepare any internal bookkeeping ledger-type

24  documents that valued the CHALSI in connection with

25  Mr. Sinitsky's debt?

Chaban - Cross

1  A.  I am not aware of any documents that are being maintained

2  by the bookkeeper or the lawyer.

3  Q.  But the bookkeeper works under your direction.  Right?

4  A.  Yes.

5  Q.  And didn't you say that previously Mr. Sinitsky had some

6  responsibility over the CHALSI, but you took over

7  responsibility over the CHALSI?

8  A.  I didn't understand.

9  Q.  Management of the CHALSI, complete management of the

10  CHALSI.

11  A.  Yes, yes.

12  Q.  That goes back to the summer of 2008 --  right -- or

13  earlier?

14  A.  I don't remember.

15  Q.  Okay.  The fact is instead of selling the boat for any

16  price, you decided to keep it.  Right?

17  A.  Right.  I don't like to sell for any price.

18  Q.  And you kept it because you wanted to use it for Paladin's

19  business use.  Right?

20  A.  I kept it because I couldn't sell it.  At the beginning of

21  the crisis, nothing could be sold at all because people just

22  didn't have any money.  We remember all those times.

23  Q.  Go back to Exhibit 1, if you would.

24  A.  Yes.

25  Q.  Please read for me -- excuse me -- please read for the

 1  Court the third sentence starting with the word "If."

 2  A.   Here there is no word "If."  It says here "In case."

 3  Q.   Okay.  Read in Russian and the translator will translate.

 4  A.   "In case the debt is not repaid on time, Mr. Chaban has the

 5       right to sell my shares in the vessel while preliminary

 6       needs to get written approval from me that -- my approval

 7       of the price of the, of the sales price for my shares.  In

 8       case" --

 9  Q.   "In writing."  It says "in writing."  Correct?

10  A.   "In case the debt is repaid, the contract is" -- "but in

11       case the debt is repaid, the contract is not valid

12       anymore."

13  Q.   And that sentence also says that the agreement as to the

14  selling price has to be in writing?

15  A.   Yes.

16  Q.   You didn't ever agree with Mr. Goldstein in writing as to

17  the selling price of the boat.  Right?

18  A.   No.

19  Q.   Instead, what had happened was that Mr. Goldstein and you

20  discussed, as we went over a little bit last week, trying to

21  sell the boat.  Right?

22  A.   Mr. Goldstein called me when I came to Miami -- no, when I

23  went back to Odessa and he said that he has a buyer.

24  Q.   And, in fact, you know who Igor Abramenko is.  The phonetic

25  spelling is A-b-r-a-m-e-n-k-o.

Chaban - Cross

```
 1          Igor Abramenko is a boat broker.  Correct?
 2  A.  He's a ship owner.
 3  Q.  He was the same ship broker that Mr. Goldstein and you used
 4  to sell the CORALL.  Correct?
 5  A.  Correct.
 6  Q.  And Mr. Igor Abramenko gave you a written offer for $1.2
 7  million from someone to buy that boat.  Isn't that true is?
 8          MR. SHALEK:  Objection, Your Honor.  Facts not in
 9  evidence.
10          THE COURT:  Overruled.
11  A.  He didn't give anything to me.
12  Q.  Do you deny receiving a written offer from Mr. Abramenko
13  for 1.2 million?
14  A.  Correct.  He didn't give anything to me.
15  Q.  How about orally?  Did you talk with him about a 1.2
16  million offer?
17  A.  No.  Mr. Abramenko told me that some people expressed some
18  interest and would like to take a look, just take a look, just
19  take a look, but when they found out the year of the ship, the
20  year, and when they realized the crisis is ongoing, it's not
21  going to be done, finished in one month, those people didn't
22  come back with that proposal.
23  Q.  So, you deny that an offer was made?
24  A.  To me, no.
25  Q.  Did you tell Mr. Goldstein that you turned down the 1.2
```

Chaban - Cross

1  million offer because it was too low?

2  A.  There was no offer given to me, never.

3  Q.  Do you remember then after that Mr. Goldstein and you had a

4  conversation about getting a different offer and he said that

5  Yuri Sinitsky, your partner, wanted to pay $1.4 million for the

6  CHALSI?

7  A.  I do.

8  Q.  And do you remember telling Mr. Goldstein that Yuri didn't

9  have the money and was drunk when he said that?

10  A.  Yes.

11  Q.  And that you said "Call Yuri back" and Mr. Goldstein did.

12  Do you remember that part of the conversation?

13  A.  No.  I just told him that Mr. Sinitsky didn't have any

14  money and he was unable to buy it and I had warned

15  Mr. Goldstein numerous times about Mr. Sinitsky, more than

16  that.

17         As Mr. Goldstein explained to me, Mr. Sinitsky offered

18  to buy his interest, his shares, for 700,000.  I told him "No

19  problem.  Take the money from Mr. Sinitsky and transfer it to

20  me because he doesn't have money."

21  Q.  And do you recall that Mr. Goldstein then came back to you

22  and said that he had spoken to Mr. Sinitsky and that he could

23  get you 1.4 million?  Do you recall a conversation with

24  Mr. Goldstein about that?

25  A.  No, I do not.

1  Q.  Do you recall Mr. Sinitsky then left on vacation to

2  Thailand?

3         MR. SHALEK:  Objection, Your Honor.  What Mr. Sinitsky

4  told Mr. Goldstein is hearsay.

5         MR. LICHTMAN:  No, I didn't say that.

6         THE COURT:  That's not the question.  Overruled.

7  A.  Would you, please, repeat the question?

8  Q.  Do you recall that Mr. Sinitsky then went on vacation to

9  Thailand?

10 A.  He went somewhere on vacation.  I did not keep track of

11 where he went.

12 Q.  Do you recall then calling Mr. Sinitsky and telling him to

13 stay out of your business with Mr. Goldstein on the CHALSI?

14 A.  It's an invention of Mr. Goldstein.  He made it up.

15 Q.  Did Mr. Sinitsky make that up?

16 A.  No, Mr. Goldstein made it up.

17 Q.  Did you not call Mr. Sinitsky on his phone in Thailand --

18 A.  100 percent not.

19 Q.   -- and tell him that if he was involved in this deal at

20 all that you would cut him off from the shipping business?

21 A.  He's bankrupt.

22 Q.  Indeed, Mr. Sinitsky is not bankrupt.  You know that

23 Mr. Sinitsky sends his kids to private school in Switzerland.

24 You knew that.  Right?

25         MR. SHALEK:  Objection.  Hearsay.

```
 1              THE COURT:  Overruled.
 2  A.  It was three or four years ago.  His kids are not in school
 3  anymore for a long time.  The kids are trying to get set up
 4  somewhere, unfortunately.
 5  Q.  You know for a fact that he never filed bankruptcy?
 6  A.  We don't have such a notion as filing for bankruptcy.  It's
 7  a different country.  He owed a lot of money at this time.
 8  Q.  Well, he settled with you.
 9  A.  No.  With me, yes, he did.
10  Q.  Yes.  Then there came the point in time Mr. Goldstein -- I
11  know you have a different -- I think you have a different
12  view -- Mr. Goldstein offered you 1.5 million for the boat.
13  Right?
14              MR. SHALEK:  Your Honor, objection.  Asked and
15  answered on page 87.
16              "Question:  And Then Mr. Goldstein came to you and
17      said 'I'll buy you out for $1.5 million."
18              It's the same question he asked last week.
19              THE COURT:  Overruled.
20  BY MR. LICHTMAN:
21  Q.  And the reason you didn't do the deal was because
22  Mr. Goldstein, according to your testimony before, said that he
23  would get you the money in a few months.  "Sign the title over
24  to me now," and that was just a crazy deal from your
25  perspective.  Right?
```

1  A.   Yes, as I testified.

2  Q.   Did you ever tell Mr. Goldstein back in 2008 or 2009 that

3  you had no intention of selling the CHALSI?

4  A.   No.

5  Q.   And, indeed, you knew that as early as December of 2008 you

6  had no intention of selling the CHALSI because you had entered

7  into the contract for repair?

8  A.   I already said.

9  Q.   Right?

10  A.   That I couldn't sell the vessel.  The only way of saving my

11  money was to try to repair the vessel and try to make some

12  money off it.

13  Q.   And it was also part of your plan to come to Florida and to

14  have him sign Exhibit 1.   Correct?

15  A.   I was already talking about my plans.  Every year in

16  January I come with my family to Miami.

17  Q.   And part of what you wanted to accomplish in that January

18  trip was to get Mr. Goldstein to give you the lien on the

19  CHALSI and part of that deal under Exhibit 1 was that you were

20  going to agree in writing preliminarily on the sale price of

21  the ship?

22  A.   I would love to have it, yes.

23  Q.   But you didn't agree on a price in writing because you

24  never intended to sell the boat.   Right?

25  A.   Mr. Goldstein didn't have intention to sell the boat.

1  That's what he wrote in the pledge, that "I pledge to repay the
2  debt and only in case the debt is not paid back, Mr. Chaban has
3  the right to sell my interest."
4  Q.  Yeah, and you still haven't sold his interest.  You kept it
5  for yourself.  Correct?
6  A.  I already said so, yes.
7  Q.  And you never tell him you weren't planning on selling the
8  boat because you wanted it for yourself and --
9  A.  I discussed only my debt, the debt with him.
10 Q.  And at the time that you had him sign this, you knew that
11 the boat wasn't worth $400,000 because you wouldn't have put
12 another 400,000 into it.
13 A.  So, you are claiming it's for me, putting words in my
14 mouth?
15 Q.  I'm just asking you your words, sir.  These are your words.
16 A.  Then I would like you to ask a question because you are
17 making a claim.
18 Q.  I've asked my questions.  You've answered my questions.
19       Have you heard the expression -- I'm sorry.  Did I cut
20 you off?
21 A.  I would like to hear the question.  So far I have just
22 heard the claim that I wanted something.
23 Q.  You wanted the boat.
24 A.  I wanted to get my money back.
25 Q.  And you have?

Chaban - Cross

1  A.  Not yet.

2  Q.  Have you heard the expression that you don't throw good

3  money after bad?

4  A.  I don't know American sayings.  I haven't heard that.

5  Q.  You haven't heard that, but you put the $400,000 into the

6  repair of the boat because you knew that was a good investment.

7  A.  I put it in, the money, because I was hoping to get my

8  money back somehow because many people make investments

9  anticipating in the future they're going to make more money.

10  With somebody, it works.  With others, it doesn't.

11  Q.  But the fact is that you did it because you knew you wanted

12  to use the boat for commercial purposes and still use it for

13  that purpose.

14  A.  I did it because I was intending to somehow cover my losses

15  or recoup my losses.

16  Q.  You did it because it was a profitable boat.  Isn't that

17  correct?

18  A.  You are claiming it or you are asking me?

19  Q.  I'm asking you.  It was a profitable boat.  Right?

20  A.  No, it was a boat that was incurring losses.  Had it been a

21  profitable boat, Mr. Goldstein would never have given it up.

22  He never forfeits opportunity to make money.

23  Q.  And did you ever have a document from -- with

24  Mr. Sinitsky -- to talk about the profitability of the boat?

25  A.  It was some bookkeeping documentation.

Chaban - Cross

1  Q.  Do you recall what that document said in terms of the

2  profitability of the boat?

3  A.  It didn't talk about the profitability.  It showed some

4  numbers about the profits from the boat.

5  Q.  Isn't that the same thing?

6  A.  No.

7  Q.  Do you recall what it showed about the profits of the boat?

8  A.  When?  What time?

9  Q.  July of '09.

10  A.  In July of 2009, Mr. Sinitsky wasn't working with me

11  anymore.

12  Q.  Did you prepare a document at about that time that talked

13  about the profits of the CHALSI?

14  A.  I was not preparing.  The bookkeeper was doing it.

15  Q.  At your direction?

16  A.  Yes.

17  Q.  And you saw the document?

18  A.  No.  The document -- the bookkeeper was checking the

19  information.

20  Q.  Why would she check the information?

21  A.  Because there was a need to settle with him for some

22  previous periods of time.  He was --

23  Q.  How long has your bookkeeper been with you?

24  A.  A long time.

25  Q.  And you trust her?

Chaban - Cross

1  A.  I trust the bookkeeper.

2  Q.  You must think that she's good at what she does and that

3  her bookkeeping is accurate.  Right?

4  A.  I think so, yes.

5  Q.  You wouldn't want her to have inaccurate books.  Right?

6  A.  Correct.  Very much so.

7  Q.  And, of course, you're the owner of the company.  Right?

8  A.  Yes.

9  Q.  And you do review the books to make sure you understand

10  what's going on with the finances of the company, don't you?

11  A.  I have a financial -- a CFO who checks it or reviews it.

12  Q.  And you check in with your CFO as well to understand the

13  finances of the company because it's your company.

14  A.  That's correct.

15  Q.  And the CFO has never said to you that the bookkeeper's

16  work is bad.  Right?

17  A.  Anything can happen.  Anything can happen on the job.

18  Q.  And did the CFO tell you that he had looked at reports of

19  the bookkeeper and they were bad?

20  A.  There had been problems.  In any case, there could be

21  problems.

22  Q.  If there were problems, you'd fire her because you can't

23  afford to have your bookkeeper not do good work.  Isn't that a

24  fair statement?

25  A.  Unfortunately, I can't afford many things, but,

1   unfortunately, humans are humans.

2   Q.  You can afford to come to Florida once a year and spend a

3   month in Florida, can't you?

4   A.  Is this relevant to --

5           MR. SHALEK:  Your Honor, what's the relevance of all

6   this?  I know they never took my client's deposition prior to

7   the trial and we're supposed to be eliciting trial testimony,

8   not taking a deposition.  Affordability to come to Florida,

9   what does it have to do with the amount of money owed on this

10  debt?

11          THE COURT:  I'm not sure.

12          What does it have to do with it?

13          MR. LICHTMAN:  He answered the question himself saying

14  he couldn't afford.  I'm testing him on that he says he

15  couldn't afford, explain how he can travel to Florida and

16  stayed a month.

17          THE COURT:  What does it matter if he can travel to

18  Florida?

19          MR. LICHTMAN:  This goes to credibility, Your Honor.

20  I request latitude.

21          MR. SHALEK:  We have given a great deal of latitude.

22  At some point we need to treat this as trial testimony, not a

23  Johnny-on-the-spot deposition in front of a Federal Judge which

24  is where this is going at this point.

25          THE COURT:  Let's move this along.  The parties

 1  estimated one day for trial and I don't think --
 2          MR. SHALEK:  Then on the stipulation, he put 45
 3  minutes down for this witness.  It has been three hours almost.
 4  BY MR. LICHTMAN:
 5  Q.  Did that document that you discussed a moment ago in your
 6  testimony indicate the value of the CHALSI?
 7  A.  What document?
 8  Q.  The document that you had with Mr. Sinitsky.
 9  A.  No.
10  Q.  Did the document indicate that it had a valuing of $1.5
11  million attributed to the CHALSI?
12  A.  Of course not.
13          MR. LICHTMAN:  May I approach the witness?
14          MR. PHILLIPS:  Your Honor, if he's going to show a
15  document, we'd like to see it first.
16          MR. LICHTMAN:  (Handing to Mr. Phillips and
17  Mr. Shalek.)
18          MR. SHALEK:  Never been produced.  Never been seen.
19          Your Honor, he has handed us a document for the first
20  time.  It has never been produced in discovery.  It has never
21  been seen.  It has never been listed as an exhibit.  It's a
22  complete and total surprise.  It's in Russian.  We don't even
23  have a translation of it.
24          We ask it be excluded and the witness not be allowed
25  to testify about this document.

1   A.  I don't know what kind of document it is.

2          THE COURT:  I haven't heard the question yet.  You're

3   making an objection.

4          MR. SHALEK:  He's asking him to look at the document.

5          THE COURT:  You handed him a document.  To refresh

6   recollection, you first have to establish he has to refresh his

7   recollection.

8          I don't know where he's going with it, but there is no

9   pending question.  He has been asked to look at a document

10  admittedly you've never received in discovery.  Let's see where

11  it goes.

12         MR. SHALEK:  All right.

13         THE COURT:  There's no refreshing of recollection

14  going on.

15  BY MR. LICHTMAN:

16  Q.  Have you seen this document?

17  A.  No.

18  Q.  Do you recognize any of the entries on the left side of the

19  document?

20         MR. SHALEK:  Objection, Your Honor.  He hasn't seen

21  it.  How can he testify about it?

22         THE COURT:  He's asking if he recognizes the entries.

23         MR. LICHTMAN:  Refreshing his recollection.

24  A.  I have never seen the document, no.

25  Q.  There's two dates across the top of it, July 1st, '09 and

1    October 1st, '09.

2            MR. SHALEK:  Objection, Your Honor.  We state the same

3    thing now.  He has never seen it.  He doesn't know the

4    entries --

5            THE COURT:  Well, I haven't heard a question.  There

6    was a statement about dates on a document.  What's the

7    question?

8    BY MR. LICHTMAN:

9    Q.  This is the document that your bookkeeper prepared in

10   connection with your trying to settle up with Mr. Sinitsky.

11   Isn't that true?

12   A.  No.  The documents signed by my bookkeeper are prepared in

13   a completely different format.  I don't know how did counsel

14   get the document and what kind of document is this.

15   Q.  You've never seen this document?

16   A.  No.

17   Q.  Do you have a boat called the ASPRO (ph.)?

18   A.  Yes.

19   Q.  And the top left word there A-C-N-P-O --

20   A.  Yes.  What next?

21   Q.  Okay.  The wording in bold above that --

22           THE COURT:  What is the question?

23   BY MR. LICHTMAN:

24   Q.  -- what does that say?

25           THE COURT:  He can't read from it.  It's not in

Chaban - Cross

1   evidence.  That he can't do for me.

2         MR. SHALEK:  Your Honor, moreover, counsel can't

3   follow along.

4         THE COURT:  You can't use a document that's not

5   translated in Federal Court proceedings.  They need to be in

6   the English language.  That's all well and good that the

7   witness understands it.  That may be helpful, but that's not

8   helpful to counsel for the plaintiff.

9         He can't read from the document, in any event,

10  Mr. Lichtman.  You know that.

11  BY MR. LICHTMAN:

12  Q.  Look at the second page.

13  A.  (Complied.)

14         I would like to know what kind of a document is this.

15  Q.  This is the document that your bookkeeper prepared for your

16  settlement with Mr. Sinitsky.  Isn't that true?

17  A.  My bookkeeper has never prepared this kind of document.

18  Q.  Did you have an agreement -- strike that.

19         Did you conclude that the amount of money that

20  Mr. Sinitsky owed you as of October 7th, 2009 was $2,603,606?

21         MR. SHALEK:  Objection.  Relevance and hearsay as to

22  Sinitsky.

23         THE COURT:  Overruled.

24  A.  What is the amount?

25  Q.  $2,603,606.

Chaban - Cross

1   A.   What year?

2   Q.   October 7th, 2009.

3   A.   No.

4   Q.   Did Mr. Sinitsky own an interest in the ASPRO?

5   A.   Yes, some time ago, yes.

6   Q.   And did he -- as of the time that you were settling with

7   him, he owned an interest in the ASPRO.  Right?

8   A.   I don't remember my business activities with Mr. Sinitsky.

9   I have to pull up documents to refresh my memory.  Besides

10  Mr. Sinitsky, I have four or five more business partners.

11  Q.   Take a look at that document and see if that refreshes your

12  memory.  The five boats that are listed in the top-left

13  corner --

14        MR. SHALEK:  Objection, Your Honor.  How do we know

15  there are five boats listed --

16        THE COURT:  Why don't we take our lunch recess and

17  that will give counsel an opportunity to go over this document

18  with Russian-speaking persons.  We'll pick up at 2:00.

19        MR. LICHTMAN:  Your Honor, I would ask you remind the

20  witness he's under sequestration.  He's a witness in the midst

21  of providing his testimony.

22        THE COURT:  He's not to discuss his testimony, but he

23  can certainly translate a document, unless you have an English

24  translation for the plaintiff.

25        MR. LICHTMAN:  No.

1           THE COURT:  Okay.  Have a good lunch.  We'll see you

2    at 2:00.

3           MR. LICHTMAN:  Thank you.

4      [Luncheon recess at 12:56 p.m.]

5           THE COURT:  Everyone please be seated.

6           Please continue.

7           MR. LICHTMAN:  Thank you, Judge.

8           As a housekeeping matter, I don't know -- does the

9    Court want to have a copy of this document I was showing to

10   Mr. Chaban, this ledger statement?

11          THE COURT:  The one in Russian?

12          MR. LICHTMAN:  Yes.

13          THE COURT:  No.

14          It reminds me of a book I was given once in Chinese.

15   I have it here in my office, but I have never read it.

16   Mandarin, rather.

17          MR. LICHTMAN:  I assume you don't speak Russian?

18          THE COURT:  I do not.

19          MR. SHALEK:  Motivation to learn, Your Honor.

20   BY MR. LICHTMAN:

21   Q.  Mr. Chaban, did you have in your business with Mr. Sinitsky

22   a joint ownership in the following boats:  The ASPRO, the MELA

23   (ph.), the CHALSI, the CHALSI V and the CHALSI VII?

24   A.  Yes.

25   Q.  And did you agree with Mr. Sinitsky at the time that he

1   tendered back his interest in the CHALSI that its value was

2   $1.5 million?

3   A.  No.

4   Q.  And you had with respect to those boats, the MELA and the

5   CHALSI V, lost money.  Correct?

6   A.  We're talking about CHALSI now?

7   Q.  Let me be more specific.  I withdraw that question.

8          In July of 2009, did the ASPRO make money or lose

9   money?

10  A.  Depends.

11  Q.  Did it make $22,899 that month?

12  A.  No.

13  Q.  Is that what your books and records would show?

14  A.  Aha.

15  Q.  When you say --

16  A.  Yes.

17  Q.  When you say "It depends," what do you mean?

18  A.  It depends.

19  Q.  It depends on what?

20  A.  It depends whether there was a cargo to ship or not.

21  Sometimes -- it was often idle.  If there was a cargo to ship

22  at that time, then it was operational.  If not, it wasn't

23  operational.

24  Q.  Did your books and records report on July 1, 2009 the ASPRO

25  had income of $22,899?

1  A.  No.

2  Q.  And did your books and records show that on July 1, 2009

3  the CHALSI had income of $21,813?

4  A.  No.

5  Q.  And did your books and records show that on October 1, 2009

6  the CHALSI had income of $37,966?

7  A.  So, where is the information coming from?

8  Q.  From this document.

9  A.  I don't know what kind of document is that.  I see for the

10 first time.

11 Q.  Aha.

12      Did your books and records show that the CHALSI had

13 allocated for repairs $300,000 as of January 7th, 2009?

14      THE COURT:  Why don't you ask -- first of all, how

15 would he even know?  Do you know how much your firm netted in

16 August of 2009?  I don't know that you keep those figures in

17 your head.  Why would this witness keep figures like that in

18 his head?  If he doesn't, then these questions don't get us

19 anywhere.

20      MR. LICHTMAN:  Your Honor, what I'm doing is trying to

21 impeach him on the basis of this document and I think I'm

22 entitled to do so.

23      THE COURT:  First ask whether he knows any numbers

24 without benefit of any records because I would assume I don't

25 know what my expenses were in August of 2009.  I have no idea.

```
 1              MR. LICHTMAN:  Okay.
 2              THE COURT:  I'm finding this particularly unhelpful.
 3    BY MR. LICHTMAN:
 4    Q.  What documents in the course of your business did you use
 5    when you valued the CHALSI?
 6    A.  We have already provided it for the Court.
 7    Q.  Is that it, the Kooy document?
 8    A.  That was the only thing that would allow us to estimate the
 9    price, the value.
10    Q.  Do you keep financial statements of Paladin Shipping?
11    A.  Yes.
12    Q.  Do your financials statements of Paladin Shipping include
13    even an entry for hard assets such as your boats?
14    A.  Probably, yes.  It has to be asked from the bookkeeper.  I
15    don't run the bookkeeping myself.
16    Q.  Do you know what your most recent books and records show as
17    listing the fair market value of the CHALSI?
18    A.  I don't know.
19    Q.  Turn to Exhibit 54, please.
20    A.  (Complied.)
21    Q.  I know that we spoke about this last week and I just want
22    to ask one question, to confirm you did not send any letter to
23    Mr. Goldstein back in response to Exhibit 54.  Correct?
24    A.  No.
25    Q.  Okay.  And with respect to -- I'm sorry -- Exhibit 10, you
```

Chaban - Cross

1  never wrote Mr. Goldstein and said "Now you sent me the
2  instrument of transfer of shares.  You still owe me more
3  money."  Correct?
4  A.  What is the question again?
5  Q.  You never wrote Mr. Goldstein after he sent you Exhibit 10
6  and said "You still owe me more money."  Correct?
7  A.  I called Mr. Goldstein over the phone and told him that he
8  owed more money.
9  Q.  I know we talked about that last week, so I'm not going to
10  go back over that again.  I'm just confirming you didn't send
11  him anything.
12  A.  No.
13  Q.  In fact, what you did is you had your bookkeeper call
14  Mr. Goldstein and you had her ask when he was going to send
15  money.  Correct?
16  A.  I talked with him once and he didn't want to talk to me
17  anymore.
18  Q.  Do you deny you asked your bookkeeper to call
19  Mr. Goldstein?
20  A.  No, I'm not denying.  Yes, I asked her to make the phone
21  call.
22  Q.  Were you present during that phone call?
23  A.  No.
24  Q.  And it came to pass that a few weeks later Mr. Goldstein
25  sent you $400,000.  Correct?

Chaban - Cross

1  A.  He sent it two months later.

2  Q.  It came in time.  It came at the same due date that it was

3  due under the contract of loan.  Correct?

4  A.  No, it came in April.

5  Q.  And that's when it was extended to.  He was given a

6  one-month extension.  Correct?

7  A.  No, I did not give him a month extension.  I allowed him

8  not to pay interest until the expiration date of the contract.

9  Q.  You didn't give him an extra month extension?

10  A.  I gave him a few days' extension.  He told me "Let's pull

11  the whole debt into one deadline.  Let's pay on the 9th."

12  Q.  And then he paid.  Correct?

13  A.  Say it again.

14  Q.  And then he paid the 400,000?

15  A.  He paid 400,000.

16  Q.  You never wrote him back after the $400,000 and made any

17  demand for past due interest, did you?

18  A.  My bookkeeper had been calling him numerous times asking

19  him to pay the money back, explaining that this sum doesn't

20  cover even partially.  The whole amount of debt is the

21  interest.  He answered that he was not intending to pay

22  anything else.

23  Q.  You weren't present during those phone calls, were you?

24  A.  Me?

25  Q.  You.

1  A.  I was not.

2  Q.  So, you don't know what she said.

3  A.  She gave me a response.  She said that "I called him over

4  the phone and he said that he didn't intend to pay any extra --

5  anymore money."

6          MR. LICHTMAN:  Objection.  Hearsay.  I think that what

7  I'm hearing is the Court would just as soon have me continue

8  and you're noting when he's giving hearsay responses?

9          THE COURT:  It is hearsay.  Sustained.

10  BY MR. LICHTMAN:

11  Q.  To be sure, you never put in writing any demand for

12  interest until the lawsuit was filed.  Correct?

13  A.  Yes.

14  Q.  And you never put in writing any demand that Mr. Goldstein

15  was responsible for any portion of repairs for the boat?

16  A.  In writing, no, only orally.

17  Q.  An describe what document Mr. Goldstein is responsible for

18  paying those expenses on.

19  A.  There are no documents.  We were working only on the basis

20  of oral agreements and we were showing him the expense portion

21  of the books.  He was checking those and he would agree to

22  that.  It was done all the time by my bookkeeper while I was

23  not present either.

24  Q.  So, you didn't show him the contract for repair and you

25  admitted that you did tell him the boat was being prepared, but

Chaban - Cross

1  after the fact you told him he's paying the expenses?

2  A.  My bookkeeper has been always showing him the books and the

3  expenses and he had been checking everything.

4  Q.  I'm talking about the expenses that you're seeking in this

5  lawsuit right now.

6  A.  He had not been -- the bookkeeper, as far as I remember,

7  talked to him once and said he has no intention of paying

8  anything else.  There were no more conversations again with him

9  after that.

10  Q.  And, again, these were conversations that you weren't party

11  to.  Correct?

12  A.  No.

13  Q.  So, you have no personal knowledge about these

14  conversations.  Right?

15  A.  I have information from the bookkeeper who was

16  communicating with him.

17         MR. LICHTMAN:  Again, Your Honor, hearsay.

18         THE COURT:  Sustained.

19  BY MR. LICHTMAN:

20  Q.  Under what basis do you think Mr. Goldstein is responsible

21  for expenses of the CHALSI from December 2008 to present date?

22  A.  Because before that we had been incurring expenses in the

23  ratio of 50/50 until he transferred the shares to me.

24  Q.  You didn't give him any of the profits of the boat from

25  before September 2008.  Correct?

Chaban - Cross

1    A.   What do you mean, shares?

2    Q.   Profit.

3    A.   He had been getting shares -- 50 percent of the profits all

4    the time.

5    Q.   He did not get profit from December 2009 on.  Is that

6    correct?  Excuse me.  2008.  Correct?

7    A.   Since December, no.  But you said September.  He had been

8    not getting since December because there was no profit.

9    Q.   From the time of the contract?

10   A.   From the time of the execution of the contract, the ship

11   had not been profitable.

12   Q.   And the expenses that were incurred for that repair were

13   all to make the ship profitable once you had full custody of

14   the boat and after he turned over his shares.  Correct?

15   A.   No, it didn't turn it into a profitable enterprise.  It

16   just be operational.

17   Q.   He didn't receive any benefit of the ship from the time

18   that you made him the loan in September 2008.  Isn't that

19   correct?

20   A.   He was receiving benefit.

21   Q.   The exhibits that you put into evidence for repair of the

22   boat are all after December, aren't they?

23   A.   Of course, yes.

24   Q.   Why is he responsible for those expenses?

25   A.   Because those expenses, they affected the value of the ship

1   until Mr. Goldstein transferred his shares.

2   Q.  So, you wanted him to pay for the repair of the boat so you

3   could keep the boat.  Is that what you're saying?

4   A.  I wanted, firstly, that he pay his debt back to me that he

5   didn't pay fully.

6   Q.  You didn't answer my question.  Did you understand my

7   question?

8   A.  No.  Will you please repeat it?

9   Q.  You want Mr. Goldstein to pay for the expenses of the boat

10  for a time period after he turned it back to you.

11  A.  After that?  No.

12  Q.  And you agree that after March, February of '09, March 4th,

13  2009, you shared no profits on that with him either, did you?

14  A.  We didn't discuss this issue with him.

15  Q.  Right.  And you didn't put anything in writing with him

16  either.

17  A.  No, we didn't.

18  Q.  And are you seeking that he pay 100 percent of those

19  expenses or 50 percent of those expenses?

20  A.  Which expenses?

21  Q.  The expenses for the CHALSI that you've put into evidence

22  in this case that you didn't know the number of.

23  A.  I want him to pay 50 percent of the expenses.

24  Q.  So, whatever the number is that's in the books, you would

25  want him to, potentially, pay half of that number?

Chaban - Cross

A.  I would like it.

Q.  Yes, but he didn't own half of the boat after March 4th of 2009, did he?

A.  That's correct.

Q.  And you didn't tell him when you asked him to sign the lien document that you were going to tell him he had to pay half of the expenses either.  Correct?

A.  He knew it anyway.  We had discussed it earlier.  When I told him about the repairs, he said "Go ahead.  I don't have money now.  I'll pay you later."

Q.  That was premised on you -- that was before you took the boat back and asked to have the collateral, long before. Correct?

A.  Before I took over the boat?

Q.  You asked -- you talked to him about paying expenses for the boat at a time that you both believed you were still going to be partners in the boat.

A.  Correct.

Q.  And at a time when you were sharing profits.

A.  At that time we were not sharing profits anymore.  There were no profits to talk about.

Q.  When was that?

A.  It was in late November, early December.

Q.  Regardless, you didn't tell him about any of the expenses or the repairs because you knew all along you wanted to keep

1  the boat for yourself and all you were interested in was

2  getting the pledge of the boat and, ultimately, the boat.

3  Isn't that correct?

4  A.  So, you are using the words "You knew."  Are you claiming I

5  knew or are you asking if I knew?

6  Q.  I missed what you said.  Are you telling me you didn't

7  understand the question?

8  A.  You are claiming that I knew.  So, are you asking if I knew

9  or are you saying that I knew?

10  Q.  Two things:  One, I'm not the witness and, two, I just

11  asked if you didn't understand the question, we'll clarify the

12  question.

13  A.  Yes, please.

14        MR. LICHTMAN:  Madam court reporter, would you read

15  back the last question?

16     [The requested text was read.]

17  A.  I didn't say that because I couldn't get in touch with

18  Mr. Goldstein

19  Q.  At what point in time was that?  You've been saying you

20  talked to him all the time.

21  A.  After the transfer of shares, I talked to him once and he

22  would not be reachable after that.

23  Q.  You kept the CHALSI and wanted to keep the CHALSI because

24  the MELA was losing money.  Right?  You kept the CHALSI because

25  it helped offset your losses on the MELA that was losing money.

Chaban - Cross

1  Correct?

2  A.  MELA was a younger vessel than the CHALSI, so CHALSI had

3  more losses than MELA.

4  Q.  Is that what your financial books and records are going to

5  show?

6  A.  Yes.

7  Q.  You knew that if you had to go replace the CHALSI, it would

8  have cost you at least $1.5 million.  Correct?

9  A.  What do you mean by "replace"?

10  Q.  To go out in the marketplace and buy a boat to replace the

11  CHALSI would have cost you at least $1.5 million?

12        MR. SHALEK:  Objection.  Relevance.

13        THE COURT:  Overruled.

14  A.  Of course not.

15  Q.  You agree that the boat generated -- the CHALSI --

16  generated a profit for every year that Mr. Goldstein owned it

17  with you.  Correct?

18  A.  Most of the time, yes.

19  Q.  And the average annual profit was 1 to $2 million per

20  year --  correct -- net profit?

21  A.  No, of course not.

22  Q.  What do you say it is?

23  A.  Around, average, it was between 500, 600,000 a year when

24  the market was good.

25  Q.  You took the boat back and you put money into it -- did I

1  interrupt you?  I'm sorry.

2  A.  Minus the cost of the repairs.

3  Q.  So, the total net profit for the year, according to you, is

4  300,000?

5  A.  I did not -- I didn't calculate the net profit because

6  every year it was different.  Some years were very good.  Some

7  were very bad.  There's always fluctuation in the shipping

8  business.

9  Q.  In 2008 when you contracted to repair the boat and you put

10  $300,000 into it, you knew that you had to generate at least

11  enough revenue to cover that $300,000 and then make money on

12  top of it.  Isn't that correct?

13  A.  Like I already said, I made the investment because,

14  otherwise, the ship would have to be scrapped for metal and I

15  didn't want it to happen and I was just planning to recoup my

16  expenses in the future.

17  Q.  How were you going to recoup your expenses in the future

18  unless you had the ship out there making a profit?

19  A.  Yes, I was anticipating it was going to bring some profits

20  and that I would sell it when the market goes up.

21  Q.  Yes.  And, indeed, the time period that you were seeking to

22  get the boat repaired, which was the same time you were talking

23  to Mr. Goldstein about getting the pledge on the ship, was the

24  height of the world economic collapse --  isn't that correct --

25  all of 2008 and the beginning of 2009?

Chaban - Cross

1   A.  This pledge, as a matter of fact, didn't have much use.

2   Mr. Goldstein would have been able to sell his shares any time

3   to anybody.  His pledge did not prevent -- would not prevent

4   him from selling his shares.

5          The only thing that it said, that if he fails to pay

6   his debt back, I would be allowed to sell his shares, but it

7   would not prevent him from selling his shares.

8   Q.  Mr. Chaban --

9   A.  That was the point of the pledge.

10  Q.  Mr. Chaban, not a single thing you just said was anywhere

11  responsive to my question.  Do you want to answer my questions

12  or just testify as to what you want to talk about?

13  A.  I want to respond to your question.

14  Q.  Thank you.

15         Late 2008, early 2009 was the height of the world

16  economic collapse.  Right?

17  A.  Yes.

18  Q.  And times were very dark for you in business.  Right?

19  A.  Yes.

20  Q.  But you found the money to put into a junkie boat, the

21  CHALSI, because you thought that you could get your money out

22  of it at the exact same time.  Right?

23  A.  I thought that I would be able to recoup my expenses.

24  Q.  And you needed to do that because you were losing money in

25  huge amounts on your newer boats, the MELA and the CHALSI V.

Chaban - Cross

1  Isn't that true?

2  A.  First of all, MELA is an old boat and CHALSI V was bringing

3  profits.  It was a new boat.  They were just a few years old,

4  so those were the only ships that were bringing any profits.

5  Q.  Those were a few years old?

6  A.  Excuse me?

7  Q.  Those boats were a few years old?

8  A.  CHALSI V was a few years old.  It was five years old, four

9  years old.

10  Q.  So, where were you losing all your money then if you were

11  concerned about the world economy?  It was being lost

12  somewhere, wasn't it?

13  A.  Of course.

14  Q.  And the CHALSI was one way that you could recoup some of

15  your losses.  The CHALSI was one of the ways that you could

16  recoup some of your losses.

17  A.  I was hoping to.  I was hoping to recoup my losses from any

18  of my boats.

19  Q.  Now, you said Mr. Goldstein could have sold his shares in

20  the company.

21  A.  Yes.

22  Q.  You really believe that?

23  A.  Of course.

24  Q.  It's a close corporation.  The only shareholders were

25  yourself, Mr. Sinitsky and Mr. Goldstein.  Right?

Chaban - Cross

1   A.   It was an open corporation that could freely sell shares.

2   Q.   Was it traded on any public market?

3   A.   You'll have to ask Mr. Goldstein.

4   Q.   So, you think that a boat that was worth $400,000 and

5   barely worth scrap offered a situation where he could have sold

6   his shares in the company to third parties to buy a 50 percent

7   interest of a business that you controlled?

8   A.   Not controlled.  It was 50/50.

9   Q.   It was 50/50.  Exactly the point.  You think that --

10  A.   He could have easily sold it because I also have the

11  situation where I own, like, 40 percent or 30 percent, so I buy

12  and sell 30, 40 percent of the vessel if I believe that it's

13  profitable.

14  Q.   You controlled the boat.  Right?

15  A.   My company was managing it.

16  Q.   Yes.  And as you said, if your company had money, it was

17  your money.  You discussed that.  When it came to the loan, it

18  was your company.  Right?

19  A.   It was managed by a managerial company, but not the company

20  that transferred the money.

21  Q.   You make the final decisions on the boat and the company.

22  Right?

23  A.   At this time?

24  Q.   In 2008 and 2009.

25  A.   In 2008 it was a collective joint decision.

Chaban - Cross

1   Q.   With Sinitsky --

2   A.   Yes, with Sinitsky and Mr. Goldstein.

3   Q.   Yes.  And then you already testified when Sinitsky was out

4   you took over.

5   A.   Then Sinitsky pulled out and Goldstein pulled out.  They

6   pulled out approximately the same time.

7   Q.   And Goldstein was living in Florida.  Correct?

8   A.   He was living in Florida and coming over to Odessa.

9   Q.   In fact, you said he was not involved in the business.  He

10  was, basically, a passive investor.  Isn't that correct?

11  A.   Yes.

12  Q.   Okay.  You don't know anybody that was willing to buy those

13  shares.  Correct?

14  A.   I do not.

15  Q.   And you don't know anybody that would have bought those

16  shares, any sizable amount, that would have paid off your debt.

17  Correct?

18  A.   Of course.

19  Q.   If you had sold and liquidated the CHALSI in March of 2009

20  when Mr. Goldstein signed over his interest in Dexter and,

21  therefore, the boat to you, that would have precluded you from

22  making more profit on the boat.  Right?

23  A.   I'm not getting any money from it now.

24  Q.   If -- excuse me.  If I understand your position, you think

25  that Mr. Goldstein should have a $200,000 credit for his

1    interest in the asset, the boat.  Correct?

2    A.  Yes.

3    Q.  Do you give him any credit for his interest in Dexter

4    Lines?

5    A.  I didn't understand what you mean.

6    Q.  His stock.  You didn't give him the credit for his interest

7    in the company.

8    A.  I give him credit for $200,000.

9    Q.  With Exhibit 10, you got all interest in the boat and all

10   interest in Dexter.  Correct?

11   A.  Yes.

12   Q.  Okay.  Now, you, I think, testified were all partners with

13   him in the CORALL.  Right?

14   A.  At a certain point, yes, I was a minor partner.

15   Q.  And there was a point in time where -- I think it was in

16   2008 -- you received an insurance payment of approximately

17   $120,000 on the CORALL.  Is that correct?

18   A.  I don't remember.  Maybe.  I don't remember.  I don't keep

19   this kind of documentation.

20   Q.  Do you recall admitting to Mr. Goldstein that you forgot to

21   give him $60,000 on an insurance payment that was received for

22   the CORALL?

23   A.  I don't remember this.  I don't think it ever happened.

24   Q.  Do you remember having a conversation with Mr. Goldstein

25   where he said that he wanted to get his credit for the $60,000,

```
 1    at the same time and wanted to pay you for your interest, but
 2    wanted to look at the books and records for the CHALSI for 2007
 3    and 2008 and you refused?
 4              MR. SHALEK:  Objection.  Compound.
 5              THE COURT:  Overruled.
 6              THE INTERPRETER:  I'm sorry.  Would you repeat the
 7    second part of the conversation?
 8              THE COURT [Viewing realtime screen]:  "Do you remember
 9         having a conversation with Mr. Goldstein where he said he
10         wanted to get his credit for the $60,000 at the same time
11         and wanted to pay you for your interest, but wanted to look
12         at the books and  records for the CHALSI for 2007 and 2008
13         and you refused?"
14    A.  He was checking it.  I don't remember checking it every
15    year, but the company -- he had been working.  He had been
16    sending a director to do a full audit every year.
17    Q.  Do you have a mutual friend named Udov,  U-d-o-v, Vitya,
18    V-i-t-y-a, or Victor is his first name?
19    A.  No.
20    Q.  You don't have a mutual friend with Mr. Goldstein named
21    Udov?
22    A.  No.
23    Q.  Did you tell Mr. Goldstein that he couldn't see the books
24    unless he put $250,000 up in escrow?
25    A.  No, no.
```

Chaban - Cross

1   Q.  Did you tell Mr. Goldstein -- excuse me -- did

2   Mr. Goldstein try to make a deal with you that he would put

3   $500,000 up in escrow if you would put $500,000 up in escrow

4   and then you'd do an accounting on the boat?

5   A.  I don't remember.  It never happened.

6          MR. LICHTMAN:  Can I have two minutes?  I may be done.

7   I'd like to check my notes real quick.

8          THE COURT:  Why don't we take a brief recess then and

9   we'll continue?

10      [There was a short recess at 2:51 p.m.]

11          THE COURT:  Please continue.

12          MR. LICHTMAN:  Your Honor, you'll be pleased to know

13  that I've already put all my papers back, so I just have very

14  quick questions.

15          THE COURT:  All right.

16  BY MR. LICHTMAN:

17  Q.  Mr. Chaban, I mean this with all respect.  The most

18  important thing in your life is your family.  Right?

19  A.  Thank you.  Thank you very much.

20  Q.  And there was a period of time where you entrusted your

21  daughter Elisa to Mr. Goldstein's care when she came to Florida

22  for her education.  Isn't that correct?

23  A.  Yes.  I have felt very sorry for that.  I don't want to

24  discuss it, but I came to regret it very much.

25  Q.  He helped her find an apartment.  Right?

Chaban - Redirect

1   A.   Anyway, I was doing the whole work for him, so that's a

2   very minor thing he could have done for me.

3   Q.   He paid for her tuition?

4          MR. SHALEK:  Objection, Your Honor.  Relevance.

5          THE COURT:  Sustained.

6   A.   I was --

7   Q.   All right.

8          MR. LICHTMAN:  Nothing further.

9          MR. SHALEK:  I intend to be very brief, Your Honor.

10                    REDIRECT EXAMINATION

11  [Beginning at 3:18 p.m., 6/30/11.]

12  BY MR. SHALEK:

13  Q.   Mr. Chaban, while Mr. Goldstein was 50 percent owner of the

14  CHALSI, what access did he have to the books and records of the

15  vessel?

16  A.   Any access.

17  Q.   Mr. Chaban, does Dexter Lines own any asset -- did Dexter

18  Lines own any asset other than the CHALSI?

19  A.   No, only CHALSI.

20  Q.   Between October of 2008 and March of 2009, can you clarify

21  for the Court what profits the CHALSI owned?

22  A.   It was not generating any profit because it was in very

23  poor technical condition.  It lost the paperwork, so it was

24  unable to ship and generate profits.

25  Q.   From October until the time Mr. Goldstein transferred his

Chaban - Redirect

 1  interest, that ship was laid up in port.  Is that correct?

 2  A.   Yes, it was laid up in the port.

 3  Q.   And why was it laid up in port?

 4  A.   It was laid up in port because it could not be operational

 5  due to its poor condition and it needed repairs right away.

 6  Q.   Between October 2008 and March 2009, who was responsible to

 7  pay for those repairs?

 8  A.   I was paying for everything in full.

 9  Q.   But who was responsible to make those payments?

10          MR. LICHTMAN:  Objection.  Calls for a legal

11  conclusion.

12          THE COURT:  Overruled.

13  A.   Mr. Goldstein was supposed to do the same thing.  I was

14  supposed to provide 50 percent.

15  Q.   Aside from the repair charges that needed to be made prior

16  to the transfer of the CHALSI, what other expenses did you

17  incur out-of-pocket while the ship was laid up from October to

18  March of 2009.

19  A.   On average, it was 30 or $35,000 a month, including $20,000

20  to provide wages for the crew, plus food for the crew, the

21  costs of the ship being kept in the port and expenses for

22  firefighters, water and electricity power.

23  Q.   And who during that five month period, October, November,

24  December, January and February, who paid that $30,000 a month?

25  A.   I was paying.

Chaban - Redirect

1  Q.   And what percentage of the actual expenses paid was

2  Mr. Goldstein responsible for?

3  A.   Mr. Goldstein was supposed to expend 50 percent.

4  Q.   Now, when were the repairs finished in 2009 and the CHALSI

5  was able to trade again?

6  A.   In May of 2009.

7  Q.   And can you, please, tell the Court from the time she began

8  sailing until the present date what type of profits the CHALSI

9  has been able to generate?

10  A.   It was generating profits inconsistently.  Sometimes it was

11  a little bit in the black, sometimes a little bit in the red.

12  Overall, it was little bit in the red with minus.

13  Q.   Then why keep operating it, sir?  Why not just scrap it?

14  A.   Because I was waiting for the moment when the market will

15  recover enough for me to recoup my expenses.  That's how the

16  shipping business operates worldwide.

17  Q.   Now, sir, let's move on to Sinitsky.  Can you tell the

18  Court what conversation you had with Sinitsky about The $1.4

19  million offer to buy the vessel?

20         MR. LICHTMAN:  Objection.  Hearsay.

21         MR. SHALEK:  Your Honor, it's offered to -- let me ask

22  it a different way.

23  BY MR. SHALEK:

24  Q.   Sir, did you have conversations with Mr. Sinitsky about the

25  $1.4 million offer?

Chaban - Redirect

1   A.   I heard it only from Mr. Goldstein, that allegedly Sinitsky

2   was offering that much money to him.  Sinitsky was not offering

3   anything to me and he never spoke to me about this matter.

4   Q.   Now, sir, how many ships have you bought and sold in your

5   time?

6   A.   Like I already said, about 25.

7   Q.   And how many of them were bought or sold without you first

8   seeing a written contract for the sale or purchase of the ship?

9   A.   None, never.

10  Q.   And aside from obtaining a written contract, what else in

11  your business usually or customarily occurs when someone buys

12  or sells a ship?

13  A.   When somebody wants to buy a ship, he or she has to come up

14  with a written offer.  So, first, he has to come up with a

15  written offer to inspect the ship.  Then it has to be agreed in

16  which port the ship could be inspected.  Then he either goes by

17  himself or sends a professional surveyor to inspect or survey

18  the ship.  Then if the ship is suitable for the potential

19  buyer, they start  haggling.  The haggling has to be done in

20  writing and if they find that they struck a deal about price,

21  they have to discuss in writing the terms of payment because it

22  could be done in installments and the price, the payment and

23  the port where the ship is going to be transferred between

24  owners.

25          On top of that, it has to be established what kind of

1  debts has the ship already incurred because ships usually have,

2  like, debts running 150 or $200,000 a month.  So, for example,

3  the debt or the outstanding payments for the fuel, for wages

4  and other items of expenses that are always paid after the

5  case.

6  Q.  Now, you heard Mr. Lichtman question you about, I think,

7  three or four alleged different offers to buy this ship.  Did

8  any of the events that you just described occur with respect to

9  any of those offers?

10  A.  There was no such event at all, none of the offers.

11       MR. SHALEK:   I have nothing further, Your Honor.

12            RECROSS EXAMINATION

13  [Beginning at 3:30 p.m., 6/30/11.]

14  BY MR. LICHTMAN:

15  Q.  Mr. Chaban, if the ship is not operational, why do you need

16  13 people on it?

17  A.  Otherwise, everything is going to be pilfered from the

18  ship.  The ship is being heated, the engine is running and the

19  crew is supposed to maintain the ship in working condition.

20  Q.  And it takes 13 people to do that while the ship is not

21  operational?  It's just sitting out there?

22  A.  Yes, approximately 10 people.

23       MR. LICHTMAN:  Nothing further.

24       THE COURT:  Thank you.  You may step down.

25       MR. PHILLIPS:  Your Honor, at this time we call

Goldstein - Direct

1  Mr. Goldstein.

2

3              LEON GOLDSTEIN, GOLDSTEIN,  SWORN

4                    DIRECT EXAMINATION

5  [Beginning at 3:31 p.m.]

6  BY MR. PHILLIPS:

7              MR. LICHTMAN:  Your Honor, plaintiff's counsel and

8  myself have agreed the interpreter can sit back by Mr. Chaban

9  and not use the loud-speaker.  We think that would be less

10  disruptive.

11             THE COURT:  Very well.

12  BY MR. PHILLIPS:

13  Q.  Mr. Goldstein, please state your name.

14  A.  Leon Goldstein.

15  Q.  What is your residence address?

16  A.  17555 Collins Avenue, apartment 3702, Sunny Isles, Florida

17  33160.

18  Q.  Now, Mr. Goldstein, you just heard your attorney ask a

19  question about whether Mr. Chaban entrusted his daughter to

20  your care while she was here in the United States going to

21  college.  Do you recall that?

22  A.  Yes, I do.

23  Q.  And while she was here, didn't you ask her to go out with

24  Mr. Firer and you set them up?

25  A.  No, I did not.

1  Q.  You did not set them up and tell her Mr. Firer was a great

2  guy?

3  A.  No, I did not.

4  Q.  Did you know that she went out with Mr. Firer?

5  A.  I did not.

6  Q.  You did not know?

7  A.  I did not know.

8  Q.  You did not know?

9  A.  I did not know.

10  Q.  Mr. Firer never told you that?

11  A.  I don't think that happened.  He never told me anything.

12  Q.  Mr. Firer was married and his wife was pregnant when she

13  came here to go to school.  Do you recall that?

14  A.  I don't remember she was pregnant at that time, but very

15  possible.

16  Q.  Mr. Goldstein, you take medicine that affects your memory,

17  don't you?

18  A.  This did not affect my memory.

19  Q.  Mr. Goldstein, do you take medicine that affects your

20  memory?

21  A.  This is, like, pills which you can buy any drugstore under

22  the counter.

23  Q.  Mr. Goldstein, do you recall having your deposition taken

24  on Monday of this week in another case?

25  A.  That's exactly what I said there.

Goldstein - Direct

1  Q.  It's a case in which you're suing for a share in adult

2  video stores.  Right?

3  A.  Correct.

4  Q.  And, Mr. Goldstein, you testified in that case under oath

5  that you're taking medicine that affects your memory.  Correct?

6  A.  I testified that I take the pills which I bought under the

7  counter which could affect my memory, correct.

8  Q.  Why do you say they could affect your memory?

9  A.  Because I remember a lot of things and if I don't remember,

10  it may affect my memory.

11  Q.  So, you're blaming it on the pills?

12  A.  I cannot say that and, as a matter of fact, I was not sued

13  in that case.  I was a witness.

14  Q.  Aren't you intervening because of your interest in those

15  adult video stores?

16  A.  I beg your pardon?

17  Q.  Aren't you trying to become a plaintiff in the case because

18  of your interest in those adult video stores?

19  A.  Like I said, I'm a witness in that case.

20  Q.  Are you trying to become a plaintiff by intervening in that

21  case?

22       MR. LICHTMAN:  Objection.  Calls for legal conclusion.

23       THE COURT:  Overruled.

24  BY MR. PHILLIPS:

25  Q.  "Yes" or "No."  Do you know?

Goldstein - Direct

1   A.  I'm not sure I understood the question.

2   Q.  Do you know you're trying to become a party to that

3   lawsuit?

4   A.  Am I becoming a party?

5   Q.  Yes.

6   A.  I understand that.  Yes.

7   Q.  Okay.  Now, Mr. Goldstein, do you recall that you were

8   requested to produce in this case documents?  Almost a year ago

9   a request was sent to you?

10  A.  No.

11  Q.  Do you recall that on two occasions we filed motions to

12  compel before this Court and on one occasion the Judge issued

13  an order to show Cause because you did not produce documents in

14  this case?

15  A.  No.

16  Q.  Do you recall that you had to provide documents to your

17  attorney so that he could comply with an exhibit list that was

18  due under the rules?

19  A.  I would imagine if you refer what happened one year ago, I

20  been represented by another attorney.  His name is Michael

21  Bernstein and I fire him and that's why he did not show me a

22  lot of things.

23  Q.  I'm talking about last month when the exhibits were due on

24  the exhibit list.  Mr. Lichtman was representing you.

25  A.  And, so, what is the question?

Goldstein - Direct

1   Q.   Do you recall that after the exhibit list was due, about a

2   few days before the trial you produced to us a handful of

3   additional documents, 10 or 12 new documents?

4   A.   I gave Mr. Lichtman some documents.

5   Q.   Why didn't you produce them sooner?

6   A.   Because I didn't find them, I guess.

7   Q.   So, you didn't look for them sooner to find them.  Correct?

8   A.   Yes, you could say that.

9   Q.   And you came in today for the first time with a brand new

10   document, didn't you?

11   A.   That's what I received.

12   Q.   And you brought it today to Mr. Lichtman to show us in

13   court.   Right?

14   A.   Because I receive it last night.

15   Q.   You got it last night?

16   A.   Yes.

17   Q.   So, you're still looking for documents while this trial is

18   proceeding.   Correct?

19   A.   Whatever I can find, of course.

20   Q.   Don't you think you should have done that a year ago when

21   you were asked to produce them?

22   A.   I never thought that I would be sued.

23   Q.   This was after you were sued, sir?

24   A.   That's what I said.  That's why I'm trying to find the

25   documents.

Goldstein - Direct

1   Q.   Now, let's clear up this issue about how much you spend for

2   a ship and how much money you put into a ship.   How much did

3   you pay for this CHALSI when it was bought?

4   A.   $100,000.

5   Q.   How much money did you put into that ship to repair it

6   after you bought it?

7   A.   I put all the money to fix the ship.   It was in excess of

8   $1 million.

9   Q.   $1 million you and Mr. Chaban put into this ship when you

10  bought it and then to fix it?

11  A.   No, it's not correct.

12  Q.   What's wrong with that?

13  A.   Chaban didn't spend any money.   That's the reason he

14  brought me as an investor.

15  Q.   Okay.   You spent all the money?

16  A.   Yes, I did.

17  Q.   We asked you for the documents for the purchase of the

18  vessel.   Is there a reason you haven't produced any records for

19  us showing how much money you put into the ship?

20  A.   I don't keep the records for 10 years, what happened

21  before.

22  Q.   All right.   You don't keep the records.

23         But did you think you were throwing good money after

24  bad when you a bought a ship for $100,000 and then put $900,000

25  for repairs into the ship?

June 30, 2011

Goldstein - Direct

1   A.  We purchased the ship just to do that.  This is the best

2   deal ever happened.  You find a hull of the ship.  When market

3   is low, you buying that for $100,000 and that's how we decide

4   with Mr. Chaban that I'll spend all my money and you fix the

5   ship and the ship will operating and we'll make a lot of money.

6   That's exactly what happened.

7   Q.  From the time you bought that ship, Mr. Chaban's company

8   managed the vessel.  Correct?

9   A.  Correct.

10  Q.  Was responsible for all the repairs.  Correct?

11  A.  He was supposed -- this is what he supposed to do.  He's

12  supposed to take the ship -- as a matter of fact, he bought the

13  ship with my money and then he brought it and build the ship.

14  Q.  He's supposed to make all of the repairs.  Correct?

15  A.  It's not repairs.  He build the ship from the scratch.

16  Q.  That's not my question.

17      Once the ship was operating and it was ongoing for the

18  10 years that you had it, or the seven years that you had it,

19  he was responsible and his company for managing the ship.

20  Right?

21  A.  Right.

22  Q.  Made the repairs to the ship?

23  A.  Everything.

24  Q.  Everything.  Paid the fuel charge?

25  A.  Everything.

Goldstein - Direct

1   Q.   Crew?

2   A.   Yes.

3   Q.   Okay.  He didn't ask your permission when he had to make

4   repairs.  He just did it.  Correct?

5   A.   That was part of the deal.  That's part of the management.

6   Q.   Okay.  Now, I downloaded the pages yesterday from Star

7   Capital's website.  Do you know what Star Capital is?

8   A.   Yes, I do.

9   Q.   What is that?

10  A.   It's the company which we're partners with Oleg Firer.

11  Q.   You and Oleg Firer are the two partners in the company?

12  A.   Correct.

13  Q.   You're both the co-chairman of the company?

14  A.   Correct.

15  Q.   You're the co-founder of the company?

16          MR. LICHTMAN:  Objection.  Are we talking Star Capital

17  Fund or a different Star Capital?

18  BY MR. PHILLIPS:

19  Q.   Let's clarify that.  How many companies does Star Capital

20  own?

21  A.   I'm a passive investor and partner there.  Oleg Firer can

22  tell you all the companies he generate from Star Capital.

23  Q.   There are over 20 companies from Star Capital, aren't

24  there?

25  A.   You have to ask him all these questions, please.

1  Q.  Well, you're listed as the co-chairman of Star Capital on
2  the website.  Correct?
3  A.  That is correct.
4  Q.  And Star Capital is the wholly owned -- strike that.
5          Star Capital fund is the wholly owned subsidiary of
6  Star Capital Holding Corp.  Correct?
7  A.  In the shipping business, we have passive investor.  The
8  same thing happened here with Star Capital.  Oleg Firer is
9  here.  Ask him all the details on that company.  He will give
10 you the detailed answers.
11 Q.  I'm asking you.
12 A.  I don't know.
13 Q.  If you don't know, tell me you don't know.
14         Why are you listed then as co-chairman of the company
15 if you don't know what the company does?
16 A.  I know a little bit what the company does and we are
17 partners in the company.  So, he's operating manager and
18 partner.
19 Q.  In fact, reading from the website, it says "Mr. Goldstein
20 is a co-founder and co-chairman of Star Capital Holding Corp."
21 Correct?
22 A.  If that's what you're reading, that's correct.
23 Q.  "A privately owned holding company with interests in oil
24 and gas, financial services, asset management, media, as well
25 as other special situation investments."

Goldstein - Direct

1           Are you familiar with that?

2    A.  Not really.

3    Q.  It also says "Previously Mr. Goldstein was a partner at

4    Lehman Auto World."  Is that true?

5    A.  That is true.

6    Q.  You were a car salesman.  Right?

7    A.  No, I was a manager and partner with Mr. Lehman for 13

8    years.

9    Q.  You were a manager of what?

10   A.  Manager of his stores and then we bought five stores in

11   Delray Beach and I was his partner and general manager of the

12   stores.

13   Q.  You were the manager of car dealerships.  Right?

14   A.  No, I was partner.  I had general managers when we bought

15   the stores.  I put my money and bought the stores with

16   Mr. Lehman.

17   Q.  And also you were a general partner at the leading venture

18   capital firm in the Ukraine.  Correct?

19   A.  Which one?

20   Q.  I'm reading from your website now, sir.  It says "Goldstein

21   was the general partner at the leading venture capital firm in

22   Ukraine."

23   A.  I don't know what was that.

24   Q.  Star Capital's website.  Let me ask you this:  Are you from

25   the Ukraine?

Goldstein - Direct

1   A.   Yes, I am.

2   Q.   Did you ever live there?

3   A.   What was that?

4   Q.   Did you ever live there?

5   A.   Yes.

6   Q.   Did you work in a venture capital firm?

7   A.   I don't remember the name, how it was named, but we have a

8   company in Ukraine, yes.

9   Q.   You don't remember the name where you were the general

10   partner of a venture capital firm as listed on the website?

11   That's what you're telling us?

12   A.   It's like with Star Capital, it was different companies and

13   it was how many years?  20 years ago.  It's possible.

14   Q.   Now, the website also says you have at least 30 years of

15   experience in investments with and operating with a focus on

16   financial services.  Is that true?

17   A.   Yes.

18   Q.   How long have you and Mr. Firer been partners in Star

19   Capital?

20   A.   From 2007.

21   Q.   Are you still a co-chairman?

22   A.   No, I'm not.

23   Q.   Why not?

24   A.   We dissolved the company.

25   Q.   When did you dissolve Star Capital?

Goldstein - Direct

1  A.  Six months ago.

2  Q.  And, in fact, you dissolved Star Capital Fund, which is a

3  defendant in this lawsuit as well, didn't you?

4  A.  I didn't dissolve it.  We did it.  We closed it up.

5  Q.  And it was involuntarily dissolved by the Secretary of

6  State.  Correct?

7  A.  I would imagine.

8  Q.  You never told the Court or any of the attorneys that you

9  shut the business down and let it get dissolved, did you?

10  A.  You never asked me.  I just been on the stand for 15

11  minutes.

12  Q.  Okay.  We'll get there.

13          Were you an employee of Star Capital?

14  A.  I was partner in Star Capital.

15  Q.  As a partner, what did you do?

16  A.  I didn't do anything.  I was a silent partner.

17  Q.  You're pretty close with Mr. Firer.  Right?

18  A.  Yes, I am.

19  Q.  Been friends for a while?

20  A.  Beg your pardon?

21  Q.  You've been friends for a while?

22  A.  Not as long as Anatoliy Chaban.

23  Q.  Mr. Firer is also from the Ukraine?

24  A.  Yes, he is.

25  Q.  Speaks Russian?

1  A.  Yes.

2  Q.  Where are you presently employed?

3  A.  I'm not employed.

4  Q.  Where were you employed eight months ago?

5  A.  I was partner -- I'm self-employed and partner, investment

6  partner.

7  Q.  At Star Capital.  Right?

8  A.  Star Capital and I have investments in Exmar (ph.).

9  Q.  If you could go to Exhibit 13, please.  These were

10  interrogatories that were served upon Star Capital of which

11  you're one of the co-chairman in the case, and the first

12  interrogatory asks for the name and address and place of

13  employment and job title of any person who has information

14  relating to the case.  You see that?

15  A.  Yes.

16  Q.  And the response says, "Leon Goldstein," and it says "Upon

17  information and belief, 17555 Collins Avenue, Sunny Isles

18  Beach, Florida."

19       Was that where you lived?

20  A.  You just asked me before.  That's the address I gave you.

21  Q.  And you're still there.  Right?

22  A.  Yes, I am.

23  Q.  And it says "Place of employment and job title unknown."

24  Do you see that?

25  A.  Yes.

Goldstein - Direct

1   Q.   And these interrogatories, if you look on the last page,

2   they were signed by Mr. Firer and notarized.  Correct?

3   A.   Yes.

4   Q.   And that was in -- actually, it's not dated -- October

5   2010.  Do you see that on the notary portion, "Sworn to and

6   affirmed before me this day of October 2010" on page 5?

7   A.   Okay.

8   Q.   And at that time, eight months ago, you were still employed

9   as a partner at Star Capital.  Correct?

10  A.   I was a partner in Star Capital all the time.

11  Q.   But Mr. Firer wrote that your employment was unknown.

12  Correct?

13  A.   Because I was not employed.

14  Q.   Did you talk to anybody about how Star Capital should

15  answer these interrogatories?

16  A.   No, I did not.

17  Q.   Now, if you can look, please, at interrogatory number 5 on

18  page 2.  Has Mr. Firer been to your house?

19  A.   Number 5?

20  Q.   Page 2.

21          MR. LICHTMAN:  Of Exhibit 13?

22  A.   I'm sorry.

23  Q.   If I go too fast, put your hands up and I'll slow down.

24  A.   I don't see page 2.

25          MR. PHILLIPS:  If I may approach, Your Honor?

Goldstein - Direct

 1          THE COURT:  You may.

 2  A.  This is number 5, no?

 3  Q.  (Indicating.)

 4  A.  This is over here.  Okay.

 5  Q.  Now, the question there asks for the address where you

 6  currently reside and where service of process can be

 7  effectuated upon you.

 8          Do you see that, number 5, and the answer is

 9  "Defendant states that he has no knowledge of Leon Goldstein's

10  current residence."  Do you see that?

11  A.  Who wrote it down?  I have not seen this before, so I don't

12  know what --

13  Q.  Let me ask you this:  Were you moving around so that your

14  partner at Star Capital didn't know where you lived?

15  A.  He does.

16  Q.  He does know where you live?

17  A.  Of course.

18  Q.  As co-chairman of Star Capital, were you also responsible

19  to review the books and records of the company?

20  A.  I do not.

21  Q.  So, you never reviewed the bank accounts?

22  A.  I didn't.

23  Q.  Now, Mr. Goldstein, I want to read for you what

24  Mr. Lichtman said in his opening statement -- we had it typed

25  up -- and he talks about the $1.5 million for the boat and the

Goldstein - Direct

1   $750,000 valuation for your shares and then he looked at the

2   Judge and he said -- quote -- "which I will tell you he would

3   buy the boat from them today for that price."

4           Is it true that you would buy the CHALSI today for

5   $1.5 million?

6   A.  I didn't say that.

7   Q.  I understand.  Your attorney did.  Was it true when he said

8   that last week, that you would buy the boat today for $1.5

9   million?

10  A.  I can give you a little detailed answer if you will give me

11  some time.  I had the buyer before and maybe he will be

12  interested to buy it as well.

13  Q.  That's not the question.

14  A.  I don't know.

15  Q.  Your attorney represented in this courtroom to this Judge

16  and he said "which I will tell you he will buy the boat from

17  them today for that price."

18          Do you have $1.5 million to buy the boat today?

19          MR. LICHTMAN:  Objection.  Relevance.

20  A.  If I need to get the money, I will get the money, more than

21  $1.5 million, yes.

22  Q.  Okay.  Are you willing to buy the boat today to resolve

23  this lawsuit?

24  A.  I have no clue what the boat looks like today.  I did know

25  what it looks like two years ago.

Goldstein - Direct

1   Q.  Have you ever visited the boat?

2   A.  No, I did not.

3   Q.  What's the difference, if you have never seen the boat, how

4   it would look today versus two years ago?

5   A.  You always -- when you have the ownership of the boat, you

6   know what the boat used to bring.  It's not what the boat looks

7   like.  It's a cargo ship.  The boat should -- the boat makes

8   the money and that's how much it's worth.  If the boat makes

9   more money, that's the value of the boat.

10  Q.  Just to clear this up, then, you are not prepared to buy

11  the boat today for that price.  Correct?

12  A.  I didn't say that.  I will think bit.  Maybe.

13  Q.  Maybe.  That's not a "Yes" or "No."  Correct?

14  A.  Well, you are asking me a question hypothetical, would I be

15  interested, and I'm answering I don't even know -- maybe the

16  boat needs anything.  Maybe I would.

17  Q.  So, then, why would your attorney, if you didn't tell him

18  that you would buy the boat, represent to the Court that you

19  would buy the boat today for that price?

20  A.  I may buy my 50 percent shares back, which is 750, for that

21  price.  I may do that.  Is good enough answer.

22  Q.  Do you have the money?

23  A.  Yes, I do.

24  Q.  Well, if you had the money, why didn't you just pay off the

25  loan if you want to keep your shares?

Goldstein - Direct

1  A.  I would pay off the loan if Chaban need the money before.

2  He start begging me to get the money two months after and the

3  agreement was for six months.  If he will wait until six

4  months, I will pay him like agreed.  I paid him $400,000.

5  Q.  Are you familiar with Ace Capital Enterprises?

6  A.  A little bit.

7  Q.  Is that a company you and Mr. Firer were involved with?

8  A.  Yes.

9       In January of this year, wasn't a final judgment

10  entered against you and Mr. Firer for $132,005?

11  A.  I don't recall that.

12  Q.  Do you recall going to court before Judge Pedro Echarte?

13  A.  I do.

14  Q.  Did you have an attorney named David Loev, L-o-e-v?

15  A.  It's Oleg's attorney and Oleg is handling this case from

16  what I know.

17  Q.  He handled the case.

18       You're not aware there's a judgment outstanding --

19       MR. LICHTMAN:  Objection.  Relevance.  The judgment

20  has nothing to do with this case.

21       THE COURT:  I'm sorry.  Move a little bit over.  I'm

22  not hearing you.

23       The judgment has nothing to do with this case?

24       MR. LICHTMAN:  Right.  It's a relevance objection.

25       THE COURT:  Overruled.

Goldstein - Direct

1   BY MR. PHILLIPS:

2   Q.   Sir --

3   A.   I said I do not know about this case.

4   Q.   Do you recall being served with the lawsuit?

5   A.   I was not.

6   Q.   You don't recall that?

7   A.   I don't recall that.

8   Q.   Do you know how the judgment was entered against you for

9   over $132,000 on January 10th, 2011?

10  A.   If you do really need answers, when Oleg Firer will be on

11  the stand, he will give you all the details on that.

12  Q.   Let's talk briefly about the loan that Mr. Chaban made to

13  you.  You borrowed this money, the $1,150,000, from Mr. Chaban

14  because you didn't have the money to invest yourself in your

15  new business.  Correct?

16  A.   No, it's not correct.

17  Q.   That's not correct?

18  A.   It is not.

19  Q.   Then why did you borrow the money?

20  A.   I have an opportunity to make money and that's why I asked

21  him if he got the money to lend and he said he did.  If he

22  would not, we just would not invest this money.

23  Q.   Are you saying it was an investment and not a loan?

24  A.   Well, he gave me a loan, but we invest it in our business,

25  but it's not like we need the money to open the business or to

Goldstein - Direct

1   operate the business.

2   Q.  So, then, why did you need the money then?

3   A.  What is the question?

4   Q.  If you didn't need the money to open the business and you

5   didn't need the money to operate the business, why did you ask

6   for over $1 million?

7   A.  We had a lot of opportunities in Star Capital in which we

8   investing the money and making money on the money.  That's what

9   it's all about.

10  Q.  So, then, why did you close Star Capital?

11  A.  Because we decided it's no longer producing what we thought

12  it would be producing.

13  Q.  Let's go over now Exhibit Number 1.  If you could turn to

14  that.  The first page is in Russian.  Do you see that?

15  A.  Yes.

16  Q.  That is your handwriting?

17  A.  It is.

18  Q.  Now, Mr. Lichtman, when he was asking Mr. Chaban, was

19  saying that you and Mr. Chaban were long-time friends.

20  Correct?

21  A.  Correct.

22  Q.  And you provided him this handwritten note pledging the

23  stock as a convenience because of your friendship.  Do you

24  recall him saying that?

25  A.  I remember.

Goldstein - Direct

1  Q.  Is that why you did it?

2  A.  I just wanted to put a peace of mind to Chaban.  I didn't

3  have to do that.

4  Q.  At the time that you wrote this handwritten January letter,

5  you had not paid any of the $23,000 a month interest that was

6  due, had you?

7  A.  We never had an agreement that I will pay.  I had an

8  agreement.  It was simple interest rate and it will be paid at

9  the very end of the loan.

10      However -- let me finish -- Chaban wrote the note that

11  it has to be 2 percent a month and I told him that it was not

12  part of the agreement.

13      He said like he didn't care.  He will deduct it from

14  what the ship makes.  So, I didn't have a choice and that's the

15  whole deal.

16  Q.  So, you got a handwritten note.  Correct?  I mean, you got

17  a typed note for the loan.  Right?

18  A.  Yes.

19  Q.  And the note said you had to pay 2 percent interest per

20  month.  Correct?

21  A.  Whatever it says.  It's not the agreement we made.

22  Q.  And you signed that agreement.  Correct?

23  A.  Correct.

24  Q.  You didn't cross it out and say "That's not the deal," did

25  you?

1    A.   A few mistakes on this deal, as well if you will check it

2    says 2 percent a month.  Take a look at this note and it says

3    instead of 8,000, I have to pay 6,000.

4           It's a lot of mistakes.  We did a lot of things on a

5    handshake.  That's why when I loaned Chaban the money, it was

6    always simple interest rate and I said it has to be the same

7    way.

8    Q.   Sir, do you remember Mr. Lichtman constantly saying to

9    Mr. Chaban "Will you please answer my question?"  Do you

10   remember that?

11   A.   Yes.

12   Q.   I'm going to nicely ask you to, please, listen to my

13   question.  If you don't understand it, tell me.  I'll rephrase

14   it.  Okay?

15   A.   Okay.

16   Q.   If you understand it, I just want you to answer the

17   question, and the question was the note said you would pay 2

18   percent per month interest and you signed that note without

19   making any changes to it.  Correct?

20   A.   Correct.

21          MR. LICHTMAN:  Asked and answered.

22          THE COURT:  Overruled.

23   A.   I just explained to you what's happening.

24   Q.   So, then, when this January 9th handwritten agreement that

25   you did at that cafe, you owed $92,000 in interest --

Goldstein - Direct

1  correct -- 23,000 a month for four months?

2  A.  I don't think so.  That happened in January.

3  Q.  And when did you sign the note?

4  A.  I signed the note in the middle of January, I think.

5  Q.  Didn't you sign the note in September of 2008?

6  A.  Very possible.

7  Q.  September, October, November, December.  That's four

8  months.

9  A.  Okay.

10 Q.  $23,000 a month interest you were accruing.  Right?

11 A.  Yes, I guess, yes.

12 Q.  So, wasn't it because you were in default of the loan that

13 you signed that stock pledge agreement?

14 A.  No, it's not.  I could have paid him if he'll ask me to

15 pay.  He never asked me to pay $92,000.  I had the money to

16 pay.

17 Q.  He didn't have to ask you to pay.  It was in the note.

18 A.  It was in the note, but he never brought it up.  It was the

19 agreement we made.

20 Q.  If you could look at Exhibit 10, please.  I want to make

21 sure I understand Exhibit 10.  This is the document in which

22 you transferred your interest in Dexter Lines, which was the

23 company that owned the CHALSI, to Paladin Shipping Company,

24 which is Mr. Chaban's company.  Correct?

25 A.  Correct.

Goldstein - Direct

1    Q.   The only assets of Dexter Lines was this one ship.

2    A.   That's what he said.

3    Q.   Well, you owned 50 percent of Dexter Lines, didn't you?

4    A.   Yes, I do.

5    Q.   Are you aware of any other assets other than the CHALSI?

6    A.   I don't even know when the company was originated.  It

7    could be one or 10 vessels.  I have no idea.

8    Q.   You have no idea what Dexter Lines owned?

9    A.   No, I did not.

10   Q.   Didn't you ask Mr. Chaban because the title to the CHALSI

11   was in his name to put it into a formal corporation and issue

12   shares of stock?

13   A.   No.  That's what he said, but that was not true.  I didn't

14   care.

15   Q.   Now, Exhibit 10, that's your signature?

16   A.   Yes, it is.

17   Q.   What is the date of your signature?

18   A.   March 4th, 2009.

19   Q.   Now, when you transferred your shares, there's nothing in

20   this document which states how much you were valuing the

21   shares.  Correct?

22   A.   I signed what he told me to sign.

23   Q.   Let me ask the question again.  Maybe you didn't understand

24   it.  Is there anything in that document that you believe sets

25   forth the value you were putting on the shares that were being

Goldstein - Direct

1  transferred?

2  A.  I don't think -- let me read it.

3       I don't see it.

4  Q.  Is there anything in that document which says it's in

5  consideration for the loans that were previously entered into?

6  A.  No, it's not.

7  Q.  And at the time of this transfer, you were aware that the

8  CHALSI had not been in service for several months.  Correct?

9  A.  I didn't know what happened to CHALSI.

10  Q.  So, you didn't know it remained in port for repairs?

11  A.  I did not.

12  Q.  Okay.  Do you agree that it costs about $30,000 a month to

13  maintain the CHALSI?

14  A.  I have no idea about that.  What I do know is it doesn't

15  need so many people.  I've been told when the vessel is not

16  operating, it needs maybe one or two people to be on the boat.

17  All together, it's 13 people operating the vessel.  So, I don't

18  know.

19  Q.  We'll go back to that in a few minutes.

20  A.  Sure.

21  Q.  Let's go back to Exhibit 1 for a second.  I want to make

22  sure I understand this.  Exhibit 1 was written on January 25th

23  of 2009.  Right?  It's the very first exhibit in the notebook.

24  A.  Yes.  I'm sorry.  Yes.

25  Q.  That's your handwriting?

Goldstein - Direct

1   A.   Yes.

2   Q.   You wrote in there, "If the debt is not repaid timely,

3   Chaban shall have the right to sell my share in the ship having

4   preliminary agreed to the selling price of my shares in

5   writing. "  Is that what you wrote?

6   A.   It is, yes.

7   Q.   So, he couldn't just sell your shares in the ship unless he

8   had an agreement with you in writing as to how much your shares

9   were worth.  Correct?

10  A.   That's correct.

11  Q.   So, as of January of 2009, you did not have or know the

12  value of the ship, did you, the CHALSI?

13  A.   I did.

14  Q.   Then why didn't you put in the agreement when you

15  hand-wrote this note, why didn't you put what you thought the

16  value was?

17  A.   The value was, that's what we can get.  At that time we had

18  an offer for $1.2 million which Chaban rejected to sell.  Then

19  I had another offer for $1.4 million.  Chaban refused to sell

20  it as well.

21       When he moved to Miami, that's the date when he moved

22  to Miami, that's true, and I give him this piece of paper

23  because I said "I want for you to know that I will pay you.

24  Don't worry because of the crisis.  I will pay you and if you

25  want to have a peace of mind, let me give you something in

Goldstein - Direct

1  writing because if something could happen to me," and I did

2  that.

3  Q.  Well, is there any requirement for Mr. Chaban to sell his

4  interest in the CHALSI at any time?

5  A.  Nobody will buy it.  Some interest if somebody owned the

6  vessel.  You have to be family or good friends.  Otherwise, who

7  will buy 50 percent with somebody who is operating the vessel?

8  It's impossible.

9  Q.  Do you remember when I asked you to try to answer my

10  questions?

11  A.  I think I did.

12  Q.  If you don't understand it, let me know.

13       Here's what I asked:  Is there any requirement for

14  Mr. Chaban to sell his interest in the CHALSI at any time?

15  A.  Chaban wants the money before the due date and this is the

16  only way to do it and that's why he said he was willing --

17  that's what he said to me.

18  Q.  Let me ask it again another way.

19  A.  No, it was not.

20  Q.  So, you did understand.

21  A.  I do understand.  I want to make clarification on

22  something.

23       MR. LICHTMAN:  He should be allowed to finish his

24  answer, Your Honor.  If he said no, he's allowed to explain his

25  answer.

Goldstein - Direct

1           THE COURT:  Correct.

2           MR. PHILLIPS:  I think he did.

3           MR. LICHTMAN:  Mr. Goldstein, are you finished?

4    BY MR. PHILLIPS:

5    Q.  Are you finished Mr. Goldstein?

6           MR. LICHTMAN:  You had an explanation you were trying

7    to give.

8    A.  I'm trying to tell you Chaban wants the money before

9    because he was afraid that crisis started and I told him I will

10   give him the money.  "Let's sell the vessel," and he said he's

11   willing to sell his share and I said I will sell my shares,

12   too, if we will find the right buyer.  That's what it's all

13   about.

14   Q.  Did he agree to sell his shares in the vessel?

15   A.  He told me he would sell it for not less than $1.4 million.

16   Q.  He put a value on what he wanted for the vessel?

17   A.  Because he did not accept 1.2 which we had.

18   Q.  Whatever the reason is.  He had a right to put whatever

19   value he wanted, didn't he?

20   A.  Yes.

21   Q.  At whatever time he wanted?

22   A.  Yes.

23   Q.  You did the same?

24   A.  Of course.

25   Q.  Now, did you have the money at the time you wrote this

Goldstein - Direct

1   letter in January to repay the note?

2   A.  I could get the money.  I'm in this business.  I could get

3   the money any time I want.

4   Q.  What business are you in?

5   A.  Well, I'm in the investment business.  I can investment the

6   money.  If I need the money, I can find the money.  If Chaban

7   don't give me $1.4 million, I will find somebody else or I will

8   not take the opportunity and that will be it.

9   Q.  If you were such good friends with Mr. Chaban and you knew

10  that he was concerned about the world financial crisis, why

11  didn't you just get the money and pay him off?

12  A.  Because we have the transition period for the money to make

13  the money and it has to be six to seven months and he knew

14  that.

15  Q.  So, you need six or seven months to make the money to pay

16  him back?

17  A.  That's how Oleg explained how that works, yes.

18  Q.  You don't know how that works?

19  A.  Very little.

20  Q.  When you wrote this note, you said that "If the debt is not

21  repaid timely."  Did you anticipate that you would not be able

22  to repay it timely and that's why you wrote it that way?

23  A.  I want him to understand that I will pay and in the case if

24  something happened to me or anything will happen, I give him

25  this piece of paper.

Goldstein - Direct

1        I didn't have to do that.  I just did it because I
2   said "You will get paid.  Do not worry, and if you want me to
3   add something, I will," but you didn't ask me questions.  He
4   asked me -- can I say something or not about these issues?
5   Q.  Go ahead.
6   A.  He asked me six weeks after I give him the money it was the
7   crisis already.  He said "I need about $250,000.  Can you give
8   me that?" and I call Oleg and Oleg said "Yes, we can give him
9   $250,000 if he needs it."  We were friends.
10       I said "Anatoliy, I'll give you 250," but I since we
11  could not invest it, don't charge me the interest.  It's only
12  six weeks."
13       I said "No, I cannot do that."  Then I don't want to
14  lose the interest, but that's what it is.  If he would ask me,
15  I always give it to him.  That's the reason for this note as
16  well.
17  Q.  Why didn't you just wire him the money then, wire him the
18  250, and say "Here it is"?
19  A.  I told him, but should absorb the 5,000 of interest and I
20  told him I would not do that.
21  Q.  Okay.  So, you borrowed money from him.  Correct?
22  A.  Yes.
23  Q.  He asked you for the bone back.  Right?
24  A.  He asked me for the money back in -- when the crisis
25  started he got worried.

100

Goldstein - Direct

1  Q.  And you said -- I'm sorry.  Go ahead.

2  A.  When the crisis started he called me and said "Leon, the

3  crisis started."  I said "Okay."  "I need some money, like

4  250,000.  Can you give me some money back?" which I gave it to

5  you.

6      I called Oleg.  I did not invest all his money.  Oleg

7  said "Yes, we can give him the money, 250, no problem," but

8  Oleg said "There's no interest for us to pay the interest

9  because we did not invest it."

10     I told Chaban "I will give you 250,000 without

11  interest."  He refused to do so.

12  Q.  Let me make sure I understand this.  This is your good

13  friend who loaned you a million 150.  Right?

14  A.  Correct.

15  Q.  He asked you for money back.  You said "I can give you 250

16  back."

17  A.  Yes.

18  Q.  You wanted to put a condition on it.  "I'll give you the

19  money back I've had for the past few months, but I don't want

20  to give you any interest."  Right?

21  A.  Why should I lose the money?  Why should I lose the

22  interest?  It was not that much.  If he needs it, okay, no big

23  deal.  The interest was like $5,000.

24  Q.  It's all about you getting something for nothing then.

25  Right?

1   A.  Not really.

2   Q.  You had the money.

3   A.  But he wants it back.

4   Q.  Okay.

5   A.  He lend the money and he wants it back a little sooner.  I

6   said "I will give you the money back."

7   Q.  I think I understand.

8   A.  Thank you.

9   Q.  Let's go back to Plaintiff's Exhibit 1 where you say

10  "Chaban shall have the right to sell my share in the ship."  Is

11  that what it says?

12  A.  Yes.

13  Q.  What was your share in the ship?

14  A.  50 percent.

15  Q.  So, how could he sell your 50 percent share in the ship?

16  On what market?

17  A.  If he will get my 50 percent, he will have 100 percent of

18  the vessel and he can do whatever he wants.

19  Q.  Okay.  But you wrote he can sell your share in the ship,

20  not the whole vessel.  Right?

21  A.  He can sell.  If he'll get my shares, he will own the

22  entire vessel.

23  Q.  That's not my question.

24          What you wrote here, though, was very specific in your

25  handwriting at that cafe when you said "Chaban shall have the

Goldstein - Direct

1  right to sell my share in the ship having preliminary agreed to

2  the selling price of my share in writing."  That's what you

3  wrote.  Right?

4  A.  That's right.

5  Q.  You didn't say he could sell the ship.

6  A.  How can I say -- this is his 50 percent.  He will do

7  whatever he wants.

8  Q.  Thank you.

9        By the way, you and Mr. Chaban never did agree to the

10  value of your shares in writing, did you?

11  A.  The shares is what we been offered at that time.  So, we

12  had situation.  We had two offers for 1.2 million, one offer

13  for 1.4 and I had an offer for 1.5 which I gave it to Chaban.

14  Q.  Okay.  Thank you.  I'll ask the question again.  Maybe

15  you'll answer it this time.

16  A.  Okay.

17  Q.  Did you and Mr. Chaban ever agree to the value of the

18  shares in writing?

19  A.  No.

20  Q.  And this agreement that you wrote didn't allow you to

21  unilaterally place a value on the shares, did it?

22  A.  Well, it says clearly that he have to consult with me

23  before he will sell my share.

24  Q.  That's right.  But you couldn't set it on your own without

25  his consent either.  Right?

1  A.  Of course.

2  Q.  Of course.

3      Now, you said that you managed five of Bill Lehman's

4  auto dealerships.  Correct?

5  A.  That's correct.

6  Q.  I guess you then oversaw and were responsible for selling

7  hundreds, if not thousands, of cars.  Right?

8  A.  I was responsible for selling cars, yes, and service as

9  well and parts as well.

10 Q.  And purchasing cars on trade as well.  Correct?

11 A.  Purchasing cars what?

12 Q.  When people would come trade cars, you would have to value

13 cars.

14 A.  Of course, appraise.

15 Q.  Did you ever buy a car from Mr. Lehman or his dealerships

16 without looking at the car or having someone inspect the car?

17 A.  Of course.  My used car managers always did that.

18 Q.  Your used car manages always inspected the cars.  Right?

19 A.  You can buy the cars over the phone as well.  You don't

20 have to do that and, you know, right now everybody is buying

21 over the Internet.

22 Q.  Well, they can buy a new car over the phone, but would you

23 buy a used car if I called you up and said "I have a 2000 Honda

24 Civic with 500 miles on it that has been in my garage"?  Would

25 you buy that from me sight unseen?

Goldstein - Direct

1    A.  Most definitely.

2    Q.  You would?

3    A.  I will ask you certain questions.  "Does the car need

4    tires?"  You will say "Yes" or "No."  "How many miles on the

5    car?"  You will tell me.  "Does the car need any paint?"  You

6    will say "No."

7            "1 to 10, what would you put on the car?"  "Maybe 8."

8    I would say "I'll give you that much."

9            If you bring me the car and the car is not described

10   right -- that's how you buy the car from wholesalers.

11   Q.  So, you put a condition on it.  If the car is not what it's

12   represented to be, you don't take it?

13   A.  If the car is not what was described to me -- you can buy

14   over the phone.  As a matter of fact, that's main practice how

15   cars being bought now.

16   Q.  Would you also check there's no lien on the car?

17           MR. LICHTMAN:  Objection to relevance, this whole line

18   of questioning.

19           THE COURT:  Overruled.

20   A.  Definitely.

21   Q.  Definitely?

22   A.  You cannot buy with a lien.

23   Q.  Let me show Mr. Lichtman why this is relevant.  We were

24   talking about before about your purchasing and selling large

25   ships.  You are aware these large ships may have liens and

105

Goldstein - Direct

1  large encumbrances against them.  Correct?

2  A.  When I was buying, I was usually buying with people like

3  Chaban that understands that industry.  I did not, so they were

4  checking all this out.

5  Q.  That's what I wanted to make sure.  You're not an expert in

6  the shipping industry.  Correct?

7  A.  I am not.

8  Q.  Mr. Chaban was?

9  A.  Not him.  His crew.

10  Q.  So, you relied on him and his crew?

11  A.  Yes.

12  Q.  For value as well as the capability of the ship to do what

13  it's supposed to do.  Correct?

14  A.  The value of the ships are usually representing what you

15  can get for the ships at certain times.  It's not -- this is

16  not an example with the cars.  The car you buying, that is one

17  thing.  The ship could be not in the shape.  If the ship is

18  generating so much money, that's what the ship worth.

19  Q.  Had you heard Mr. Chaban testify about tired metal?  Do you

20  recall that testimony?

21  A.  Yes.

22  Q.  Are you familiar with that phrase?

23  A.  Very little.

24  Q.  You agree as ships gets over 30, 40, 50-years-old, the

25  metal could crack and leak and become tired?

Goldstein - Direct

A.   Right.

Q.   In January and February of 2009, can you tell me what liens and encumbrances there were against the CHALSI?

A.   I have no idea.  There should not be any liens because it was paid for.  I paid for the hull for the vessel and we just build the vessel in early 2000.

As far as tired metal, we put new vessel.  So, for you to understand, we just built very new vessel from scratch.

Q.   You didn't rebuild the whole hull of the ship, did you?

A.   No, we did.

Q.   Oh?

A.   We built -- there is a phrase which --

MR. PHILLIPS:  If I may approach, Your Honor?

THE COURT:  You may.

BY MR. PHILLIPS:

Q.   Do you know if this is a picture of the CHALSI?

A.   Could be.  Yeah, it says "CHALSI."

Q.   My question is do you know if that's a photograph of the CHALSI.

A.   No, I don't.

Q.   You do not know.  Okay.

Now, let's go over these offers you're talking about. Have you produced to us a single written document showing us an offer to purchase the CHALSI from any third party?

A.   We have written offer and Chaban knows about that.

Goldstein - Direct

1    However, from what I understood, this deal is completely closed

2    and that's why I didn't kept it all the written notice.

3    However, we have oral offers and we have one gentleman who gave

4    me an offer who knew the shape of the vessel and he gave me

5    $1.3 million as well.

6    Q.  Let me back up again.  Do you have a single document --

7    A.  Not with me right now, but I probably can provide you

8    something.

9    Q.  Well, why haven't you done that in the last year we've been

10   in litigation if that's what the whole case is about?

11   A.  I didn't know what the case was all about.

12   Q.  Until today you didn't know what the case is about?

13   A.  It's not today.  I didn't know I need to produce this type

14   of things.  I thought Chaban wants to get repair bills after he

15   bought the vessel.  That was my understanding.

16   Q.  So, you're saying no one ever told you what this case is

17   about and you only thought it was repair bills?

18   A.  I went in mediation with Chaban --

19   Q.  You can't talk about mediation in court.  I'm sorry.

20   A.  If you want me to explain --  okay.

21   Q.  You can't talk about mediation.

22   A.  They told me what this was about.

23   Q.  Clearly, you were not told if that's what you think this

24   case is about.

25          MR. LICHTMAN:  Objection.  Argumentative.

Goldstein - Direct

```
 1          THE COURT:  Sustained.
 2  BY MR. PHILLIPS:
 3  Q.  Can we go to Exhibit 4, please?  Do you have Exhibit 4?
 4  Just so I'm clear, I want to set the stage for you now,
 5  Mr. Goldstein.
 6          On January 25th of 2009 in Exhibit 1 you acknowledged
 7  the debt and discussed the transfer of the shares.  Correct?
 8  A.  On January 2009?
 9  Q.  Yes.  In Exhibit 1 when you signed that letter at the cafe,
10  that was January 25th, 2009.  Right?
11  A.  Yes, of course, yes.
12  Q.  Okay.  And then we talked about Exhibit 10 which was on
13  March 4th of 2009 where you transferred your shares in Dexter
14  Lines to Paladin Shipping.  Do you recall that?
15  A.  That's correct, yes.
16  Q.  Now, if you look at Exhibit 4, that shows that on April 8th
17  of 2009 --
18  A.  Okay.
19  Q.  -- you sent $400,000 -- well, actually Star Capital sent
20  the $400,000 --
21  A.  Correct.
22  Q.  -- to Paladin Shipping --
23  A.  Yes.
24  Q.  -- Mr. Chaban's company.
25  A.  Yes.
```

Goldstein - Direct

1   Q.   And at that time you thought -- you said it was your belief

2   that you've paid off the loan.  Correct?

3   A.   Not only -- I said his bookkeeper said that that's the only

4   thing I owed plus the interest.

5   Q.   You never wrote a letter stating that you had satisfied the

6   payment, did you?

7   A.   I wrote another letter which says that I paid the first --

8   we had 750 and 400.  When I paid 750 with the shares, then she

9   told me "When are you going to pay 400,000?"  I said "I'll pay

10  when my due date will be," and that's when I paid.

11  Q.   In fact, sir, you never even asked for the loan to be sent

12  back marked "Paid in full" at any time, did you?

13  A.   What is the question?

14  Q.   You never even asked for those notes, the loan documents to

15  be marked "Paid in full" and sent back to you.  Correct?

16  A.   They asked me to pay $400,000 and they asked me when this

17  money will be transferred to them.

18  Q.   Clearly, you don't understand the question.  Let me

19  rephrase it.

20  A.   Please.

21  Q.   You understand that you signed notes what you call a loan

22  agreement.  Right?

23  A.   Yes.  Aha.

24  Q.   You never asked to have those sent back to you and marked

25  "Paid in full," did you?

June 30, 2011

1   A.   I did not.

2   Q.   You're -- in the auto industry, you know if there was a

3   lien on the title, you knew to have that satisfied and sent

4   back from the state.  Correct?

5   A.   Correct.

6   Q.   And you know with Bill Lehman, if they ever sign a note or

7   financing agreement, at the end of the term you send the notes

8   back --  correct?

9   A.   Correct.

10  Q.   -- once they're paid.

11          So, in your profession as the head of finance and the

12  head of these five auto dealerships, you're very familiar with

13  lending money, aren't you?

14  A.   Yes, I am.

15  Q.   In fact, you said that one of your specialties is

16  money-lending and investing.  Correct?

17  A.   Correct.

18  Q.   Yet here you never asked to have the original loan

19  documents sent back to you at any time.  Correct?

20  A.   Can I clarify something?

21  Q.   If you must.

22  A.   The money Chaban sent to me was sometime in October.  The

23  note I wrote him was sometime in January.  The promissory note

24  you have was one month after.  Chaban sent me the money on pure

25  goodwill and trust and I did the same thing for him long time

1    ago because he always lend the money from me without any single

2    paper.  So if we go and check who is the lien on the title, we

3    trust each other.

4    Q.  I think you just said he sent you the money in January.

5    A.  I didn't say that.  I said I signed the note in January,

6    that note, but he sent me the money in September.

7    Q.  You signed the notes in September, didn't you, the two

8    notes?

9    A.  No.  These notes were signed afterwards.  It's not like I

10   signed the notes and he sent me the money.  It was a few weeks

11   after.  If I have intention not to pay like you think I did, I

12   never sign anything at all.

13   Q.  I'm not saying you never had an intention.

14   A.  It looks to me like you said "You never checked liens on

15   the title."  We trust each other.  I never thought it would

16   come to that point.

17   Q.  Let's go back.

18   A.  Okay.

19   Q.  We were talking about January 25th.  You signed Exhibit 1.

20   A.  Which was four months after, right.

21   Q.  March 4th, you signed Exhibit 10 transferring the shares.

22   April 8th you sent $400,000.  Why then on September 16th of

23   2009 -- if you look at Exhibit 53, that's a letter written by

24   you --  correct --  exhibit 53?

25   A.  Yes.

112

Goldstein - Direct

1  Q.  Why then if you believed everything was satisfied in April

2  when you sent the 400,000, did you write a letter to Black Sea

3  Shipping Management Company authorizing an MBA and Ph.D in

4  economics to audit and review the financial and economic

5  indicators of the CHALSI?

6  A.  When you're selling the ship or selling your shares and you

7  own 50 percent of that, it's always -- there's some fuel on the

8  ship.  It's oil on the ship.  It's a lot of things you have to

9  consider and usually after you sign that, then you go plus and

10 minuses.  We never did that.

11        On top of that, the vessel which we sold before,

12 CORALL, I knew the insurance is coming.  I never been told and

13 I found out from his partner that 120,000 did came in and I

14 confront him.  He said "Oh, yeah.  We forgot to do that.".

15        So, I said "I want to check all the books to see if

16 you forgot something else," and if everything would be okay,

17 then he should show me the books.

18 Q.  If it showed you owed him $1 million, you would have paid

19 the $1 million?

20 A.  Oh, yes.

21 Q.  Didn't you want an audit in September of 2009 because you

22 were trying to determine the value of the CHALSI?

23 A.  What is the question?

24 Q.  Didn't you write that letter in September of 2009 because

25 you were trying to determine the value of the CHALSI?

Goldstein - Direct

1  A.  This letter?

2  Q.  Yes.  Isn't that so you could determine the value of the

3  CHALSI?

4  A.  This letter has nothing to do with the value.  This letter

5  has to do with what I get paid and I know that I was not paid

6  the right way.  Chaban told everybody that the vessel used to

7  make 500,000.  He paid me $40,000 a month.  So, the vessel used

8  to make $1 million-plus.

9  Q.  So, as an investment banker, auto dealer, investor in adult

10 video stores and whatever else you do, are you telling me that

11 after you transfer your shares and buy or sell a business, you

12 go back six months later to do an audit to settle up?

13 A.  I owed him the interest on the money and that's the reason

14 I came.  I want to find out how much -- what I owed and what

15 maybe he owed me.  If I will not find out anything on the

16 books, I'll just pay him what I owed him.

17 Q.  Well, so, as you sit here today you acknowledge that you

18 owe Mr. Chaban the interest on that money.  Correct?

19 A.  Yes.

20 Q.  Is there a reason you haven't paid it?

21 A.  I still want to see the books.

22 Q.  Well, have you asked for that in this case and maybe sued

23 for an accounting?

24 A.  I ask him so many times and he never produce it.

25 Q.  Do you have a bank account of your own?

1  A.  Yes, I do.

2          MR. LICHTMAN:  Objection.  Relevance.

3          MR. PHILLIPS:  I'll get to it, Judge, if I have two

4  more questions.

5  BY MR. PHILLIPS:

6  Q.  Do you have a checking account?

7  A.  Yes, I do.

8  Q.  If you have a bank account and checking account, why did

9  all the money from Mr. Chaban and his companies go into Star

10 Capital's accounts and all the money back from Mr. Chaban come

11 from Star Capital accounts if they were loans to you?

12 A.  What is the question?

13 Q.  Why were you using your companies' accounts rather than

14 your own accounts for personal loans?

15 A.  I think the first tranche came to me and then to Star

16 Capital.  The second one came to Star Capital directly.

17 Q.  Can you look at Exhibit 3, please?

18 A.  3?

19 Q.  3.

20         These were produced by Star Capital and don't they

21 show that both the 800,000 and 400,000, the first two payments

22 on September 5th and September 8th, were sent to Star Capital

23 fund's accounts?

24 A.  Okay.  Yes.

25 Q.  Correct?

Goldstein - Direct

1  A.  I was under the impression it came to me.

2  Q.  So, they didn't come to you.

3  A.  I was under the impression one tranche came to me.

4  Q.  So, the money was used by Star Capital as well.  Right?

5  A.  Of course.  That's the money we needed.  It was paid back

6  from Star Capital.  Is that correct?

7  Q.  Well, not quite.  Only 400,000 was.  There's still quite a

8  bit missing.

9       If you could now look at Exhibit 6, please, and on the

10  very top of the page there's numbers.  If you could look at

11  number 3.  It's the second page of Exhibit 6.  Do you see that?

12  A.  Okay.  Tell me what you're referring to.

13  Q.  Do you know what that swift input is.  Do you see the

14  document?  Just page 3, the top upper left.  Do you see that?

15  A.  Tell me what should I look for.

16  Q.  Okay.  First of all, under -- next to number 70 -- there's

17  a number 70 there -- it says "Remittance information."  Do you

18  see that?  It says "Funds as per loan agreement dated" --

19  A.  I think I'm on the wrong page.

20  Q.  Let me show you.

21       MR. PHILLIPS:  If I may, Your Honor?

22       MR. LICHTMAN:  Gary, can you show me where you're

23  reading from?

24       MR. SHALEK:  I'll show him.

25  BY MR. PHILLIPS:

Goldstein - Direct

1    Q.   Okay.  If you look at number 33 B, that shows $810,000 was

2    sent.  Correct?

3    A.   Okay.

4    Q.   You're a financial guy.  Do you understand that that's what

5    it says?

6    A.   Yeah, I guess.

7    Q.   Okay.  Then if you look at number 59, it shows the

8    beneficiary is Star Capital.  Do you see that?

9    A.   Okay.

10   Q.   And then if you look at number 50 F, it shows it came from

11   Concord Shipping Corporation.  Do you see that?

12   A.   All right.

13   Q.   You know that Concord Shipping Corporation is one of

14   Mr. Chaban's companies.  Right?

15   A.   All right.

16   Q.   And then under 70 it says "Funds as per loan dated June

17   2nd, '08."  Do you see that?

18   A.   Okay.

19   Q.   Did you borrow $810,000 from Concord Shipping Company on

20   June 2nd before you made these other loans in September?

21        MR. LICHTMAN:  Objection.  Relevance.  There's nothing

22   in this Complaint that deals -- in this lawsuit that deals with

23   any kind of $810,000 loan.

24        MR. PHILLIPS:  Your Honor, they're in evidence

25   already.

Goldstein - Direct

```
 1              THE COURT:  Overruled.
 2              MR. LICHTMAN:  They're what?
 3              MR. PHILLIPS:  They're in evidence.
 4   A.  I think that's the money he owed me and he paid it off.
 5   All the time, I'm lender.  Just once I asked him to give me the
 6   money.  So he paid me back what he owed and we didn't have any
 7   piece of paper saying that he owed me one cent.  I just wanted
 8   for you to know.
 9   Q.  That wasn't another loan to you from Concord Shipping?
10   A.  No, it's not.  It's paid off what he owed me.
11   Q.  You're sure?
12   A.  It was not another loan.
13   Q.  Are you sure?
14   A.  I'm sure there's not another loan other than 750 and
15   400,000.
16   Q.  Now, if we go to Exhibit 14, this is the loan agreement
17   that you signed on the bottom of the page.  Correct?
18   A.  That is correct.
19   Q.  If you look at paragraph 6, you see where it says "The loan
20   shall be considered repaid at the moment when the entire amount
21   of loan, including the interest, is handed in or enters the
22   money-lender's bank account"?
23   A.  Yes.
24   Q.  Okay.  That still hasn't occurred, has it?
25   A.  I still want to see the books.  I don't know what I owe
```

118

Goldstein - Direct

1  him.  He will not provide me any information.

2  Q.  So, you're telling the Court, as we sit here today, that

3  even though money is due you don't want to pay it because you

4  want to go look at the books.

5  A.  I do not know whether I owe him the money or he owe me the

6  money.

7          Can I add something up?  If you heard my attorney was

8  asking questions, I was willing when I came to Odessa to put

9  $500,000 with mutual friend and Chaban will put 500,000 to show

10  me the books.  If he will find anything wrong, I will lose the

11  money.  He refused to do so.  He would not show me the books.

12  I was his partner.

13  Q.  You heard Mr. Chaban say that conversation never occurred.

14  A.  Because he said a little different, but Chaban probably

15  will not admit it anyway.  But what can I tell you?  He should

16  show me the books.  I'm his partner.  I'm not asking for

17  anything else.

18  Q.  Why didn't you send out a request to look at the books in

19  this lawsuit?

20  A.  I did.  You saw it.

21  Q.  No, I'm talking about in the lawsuit.

22  A.  What's the question?

23  Q.  In the lawsuit you have a right to ask for documents just

24  like we did.  Why didn't you ask for those documents?

25  A.  I don't know -- he wouldn't show me the books long time

Goldstein - Direct

1    ago.  Why would he show me right now?  I still willing to do
2    that.
3    Q.  Could you look at Exhibit 54, please?
4    A.  Hold on for a second.
5    Q.  By the way, Mr. Goldstein --
6    A.  Yes, I'm here.
7    Q.  -- is there anything in your loan documents that states
8    you're entitled to a set-off or an accounting or to inspect
9    records or do anything else before you have to pay?
10        MR. LICHTMAN:  Objection.  Calls for legal conclusion.
11   A.  I don't know what is said.
12        THE COURT:  Overruled.
13        MR. LICHTMAN:  Leon, hold on.
14        THE COURT:  Overruled.
15   BY MR. PHILLIPS:
16   Q.  Are you saying you don't know what the loan documents say?
17   Is that what you said?
18   A.  Should I answer or no?
19   Q.  Yes.
20   A.  Ask the question, please, one more time.
21   Q.  Is there anything in the loan documents -- you're talking
22   about wanting an accounting -- that gives you a right to an
23   accounting before you pay the loan?
24   A.  If he would refuse to give me that, what should I do?
25   Q.  Let me ask again.  Is there anything in the loan document,

120

Goldstein - Direct

```
 1   if you read it, that gives you the right to an accounting
 2   before you have to pay off the loan?
 3              MR. LICHTMAN:  Objection.  The document speaks for
 4   itself.
 5              THE COURT:  Overruled.
 6   A.  Which loan documents are you referring to?
 7   Q.  Any loan document, any record before us today, any one you
 8   want to pick.
 9   A.  It is common practice when you selling ship -- I cannot
10   tell you anything else.  I would like to see the books.
11   Q.  Do you agree with me that there's nothing in writing that
12   gives you the right to an accounting before you have to pay off
13   that loan?
14   A.  I do not know that.
15   Q.  You don't know.  Okay.
16              Now, Mr. Chaban, I'm curious.  Mr. Lichtman was asking
17   some questions about this Exhibit 54 and I want to know what
18   date did you write this letter?
19   A.  What is the question?
20   Q.  What date -- when did you write that letter?
21   A.  I wrote the letter after we talked with Chaban over the
22   phone.  I think it was February 1st.  I think that's what it
23   says, and --
24   Q.  Wait, wait, wait.  Where does it say you wrote it February
25   1st?
```

Goldstein - Direct

1  A.  I think somewhere there.  Yeah, it's here.  Paragraph --

2  almost at the very end.  "Hereby I inform you starting February

3  1st, 2009, I'm stopping interest payments on $750,000 credit

4  because you -- I consider this credit is paid off."

5  Q.  So, you wrote it before February 1st.  Right?

6  A.  What's that?

7  Q.  You wrote it before February 1st.

8  A.  No, I didn't wrote before.  This letter -- when this letter

9  happened, when the conversation happened was February 1st.  No,

10 I wrote it after.  Of course, after.

11 Q.  You wrote it before February 5th.  Correct?

12 A.  After.

13 Q.  After?  Then why do you say "Hereby I inform you that

14 starting February 5th."  How could you start something after it

15 happened already?

16 A.  Because I was talking to him on the phone and I made him an

17 offer for the ship for $1.5 million.

18       I said "I would like for you to transfer the stock and

19 I will give you 1.5."  It was not only there.  I said "I have

20 an offer.  Would you sell for 1.5?"

21       Chaban hang up the phone on me and I couldn't hear

22 from him a couple of weeks.  Every day it cost me almost $1,000

23 in interest.  So, I tried to get ahold of him.  Never answer.

24 I wrote him this letter.

25 Q.  Maybe I'm not being clear.

Goldstein - Direct

1    A.   All right.

2    Q.   You wrote this letter and you say "Hereby I inform you that

3    starting February 5th, 2009 I am stopping interest payments."

4    Do you see that?

5    A.   Right.

6    Q.   So, you were informing him that starting on February 5th

7    you were stopping interest payments.   Right?

8    A.   Okay.

9    Q.   So, then, when did you write there letter?

10   A.   I wrote this letter after February 1st.   Let's say February

11   15th.

12   Q.   Why would you write a letter on the 15th saying you were

13   stopping interest payments 10 days earlier?

14   A.   Because I was making an offer on February 5th.   If he'll

15   accept it, it's paid off.

16   Q.   And just so I'm clear, on January 25th --

17   A.   Right.

18   Q.   -- shortly before you stopped the interest payments on

19   February 5th, you wrote a letter telling Mr. Chaban that he can

20   have 50 percent of your share in the ship as part of the

21   collateral.

22   A.   Correct.

23   Q.   And then 10 days later, within 10 days of your doing this

24   wonderful thing on your own, you write a letter saying "I'm not

25   paying you any more interest."

123

Goldstein - Direct

```
 1              MR. LICHTMAN:  Objection.  Argumentative.
 2   A.  I think you misunderstood.  I --
 3              MR. LICHTMAN:  Mr. Goldstein.
 4              THE WITNESS:  Yes.
 5              MR. LICHTMAN:  Objection.  Argumentative.
 6              THE COURT:  Overruled.
 7   BY MR. PHILLIPS:
 8   Q.  Was it within 10 days you wrote this follow-up letter?
 9   A.  No.
10   Q.  Was it within 10 days you stopped paying the interest?
11   A.  February 5th, 10 days after I wrote the letter I called him
12   and said "I have a offer $1.5 million."  He said "I'm not sure
13   if your -- who have the money."
14              I said "I will buy your shares for 750."  That's what
15   it was all about and he hang up the phone.
16   Q.  How could you buy his shares?  You didn't even have the
17   money to pay back the loan?
18   A.  I have the money.  He would not -- my loan due was in
19   March.  He was asking me to give the money back in December.
20   Q.  This is February now --
21   A.  Right.
22   Q.  -- A month before the loan is due.
23   A.  My loan is not due at this time.  My loan due in a month
24   and a half.  So, right now we start selling the ship.  We start
25   selling the vessel.  We had offers from the vessel.
```

Goldstein - Direct

1    Q.  When did you start selling the vessel?

2    A.  When Chaban asked me, he needs the money.  I said "The only

3    way if you want to get the money before, then sell the vessel."

4    Q.  Did you --

5    A.  If he will not ask me for the money before, we will not sit

6    in this courtroom.  I will have my vessel.  He will have his

7    750.  I didn't have problems to pay him in time.

8    Q.  Didn't Mr. Chaban say "Send me a written agreement from the

9    purchaser to look at"?

10   A.  No.  I said "I will buy it."

11   Q.  You will buy it.

12   A.  That's what it says here.

13   Q.  How can you buy it?  You didn't have any money.

14          MR. LICHTMAN:   Objection.  Asked and answered.  He's

15   mischaracterizing the witness' testimony.

16   A.  I had the money.

17   Q.  You had the money in your account at that time?

18   A.  I had the money.

19   Q.  If we get your bank records and your account records for

20   February 2009, you had that much money in the bank?

21   A.  I may.

22   Q.  You may?

23   A.  I probably had some money in the bank.  Could be some money

24   in my company.  I had a lot of real estate that I could lend

25   the money from, like collateral.  So I could get the money, but

1    I didn't need to.

2          We start selling the vessel together.  We have -- he

3    said the vessel is not sellable.  I had four offers in probably

4    the next 10 days.

5    Q.  That's wonderful.  Can we see one written offer that you

6    got, one written offer?

7    A.  Well, why would I write this letter if I didn't --

8    Q.  I'm asking you, can I see one written offer?

9    A.  I don't have it because the deal was done.  Let me ask you

10   a question.  Why would I send him 400,000 if I am, like, I

11   didn't have the money, I didn't want to pay.

12   Q.  Well, Star Capital sent that money, first of all.  Right?

13   A.  The same thing.

14   Q.  Oh, it is the same thing?  I thought you said you didn't

15   know about the bank records of Star Capital.

16   A.  The money needs to be to Star Capital and Star Capital used

17   the money and Star Capital -- Chaban was not the only investor

18   in Star Capital.  We had different invests and everybody got

19   paid.

20   Q.  Can you show me the letters that you wrote to other

21   shareholders, Mr. Chaban and Mr. Sinitsky, to see whether they

22   wanted to sell the boat?

23   A.  I asked Chaban if he wants to sell his shares.

24   Q.  Excuse me.  I don't want to interrupt.  My question is just

25   simply can you show me any letters.  That's a "Yes" or "No."

126

Goldstein - Direct

1    A.  Letters from who?

2    Q.  From you to any of the other shareholders saying "Do you

3    want to sell the vessel?"

4    A.  That I want to sell the vessel?

5    Q.  Yes.

6    A.  No.  This is the letter --

7    Q.  Other than that letter, do you have anything else before

8    that?  "Yes" or "No"?

9    A.  I made a note to offer to him, "I will buy this vessel for

10   $1.5 million."  What other offers do you want?

11   Q.  That's wonderful.  You made an offer, and you said to him

12   "Give me the vessel.  Give me the stock and I'll pay you in the

13   future."

14   A.  I did not say that.  Why would I do that?  He had the

15   vessel.  He had all the documents.

16   Q.  You understand you had no right to sell that vessel on your

17   own.  Correct?

18   A.  Nobody will buy 50 percent of the shares, but Chaban wants

19   the money and we start selling the vessel.

20   Q.  Sir, that's not my question.

21   A.  Your question --

22   Q.  My question is do you understand that you, personally, did

23   not have the right to sell that vessel without the other

24   shareholders' consent.  Correct?

25   A.  Because I'm 50 percent of the owner.

June 30, 2011

Goldstein - Direct

1  Q.  So, you could not sell it.  Correct?

2  A.  I could have talked to Yuri Sinitsky.  He would sell his

3  shares and that's --

4  Q.  But Mr. Chaban had to agree to sell his shares, too.

5  Right?

6  A.  He said so.

7  Q.  He didn't have to agree to that, did he?

8  A.  It's, obviously, understood to everybody that Chaban said

9  that the vessel was 400,000 and when the offer came over a

10  million he did not have intention, never had intention to sell

11  it.  He just want to buy it cheap.

12       That's how you do it.  You buy the vessels when the

13  market is low and you sell it when the market is high.  That's

14  how you making your money.

15       Right now is the time to buy the vessels or it was at

16  that time when the market -- nobody wants to buy it, but

17  everybody knew this vessel used to make a lot of money because

18  we made the ship very, very interesting.  It holds more than

19  5,000 tons and that's how we made the ship.  So, this vessel

20  never lost the money.

21       However, when we start selling the vessel, Chaban

22  realized he wants to buy it cheap and that's what he's doing

23  right now.

24  Q.  Sir, you said a second ago Mr. Sinitsky would sell his

25  interest in the vessel at that time.  Right?  Isn't that what

Goldstein - Direct

1   you just said?

2   A.   Mr. Sinitsky tried to buy it for 1.4 and that's his offer

3   was, but Chaban will not let him interfere in the sale.

4   Q.   Can you look at what you wrote in Exhibit 54 again to

5   refresh your recollection?

6   A.   Sure.

7   Q.   Didn't you say -- and this is the fourth paragraph from the

8   bottom -- "It seems like no one else is interested in selling

9   the ship."  Do you see that?

10  A.   Yes.

11  Q.   That means none of your other shareholders are interested

12  in selling the ship.  Correct?  That's what you wrote.

13  A.   Yes.

14  Q.   And you said "At this point I am not either."  Right?

15  That's what you wrote?

16  A.   Right.

17  Q.   You didn't want to sell the vessel either at that point.

18  Correct?

19  A.   No, no.  You cannot take two words out of the entire thing

20  and say I didn't want it.

21         I'm saying this is a frustration letter.  I said "I

22  find so many buyers and nobody cares."  So, nobody wants to

23  sell the vessel.  "I made you an offer for 1.5.  You reject it.

24  It's a shotgun.  Then you will buy my shares."

25         Chaban tried to buy the time.  Every day it costs me

Goldstein - Direct

1   like $800 a day for interest.  That's what it's all about.  I

2   want to resolve the thing.  I said "You will buy it or I will

3   buy it."  Obviously, we couldn't work together anymore.

4   Q.  You had no right to make a shotgun offer, did you?

5   A.  That's what I do.

6   Q.  That's what you do.  But there's no agreement that said you

7   had the right to do that, was there?

8   A.  He had to buy me out.

9   Q.  If someone says "You have to buy me out," it has to be

10  done?

11  A.  That's the agreement we had before, that we could buy each

12  other in the shotgun.

13  Q.  Where is that written?

14  A.  Well, we been in business for quite some time.  That's how

15  we doing things.  How you do the partnership?  If one person

16  doesn't want to sell his shares, then what do you do?

17          Chaban needs the money and I tried to help him.

18  That's what it's all about.  I would pay him 750 and I would

19  have the interest in that vessel.

20  Q.  And yet in this case, it is true that you never produced a

21  single document evidencing who the buyer was or what the terms

22  of any transaction were.  Correct?

23  A.  I was the buyer.

24  Q.  You were the buyer.  Okay.

25          And then in this letter you wrote and you say "Hereby

1    I inform you that starting February 5th, 2009 I am stopping

2    interest payments on the $750,000 credit because you crumbed my

3    deal and I consider this credit paid."  Do you see that?

4    A.   Yes.

5    Q.   You never said there was an agreement, just that you

6    considered it and that's the way you were going to have it

7    done.  Right?

8    A.   That's August.  I'm buying -- he said he would sell the

9    ship for 1.4.  I gave him 1.5.  I just wanted to finish this

10   transaction.

11   Q.   And didn't Mr. Chaban tell you "We need to have the ship

12   valued so we could accurately appraise the stock value"?

13   A.   After I tried to buy it for 1.5.  I was the buyer.  I

14   didn't have to do anything.  I bought it blindly and decide

15   because I have somebody who want to go with me in this

16   business.

17   Q.   I understand you think you were the buyer, but this letter

18   says you have no interest in selling the ship, doesn't it?

19          MR. LICHTMAN:  Objection.  Mischaracterization of the

20   document.

21   A.   What it says?

22          THE COURT:  Overruled.

23   BY MR. PHILLIPS:

24   Q.   You say "But that wouldn't do.  It seems that no one else

25   is interested in selling the ship.  At this point I am not

131

Goldstein - Direct

1  either."  Isn't that what you typed?

2  A.  That's exactly what it says because I'm tried to sell the

3  ship and they didn't want to do anything.  Then I said I will

4  buy the ship.  What else should be done?  Then I stopped the

5  interest.

6  Q.  I'm sorry.  Are you done?

7  A.  I'm done.

8  Q.  Do you have a Russian typewriter at home?

9  A.  No, I don't.

10  Q.  How did you get this typed up in Russian then?

11  A.  There is computers with Russian typing.  I don't remember

12  how I did it, but I think that's what I did.

13  Q.  You have a computer at home with Russian typing on it?

14  A.  Yes.

15  Q.  By the way, in January of 2009, Exhibit 1, you wrote -- and

16  that was 10 days before you decided you were going to stop

17  paying interest.  Right?  You decided to stop paying interest

18  February 5th, 10 days after this letter, Exhibit 1, is written.

19  Correct?

20  A.  I don't know.  1.4 on January 25th and I made him an offer

21  of 1.5 just to close and forget about the situation.

22  Q.  Maybe I should ask the question again.  It has nothing to

23  do with offers.  I don't care about what the offers are, who is

24  buying the ship or selling the ship.

25          My only question is that on January 25th, 2009 you

1    wrote this handwritten letter, 10 days before you decided you
2    were going to stop paying the interest on February 5th.  Right?
3    A.  I didn't decide.  What I wrote on January 25th, I didn't
4    know what I would do on February 5th.
5    Q.  I understand, but you did this within 10 days after you
6    gave up your shares, within 10 days --
7    A.  I didn't give my shares.  This is the letter for him to
8    have a peace of mind.  I shouldn't do it.  I just did it.  I
9    said "Anatoliy, do not worry.  Crisis are there.  I will pay
10   you in time."

11          He said "Give me something in writing.  Who knows what
12   can happen to you."  I said "No problems," and I give him this
13   letter.

14          Four months later after I got the money and then I
15   made him an offer again because every day it cost him between
16   800 and $1,000 in interest and I should pay.  I didn't want to.
17   Q.  So, stick with me, though, for the time line.
18   A.  Sure.
19   Q.  On January 25th you write this agreement saying "If the
20   debt is not repaid timely, Chaban should have the right to sell
21   my shares if he agrees in writing to the price."
22   A.  Okay.
23   Q.  Then 10 days after you write this letter for his peace of
24   mind, you decide you're not paying interest anymore as of
25   February 5th.  Correct?

1   A.   No.

2   Q.   No?

3   A.   No.   I make him an offer.   If he'll accept it, this deal is

4   done on February 5th.   I know what you're referring to.   I'm

5   just trying to explain why I did that.

6   Q.   I'm not asking for an explanation.   I'm just asking if what

7   you wrote here is true, that "As of February 5th I'm not paying

8   any more interest."

9   A.   Because I made him an offer and he did not want to do

10   anything.   He just hang up the phone and he thought every day,

11   every day he'll get another 23,000 from me which I didn't want.

12          I said "I will buy the vessel and get it over with."

13   He didn't answer.   I said I'm stopping the interest from the

14   date I give him an offer over the phone.

15   Q.   Sir, simple question:   You wrote this letter on January

16   25th.   Right?

17   A.   Yes.

18   Q.   Within 10 days you write a letter saying "I'm stopping

19   interest payments effective February 5th."   Right?

20   A.   On February 5th I tried to buy the vessel from him.

21   Q.   That's not my question.   Did you say you're not paying the

22   interest?

23   A.   That's correct.

24   Q.   Okay.   Why then if you were trying to buy the vessel and

25   you were -- for four months you had buyers you were trying to

Goldstein - Direct

1  get -- didn't you put this in the handwritten letter that you

2  wrote out on January 25th?  Why didn't you mention any of that

3  in the letter?

4  A.  What should have I mentioned?

5  Q.  How about "I have a buyer for the vessel for 1 million

6  four"?  How about "I will buy the vessel from you for a million

7  five"?

8  A.  I had the buyer for 1.4.  It was his partner and he -- I

9  called his partner.  I said "Do you have the money?"  He said

10 "Leon, I have the money.  I cannot talk to you because Chaban

11 called me and he said if I will interfere in this particular

12 transaction he will push me out of the business and I cannot do

13 that because I owe him the money.  Sorry about that.  He

14 doesn't want to sell it.  He just want to buy it cheap.  I'm

15 out of that," and I understand at that point what is all about.

16        He doesn't need the money.  He just want to buy the

17 vessel cheap.  So, I said to myself --  I call a couple of

18 people and they said "No problem.  Let's do it," and I give him

19 an offer for 1.5 10 days later.

20 Q.  I think we all heard you say that about 10 times.  My

21 question really is not that.

22        My question is if you had buyers or you wanted to buy

23 the vessel or you had other deals, why didn't you put it in the

24 handwritten note that you prepared?

25 A.  This is the letter says that I am buying the vessel.  What

Goldstein - Direct

1  else do you want me to do?

2  Q.  Well, January 25th, the handwritten note that you prepared,

3  where does it say you're buying the vessel in that letter?

4  A.  I did not want to buy it at that time.

5  Q.  So, you decided between January 25th over the next week or

6  10 days you were going to buy it.

7  A.  Yes.

8  Q.  Didn't you say you had been trying to sell it for four

9  months?

10 A.  Let me tell you something.  We didn't try to sell it for

11 four months.  We -- he asked me to give him the money in

12 January.  It was way before my due date and when we start -- I

13 start shopping the vessel.  I had people, four offers in the

14 next 10 days, and they all were in the shipping business.  So,

15 how could I go wrong?  I called somebody else and said "Let's

16 buy it together," and I called him and said "I will pay $1.5

17 million."

18 Q.  All those offers were within 10 days?

19 A.  I --

20 Q.  "Yes" or "No"?

21 A.  It could be even sooner.

22 Q.  Were you trying to shop the vessel for four months?

23 A.  I did not shop it for four months.

24 Q.  Please look at the letter again, 54.

25 A.  I know, but this is where he asked me for the money,

Goldstein - Direct

1  sometime in January.

2  Q.  Will you please look at 54 again, the letter.

3  A.  I know --

4  Q.  You say "I would like to point out the fact that for the

5  last four months I have actively been trying to sell the

6  CHALSI, the dry cargo carrier, and not without result."  Do you

7  see that?

8  A.  Yeah.

9  Q.  So, were you making it up?

10         MR. LICHTMAN:  You said "months," Mr. Phillips.  Do

11  you mean months or weeks?

12         MR. PHILLIPS:  It says "last four months," my

13  translation.

14  BY MR. PHILLIPS:

15  Q.  What did you write, "months" or "weeks"?

16         MR. LICHTMAN:  Weeks.

17  A.  It says "months."

18         MR. LICHTMAN:  The translation --

19         THE COURT:  Why don't we stop at this point?  It's

20  clear we won't be finished today.

21         We'll let Mr. Goldstein retake his seat and do you

22  have an estimate, more or less, of another half day, another

23  full day?

24         MR. PHILLIPS:  I have maybe a half-hour with this

25  witness and maybe a half-hour with the other witness and I'll

1   be done.

2          THE COURT:  All right.

3          MR. LICHTMAN:  I would guess that I would need, I'll

4   call it, 90 minutes with Mr. Goldstein and a very brief time

5   with Mr. Firer.

6          MR. PHILLIPS:  Your Honor, the only other thing is --

7   I don't know how they want to handle this, but Mr. Chaban's

8   daughter is going into treatment for six weeks and he wanted to

9   stay with her at the hospital in Massachusetts.

10         MR. SHALEK:  Germany.

11         THE COURT:  Beginning when?  I'm sorry.

12         MR. PHILLIPS:  He'll be here tomorrow.

13         MR. LICHTMAN:  I'm not available.

14         I don't know if this is acceptable to the Court.  I

15   don't have any plans to recall Mr. Chaban.  He could be

16   excused.

17         MR. PHILLIPS:  Your Honor, he said it would be okay to

18   conclude it without him, if he could be excused.

19         THE COURT:  I was looking at tentatively next

20   Thursday, July 7, from 8:30 to 1:00.  I don't know if that

21   gives you enough time.

22         MR. LICHTMAN:  That would be July --

23         THE COURT:  July 7th.

24         MR. LICHTMAN:  From my perspective, that is bingo.

25   You could not have picked a better day.

1        MR. PHILLIPS:  I have a deposition in the Rothstein

2   case.  Neither of us will be there.

3        THE COURT:  All right.  So, next Thursday, July 7th,

4   at 8:30.

5        Thank you.  Have a safe drive home.  There's a severe

6   weather advisory out.  Thank you.

7                              - - - -

8                    C E R T I F I C A T E

9        I hereby certify that the foregoing is an accurate

10  transcription of proceedings in the above-entitled matter.

11

12  ____07/02/11_____          _____
         DATE                    BARBARA MEDINA
13                               Official United States Court Reporter
                                 400 North Miami Avenue, Suite 12-2
14                               Miami, FL  33128 - 305.523.5518
                                              (Fax) 305.523.5519
15                               Email:  barbara.medina127@gmail.com

16

17

18

19

20

21

22

23

24

25

## A

able 6:6,16 58:2,23 67:5,9 98:21
above-entitled 138:10
Abramenko 28:24 29:1,6,12,17
absorb 99:19
accept 97:17 122:15 133:3
acceptable 137:14
accepted 23:21,22
access 65:14,16
accomplish 33:17
account 113:25 114:6,8,8 117:22 124:17,19
accounting 64:4 113:23 119:8,22,23 120:1,12
accounts 84:21 114:10,11,13,14,23
accruing 92:10
accurate 37:3 138:9
accurately 114:2
Ace 87:5
acknowledge 113:17
acknowledged 108:6
actively 136:5
activities 43:8
actual 67:1
add 7:23 99:3 118:7
additional 74:3
address 3:4 19:22 70:15 82:12,20 84:5
ADMINISTRATIVE 3:2
admit 118:15
admitted 50:25
admittedly 40:10
admitting 62:20
adult 72:1,15,18 113:9
advisory 138:6
affect 71:18 72:7,8,10
affirmed 83:6
afford 37:23,25 38:2,14,15
Affordability 38:8
afraid 97:9
ago 11:19 18:18 32:2 39:5 43:5 73:8,19 74:20
   80:13 81:1 82:4 83:8 85:25 86:4 111:1 119:1
   127:24
agree 15:1,3,4 16:3 28:16 33:20,23 44:25 50:21
   53:12 56:15 94:12 97:14 102:9,17 105:24
   120:11 127:4,7
agreed 4:24 13:24 18:4,6 68:15 70:8 87:4 95:4
   102:1
agreement 28:13 42:18 87:3 90:7,8,12,21,22
   91:24 92:13,19 95:8,14 102:20 109:22 110:7
   115:18 117:16 124:8 129:6,11 130:5 132:19
agreements 24:18 50:20
agrees 132:21
Aha 45:14 46:11 109:23
ahead 6:1 54:9 99:5 100:1
ahold 17:15 121:23
alleged 69:7
allegedly 6:19 68:1
allocated 46:13
allow 14:2 47:8 102:20
allowed 20:20 39:24 49:7 58:6 96:23,24
allows 26:6
ALTONAGA 1:12
American 35:4
amount 8:12 11:13,16,23 18:4 21:8 22:21,21
   38:9 42:19,24 49:20 61:16 117:20
amounts 58:25
Anatoliy 1:5 2:9 4:7 81:22 99:10 132:9
annual 56:19
answer 7:12 12:13,25 15:9,10 16:19,22,23 17:8
   17:13,14 18:1,8 21:14,17 23:1 53:6 58:11
   83:15 84:8 85:10 86:21 91:9,16 96:9,24,25
   102:15 119:18 121:23 133:13
answered 10:9 17:23,25 32:15 34:18 38:13
   49:21 91:21 124:14
answering 96:1
answers 21:13 78:10 88:10
anticipate 98:21
anticipating 26:7 35:9 57:19
anybody 58:3 61:12,15 83:14
anymore 28:12 32:3 36:11 48:17 50:5 54:20
   129:3 132:24
anyway 54:8 65:1 118:15
apartment 7:4,5,9,10 64:25 70:16
apartments 5:5
apologies 4:1
apologize 20:14
Apparently 20:2
APPEARANCES 1:14
appraise 103:14 130:12
approach 39:13 83:25 106:13
approval 14:24 28:6,6
approved 8:15
approximately 8:2,2 61:6 62:16 69:22
April 49:4 108:16 111:22 112:1
aren't 52:22 72:14,17 77:23 110:13
Argumentative 10:19 15:11 107:25 123:1,5
arose 17:2
arranged 5:9
arrangement 6:18 7:7
arrested 16:1
ascertain 23:4
aside 66:15 68:10
asked 4:18 6:4,5,17 8:10,24 10:17 12:18 16:12
   16:17 18:1 22:22 23:23 32:14,18 34:18 40:9
   47:14 48:18,20 54:5,12,15 55:11 74:21 75:17
   81:10 82:20 88:20 91:21 92:15 96:9,13 99:4,6
   99:23,24 100:15 109:11,14,16,16,24 110:18
   113:22 117:5 124:2,14 125:23 135:11,25
asking 6:6,8,10 16:14 23:2 34:15 35:18,19 40:4
   40:22 49:18 55:5,8 78:11 86:14 99:8 118:8
   118:16 120:16 123:19 125:8 133:6,6
asks 82:12 84:5
ASPRO 41:17 43:4,7 44:22 45:8,24
asset 62:1 65:17,18 78:24
assets 47:13 93:1,5
assume 21:1 44:17 46:24
assumed 20:12
attorney 9:25 21:6 70:18 73:17,20 85:7,15
   86:17 87:14,15 118:7
attorneys 81:8
attribute 114,7
attributed 10:14 39:11
audit 63:16 112:4,21 113:12
August 46:16,25 130:8
authorizing 112:3
auto 79:4 103:4 110:2,12 113:9
available 137:13
Avenue 2:4 70:16 82:17 138:13
average 59:19,23 66:19
avoid 17:15
aware 27:1 87:18 93:5 94:7 104:25
A-b-r-a-m-e-n-k-o 28:25
A-C-N-P-O 41:19
a.m 4:9

## B

B 1:16 116:1
back 4:17 12:16 14:2,21 17:3 20:25 21:3,20,20
   22:3,20 23:19 27:12,23 28:23 29:22 30:11,21
   33:2 34:2,24 35:8 45:1 47:23 48:10 49:16,19
   53:4,10 54:12 55:15 56:25 58:6 64:13 70:8
   86:20 94:19,21 98:16 99:23,24 100:4,15,16
   100:19 101:3,5,6,9 107:6 109:12,15,24 110:4
   110:8,19 111:7 112:3,16,18 114:10 115:5 117:6
   123:17,19
bad 6:1 35:3 37:16,19 57:7 75:24
bank 84:21 113:25 114:8 117:22 124:19,20,23
   125:15
banker 113:9
bankrupt 31:21,22
bankruptcy 32:5,6
BARBARA 2:2 138:12
barbara.medina127@gmail.com 2:5 138:15
barely 60:5
based 13:17
basically 61:10
basis 46:21 50:19 51:20
Beach 79:11 82:18
becoming 73:4
beg 72:16 81:20
began 67:7
begged 4:18
begging 87:2
beginning 4:9 27:20 57:25 65:11 69:13 70:5
   137:11
belief 82:17 109:1
believe 10:3 16:20,23 59:22 60:12 93:24
believed 54:16 112:1
belongs 10:13
bench 12:22 21:12
beneficiary 116:8
benefit 46:24 52:17,20
Berger 7:22 4:13
Berlowitz 1:17
Bernstein 73:21
best 76:1
better 137:25
big 100:22
Bill 103:3 110:6
bills 107:14,17
bingo 137:24
bit 28:20 67:11,11,12 78:16 86:12 87:6,21 115:8
black 67:11 112:2
blaming 72:11
blindly 130:14
boats 19:4 43:12,15 44:22 45:4 47:13 58:25
bold 41:21
bone 99:23
book 7:19 9:4 44:14
bookkeeper 8:12 27:2,3 36:14,18,23 37:1,19,23
   41:9,12 42:15,17 47:14 48:13,18 49:18 50:22
   51:2,6,15 109:3
bookkeeper's 37:15
bookkeeping 26:23 35:25 37:3 47:15
books 37:5,9 45:13,24 46:2,5,12 47:16 50:21
   51:2 53:24 56:4 63:2,12,23 65:14 84:19
   112:15,17 113:16,21 117:25 118:4,10,11,16
   118:18,25 120:10
borrow 88:19 116:19
borrowed 88:13 99:21
bottom 117:17 128:8
bought 61:15 68:4,7 72:6 75:3,6,10,24 76:7,12
   79:10,14,15 104:15 107:15 130:14
Boulevard 1:17,23
brand 74:9
break 23:15
brief 64:8 65:9 137:4
briefly 88:12
bring 57:19 86:6 104:9
bringing 59:2,4
broker 24:18 25:4 29:1,3
brokerage 25:2
brother 7:14
brought 24:18 74:12 75:14 76:13 92:18
build 76:13,15 106:6
building 5:21
built 106:8,12
bulk 21:8
business 5:20 19:2,3,6,7 27:19 31:13,20 43:8
   43:10 44:21 47:4 57:8 58:18 60:7 61:9 67:16
   68:11 78:7 81:9 88:15,24,25 89:1,4,5 98:2,4,5
   113:11 129:14 130:16 134:12 135:14
buy 5:25 29:7 30:14,18 32:17 56:10 60:6,11
   61:12 67:19 68:13 69:7 71:21 85:3,4,8,12,16
   85:18,22 86:10,18,19,20 96:5,7 103:15,19,22
   103:23,25 104:10,13,22 113:11 123:14,16
   124:10,11,13 126:9,18 127:11,12,15,16,22
   128:2,24,25 129:2,3,8,9,11,11 130:3 131:4
   133:12,20,24 134:6,14,16,22 135:4,6,16
buyer 28:23 68:19 85:11 97:12 129:21,23,24
   130:13,17 134:5,8
buyers 128:22 133:25 134:22
buying 76:3 103:20 105:2,2,16 130:8 131:24
   134:25 135:3
buys 68:11

## C

C 138:8,8
cafe 91:25 101:25 108:9
calculate 57:5
calculations 65:4
call 20:23 30:11 31:17 48:13,18,21,22 69:25
   99:8 109:21 134:17 137:4
called 19:25 28:22 41:17 48:7 50:3 100:2,6
   103:23 123:11 134:9,11 135:15,16
calling 6:14 31:12 49:18
calls 49:23 66:10 72:22 119:10
Cantor 1:17
can't 20:7,17 37:22,25 38:3 41:25 42:1,2,4,9
   107:19,21
capability 105:12
capital 1:9 16:16 21:9 77:7,16,17,19,22,23 78:1
   78:4,5,6,8,20 79:18,21 80:6,10,12,19,25 81:2
   81:13,14 82:7,8,10 83:9,10,14 84:14,18 87:5
   89:7,10 108:19 114:11,16,16,20,22 115:4,6
   116:8 125:12,15,16,16,17,18
Capital's 77:7 79:24 114:10
car 6:15,16 79:6,13 103:15,16,16,17,18,22,23
   104:3,5,5,7,9,9,10,11,13,16 105:16
care 64:21 70:20 90:13 93:14 131:23
cares 128:22
cargo 45:20,21 86:7 136:6
carrier 136:6
cars 103:7,8,10,11,12,13,18,19 104:15 105:16
case 1:3 5:21 14:22 28:2,4,8,10,11 34:2 37:20
   53:22 69:5 71:24 72:1,4,13,17,19,21 73:8,14
   82:11,14 87:15,17,20,23 88:3 98:23 107:10
   107:11,12,16,24 113:22 129:20 138:2

Cause 73:13
CECILIA 1:12
cent 117:7
Centre 1:22
certain 62:14 104:3 105:15
certainly 25:15 43:23
Certificate 2:15
certified 20:5
certify 138:9
CFO 37:11,12,15,18
Chaban 1:5 2:9 4:7,15 9:5 10:1 13:2 14:14 28:4
34:2 44:10,21 58:8,10 64:17 65:13,17 69:15
70:8,19 75:9,13 76:4 81:22 87:1 88:12,13
89:18,19 90:2,10 91:5,9 93:10 95:3,18,19
96:3,14,15 97:8 98:6,9 100:10 101:10,25
102:9,13,17 105:3,8,19 106:25 107:14,18
110:22,24 113:6,18 114:9,10 118:9,13,14
120:16,21 121:21 122:19 124:2,8 125:17,21
125:23 126:18 127:4,8,21 128:3,25 129:17
130:11 132:20 134:10 137:15
Chaban's 76:7 92:24 108:24 116:14 137:7
CHALSI 7:17 8:1 9:14,16 10:2,17 12:7 17:11
18:7 21:4 26:24 27:6,7,9,10 30:6 31:13 33:3,6
33:19 36:13 39:6,11 44:23,23,23 45:1,5,6
46:3,6,12 47:5,17 51:21 53:21 55:23,23,24
56:2,2,7,11,15 58:21,25 59:2,8,14,15 61:19
63:2,12 65:14,18,19,21 66:16 67:4,8 75:3
85:4 92:23 93:5,10 94:8,9,13 95:12 96:4,14
106:3,16,17,19,24 112:5,22,25 113:3 136:6
chance 5:2 16:20,25 18:21,22
changes 91:19
charge 76:24 99:11
charges 66:15
CHARLES 1:21
cheap 127:11,22 134:14,17
check 36:20 37:12 64:7 91:1 104:16 111:2
112:15
checked 111:14
checking 36:18 50:21 51:3 63:14,14 105:4
114:6,8
checks 37:11
chevrons 3:6
Chinese 44:14
choice 90:14
Chuck 4:12
CITATION 2:22
Civic 103:24
claim 16:20 34:17,22
claiming 34:13 35:18 55:4,8
clarification 96:21
clarify 7:11 15:14 55:11 65:20 77:19 110:20
clear 22:15 75:1 86:10 108:4 121:25 122:16
136:20
clearly 10:21 21:13 102:22 107:23 109:18
clichtman@bergersingerman.com 1:25
client's 38:6
close 59:24 81:17 89:10 131:21
closed 81:4 107:1
closely 13:2
clue 85:24
clueless 20:2
collapse 57:24 58:16
collateral 14:6 15:6 16:11,18,21,24,25 18:7,10
18:10,12,18,22,23 19:10,12 20:9 21:4,21,23
54:12 122:21 124:25
collaterally 20:1
collective 60:25
college 70:21
Collins 70:16 82:17
come 6:19 29:22 33:13,16 38:2,8 68:13,14
103:12 111:16 114:10 115:2
coming 32:23 26:5 46:7 61:8 112:12
commerce 25:18 26:2
commercial 13:21 24:10 35:12
common 120:9
communicating 5:11 51:16
companies 77:19,22,23 80:12 114:9,13 116:14
company 1:10 10:13 37:7,10,13,13 59:20 60:6
60:15,16,18,19,19,21 62:13 15 76:7,19
77:10,11,13,15 78:9,14,15,16,17,23 80:8,24
84:19 87:7 92:23,23,24 93:6 108:24 112:3
116:19 124:24
compel 73:17
Complaint 116:22
complete 27:9 39:22
completely 41:13 107:1
Complied 8:14 42:13 47:20
comply 73:17
Compound 63:4
computer 131:13

computers 131:11
concern 5:2
concerned 21:8 59:11 98:10
conclude 42:19 137:18
conclusion 66:11 72:22 119:10
Concord 116:11,13,19 117:9
condition 65:23 66:5 69:19 100:18 104:11
conference 2:25 3:4
confirm 47:22
confirming 48:11
confront 112:14
confusion 9:9 10:22
conjunction 23:9,13
connection 26:24 41:10
consent 102:25 126:24
consider 14:4 112:9 121:4 130:3
consideration 94:5
considered 18:21 117:20 130:6
consists 7:23 8:11
constantly 91:8
constitute 14:4
consult 102:22
CONTENTS 2:7
context 17:8,24
continue 44:6 50:7 64:9,11
continued 1:12 13:20 17:21 26:2
continuing 25:18
contract 8:15 9:10 11:10 12:4,19 13:3,8,10,11
14:9 16:6 22:1,15 28:10,11 33:7 49:3,8 50:24
52:9,10 68:8,10
contracted 17:7
controlled 60:7,8,14
cont'd 4:8
convenience 89:23
CONVENTIONS 3:2
conversation 6:7,12 17:16,22 22:2 30:4,12,23
62:24 63:7,9 67:18 118:13 121:9
conversations 12:21 51:8,10,14 67:24
convinced 17:17
copy 9:3,4,4,6 44:9
CORALL 29:4 62:13,17,22 112:12
corner 8:18,25 43:13
Corp 78:6,20
corporation 1:5 59:24 60:1 93:11 116:11,13
cost 8:11,11 56:8,11 57:2 121:22 132:15
costs 7:20,23 66:21 94:12 128:25
couldn't 24:14 27:20 33:10 38:14,15 55:17
63:23 95:7 102:24 121:21 129:3
counsel 3:3 17:4 41:13 42:2,8 43:17 70:7
count 16:24
counter 71:22 72:7
country 32:7
couple 5:17 11:19 121:22 134:17
course 5:14 7:20 13:14,19 37:7 39:12 47:4
52:23 56:14,21 59:13,23 61:18 74:19 84:17
97:24 103:1,2,14,17 108:11 115:5 121:12
court 1:1 2:3 3:4 4:1,5,11,22 10:23 12:14,22,25
15:12,24 17:20 18:16 19:20 20:11,22 21:14
23:3 24:19 25:23 28:1 29:10 31:6 32:1,19
38:11,17,25 40:2,5,13,22 41:5,22,25 42:4,5
42:23 43:16,22 44:1,5,9,11,13,18 46:14,23
47:2,6 50:7,9 51:18 55:14 56:13 63:5,8 64:8
64:11,15 65:5,21 66:12 67:7,18 69:24 70:11
72:23 73:12 74:13 81:8 84:1 86:18 87:12,21
87:25 91:22 97:1 104:19 106:14 107:19 108:1
117:1 118:2 119:12,14 120:5 123:6 130:22
136:19 137:2,11,14,19,23 138:3,13
Courthouse 2:3
courtroom 85:15 124:6
cousin 5:8,9 7:7
cousin's 5:15,19
cover 26:9 35:14 49:20 57:11
covered 26:21
co-chairman 77:13 78:1,14,20 80:21 82:11
84:18
co-founder 77:15 78:20
crack 105:25
crazy 32:24
credibility 38:19
credit 18:5 61:25 62:3,6,8,25 63:10 121:3,4
130:2,3
crew 66:20,20 69:19 77:1 105:9,10
crisis 27:21 29:20 95:24 97:9 98:10 99:7,24
100:2,3 132:9
cross 4:8 90:24
Cross-Examination 2:10
crumbled 130:2
curious 120:16
current 84:10
currently 84:6

custody 24:4 52:13
customarily 68:11
cut 31:20 34:19

D

dark 58:18
date 8:18,19,20,25 9:2,10 49:2,8 51:21 67:8
93:17 95:21 96:15 109:10 120:18,20 133:14
135:12 138:12
dated 83:4 115:18 116:16
dates 40:25 41:6
daughter 6:23 64:21 70:19 137:8
David 87:14
day 6:18,24 39:1 83:6 121:22 128:25 129:1
132:15 133:10,11 136:22,23 137:25
days 49:10 74:2 122:13,23,23 123:8,10,11 125:4
131:16,18 132:1,5,6,23 133:18 134:19 135:6
135:14,18
deadline 18:4,6 49:11
deal 5:24 31:19 32:21,24 33:19 38:21 64:2 68:20
76:2 77:5 90:15,24 91:1 100:23 107:1 125:9
123:3 133:3
dealer 113:9
dealerships 79:13 103:4,15 110:12
deals 116:22,22 134:23
debt 12:16 16:14 26:17,25 28:4,10,11 34:2,2,9,9
34:10 49:11,20 53:4 58:6 61:16 69:3 95:2
98:20 108:7 132:20
debts 26:21 69:1,2
December 8:22 9:10 11:10 12:4 13:3 22:3 33:5
51:21 52:5,7,8,22 54:23 66:24 92:7 123:19
decide 76:3 130:14 132:3,24
decided 27:16 89:11 131:16,17 132:1 135:5
decision 23:5 60:25
decisions 60:21
deduct 90:13
default 92:12
defendant 1:11,20 81:3 84:9
defendants 4:13
definitely 104:1,20,21
Delray 79:11
demand 49:17 50:11,14
deny 29:12,23 48:18
denying 48:20
departure 6:18,19
depends 45:10,17,18,19,20
deposition 38:6,8,23 71:23 138:1
describe 17:22 50:17
described 69:8 104:9,13
Description 2:19
Descriptions 3:1
detailed 78:10 85:10
details 78:9 88:11
determine 112:22,25 113:2
Dexter 10:18 14:5 61:20 62:3,10 65:17,17 92:22
93:1,3,8 108:13
difference 86:3
different 8:11 30:4 32:7,11,11 41:13 57:6 67:22
69:7 77:17 80:12 118:14 125:18
difficulty 6:9
dinner 5:15
Direct 2:14 70:4
direction 16:16 21:17 27:3 36:15
directly 5:11 21:15,18 114:16
director 63:16
discovery 39:20 40:10
discuss 5:3,3 43:22 53:14 64:24 68:21
discussed 22:22 28:20 34:9 39:5 54:8 60:17
108:7
discussion 6:10
discussions 22:8
dispute 20:10
disruptive 70:10
dissolve 80:25 81:4
dissolved 80:24 81:2,5,9
DISTRICT 1:1,1,13
DIVISION 1:2
document 9:1 14:8,13,21 16:13 23:24,24 26:19
35:23 36:1,12,17,18 39:5,7,8,10,15,19,25
40:1,4,5,9,16,19,24 41:6,9,14,14,15 42:4,9,14
42:15,17 43:11,17,23 44:9 46:8,9,21 47:7
50:17 54:6 74:10 92:21 93:20,24 94:4 106:23
107:6 115:14 119:25 120:3,7 129:21 130:20
documentation 35:25 62:19
documents 7:24 14:8 26:10,13,24 27:1 41:12
43:9 47:4 50:19 73:8,13,16 74:3,3,4,17,25
75:17 109:14 110:19 118:23,24 119:7,16,21
120:6 126:15
doesn't 14:22 30:20 35:10 41:3 46:18 49:19

94:14 129:16 130:18 134:14,16
doing 20:13 36:14 46:20 65:1 122:23 127:22
129:15
double 11:12
doubts 13:6
downloaded 77:6
drive 138:5
drugstore 71:21
drunk 30:9
dry 136:6
due 49:2,3,17 66:5 73:18,23 74:1 90:6 96:15
109:10 118:3 123:18,22,23,23 135:12

**E**

E 138:8,8
earlier 21:24 27:13 54:8 122:13
early 33:5 54:23 58:15 106:6
easily 60:10
East 1:23
Echarte 87:12
economic 57:24 58:16 112:4
economics 112:4
economy 59:11
education 64:22
effective 133:19
effectuated 84:7
eight 82:4 83:8
either 50:23 53:13,16 54:7 68:16 102:25 128:14
128:17 131:1
electricity 66:22
eliciting 38:7
Elisa 64:21
Email 138:15
employed 82:2,3,4 83:8,13
employee 81:13
employment 82:13,23 83:11
encumbrances 105:1 106:3
engine 69:18
English 9:5 14:15 42:6 43:23
entered 33:6 87:10 88:8 94:5
enterprise 52:15
Enterprises 87:5
enters 117:21
entire 101:22 117:20 128:19
entitled 46:22 119:8
entries 40:18,22 41:4
entrusted 64:20 70:19
entry 47:13
equal 11:21
escrow 63:24 64:3,3
ESQ 1:16,16,21
establish 40:6
established 68:25
estate 124:24
estimate 11:21 25:24 47:8 136:22
estimated 39:1
estimates 8:12
estimating 10:21
evades 21:13
event 42:9 69:10
events 69:8
everybody 103:20 113:6 125:18 127:8,17
evidence 2:18 22:13 29:9 42:1 52:21 53:21
116:24 117:3
evidencing 129:21
exact 8:12 58:22
exactly 7:16 22:4 60:9 71:25 76:6 131:2
Examination 2:11,14 4:8 65:10 69:12 70:4
example 69:2 105:16
excess 75:7
exchange 18:5
excluded 39:24
excuse 22:24 27:25 52:6 59:6 61:24 64:1 125:24
excused 137:16,18
execution 52:10
exhibit 8:13,22,22 14:4,10,12,14,14,17 16:7,7
20:25 22:16 23:8,9,13,17,19,21 27:23 33:14
33:19 39:21 47:19,23,25 48:5 62:9 73:17,24
74:1 82:9 83:21 89:13 92:20,21 93:15 94:21
94:22,23 101:9 108:3,3,6,9,12,16 111:19,21
111:23,24 114:17 115:9,11 117:16 119:3
120:17 128:4 131:15,18
exhibits 2:17,18 52:21 73:23
Exmar 82:8
expected 16:17
expend 67:3
expense 50:20
expenses 8:3 46:25 50:18 51:1,3,4,21,22 52:12
52:24,25 53:9,19,19,20,21,23 54:7,15,24

57:16,17 58:23 66:16,21 67:1,15 69:4
experience 80:15
expert 105:5
expiration 49:8
explain 38:15 96:24 107:20 133:5
explained 30:17 91:23 98:17
explaining 49:19
explanation 97:6 133:6
export 26:6
expressed 29:17
expression 34:19 35:2
extend 18:4
extended 49:5
extending 18:6
extension 6:7,9,10
extra 49:9 50:4

**F**

F 116:10 138:8
fact 23:4 24:2 27:15 28:24 32:5 35:11 48:13
51:1 58:1 61:9 72:12 76:12 78:19 81:2 104:14
109:11 110:15 136:4
Facts 29:8
fails 58:5
fair 37:24 47:17
familiar 79:1 87:5 105:22 110:12
family 6:23 33:16 64:18 96:6
far 16:1 24:25 34:21 51:6 106:7
fast 83:23
fax 2:5 8:25 9:2 138:14
February 53:12 66:24 106:2 120:22,24 121:2,5
121:7,9,11,14 122:3,6,10,10,14,19 123:11,20
124:20 130:1 131:18 132:2,4,25 133:4,7,19
133:20
Federal 2:3 38:23 42:5
felt 64:23
figure 13:16,17
figures 46:16,17
filed 32:5 50:12 73:11
filing 32:6
final 10:1 60:21 87:9
finally 4:24 17:16 26:6
finance 110:11
finances 37:11 48:12
financial 37:11 47:10 56:4 78:24 80:16 98:10
112:4 116:4
financials 47:12
financing 110:7
find 4:25 68:20 74:6,7,19,24 76:2 97:12 98:6,7
113:14,15 118:10 128:22
finding 47:2
finish 90:10 96:23 130:9
finished 29:21 67:4 97:3,5 136:20
fire 37:22 73:21
firefighters 62:16
Firer 19:18,23 20:5 70:24 71:1,4,10,12 77:10,11
77:21 78:8 80:18 81:17,23 83:2,11,18 87:7,10
88:10 137:5
firm 46:15 79:18,21 80:6,10
first 6:13 19:12 39:15,19 40:6 46:10,14,23 59:2
63:18 68:7,14 74:9 82:11 89:14 94:23 109:7
114:15,21 115:16 125:12
firstly 53:4
five 43:10,12,15 59:8 66:23 79:10 103:3 110:12
134:7
fix 75:7,10 76:4
fixing 8:6
FL 1:18,24 2:4 138:14
Florida 1:1,5,7,9 12:6,20 13:4,6,9,23 33:13 38:2
38:3,8,15,18 61:7,8 64:21 70:16 82:18
fluctuation 57:7
focus 80:15
follow 42:3
following 44:22
follow-up 123:8
food 66:20
foregoing 138:9
forfeits 35:12
forget 131:21
Forgive 14:14
forgot 62:20 112:14,16
formal 93:11
format 41:13
forth 93:25
forthcoming 12:15
found 29:19 58:20 112:13
four 26:7 32:2 43:10 59:8 69:7 92:1,7 111:20
125:3 132:14 133:25 134:6 135:8,11,13,22,23
136:5,12

fourth 128:7
freely 60:1
friend 63:17,20 100:13 118:9
friends 5:12,17 7:8,10 81:19,21 89:19 96:6 98:9
99:9
friendship 89:23
friend's 5:19
front 6:22 14:8 38:23
frozen 16:1
frustration 128:21
Ft 1:24
fuel 69:3 76:24 112:7
full 52:13 63:16 66:8 109:12,15,25 136:23
fully 53:5
fund 1:9 7:17 7:17 78:5 81:2
Funds 115:18 116:16
fund's 114:23
further 65:8 69:11,23
future 20:20 35:9 57:16,17 126:13

**G**

garage 103:24
Gary 1:16 115:22
gas 78:24
general 79:11,14,17,21 80:9
generate 57:10 65:24 67:9 77:22
generated 56:15,16
generating 65:22 67:10 105:18
gentleman 107:3
Germany 137:10
getting 14:24 20:3 24:6 30:4 52:3,8 55:2 57:23
61:23 100:24
give 12:8 13:24 14:1 16:20 29:11,14 33:18
43:17 49:7,9 51:24 62:3,6,8,21 78:9 85:10,10
88:11 95:22,25 97:7,10 98:7,24 99:6,7,8,10
99:15 100:4,7,10,15,18,20 101:6 104:8 117:5
119:24 121:19 123:19 126:12,12 132:7,11,12
133:14 134:18 135:11
given 15:25 30:2 35:21 38:21 44:14 49:5
gives 119:22 120:1,12 137:21
giving 15:4 24:25 50:8
go 4:17 6:1 18:22 26:8 27:23 43:17 48:10 54:9
56:7,10 70:23 71:13 82:9 83:23 89:13 94:19
94:21 99:5 100:1 101:9 106:22 108:3 111:2
111:17 112:9 113:12 114:9 117:16 118:4
130:15 135:15
Godson 7:4
goes 27:12 38:19 40:11 57:20 68:16
going 4:25 5:3,24 7:1,8 12:16 13:12 17:3,9 19:7
20:12,20 22:23 23:3 26:8 29:21 33:20 35:9
37:10 38:24 39:14 40:8,14 48:9,14 54:6,16
56:4 57:17,19 68:23 69:17 70:20 87:12 91:12
109:9 130:6 131:16 132:2 135:6 137:8
Goldstein's 5:19 7:14 14:19 64:21 84:9
good 4:1,10,11,15,16 35:2,6 37:2,23 42:6 44:1
54:24 57:6 75:23 86:21 96:6 98:9 100:12
goodwill 110:25
gphillips@phillipslawyers.com 1:19
grains 26:6
grasp 15:13
great 38:21 71:1
guaranty 16:5
guess 20:6 74:6 92:11 103:6 116:6 137:3
guest 5:6,7
guy 71:2 116:4

**H**

H 1:21
haggling 68:19,19
half 6:13 9:19,19 53:25 54:2,6 123:24 136:22
half-hour 136:24,25
handed 39:19 40:5 117:21
handful 74:2
Handing 39:16
handle 137:7
handled 20:13 87:17
handling 87:15
hands 83:23
handshake 91:5
handwriting 89:16 94:25 101:25
handwritten 89:22 90:4,16 91:24 132:1 134:1
134:24 135:2
hand-wrote 95:15
happen 37:17,17 57:15 96:1 98:24 132:12
happened 28:19 62:23 64:5 71:11 73:19 75:20
76:2,6 78:8 92:2 94:9 98:24 121:9,9,15
happening 91:23
hard 5:18 15:13 18:11 47:13

hasn't 40:20 117:24
haven't 24:13 34:4 35:4,5 40:2 41:5 75:18 107:9
  113:20
head 46:17,18 110:11,12
hear 19:12 20:7 34:21 121:21
heard 12:25 21:8 34:19,22 35:2,4,5 40:2 41:5
  68:1 69:6 70:18 105:19 118:7,13 134:20
hearing 50:7 87:22
hearsay 31:4,25 42:21 50:6,8,9 51:17 67:20
heated 69:18
height 57:24 58:15
help 5:23 16:17 129:17
helped 55:25 64:25
helpful 42:7,8
here's 17:24 96:13
he'll 92:14 101:21 122:14 133:3,11 137:12
he's 6:25 9:5 10:21 12:15 19:18 19:22 31:21
  39:14 40:4,8,22 43:20,20,22 50:8 51:1 76:11
  76:14 78:17 96:24 97:10 124:14 127:22
high 127:13
hold 119:4,13
holding 78:6,20,23
holds 127:18
Hollywood 1:17,18
home 131:8,13 138:5
Honda 103:23
honor 4:3,21 8:24 9:3,20 10:19 12:17 16:14
  18:14 19:17,21 20:4 21:12 22:13 23:1,9 25:22
  29:8 31:3 32:14 38:5,19 39:14,19 40:20 41:2
  42:2 43:14,19 44:19 46:20 51:17 64:12 65:4,9
  67:21 69:11,25 70:7 83:25 96:24 106:13
  115:21 116:24 137:6,17
HONORABLE 1:12
hoping 35:7 59:17,17
hospital 137:9
hour 4:24 6:3,5,7 17:16
hours 39:3
house 83:18
housekeeping 44:8
huge 58:25
hull 76:2 106:5,9
humans 38:1,1
hundreds 103:7
hypothetical 86:14

I

idea 46:25 93:7,8 94:14 106:4
identification 2:18 3:5
identify 3:3
idle 45:21
Igor 28:24 29:1,6
II 1:22
imagine 73:19 81:7
impeach 46:21
important 21:24 64:18
impossible 96:8
impression 115:1,3
improved 24:21
inaccurate 37:5
include 47:12
included 9:5
including 66:19 117:21
income 45:25 46:3,6
inconsistently 67:10
increase 13:12
incur 66:17
incurred 52:12 69:1
incurring 35:20 51:22
INDEX 2:17,22,25
indicate 39:6,10
indicated 3:5
Indicating 84:3
indicators 112:5
industry 105:3,6 110:2
industry-standard 3:5
inform 121:2,13 122:2 130:1
information 36:19,20 46:7 51:15 82:13,17
  115:17 118:11
informing 122:6
initially 20:21
input 115:13
inspect 68:15,17 103:16 119:8
inspected 68:16 103:18
installments 68:22
instrument 22:15 48:2
insurance 62:16,21 112:12
intend 50:4 65:9
intended 33:24
intending 35:14 49:21

intention 33:3,6,25 51:7 111:11,13 127:10,10
interest 11:8 14:5,20,23 15:2,5,15,15 16:3 21:4
  21:5,22 29:18 30:18 34:3,4 43:4,7 45:1 49:8
  49:17,21 50:12 60:7 61:20 62:1,3,6,9,10 63:1
  63:11 66:1 72:14,18 90:5,8,19 91:6,18,25
  92:10,22 96:4,5,14 99:11,14,19 100:8,8,11,20
  100:22,23 109:4 113:13,18 117:21 121:3,23
  122:3,7,13,18,25 123:10 127:25 129:1,19
  130:2,18 131:5,17,17 132:2,16,24 133:8,13
  133:19,22
interested 55:1 85:12 86:15 128:8,11 130:25
interesting 127:18
interests 19:6,8 78:23
interfere 128:3 134:11
internal 26:10,13,23
Internet 103:21
interpreter 4:7,16 23:10 63:6 70:8
interrogatories 82:10 83:1,15
interrogatory 82:12 83:17
intervened 72:11 125:24
intervening 72:14,20
introduced 5:12
invention 31:14
invest 88:14,22,24 99:11 100:6,9
investing 89:8 110:16
investment 35:6 57:13 82:5 88:23 98:5,5 113:9
investments 35:8 78:25 80:15 82:8
investor 61:10 75:14 77:21 78:7 113:9 125:17
invests 125:18
involuntarily 81:5
involved 31:19 61:9 87:7
Isles 70:16 82:17
isn't 5:6 6:5 10:20 11:18 15:5 29:7 35:16 36:5
  37:23 41:11 42:16 52:18 55:3 57:12,24 59:1
  61:10 64:22 113:2 127:25 131:1
issue 19:24 53:14 75:1 93:11
issued 73:12
issues 99:4
items 69:4
it's 6:15 8:2 11:14,16,16,21 14:8 15:13 18:11
  19:25 21:12 26:4 29:20 31:14 32:6,18 34:13
  37:13 39:21,22 41:25 59:24 60:12 67:21
  69:21 72:1 75:11 76:15 77:10 80:12,13 83:4
  86:6,7,8 87:15,24 88:16,25 89:9,11 90:21
  91:4 92:14 94:4,6,17,23 96:8 97:17 99:11
  100:24 104:11 105:13,15 107:13 111:9 112:7
  112:8,8 115:11 117:10,10 121:1 122:15 127:8
  128:24 129:1,18 136:19
I'd 8:13 64:7
I'll 14:2 19:25 20:7 23:15 32:17 54:10 76:4 83:23
  91:13 99:10 100:18 102:14 104:8 109:9
  113:16 114:3 115:24 126:12 136:25 137:3
I'm 5:24 7:8,15,20 14:14,16 17:3,9 19:6 20:2
  23:2,3,10,15 34:15,19 35:19 38:11,14,14 46:20
  46:21 47:2,25 48:9,10,20 50:7 51:4 55:10
  57:1 61:23 63:6 72:19 73:1,23 74:24 77:21
  78:11 79:20 80:22 82:3,5 83:22 86:15 87:21
  87:21 91:12 94:24 97:8 98:2,5 100:1 107:19
  108:4 111:13 115:19 117:5,14 118:16,16,21
  119:6 120:16 121:3,25 122:16,24 123:12
  125:8 126:25 128:21 130:8 131:2,6,7 133:4,6
  133:6,7,13,18 134:14 137:11,13
I've 7:13 12:25 17:14 34:18 64:13 94:15 100:19
i.e 3:6

J

January 14:9 33:16,17 46:13 66:24 87:9 88:9
  90:4 91:24 92:2,4 94:22 95:11 98:1 106:2
  108:6,8,10 110:23 111:4,5,19 122:16 131:15
  131:20,25 132:3,19 133:15 134:2 135:2,5,12
  136:1
JEFFREY 1:16
job 37:17 82:13,23
Johnny-on-the-spot 38:23
joint 44:22 60:25
jshalek@phillipslawyers.com 1:19
Judge 1:13 4:10 38:24 44:7 73:12 85:2,15 87:12
  114:3
Judge's 21:17
judgment 87:9,18,19,23 88:8
July 36:9,10 40:25 45:8,24 46:2 137:20,22,23
  138:3
June 1:8 8:21 116:16,20
junkie 58:20

K

keep 27:16 31:10 46:16,17 47:10 53:3 54:25
  55:23 62:18 67:13 75:20,22 86:25
keeping 4:1

kept 5:3 12:15 24:10 27:18,20 34:4 55:23,24
  66:21 107:2
kids 31:23 32:2,3
kind 16:12,13 18:12,21 19:11 20:23 21:21 26:19
  40:1 41:14 42:14,17 46:9 62:19 68:25 116:23
knew 12:18 13:11,15 31:24 33:5 34:10 35:6,11
  54:8,25 55:4,5,5,8,8,9 56:7 57:10 98:9,13
  107:4 110:3 112:12 127:17
knowledge 51:13 84:9
knows 8:12 46:23 106:25 132:11
Kooy 47:7

L

laid 66:1,2,3,4,17
language 42:6
large 104:24,25 105:1
Las 1:22,23
late 54:23 58:15
latitude 38:20,21
Lauderdale 1:24
lawsuit 50:12 51:5 73:3 81:3 85:23 88:4 116:22
  118:19,21,23
lawyer 10:17 27:2
leading 79:17,21
leak 105:25
leaking 5:22
learn 44:19
leave 4:25
leaving 6:4
ledger 44:10
ledger-type 26:23
left 6:7,22 17:17 31:1 40:18 41:19 115:14
legal 15:17 66:10 72:22 119:10
Lehman 79:4,7,16 103:15 110:6
Lehman's 103:3
lend 88:21 101:5 111:1 124:24
lender 16:2 117:5
lending 110:13
Leon 2:13 70:3,14 82:16 84:9 100:2 119:13
  134:10
letter 47:22 90:4 98:1 108:9 109:5,7 111:23
  112:2,24 113:1,4,4 120:18,20,21 121:8,8,24
  122:2,9,10,12,19,24 123:8,11 125:7 126:6,7
  128:21 129:25 130:17 131:18 132:1,7,13,23
  133:15,18 134:1,3,25 135:3,24 136:2
letters 125:20,25 126:1
let's 5:3 38:25 40:10 49:10,11 67:17 75:1 77:19
  88:12 89:13 94:21 97:10 101:9 106:22 111:17
  122:10 134:18 135:15
Liability 1:9
lien 15:22,24,25 16:4,7,8 18:20,20,24,24,25 19:1
  19:11,13,14 20:19,19 21:3,7,7,21,23 33:18
  54:5 104:16,22 110:3 111:2
liened 15:25 20:19
liens 104:25 106:2,4 111:14
life 64:18
Limited 1:9
line 2:19,19 9:24 17:9,21,25 104:17 132:17
Lines 62:4 65:17,18 92:22 93:1,3,8 108:14
liquidated 61:19
list 25:4 73:17,24 74:1
listed 26:4 39:21 43:12,15 78:1,14 80:10
listen 13:2 91:12
listing 47:17
litigation 8:8 107:10
little 28:20 67:11,11,12 78:16 85:10 87:6,21
  98:19 101:5 105:23 118:14
live 80:2,4 84:16
lived 82:19 84:14
living 61:7,8
LLC 1:9
loan 4:20 49:3 52:18 60:17 86:25 87:1 88:12,23
  88:24 90:9,17 92:12 94:21,24 111:10 110:18
  115:18 116:16,23 117:9,12,14,16,19,21 119:7
  119:16,21,23,25 120:2,6,7,13 123:17,18,22
  123:23,23
loaned 91:5 100:13
loans 94:5 114:11,14 116:20
Loev 87:14
long 32:3 36:23,24 54:12 80:18 81:22 110:25
  118:25
longer 89:11
long-time 89:19
look 29:18,18,19 40:4,9 42:12 43:11 63:2,11
  74:7 83:1,17 86:4 91:2 92:20 108:16 111:23
  114:17 115:9,10,15 116:1,7,10 117:19 118:4
  118:18 119:3 124:9 128:4 135:24 136:2
looked 8:14 37:18 85:1

**looking** 74:17 103:16 137:19
**looks** 85:24,25 86:6 111:14
**lose** 45:8 99:14 100:21,21 118:10
**losing** 55:24,25 58:24 59:10
**losses** 26:9 35:14,15,20 55:25 56:3 59:15,16,17
**lost** 20:3 45:5 59:11 65:23 127:20
**lot** 32:7 72:9 73:22 76:5 89:7 91:4,4 112:8 124:24 127:17
**loud-speaker** 70:9
**love** 33:22
**low** 30:1 76:3 127:13
**lunch** 43:16 44:1
**Luncheon** 44:4
**L-o-e-v** 87:14

---

**M**

**M** 1:12
**mad** 6:13
**Madam** 55:14
**main** 104:14
**maintain** 69:19 94:13
**maintained** 27:1
**making** 34:17 40:3 57:18 61:22 89:8 91:19 122:14 127:14 136:9
**managed** 60:19 76:8 103:3
**management** 27:9,9 77:5 78:24 112:3
**manager** 78:17 79:7,9,10,11,13
**managerial** 60:19
**managers** 79:14 103:17
**manages** 103:18
**managing** 60:15 76:19
**Mandarin** 44:16
**March** 10:2,9 53:12,12 54:2 61:19 65:20 66:6,18 93:18 108:13 111:21 123:19
**marked** 2:18 109:12,15,24
**market** 26:5 47:17 56:24 57:20 60:2 67:14 76:2 101:16 127:13,13,16
**marketplace** 56:10
**married** 71:12
**Massachusetts** 137:9
**matter** 6:15 38:17 44:8 58:1 68:3 72:12 76:12 104:14 138:10
**maximum** 10:9 11:23
**MBA** 112:3
**mean** 7:14 11:13 14:13 15:14 45:17 52:1 56:9 62:5 64:17 90:16 136:11
**meaningful** 5:18 6:7,9,12
**means** 19:10 20:1 128:11
**media** 78:24
**mediation** 107:18,19,21
**medicine** 71:16,19 72:5
**MEDINA** 2:2 138:12
**meet** 4:6 14 17:17
**meeting** 4:19 5:1
**MELA** 44:22 45:4 55:24,25 56:2,3 58:25 59:2
**memory** 43:9,12 71:16,18,20 72:5,7,8,10
**mention** 134:2
**mentioned** 134:4
**met** 5:17
**metal** 57:14 105:19,25 106:7
**Miami** 1:2,7 2:4,4 17:12 28:22 33:16 95:21,22 138:13,14
**Michael** 73:20
**middle** 92:4
**midst** 43:20
**miles** 103:24 104:4
**million** 29:7,13,16 30:1,5,23 32:12,17 39:11 45:2 56:8,11,19 67:19,25 75:8,9 84:25 85:5,9 85:18,21 89:6 95:18,19 97:15 98:7 100:13 102:12 107:5 112:18,19 121:17 123:12 126:10 127:10 134:5,6 135:17
**million-plus** 113:8
**mind** 90:2 95:25 132:8,24
**minor** 62:14 65:2
**minus** 57:2 67:12
**minuses** 112:10
**minutes** 6:16,21 11:19 18:18 39:3 64:6 81:11 94:19 137:4
**Mischaracterization** 130:19
**mischaracterizing** 124:15
**missed** 55:6
**missing** 115:8
**mistakes** 91:1,4
**misunderstood** 14:16 123:2
**moment** 9:20 15:18 39:5 67:14 117:20
**Monday** 71:24
**money-lender's** 117:22
**money-lending** 110:16
**month** 13:3 21:24 29:21 38:3,16 45:11 49:7,9

---

69:23,24 69:2 73:23 90:5,11,20 91:2,18 92:1,10 94:12 110:24 113:7 123:22,23
**months** 26:7 32:23 49:1 81:1 82:4 83:8 87:2,3,4 92:1,8 94:8 98:13,15 100:19 111:20 113:12 132:14 133:25 135:9,11,22,23 136:5,10,11,12 136:15,17
**morning** 4:1,10,11,15,16
**mortgage** 15:20
**motions** 73:11
**Motivation** 44:19
**mouth** 34:14
**moved** 57:9 21:10 22:25 38:25 67:17 87:21
**moved** 17:19 95:21,21
**moving** 84:13
**mutual** 5:17,19 63:17,20 118:9

---

**N**

**name** 63:18 70:13 73:20 80:7,9 82:12 93:11
**named** 63:17,20 80:7 87:14
**need** 17:8 18:2 36:21 38:22 42:5 69:15 85:20 87:1 88:10,25 89:2,4,5 94:15 98:6,15 99:7 100:3 104:3,5 107:13 125:1 130:11 134:16 137:3
**needed** 58:24 66:5,15 115:5
**needs** 28:6 86:16 94:16 99:9 100:22 124:2 125:16 129:17
**negotiating** 26:16
**negotiations** 22:8
**Neither** 138:2
**net** 56:20 57:3,5
**netted** 46:15
**never** 6:4 19:22 24:15 30:2 32:5 33:24 34:7 35:21,22 37:15 38:6 39:18,18,20,20,21 40:10 40:24 41:3,15 42:17 44:15 48:1,5 49:16 50:11 50:14 64:5 68:3,9 71:10,11 74:2 80:5,10 84:21 86:3 90:7 92:15,18 102:9 109:5,11,14 109:24 110:18 111:12,13,14,15 112:10,12 113:24 118:13 121:23 127:10,20 129:20 130:5
**new** 59:3 74:3,9 88:15 103:22 106:7,8
**newer** 58:25
**nicely** 91:12
**night** 74:14,15
**NONJURY** 1:12
**nonresponsive** 12:10 17:19 21:11
**North** 2:4 138:13
**notarized** 83:2
**notary** 20:21 83:5
**note** 6:17,22 16:8,13,17 17:18 18:1,2,3,6 89:22 90:10,16,17,19 91:2,17,18 92:3,4,5,17,18 95:15 98:1,20 99:15 110:6,23,23 111:5,6 126:9 134:24 135:2
**notebook** 94:23
**notes** 64:7 109:14,21 110:7 111:7,8,9,10
**notice** 107:2
**noting** 50:8
**notion** 32:6
**November** 54:23 66:23 92:7
**number** 8:10 53:22,24,25 83:17,19 84:2,8 89:13 115:11,16,17 116:1,7,10
**numbers** 8:7,11 36:4 46:23 115:10
**numerous** 24:16 25:2 30:15 49:18

---

**O**

**oath** 72:4
**object** 20:4,5
**objection** 4:21 10:19 12:9,17 15:11 17:19,20 18:14 21:10 22:25 25:22 29:8 31:3,25 32:14 40:3,20 41:2 42:21 43:14 50:6 56:12 63:4 65:4 66:10 67:20 72:22 77:16 85:19 87:19,24 104:17 107:25 114:2 116:21 119:10 120:3 123:1,5 124:14 130:19
**objections** 20:13
**obligates** 16:13
**obtain** 18:22
**obtaining** 68:10
**obviously** 127:8 129:3
**occasion** 73:12
**occasions** 73:11
**occur** 19:22 69:8
**occurred** 117:24 118:13
**occurs** 68:11
**October** 41:1 42:20 43:2 46:5 65:20,25 66:6,17
**Odessa** 28:23 61:8 118:8
**offer** 29:6,12,16,23 30:1,2,4 67:19,25 68:14,15 95:18,19 102:12,13 106:24,25 107:4 121:17 121:20 122:14 123:12 125:5,6,8 126:9,11 127:9 128:2,23 129:4 131:20 132:15 133:3,9

---

133:14 134:19
**offered** 25:1,9 30:17 32:12 60:5 67:21 102:11
**offering** 68:2,2
**offers** 22:8 89:7,9,10 102:12 106:22 107:3 123:25 125:3 126:10 131:23,23 135:13,18
**office** 44:15
**Official** 2:3 138:13
**officially** 16:4,10
**offset** 55:25
**Oh** 9:7 106:11 112:14,20 125:14
**oil** 78:23 112:8
**okay** 7:15 8:17 9:13,16 12:16,24 19:16 23:6,15 27:15 28:3 41:21 44:1 47:1,25 61:12 62:12 73:7 75:15 77:3,6 81:12 83:7 84:4 85:22 91:14,15 92:9 94:12 99:21 100:3,22 101:4,19 102:14,16 106:21 107:20 108:12,18 111:18 112:16 114:24 115:12,16 116:1,3,7,9,18 117:24 120:15 122:8 129:24 132:22 133:24 137:17
**Olas** 1:22,23
**old** 59:2,3,5,7,8,8,9
**Oleg** 77:10,11,21 78:8 87:15 88:10 98:17 99:8,8 100:6,6,8
**Oleg's** 87:15
**once** 5:20 38:2 44:14 48:16 51:7 52:13 55:21 76:17 110:10 117:5
**one-month** 49:6
**ongoing** 29:20 76:17
**open** 60:1 88:25 89:4
**opening** 84:24
**operate** 89:1,5
**operates** 67:16
**operating** 67:13 76:5,17 78:17 80:15 94:16,17 96:7
**operational** 45:22,23 52:16 66:4 69:15,21
**opportunities** 89:7
**opportunity** 17:10 35:22 43:17 88:20 98:8
**option** 7:9 22:19 23:23
**oral** 50:20 107:3
**orally** 25:15 50:16
**order** 73:13
**original** 21:1 110:18
**originated** 93:6
**out-of-pocket** 66:17
**Overall** 67:12
**overruled** 4:22 10:23 12:14 15:12 17:20 18:16 25:23 29:10 31:6 32:1,19 42:23 56:13 63:5 66:12 72:23 87:25 91:22 104:19 117:1 119:12 119:14 120:5 123:6 130:22
**oversaw** 103:6
**owe** 48:2,6 113:18 117:25 118:5,5 134:13
**owed** 26:17 32:7 38:9 42:20 48:8 91:25 109:4 112:18 113:13,14,15,16 117:4,6,7,10
**owned** 43:7 56:16 65:21 78:4,5,23 92:23 93:3,8 96:5
**owner** 29:2 37:7 65:13 126:25
**owners** 5:21,24 68:24
**ownership** 44:22 86:5

---

**P**

**page** 2:8,19,19,23 3:1 9:24 17:4 32:15 42:12 83:1,6,18,20,24 89:14 115:10,11,14,19 117:17
**pages** 77:6
**paid** 26:21 34:2 49:12,14,15 61:16 65:3 66:24 67:1 69:4 76:24 87:4 90:5,8 92:14 99:2 106:5 106:5 109:2,7,8,10,12,15,25 110:10 112:18 113:5,5,7,20 115:5 117:4,6,10 121:4 122:15 125:19 130:3
**paint** 104:5
**Paladin** 1:4 26:10 47:10,12 92:23 108:14,22
**Paladin's** 27:18
**paper** 95:22 98:25 111:2 117:7
**papers** 7:24 64:13
**paperwork** 65:23
**paragraph** 117:19 121:1 128:7
**pardon** 72:16 81:20
**part** 21:7,7 22:21 30:12 33:13,17,19 63:7 77:5,5 90:12 122:20
**partial** 21:23
**partially** 49:20
**particular** 134:11
**particularly** 47:2
**parties** 38:25 60:6
**partner** 30:5 62:14 77:21 78:18 79:3,7,11,14,17 79:21 80:10 81:14,15,16 82:5,5,6 83:9,10 84:14 112:13 118:12,16 134:8,9
**partners** 43:10 54:17 62:12 77:10,11 78:17

80:18
**partnership** 129:15
**parts** 103:9
**party** 51:10 73:2,4 106:24
**pass** 48:24
**passive** 61:10 77:21 78:7
**pay** 12:16 14:21 30:5 49:8,11,19,21 50:4 53:2,4
53:5,9,18,23,25 54:6,10 58:5 63:1,11 66:7
75:3 86:24 87:1,4 90:7,19 91:3,17 92:15,15
92:16,17 95:23,24 98:11,15,23 100:8 109:9,9
109:16 111:11 113:16 118:3 119:9,23 120:2
120:12 123:17 124:7,25 125:11 126:12 129:18
132:9,16 135:16
**paying** 50:18 51:1,7 54:15 66:8,25 122:25
123:10 131:17,17 132:2,24 133:7,21
**payment** 62:16,21 68:21,22 109:6
**payments** 66:9 69:3 114:21 121:3 122:3,7,13,18
130:2 133:19
**peace** 90:2 95:25 132:8,23
**Pedro** 87:12
**pending** 40:9
**people** 27:21 29:17,21 35:8 69:16,20,22 94:15
94:16,17 103:12 105:2 134:18 135:13
**percent** 10:15,15 11:8 31:18 52:3 53:18,19,23
60:6,11,11,12 65:13 66:14 67:3 86:20 90:11
90:19 91:2,18 93:3 96:7 101:14,15,17,17
102:6 112:7 122:20 126:18,25
**percentage** 67:1
**period** 53:10 57:21 64:20 66:23 98:12
**periods** 36:22
**permission** 77:3
**person** 7:5 20:21 82:13 129:15
**personal** 5:20 18:1 51:13 114:14
**personally** 8:1 126:22
**persons** 43:18
**perspective** 32:25 137:24
**ph** 7:4 20:1 41:17 44:23 82:8
**Phillips** 1:16,17 2:14 8:24 14:10 17:6 18:14 20:4
20:14 39:14,16 69:25 70:6,12 72:24 77:18
83:25 88:1 97:2,4 106:13,15 108:2 114:3,5
115:21,25 116:24 117:3 119:15 123:7 130:23
136:10,12,14,24 137:6,12,17 138:1
**phone** 6:14 31:17 48:7,20,22 49:23 50:4 103:19
103:22 104:14 120:22 121:16,21 123:15
133:10,14
**phonetic** 28:24
**photograph** 106:18
**phrase** 105:22 106:12
**physical** 24:4
**Ph.D** 112:3
**pick** 43:18 120:8
**picked** 137:25
**picture** 106:16
**piece** 95:22 98:25 117:7
**pilfered** 69:17
**pills** 71:21 72:6,11
**Pinnacle** 5:5 7:2
**place** 5:17,19,19 82:12,23 102:21
**plaintiff** 1:15 4:7 42:8 43:24 72:17,20
**Plaintiffs** 1:6
**plaintiff's** 70:7 101:9
**plan** 33:13
**plane** 17:17
**planning** 34:7 57:15
**plans** 25:14 33:15 137:15
**please** 8:13 14:12 16:18 21:14 23:10 27:25,25
31:7 44:5,6 47:19 53:8 53:13 64:11 67:7
70:13 77:25 82:9 83:17 91:9,12 92:20 108:3
109:20 114:17 115:9 119:3,20 135:24 136:2
**pleased** 64:12
**pledge** 6:4,11,22 12:7 13:5,7,24 14:3,4,7,19
16:8,13,15 23:17 34:1,1 55:2 57:23 58:1,3,9
92:13
**pledged** 14:21
**pledging** 89:22
**plus** 66:20 109:4 112:9
**point** 22:7,11 26:16 32:10 38:22,24 55:19 58:9
60:9 62:14,15 111:16 128:14,17 130:25
134:15 136:4,19
**poor** 65:23 66:5
**port** 66:1,2,3,4,21 68:16,23 94:10
**portion** 24:3 50:15,20 83:5
**position** 61:24
**possibility** 17:1,1
**possible** 71:15 80:13 92:6
**potential** 68:18
**potentially** 53:25
**power** 66:22
**practice** 104:14 120:9
**precluded** 61:21

**pregnant** 71:12,14
**preliminarily** 14:25 33:20
**preliminary** 28:5 95:4 102:1
**premised** 54:11
**prepare** 26:10,13,19,23 36:12
**prepared** 25:12,13,15 41:9,12 42:15,17 50:25
86:10 134:24 135:2
**preparing** 36:14
**present** 48:22 49:23 50:23 51:21 67:8
**presently** 82:2
**presume** 19:6
**pretty** 81:17
**prevent** 58:3,3,7
**previous** 36:22
**previously** 27:5 79:3 94:5
**price** 14:25 27:16,17 28:7,7,14,17 33:20,23 47:9
68:20,22 85:3,17 86:11,19,21 95:4 102:2
132:21
**prior** 38:6 66:15
**private** 31:23
**privately** 78:23
**probably** 47:14 107:7 118:14 124:23 125:3
**problem** 19:18 30:19 100:7 134:18
**problems** 21:9 37:20,21,22 124:7 132:12
**proceed** 4:2
**proceeding** 74:18
**proceedings** 1:12 20:22 42:5 138:10
**process** 21:25 84:6
**processed** 16:4
**produce** 73:8,13 74:5,21 107:13 113:24
**produced** 39:18,20 74:2 75:18 106:23 114:20
129:20
**producing** 89:11,12
**profession** 110:11
**professional** 68:17
**profit** 52:2,5,8 56:16,19,20 57:3,5,18 61:22
65:22
**profitability** 35:24 36:2,3
**profitable** 35:16,19,21 52:11,13,15 60:13
**profits** 36:4,7,13 51:24 52:3 53:13 54:19,20,21
57:19 59:3,4 65:21,24 67:8,10
**promised** 12:8
**promising** 12:15
**promissory** 17:18 110:23
**pronounce** 19:25
**proof** 25:3
**property** 15:25 16:3 20:19,20,22,24 26:20
**proposal** 29:22
**protectable** 21:5,22
**protection** 16:2
**provide** 16:17 66:14,20 73:16 107:7 118:1
**provided** 47:6 89:22
**providing** 43:21
**public** 60:2
**pull** 43:9 49:10
**pulled** 61:5,5,6
**purchase** 6:1 68:8 75:17 106:24
**purchased** 76:1
**purchaser** 124:9
**purchasing** 103:10,11 104:24
**pure** 110:24
**purpose** 35:13
**purposes** 13:21 23:5 24:10 35:12
**push** 134:12
**put** 7:3 17:8 18:6 24:21 25:6,24 34:11 35:5,7
39:2 50:11,14 52:21 53:15,21 56:25 57:9
58:20 63:24 64:2,3,13 75:2,5,7,9,19,24 79:15
83:23 90:2 93:11 95:14,15 97:16,18 100:18
104:7,11 106:7 118:8,9 134:1,23
**putting** 25:1 34:13 93:25
**P.A** 1:17
**p.m** 44:4 64:10 65:11 69:13 70:5

**Q**

**question** 10:1,4,7,8,20 11:6 12:13,18 13:2 15:9
15:10,13,14 17:10,22 21:15,18 23:11,14 31:6
31:7 32:16,18 34:16,21 38:13 40:2,9 41:5,7
41:22 45:7 47:22 48:4 53:6,7 55:7,11,12,15
58:11,13 69:6 70:19 73:1,25 76:16 84:5 85:13
86:14 89:3 91:9,13,17,17 93:23 101:23
102:14 106:18 109:13,18 112:23 114:12
118:22 119:20 120:19 125:10,24 126:20,21
126:22 131:22,25 133:15,21 134:21,22
**questioning** 104:18
**questions** 16:19 21:13 23:1 34:18,18 46:18
58:11 64:14 77:25 96:10 99:3 104:3 114:4
118:8 120:17
**quick** 64:7,14
**quite** 19:21 115:7,7 129:14

**quote** 85:2

**R**

**R** 138:8
**rate** 90:8 91:6
**ratio** 51:23
**reachable** 55:22
**read** 17:9 27:25,25 28:3 41:25 42:9 44:15 55:14
55:16 84:23 94:2 120:1
**reading** 9:5 78:19,22 79:20 115:23
**real** 10:9 64:7 124:24
**realized** 29:20 127:22
**really** 59:22 79:2 88:10 101:1 134:21
**realtime** 63:18
**reason** 32:21 75:13,18 97:18 99:15 113:13,20
**rebuild** 106:9
**recall** 30:21,23 31:1,8,12 36:1,7 62:20 70:21
71:13,23 73:7,11,16 74:1 87:11,12 88:4,6,7
89:24 105:20 108:14 137:15
**receive** 52:17 74:14
**received** 2:18 10:1 40:10 62:16,21 74:11
**receiving** 29:12 52:20
**recess** 43:16 44:4 64:8,10
**recognize** 40:18
**recognizes** 40:22
**recollection** 40:6,7,13,23 128:5
**record** 4:12 120:7
**records** 45:13,24 46:2,5,12,24 47:16 56:4 63:2
63:12 65:14 75:18,20,22 84:19 119:9 124:19
124:19 125:15
**recoup** 35:15 57:15,17 58:23 59:14,16,17 67:15
**recover** 67:15
**RECROSS** 69:12
**Recross-Examination** 2:12
**red** 67:11,12
**Redirect** 2:11 65:10
**refer** 73:19
**referring** 115:12 120:6 133:4
**refresh** 40:5,6 43:9 128:5
**refreshes** 43:11
**refreshing** 40:13,23
**refuse** 119:24
**refused** 63:3,13 95:19 100:11 118:11
**regarding** 13:7
**Regardless** 54:24
**regards** 5:21
**registered** 16:4,9
**regret** 64:24
**regularly** 5:15
**reject** 128:23
**rejected** 95:18
**relating** 82:14
**relevance** 25:22 38:5 42:21 56:12 65:4 85:19
87:19,24 104:17 114:2 116:21
**relevant** 23:5 38:4 104:23
**relied** 105:10
**remained** 94:10
**remember** 7:13 8:7,10,19 9:14,22 10:4,7,8 18:8
27:14,22 30:3,8,12 43:8 51:6 62:18,18,23,24
63:8,14 64:5 71:14 72:9,9 80:7,9 89:25 91:8
91:10 96:9 131:11
**remind** 43:19
**reminds** 44:14
**Remittance** 115:17
**rented** 7:5
**repaid** 28:4,10,11 95:2 98:21 117:20 132:20
**repair** 7:6 8:1,15 11:11,12,24 13:3 33:7,11 35:6
50:24 52:12,21 53:2 57:9 66:15 75:5 107:14
107:17
**repaired** 13:17,20 24:6,8 57:22
**repairing** 21:25
**repairs** 5:22 11:15,18 12:19 13:8,12 22:2,4
46:13 50:15 54:9,25 57:2 66:5,7 67:4 75:25
76:10,14,15,22 77:4 94:10
**repay** 34:1 98:1,22
**repeat** 23:11 31:7 53:8 63:6
**repeatedly** 4:19 23:1
**rephrase** 91:13 109:19
**replace** 56:7,9,10
**report** 45:24
**REPORTED** 2:1
**Reporter** 2:3 55:14 138:13
**Reporter's** 2:15
**reports** 37:18
**represent** 86:18
**represented** 73:20 85:15 104:12
**representing** 73:24 105:14
**request** 38:20 73:9 118:18
**requested** 55:16 73:8

requirement 96:3,13
reside 84:6
residence 70:15 84:10
resolve 20:11 85:22 129:2
respect 45:4 47:25 64:17 69:8
respond 58:13
response 47:23 50:3 82:16
responses 50:8
responsibility 27:6,7
responsible 50:15,17 51:20 52:24 66:6,9 67:12
    76:10,19 84:18 103:6,8
responsive 6:17
rest 22:21
restate 12:17
result 136:6
RESUMED 4:7
retake 136:21
return 8:13
revenue 57:11
review 37:9 84:19 112:4
reviewed 84:21
reviews 37:11
roof 5:22
Rothstein 138:1
rules 73:18
run 47:15
rundown 7:20,23
rundowns 8:11
running 69:2,18
Russia 20:25 21:20 26:6
Russian 9:3,4,6 14:10,15 19:18,23,25 20:8,9,11
    28:3 39:22 44:11,17 81:25 89:14 131:8,10,11
    131:13
Russian-speaker 18:15
Russian-speaking 43:18

S

safe 138:5
sailing 67:8
sale 26:4 33:20 68:8 128:3
sales 28:7
salesman 79:6
satisfied 109:5 110:3 112:1
saving 33:10
saw 36:17 118:20
saying 5:3 11:25 17:15,16 38:13 53:3 55:9,19
    88:23 89:19,24 91:8 107:16 111:13 117:7
    119:16 122:12,24 126:2 128:21 132:19
    133:18
sayings 35:4
says 19:24 28:2,9,13 38:14 78:19 79:3,20 80:14
    82:16,16,23 90:21 91:2,2 94:4 101:11 102:22
    106:17 109:7 115:17,18 116:5,16 117:19
    120:23 124:12 129:9 130:18,21 131:2 134:25
    136:12,17
school 31:23 32:2 71:13
scrap 22:20 60:5 67:13
scrapped 57:14
scratch 76:15 106:8
screen 63:8
Sea 112:2
seat 136:21
seated 4:6 44:5
second 42:12 63:7 94:21 114:16 115:11 119:4
    127:24
Secretary 81:5
security 15:2,3,4,15,15 18:22 20:24
see 8:18,19 10:22 14:18 39:15 40:10 43:11 44:1
    46:9 63:23 82:14,24 83:5,24 84:8,10 89:14
    94:3 112:15 113:21 115:11,13,14,18 116:8,11
    116:17 117:19,25 120:10 122:4 125:5,8,21
    128:9 130:3 136:7
seeing 68:8
seeking 51:4 53:18 57:21
seen 39:18,21 40:16,20,24 41:3,15 84:11 86:3
seized 20:21
self-employed 82:5
sell 14:2,23 15:7 16:9 20:21 22:9 24:14 25:2,12
    25:13,14,15 26:8 27:17,20 28:5,21 29:4 33:10
    33:24,25 34:3 57:20 58:2,6 60:1,12 95:3,7,18
    95:19 96:3,14 97:10,11,11,14,15 101:10,15
    101:19,21 102:1,5,23 113:11 121:20 124:3
    125:22,23 126:3,4,16,23 127:1,2,4,10,13,24
    128:17,23 129:16 130:8 131:2 132:20 134:14
    135:8,10 136:5
sellable 125:3
selling 27:15 28:14,17 33:3,6 34:7 58:4,7 95:4
    102:2 103:6,8 104:24 112:6,6 120:9 123:24
    123:25 124:1 125:2 126:19 127:21 128:8,12

130:18,25 131:24
sells 68:12
send 23:23 47:22 48:10,14 110:7 118:18 124:8
    125:10
sending 63:16
sends 31:23 68:17
sent 22:12,15 48:1,5,25 49:1 73:9 108:19,19
    109:11,15,24 110:3,19,22,24 111:4,6,10,22
    112:2 114:22 116:2 125:12
sentence 28:1,13
September 51:25 52:7,18 92:5,7 111:6,7,22
    112:21,24 114:22,22 116:20
sequestration 43:20
serious 6:15 21:9
served 82:10 88:4
serves 16:2
service 84:6 94:8 103:8
services 78:24 80:16
set 32:3 70:24 71:1 102:24 108:4
sets 93:24
sette 36:21 41:10 113:12
settled 32:8
settlement 42:16
settling 43:6
set-off 119:8
seven 76:18 98:13,15
severe 138:5
Shalek 1:16 2:11 4:21 9:3,25 10:19 15:11 17:21
    20:12 22:13 25:22 29:8 31:3,25 32:14 38:5,21
    39:2,17,18 40:4,12,20 41:2 42:2,21 43:14
    44:19 56:12 63:4 65:4,9,12 67:21,23 69:11
    115:24 137:10
shape 6:2 105:17 107:4
share 14:2 15:7 72:1 95:3 97:11 101:10,13,15
    101:19 102:1,2,23 122:20
shared 53:13
shareholders 59:24 125:21 126:2,24 128:11
shares 10:2,5,6,10,11,12,14,15,21 11:2,4,7
    13:15,25 14:5 22:16 28:5,7 30:18 48:2 51:23
    52:1,3,14 53:1 55:21 58:2,4,6,7 59:19 60:1,6
    61:13,16 85:1 86:20,25 93:12,19,21,25 95:4,7
    95:8 97:11,14 101:21 102:10,11,18,21 108:7
    108:13 109:8 111:21 112:6 113:11 123:14,16
    125:23 126:18 127:3,4 128:24 129:16 132:6,7
    132:21
sharing 54:19,20
she's 20:8 37:2
ship 8:16 10:3 11:24,24 12:19 13:3,12,17,20
    13:21,9 33:21 45:20,21 52:10,13,17,25
    57:14,18,23 65:24 66:1,17,21 68:8,12,13,15
    68:16,18,18,23 69:1,7,15,18,19,20 75:2,2
    75:5,7,9,19,24,25 76:1,2,5,5,7,12,13,13,15,17
    76:19,22 86:7 90:14 93:1 95:3,7,12 101:10,13
    101:15,19 102:1,5 105:12,17,17,18 106:9
    112:6,6,8 120:9 121:17 122:20 123:24 127:18
    127:19 128:9,12 130:9,11,18,25 131:3,4,24
    131:24
shipping 1:4 19:2,3 31:20 47:10,12 57:7 67:16
    78:7 92:23 105:6 108:14,22 112:3 116:11,13
    116:19 117:9 135:14
ships 59:4 68:4 69:1 104:25,25 105:14,15,24
shop 135:22,23
shopping 135:13
short 64:10
shortly 122:18
shotgun 128:24 129:4,12
shouldn't 132:8
show 39:14 45:13 46:2,5,12 47:16 50:24 56:5
    73:13,21 74:12 104:23 112:17 114:21 115:20
    115:21,24 118:9,11,16,25 119:1 125:20,25
showed 36:3,7 112:18
showing 44:9 50:20 51:2 75:19 106:23
shows 8:22 108:16 116:1,7,10
shut 81:9
side 40:18
SIDEBAR 2:25
sight 103:25
sign 6:17 11:10 32:23 33:14 34:10 54:5 92:3,5
    93:22 110:6 111:12 112:9
signature 17:18 93:15,17
signed 12:4,19 13:2,8,10,11 14:9,13 17:17 22:4
    41:12 61:20 83:2 90:22 91:18 92:4,13 93:22
    108:9 109:21 111:5,7,9,10,19,21 117:17
silent 81:16
simple 90:8 91:6 133:15
simply 125:25
Singerman 1:22 4:13
single 58:10 106:23 107:6 111:1 129:21
Sinitsky 26:14,17 27:5 30:5,13,15,17,19,22 31:1
    31:3,8,12,15,17,22,23 35:24 36:10 39:8 41:10

42:16,20,22 43:4,8,10 44:21,25 59:25 61:1,2
    61:3,5 67:17,18,24 68:1,2 125:21 127:2,24
    128:2
Sinitsky's 26:25
sir 34:15 67:13,17,24 68:4 74:23 79:20 88:2
    91:8 109:11 126:20 127:24 133:15
sit 4:3 8:5 25:3 70:8 113:17 118:2 124:5
sites 25:2
sitting 69:21
situation 60:5,11 78:25 102:12 131:21
six 81:1 87:3,3 98:13,15 99:6,12 113:12 137:8
sizable 61:16
slow 83:23
small 21:7
sold 16:1 24:13,15 25:9 27:21 34:4 59:19 60:5
    60:10 61:19 68:4,7 112:11
somebody 35:10 68:13 96:5,7 98:7 130:15
    135:15
soon 50:7
sooner 6:5,6,8 74:5,7 101:5 135:21
sorry 7:20 14:16 23:10,15 34:19 47:25 57:1 63:6
    64:23 83:22 87:21 94:24 100:1 107:19 131:6
    134:13 137:11
SOUTHERN 1:1
speak 17:10 20:11 44:17
speaker 3:5
speaks 19:18,23 20:8 81:25 120:3
special 78:25
specialties 110:15
specific 12:18 45:7 101:24
specifically 20:1
spelling 28:25
spend 7:16,22 38:2 75:1,13 76:4
spent 8:1 11:11,14,18,23,23 75:15
spoke 6:21 47:21 68:3
spoken 30:22
stage 108:4
stand 20:7 81:10 88:11
Star 1:9 16:16 21:8 77:6,7,16,17,19,22,23 78:1,4
    78:5,6,8,20 79:24 80:12,18,25 81:2,13,14
    82:7,8,10 83:9,10,14 84:14,18 89:7,10 108:19
    114:9,11,15,16,20,22 115:4,6 116:8 125:12
    125:15,16,16,17,18
start 17:8 68:19 87:2 121:14 123:24,24 124:1
    125:9 129:12 127:21 135:12,13
started 21:25 22:2,4 97:9 99:25 100:2,3
starting 17:9,24 28:1 121:2,14 122:3,6 130:1
state 41:2 70:13 81:6 110:4
statement 37:24 41:6 44:10 84:24
statements 47:10,12
states 1:1,13 2:3,3 70:20 84:9 93:20 119:7
    138:13
stating 109:5
stay 5:9 7:8,8,10 31:13 137:9
stayed 5:5,14 7:2,11 38:16
staying 5:7 7:4,13
Ste 2:4
step 69:24
stick 132:17
stipulating 14:24
stipulation 14:24 39:2
stock 13:5 62:6 89:23 92:13 93:12 121:18
    126:12 130:12
stop 131:16,17 132:2 136:19
stopped 122:18 123:10 131:4
stopping 121:3 122:3,7,13 130:1 133:13,18
stores 72:2,15,18 79:10,10,12,15,15 113:10
strike 12:9 17:19 21:10 22:25 42:18 78:4
striking 23:3
struck 68:20
subject 5:2
subsidiary 78:5
sue 5:23 20:20
sued 72:19 74:22,23 113:22
suggested 6:25
suggesting 6:14
suing 72:1
suitable 68:18
Suite 1:18,23 138:13
sum 49:19
summer 24:24 25:8,19 27:12
Sunny 70:16 82:17
supposed 16:11 38:7 66:13,14 67:3 69:19 76:11
    76:11,12,14 105:13
sure 4:5 37:9 38:11 50:11 73:1 92:21 94:20,22
    100:12 105:5 117:11,13,14 123:12 128:6
    132:18
surprise 39:22
survey 68:17
surveyor 68:17

**Sustained** 50:9 51:18 65:5 108:1
**swift** 115:13
**Switzerland** 31:23
**Sworn** 70:3 83:5

---

**T**

**T** 138:8,8
**TABLE** 2:7
**take** 29:18,18,19 30:19 43:11,16 64:8 71:16,19 72:6 76:12 91:2 98:8 104:12 128:19
**taken** 71:23
**takes** 69:20
**talk** 5:2,18 6:16,24 13:4 29:15 35:24 36:3 48:16 54:21 58:12 83:14 88:12 107:19,21 134:10
**talked** 36:12 48:19 51:7 54:15 55:20,21 108:12 120:21 127:2
**talking** 4:19 19:18 33:15 45:6 51:4 57:22 73:23 77:16 104:24 106:22 111:19 118:21 119:21 121:16
**talks** 84:25
**technical** 65:23
**telephone** 3:4
**telexed** 18:3
**tell** 7:22 15:24 29:25 31:19 33:2 34:7 37:18 50:25 54:5,6,24 63:23 64:1 67:7,17 71:1 77:22 78:13 85:2,16 86:17 91:13 97:8 104:5 106:2 115:12,15 118:15 120:10 130:11 135:10
**telling** 7:25 20:9 30:8 31:12 55:6 80:11 113:10 118:2 122:19
**tells** 19:23
**tendered** 23:8 45:1
**tentatively** 137:19
**term** 18:12,13,13,15,18 19:11,11 110:7
**terminology** 51:7
**terms** 36:1 68:21 129:21
**testified** 4:17 6:9 9:13,18 11:14 33:1 61:3 62:12 72:4,6
**testify** 5:25 20:6 39:25 40:21 58:12 105:19
**testifying** 9:22
**testimony** 9:24 10:20,20 11:12,19 17:3 23:3 32:22 38:7,22 39:6 43:21,22 105:20 124:15
**testing** 38:14
**text** 55:16
**Thailand** 31:2,9,17
**Thank** 23:6,16 44:3,7 58:14 64:19,19 69:24 101:8 102:8,14 138:5,6
**there's** 8:18,25 19:23 20:2,9,10 22:13 40:13,25 57:7 87:18 93:19 100:8 104:16 112:7 115:7 115:10,16 116:21 117:14 120:11 129:6 138:5
**they're** 35:9 110:10 116:24 117:2,3
**thing** 36:5 41:3 47:8 58:5,10 64:18 65:2 66:13 78:8 105:17 109:4 110:25 122:24 125:13,14 128:19 129:2 137:6
**things** 37:25 55:10 72:9 73:22 91:4 107:14 112:8 129:15
**think** 7:1 8:25 11:14 16:11 25:9 32:11 37:2,4 39:1 46:21 50:6 51:20 60:4,9 61:24 62:15 62:23 69:6 70:9 71:11 74:20 75:23 86:12 92:2 92:4 94:2 96:11 97:2 101:7 102:23 111:4,11 114:15 115:19 117:4 120:22,22 121:1 123:2 130:17 131:12 134:20
**thinking** 21:3
**third** 28:1 60:6 106:24
**thought** 11:24 58:21,23 74:22 89:11 95:15 107:14,17 109:1 111:15 125:14 133:10
**thousands** 103:7
**three** 26:7 32:2 39:3 69:7
**throw** 35:2
**throwing** 75:23
**Thursday** 137:20 138:3
**time** 3:3 4:21 5:14 6:20 8:7 17:23 19:12 22:7,11 26:5,16 28:4 32:3,7,10 34:10 36:8,12,22,24 39:20 43:5,6 44:25 45:22 46:10 49:2 50:22 52:4,9,10,17 53:10 54:16,19,20 55:19,20 56:18 57:21,22 58:2,22 60:23 61:6 62:15 63:1 63:10 64:20 65:25 67:7 68:5 69:25 71:14 74:9 76:7 83:8,10 85:11 90:4 94:7 95:17 96:4,14 97:21,25 98:3 102:11,15 109:1,12 110:19,25 117:5 118:25 119:20 123:23 124:7,17 127:15 127:16,25 128:25 129:14 132:10,17 135:4 137:4,21
**timely** 95:2 98:21,22 132:20
**times** 5:1,17 7:11,13 17:14 24:16,16 25:2 27:22 30:15 49:18 58:18 105:15 113:24 134:20
**tired** 105:19,25 106:7
**tires** 104:4
**title** 22:12,13 32:23 82:13,23 93:10 110:3 111:2 111:15

---

**titled** 14:9
**today** 7:25 25:3,25 74:9,12 85:3,4,8,17,18,22,24 86:4,11,19 107:12,13 113:17 118:2 120:7 136:20
**told** 6:25 14:1 29:17 30:13,18 31:4 48:7 49:10 51:1 54:9 71:10,11 81:8 90:10 93:22 94:15 97:9,15 99:19,20 100:10 107:16,22,23 109:9 112:12 113:6
**tomorrow** 137:12
**tons** 127:19
**top** 8:18,24 17:8 26:21 40:25 41:19 57:12 68:25 112:11 115:10,14
**top-left** 43:12
**total** 11:4,7 39:22 57:3
**touch** 5:11 55:17
**track** 31:10
**trade** 67:5 103:10,12
**traded** 60:2
**tranche** 114:16 115:3
**transaction** 129:22 130:10 134:12
**transcript** 1:12 17:4
**transcription** 138:10
**transfer** 30:19 48:2 55:21 66:16 94:7 108:7 113:11 121:18
**transferred** 10:11,15 16:16 24:3 51:23 53:1 60:20 65:25 68:23 92:22 93:19 94:1 108:13 109:17
**transferring** 111:21
**transition** 98:12
**translate** 28:3 43:23
**translated** 42:5
**translates** 18:11
**translation** 9:5 20:3 39:23 43:24 136:13,18
**translator** 19:19,24 20:6 28:3
**translator's** 18:15
**travel** 38:15,17
**treat** 38:22
**treatment** 137:8
**trial** 1:12 4:18 12:22 21:12 38:7,7,22 39:1 74:2 74:17
**tried** 6:25 24:16 25:4 121:23 128:2,25 129:17 130:13 131:2 133:20
**trier** 23:4
**trip** 33:18
**true** 5:6 15:6 29:7 41:11 42:16 59:1 79:4,5 80:16 85:4,7 93:13 95:22 129:20 133:7
**trust** 36:25 37:1 110:25 111:3,15
**try** 16:19 20:7 26:8 33:11,11 64:2 96:9 135:10
**trying** 17:14,15 28:20 32:3 41:10 46:20 72:17,20 73:2 74:24 97:6,8 112:22,25 133:5,24,25
**tuition** 65:3
**turn** 47:19 52:15 89:13
**turned** 29:25 52:14 53:10
**turns** 20:22
**twice** 11:13,16
**two** 40:25 49:1 55:10,10 64:6 73:11 77:11 85:25 86:4 87:2 94:16 102:12 111:7 114:3,21 128:19
**type** 67:8 107:13
**typed** 84:24 90:17 131:1,10
**typewriter** 131:8
**typing** 131:11,13

---

**U**

**Udov** 63:17,21
**Ukraine** 79:18,22,25 80:8 81:23
**ultimately** 11:11 55:2
**unable** 30:14 65:24
**unclear** 7:16
**understand** 9:1 11:6 12:22 14:16 16:6 18:11 19:14 20:16 21:6,12,17 23:14 27:8 37:9,12 53:6 65:7,11 61:24 62:5 73:6 85:7 91:13,16 92:21 93:23 94:22 96:1,20,21 98:23 100:12 101:7 106:8 109:18,21 116:4 116:16,22 130:17 132:5 134:15
**understanding** 15:24 21:21 107:15
**understands** 42:7 105:3
**understood** 10:5 14:19 73:1 107:1 127:8
**unfortunately** 24:17 32:4 37:25 38:1
**unhelpful** 47:2
**unilaterally** 102:21
**unit** 5:5,15,22,25 6:2 7:2,2,12
**United** 1:1,13 2:3,3 70:20 138:13
**unknown** 82:23 83:11
**unseen** 103:25
**until** 115:14
**use** 13:20 18:12,24 19:11,12 27:18,19 35:12,12 42:4 47:4 58:1 70:9

---

**usually** 68:11 69:1 105:2,14 112:9
**U-d-o-v** 63:17

---

**V**

**V** 44:23 45:5 58:25 59:2,8
**vacation** 31:1,8,10
**valid** 28:11
**valuation** 85:1
**value** 9:13 10:3,5,5,9,14,17,18,21,25 11:1,3,3,4 11:7,21 13:12,15,17 24:21 26:7 39:6 45:1 47:9,17 52:25 86:9 93:25 95:12,16,17 97:16 97:19 102:10,17,21 103:12 105:12,14 112:22 112:25 113:2,4 130:12
**valued** 11:2 26:11,14,24 47:5 130:12
**valuing** 39:10 93:20
**venture** 79:17,21 80:6,10
**version** 14:10
**versus** 86:4
**vessel** 10:13,16 11:1,16,20 14:2,23 15:8 22:20 26:8 28:5 33:10,11 56:2 60:12 65:15 67:19 75:18 76:8 94:15,17 96:6,7 97:10,14,16 101:18,20,22 106:5,6,7,8 107:4,15 112:11 113:6,7 123:25,25 124:1,3,6 125:2,3 126:3,4 126:9,12,15,16,19,23 127:9,17,19,21,25 128:17,23 129:19 133:12,20,24 134:5,6,17,23 134:25 135:3,13,22
**vessels** 8:6,8 93:7 127:12,15
**Victor** 63:18
**video** 72:2,15,18 113:10
**view** 32:12
**Viewing** 63:8
**VII** 44:23
**visited** 12:20 86:1
**Vitya** 63:17
**vs** 1:8
**V-i-t-y-a** 63:18

---

**W**

**wages** 66:20 69:3
**wait** 87:3 120:24,24,24
**waiting** 4:2 67:14
**want** 4:17 15:9,10 37:5 44:9 47:21 48:16 53:9 53:23,25 57:15 58:11,12,13 64:23 84:23 86:25 91:16 92:20 94:21 95:23,25 96:21 98:3 98:23 99:2,13 100:19 107:20 108:4 112:15,21 113:14,21 117:25 118:3,4 120:8,17 124:3 125:11,24 126:3,4,10 127:11 128:17,20 129:2 129:16 130:15 131:3 132:16 133:9,11 134:14 134:14,16 135:1,4 137:7
**wanted** 5:23,23,25,25 7:15 12:13 15:5,6 22:20 27:18 30:5 33:17 34:8,22,23,24 35:11 53:2,4 54:25 55:23 62:25 63:1,2,10,11,11 90:2 97:16 97:19,21 100:18 105:5 117:7 125:22 130:9 134:22 137:8
**wanting** 119:22
**wants** 68:13 96:15 97:8 101:3,5,18 102:7 107:14 125:23 126:18 127:16,22 128:22
**warned** 30:14
**wasn't** 18:13 34:11 36:10 45:22 59:12 87:9 92:12 117:9
**water** 66:22
**way** 33:10 59:14 67:22 91:7 96:16,18 98:22 102:9 113:6 119:5 124:3 130:6 131:15 135:12
**ways** 59:15
**weather** 138:6
**website** 77:7 78:2,19 79:20,24 80:10,14
**week** 4:18 6:13 9:13,22 14:6 17:3 28:20 32:18 47:21 48:9 71:24 85:8 135:5
**weeks** 48:24 99:6,12 111:10 121:22 136:11,15 136:16 137:8
**went** 20:25 21:3,20,20 28:20,23 31:8,10,11 71:4 107:18
**weren't** 25:15 34:7 49:23 51:10
**we'd** 39:15
**we'll** 43:18 44:1 55:11 64:9 76:5 81:12 94:19 136:21
**we're** 5:13 17:24 20:20 26:8 38:7 45:6 77:10
**we've** 107:9
**what's** 37:10 38:5 41:6 75:12 86:3 91:23 118:22 121:6
**wheat** 26:6
**wholesalers** 104:10
**wholly** 78:4,5
**wife** 71:12
**willing** 61:12 85:22 96:16 97:11 118:8 119:1
**wire** 99:17,17
**wish** 4:2
**wishes** 21:13
**withdraw** 45:7

---

**witness** 20:6,13 39:3,13,24 42:7 43:20,20 46:17
  55:10 72:13,19 123:4 124:15 136:25,25
**wonderful** 122:24 125:5 126:11
**won't** 136:20
**word** 18:11,20,20,24,24,25 19:10,12,13,14,17
  19:24,25 20:9,16 23:9 28:1,2 41:19
**wording** 41:21
**words** 34:13,15,15 55:4 128:19
**work** 14:22 24:17 37:16,23 65:1 80:6 129:3
**working** 14:14,15 36:10 50:19 63:15 69:19
**works** 27:3 35:10 98:17,18
**world** 57:24 58:15 59:11 79:4 98:10
**worldwide** 67:16
**worried** 99:25
**worry** 95:24 99:2 132:9
**worth** 9:16 11:17,20,24 24:24 25:6,7,21,25
  34:11 60:4,5 86:8 95:9 105:18
**wouldn't** 6:12 13:15 25:2 34:11 37:5 118:25
  130:24
**write** 16:12 18:1 112:2,22,24 120:18,20 122:9,12
  122:24 125:7 132:19,23 133:18 136:15
**writing** 14:24,25 28:9,9,14,16 33:20,23 50:11,14
  50:16 53:15 68:20,21 95:5,8 96:1 102:2,10,18
  120:11 132:11,21
**written** 28:6 29:6,12 68:8,10,14,15 94:22 106:23
  106:25 107:2 111:23 124:8 125:5,6,8 129:13
  131:18
**wrong** 75:12 115:19 118:10 135:15
**wrote** 15:7 16:15 34:1 48:1,5 49:16 83:11 84:11
  90:4,10 95:2,5 97:25 98:20,22 101:19,24
  102:3,20 109:5,7 110:23 120:21,24 121:5,7,8
  121:10,11,24 122:2,10,19 123:8,11 125:20
  128:4,12,15 129:25 131:15 132:1,3 133:7,15
  134:2

**Y**

**yeah** 34:4 106:17 112:14 116:6 121:1 136:8
**year** 29:19,20 33:15 38:2 43:1 56:16,20,23 57:3
  57:6 63:15,16 73:8,19 74:20 87:9 107:9
**years** 19:2,3 32:2 57:6 59:3,5,7,8,8,9 75:20
  76:18,18 79:8 80:13,13,14 85:25 86:4
**yesterday** 77:6
**younger** 56:2
**you'd** 37:22 64:4
**you'll** 60:3 64:12 102:15
**you're** 8:8 11:25 14:15 37:7 40:2 50:8 51:4 53:3
  72:1,5,11 73:2 74:17 77:13,15 78:1,22 80:11
  81:17 82:11,21 87:18 105:5 106:22 107:16
  110:2,12 112:6 115:12,22 116:4 117:11 118:2
  119:8,21 132:24 133:4,21 135:3
**you've** 19:2 34:18 40:10 41:15 53:21 55:19
  81:21 109:2
**Yuri** 30:5,8,11 127:2

**Z**

**zalog** 20:1,1,16,18

**$**

**$1** 75:8,9 89:6 112:18,19 113:8
**$1,000** 121:22 132:16
**$1,150,000** 88:13
**$1.2** 29:6 95:18
**$1.3** 107:5
**$1.4** 30:5 67:18,25 95:19 97:15 98:7
**$1.5** 32:17 39:10 45:2 56:8,11 84:25 85:5,8,18
  85:21 121:17 123:12 126:10 135:16
**$100,000** 75:4,24 76:3
**$120,000** 62:17
**$132,000** 88:9
**$132,005** 87:10
**$2** 56:19
**$2,603,606** 42:20,25
**$20,000** 66:19
**$200,000** 9:14,16 10:10 11:2,8 61:25 62:8 69:2
**$21,813** 46:3
**$22,899** 45:11,25
**$23,000** 90:5 92:10
**$250,000** 63:24 99:7,9
**$30,000** 66:24 94:12
**$300,000** 46:13 57:10,11
**$35,000** 66:19
**$37,966** 46:6
**$40,000** 113:7
**$400,000** 8:2 11:1,15,18,20,21 13:16 25:6,7
  34:11 35:5 48:25 49:16 60:4 87:4 108:19,20
  109:16 111:22
**$5,000** 100:23
**$500,000** 25:8 64:3,3 118:9
**$60,000** 62:21,25 63:10

**$750,000** 85:1 121:3 130:2
**$800** 129:1
**$810,000** 116:1,19,23
**$900,000** 75:24
**$92,000** 91:25 92:15

**0**

**08** 116:17
**09** 36:9 40:25 41:1 53:12

**1**

**1** 14:10,12,14,14,17 16:7 20:25 23:9,13,17 27:23
  33:14,19 45:24 46:2,5 56:19 89:13 94:21,22
  101:9 104:7 108:6,9 111:19 131:15,18 134:5
**1st** 40:25 41:1 120:22,25 121:3,5,7,9 122:10
**1.2** 29:13,15,25 97:17 102:12
**1.4** 30:23 102:13 128:2 130:9 131:20 134:8
**1.5** 32:12 102:13 121:19,20 128:23 130:9,13
  131:21 134:19
**1:00** 137:20
**10** 6:16 8:6,8 19:4 22:16 23:8,19,21 47:25 48:5
  62:9 69:22 74:3 75:20 76:18 92:20,21 93:7,15
  104:7 108:12 111:21 122:13,23,23 123:8,10
  123:11 125:4 131:16,18 132:1,5,6,23 133:18
  134:19,20 135:6,14,18
**10th** 8:21 88:9
**10-21612-CIV-Altonaga** 1:3
**100** 31:18 53:18 101:17
**1000** 1:23
**11** 8:11
**11:27** 4:9
**12** 74:3
**12-2** 2:4 138:13
**12:56** 44:4
**120,000** 112:13
**13** 17:21 69:16,20 79:7 82:9 83:21 94:17
**138** 2:15
**14** 117:16
**15** 17:25 19:3 81:10
**15th** 8:22 9:10 11:10 12:4 122:11,12
**150** 69:2 100:13
**16** 14:4,7 16:7
**16th** 111:22
**17** 17:4
**17555** 70:16 82:17
**18** 8:13,22

**2**

**2** 17:9 83:18,20,24 90:11,19 91:2,17
**2nd** 116:17,20
**2:00** 43:18 44:2
**2:51** 64:10
**20** 77:23 80:13
**200,000** 9:18 10:6 11:4,5
**2000** 103:23 106:6
**2002** 10:9
**2007** 63:2,12 80:20
**2008** 8:23 9:10 11:10 27:12 33:2,5 51:21,25 52:6
  52:18 57:9,25 58:15 60:24,25 62:16 63:3,12
  65:20 66:6 92:5
**2009** 8:21 10:2 14:9 17:11 24:24 25:19,21,24
  33:2 36:10 42:20 43:2 45:8,24 46:2,5,13,16
  46:25 52:5 53:13 54:3 57:25 58:15 60:24
  61:19 65:20 66:6,18 67:4,6 93:18 94:23 95:11
  106:2 108:6,8,10,13,17 111:23 112:21,24
  121:3 122:3 124:20 130:1 131:15,25
**2010** 83:5,6
**2011** 1:8 88:9
**23,000** 92:1 133:11
**25** 9:24 68:6
**25th** 14:9 94:22 108:6,10 111:19 122:16 131:20
  131:25 132:3,19 133:16 134:2 135:2,5
**250** 99:10,18 100:7,15
**250,000** 100:4,10

**3**

**3** 114:17,18,19 115:11,14
**3:18** 65:11
**3:30** 69:13
**3:31** 70:5
**30** 1:8 6:21 19:2 60:11,12 66:19 80:14 105:24
**300,000** 37:12
**305.523.5518** 2:4 138:14
**305.523.5519** 2:5 138:14
**33** 116:1
**3302** 7:2,12
**33021** 1:18
**33128** 138:14

**33128-1810** 2:4
**33160** 70:17
**33301** 1:24
**350** 1:23
**3702** 70:16
**375-South** 1:18
**380** 9:17

**4**

**4** 2:9,10 108:3,3,16
**4th** 53:12 54:2 93:18 108:13 111:21
**40** 6:21 60:11,12 105:24
**400** 2:4 8:4,5 9:17 109:8 138:13
**400,000** 11:3 25:16 34:12 49:14,15 109:9 112:2
  114:21 115:7 117:15 125:10 127:9
**4000** 1:17
**45** 39:2

**5**

**5** 6:16 83:6,17,19 84:2,8
**5th** 114:22 121:11,14 122:3,6,14,19 123:11
  130:1 131:18 132:2,4,25 133:4,7,19,20
**5,000** 99:19 127:19
**50** 10:15,15 11:8 52:3 53:19,23 60:6 65:13 66:14
  67:3 86:20 93:3 96:7 101:14,15,17 102:6
  112:7 116:10 122:20 126:18,25
**50-years-old** 105:24
**50/50** 51:23 60:8,9
**500** 8:5 25:1,9 56:23 103:24
**500,000** 25:13 113:7 118:9
**53** 111:23,24
**54** 47:19,23 119:3 120:17 128:4 135:24 136:2
**59** 116:7

**6**

**6** 115:9,11 117:19
**6,000** 91:3
**6/30/11** 4:9 65:11 69:13
**600** 8:4 25:10
**600,000** 56:23
**65** 2:11
**69** 2:12

**7**

**7** 137:20
**7th** 42:20 43:2 46:13 137:23 138:3
**70** 2:13,14 115:16,17 116:16
**700,000** 30:18
**750** 86:20 109:8,8 117:14 123:14 124:7 129:18

**8**

**8** 9:24 104:7
**8th** 108:16 111:22 114:22
**8,000** 91:3
**8:30** 137:20 138:4
**800** 132:16
**800,000** 114:21
**87** 32:15

**9**

**9th** 49:11 91:24
**90** 137:4
**954.525.9900** 1:24
**954.966.1820** 1:18