### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

#### CASE NO. 10-21612-CIV-ALTONAGA/Simonton

**PALADIN SHIPPING CO. LTD.**, and
**ANATOLIY CHABAN**,

      Plaintiffs,

vs.

**STAR CAPITAL FUND, LLC**,
and **LEON GOLDSTEIN**,

      Defendants.

_____/

### ORDER SETTING FORTH FINDINGS
### OF FACT AND CONCLUSIONS OF LAW

**THIS CASE** came before the Court for a non-jury trial on June 24, 30, and July 7, 2011.

The Court has carefully considered the testimony of the witnesses, the exhibits admitted in evidence,

the parties' written submissions, and the applicable law.  Based on a review of the record and

pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court makes the following findings of fact

and conclusions of law.

### I.  FACTUAL FINDINGS

Друг познаётся в беде́.[1]

Eleven years ago, Defendant, Leon Goldstein, called his old friend and business partner,

Plaintiff, Anatoliy Chaban, to tell him that there was "a hulk of an old steam boat on sale in

Odessa[,Ukraine]."[2] (June 27 Tr. 6:5-7 [ECF No. 114]).  Goldstein suggested to Chaban that the two

---

[1]  You find out who your friends are when in trouble.

[2]  The boat was a Volga-Don type vessel built in Romania in 1968.  (*See* Tr. Ex. 28).  At the time of purchase, it was called the Kombat.  (*See* June 24 Tr. 6:12 [ECF No. 114]).

CASE NO. 10-21612-CIV-ALTONAGA/Simonton

repair the boat, obtain new documentation, and use it for a shipping business.  (*See id.* 6:8-9).
Chaban agreed, and each man paid half of the $100,000 purchase price.  (*See id.* 6:13-14).  Before
the ship, rechristened the M/V Chalsi, launched on May 5, 2002, Goldstein and Chaban had invested
an additional $500,000 each to upgrade and repair the boat to make it ready for trade.[3]

For a while the partnership paid off; Goldstein's share of the profits was $270,000 each of
the first two years.  (*See id.* 8:12-14).  But the Chalsi required ongoing repairs, and in time ports
began refusing to admit the aging ship, especially in winter when ice formed on parts of the Black
Sea.  (*See id.* 9:17-21).  In fall 2008, the classification society that had registered the Chalsi withdrew
its classification.  (*See id.* 9:24-25).  Consequently, in October of 2008, the Chalsi was quarantined
in port, unable to sail, and in need of a major overhaul.  (*See id.* 10:1-5).

By coincidence, just a month or so before the Chalsi was quarantined, Goldstein approached
Chaban with another business idea.  Goldstein had a new company, Defendant Star Capital Fund,
LLC ("Star Capital"), that would lend money to businesses with an acute need for cash at a 120-
percent annual rate of interest while taking a security interest in the cash flow and assets of the
businesses.  (*See id.* 10:23–11:13).  Goldstein told Chaban, "the whole scheme is riskless," and asked
him to invest.  (*Id.* 10:23, 11:5).  Chaban declined the opportunity.  (*See id.* 11:14-15).  When
Chaban refused to invest, Goldstein asked him for a loan instead, so "he could make money in that

---

[3] "[This] was the absolute minimum repairs [Goldstein and Chaban] could invest in it."  (June 24 Tr. 7:18–19).  After the repairs, the vessel could only sail under a Cambodian flag, "the blackest flag in the world."  (*Id.* at 7:7–12).  To sail under a white flag, "it would have required repairs worth between [$]7 and $8 million.  To sail under a green flag, it would require repairs in the range of [$]3 million."  (*Id.* at 7:16–18).  Goldstein and Chaban did make some modifications to the boat so that it could carry more cargo and make greater profit.  (*See* June 30 Tr. 127:18-20 [ECF No. 117] ("[W]e made the ship very, very interesting.  It holds more than 5,000 tons and that's how we made the ship.  So, this vessel never lost the money.")).

CASE NO. 10-21612-CIV-ALTONAGA/Simonton

way through Star Capital." (*Id.* 11:18-20).

The two men worked out an oral agreement that was later memorialized in writing.[2] (*See* June 30 Tr. 111:9-11 ("These notes were signed afterwards . . . . It was a few weeks after.")). On September 5, 2008, pursuant to their agreement, Chaban lent Goldstein $750,000 at 2% interest per month; the principal was to be repaid in full, six months later, on March 5, 2009. (*See* June 24 Tr. 12:20-25, 72:1-4; *see also* Tr. Ex. 14). A few days later on September 9, 2008, Goldstein asked Chaban to lend him an additional $400,000, also for six months and at the same interest rate as the prior loan. (*See* June 24 Tr. 13:3-14, 72:4-9; *see also* Tr. Ex. 15). Chaban agreed, and a second written memorandum was later signed. (*See* Tr. Ex. 15). The money, $1,150,000 in all, was sent from Chaban's company, Plaintiff Paladin Shipping Co. Ltd.'s ("Paladin['s]") bank account to a Star Capital account.[3]

Within weeks the international economic crisis began, and "[e]verything stopped . . . and everything was scary. So, [Paladin and Chaban] asked Mr. Goldstein to pay [them] back the money

---

[2] The parties seem to agree that not all of the terms of their agreement were written down, and that some of the terms in the memorandum do not reflect their actual oral agreement. (*See, e.g.*, June 30 Tr. 90:21 (Goldstein: "Whatever it says. It's not the agreement we made."), 91:4-5 (Goldstein: "It's a lot of mistakes. We did a lot of things on a handshake."), 110:24–111:12 (Goldstein: "Chaban sent me the money on pure goodwill and trust and I did the same thing for him [a] long time ago because he always lend [sic] the money from me without any single paper."); *see also* (June 24 Tr. 82:3-4 (Chaban: "There is a lot of things we don't have in writing. Had we had everything in writing, we wouldn't be sitting now in court.")). Despite the informal methods by which Chaban and Goldstein made their agreements, there is broad consensus between them on the relevant terms of the agreements covering this dispute.

[3] Although the money was transferred between two corporations, there is no doubt that this was a deal between two men. (*See* June 24 Tr. 14:6–7 (Chaban: "I gave my personal money. It was — Paladin gave the money, but it was my money."), 74:19 ("I believe if the company is mine, then it is my money."), 75:18–19 ("I identified Star Capital with Mr. Goldstein. I believe it's the same. That's how he explained it to me."); *see also* June 30 Tr. 125:9-13 (Goldstein: "A . . . . Why would I send him 400,000 if . . . I didn't have the money? Q. Well, Star Capital sent the money first of all, right? A. The same thing.")).

3

CASE NO. 10-21612-CIV-ALTONAGA/Simonton

due earlier, either the whole amount or partial amount." (June 24 Tr. 13:16–20; *see also* June 30 Tr. 99:6-12). During this time, Chaban was having some financial difficulties (*see* June 30 Tr. 58:15-19 ("Q. And times were very dark for you in business. Right? A. Yes."); *see also* June 24 Tr. 78:13-22), and Chaban was also concerned about Goldstein's ability to repay the loans (*see* June 24 Tr. 20:16-18, 21:7-9 ("I was still concerned for the bulk of the amount because I heard Star Capital had some very serious problems."), 80:6-7). In these conversations, which took place in October 2008, Goldstein said he could transfer back part of the money — about $250,000 — that Star Capital had not used. (*See* June 24 Tr. 14:11-13; June 30 Tr. 99:6-12). However, Goldstein was willing to return the $250,000 only if Chaban would forego the $5,000 in interest that had accrued on it. (*See* June 30 Tr. 99:10-16, 100:6-11). Chaban refused, and Goldstein did not return the money.[4] (*See id*. 100:10-11).

Although the precise date is not clear from the record, at some point thereafter, Goldstein began to suggest to Chaban that if he needed money before the loans were due to be repaid, the two men should sell the Chalsi. (*See* June 30 Tr. 96:15-16 ("Chaban wants the money before the due date and this is the only way to do it."); *see also id.* 97:8-15).

During all of these developments, the Chalsi, idle in port and undergoing repairs, was racking up $30,000 a month in crew costs. (*See* June 24 Tr. 15:13-15). By mid-spring 2009, the series of repairs completed on the Chalsi totaled more than $400,000. (*See* June 30 Tr. 7:25–8:7, 65:25–67:6;

---

[4] Chaban tells a slightly different version. In his version, Goldstein agreed by phone to transfer some of the money back, but then did not follow through. (*See* June 24 Tr. 14:11-15). When Goldstein did not make this partial payment, Chaban asked Goldstein to at least pay the $23,000 in interest that had come due on the total amount of the loans; Goldstein told Chaban he would do so, but then did not. (*See id.* 14:16–15:5; *see also* Tr. Ex. 9).

CASE NO. 10-21612-CIV-ALTONAGA/Simonton

*see also* Tr. Exs. 20–27 (invoices for repairs to the Chalsi)).

Every year in January, Chaban traveled to Miami on vacation with his family. During his trip to Miami in January of 2009, Chaban made several attempts to discuss the loans with Goldstein, who lives in Miami. (*See* June 30 Tr. 6:6-20). Finally, one hour before Chaban's plane left for Ukraine, he and Goldstein met in a café. (*See* June 24 Tr. 17:4-8, 82:24–83:3). At this meeting, Chaban was able to convince Goldstein to write out and sign the following note:

> I, Leon Goldstein, has [sic] borrowed USD 1,150,000 from A.F. Chaban and is [sic] to return them [sic] with interest on March 9, 2009. Fifty per cent (50%) of my share in the ship "Chalsi" makes a part of this collateral. If the debt is not repaid timely, Chaban shall have the right to sell my share in the ship having preliminarily agreed to the selling price of my share in writing. If the debt is repaid, the Contract shall become null and void.

(Tr. Ex. 1 (translation of the Russian original); *see also* June 24 Tr. 17:4-8). This note, drafted on January 25, 2009, extended the deadline for the $750,000 dollar loan to March 9, 2009 from March 5, 2009 in exchange for Goldstein's promise to give, as collateral, his shares in Dexter Lines Ltd. ("Dexter Lines"), the Belizean corporation that owns the Chalsi. (*See* June 24 Tr. 17:18-21; *see* Tr. Ex. 11). Both parties also state that at this meeting Chaban agreed to accept a single interest payment at the end of the credit term rather than require Goldstein to make monthly interest payments. (*See* June 24 Tr. 80:19-20, 81:23–82:4; June 30 Tr. 90:7-9). However, Goldstein did not include this term in the handwritten note.

A week or so later, after Chaban had returned to Ukraine, Goldstein called Chaban and asked to buy out Chaban's share of the Chalsi.[5] (*See* June 24 Tr. 19:1-3, 87:6-15). Chaban reacted

---

[5] There was testimony from Goldstein about a number of offers to purchase the Chalsi at this time, but whether these offers were serious is highly contested. Goldstein testified he notified Chaban of at least three offers for the Chalsi, ranging in value from $1.2 to $1.5 million. (*See* June 30 Tr. 95:17-20 ("[W]e had

CASE NO. 10-21612-CIV-ALTONAGA/Simonton

incredulously, asking Goldstein, "When are you intending to transfer money for my share and for the amount you owe?" (*Id*. at 19:3-5, *see also id*. at 87:8-13). Goldstein indicated he could pay when he came into money in a few months. (*See id*. at 19:6-7, 87:10-11). Chaban testified that he was not crazy, and that "Goldstein owed [him] money anyway and what [Goldstein] was asking [Chaban] to do is transfer the ship to him without getting any money." (*Id*. at 18:8-10; *see also id*. at 87:11-13). Goldstein never provided an offer in writing, and Chaban declined to sell his shares to Goldstein.[6] (*See id*. 19:8-18, 87:14-23, 90:21-23).

Sometime in mid-February, Goldstein sent an acerbic letter to Chaban in which he declared that "starting February 5, 2009 I am stopping interest payments on the $750,000 credit because you crumbed [sic] my deal, and I consider this credit paid. You have now become rightful 100% owners;[7] of the dry cargo carrier Chalsi. Congratulations."[8] (Tr. Ex. 54 (translated from the Russian

---

an offer for $1.2 million which Chaban rejected to sell. Then I had another offer for $1.4 million. Chaban refused to sell it as well."); *see also id*. 121:16-17 ("I made him an offer for the ship for $1.5 million.")).

Chaban denies that any of these were real offers because they were not in writing. (*See* June 30 Tr. 29:12-14 ("Q. Do you deny receiving a written offer from Mr. Abramenko for 1.2 million? A. Correct. He didn't give anything to me."), 30:17-20 ("As Mr. Goldstein explained to me, Mr. Sinitsky offered to buy . . . his shares, for 700,000 [$1.4 million for the Chalsi]. I told him 'No problem. Take the money from Mr. Sinitsky and transfer it to me because he doesn't have money.'"), 69:7-10 ("Q. Now, you heard Mr. Lichtman question you about, I think, three or four alleged different offers to buy this ship. Did any of the events [written negotiations] that you just described occur with respect to any of those offers? A. There was no such event at all, none of the offers.")).

[6] За́ морем телу́шка — полу́шка, да рубль перево́з. (Overseas, a cow [costs] a quarter of a kopeck, but [it will cost] a rouble to ship [it here].)

[7] Another man, Sinitsky, had owned a 25% share of Dexter Lines. (*See* June 24 Tr. 66:3-4.) He transferred his share of the Chalsi to Chaban before this litigation to settle other debt. (*See id*. 66:9-11.)

[8] Goldstein described this as a "shotgun deal." (June 30 Tr. 128:23-24 ("I made you an offer for [$]1.5 [million]. You reject it. It's a shotgun. Then you will buy my shares.")). In Goldstein's view, when Chaban did not accept Goldstein's offer of $750,000 to buy his shares, Chaban became obligated to buy Goldstein's shares for that price. Goldstein explained that this was a background understanding between

6

CASE NO. 10-21612-CIV-ALTONAGA/Simonton

original); *see also* June 30 Tr. 122:9-25 (Goldstein: "I wrote this letter after February 1st. Let's say February 15th.")). On March 4, 2009, a few weeks after sending this letter, Goldstein transferred his shares in Dexter Lines to Paladin Shipping. (*See* Tr. Ex. 10). Yet, before the transfer, the parties did not "preliminarily agree[] to the selling price of [Goldstein's] share in writing." (Tr. Ex. 54; *see also* June 30 Tr. 28:16-18, 102:17-19). Chaban testified that after he received the share transfer from Goldstein, he "called Mr. Goldstein over the phone and told him that he owed more money." (*Id.* 48:7-8). So in April, a month after transferring his shares in Dexter Lines and a month after the loan's due date, Goldstein (through Star Capital) made a payment of $400,000 to Plaintiffs. (*See* June 30 Tr. 48:24–49:15). The parties now dispute the value of Goldstein's shares of Dexter Lines, and whether the transfer of those shares together with the $400,000 payment covered the principal amount that Goldstein borrowed.[9]

At the time of transfer, Goldstein valued his shares in Dexter Lines at $750,000. (*See* Tr. Ex. 54; June 24 Tr. 19:21-24). By contrast, Chaban claims Goldstein's shares in Dexter Lines were worth no more than $200,000 to $250,000 at that time. (*See* June 30 Tr. 9:13-15, 10:5-6, 11:1-2, 62:8 ("I give him credit for $200,000."). *But compare id.* 24:25 ("[The boat was worth n]othing, because nobody was giving anything for it so far."), *with id.* 25:9-10 ("Nothing was offered[, but] I think I could have sold it for [$]500 or [$]600 [thousand]."), *and id.* 26:6-9 ("[W]e are anticipating

himself and Chaban. (*See id.* 129:9-19 ("That's the agreement we had before, that we could buy each other in the shotgun . . . . [We have] been in business for quite some time. That's how we doing [sic] things.")).

[9] Both sides agree that Goldstein did not pay the interest due on the $1,150,000 in loans. (*See* June 30 Tr. 113:13-21 ("Q . . . . [A]s you [Goldstein] sit here today you acknowledge that you owe Mr. Chaban the interest on that money? A. Yes.")). Goldstein maintains he has refused to pay because he was not permitted to inspect the books for the Chalsi; he was apparently suspicious that Chaban had not given him all the profits to which he was entitled. (*See* June 30 Tr. 113:2-19).

7

CASE NO. 10-21612-CIV-ALTONAGA/Simonton

in three or four months the value of the vessel will go up and we're going to try to sell it [for] enough to cover our losses.")).

In reaching the $200,000 price for Goldstein's shares, Chaban relied on a written estimate of the Chalsi's value (the "Valuation Certificate" Tr. Ex. 28) prepared by Madeline Kooy, one of three "sworn sale and purchase brokers for seagoing vessels" in the Netherlands. (June 24 Tr. 26:25 –27:7; *see also id.* 24:10-18; June 30 Tr. 47:7-9). Ms. Kooy testified she was asked to value the Chalsi using a "willing buyer/willing seller" methodology and was not asked to value the vessel as "a going concern." (June 24 Tr. 57:1-11). That estimate, obtained by Chaban before this lawsuit, set the value of the Chalsi on February 25, 2009 at "Between US$350,000 and US$400,000."[10] (Valuation Certificate; *see also* June 24 Tr. 32:17-19). Chaban testified that "[the Valuation Certificate] was the only thing that would allow us to estimate the price, the value" of the Chalsi. (June 30 Tr. 47:7-9).

Accordingly, the Court distills the question before it as follows: what was the value, in March 2009, of a 50% share of a Belizean company whose sole asset was a specially-modified, Romanian-built, Cambodian-flagged, 1968 Volgo-Don dry-cargo freighter that usually carried scrap metal and

---

[10]   Prior to trial, Defendants objected on procedural grounds to Ms. Kooy testifying as an expert witness. (*See* June 7 Order [ECF No. 97]). The Court ruled that Ms. Kooy would not be permitted to testify as an expert, but recognized some of her testimony could be admissible if she testified as a lay witness. (*See* June 17 Order [ECF No. 109]). For instance, Ms. Kooy could testify to facts about the preparation of the Valuation Certificate based on her perceptions; these could include who asked her to prepare it, how much she was paid to do so, what information she had about the Chalsi, and what type of valuation she was asked to perform. Moreover, had Defendants objected to the Valuation Certificate on hearsay grounds, Ms. Kooy could have testified as a records custodian to lay a foundation for the business records hearsay exception. By contrast, Ms. Kooy could not testify about the relative importance of the various pieces of information she considered in assigning a value to the Chalsi, nor could she offer an opinion about the value of the ship. Therefore, although Plaintiffs' counsel elicited from Ms. Kooy some testimony based on her specialized knowledge, the Court only considered Ms. Kooy's testimony to the extent it established the factual context for her preparation of the Valuation Certificate.

CASE NO. 10-21612-CIV-ALTONAGA/Simonton

coal on the Black Sea, but which at that time was undergoing extensive repairs?[11]

## II.  CONCLUSIONS OF LAW

Дру́жба дру́жбой, а табачо́к врозь.[12]

Although the Second Amended Complaint [ECF No. 49] alleges three causes of action —

breach of contract (Claim I), money lent (Claims II and III), and unjust enrichment (Claim IV) –

Florida law does not allow a plaintiff to recover for money lent or unjust enrichment if there is a

valid contract governing the dispute.[13]  *See Hazen v. Cobb*, 117 So. 853, 857–58 (Fla. 1928);[14] *see*

---

[11]  Little discovery and no depositions were taken in this case.  Because so little preparation was done before trial, the parties used the trial as an opportunity to air many grievances whose scope stretched far beyond the pleadings.  In the trial testimony, there were allegations that Chaban had not been paying Goldstein all the profits he was owed on the Chalsi, that Chaban did not pay Goldstein proceeds from an insurance claim on another boat they owned, and that Goldstein had not paid for repairs on the Chalsi under their partnership agreement.  This last dispute received a great deal of focus at trial.  There were also allusions to disputes over family matters that had arisen between the two men.  The Second Amended Complaint only addresses Goldstein's failure to repay a $1,150,000 loan from the Plaintiffs, and Goldstein made no counterclaims.  There were no motions at trial to amend pleadings to conform to the evidence presented.  Consequently, the Court limits this Order to the issues properly before it and declines to express a view about some of the other disputes alluded to in the testimony.

[12]  Friendship is friendship, but [keep our] tobacco apart.

[13]  Claims III and Claim IV named Star Capital as a Co-Defendant.  Star Capital, however, was dismissed by stipulation of the parties at trial on July 7, 2011.  (*See* July 7 Tr. 11:9–12 [ECF No. 119]).

[14]  There are some interesting historical reasons a plaintiff cannot recover both under an express contract and under a claim for money lent.  A detailed discussion of the defunct form of action of assumpsit — the form of action for the recovery for the breach of an express or implied contract — is available in the Florida Supreme Court's opinion in *Hazen*, 117 So. at 857–58.  There, the court distinguished general and special assumpsit.  The court wrote, "in general assumpsit, on the common counts [including money lent], only an *implied* contract is the basis of the action, while in special assumpsit an *express* contract is the only basis."  *Id*. at 857 (emphasis in original).  The court elaborated, "where the plaintiff founds his action on an express contract, special assumpsit is the only appropriate remedy . . . .  The law will not imply a contract where a valid express one exists."  *Id.* at 857–58.

Of course, besides these historical distinctions, other reasons exist to deny a plaintiff the right to simultaneously recover under an express contract and a claim for money lent.  For instance, a plaintiff should not be able to obtain a double recovery or recover more than he or she is due under the express contract.  (None of these reasons prevent a plaintiff from pleading both breach of contract and money lent as alternative

9

CASE NO. 10-21612-CIV-ALTONAGA/Simonton

*also Bowleg v. Bowe*, 502 So. 2d 71, 72 (Fla. 3d DCA 1987) ("[T]he theory of unjust enrichment is equitable in nature and is, therefore, not available where there is an adequate legal remedy."). Because the parties agree that a valid express contract governs their dispute, the Opinion is confined to the breach-of-contract claim.[15]

### Breach of Contract

Гла́дко бы́ло на бума́ге, да забы́ли про овра́ги.[16]

To recover for breach of contract a plaintiff must prove: "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citing *Friedman v. N.Y. Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. 4th DCA 2008)); *see also Carpenter Contractors of Am., Inc. v. Fastener Corp. of Am., Inc.*, 611 So. 2d 564, 565 (Fla. 4th DCA 1992) ("Under a breach of contract cause of action the burden of proof is on the plaintiff to prove [the elements] by a preponderance of the evidence.").

### (1) The Existence of a Contract

The parties agree a contract exists and agree on the relevant terms of the contract. In

---

bases of recovery.).

[15]   The parties provided little guidance on the applicable law in their oral arguments during trial or in their proposed findings of fact and conclusions of law. They have characterized this as a simple contract dispute in which the only issue is the value of the Chalsi. In the Court's view, this case would be more easily analyzed as a secured-transactions case where the parties are disputing the value of collateral retained by a creditor. *See, e.g.*, *Allen v. Coates*, 661 So. 2d 879, 882 (Fla. 1st DCA 1995) (announcing that "a security interest in the capital stock of [a closely-held corporation] is governed generally by the [Uniform Commercial] Code . . ."). Yet, because the Court has not had the benefit of the parties' briefing on these issues and because the Court reaches the same result under a breach-of-contract analysis as it would if this were a deficiency action under Article 9 of the Uniform Commercial Code, the Court decides this case under the breach-of-contract framework suggested by the parties, despite a somewhat awkward fit. (*See infra*, n.18).

[16]   It was smooth on paper, but [we've] forgotten about ravines.

CASE NO. 10-21612-CIV-ALTONAGA/Simonton

particular, they agree that in September 2008, Chaban made two six-month-term loans to Goldstein — one loan for $750,000 and the other for $400,000.  Goldstein was to pay interest at a rate of 2% per month.  The first loan was due March 5, 2009 and the second, three days later.  The essential terms of these agreements were later memorialized in two separate writings.

In late-January 2009, at Chaban's urging, the parties agreed to modify and combine the two original loan agreements.  In a handwritten note, Goldstein agreed to give Chaban a security interest in Goldstein's shares of Dexter Lines as collateral for a portion of the outstanding loans in exchange for a short extension of time to repay both loans and for the right to pay the interest due at the end of the loans' terms rather than each month.  The January 2009 modification yielded a single agreement (the "Loan Contract") in which Goldstein promised to repay Chaban, no later than March 9, 2009, $1,150,000 in principal plus whatever interest had accrued during the term.  If Goldstein failed to pay all or part of the amount due under the Loan Contract, Chaban could take control of and sell Goldstein's shares of Dexter Lines to cover the shortfall.[17]

### (2)    Material Breach

"When performance of a duty under a contract is due[,] any non-performance is a breach." RESTATEMENT (SECOND) OF CONTRACTS § 235(2).  Plaintiffs contend that Goldstein breached the Loan Contract by failing to pay the total amount due under the Loan Contract and that the shortfall includes both unpaid principal and unpaid interest.

On March 4, 2009, Goldstein tendered his shares of Dexter Lines to Plaintiffs as partial

---

[17]  The Court recognizes the terms of the Loan Contract are collected from a hodgepodge of oral and written communications between the parties, but the parties agree on these essential terms and seem content to avoid arguing over technicalities regarding the formation or terms of the Loan Contract.

CASE NO. 10-21612-CIV-ALTONAGA/Simonton

satisfaction of the outstanding debt under the Loan Contract.[18]  Goldstein asserts the shares were

worth $750,000.  (*See* Tr. Ex. 54 ("I am stopping interest payments on the $750,000 credit because

you crumbed my deal, and I consider this credit paid.")).  "[A]bsent the agreement of the parties in

advance, or the acceptance by the obligee at the time of tender and payment to some different

medium of payment, both the tender of payment and the actual payment of a debt owed must be in

lawful money." 28 Richard A. Lord, WILLISTON ON CONTRACTS § 72:31 (4th ed. 2002) [hereinafter

WILLISTON]; *see also, e.g., Seaver v. Stratton*, 183 So. 335, 337 (Fla. 1938) ("The law is settled that

the giving of a promissory note in payment for articles sold or for any other valuable consideration

is not payment therefor unless specially agreed by the parties to be so taken.").  In this case, Chaban

accepted Goldstein's tender of his shares of Dexter Lines as partial payment under the Loan

Contract.  (*See* June 30 Tr. 22:23–23:1 ("I asked him to send me money and he just gave me a

document instead, a document for the boat.  Q.  So, you took the boat, actually.  Correct?  A.  Yes.");

*see also id.* 62:8 ("I give him credit for $200,000.")).  Consequently, Chaban waived his right to

challenge the medium of payment.  *See* 28 WILLISTON § 72:42 ("As a general principle, an objection

to a faulty tender must be made promptly and specifically or it is waived.").

Chaban has not, however, waived his right to challenge the amount of the payment.  *Id.*  ("A

defect in the amount tendered should not so readily be deemed waived . . . . [because] even if the

creditor should assent to accept a smaller sum than that to which it was entitled . . . [it] would not

---

[18]  The Court finds as a matter of fact that Goldstein tendered the shares of Dexter Lines as payment
for $750,000 of the loan balance and that Chaban did not repossess the shares as collateral after default by
Goldstein.  On these facts, it is merely a coincidence that the shares also served as collateral under the Loan
Contract, and it is appropriate to analyze the case as a breach-of-contract case rather than as an Article 9
deficiency action.

CASE NO. 10-21612-CIV-ALTONAGA/Simonton

deprive it, at common law, of a right to recover it subsequently, since there would be a lack of consideration on which to base, and make enforceable, any such agreement.").

Plaintiffs maintain that, at the time of transfer, the Dexter-Lines shares (along with the $400,000 money payment) did not cover the entire balance Goldstein owed, and that Goldstein therefore breached the Loan Contract. Although the value of Goldstein's shares in Dexter Lines is hotly contested, it is undisputed that the value of the shares plus the $400,000 payment did not cover the interest due on the loan. Pursuant to the Loan Contract, interest accrued on the $1,150,000 principal amount at rate of 2% per month and required that the interest be repaid by March 9, 2009. Goldstein promised to pay the interest but, according to his own testimony, he has not done so. Goldstein is therefore in material breach of the Loan Contract and liable to Chaban for at least the interest due. The total amount of interest is calculated below in the discussion on damages. Goldstein may owe more than interest if Plaintiffs can prove that Goldstein's shares in Dexter Lines were worth less than $750,000 at the time of transfer. Because it is undisputed that Goldstein materially breached the Loan Contract by failing to pay the total amount due thereunder, the Court need only consider the value of Dexter Lines in its damages discussion.

**(3) Damages**

"The purpose of compensation for a breach of contract is to place the injured party in the position he or she would have been in had the breach not occurred." *Sharick v. Se. Univ. of Health Scis, Inc.*, 780 So. 2d 136, 139 (Fla. 3d DCA 2000). "[I]t is incumbent upon the party seeking damages to present evidence to justify an award of damages in a definite amount." *Smith v. Austin Dev. Co.*, 538 So. 2d 128, 129 (Fla. 2d DCA 1989) (citing *United Steel & Strip Corp. v. Monex*

13

CASE NO. 10-21612-CIV-ALTONAGA/Simonton

*Corp.*, 310 So. 2d 339 (Fla. 3d DCA 1975)).  "Damages cannot be based on speculation or guesswork, but must have some reasonable basis in fact."  *Air Caledonie Int'l v. AAR Parts Trading, Inc.*, 315 F. Supp. 2d 1319, 1340 (S.D. Fla. 2004) (citing *Austin Dev. Co.*, 538 So. 2d at 129); *see also* FLA. JUR. § 15 ("[D]amages must be shown with a degree of certainty that satisfies the mind of a prudent and impartial person and cannot be left to speculation and conjecture because damages that are uncertain, speculative, or conjectural cannot be recovered.") (collecting cases) (footnote call numbers omitted).  Nevertheless, an inability of the plaintiff "to give the precise amount does not preclude recovery where substantial damages are suffered."  *Electro Servs., Inc. v. Exide Corp.*, 847 F.2d 1524, 1528 (11th Cir. 1988); *see also Conner v. Atlas Aircraft Corp.*, 310 So. 2d 352, 354 (Fla. 3d DCA 1975).

Plaintiffs have proposed several alternative damages calculations of the damage caused by Goldstein's failure to pay the total amount due under the Loan Contract.  Each proposed calculation assumes a loan origination date of September 8, 2008, and each calculation gives Goldstein credit for his $400,000 cash transfer to Plaintiffs on April 9, 2009.  The Plaintiffs' proposed calculations also give Goldstein a $200,000 credit for the March 4, 2009 transfer of his Dexter-Lines shares; however, Plaintiffs argue the value of those shares should be offset by the cost of the repairs and "laid-up" charges the Chalsi incurred between October 2008 and the March 4, 2009 transfer of shares.  After explaining their alternative calculations of the value of Goldstein's transfer of shares in Dexter Lines and why the value should be offset by the cost of repairs and laid-up charges, Plaintiffs calculate the amount of interest that would have accrued in light of the assumptions underlying each alternative.  Under the three alternative calculations proposed by Plaintiffs, the

14

CASE NO. 10-21612-CIV-ALTONAGA/Simonton

alleged damages range between $1.1 and $1.3 million.

(a)  *Value of Dexter Lines*

On March 4, 2009, Goldstein transferred his 50% share of Dexter Lines to Paladin.  Plaintiffs maintain that the value of those shares was equal to one-half the value of the Chalsi on that date, and that the Chalsi was worth no more than $400,000.  There are a number of problems with this valuation.

According to Chaban's testimony, the Valuation Certificate, showing the Chalsi to be worth between $350,000 and $400,000, "was the only thing that would allow us to estimate the price, the value" of the Chalsi.  (June 30 Tr. 47:7-9).  Yet, the admissible evidence bearing on the significance of the Valuation Certificate tends to show that for the purposes of this litigation, it is not an accurate valuation of the Chalsi or, more importantly, Dexter Lines.[19]  For instance, the Valuation Certificate itself states, "We have not undertaken  physical inspection of the vessel, . . . nor have we been able to compare this vessel with any similar units being available on the sales market or having been sold around the date of this valuation." (Valuation Certificate).  Moreover Ms. Kooy, who prepared the Valuation Certificate, explained that she was not asked to value the Chalsi as a going concern but only to give its value in a willing buyer/willing seller transaction.  (*See* June 24 Tr. 57:1-11; 58:7-10).

This second point is an important distinction because the Chalsi is not a pleasure yacht but a shipping vessel engaged in business.  When this dispute arose, the Chalsi, as a going concern, had

---

[19]  As explained, because Plaintiffs did not follow the Federal Rules of Civil Procedure regarding expert witnesses with respect to Ms. Kooy, she was not allowed to testify as an expert.  The Court has therefore only considered Ms. Kooy's testimony to the extent it did not rely on technical or specialized knowledge.

CASE NO. 10-21612-CIV-ALTONAGA/Simonton

been extremely profitable for Goldstein and Chaban for much of a decade.  Although the parties disagree on just how much money the Chalsi made, the boat had generated at least $500,000 in profits some years.  (*See* June 24 Tr. 8:11-15; *cf.* June 30 Tr. 113:6-8 ("Chaban told everybody that the vessel used to make [$]500,000.  He paid me [Goldstein] $40,000 a month.  So, the vessel used to make $1 million-plus.")).  Chaban also testified that he overhauled the Chalsi because he anticipated that after repairs were completed, Dexter Lines would return to profitability.  (*See* June 30 Tr. 57:19-20 ("Yes, I was anticipating it was going to bring some profits and that I would sell it when the market goes up.")).  These facts bear on the value of the shares of Dexter Lines, but were not considered by Ms. Kooy when she prepared the Valuation Certificate.[20]  (*See* June 24 Tr. 58:20-21 ("I can't judge about it because I don't know anything about the company or the income of the vessel.")).

Indeed, actual valuation of the shares of Dexter Lines is not a straightforward matter.  A casual survey of relevant case law shows that courts employ a variety of valuation methods in bankruptcy, tax, and minority shareholder disputes to determine the value of the shares of closely-held corporations.[21]  Generally, "no one factor governs the valuation of shares of stock in a closely-held corporation but . . . all factors, such as market value, asset value, and future earning prospects, should be considered."  *In re Harper*, 157 B.R. 858, 863 (Bankr. E.D. Ark. 1993) (*citing*, *inter alia*, *In re Hubbard*, 135 B.R. 430 (Bankr. S.D. Fla. 1991); *Inst. Equip. & Interiors, Inc. v. Hughes*, 562

---

[20]  As discussed below, Plaintiffs made no explicit effort to prove the value of Dexter Lines, but decided instead to rely on the Chalsi's Valuation Certificate to establish the value of the shares of Dexter Lines.

[21]  This is yet another area where the parties cited no law to guide the Court's decision.

CASE NO. 10-21612-CIV-ALTONAGA/Simonton

N.E.2d 662, 666–67 (Ill. App. Ct. 1990); *Universal City Studios, Inc. v. Francis I. duPont & Co.*, 334 A.2d 216, 218 (Del. 1975)); *see also* William Meade Fletcher, FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS §§ 4657, 5906.120 (discussing factors relevant to the valuation of closely-held corporations).

Without delving into the various methods courts have used to value closely-held corporations, the Court can comfortably say that Plaintiffs — who bear the burden of proving damages in this case — have not provided the kind of information about Dexter Lines that is necessary to place a value on the corporation's shares. Although there is some testimony about Dexter Lines's business history, it all amounts to round numbers and general statements. Overall, the Chalsi made a lot of money at first, then less, then it lost money, but now it is likely to be profitable again. There is nothing specific in the record about Dexter Lines's finances. In particular, the accounting books for Dexter Lines are not in evidence. Where there is specific evidence – for example, the Chalsi's repair invoices (Tr. Exs. 20–27) – that evidence suggests the need for more detail. Continuing that example, those repair invoices and accompanying bank transfer receipts show that Concord Shipbuilding Corporation ("Concord"), the company that manages the Chalsi (*see* June 24 Tr. 16:5), paid for all of the Chalsi's repairs. (*See* Tr. Exs. 20–27, 29–40). But the record does not make clear if Concord's payments were intended as loans to Dexter Lines or as additional injections of capital.[22]   Without seeing Dexter Lines's books, it is impossible for the Court to

---

[22]   The Court gathers that Concord's payments on behalf of Dexter Lines were governed by a partnership agreement between Goldstein and Chaban in which they agreed to split the profits and losses of Dexter Lines between them. This agreement is not within the scope of the pleadings and so is not addressed in these Findings. The Court does note, however, that the parties' general disregard for corporate formalities and tendency to make corollary oral agreements also complicate valuation of Dexter Lines.

CASE NO. 10-21612-CIV-ALTONAGA/Simonton

reasonably approximate the past profitability of Dexter Lines, or to determine if it owed any money to Concord which could affect the value of Dexter Lines's shares.  Nor did Plaintiffs provide any

detail about Dexter Lines's potential for future profit.  At bottom, the only concrete evidence about Dexter Lines's value is the Valuation Certificate's appraisal of the Chalsi — Dexter Lines's sole asset.  Even if the Court thought the sale value of the Chalsi reflected in the Valuation Certificate was enough evidence by itself to place a value on Dexter Lines, the evidence presented at trial suggests it does not provide an accurate valuation of the Chalsi.

Indeed, one problem with the $400,000 valuation of Dexter Lines, is that Chaban himself testified that not long after the time Ms. Kooy prepared the Valuation Certificate, he probably could have sold the boat for $500,000 or $600,000 — meaning, in his view, he could have found a willing buyer at those prices.  (*See* June 30 Tr. 25:9-10).  Yet, Chaban would not sell the boat at that price; instead, he spent at least $400,000 dollars repairing the Chalsi in the hopes that he would be able to either continue to use the boat or get his investment back.  This undermines the Valuation Certificate's premise that a willing seller would part with the Chalsi for $400,000, and is evidence the Valuation Certificate undervalues Dexter Lines's sole asset.

Ultimately, the Plaintiffs have not met their burden to establish the value of Goldstein's shares of Dexter Lines.  The value of Dexter Lines on March 4, 2009 cannot be measured with any certainty based on the evidence Plaintiffs have provided, and so Plaintiffs cannot establish that Goldstein failed to repay the principal due under the Loan Contract.  "If damages claimed are so remote, contingent, conjectural, and speculative as to be immeasurable pecuniarily, no substantial recovery can be had therefor." *Farrington v. Richardson*, 16 So. 2d 158, 162 (Fla. 1944); *see also*

18

CASE NO. 10-21612-CIV-ALTONAGA/Simonton

*Hudson Marine Mgmt. Servs., Inc. v. Thomas Miller (Miami), Inc.*, 417 F. App'x 845, 848 (11th Cir. 2011) (affirming finding of no damages where plaintiff failed to provide sufficient evidence of the value of the work it performed but instead "proposed multiple, competing formulas and asked the district court to choose among them in calculating its damages"); *Travelers Indem. Co. v. Peacock Const. Co.*, 423 F.2d 1153, 1157 (5th Cir. 1970); *Austin Dev. Co.*, 538 So. 2d at 129 ("Damages cannot be based upon speculation or guesswork, but must have some reasonable basis in fact."); *accord Coates*, 661 So. 2d at 887 (quoting *Weiner v. Am. Petrofina Mktg., Inc.*, 482 So. 2d 1362, 1365 (Fla. 1986)) ("'[T]here will arise a presumption that the fair market value of the collateral at the time of [retaining it] was equal to the amount of the total debt that it secured.'") (some alterations in original).

(b)  *Amount Owed for Repairs and Laid-Up Charges*

Plaintiffs contend Goldstein owes Chaban more than $200,000 for repairs and laid-up charges incurred by the Chalsi while she was quarantined in port from October 2008 through the spring of 2009.  From the testimony adduced at trial, the Court understands the apportionment of these costs is governed by a partnership agreement between the parties.  No breach of the partnership agreement or action for an accounting was pleaded either before or after trial, and the apportionment of these costs is not governed by the Loan Contract at issue in this case.  The Court expresses no view as to whether Goldstein owes Chaban money for these expenses.

(c)  *Interest Due Under the Loan Contract*

It is undisputed that Goldstein did not pay the interest due under the Loan Contract and, therefore, Chaban may recover the interest owed as damages.  The Court assumes, for the purposes

19

CASE NO. 10-21612-CIV-ALTONAGA/Simonton

of calculating the interest due, that the transfer of shares to Paladin on March 4, 2009 was equal to a cash payment of $750,000 because the Plaintiffs failed to prove they suffered any damage by accepting Goldstein's shares of Dexter Lines as payment toward the $1,150,000 in principal. Accordingly, Plaintiffs are entitled to interest at the rate of 2% per month for the period between September 8, 2008 and March 4, 2009 on the entire principal amount of $1,150,000. Between March 4, 2009 and April 9, 2009, there remained a principal balance of $400,000. Interest continued to accrue on $400,000 at the rate of 2% per month until Goldstein paid that amount by cash transfer on April 9. Therefore, the total amount of interest that accrued before Goldstein repaid the loan is calculated as follows:

September 8, 2008 – March 4, 2009:

$1,150,000 at 24% = $276,000/365 days = $756.16 x 177 days = **$133,840.32**

March 5, 2009 – April 9, 2009:

$400,000 at 24% = $96,000/365 days = $263.01 x 35 days = **$9,205.35**

Total interest on principal due:

**$143,045.67**

This amount was due when Goldstein paid off the principal on April 9, 2009. Plaintiffs are entitled to prejudgment interest on this amount at the statutory rate. *See* FLA. STAT. § 687.01.

**III.  CONCLUSION**

Долг платежо́м кра́сен.[23]

The Court resolves the issues in favor of Paladin Shipping and Anatoliy Chaban, and against

---

[23]  Debt is beautiful [only] after [it is] repaid.

CASE NO. 10-21612-CIV-ALTONAGA/Simonton

Leon Goldstein.  For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that final judgment will be entered by separate order in favor of Paladin Shipping and Anatoliy Chaban and against Leon Goldstein.  Plaintiffs are instructed to submit a proposed order[24] of final judgment by August 9, 2011.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 2nd day of August, 2011.

_Cecilia M. Altonaga_
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record

---

[24] Pursuant to the CM/ECF Administrative Procedures, proposed orders shall be filed as an attachment to a motion, notice, or other filing.  The proposed document must also be e-mailed to the judge at the judge's email address.  The proposed document shall be submitted by e-mail in WordPerfect or Word format.  The e-mail line and the name of the attachment should include the case number, followed by a short description of the attachment (e.g., 00-cv-00000 Order).