1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
2                      Miami District

3           CASE NO. 10-21612-CIV-ALTONAGA/Simonton

4    PALADIN SHIPPING CO., LTD., a        )
     Foreign corporation, and ANATOLIY    )
5    CHABAN, individually,                )
                                          )
6        Plaintiffs/Judgment Creditors,   )
                                          )
7    vs.                                  )
                                          )
8    STAR CAPITAL FUND, LLC, a Florida    )
     Corporation, LEON GOLDSTEIN,         )
9    individually,                        )
                                          )
10       Defendants/Judgment Debtors.     )
     _____)

11

12   75 RETAIL ENTERPRISES, INC., a       )
     Florida Corporation, 40 RETAIL       )
     CORPORATION, a Florida Corporation,  )
13   CENTURY DRIVE RETAIL CORPORATION, a  )
     Florida Corporation, et al.          )
14                                        )
         Impleaded Defendants.            )
15   _____)

16                              Boca Raton, Florida
                                December 22, 2014
17                              10:00 a.m.

18

19           VIDEOTAPED DEPOSITION OF LEON GOLDSTEIN

20           Taken before Sonia Rogers, Registered

21   Professional Reporter and Notary Public in and for

22   the State of Florida at Large, pursuant to

23   Notice of Taking Deposition filed in the

24   above cause.

25                         *  *  *  *

```
 1                         APPEARANCES

 2


 3        ON BEHALF OF LEON GOLDSTEIN:

 4            MAYERSOHN LAW GROUP, P.A.
             By:  Leah H. Mayersohn, Esquire
 5           101 Northeast Third Avenue, Suite 1250
             Fort Lauderdale, Florida 33301
 6


 7


 8        ON BEHALF OF PALADIN SHIPPING COMPANY LIMITED
          and ANATOLIY CHABAN:
 9
             PHILLIPS, CANTON, SHALEK, et al.
10           By:  Jeffrey B. Shalek, Esquire
             400 Hollywood Boulevard, Suite 500 North
11           Hollywood, Florida 33021

12


13        ON BEHALF OF THE IMPLEADED DEFENDANTS:

14           TOBIN & REYES, P.A.
             By:  Ricardo A. Reyes, Esquire
15           225 Northeast Mizner Boulevard, Suite 510
             Boca Raton, Florida 33432
16

17        ON BEHALF OF PINNACLE THREE:

18           HELLER WALDMAN, P.L.
             By:  Michael A. Sayre, Esquire
19           3250 Mary Street, Suite 102
             Coconut Grove, Florida 33133
20

21     Also present:  Evgueni Souliaguine

22                     Tatiana Sulyagina

23                     Valeri Tamarov

24

25
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1                        EXAMINATION

 2                 DIRECT   CROSS   REDIRECT   RECROSS

 3    BY MR. REYES:      3                336

 4    BY MS. MAYERSOHN         288

 5    BY MR. SAYRE            322

 6    BY MR. SHALEK           327

 7

 8                         EXHIBITS

 9                                    Page       Line

10    Impleaded Defendants' Exhibit 1       8        1

11    Impleaded Defendants' Exhibit 2      25       11

12    Impleaded Defendants' Exhibit 3      35        8

13    Impleaded Defendants' Exhibit 4      66        5

14    Impleaded Defendants' Exhibits 5&6   97       11

15    Impleaded Defendants' Exhibit 7     117       15

16    Impleaded Defendants' Exhibit 8     118        8

17    Impleaded Defendants' Exhibit 9     115       17

18    Impleaded Defendants' Exhibit 10    160       15

19    Impleaded Defendants' Exhibit 11    168       14

20    Impleaded Defendants' Exhibit 12    174        6

21    Impleaded Defendants' Exhibit 13    182        9

22    Impleaded Defendants' Exhibit 14    190       12

23    Impleaded Defendants' Exhibit 15    204       25

24    Impleaded Defendants' Exhibit 16    207        6

25    Impleaded Defendants' Exhibit 17    209        7
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1                    EXHIBITS CONTINUED

 2     Impleaded Defendants' Exhibit 18      225        22

 3     Impleaded Defendants' Exhibit 19      229        19

 4     Impleaded Defendants' Exhibit 20      235        24

 5     Impleaded Defendants' Exhibit 21      241        16

 6     Impleaded Defendants' Exhibit 22      245        25

 7     Impleaded Defendants' Exhibit 23      258        24

 8     Impleaded Defendants' Exhibit 24      260         6

 9     Impleaded Defendants' Exhibit 25      266        11

10     Impleaded Defendants' Exhibit 26      275        12

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    THEREUPON:

2

3         THE VIDEOGRAPHER:  In the case styled

4    Paladin Shipping Company, Limited and Anatoliy

5    Chaban vs. Star Capital Fund, LLC and Leon

6    Goldstein.  Case No.

7    10-21612-CIV-Altonaga/Simonton.

8         This is the videotaped deposition of Leon

9    Goldstein.  This deposition is taking place at

10   225 Northeast Mizner Boulevard, Boca Raton,

11   Florida on December 22nd, 2014.  The time is

12   now 10:21 a.m.

13        Would counsel please state their

14   appearances for the record.

15        MR. SHALEK:  Jeffrey Shalek on behalf of

16   the plaintiffs, Anatoliy Chaban and Paladin

17   Shipping.

18        MS. MAYERSOHN:  Leah Mayersohn on behalf

19   of Leon Goldstein.

20        MR. SAYRE:  Michael Sayre on behalf of

21   Pinnacle Three, Vernal and North Star Maritime

22   Miami, LLC.

23        MR. REYES:  And Rick Reyes on behalf of

24   impleaded defendants Century Drive Retail, 40

25   Retail, Sterlington Retail and 75 Retail.

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
1    (Thereupon, LEON GOLDSTEIN was called as a witness

2    and, having been first duly sworn, was examined and

3    testified under oath as follows:

4

5                    DIRECT EXAMINATION

6    BY MR. REYES:

7        Q    Mr. Goldstein, good morning.

8        A    Good morning.

9        Q    We are here today to take your deposition

10   pursuant to a court order entered by Magistrate

11   O'Sullivan.

12               Are you aware of that?

13       A    Yes.

14       Q    And I know you've been through many

15   depositions, so you know how this process works,

16   correct?

17       A    I think so.

18       Q    Okay.  I'm going to ask you a series of

19   questions here today that you are going to answer

20   under oath.  Do you understand that?

21       A    Yes, I do.

22       Q    And do you understand what it means to be

23   under oath?

24       A    What did you say?

25       Q    You understand what it means to be under
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    oath?

2        A    Yes.

3        Q    Okay.  If at any time during this

4    deposition you don't understand a question, please

5    tell me and I will try to ask it a different way.

6    Okay?

7        A    Okay.

8        Q    Please let me finish the question before

9    you start your answer and I'll let you finish the

10   answer before we go to the next question.  Okay?

11       A    Okay.

12       Q    And if at any time you need a break, we

13   can take a break as long as there is not a question

14   pending.  All right?

15       A    Yes.

16       Q    There may be instances where there are

17   objections made to the form of a question.  You are

18   still to answer that question unless your attorney

19   tells you not to.  Do you understand that?

20       A    Yes, I do.

21       Q    Okay.  Have you seen the order entered by

22   Magistrate O'Sullivan for your deposition today?

23       A    Yes.

24            MR. REYES:  I want to mark that as Exhibit

25       1 for your deposition and ask you about it.

```
 1              (Thereupon, the above-referred to document

 2         was marked as Impleaded Defendants' Exhibit No.

 3         1 for identification.)

 4    BY MR. REYES:

 5         Q    I'm showing you what's marked as Exhibit 1

 6    for your deposition, Mr. Goldstein.

 7                   Is that the order that you said you

 8    had seen?

 9         A    Yes, that's the one.

10         Q    It's dated December 11, 2014 ordering that

11    you appear today in my office for a deposition,

12    correct?

13         A    Correct.

14         Q    And did you travel here -- were you

15    outside the United States when this order was

16    entered?

17         A    No.

18         Q    You were here in Miami?

19         A    Yes.

20         Q    And when did you come back to Florida?

21              MR. SAYRE:  Objection, relevancy.

22              THE WITNESS:  In October.

23    BY MR. REYES:

24         Q    So you've been here continuously since

25    October?
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
1        A    No.  I was traveling to Moscow in -- from
2   November 12th until November 20th.
3        Q    All right.  So you returned to Florida
4   from the Ukraine in October?
5        A    That's correct.
6        Q    And you were here except for the period of
7   November 12 through November 20 when you traveled to
8   Moscow; is that correct?
9        A    That's correct.
10       Q    All right.  And since November 20 to
11  today, you've been here in Florida?
12       A    Yes.
13       Q    In the order Magistrate O'Sullivan stated
14  that you were to prepare to be able to answer my
15  questions with respect to the documents that we have
16  requested in this case.  Did you see that?
17       A    Yes.
18       Q    Okay.  And did you prepare so that you
19  could answer my questions today?
20       A    As much as I remember.
21       Q    Okay.  What did you do specifically to
22  prepare so that you could answer my questions today?
23       A    I was trying to reach my partner, whose
24  name is Oleg Firer, because he knows pretty much of
25  everything you ask for, but he was out of country
```

```
 1    and he just came back yesterday and I ask him what

 2    he remembers and that's basically.

 3         Q    Okay.  Other than trying to reach Oleg

 4    Firer, did you do anything else to prepare for this

 5    deposition today?

 6         A    Well, a lot of questions which you asked

 7    me for Oleg Firer knows because he was my partner

 8    and he is more involved in what you are asking me

 9    for because my memory is not as good and everybody

10    knows that and, like I said, he was out of country

11    and was very hard to be reached, but yesterday --

12         Q    What did -- I'm sorry, I didn't mean to

13    interrupt.

14         A    But yesterday finally he came to Miami and

15    I was talking to him and he gave me a couple of

16    things to remind me what I don't remember.

17         Q    Okay.  And what did he remind you about?

18    Mr. Firer.

19         A    A few documents which I signed and --

20    because I don't remember exactly what's been signed.

21         Q    And did you bring those documents with

22    you?

23         A    No, I did not.

24         Q    And what are those documents?

25         A    I think -- I signed -- I think he told me
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1  we signed -- I signed stock certificate and mortgage

2  agreement and some other documents which I do not

3  remember and he said that he will look for them and

4  if you have any questions he would be more than

5  happy to answer to everything you have because he

6  was involved in the -- in my business more than I do

7  because he was working partner and I was silent

8  partner.

9       Q    What business are you referring to?

10      A    I'm referring to the business of Star

11 Capital at that time.

12      Q    You mentioned that Mr. Firer is your

13 partner, what business is he your partner in?

14      A    That's the business he's my partner.  We

15 were partners in Star Capital Fund.

16      Q    All right.  And why would Mr. Firer be

17 familiar with the documents that we had requested in

18 this case?

19      A    Because he was handling all business

20 details.  He was my working partner and pretty much

21 he knows everything about the business.

22      Q    So was Mr. Firer involved in the loan

23 transaction that you did with Mr. Yelizarov?

24      A    Yes.  Correct.

25      Q    And how was he involved in that

1    transaction?

2         A    He was involved because we -- when we need

3    the money Mr. Firer was asking for the money and

4    that's how Yelizarov send the money to Star Capital

5    Fund for our business.

6         Q    So the money that was allegedly lent was

7    lent to Star Capital, not to you?

8              MR. SAYRE:  Objection.

9    BY MR. REYES:

10        Q    Is that correct?

11        A    Yes, it was sent to Star Capital.  Yes,

12   as far as I remember.

13        Q    And did you go through Star Capital's

14   records to look for documents that could be

15   responsive to our request for production of

16   documents?

17        A    No.  Like I said, I don't have -- I didn't

18   have a chance because he was out of country and he

19   knows pretty much what you are asking me for.

20        Q    But Star Capital is your company too,

21   correct?

22        A    Star Capital, I was 50 percent partner,

23   but I was silent partner.

24        Q    Okay.  So you're 50 percent owner of Star

25   Capital, but you did not go through any of Star

```
1    Capital's records to see if there were documents

2    that should have been produced to us pursuant to

3    this judge's order; is that correct?

4         A    I don't have ability to look for them

5    because I gave everything, everything which I had,

6    so there is nowhere to look for.

7         Q    You gave everything to Mr. Firer?

8         A    I gave everything to Mr. Keifitz who is

9    the attorney for Mr. Yelizarov.

10        Q    All right.  Let me ask you about that.

11              You gave everything to Attorney --

12   how do you pronounce it -- Keifitz?

13        A    That is correct.

14        Q    Okay.  And when you say you gave

15   everything to Attorney Keifitz, what did you give to

16   Attorney Keifitz by way of documents?

17        A    Whatever I had I turned to Mr. Keifitz and

18   that's basically what I did.  I put everything on

19   his desk.

20        Q    Say it one more time?

21        A    Put everything on his desk.

22        Q    Okay.  And when did that occur?

23        A    A few years ago.

24        Q    And why were you with Mr. Keifitz to give

25   him documents a few years ago?
```

1          A     He was asking because I owed Yelizarov a

2     lot of money and I was not able to pay.

3          Q     You mean Star Capital owed Mr. Yelizarov a

4     lot of money?

5               MR. SAYRE:  Objection.

6     BY MR. REYES:

7          Q     Is that correct?

8               MR. SAYRE:  Mischaracterization of his

9          testimony.

10               MR. REYES:  You know those objections are

11          improper, Counsel.  And you either object to

12          form or privilege.  Please don't coach the

13          witness.

14               MR. SAYRE:  I'm not coaching the witness.

15               MR. REYES:  Anything you say other than

16          form or privilege is coaching, so please don't

17          do that.

18     BY MR. REYES:

19          Q     The question was:  Star Capital owed

20     Mr. Yelizarov; is that correct?

21               MR. SAYRE:  Objection, mischaracterization

22          of his testimony.

23               THE WITNESS:  Star Capital and Leon

24          Goldstein and Oleg Firer owed the money to

25          Oleksandr Yelizarov.

---

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1   BY MR. REYES:

2        Q    Star Capital, Leon Goldstein and Oleg

3   Firer; is that correct?

4        A    Yes, because we were partners in the

5   business so that's who owed the money to Oleksandr

6   Yelizarov, but I was the one who Yelizarov knew and

7   I was the one who Yelizarov trust -- trusted.

8   That's the reason I -- when I'm saying I owe the

9   money or Star Capital owe the money, I mean that if

10  it will be not me in Star Capital, Oleksandr

11  Yelizarov will not lend the money to the company.

12       Q    When you are saying Yelizarov lent the

13  money, did he lend it himself or he lent it through

14  North Star?

15            MR. SAYRE:  Objection.

16            THE WITNESS:  I don't understand the

17       question.

18  BY MR. REYES:

19       Q    Are you familiar with the company North

20  Star Maritime, Inc.?

21       A    Yes, I do.  Of course.

22       Q    And you understand that to be a company

23  owned by Mr. Yelizarov?

24       A    Yes.

25       Q    Okay.  And when you have been telling us

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1   this morning about money being lent by Mr. Yelizarov

2   to Star Capital, was that money lent through North

3   Star Maritime, Inc. or personally by Mr. Yelizarov?

4            MR. SAYRE:  Objection.

5            THE WITNESS:  I don't have a clue.  We

6        need the money and the minute we need the

7        money, the money was transferred.  From where,

8        how, we didn't ask these questions.

9   BY MR. REYES:

10   Q    All right.  I was asking you what you did

11   to prepare.  So you -- you said you were able to

12   speak to Oleg last night.

13            Is there anything else you did to be

14   able to -- by way of preparation -- to be able to

15   answer my questions today?

16   A    If I would have these documents in my

17   possession, obviously I would go through them, but

18   still I don't have them and I have to remember what

19   I signed and what's been done.  I asked Oleg because

20   he knows and he remembers that and he told me what

21   I'm just telling you.  And he said, if you have

22   questions in details, whatever you need, he would be

23   more than happy to answer all your questions because

24   he knows these answers.

25   Q    But you did not ask Oleg to give you any

1    documents to produce to us, correct?

2        A    I don't think he has these documents.  I

3    think we gave them to Mr. Keifitz, maybe Mr. Sayre,

4    but I don't have even ability to find them and to

5    look for them.

6        Q    And did you contact Mr. Keifitz and ask

7    him for documents to produce in this case?

8        A    I'm not client of Mr. Keifitz and he told

9    me specifically do not call him because he will

10   not -- I'm doing that through Oleg.  Oleg can talk

11   to Mr. Keifitz.

12       Q    What is the answer to my question?  Did

13   you call Mr. Keifitz and ask him for records?

14       A    No, I did not.

15       Q    Did you write to Mr. Keifitz by e-mail or

16   letter and request records?

17       A    I think I told you the answer.  I tried

18   something with Mr. Keifitz and he closed the door on

19   me by saying I'm not his client.

20       Q    When was that?

21       A    Well, I -- probably eight, nine months

22   ago.  I forgot what I was asking for and he just

23   told me that.

24       Q    So let me make sure I understand your

25   testimony here under oath today.

1          You are saying a few years ago you

2   gave your documents to Mr. Keifitz; is that right?

3        A    Yes.

4        Q    Okay.  And you are saying that eight or

5   nine months ago you contacted Mr. Keifitz and asked

6   him for information; is that right?

7        A    Something I need from him and he basically

8   explain it to me and -- if I need anything

9   basically, from Mr. Keifitz, I'm calling Oleg and

10  Oleg contacted Mr. Keifitz and that's how maybe

11  something I have answers.  If Mr. Keifitz will give

12  it to Oleg.

13       Q    And you -- do you recall what it was you

14  were asking Mr. Keifitz for -- or Keifitz for?

15       A    What is the question?

16       Q    What were you asking Mr. Keifitz for?

17       A    I do not remember what was specifically I

18  was asking for, but I do remember his answer.

19       Q    And you said earlier that Mr. Keifitz is

20  Mr. Yelizarov's attorney, correct?

21       A    From what I understand.

22       Q    Okay.  And Mr. Yelizarov is a personal

23  friend of yours, correct?

24       A    That is correct.

25       Q    For over 20 years, correct?

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1          A     Yes.

 2          Q     And you and he are in business together,

 3   correct?

 4          A     Yes.  We were in business together.

 5          Q     You were?  When did you stop being in

 6   business together?

 7          A     When I sold the last vessel I had.

 8          Q     But you and he were in the shipping

 9   business together?

10          A     That's what I'm referring to.

11          Q     For how long were you and he in the

12   shipping business?

13          A     No, that is not a true statement.  I was

14   not in his business.  I used to own cargo ships and

15   he was managing my ships.  So I cannot say I was his

16   partner in his business.  I was just giving my

17   vessels because I am not in this business and he was

18   managing them and Chaban, who is a client of

19   Mr. Shalek, did the same thing for me and I was --

20   other than the last vessel, which we had

21   partnership, but most like -- mostly all the time he

22   was managing my vessels.

23          Q     Who is "he" in that sentence?

24          A     I'm talking to Mr. -- I'm talking about

25   Yelizarov and I'm talking about Chaban.  I'm just
```

1   trying to tell you how partnership did the work.

2        Q    So the partnership that you are describing

3   with Mr. Yelizarov was that he would manage ships

4   that you owned; is that right?

5        A    That is correct.

6        Q    And these ships were located in Europe?

7        A    Yes.

8        Q    And you and Mr. Yelizarov owned at least

9   one ship together; is that correct?

10       A    No, it's not correct.  Me and Chaban owned

11  one ship together.

12       Q    You and Chaban.  Okay.

13            And you and Mr. Yelizarov are still

14  friends; is that correct?

15       A    Yes.

16       Q    I understand you stay with him when you go

17  to Ukraine; is that correct?

18       A    I'm friends with him.  Sometimes I'm

19  staying with him.  Sometimes I'm not.

20       Q    Okay.  And did you contact your friend of

21  over 20 years to have him tell Mr. Keifitz to turn

22  the documents over to you?

23       A    Repeat the question, please.

24       Q    Did you tell your friend of over 20 years

25  to call his lawyer, Mr. Keifitz, and instruct

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1   Mr. Keifitz to give you the documents that you

 2   wanted?

 3            MR. SAYRE:  I'm going to object to this

 4        line of questioning because you're -- the

 5        questioning --

 6            MR. REYES:  He has an attorney, Mike.

 7            MR. SAYRE:  But, no, this applies to my

 8        case.  There is a case for -- I don't know what

 9        it is.  It's some sort of fraud case and that's

10        what this questioning is directed to.  You are

11        not a party to that case and this question is

12        outside the scope of that case, number one.

13            Number two, as I understand it, the order

14        was limited to questions regarding the request

15        for production that were served on Goldstein.

16        I don't know what this has to do with that.

17            MR. REYES:  Would you --

18            MR. SAYRE:  I don't know whether Ms.

19        Mayersohn wants to raise her own objections.

20            MS. MAYERSOHN:  My objection was separate.

21        I think it's, you know, entirely proper to ask

22        Mr. Goldstein questions about whether or not he

23        contacted Mr. Yelizarov, but not to ask him

24        questions that would deal with Mr. Yelizarov

25        and Mr. Yelizarov's attorney-client privilege
```

```
1      with his attorneys.

2           So I would just ask that you limit your

3      question to my client asking his friend, Mr.

4      Yelizarov, for documents rather than whether or

5      not he made separate instructions to his

6      client -- to his attorney.

7           MR. REYES:  You are asserting

8      attorney-client privilege for Mr. Yelizarov?

9           MS. MAYERSOHN:  What I'm saying is that

10     there could be a potential problem.  I'm not

11     asserting it on his behalf.  Obviously I don't

12     represent him, but from a questioning

13     standpoint I have no problem if you ask

14     Mr. Goldstein questions about whether or not he

15     contacted Mr. Yelizarov and asked him for

16     documents, but I think it's improper for you to

17     ask if he directed his attorney to do certain

18     things.

19          MR. REYES:  Would you read the question

20     back, please.  Or do you remember the question?

21          THE WITNESS:  I do not.

22          MR. REYES:  Okay.  I'm going to have it

23     read back.

24          (Thereupon, the pending question was read

25     back by the court reporter.)
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1            THE WITNESS:  Can you ask me a specific

 2       question?  Because when you said your friend,

 3       I'm not sure whom you are referring to so I'd

 4       like for you to give me --

 5  BY MR. REYES:

 6       Q    I'm referring to Mr. --

 7       A    Just repeat the question for me, if you

 8  can, please.

 9       Q    Did you contact Mr. Yelizarov and ask him

10  to instruct his lawyer to give you back the

11  documents that you gave to Mr. Keifitz?

12       A    No, I did not.

13       Q    And why did you not do that?

14       A    I don't know.  I know that Mr. Keifitz

15  will not give me these documents and I know that if

16  you need the documents, Oleg can provided it to you.

17       Q    Well, how is it that Oleg can provide them

18  to me if they are with Mr. Keifitz?  Is Mr. Keifitz

19  representing Oleg, too?

20       A    No.  However, Mr. Keifitz -- if Oleg is

21  asking him, somehow Mr. Keifitz is talking to him.

22  He is not really talking to me because he just -- he

23  understand that I am involved and I owe the money to

24  Yelizarov and that is how he basically, I think,

25  looking in this particular situation.
```

```
 1        Q    Did you ask Oleg Firer to contact

 2   Mr. Keifitz so that you can get those documents back

 3   and produce them?

 4        A    I think I told you, he was in Moscow.  I

 5   was not able to reach him.

 6        Q    So you are saying Mr. Keifitz would

 7   respond to Oleg Firer and give the documents to him,

 8   but he would not give them to you?

 9             MR. SAYRE:  Objection.

10             THE WITNESS:  I didn't say that.  I'm

11        saying that he will not give it to me, but

12        maybe he would be able to do.  That was all.

13        And on the other hand, Oleg remember a lot of

14        things which you are asking me for and he would

15        give you specific answers if that's what you

16        are looking for.

17   BY MR. REYES:

18        Q    You understand from this order that I've

19   marked as Exhibit 1 that Magistrate O'Sullivan

20   instructed you to redo your response to our request

21   for documents.  Did you understand that?

22        A    I understand that, yes.

23        Q    All right.  And were you involved in

24   drafting the amended response?

25        A    No.
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1      Q    Did you see the amended response before it

2   was sent to us?

3      A    I'm not sure exactly what I saw, what I

4   didn't see, but I don't think I remember what --

5   understand that.

6      Q    Well, let me show it to you and I'll

7   ask -- let me know if you saw it before.

8              Well, first of all, let me mark the

9   actual request for production.  I want to have you

10  identify it for me.

11             (Thereupon, the above-referred to document

12       was marked as Impleaded Defendants' Exhibit No.

13       2 for identification.)

14  BY MR. REYES:

15     Q    I'm showing you a document, it's called

16  Impleaded Defendants' First Request for Production

17  to Leon Goldstein.

18             Have you seen that document before

19  today?

20     A    The one which I'm reading?

21     Q    Yes.

22     A    Yes.

23     Q    You have seen it before?  Okay.

24             And did you look for documents that

25  were responsive to this request?

```
 1              MR. SAYRE:  Objection, asked and answered.

 2              THE WITNESS:  Like I said, I don't have

 3         anywhere to look for them.  I give everything

 4         away.  I have nothing at all.

 5    BY MR. REYES:

 6         Q    Okay.  Did you contact anyone that worked

 7    for you to provide -- to see if they had records

 8    responsive to this request?  For example, your

 9    accountants or your lawyers.

10         A    I know who knows the answer.  It's Oleg

11    Firer.  I don't have anybody to call.  I don't have

12    anybody who is working for me, but Oleg Firer, who

13    was my working partner, knows the answers.

14         Q    And from your answer can I take it then

15    that you did not ask Mr. Haft, for example, your

16    accountant, for any records that might be responsive

17    to this request; is that correct?

18         A    Mr. Haft -- Mr. Haft doesn't have all

19    these things.

20         Q    Did you ask Mr. Haft if he had any of the

21    documents that we were looking for?

22         A    Why should I?

23         Q    Can you answer my question?

24         A    Well, no, I did not.

25         Q    Okay.  Did you contact Mr. Sexton, who was
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    representing you at a point in time, to see if he

2    had any documents responsive to this request?

3         A    He is not answering my phone calls.

4         Q    Did you try to contact Mr. Sexton for

5    records?

6         A    Mr. Firer is doing that.  He is the one

7    who hired Mr. Sexton and he is the one who is

8    handling with Mr. Sexton.

9         Q    I don't understand your answer.  I thought

10   you said you didn't get a chance to speak to

11   Mr. Firer until yesterday?

12        A    Right.

13             MS. MAYERSOHN:  Objection.  Your

14        question -- your prior question didn't call for

15        an appropriate time frame as to when he

16        contacted Oleg to contact Mr. Sexton

17        regarding when he --

18             MR. REYES:  These objections are

19        completely inappropriate and they shouldn't be

20        made.  Form or privilege.

21   BY MR. REYES:

22        Q    You told me, Mr. Goldstein, that you spoke

23   to Oleg Firer for the first time yesterday about

24   getting documents responsive to our request for

25   production; is that correct?

1     A    I was -- yes, I was talking to him

2  about -- to remind me what did I sign, what I did

3  not sign.

4     Q    Okay.  So how is it then that Mr. Firer is

5  communicating with Mr. Sexton for records if you

6  only spoke to Oleg yesterday?

7     A    You probably misunderstood me.  I didn't

8  say that he was talking to him.  I'm saying that I'm

9  not the one who -- I'm saying to you that Mr. Sexton

10  is not talking to me, but in the past Mr. Sexton was

11  talking to Oleg.  In the past means, let's say, six

12  months ago because Oleg is handling the entire

13  business and Oleg is the one who knows where the

14  papers and what did I sign.

15     Q    This request for production of documents

16  to you, Mr. Goldstein, is dated June 5 of 2014.  You

17  can see that on Page 7, if you want to confirm it

18  for yourself.

19           Do you see that this was served on

20  you on June 5 of 2014?

21        MS. MAYERSOHN:  Object to the

22     characterization of served.

23        THE WITNESS:  Yes, I can see that.

24  BY MR. REYES:

25     Q    Okay.  And you know that there has been

1   several orders entered by Magistrate O'Sullivan to

2   require you to comply to this request for production

3   of documents; is that correct?

4        A    You are realizing that on June 5 up to

5   October 7th I was out of country.  So whatever you

6   are telling me there I have not seen.

7        Q    Okay.  Is it correct that from June 5,

8   2014 through today, that you have not asked Mr. Haft

9   if he has any documents responsive to this request?

10       A    My answer is, all the documents which I

11  had I give it to Mikhael Keifitz and Oleg has the

12  answers and Mr. Haft -- I can call anybody I want,

13  but I didn't because I did not feel that Mr. Haft

14  have anything to do with these papers and that's why

15  I did not call him.

16       Q    And that's what I'm trying to find out,

17  Mr. Goldstein, is, what efforts you made to find

18  documents.  I understand your argument is that you

19  don't think Mr. Haft has documents.  I just want to

20  find out what efforts you made to find documents.

21  Do you understand what I'm saying to you?

22       A    I want to make sure that you understand

23  what I'm answering.  I'm answering you that whatever

24  you ask me for, my partner, Oleg Firer, is in the

25  country and he said that he would give you all the

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    necessary answers if you want.  You are kind of

2    asking the wrong person the questions which you are

3    looking for.

4         Q    Mr. Goldstein, is it correct that you have

5    not asked Mr. Haft for any records responsive to

6    this request?

7         A    I did not and I am giving you the reason,

8    because I don't think he has it because we gave it

9    to my -- to Mr. Keifitz.  Why should I ask Mr. Haft?

10        Q    Okay.  It's also true that you did not ask

11   Mr. Sexton for any documents responsive to this

12   request?

13        A    That is true.

14        Q    Okay.  You also didn't ask Mr. Keifitz for

15   any documents responsive to this request; is that

16   correct?

17        A    You are asking me the questions if I'm

18   telling you that somebody will not talk to me

19   because I'm not his client, it doesn't mean that I

20   didn't have effort to produce the documents.  I just

21   know that he will not talk to me about anything.  I

22   signed everything and put it on his desk.

23   Mr. Sexton is not my attorney and that's why I'm not

24   calling him, because he is not my attorney.

25        Q    Okay.  I don't think you answered my

1   question.

2               Is it correct that you did not

3   contact Mr. Keifitz and ask him for documents

4   responsive to this request; is that correct?

5       A    That is correct.  Not only Mr. Keifitz.  I

6   didn't ask my secretary or I used to have -- I

7   didn't ask my wife.  I didn't ask a lot of

8   neighbors.  I did not ask some people who had

9   nothing to do with that and I -- basically that's

10  what I'm trying to tell you, that I'm -- I know who

11  knows about the documents and that's basically

12  Mr. Firer, which I'm trying to get a hold of him to

13  get me that information.  I'm trying to answer your

14  question for you to realize that I would like to

15  produce whatever you ask me for, but if I don't have

16  it, then I don't have it and if I'm not represented

17  by Mr. Sexton he will not talk to me because he is

18  not my attorney, and if Mikhael Keifitz is not my

19  attorney he will not answer.  The same -- the same

20  thing.  That's basically my answer.

21      Q    Is it correct that you did not ask

22  Mr. Yelizarov for any documents that might be

23  responsive to this request for production of

24  documents?

25      A    The same answer.  I did not ask him

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1   because he did not have it.  He knows where the

2   paper's probably and why would I ask him?  He is in

3   Russia.

4        Q    And he is represented by Mr. Keifitz, the

5   lawyer who you say will not turn documents over to

6   you, right?

7        A    I didn't say he will not.  Mr. Keifitz is

8   not my attorney.  So he will not discuss any

9   business with me because he is not my attorney.

10       Q    Okay.  Did you contact any of the banks

11  that you opened accounts with for Pinnacle to get

12  records responsive to our request?

13       A    I did not.  Pinnacle --

14       Q    I didn't ask you why.  I just want to

15  know, did you contact the banks?

16       A    No, I did not.

17       Q    Okay.  Did you contact anyone at Pinnacle

18  to get records?

19       A    Who are you referring to?

20       Q    Whoever is in control of Pinnacle.

21            Did you contact anyone at Pinnacle to

22  get records responsive to our request for

23  production?

24       A    Oleg Firer is secretary of Pinnacle.  Yes,

25  I called him and ask him for that, but he did not

---

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    answer me because he wasn't in the country.

2          Q     So Oleg Firer is the secretary of

3    Pinnacle?

4          A     That is correct.

5          Q     And how long has Oleg Firer been the

6    secretary of Pinnacle?

7          A     I don't remember.

8          Q     Did you contact anyone at North Star

9    Maritime, Inc. or North Star Maritime Miami, LLC to

10   obtain records responsive to our request for

11   production of documents?

12         A     Who are you referring to?  I'm not sure

13   who at North Star -- or who is the person I really

14   need to contact to.  When you are saying -- North

15   Star is the company.  So when you are asking me that

16   question, can you specifically ask me who I really

17   need to ask for?

18         Q     Did you contact anyone, anyone associated

19   with North Star Maritime, Inc. or North Star

20   Maritime Miami, LLC to request documents that could

21   be responsive to our request for production?

22         A     I don't even -- if I want to, I'm not sure

23   whom I really can ask for and what does North

24   Star -- and what I'm -- no, I did not because I have

25   nothing to -- I don't even know who to call if I

---

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    want to.

2         Q    You don't know who is in control of North

3    Star Maritime, Inc. or North Star Maritime Miami,

4    Inc. -- LLC?

5         A    You already ask me the question.

6    Yelizarov -- Oleksandr Yelizarov who is the

7    president of North Star, but you ask me the

8    question, I said I did not.  So who else?  You ask

9    me the question --

10        Q    Well, doesn't North Star have lawyers?

11        A    I don't know what North Star has.

12        Q    So you did not contact any attorneys for

13   North Star Maritime, Inc. or North Star Maritime

14   Miami, LLC for records; is that correct?

15        A    Who would give me any answers?  Even if I

16   knew, who would give me any answers for North Star

17   to Leon Goldstein who has nothing to do with North

18   Star?

19        Q    What's the answer to my question, Mr.

20   Goldstein?

21        A    No, I did not.

22        Q    So the sum total of your efforts to find

23   documents responsive to my request is asking Oleg

24   Firer what records he could get for you, is that it?

25        A    That is correct.

1     Q     And that conversation with Oleg Firer

2  occurred yesterday; is that correct?

3     A     Right.

4     Q     Let me have you identify the amended

5  response that was given to us pursuant to that

6  order.

7          MR. REYES:  I'll make that Exhibit 3.

8          (Thereupon, the above-referred to document

9      was marked as Impleaded Defendants' Exhibit No.

10     3 for identification.)

11 BY MR. REYES:

12    Q     Take a moment, if you would, and look at

13 what I've marked as Exhibit 3, please.

14          Do you recognize what I've marked as

15 Exhibit 3?

16    A     Yes.

17    Q     Would you tell us what it is?

18    A     Yes.

19    Q     Mr. Goldstein, is this your amended

20 response to our request for production pursuant to

21 Judge O'Sullivan's order of December 11th that we

22 marked as Exhibit 1?

23    A     Yes.

24    Q     And is it correct that you did not produce

25 any additional documents to us when you served this

1    amended response?

2         A    That is correct.

3         Q    And you know Judge -- Magistrate

4    O'Sullivan specifically instructed you to state in

5    your response your knowledge of where the documents

6    are?

7         A    Yes.

8         Q    Okay.  And did you go through each

9    category of our request to attempt to determine

10   where the documents are?

11        A    Yes.

12        Q    How often do you speak with Mr. Yelizarov?

13             MR. SAYRE:  Objection, outside the scope

14        of the order as to the questions that can be

15        asked at this deposition.

16   BY MR. REYES:

17        Q    Do you understand my question, Mr.

18   Goldstein?

19        A    Yes, I do.  There is no specific things.

20   If I want to talk to him, I'm talking to him.  If he

21   wants to talk to me, he is talking to me.

22        Q    Do you speak to Mr. Yelizarov on a weekly

23   basis?

24        A    Like I said, it could be on a weekly

25   basis, it could be on a daily basis.  If somebody

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    wants to talk to somebody, they could just be

2    talking.

3        Q    So sometimes -- are you saying that there

4    are times where you are speaking to him on a daily

5    basis?

6        A    If I want to talk to him about

7    something -- if I need to talk to him, then I will

8    call him.  It's just not --

9        Q    When was the last time you spoke to him?

10       A    Five days ago.

11       Q    Did you -- did you discuss our document

12   request?

13       A    He doesn't have it, so.

14           MR. SAYRE:  Objection, asked and answered.

15           THE WITNESS:  He doesn't have it.  I told

16       him that I'm going to deposition and he said,

17       okay, talk to -- he has no knowledge where the

18       documents are and we all understand where the

19       documents are, so -- Mikhael Keifitz has them.

20   BY MR. REYES:

21       Q    So you and Yelizarov spoke five days ago

22   in which you told him that you were ordered to

23   appear at a deposition to answer questions about the

24   documents?

25           MR. SAYRE:  Objection.

```
1              THE WITNESS:  I told him I'm going to

2         deposition and I told him that the question is

3         about the documents and --

4    BY MR. REYES:

5         Q    And he said to you on that call that all

6    the documents are with Mr. Keifitz?

7         A    No, he didn't say that.

8         Q    You said it to him?

9         A    No, it's not -- I'm just telling you --

10             MR. SAYRE:  Objection.

11   BY MR. REYES:

12        Q    Who in that conversation said all the

13   documents are with Mr. Keifitz?

14        A    We didn't talk about the documents.  I

15   just talk to him five days ago.

16        Q    How is it that you know Mr. Yelizarov does

17   not have any knowledge about the documents?

18        A    Because we gave everything to Mr. Keifitz

19   and he is representing him.  Yelizarov is in

20   Ukraine.

21        Q    So in the telephone call, besides

22   discussing that you were appearing for deposition to

23   answer questions about the documents, what else did

24   you and Mr. Yelizarov discuss about the documents?

25             MR. SAYRE:  Objection.
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1              THE WITNESS:  Talked about the weather.

 2         Talked about a lot of different issues.

 3    BY MR. REYES:

 4         Q    I don't think you heard my question.

 5                   What else did you and he talk about

 6    with respect to the documents?

 7         A    I didn't talk to him about the documents,

 8    period.  I just told him that I will be in

 9    deposition.

10         Q    Why didn't you tell or ask Mr. Yelizarov,

11    would you please contact Mr. Keifitz and have him

12    release the documents so that I can comply with this

13    judge's order?  Why didn't you do that?

14         A    Because Oleg is the one who is, like I

15    said, knows and handling all these documents.  So if

16    he needs anything he can contact Oleg and he knows

17    that.  He will provide you whatever you may need.

18         Q    My question, sir, is:  Why didn't you ask

19    Yelizarov to help you get the documents from Keifitz

20    so that you can comply with the judge's order?

21         A    Mr. Yelizarov, when I'm trying to talk to

22    him about anything, he already told me a long time

23    ago, whatever you need, get it from Mr. Keifitz

24    through Oleg and that's how it was done before.

25         Q    So you are saying that Mr. Yelizarov tells
```

1    you, Oleg has to ask, it can't be Leon Goldstein, is

2    that what you are saying?

3         A    No, I didn't say that.

4         Q    Okay.

5         A    We didn't discuss that, but that's what

6    I'm saying.

7         Q    Okay.  And my question to you, sir, which

8    I don't think you've answered is:  Why didn't you

9    ask Yelizarov to help you get the documents from

10   Mr. Keifitz so that you can comply with the court's

11   order?

12        A    Mr. Yelizarov has no knowledge which

13   documents and what do I need.  Mr. Keifitz has them

14   and in the past if anything I need, anything I'm

15   talking to Oleg and Oleg is talking to

16   Mr. Yelizarov -- Mr. Keifitz, I mean.  I'm sorry.

17        Q    But wouldn't it have been easy enough to

18   say to Mr. Yelizarov, would you please call

19   Mr. Keifitz and just have him turn over to me

20   whatever he has that this judge has ordered you to

21   produce?

22        A    Mr. Yelizarov doesn't want to talk about

23   business with me as far as the documents because he

24   said I have no knowledge, I gave it to my attorney

25   and that's it.  We are not talking about that.

```
 1        Q    So you really have no reason as to why you

 2   didn't ask Mr. Yelizarov to help you get the

 3   documents from his lawyer; is that right?

 4             MR. SAYRE:  Objection.

 5             THE WITNESS:  No, that is not right.  I

 6        know how easy to do it and I know that Oleg has

 7        them, and it's much easier to do what I'm

 8        telling you because Oleg knows the answers.

 9   BY MR. REYES:

10        Q    Oh, so Oleg has the documents as well as

11   Mr. Keifitz?

12        A    I didn't say that.  Oleg can probably give

13   you the answers you are asking me for.  You are just

14   asking -- you are asking the wrong person.  It's not

15   like I don't want to give you.  Believe me, if I

16   would have it, I would bring it.  I just don't have

17   ability to do that.

18        Q    You didn't make any effort to get the

19   documents, Mr. Goldstein?

20             MR. SAYRE:  Objection.

21   BY MR. REYES:

22        Q    How do you know you don't have the ability

23   if you made no effort to look for the documents?

24             MR. SAYRE:  Objection.

25             MS. MAYERSOHN:  Objection, compound
```

```
 1              question.

 2                   MR. SAYRE:  And mischaracterization.

 3   BY MR. REYES:

 4        Q    Mr. Goldstein, you've already told me that

 5   other than calling Oleg yesterday you've made no

 6   effort to get documents responsive to this request?

 7                   MS. MAYERSOHN:  Objection,

 8         mischaracterization.

 9                   MR. SHALEK:  How is it a

10         mischaracterization?

11                   MS. MAYERSOHN:  He's explained before what

12         he's done.

13                   MR. SHALEK:  He has done nothing except

14         ask Oleg yesterday.  That's what he said.

15                   MR. SAYRE:  Hold on.  Hold on.

16                   MR. SHALEK:  That's not a

17         mischaracterization.

18                   MR. SAYRE:  She is not answering

19         questions.  Leon is answering questions.

20                   MR. SHALEK:  I'm just asking her if it has

21         anything to do with the mischaracterization.

22                   MR. REYES:  Let's keep --

23                   MS. MAYERSOHN:  Please rephrase the

24         question.

25                   MR. REYES:  -- the conversation -- you
```

```
 1          guys will have your chance to ask Mr. Goldstein

 2          questions.

 3     BY MR. REYES:

 4          Q    Mr. Goldstein, you've told us here this

 5     morning than other that talking to Oleg yesterday

 6     you have not made any effort to find the documents

 7     that the judge ordered you to produce; is that

 8     correct?

 9          A    You keep asking me the questions which I'm

10     giving you the answers all the time.  I'm trying to

11     explain to you that I will -- I did -- I know how to

12     get them and I know if you need them, that's the

13     person you need to talk to and that's the only way.

14     I give everything to Mikhael Keifitz and I don't

15     have anything in my possession.  Mikhael Keifitz is

16     not my attorney.  He will not give me anything back,

17     but if you need all that on it, anything, it's very

18     easy to call Oleg Firer or bring him to deposition

19     and you will get anything you want.

20          Q    Do you understand, Mr. Goldstein, that you

21     are ordered by a court to go get these documents,

22     not for me to ask Oleg Firer for the documents?  Do

23     you understand that?

24          A    I do.

25          Q    Okay.  But you did not do that; is that
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    correct?

2         A    No, it's not.  I did everything I could

3    trying to get a hold of Oleg because I know that's

4    how I can get the documents.

5         Q    Mr. Goldstein, I want to give you every

6    chance -- I want to give you every chance.

7              Please tell me, other than speaking

8    to Oleg yesterday as to his ability to get you

9    documents, what have you done to locate documents

10   responsive to our request for production?

11        A    There are two people who can get you the

12   documents, one is Mr. Keifitz, who is not my

13   attorney and who will not give me anything at all.

14   Oleg has ability.  Maybe he has whatever you may

15   need and he basically told me yesterday that if you

16   need -- anything you want, and he was -- is my

17   partner, talk to him and he will provide it to you.

18        Q    Okay.  Will you answer my question or no?

19        A    That's how I can answer you.

20        MR. REYES:  Will you read it back to him,

21   please.

22        (Thereupon, the pending question was read

23   back by the court reporter.)

24        THE WITNESS:  And I answered the question

25   that it's not like I'm ignoring the judge

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1        order.  I just cannot get them and I know who

2        can and this is the person who is my partner.

3        You are just asking questions to the wrong

4        person.  I just don't have ability to do that.

5   BY MR. REYES:

6        Q    Mr. Goldstein, I've heard you say multiple

7   times that it's your belief that Mr. Keifitz will

8   not give you the documents and it's your belief that

9   Oleg will be successful in getting them from

10  Mr. Keifitz, right?

11       A    I'm saying that Mr. Keifitz will not give

12  me anything at all.

13       Q    But I want to know what efforts you made

14  to get documents, even if they were unsuccessful,

15  what efforts did you make?

16       A    Well, if I would call Mr. Keifitz and ask

17  him and he will hang up the phone, would it be an

18  effort?  He did it already.  He already hang up the

19  phone on me and said, do not call me on the

20  business.

21       Q    Okay.  You said that was nine months ago?

22       A    It's good enough that he is not talking to

23  me.

24       Q    Okay.  But that was before I made a

25  document request.  And that was before Judge

1    O'Sullivan told you -- ordered you to produce

2    documents in this case.

3                   So I just want to know, is there

4    anything else you did to attempt to comply with the

5    court's order besides speaking to Oleg yesterday?

6    Yes or no?

7         A    What could I do other than trying to get

8    the documents from the person who is not my

9    attorney?  He will not give it to me, and call him

10   another time, he will think that I'm like stupid or

11   something.  He said to me, do not call me on the

12   business.  I'm not your attorney.

13        Q    Will you answer the question,

14   Mr. Goldstein?

15        A    That's the only way I can answer you.  I

16   know how to get it and I'm telling you what you can

17   get if you really want these documents.  But if you

18   want for me to look bad because I'm -- because I'm

19   like ignoring judge order, it's not right.  I'm

20   here, I want to help you and I'm telling you how to

21   get them.

22        Q    Mr. Goldstein, is it correct that the only

23   effort you made to obtain responsive documents to

24   comply with the court's order was to speak to Oleg

25   yesterday?

1          MS. MAYERSOHN:  Objection, asked and

2     answered.

3          MR. SAYRE:  Objection, asked and answered.

4     You just don't like the answer.

5          MR. REYES:  He doesn't answer the

6     question.

7          MR. SAYRE:  He's answered it.

8          MS. MAYERSOHN:  He's answered it multiple

9     times.

10         MR. SHALEK:  Don't argue with them.  Go

11    ahead.  They've said their objection.  You can

12    answer again.

13   BY MR. REYES:

14    Q    Will you answer my question, Mr.

15   Goldstein?

16    A    No, it's not correct.

17    Q    What other effort did you make?

18    A    I did everything possible in my power to

19   do that.

20    Q    What other effort did you make?

21    A    This is the only way to get the documents

22   is through the person who knows how to get them and

23   Oleg is the one who knows and that's basically -- we

24   can get the documents if you need them, but if you

25   want to trick me that I did not try to do that,

1    that's just not true.

2         Q    I'm not trying to trick you,

3    Mr. Goldstein.  I want to know, did you -- it's very

4    simple.  Did you do anything other than speak to

5    Oleg?  And I understand that you are saying that

6    Oleg is the only one that can get them and we'll

7    find out if that's true or not.  I just want to

8    know, did you do anything other than ask Oleg?  If

9    the answer is no, it's fine, but if you did

10   something else, what was it?

11        A    There was nobody else to talk to.  Call

12   Mikhael Keifitz one more time who already told me

13   that he will not talk to you?  If I would call

14   Mr. Shalek, as an example, and ask him for

15   something, he will not answer me anything.  He will

16   say, I'm not your attorney and that's it.  And if he

17   would tell me that nine months ago, I will not call

18   him today again because he already gave me the

19   answer.  So I've been clearly said from

20   Mr. Yelizarov's attorney, do not call me on anything

21   which related to the business.

22        Q    And why was it that you waited until

23   yesterday to call Mr. Firer?

24             MR. SAYRE:  Objection, asked and answered.

25             THE WITNESS:  I didn't say I called

                PRESTIGE REPORTING SERVICE, INC.
                       (954) 764-7297

```
 1           Mr. Firer.  I said I called him numerous times.

 2           He is in Russia.  He was not -- I was not able

 3           to get a hold of him.  Yesterday he came to the

 4           country.

 5    BY MR. SAYRE:

 6           Q    What number do you call Mr. Firer at?

 7                MR. SAYRE:  Objection.

 8                THE WITNESS:  The number (305) 343 --

 9    BY MR. REYES:

10           Q    Stop.  Stop.  (305) 343?

11                MR. SAYRE:  You know what, I'm going to

12           object.  That's personal information and to the

13           extent that a transcript is ordered, I'd like

14           it redacted or if anything is filed in the

15           court record, I'd like it redacted.

16                MR. REYES:  Are you now representing

17           Mr. Firer, too?  You've got a whole lot of

18           clients in this case.  Do you represent Mr.

19           Firer, too?

20                MR. SAYRE:  He is a member of Pinnacle

21           Three, as it's been testified to.

22                MR. REYES:  As of this morning I see that

23           you filed the amended making Mr. Firer the

24           secretary of Pinnacle.

25                MR. SAYRE:  That's a mis --
```

```
 1           MR. SHALEK:  Mr. Firer is not a member of
 2      Pinnacle.  Mr. Firer is the member of --
 3           MR. REYES:  Star Capital.
 4           MR. SHALEK:  -- Star Capital.
 5           MR. REYES:  They filed an amended report
 6      with Sunbiz adding him as secretary this
 7      morning.
 8           MR. SHALEK:  This morning?
 9           MR. SAYRE:  Check the date on it.  Check
10      the date on it.
11           MR. REYES:  This morning.
12           MR. SAYRE:  I would check the date on
13      that.
14           MR. REYES:  This morning.
15           MR. SAYRE:  It may have appeared this
16      morning.
17           MR. REYES:  This morning, December 22nd,
18      2014 filed, it says.
19 BY MR. REYES:
20      Q    What was the number again, (305) 343?
21      A    This is not the right phone.  The right
22 phone call in Russia is 7, but I don't remember.
23      Q    Well, do you have your phone with you?
24      A    It's not in my phone.  This is his
25 international call.
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1        Q     Well, what is Mr. Firer's local number,

 2   (305) 343?

 3        A     I need to look for that.

 4        Q     Well, would you look on your phone and

 5   give me that number, please?

 6        A     I need to look for it.

 7              MR. SAYRE:  I repeat my objection.

 8   BY MR. REYES:

 9        Q     That doesn't mean you don't answer.

10              Will you look on your phone and give

11   me Mr. Firer's number, please.

12        A     (Thereupon, the number was redacted)

13              MR. SAYRE:  I'm going to move that that be

14        redacted from any filings on the public record.

15   BY MR. REYES:

16        Q     And you don't have the international

17   number on there?

18        A     Not here, no.

19        Q     Okay.  And when you were trying to reach

20   Mr. Firer to help you respond to our request for

21   production, is it your testimony you called him only

22   on the international number, not the local number?

23        A     Well, he is answering international number

24   when he is out of the country.

25        Q     Okay.  And you've been in Florida since
```

1    October except for those eight days that you went to

2    Moscow; is that right?

3        A    That's right.

4        Q    And is it your testimony Mr. Firer was not

5    in Florida at the time that -- during this time that

6    you have been in Florida?

7        A    Mr. Firer is traveling all the time, so

8    it's very hard to get a hold of him.  He is

9    everywhere.

10        Q    Are you saying that he was in Florida or

11    not in Florida?

12        A    I don't know.

13        Q    Prior to speaking to him yesterday, when

14    was the last time that you spoke to Mr. Firer, your

15    business partner?

16        A    I don't remember.

17        Q    And why is it that Mr. Firer was added

18    this morning as the secretary of Pinnacle?

19            MR. SAYRE:  By the way, I think that

20        that's wrong.  I see the date on there, but I

21        think that that is not reflective of the true

22        facts, so --

23            MR. REYES:  Mike, you don't get to make

24        commentary on the record.

25            MR. SAYRE:  Well, I do if you -- I

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    understand that --

2         MR. REYES:  You don't get to make

3    commentary no matter what I ask.

4         MR. SAYRE:  So you want to make -- you

5    want to have an improper factual basis for your

6    question?

7         MR. REYES:  I don't think it's improper,

8    but you will have a chance to cross examine the

9    witness and ask anything you want, but stop

10   just making speeches.  It doesn't work that

11   way.

12        MR. SAYRE:  So you want, as an officer of

13   the court, you want to have an improper premise

14   to your question?

15        MR. REYES:  Did you understand what I

16   said?

17        MR. SAYRE:  Do you understand what I said?

18        MR. REYES:  Please, form or privilege.  Do

19   not make speeches.  We don't need it.  You will

20   have cross.  You'll get to ask whatever you

21   want.  Okay?  Or you can move for protective

22   order.  You can do whatever you think you need

23   to do, but please don't sit here and just spout

24   out what you think the facts are.  Okay?

25        MR. SAYRE:  I can appreciate what you are

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1        saying and hopefully you can appreciate what

2        I'm saying and we are not going to reach an

3        agreement on this point, Rick.

4            MR. REYES:  I'd like to reach an agreement

5        that we'll follow the rules.

6            MR. SAYRE:  As would I.

7            MR. REYES:  Okay.  So the rules are form

8        and privilege and that's it.  So please stop.

9        Please.

10           MR. SAYRE:  I will object as I see fit.

11           MR. REYES:  Okay.

12  BY MR. REYES:

13      Q    Mr. Goldstein, would you tell us why it is

14  that Oleg Firer was added as secretary of Pinnacle

15  today --

16           MR. SAYRE:  Objection.

17  BY MR. REYES:

18      Q    -- December 22nd, 2014?

19           MR. SAYRE:  Mischaracterization.

20           THE WITNESS:  I don't know.

21  BY MR. REYES:

22      Q    You had nothing to do with it?

23      A    What do you mean?

24      Q    Did you have anything to do with Oleg

25  Firer becoming the secretary of Pinnacle?

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1        A    Oleg Firer was handling all my stuff and
 2   he is secretary of Pinnacle.  When, what and how, I
 3   don't know.  I don't remember.
 4        Q    What do you mean?  Oleg Firer is handling
 5   Pinnacle for you?
 6             MR. SAYRE:  Objection.
 7             THE WITNESS:  Oleg Firer is secretary for
 8        Pinnacle.  That's what I said.
 9   BY MR. REYES:
10        Q    Okay.  And I'm asking you, why is it that
11   Oleg Firer is the secretary of Pinnacle?
12        A    Why?
13        Q    Yes.
14        A    I don't know.  Because he is secretary of
15   Pinnacle.
16        Q    Did you make him the secretary of
17   Pinnacle?
18             MR. SAYRE:  Objection, asked and answered.
19   BY MR. REYES:
20        Q    Did you hear my question, sir?  No matter
21   how much counsel tries to interrupt the deposition,
22   you still have to answer.  He refuses to follow the
23   rules and he is making other statements that aren't
24   allowed.
25             But my question to you is:  Why was
```

```
 1      he appointed secretary of Pinnacle?

 2              MR. SAYRE:  Objection, asked and answered.

 3              THE WITNESS:  I don't understand when you

 4          are saying why.  He is the secretary of

 5          Pinnacle and that's it.

 6      BY MR. REYES:

 7          Q    Did you want him to be the secretary of

 8      Pinnacle?

 9          A    Yes.

10          Q    And why did you want him to be the

11      secretary of Pinnacle?

12          A    Because he was my partner in different

13      business.  I want him to help me with Pinnacle

14      Corporation.

15          Q    And why do you want Oleg to help you run

16      Pinnacle Corporation?

17          A    Because I don't know too much about this

18      and I trust him and I want him to help me with that.

19          Q    You want him to run Pinnacle for you?

20              MR. SAYRE:  Objection.

21              THE WITNESS:  I want him to be a secretary

22          of Pinnacle.

23      BY MR. REYES:

24          Q    But do you want him to run the company for

25      you?
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1              MR. SAYRE:  Objection.

 2              THE WITNESS:  I didn't say that.

 3   BY MR. REYES:

 4       Q    How is he going to help you in Pinnacle?

 5   You said he is going to help you in Pinnacle.

 6                   How is Oleg Firer going to help you

 7   in Pinnacle?

 8       A    Well, first of all, I'm out of country

 9   about five, six months out of the year and I need

10   somebody to handle the things for me and he is a

11   good working partner.

12       Q    And what does he do for you at Pinnacle

13   that you would otherwise have to do?

14              MR. SAYRE:  Objection.  No time frame.

15              THE WITNESS:  Whatever needs to be done he

16         will do.  If there is nothing to be done, he is

17         not doing anything.

18   BY MR. REYES:

19       Q    So you have Oleg run Pinnacle for you?

20              MR. SAYRE:  Objection.  No time frame.

21              THE WITNESS:  No.  He is helping me in

22         Pinnacle Three Corporation and -- it's a lot of

23         e-mails sometimes going to Pinnacle Three

24         Corporation.  I'm out of country and he is

25         informing me sometimes what needs to be done or
```

```
 1        whatever, and that's basically what I would

 2        like him to do.

 3   BY MR. REYES:

 4        Q    And why does he inform you about what's

 5   going on with Pinnacle, because you are the owner?

 6             MR. SAYRE:  Objection.  You've given no

 7        time frame.

 8   BY MR. REYES:

 9        Q    Why does Mr. Firer inform you what's going

10   on in Pinnacle?

11        A    It's not specifically he is informing me.

12   If there is anything going on that I need somebody

13   to help me -- like I said, I'm almost half of the

14   year out of country.  So somebody needs to be here

15   and do things for me in the case if it needs to be

16   done, and I don't understand why I should not have

17   secretary of Oleg Firer if he was my partner in Star

18   Capital.

19        Q    Are you saying because you travel you are

20   not available to run the affairs of Pinnacle so you

21   have Oleg doing those things?

22             MR. SAYRE:  Objection.

23             THE WITNESS:  It's one of the reasons.

24   BY MR. REYES:

25        Q    Okay.  And you know the secretary of
```

```
 1   state's records show that Oleg was added as a

 2   secretary today, did you know that?

 3        A    No, I didn't know that.  I was under the

 4   impression he was all the time.

 5        Q    You thought he was secretary all the time?

 6        A    Uh-huh.

 7        Q    Yes?

 8        A    I thought he is secretary not starting

 9   today.

10        Q    Okay.  And it's your testimony that

11   because you travel so much you would like Oleg to

12   run Pinnacle for you?

13             MR. SAYRE:  Objection.

14             MS. MAYERSOHN:  I think he is a little

15        confused.

16             MR. SAYRE:  I think he is, too, because

17        you gave him --

18             MR. REYES:  Here we go.  Here we go with

19        the speeches and the coaching.  Judge

20        O'Sullivan, as frustrated as he is with

21        Mr. Goldstein's refusal to make discovery, is,

22        I think, going to be more frustrated with

23        counsel interrupting the deposition with

24        speaking objections.

25             MR. SAYRE:  Well, you are giving improper
```

```
 1      time frame.  You are getting misleading

 2      testimony.

 3           MR. REYES:  I'm trying to get the truth

 4      and there's a lot of --

 5           MR. SAYRE:  Then frame your question

 6      properly.

 7           MR. REYES:  -- obstruction today to

 8      prevent me from getting that.

 9           MS. MAYERSOHN:  If you could just -- I

10      would ask --

11           MR. REYES:  No, you will do cross.

12           MS. MAYERSOHN:  -- if you could just give

13      him a time frame so that he is clear as to who

14      owned Pinnacle when.

15           MR. REYES:  I'm asking my question as I

16      want to ask and I'm going to ask the reporter

17      to read it back and I'm going to please ask

18      that you stop interrupting or we are going to

19      have to get the magistrate on the phone if this

20      continues.

21           MR. SAYRE:  I would love to get the

22      magistrate on the phone as to the scope -- when

23      we do, I'm going to ask about the scope of this

24      deposition because as I understood it -- I was

25      not there --
```

```
 1              Leah, tell me if I'm wrong, he was

 2      supposed to -- he was supposed to answer

 3      questions regarding request for production.

 4      We've gone way outside of that.

 5              MS. MAYERSOHN:  Correct.

 6              MR. SHALEK:  The great, I was not there,

 7      excuse.  We have heard that in court and the

 8      judge didn't buy it then.

 9              MR. SAYRE:  How come you are not objecting

10      to that, Rick?

11              MR. REYES:  I'm waiting for the question

12      to get read back.

13              MR. SAYRE:  Mr. Shalek just said

14      something.

15              MR. REYES:  He was referring to your

16      comment, not coaching the witness.

17              MR. SAYRE:  But he is allowed to just

18      speak?

19              MR. REYES:  No, he is not, but he was

20      referring to your comment.

21              MR. SAYRE:  I think we are going to have

22      to get the judge on the phone at some point

23      because -- Leah --

24              (Thereupon, the pending question was read

25      back by the court reporter.)
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1  BY MR. REYES:

2      Q    Can you answer that question,

3  Mr. Goldstein?

4      A    I guess I answered this a couple of times.

5  I'm 65 years old.  I am not in town or in the

6  country and I need somebody to watch it because

7  my -- I have memory problems.  I have some problems,

8  so if Oleg is the secretary it will not hurt me and

9  that's what I needed him for.

10     Q    When you say you need somebody to watch

11  it, are you referring to Pinnacle?

12     A    What I'm saying, if I need help in any

13  business, I'm trusting Oleg Firer and he understand

14  much more than I do today and that's why I need some

15  help.

16     Q    And is that why he is the secretary of

17  Pinnacle?

18     A    That's one of the reasons.

19     Q    Okay.  Can you give me some examples of

20  what it is that Mr. Oleg does in running Pinnacle

21  for you?

22          MS. MAYERSOHN:  Now I'm going to get --

23          MR. SAYRE:  Objection.

24          MS. MAYERSOHN:  -- way beyond the scope.

25          MR. SAYRE:  Let's get the magistrate on

```
 1        the phone.  You can talk to him about my

 2        objections and we can talk about the scope of

 3        your deposition, if you want to continue down

 4        this road.

 5   BY MR. REYES:

 6        Q    Mr. Goldstein, can you answer the

 7   question?

 8             MR. SAYRE:  Let's get the magistrate on

 9        the phone if you are going to continue.

10             MR. REYES:  No, I'm not getting any

11        magistrate on the phone.  I have a question

12        pending.

13             MR. SAYRE:  Leah, if you want to stop -- I

14        can't stop the deposition.  He is your witness,

15        but are you going to continue?

16             MS. MAYERSOHN:  I'd like to get him on the

17        phone.  If we can just take a brief recess.

18        It's 11:23.

19             MR. REYES:  I have a question pending.

20        Are you instructing him not to answer the

21        question?

22             MS. MAYERSOHN:  We can reconvene

23        afterwards.

24             MR. REYES:  Does that mean, yes --

25             MS. MAYERSOHN:  Yes.
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1              MR. REYES:  -- you are instructing him not
 2         to answer that question?
 3              MS. MAYERSOHN:  He is happy to answer it
 4         after the magistrate gets on the phone
 5         regarding the scope and whether this is beyond
 6         the scope of the depo.
 7              MR. REYES:  And the question specifically
 8         is -- would you read the question back so that
 9         we are clear on the question that you are not
10         allowing him to answer?
11              MR. SHALEK:  And, Leah, you are not going
12         to talk to Leon outside while we are trying to
13         get --
14              MS. MAYERSOHN:  No.
15              MR. SHALEK:  Okay.  Thank you.  Just
16         wanted to make sure that's clear for the
17         record.
18              (Thereupon, the pending question was read
19         back by the court reporter.)
20              MR. REYES:  That's the question you won't
21         let him answer?
22              MS. MAYERSOHN:  Yes.
23    BY MR. REYES:
24         Q    Okay.  We will put that aside, Mr.
25    Goldstein, so that I can continue the deposition.
```

1          You know that there was an initial --

2          MS. MAYERSOHN:  Excuse me.  Rick, are we

3     going to call the magistrate now?

4          MR. REYES:  No.  I'm going to --

5          MR. SAYRE:  He is stopping -- he has

6     agreed to move on.

7          MR. REYES:  I've moved the question and we

8     can talk to him after.

9          MS. MAYERSOHN:  I appreciate that.

10    BY MR. REYES:

11        Q    Mr. Goldstein, you are aware that

12    documents -- a few documents were sent to us on your

13    behalf by your attorney when you responded to our

14    request for production the first time?

15        A    Yes.

16        Q    Okay.  How were you able to obtain those

17    documents?

18        A    My attorney did, whatever she could find.

19        Q    So what we got the first time were records

20    that your lawyer was able to obtain on her own to

21    respond to the request?

22        A    I could not get any records.  So whatever

23    you -- whatever my attorney could have get, that's

24    what she got.

25        Q    Did you see the documents that your

1    attorney gave us?

2        A    Yeah, I think so.  Yeah.

3            MR. REYES:  Let me mark this as Composite

4        Exhibit 4.

5            (Thereupon, the above-referred to document

6        was marked as Impleaded Defendants' Exhibit No.

7        4 for identification.)

8    BY MR. REYES:

9        Q    Take a moment, if you would,

10   Mr. Goldstein, and just look at that group of

11   documents.  Did you go through them?

12       A    What is that?

13       Q    Would you -- page -- just go through --

14   they are clipped in the corner.  If you could just

15   look at what's in the group of documents.  You don't

16   need to look at every page unless you want to.

17       A    What do you want me to do?

18       Q    I'd just like you just to peruse what's in

19   there, if you could, please.

20            The first document in Composite

21   Exhibit 4 is a print-out from the public records of

22   Miami-Dade County; is that right?

23       A    It looks like.

24       Q    Okay.  The second document is something

25   called a Loan and Security Agreement of March 1,

---

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1    2007.  Do you see that?

 2         A    Yes.

 3         Q    Okay.  Do you know where this document was

 4    obtained?

 5         A    No, I don't.

 6         Q    Have you ever seen it before today?

 7         A    I saw it briefly, but my attorney told me

 8    that she --

 9              MS. MAYERSOHN:  Objection.  Response is

10              regarding attorney-client privilege.  Move to

11              strike.

12    BY MR. REYES:

13         Q    Was the first time you saw this document,

14    Mr. Goldstein, when your lawyer produced it to us?

15         A    I don't remember what I saw, what I don't,

16    really, because too many documents I saw.

17         Q    Too many documents?  Ones that aren't here

18    today?

19         A    Well -- what is that?

20         Q    Other documents than what was given to us?

21         A    Well, I was trying to find a lot of things

22    or my attorney tried to find a lot of things and

23    probably this -- okay.  I can see my signatures.  So

24    what is the question?

25         Q    My question was:  Was the first time you
```

```
1    saw this document -- it's called Loan and Security

2    Agreement --

3         A    No, it's not.

4         Q    -- when your lawyer gathered it to be

5    produced to us?

6         A    I saw them before.

7         Q    But you did not have this in your

8    possession?

9         A    I did not.

10         Q    Okay.  And then there is a Sunbiz

11    report --

12         A    Okay.

13         Q    -- from the public record for North Star

14    Maritime Miami, LLC.  Do you see that?

15         A    Yes.

16         Q    And the next document you produced to us

17    is a Sunbiz report for North Star Maritime, Inc.; is

18    that correct?

19         A    That's correct.

20         Q    The next document you produced to us is a

21    copy of the $150,000 note that was part of the

22    settlement of the lawsuit involving 40 Retail,

23    Century, Sterlington and 75 Retail?

24         A    Yes.

25         Q    The next document is a print-out from the
```

1    public record from the secretary of state in

2    Illinois; is that correct?

3          A    Let me see which one.  Oh, okay.  Yes.

4          Q    Then the next document is a Sunbiz report

5    for Pinnacle Three Corporation, the Florida entity;

6    is that correct?

7          A    Let me see where it is.  Which one are you

8    reading because they are not in the same order?

9          Q    They were in the same order.

10         A    I'm sorry.  Yes.  That's correct.

11         Q    And then it looks like we got the same

12   Sunbiz report again.  So it looks like we got it

13   twice regarding Pinnacle Corporation?

14         A    Yes.

15         Q    And then there is a copy of the deposition

16   that you gave -- I'm sorry, a transcript of the

17   hearing before Judge Feder that occurred on March 26

18   of 2014?

19         A    Right.

20         Q    Was this something you had in your

21   possession or was this something your lawyer

22   obtained?

23         A    I didn't have that in my possession.  I

24   have nothing in my possession.

25         Q    And then you produced K-1s that were given

1   to you for your interest in Century, Sterlington, 40

2   and 75 Retail; is that correct?

3        A    That's correct.

4        Q    Why did you produce these K-1s?

5        A    What do you mean why I produce them?

6        Q    Why did you produce those documents to us?

7        A    My attorney produce whatever she can find.

8   I think that's what she did.

9        Q    Why didn't you give us the K-1s for

10  Pinnacle?

11       A    Like I said, my attorney give you

12  everything she could find.

13       Q    Do you have K-1s for Pinnacle?

14       A    Yes, I do.

15       Q    What is the last year that you received a

16  K-1 for Pinnacle?

17       A    This year.

18       Q    When you say "this year," you are

19  referring to 2013 or 2014?

20       A    I'm referring that I received them 2014.

21       Q    So you got a K-1 for 2014 for Pinnacle.

22            Did you get a K-1 for 2013 for

23  Pinnacle?

24       A    Yes.

25       Q    Did you get a K-1 for Pinnacle for 2012?

```
 1          A     Yes.

 2          Q     Has Pinnacle filed tax returns for the

 3    year '13?

 4          A     No.

 5          Q     Has Pinnacle filed tax returns for the

 6    year '12?

 7          A     No.

 8          Q     Has Pinnacle -- when was the last time

 9    Pinnacle filed a tax return?

10          A     I think '11.

11          Q     2011?

12          A     I think so.

13          Q     And are you -- when you say you have K-1s

14    for 2014 and -- 2014, 2013, 2012, are we talking

15    about Pinnacle Florida or Pinnacle Illinois or both?

16          A     I would say it's Pinnacle Florida because

17    it's the same company.

18          Q     So having looked at the group of documents

19    that you've produced to us, the only document that

20    is not in the public record or originated from my

21    clients is this Loan and Security Agreement in your

22    production; is that correct?

23          A     Which one is that?

24                MS. MAYERSOHN:  Objection, improper

25          response -- improper characterization, excuse
```

```
 1          me.
 2                  MR. SAYRE:  Improper basis.
 3     BY MR. REYES:
 4          Q    Is your -- are all your documents from the
 5     public record, other than what my client gave you,
 6     the K-1s, with the exception of this Loan and
 7     Security Agreement?
 8                  MR. SAYRE:  That is public record.
 9                  MS. MAYERSOHN:  What about the transcript?
10                  MR. REYES:  That would be a public record.
11          The court reporter proceeding is public.
12                  MS. MAYERSOHN:  It's not filed.
13                  MR. SAYRE:  Isn't a loan agreement public
14          too?
15                  MR. REYES:  I don't know if it's public.
16          We'll find out.
17                  THE WITNESS:  Repeat the question.  I'm
18          not sure I understand it.
19     BY MR. REYES:
20          Q    Well, I guess it is recorded.  I guess
21     Mr. Sayre makes a good point.
22                  So the documents that you've produced
23     to us, with the exception of the K-1s and the
24     transcript, are all documents from the public
25     record; is that correct?
```

```
1        A    I think so.

2             MR. REYES:  Let's take a quick break.

3             THE VIDEOGRAPHER:  Off the record at

4        11:33.

5             (Thereupon, a recess was taken.)

6             THE VIDEOGRAPHER:  Okay.  We are back on

7        the record at 11:50.

8   BY MR. REYES:

9        Q    Mr. Goldstein, we were looking at the

10  documents you had produced in this case when we took

11  the break, do you recall that, Exhibit 4, we were

12  looking at the group of documents your lawyer gave

13  us?

14       A    Yes.

15       Q    I just want to go back, if I could, to

16  your testimony about Oleg being able to get us the

17  documents.

18       A    Yes.

19       Q    Why is it, if you know, that Mr. Keifitz

20  would give documents to Oleg but not give them to

21  you?

22       A    Mr. Keifitz knows the situation, the legal

23  situation between me and Chaban and -- so I'm like

24  on the other side of the table and that's why he

25  will not discuss any business with me.
```

1        Q     When you say you are on the other side of

2     the table, from who, what do you mean?

3        A     I'm not his client.  That is one of the

4     reasons he will not deal with me because I think --

5     he is an attorney.

6        Q     Is Oleg his client?

7              MR. SAYRE:  Objection, it calls for

8        speculation.

9              THE WITNESS:  I'm not sure.  It could be.

10    BY MR. REYES:

11       Q     Do you know if Mr. Keifitz has represented

12    Oleg in the past?

13       A     I don't know that.

14       Q     Has Mr. Keifitz represented Star Capital

15    in the past?

16       A     I don't know that either.

17       Q     Okay.  I think you testified that you have

18    Oleg check e-mails for Pinnacle.  What e-mail

19    address would he be checking for Pinnacle?

20       A     I don't know which e-mail address Oleg is

21    checking, but I know that Oleg is helping because

22    Oleg used to be my partner.  Oleg knows about

23    Pinnacle and since I'm no longer president of

24    Pinnacle, so he's helping overall and he's helping

25    Yelizarov and he is giving him advice and so

1    whatever.  And that's why I did not know when Oleg

2    became a secretary because I guess Yelizarov put him

3    secretary, but Oleg is helping him.

4          Q    What e-mail addresses do you know of?

5          A    Oleg's?

6          Q    The one that Oleg may be checking for

7    Pinnacle?

8          A    I don't know.

9          Q    What e-mail address does Pinnacle have?

10         A    I don't know.

11         Q    Did Pinnacle have any e-mail addresses?

12         A    When I was the president it was an e-mail

13   address.

14         Q    What was that e-mail address?

15         A    What is that?

16         Q    What was it?

17         A    I have to look at that.  I'm like one year

18   already out of the company so I don't remember.

19   Maybe they changed the e-mail address, but I'm in a

20   way of maybe sloppy with papers and not really good

21   in the e-mails and Oleg is very good at that and

22   Oleg knew about this business from A to Z and Oleg

23   was helping me, not be maybe a secretary, but when I

24   was out of this company then I guess Yelizarov put

25   him on.  That's why I have no idea if he is one day

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1   or six months legally, but anything --

 2        Q    Did you discuss with Mr. Sayre on the

 3   break the issue of Oleg becoming the secretary of

 4   Pinnacle?

 5        A    I didn't check.  I didn't talk to

 6   Mr. Sayre.

 7             MR. SAYRE:  By the way, this is outside

 8        the scope of the deposition.  Do we need to get

 9        the attorney on the phone -- I'm sorry, the

10        judge on the phone?

11             MR. REYES:  As to whether he spoke to you

12        on the break?

13             MR. SAYRE:  No, but this general line of

14        questioning.

15             MR. REYES:  I'm just following --

16             MR. SAYRE:  What does this have to do with

17        documents?  Tell me and I'll stop objecting.

18             MR. REYES:  Well, the e-mails could be

19        responsive to our request for production.

20             MR. SAYRE:  But when Oleg became, you know

21        --

22             MR. REYES:  That's him talking about it.

23        I'm asking him --

24             MR. SAYRE:  You asked him.

25             MR. REYES:  -- what e-mails he checked and
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    he is spouting off with a --

2         MR. SHALEK:  Rick, don't pander with him

3    and his ridiculous threats.

4         MR. REYES:  I just want -- guys, I just

5    want to try to finish this deposition today

6    without -- if we can just have the witness

7    answer the questions it would be a lot faster.

8         MR. SAYRE:  If you ask proper questions,

9    you are absolutely right.

10        MR. REYES:  I think I have.

11   BY MR. REYES:

12        Q    And the question I was asking was:  What

13   are the e-mail addresses that Pinnacle used and are

14   you able to tell me what those are?

15        A    I don't know what they are using right

16   now.  I have nothing to do with Pinnacle anymore.

17        Q    What e-mail addresses did Pinnacle use?

18        A    Maybe I will find them if you need them

19   because I used to have them, but not anymore.

20        Q    You don't have them on your phone, for

21   example?

22        A    No.

23        Q    Okay.  And do you communicate with Oleg in

24   writing as well as by telephone?

25        A    If I get -- I cannot get a hold of him

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1    sometimes I'm writing him because, like I said, he

 2    is very hard to get a hold of.

 3         Q    What e-mail address do you use for Oleg?

 4         A    I -- I'm putting in my computer Oleg and

 5    something comes up and that's what I'm using.  I

 6    don't remember the -- Oleg whatever.  He got a

 7    couple of e-mail addresses.

 8         Q    Do you text with Oleg?

 9         A    Sometimes.

10         Q    And when you would text with him, is it

11    the 305 number that you gave me earlier or is it a

12    different number?

13         A    That's the number.

14         Q    I'm sorry?

15         A    That is the number.

16         Q    The 305 number is the one you would text

17    with him?

18         A    Yes.

19         Q    So if there were text messages between you

20    and Oleg it would be the 305 number?

21         A    Yes, I think so.

22         Q    And you would have on your computer

23    e-mails between you and Oleg?

24         A    Yes.

25         Q    Okay.  And did you search your e-mails to
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    respond to our request for production of documents?

2        A    I don't have anything in my e-mails

3    concerning the production.  Yes, I did research

4    whatever I could.

5        Q    So you searched your e-mails?

6        A    I looked at them, yes.

7        Q    I asked you if you had spoken on the break

8    with Mr. Sayre.

9             Did you speak with Ms. Mayersohn on

10   the break about Oleg being appointed secretary?

11            MR. SAYRE:  Objection -- well, I can't --

12            MS. MAYERSOHN:  It's attorney-client

13       privilege is what you are trying to comment on.

14            MR. SHALEK:  Excuse me, there is not a

15       privilege for -- while he is on the stand.

16            MS. MAYERSOHN:  He is asking --

17            MR. SHALEK:  I understand that.  If he is

18       on the stand you have no right to pull him

19       aside during a break and tell him how to

20       reanswer questions.  That's not a privilege.

21            MS. MAYERSOHN:  I think it's how he

22       phrased the question.  If he rephrases the

23       question --

24            MR. SAYRE:  You are asking about

25       attorney-client communication.  How is that not

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1         privilege?

 2              MR. SHALEK:  I'm going to explain it to

 3         you.

 4              MR. SAYRE:  Please.

 5              MR. SHALEK:  He is on the stand.  The

 6         deposition is taken as if the witness remains

 7         on the stand.  There was a brief bathroom

 8         break.  That does not give Ms. Mayersohn the

 9         right to have a privilege conversation about

10         the scope of the testimony being given.  If

11         this was a trial, she would not be able to pull

12         him aside during a five-minute break and tell

13         him, oh, change your answer to the question.

14         There is no privilege attached to that.

15              MR. SAYRE:  So you are allowed to delve

16         into an attorney-client -- a communication

17         between a client and his attorney, there is a

18         special exception for breaks between

19         depositions?

20              MR. SHALEK:  That's my understanding.

21              MR. SAYRE:  That is incorrect.

22              MR. REYES:  Okay, gentlemen.  I think they

23         are done.

24    BY MR. REYES:

25         Q    Mr. Goldstein, I had asked you a question.
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1              MR. REYES:  Are you instructing him not to

 2        answer the question?

 3              MS. MAYERSOHN:  I'm instructing him not to

 4        comment on anything privilege, but he can

 5        certainly discuss in general his bathroom

 6        break.

 7              MR. REYES:  I didn't ask him about his

 8        bathroom break.

 9    BY MR. REYES:

10        Q    I asked you, Mr. Goldstein -- let me ask

11    you the question again.  Can I do that?  Do you

12    remember the question?

13        A    Repeat it one more time.

14        Q    Okay.  While we were on the break, did you

15    have a conversation with Ms. Mayersohn about Oleg

16    Firer being --

17              MS. MAYERSOHN:  I think the appropriate --

18    BY MR. REYES:

19        Q    -- appointed secretary of Pinnacle?

20              MS. MAYERSOHN:  I think -- I would object

21        again based upon privilege.  I think the

22        appropriate thing is whether or not he had a

23        conversation with me without discussing the

24        content of the conversation.

25              MR. SAYRE:  That is fine.
```

1      MS. MAYERSOHN:  I think that would be an

2      appropriate question.

3          MR. REYES:  Are you instructing him not to

4      answer my question?

5          MS. MAYERSOHN:  On privilege?  Yes,

6      because you are calling for something that is

7      on privilege.  If you rephrase the question as

8      I've indicated, then I'll instruct him to

9      answer it.

10         MR. REYES:  Well, I want to be clear on

11      the record.

12         MR. SAYRE:  If he had a conversation with

13      me, not the content of the conversation.

14         MR. REYES:  The question I asked, you are

15      instructing him not to answer, meaning you are

16      not going to let him divulge whether you and he

17      discussed Oleg Firer being appointed as

18      secretary today?

19         MS. MAYERSOHN:  Well, I mean, it's an

20      easy -- well, it's an easy answer.  You are

21      calling for something about privilege, but

22      rephrase the question and I think his answer

23      will satisfy you.

24         MR. REYES:  I don't want to rephrase the

25      question.  Are you telling him not to answer

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1          the question?
 2                MR. SAYRE:  If you want to save time and
 3          money, get the judge on the phone.  We can do
 4          this now.
 5                MR. SHALEK:  No, we don't want to do that.
 6          We just want to know if --
 7                MR. REYES:  Gentlemen, listen --
 8                MR. SHALEK:  -- are you asserting a
 9          privilege or not?  It's simple.
10                MR. SAYRE:  The content of your
11          conversation he shouldn't be able to get into.
12                MR. SHALEK:  Are you instructing or not?
13                MR. REYES:  I think Michael is instructing
14          Leah and Leah is going to instruct Leon.
15                MR. SAYRE:  I'm not instructing.  I'm
16          telling Leah what the law is.
17                MS. MAYERSOHN:  I understand, but, you
18          know, I don't want him to be waiving privileges
19          to other matters, which is the only reason why
20          I'm objecting.
21                MR. REYES:  Well, he was under oath, we
22          took a break and I want to know if there was a
23          discussion such that he'd change his answers
24          with respect to Pinnacle.
25
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1    BY MR. REYES:

 2         Q    And so I'd like to know, was there a

 3    discussion about Oleg Firer being the secretary of

 4    Pinnacle while we were on the break?

 5         A    I called Oleg Firer and asked him --

 6              MR. SAYRE:  That's fine.

 7              MS. MAYERSOHN:  That's fine.

 8              THE WITNESS:  -- when did he put himself

 9              on the secretary and I said, it said that you

10              did it yesterday because I have no knowledge,

11              because I have nothing from Pinnacle.  He said,

12              no, it was a longer than that and he kind of

13              redid his secretary today, but he said it was

14              longer because Yelizarov put him as a

15              secretary.  I don't know how long ago and

16              that's because it looks like very stupid that I

17              have no clue of when he was put in as a

18              secretary.

19    BY MR. REYES:

20         Q    So Mr. Firer confirmed to you on the break

21    that he filed today with Sunbiz a document showing

22    him as the secretary?

23         A    He said he was the secretary longer than

24    two days ago and he said it was a while ago and

25    right now I think he rechecked him, whatever, and --
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1   because he basically knows about this and he is

2   helping Yelizarov —— he is giving everything,

3   checking e-mails and whatever, so.

4        Q    My question to you, sir, was:  Did he

5   confirm to you that he filed with the secretary of

6   state today?  Did he confirm that to you?

7        A    He didn't confirm it that way.  I asked

8   him, did he put himself today or yesterday as a

9   secretary.  He said, no, he did not.  It was much

10  longer than that.

11       Q    Did he confirm there was a filing today

12  for Pinnacle in which Oleg Firer is listed as

13  secretary?

14       A    He said something today he did —— redid

15  something.  I'm not sure because to me when you ask

16  me a question that he did it today, he said, no,

17  it's not.  It was earlier and I did not —— he said

18  today he re —— I'm losing the word, the English

19  word, but he rechecked today, but he was put in as a

20  secretary, I don't know, six months ago or a year

21  ago.  I don't know.

22       Q    What's the Russian word that he used?

23  Since we have a video maybe someone can translate it

24  for us.  What was the word that he used?

25       A    Let me think about this.  I don't —— let

1    me think.  Sometimes when I'm thinking in English I

2    cannot just go back to Russian.  But basically what

3    he said that he did not put himself as a secretary

4    today or yesterday.  It was longer than that and

5    that's basically what was my question to him.  I

6    said, did you do it like that and he said, no, it

7    was longer than that.

8         Q    Did he confirm that something was filed

9    today?

10        A    He said something, yes, or filed or

11   whatever he did.  Yeah.  I'm not sure exactly the

12   word, but he did something today, yes, or yesterday,

13   but as a secretary he is in the company much longer

14   than two days.

15        Q    You know that part of the records that

16   we've sought in this case are the corporate records

17   of Pinnacle.  Since Oleg, your partner in Star

18   Capital, claims to have been the secretary of

19   Pinnacle for some some time, why didn't you get the

20   corporate records of Pinnacle from him?

21        A    I didn't get from –– couple of records

22   from him.

23        Q    I know you didn't and my question is why

24   didn't you get Pinnacle's corporate records from

25   Oleg if in fact he was the secretary of Pinnacle

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    earlier than today?

2        A    Well, I'm telling you that I did not know

3    that he was the secretary in the very beginning

4    because it's something which I did not know, but I

5    could not get a hold of him.  I told you the

6    reasons.  He is not in the country.

7        Q    You said you did not know that Oleg was

8    the secretary.

9                When is it that you learned that Oleg

10   was the secretary of Pinnacle?

11       A    I called him and find out.

12       Q    So you learned that yesterday for the

13   first time that he was the secretary of Pinnacle?

14       A    I've been -- I have nothing to do with

15   Pinnacle and Oleg is the secretary one day or a year

16   makes no difference to me.

17       Q    But I didn't ask you if it made a

18   difference to you, sir.

19                I said, when did you learn that he

20   was the secretary of Pinnacle?

21       A    Today.

22       Q    Today?

23       A    Yeah.

24       Q    Okay.

25       A    Well, put it this way, today you told me

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1   that and by talking to him yesterday I think he told

 2   me that he is the secretary.  So it's like -- but he

 3   was helping me.  Being a secretary of Pinnacle or

 4   was not a secretary of Pinnacle, he really is

 5   helping me in a lot of businesses which I used to

 6   have with him.  He is a working partner.

 7        Q    He is still in business with you today,

 8   Oleg?

 9        A    No, I'm not.

10        Q    And let me just close this circle on this.

11             When you spoke to Oleg yesterday, can

12   you tell the court what did you ask him for

13   specifically to comply with the order, what

14   documents did you ask Oleg for yesterday?

15        A    I ask him for the documents which

16   Mr. O'Sullivan needs and he said --

17        Q    Mr. who needs?

18        A    The magistrate who -- whatever --

19        Q    O'Sullivan?

20        A    Yes, Mr. O'Sullivan.  And he told me that

21   whatever you need and you have questions, he is more

22   than happy to help you with that and he will be --

23   if you will deposition him, he will give you these

24   answers, so basically.

25        Q    Did you give Oleg a copy of the document
```

1    request --

2         A    I showed him.

3         Q    -- Exhibit 2?

4         A    I showed him, yes.

5         Q    How did you show it to him?  You were on

6    the telephone with him.  How did you show it to him?

7         A    No, I didn't tell you I'm on the

8    telephone.  I was meeting with him yesterday.  I saw

9    him yesterday.  We spent a couple of hours.

10        Q    Okay.  Oh, so you spent a couple of hours

11   together.

12                   Who was present at that meeting

13   besides the two of you?

14        A    Who was what?

15        Q    Who else was there besides the two of you?

16        A    A lot of people was there.  His wife was

17   there.  His kids was there.

18        Q    Where was this meeting?

19        A    In the -- called -- a place called Lick

20   (phonetic).  It's a new place.  It's like

21   on-the-water restaurant.  We had brunch there.

22        Q    Okay.  And you brought the request for

23   production with you?

24        A    I had it pictured and I showed it to him.

25   I said, that's what I need.

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1        Q    And there is 25 categories in there.  Did
 2   you go over all 25 categories with him?
 3        A    No.  I ask him to talk to Leah and he did
 4   talk to her and she told him what we need and he
 5   told what he can probably get and stuff like that.
 6        Q    What documents did he say he was going to
 7   be able to get?
 8        A    I don't know.  He was talking to her and I
 9   was not involved.  I have a hearing problem.  I
10   don't know what they are talking about.
11        Q    But you and Oleg are in person and you
12   called Leah on the telephone?
13        A    Because --
14        Q    Is that right?
15        A    I told him to call --
16        Q    Is that correct?  You can tell me then
17   later what you discussed, but was that correct that
18   you were together when you called Ms. Mayersohn?
19        A    Yes.
20        Q    Okay.  All right.  Now tell me what was
21   discussed.
22        A    I don't know.  It was discussed the
23   documents that we need to provide today and that's
24   what he was talking to Leah.
25        Q    Well, you needed to provide them on
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1   December 15th.  Did you know that?

2        A    Yes, I know, but he just came to the

3   country December 14th.

4        Q    Are you saying, Mr. Goldstein, that you

5   did not have an opportunity, between October and

6   yesterday, to speak with Mr. Firer to get documents?

7        A    Yes, that's what I'm telling you.

8        Q    You weren't at his house at any time prior

9   to yesterday where you could have discussed the

10  documents that were ordered to be turned over by the

11  court?

12       A    I was with him and I told him about that

13  and he said I'll do my best, I will do this, do

14  that.  Sometimes he is promising and he is not

15  complying with the promises, but at that time I

16  showed him that.

17       Q    So you were at his house prior to

18  yesterday where you and he discussed the fact that

19  you had been ordered by the magistrate to turn over

20  documents?

21       A    I was at his house.  I'm not sure what I

22  told him at this time -- at that time, but I told

23  him that I need these documents and he said he will

24  do his best to get it.

25       Q    And what documents did you ask him for at

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1    the time that you were at his house?

 2          A    I don't remember.

 3          Q    Did you have the document list with you?

 4          A    No, I did not.

 5          Q    Okay.  Can you tell us here on the record

 6    what documents you asked for, if any, specifically?

 7          A    I said I will have deposition and I need

 8    some documents and he said I will -- I understand.

 9    I will try to help you with that, basically, or --

10    or if you need to talk to him, he is available.

11          Q    Weren't you at his house before Magistrate

12    O'Sullivan ordered your deposition, Mr. Goldstein?

13          A    I don't remember.

14          Q    Well, this order, you see, was issued

15    December 11 of 2014 ordering your deposition, right?

16    Do you see that?

17          A    December 11, yes.

18          Q    Okay.  But it's a fact that you were at

19    Oleg Firer's house prior to December 11, 2014 in

20    which you and he discussed the need to produce

21    documents?

22          A    Like I said to you, I told him that I will

23    have deposition and I may need his help and he said

24    he will help.

25          Q    Why were you and he talking about a
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    deposition at a time before it was ordered by the

2    court?

3         A    Because I think that we had the deposition

4    already scheduled on December 15th prior to that.

5         Q    I don't think that's correct, but --

6         A    Maybe.

7         Q    So bottom line was, you were at his

8    house -- at Oleg Firer's house and you said, they

9    are going to take my deposition, I need documents?

10        A    I didn't say that.  You asked me, did I

11   see Oleg before?  Yes.  Was it his house?  Yes.

12   Maybe just not once, so -- we are friends and we are

13   talking and -- as a matter of fact, he came in

14   yesterday to the country and he saw me and he tried

15   to help me and that's what I'm trying to tell you.

16        Q    I thought you just testified that he

17   returned on December 14th.  Now you are saying he

18   returned yesterday?  Which one is it?

19        A    Oh, wait a second.  I'm saying not 14th.

20   I'm sorry.  He came to the country on Sunday.  I'm

21   confused on the dates.

22        Q    But between October and yesterday

23   Mr. Firer was in Florida as well, isn't that true?

24        A    Yes, he is in and out.  Yes.

25        Q    And you met with him between October and

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1    yesterday; isn't that true?

 2         A    Yes.

 3         Q    So you had opportunities to ask Mr. Firer

 4    for documents before yesterday; isn't that true?

 5         A    I told you that I said that I will have

 6    the deposition and he said, if you need my help, I

 7    will help you.

 8         Q    That was yesterday.  I'm asking you --

 9         A    No --

10         Q    -- in your earlier conversations.

11         A    -- it could be prior to that.  I cannot

12    remember exactly the conversation which we had with

13    Oleg.  We are talking a lot of different things.

14         Q    Was yesterday the first time you and

15    Mr. Firer reviewed the document list together?

16         A    Yesterday I told him that I am trying to

17    get the documents and my attorney is doing the best

18    she can and she cannot get everything which Judge

19    O'Sullivan is trying to get and I said, we need your

20    help and instead of me talking to Leah I give him

21    the phone and he spent some time with her talking to

22    her.

23         Q    Okay.  What's the answer to my question,

24    Mr. Goldstein?

25              I asked you, was yesterday the first
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1   time you and Oleg reviewed the list of documents

 2   that we were requesting?

 3        A    I'm answering you the question this way:

 4   I told him it's a lot of documents we need to

 5   produce and Leah knows exactly what we need to

 6   produce.  Please call her and try to help for

 7   tomorrow's deposition.

 8        Q    Mr. Goldstein, you told me that you had

 9   the document request, a picture of it.  I assume you

10   mean a scan of the document.

11        A    No, it's not a scan, but some of them I

12   probably took a picture and I showed to him and I

13   said, we need more than that and he said, okay, I

14   cannot get it right now, but I probably -- whatever

15   you need, I will try to help.

16        Q    So you actually photographed the request

17   for production with your phone?

18        A    No, I did not.

19        Q    What is it you showed Oleg yesterday,

20   Mr. Goldstein?

21        A    I said to him that we have --

22        Q    No, what did you show him yesterday?

23        A    I -- it's not like I showed to him

24   yesterday.

25        Q    Why did you testify that you showed him a
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    picture?  What did you show him yesterday?

2        A    I showed him different things.  It has

3    nothing to do with probably production of the

4    documents, but I asked him to help me to get these

5    documents and he said, what exactly do you need and

6    stuff like that and he was talking to Leah, like I

7    told you.

8        Q    Okay.  So your answer is you've never

9    shown the list of the documents we are seeking to

10   Oleg; is that correct?

11       A    I did not show him the list what you are

12   asking for, yes.

13       Q    Not yesterday or no time before that; is

14   that correct?

15       A    He told me that whatever you may need, ask

16   him, he will try to help you with that and he told

17   me he will help me with that as well, whatever he

18   could and, yes, whatever we produce it to you,

19   that's what -- the most we can produce.

20       Q    Mr. Goldstein, your answer is

21   unresponsive.

22            Have you ever shown Oleg Firer what

23   we marked as Exhibit 2?

24       A    I don't remember.  No, I don't think so.

25       Q    In the documents that your attorney gave

1    us was that loan agreement that I asked you about

2    earlier.

3         A    Yes.

4         Q    Okay.

5              MR. REYES:  And I want to mark that as a

6         separate exhibit just so we can keep that group

7         of documents together.  Can we do that?

8              I'm going to make this one No. 5 and this

9         other document No. 6.  That will be 5 and that

10        one will be 6.

11             (Thereupon, the above-referred to

12        documents were marked as Impleaded Defendants'

13        Exhibit Nos. 5 and 6 for identification.)

14             MR. SHALEK:  Let me see what you marked.

15             MR. REYES:  It's the Loan and Security

16        Agreement and then there's a -- for the 13

17        million, and then there's this other document

18        for a million-5, so I put them separate.  They

19        were like this before.  They were combined

20        previously.

21             MR. SHALEK:  Okay.

22             MS. MAYERSOHN:  This is one document,

23        right?

24             MR. REYES:  In your production it's one

25        document.  I've made it two.

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
1              MS. MAYERSOHN:  Okay.

2   BY MR. REYES:

3        Q    Mr. Goldstein, do you see what I've marked

4   as Exhibit 5 and 6?  And you can satisfy yourself

5   that this is the same -- those are the same

6   documents that your lawyer gave me that's in Exhibit

7   4.  I've just made them two separate documents.  The

8   one that I've marked No. 5 is right here and the one

9   I've marked No. 6 is right there.

10       A    Okay.

11       Q    Within Exhibit 4.  Okay?

12             One of our requests for documents in

13  this case, specifically Request No. 1, asks for all

14  documents evidencing any liens, security interests,

15  security agreements, mortgages or encumbrances on

16  Pinnacle Florida, Pinnacle Illinois or Goldstein's

17  assets in favor of Yelizarov, North Star, North

18  Star, LLC or Vernal.  That was No. 1.

19             And then No. 6 specifically asked for

20  any documents evidencing any loans to Pinnacle

21  Florida, Pinnacle Illinois or Goldstein.  And you

22  can confirm that for yourself, but those are

23  Requests 1 and 6.

24             And I assume these two loan

25  agreements would be documents responsive to those
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    requests.  Do you agree?

2        A    Yes.

3        Q    Okay.  What I've marked Exhibit 5 is a

4    document called Loan and Security Agreement and it's

5    dated March 1 of 2007.  Do you see that?  Do you see

6    the date on there is March 1 of 2007?

7        A    Yes.

8        Q    Okay.  And it states that it's between

9    Pinnacle Three Corporation, a Florida corporation,

10   and you individually, and that Pinnacle Three

11   Corporation and you are the borrowers under that

12   loan and that the lender is North Star Maritime,

13   Inc., a Panama corporation.  Do you see that?

14       A    Yes.

15       Q    Okay.  My first question to you is:  Where

16   are -- or where is the original of this document?

17            MR. SAYRE:  Objection.  I'm going to ask

18       for a break.  I want to clarify what the judge

19       said at the hearing with Ms. Mayersohn because

20       I feel like you are going outside of the scope

21       of the request for production and really what

22       you are trying to do is make Mr. -- attempt to

23       make Mr. Chaban and Paladin in this case one.

24            You were brought into this litigation to

25       determine whether you had assets of

```
 1        Mr. Goldstein and this has nothing to do with

 2        that.

 3             MR. REYES:  I requested the original of

 4        this document.  It wasn't produced.  I'm asking

 5        where it is.  So --

 6             MR. SAYRE:  And what does that have to do

 7        with being a judgment --

 8             MR. REYES:  It has to do with the fact

 9        that this --

10             MR. SAYRE:  I'm sorry, a debtor of

11        Mr. Goldstein?

12             MR. REYES:  I don't think I need to answer

13        your questions, but --

14             MR. SAYRE:  Well, I'm about to get the

15        judge on the phone.

16             MR. REYES:  -- the court has already found

17        that Mr. Goldstein waived all judgments.  He

18        was to provide full responses to our request

19        for production and I'm entitled to inquire

20        where the documents are that were not turned

21        over to me.  And so I'm asking, where is the

22        original of this document which I asked for in

23        this request for production.

24             MR. SAYRE:  Okay.

25
```

```
 1   BY MR. REYES:
 2        Q    Mr. Goldstein, would you tell us, please,
 3   where is the original of this document?
 4        A    I don't know.
 5        Q    When was the last time that you saw the
 6   original of this document?
 7        A    I gave everything I have and I have
 8   nothing in my possession, and you are trying to
 9   confuse me, I guess, and I'm just telling you I have
10   nothing in my possession.  At the time I signed
11   everything to North Star, gave all the papers to
12   Mike Keifitz and I'm done with that.  So what
13   exactly do you want from me right now?
14        Q    I want to know, when was the last time you
15   saw the original?
16        A    I don't remember.
17        Q    Did you ever see the original?
18        A    Maybe.
19        Q    Maybe?  You don't know?
20        A    I don't remember what I saw today.  It's
21   been a long time.  I signed everything away.  I got
22   nothing.  What do you want from me?  Who has the
23   documents?  Maybe Mikhael Keifitz.  Maybe somebody
24   else.  I have no clue.  Maybe Mr. Sayre.  But they
25   are not my attorneys and my attorney is Leah and she
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1    is doing everything possible to locate you

 2    everything you want.

 3         Q    Did you keep a separate file regarding

 4    this loan with --

 5         A    Okay.  Did I keep what?  Let me turn it

 6    off.  I have new -- I'm sorry, I have iPhone 6.  I

 7    just changed it to this phone today.  Okay.

 8              Did I have separate file?  No, I did

 9    not.

10         Q    Who was that on the phone?

11         A    My son.

12         Q    My question was:  Did you keep a separate

13    file with respect to this loan with North Star,

14    Maritime, Inc.?

15         A    No.

16         Q    You never kept the file?

17         A    No.

18         Q    Up until the time you turned over records

19    to Mr. Keifitz, what documents did you maintain

20    regarding this loan?

21         A    I have stack of documents and when

22    Mr. Keifitz ask me to sign everything away, I came

23    to his office, put everything there, said, what do

24    you want me to sign and he told me everywhere to

25    sign and I did and I walked away and that is it.
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1      Q    What documents did you keep regarding this

2    loan before you turned them over to Mr. Keifitz?

3      A    I did not keep anything.

4      Q    What documents did you have that you

5    turned over to Mr. Keifitz about this loan?

6      A    I don't remember which documents.  It was

7    a bunch of documents.  It was, like I said, in

8    separate file which he said, bring everything you

9    have regardless, Pinnacle, everything you have.  I

10   bring it over.  Mr. Yelizarov was there.  I signed

11   everything, the confession of judgment and said

12   goodbye to them and that is it.

13     Q    And I'm trying to understand what records

14   did you keep as a practice at Pinnacle before you

15   turned it over?

16     A    I don't remember.

17     Q    Okay.  Who kept the files?

18     A    I had them before and then I give it to

19   them.

20     Q    Okay.  Did someone help you keep the

21   files, create the files?

22     A    Whatever I had, the documents, I put them

23   in some files, then I brought everything which I had

24   and I gave it to Mr. Keifitz.

25     Q    Where were they before you put them in

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1   those files for Mr. Keifitz?

2       A    In my house.

3       Q    And how did you keep them in your house,

4   what was your recordkeeping process?

5       A    It was like a thing which you put in

6   papers and that's what I put.

7       Q    You kept them in separate files?

8       A    No, I don't think so.  It was papers

9   which, let's say, Pinnacle papers, these papers, I

10  give everything away.

11      Q    What lawyer was involved in creating this

12  loan back in 2007 that may have documents?

13      A    I don't remember what was seven years ago.

14      Q    You don't recall what lawyer was involved?

15           I'm sorry, I didn't hear you.

16           THE COURT REPORTER:  He hasn't answered.

17  BY MR. REYES:

18      Q    I said, you don't recall what lawyer was

19  involved?

20      A    No.

21      Q    Who was representing you in 2007?  Who was

22  your lawyer in 2007?

23      A    I didn't have one.

24      Q    This is a loan transaction for

25  $13 million.

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1        A     Right.

 2        Q     Did you know that?

 3        A     Yes.

 4        Q     You are saying you did this transaction

 5   without a lawyer?

 6        A     This transaction was done -- that's the

 7   money which we borrowed -- which we borrowed from

 8   North Star and we are doing a lot of business

 9   without attorneys.

10        Q     Did you do this Loan and Security

11   Agreement of March 1, 2007 without an attorney?

12              MR. SAYRE:  Objection, asked and answered.

13              THE WITNESS:  I told you I don't remember.

14   BY MR. REYES:

15        Q     And you don't recall who your lawyer was

16   back then either?

17        A     I don't.  I could be wrong.  It could be

18   Mr. Lichtman.  I'm not sure.  I'm wrong.  It's 2007.

19   I don't know when.  It could be Mr. Lichtman, but

20   I'm not a hundred percent sure.

21        Q     If you could turn to the second page of

22   this document, please.  In the middle there's a

23   paragraph that begins with the word "whereas."

24        A     Yes.

25        Q     It says:  Whereas, borrower desires to
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1    borrow from the lender hereunder the amount of

 2    $13 million (as the same may from time to time be

 3    amended, modified, supplemented or revised -- and

 4    that's defined as the loan -- ), which would be

 5    evidenced by secured promissory notes executed by

 6    the borrower.

 7              Do you see those words?

 8        A    Yes.

 9        Q    Okay.  We have not received any promissory

10    notes.  Are there promissory notes associated with

11    this Loan and Security Agreement?

12        A    I don't know.

13        Q    Do you recall ever signing a promissory

14    note?

15        A    I don't remember.  It was in 2007?  You

16    are talking about what was almost eight years ago?

17    I'm not recalling that.

18        Q    So as you sit here today, Mr. Goldstein,

19    you don't know if there was ever a promissory note

20    associated with this loan?

21        A    That's what I'm saying.

22        Q    This document shows the borrowers as being

23    you personally and Pinnacle Florida, do you see

24    that?

25        A    Okay.
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1        Q     Is that correct, those were the borrowers

 2   under the loan?

 3        A     If that's what it says, yes.

 4        Q     And if we go to the next whereas clause,

 5   it says:  Included in the loan amount listed above,

 6   there are shall be mortgage for $1,500,000, which

 7   would be evidenced by mortgage instrument executed

 8   by borrower as a separate document.  Do you see

 9   those words?

10        A     Yes.

11        Q     Okay.  And is that separate mortgage

12   instrument the document that I marked as Exhibit 6?

13        A     Maybe.

14        Q     Would you look at Exhibit 6 and tell me,

15   right here, this document here.

16        A     Where is Exhibit 6?

17        Q     In the bottom left-hand corner.

18        A     Oh, okay.

19        Q     The bottom left-hand corner.

20              Is Exhibit 6 the separate mortgage

21   that's being referred to in the paragraph that I

22   just read?

23        A     It could be.

24        Q     It could be?

25        A     I don't know.
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
1        Q    You don't know?

2        A    No.

3        Q    Okay.  Do you recognize Exhibit 6?

4        A    I cannot recognize what was two months ago

5   and I'm not recognizing what was done seven years

6   ago or eight years ago.

7        Q    Well, Exhibit 6 appears to be a mortgage

8   that you signed against Pinnacle Condo Unit TS-2?

9        A    Yes.

10       Q    Do you know what unit that is?

11       A    Yes.

12       Q    Who lives in Pinnacle Condo Unit TS-2?

13       A    Who is what?

14       Q    Who lives in that unit?

15       A    Who lives?  Nobody.

16       Q    Is it a unit that Pinnacle still owns?

17       A    I'm assuming so.

18       Q    Or is this a unit that you own personally?

19            MR. SAYRE:  Objection.  Outside the scope

20       of what --

21            THE WITNESS:  I don't know how it's done.

22            MR. SAYRE:  -- the order permitted for the

23       deposition.

24            THE WITNESS:  There is a -- I'm sorry.

25       There is probably a $1.5 million judgment on
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1         that or something like that so I would imagine.

2    BY MR. REYES:

3         Q    I'm not sure I understand your answer,

4    Mr. Goldstein.  I'm simply asking you --

5         A    I don't know who own it.  I used to own

6    it, but since I gave everything away, so I don't own

7    it anymore.

8         Q    This mortgage that I've marked as Exhibit

9    6 is between North Star Maritime, Inc. and you

10   personally.  Do you see that?

11        A    Right.

12        Q    It's securing a debt of $1.5 million.  Do

13   you see that?

14        A    Right.

15        Q    And the collateral is Pinnacle Condo Unit

16   TS-2.  Do you see that?

17        A    Right.  Sure.

18        Q    And you are saying that was owned by you

19   personally?

20        A    Used to be.

21             MS. MAYERSOHN:  I object as this is beyond

22        the scope of asking him about the production.

23             THE VIDEOGRAPHER:  We have five minutes

24        left on the video.

25             MR. SAYRE:  I'll second that objection.

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
1    BY MR. REYES:

2         Q    Mr. Goldstein, was it a unit you owned

3    personally?

4         A    Yes, I did.

5         Q    This mortgage also references a note.

6              Was there a note with respect to this

7    mortgage, a promissory note?

8         A    Well, like I said, maybe.

9         Q    You don't know?

10        A    I don't remember what was eight years ago.

11        Q    You don't know if you signed a note for

12   $1.5 million?

13        A    I did sign it.

14        Q    Where is it then?  It wasn't produced to

15   us.  Where is it?

16        A    I told you one more time, I left

17   everything which I have, every document, and gave it

18   to Mikhael Keifitz because whatever I owned is less

19   than what I owed to North Star Maritime.  So I gave

20   everything away and I want my life back.

21        Q    So you are saying there were original

22   promissory notes and those were given to

23   Mr. Keifitz, is that your testimony?

24             MR. SAYRE:  Objection.

25             THE WITNESS:  I didn't say that.  I said I
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1        do not know.  I gave everything I have.  It

 2        could be promissory note.  Maybe not, but if

 3        you want to find out you have to talk to

 4        different people, but you want torture me and I

 5        do not know.

 6   BY MR. REYES:

 7        Q    Mr. Goldstein, I don't want to torture

 8   you.  I'd like the documents that have been withheld

 9   and I've had to go to court four or five times to

10   make you comply and you still haven't complied.

11             MR. SAYRE:  Objection.

12             THE WITNESS:  So am I.  Believe me, I'm

13        doing everything possible to find them and my

14        attorney is spending -- I don't know.  She is

15        calling sometimes at midnight because she

16        cannot find this and that and I just gave it to

17        Mr. Keifitz, and you have to really ask

18        Mr. Firer and he probably will produce it to

19        you.

20   BY MR. REYES:

21        Q    I'm trying to understand what you

22   recollect there being associated with these

23   mortgages so that I can ask Mr. Keifitz if he has

24   them.  Okay?  And so I'm trying to understand, you

25   are claiming that Pinnacle Florida and you borrowed
```

```
1    or entered into a loan transaction for $13 million

2    on March 1st of 2007, correct?

3         A    Correct.

4         Q    And I'm trying to find out first if there

5    is a promissory note.  You are not sure; is that

6    right?

7         A    That's right.

8         Q    I'm trying to ask you if the originals

9    exist today.  You are not sure either; is that

10   correct?

11        A    That is correct.

12        Q    Let me ask you this -- would -- strike

13   that.

14             This loan that is referenced in

15   Exhibit 5, okay, the 13 million, because the

16   13 million appears to also include the million-5, at

17   least if we read that correctly.

18        A    It could be.

19        Q    Is this loan referenced anywhere in your

20   tax returns?

21        A    I don't think so.

22        Q    Why is this loan not referenced anywhere

23   in your tax returns?

24        A    I don't know why.  We are doing business

25   with Russian people a little differently and the
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    same thing we are doing with Chaban and when Chaban

2    was borrowing money from me, we had like a small

3    piece of paper who owed whom and that's how we are

4    doing business and with Yelizarov, he lent me the

5    money and I should pay him back with the interest

6    and that's what it is.  So it's not reflected on my

7    income tax return, but that is the reason.

8        Q    So is it correct that between 2007 and the

9    present time, the borrowing of the money is not

10   referenced on your tax returns nor is the repayment

11   of any of the money referenced on your tax returns?

12       A    I have to look at that because I think I

13   told Mr. Haft, but I'm not sure that this

14   transaction exists, but one more time, we were

15   obligated to pay whatever we borrowed from North

16   Star Maritime and if you would pay it back, that

17   would be it.  I don't see why should it be reflected

18   on the tax returns.

19            THE VIDEOGRAPHER:  Okay.  Time out.

20            MR. REYES:  Time?  We have to change the

21       tape.

22            THE VIDEOGRAPHER:  We are off the record

23       at 12:36.

24            (Thereupon, a discussion was had off the

25       record, after which the following proceedings

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1        were had:)

 2               THE VIDEOGRAPHER:  Okay.  We are back on

 3        the record at 12:54.

 4               MR. REYES:  May we proceed?

 5               THE VIDEOGRAPHER:  Yes.

 6    BY MR. REYES:

 7        Q    Mr. Goldstein, before we took the break to

 8    change the tape you were telling us that the loan

 9    with North Star Maritime, Inc. that's in Exhibit 5

10    was not referenced on the tax returns of Pinnacle

11    Florida or your personal tax returns.

12               Do you remember that testimony?

13        A    From what I understood probably it should

14    be reflected on the balance sheets, but not on the

15    income tax return, but we need to talk to Glen Haft

16    to find out how he did that.

17        Q    Okay.  So you advised Mr. Haft of the

18    existence of this loan that's in Exhibit 5?

19        A    I think so.  It was seven years ago.

20        Q    Okay.  Is the loan that's referenced in

21    Exhibit 5 referenced in any of the records of

22    Pinnacle Three Corporation?

23               MR. SAYRE:  Objection.

24               THE WITNESS:  I don't know.

25
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1    BY MR. REYES:

 2         Q    If we were to look at the minutes of

 3    Pinnacle Three Corporation, the board resolutions,

 4    any of the corporate records of Pinnacle Three

 5    Corporation, is this loan with North Star Maritime,

 6    Inc. referenced anywhere?

 7              MS. MAYERSOHN:  I'm going to object as to

 8         scope.

 9              THE WITNESS:  I don't remember that.

10    BY MR. REYES:

11         Q    I didn't hear your answer.  I'm sorry.

12         A    I said I do not remember.

13         Q    We've talked about Pinnacle Florida and

14    Pinnacle Illinois during this deposition.  Those are

15    two separate companies, correct?

16         A    Was two separate companies because it used

17    to do business in Illinois.  When I changed it to

18    Florida, all the assets and everything became

19    Pinnacle Florida.

20         Q    Okay.  The -- if we were going to look at

21    the records of Pinnacle to see if the North Star

22    loan was reflected anywhere, we would look at the

23    records of Pinnacle Three Corporation, a Florida

24    corporation based upon the borrower here?

25         A    It could be -- it could be Florida or
```

1   Illinois.  I'm not sure at that time when I

2   transferred the asset to Florida, but this is --

3   this is -- you can say it is the same company, just

4   doing business in Illinois or in Miami.

5        Q    We established, though, Exhibit 5 says

6   Pinnacle Three Corporation, a Florida corporation,

7   correct?

8        A    That's what it says.

9        Q    Yeah.  And Exhibit 6 -- well, that's just

10  you personally.  Excuse me.  But this one here has

11  the borrower as the Florida corp, not the Illinois

12  corp?

13       A    As I said, it is the same company.  It has

14  the same account number.  It has the bank.  Just

15  stopped doing business in Illinois and transferred

16  everything to Florida.

17       Q    But there were two companies formed,

18  correct?

19       A    It was one company formed there and then

20  Mr. Haft told me what is the reason to have Illinois

21  company and paying taxes in Illinois that you are

22  not doing business.  Why don't we change it to

23  Miami, Florida and it would be the same company,

24  bring all the assets over here and continue doing

25  business.

1       Q    Well, you filed to create an Illinois

2  corporation in the state of Illinois called Pinnacle

3  Three Corporation, correct?

4       A    Yes.

5       Q    And then you filed separately in Florida

6  to create a company called Pinnacle Three

7  Corporation; is that correct?

8       A    I would imagine so.  Mr. Haft did it for

9  me and how he did it, I'm not sure, but it's the

10  same company, it was the same president, which was

11  me, and the same assets became -- from Illinois went

12  to Miami, Pinnacle Miami.

13       Q    Let me show you this document here.  I'll

14  make this Exhibit 7.

15            (Thereupon, the above-referred to document

16       was marked as Impleaded Defendants' Exhibit No.

17       7 for identification.)

18  BY MR. REYES:

19       Q    Do you recognize these documents that I'm

20  showing you as Defense Exhibit 7?

21       A    I can see them, yes.

22       Q    These are records of Pinnacle Three

23  Corporation, an Illinois corporation, correct?

24       A    Right.

25       Q    And according to these documents it says

 1   Pinnacle Three Corporation, an Illinois corporation,

 2   was qualified to do business in Florida on

 3   December 2nd, 2003.  Do you see that?  Your lawyer

 4   is showing you some documents here.

 5         A    Yes.

 6         Q    Okay.  Let me show you this document.

 7   I'll make this Exhibit 8.

 8              (Thereupon, the above-referred to document

 9         was marked as Impleaded Defendants' Exhibit No.

10         8 for identification.)

11   BY MR. REYES:

12         Q    Take a moment and look at what I've marked

13   Exhibit 8.  Do you recognize the documents that I've

14   marked Exhibit 8?

15         A    I don't, but I can see them.

16         Q    You can see that these are the corporate

17   filings when Pinnacle Three Corporation, the Florida

18   corporation, was incorporated in Florida, correct?

19         A    Yes.

20         Q    And from these records, can we agree that

21   Pinnacle Three Corporation, a Florida corporation,

22   was created January 31 of 2008?

23         A    Okay.

24         Q    Do you agree?

25         A    Yes.

1       Q    So having looked at Exhibit 7 and 8, can

2  we agree that there were two separate corporations,

3  one in Illinois and one in Florida, with the same

4  name?

5       A    It is the same corporation.

6       Q    But there were two entities formed,

7  correct?

8       A    I think this is the only way, from my

9  understood, was how to transfer it to Florida.

10  That's what my CPA told me to, I think, open another

11  corporation and just keep everything the same,

12  account number and everything the same, so.

13       Q    And so you opened the new corporation on

14  January 31 of 2008 according to this document,

15  correct?

16       A    Probably, yes.  Yes.

17       Q    All right.  I was asking you about the two

18  different corporations because I'm trying to

19  understand if this North Star loan appears anywhere

20  in the corporate records of Pinnacle Three

21  Corporation.

22            Do you know any documents of Pinnacle

23  Three Corporation that would reference that there

24  was a loan to Pinnacle from North Star Maritime,

25  Inc.?

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1              MS. MAYERSOHN:  Same objection.  Beyond

 2        the scope.

 3              THE WITNESS:  I cannot recall.

 4    BY MR. REYES:

 5        Q    You understand that we've requested in our

 6    document production, documents of Pinnacle Three

 7    Corporation that would show that there was a loan

 8    and we haven't received anything like that.

 9                  So I'm asking you, are there any

10    records of Pinnacle Three Corporation that would

11    show there was a loan between North Star Maritime,

12    Inc. and Pinnacle Three Corporation?

13        A    I don't know.  Maybe they are in

14    existence.  We have to really find out from Mikhael

15    Keifitz.

16        Q    But sitting here today, do you know of a

17    document that I can ask Mr. Keifitz for

18    specifically?

19        A    You know what do you want to get, so you

20    can ask him and he will tell you if he got it or

21    not.  I do not recall what was eight years ago.

22        Q    Okay.  But as the person who was the

23    hundred percent owner of Pinnacle Three Corporation,

24    I'm trying to understand if you know if there were

25    any corporate records that referenced this loan,
```

1  whether it was your minutes, whether it was

2  resolutions, any documents that reference the

3  existence of this North Star Maritime, Inc. loan?

4      A    I don't remember.

5      Q    You said you didn't recall who was the

6  lawyer for Pinnacle Three and yourself.

7            Who was the lawyer for North Star

8  when the transaction was done back in March of 2007?

9          MR. SAYRE:  Objection.

10         THE WITNESS:  I have nothing to do with

11      North Star.  I don't know who was the attorney.

12  BY MR. REYES:

13     Q    Where did the closing take place for this

14  loan?

15     A    I don't remember that either.

16     Q    Was there a closing?

17     A    Probably.  I don't remember what happened

18  eight years ago.

19     Q    What was the collateral for this loan,

20  Exhibit 5?

21     A    For which loan?

22     Q    Exhibit 5, this one here.

23         MR. SAYRE:  What's Exhibit 5?

24         THE WITNESS:  You understand that

25      collateral --

                    PRESTIGE REPORTING SERVICE, INC.
                            (954) 764-7297

```
 1              MS. MAYERSOHN:  The Loan and Security

 2         Agreement.

 3              MR. SAYRE:  The 2007?

 4              MS. MAYERSOHN:  Not the -- not Exhibit 6.

 5              THE WITNESS:  Collateral was everything

 6         Pinnacle Three owed and I owed, was the

 7         collateral for the loan.

 8    BY MR. REYES:

 9         Q    Were your shares in Pinnacle Three

10    Corporation, the Florida corporation, part of the

11    collateral?

12         A    Yes.

13              MR. SAYRE:  Objection, asked and answered.

14    BY MR. REYES:

15         Q    Yes, they were?

16         A    I thought -- I think so, yes.

17         Q    Okay.  And were those shares issued to

18    Pinnacle Three Corporation, the Florida corporation

19    issued its shares?

20         A    I imagine so.

21         Q    And you had them in your possession and

22    put them up as collateral for this loan?

23         A    I cannot remember that.

24         Q    Well, do you recall ever having shares for

25    Pinnacle Three Corporation, the Florida corporation?
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1          A     I cannot recall if there are shares being

2     issued.  Probably I had them.

3          Q     Was there a stock pledge agreement

4     associated with this Loan and Security Agreement?

5          A     I would imagine so.

6          Q     And where is that document that hasn't

7     been produced to us?

8          A     I don't -- I have -- everything I had I

9     give it to Mikhael Keifitz.  I don't know where is

10    anything.

11         Q     Were there any witnesses present at the

12    time that you signed this loan for Pinnacle Three

13    Corporation and yourself personally?

14         A     Eight years ago?  That's the question?

15         Q     Were there -- no, the question is, were

16    there any witnesses present?

17         A     I cannot recall that.

18         Q     Well, if you can look on the last page of

19    this document, there appears to be somebody who has

20    signed as a witness.  Can you tell us who that

21    witness is?

22         A     I don't know.  I cannot recognize the

23    signature.

24         Q     You don't recognize that one?

25         A     No.

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1        Q    Do you recognize who signed for North Star

 2   Maritime, Inc.?

 3        A    No, I cannot.

 4        Q    Did you sign for --

 5        A    Yes, I did.

 6        Q    -- for Pinnacle and yourself?

 7        A    Yes.

 8        Q    If we look at Exhibit 6, the other

 9   document that I gave you --

10             MS. MAYERSOHN:  This document?

11   BY MR. REYES:

12        Q    -- there is a witness for your signature.

13   That document there.  Yes, that's it right there.

14                  There is a witness for you and a

15   witness for North Star.  Do you know who those

16   witnesses are?

17        A    I can see that is the same signature for

18   the witness, so it's probably the same person, but,

19   one more time, I cannot recall who was that.  It's

20   eight years ago.  I have no idea.  We've got two

21   witnesses here and two witnesses there.  I don't

22   know, but this is my signature.

23        Q    You told us earlier that you have a bad

24   memory, Mr. Goldstein; is that correct?

25        A    Well, I have bad memory.  That's what I
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    told you, but eight years ago, even if I have good

2    memory, I'm not sure if I would remember who was the

3    witness –– who witnessed the signature, who was in

4    the office eight years.

5         Q    And what are your memory problems that you

6    have?

7         A    I have memory problems.  I'm 65 years old.

8    I have memory problems.

9         Q    Okay.  And given that you have memory

10   problems, did you have any kind of practice of

11   trying to document events or put to writing things

12   so that you would be able to refer to them since you

13   have a bad memory?

14        A    No, but, like I said, Oleg was my partner

15   in the business and he have very, very good memory

16   and that's why I'm telling you that he knows and he

17   remembers all the things.

18        Q    Is Oleg either of the witnesses?

19        A    I don't think so.

20        Q    Would you recognize his signature?

21        A    I think this is not his signature.

22        Q    So you don't remember where you were or

23   whether there was a closing or anything that we

24   could go to that place to see if any of these

25   documents exist?

1        A     Everything which was done documentally

2    (sic) is Oleg was doing and he, like I said, is very

3    good at that and if you need all these answers, I

4    would suggest you to put Oleg in deposition and he

5    will give you all the answers you are asking for.

6        Q     I want to know what you know,

7    Mr. Goldstein.  You are the one that's been ordered

8    to be here today with the records and they are not

9    here, the records.

10       A     No, I understand, but I did my best to

11   find whatever you need.

12       Q     Well, that's to be decided by the judge.

13   I know you spoke to Oleg yesterday and that's what

14   you say is your best and we'll see if the judge

15   agrees with that.  But I want to know what records

16   would have existed if in fact you borrowed

17   $13 million.  You understand that one would think if

18   you borrowed $13 million that there would be some

19   record of it.  Does that sound reasonable to you?

20            MR. SAYRE:  Objection.

21            THE WITNESS:  I agree, but if you –– if

22       that is so important and Oleg came to the

23       country only yesterday, if you would give us

24       additional time, he probably will produce you

25       whatever you need.  Just the lack of time, we

1          could not get it.

2      BY MR. REYES:

3          Q    You know the judge had a hearing on an

4      order to show cause on October 28 as to why you

5      shouldn't be arrested for not making discovery?

6      That was over six weeks ago.

7          A    I remember that.

8          Q    And you know the judge ordered that you

9      produce documents at that time?

10         A    But if I don't have in my possession, I

11     don't know where to get it.  My attorney was

12     working, I don't know, probably 24 hours to get

13     whatever she can find you.  How can I get you the

14     documents if I don't have them in my possession?

15         Q    Well, I'm not here to answer your

16     questions, Mr. Goldstein, but certainly you could

17     have had Mr. Yelizarov, Mr. Keifitz, Mr. Yelizarov's

18     lawyers, Pinnacle, the banks, all could have given

19     you records to comply with the court's order, none

20     of which you did, but let's move on.

21              Is it your testimony, sir, here under

22     oath that money was actually lent under this loan

23     agreement?

24         A    Yes.

25         Q    And where are the records that would show

1  money was actually lent under this loan agreement?

2       A    Why don't I make the statement one more

3  time.  Of course you want to ask questions.  I'm

4  telling you one more time.  I give everything I had

5  and I don't have anything at all and if you want me

6  to produce you all these things, then I need some

7  help and Oleg is the key person to produce them and

8  if you'll give us a little more time, you will get

9  probably everything you are asking for, but right

10 now I just don't have it and you will ask me that

11 question or that question, I just don't have it.

12      Q    Well, Mr. Goldstein, how was the money

13 lent?  Was there a check, was there a wire transfer?

14 How was the money lent under this loan that you say

15 happened on March 1 of 2007?

16      A    It was wire transfers.

17      Q    Okay.  Wire transfer from where to where?

18      A    From where I don't know.  But to Star

19 Capital mostly.

20      Q    All right.  So the monies that were lent

21 under this loan that we've marked as Exhibit 5 was

22 lent to Star Capital?

23      A    That is correct.

24           MR. SAYRE:  Objection.

25

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
1    BY MR. REYES:

2         Q    And wouldn't you have access to those bank

3    records that you could show us that in fact money

4    was wired?

5         A    I probably would.

6         Q    So why didn't you produce those to us?  We

7    asked for all documents showing that money was

8    actually lent under this loan?  Why didn't you get

9    us evidence of those wire transfers?

10        A    I'm pretty sure they may have Mikhael

11   Keifitz.  And one more time, I give everything I

12   had.

13        Q    So you are saying now you gave Mikhael

14   Keifitz the bank records of Star Capital that would

15   show the wire transfers, you gave them that too?

16             MR. SAYRE:  Objection.

17             THE WITNESS:  I didn't say that.  I said I

18        don't have them.

19   BY MR. REYES:

20        Q    I thought you told me earlier you still

21   own 50 percent of Star Capital?

22        A    You can say that, but the company is no

23   longer in business.

24        Q    But you still own 50 percent of the

25   company, correct?
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1      A    I don't think so.  If the company is no

2  longer in business, so what I own?  Nothing.

3      Q    The owners that are listed in the company

4  are you and Oleg, 50/50, right?

5      A    I don't know that.

6      Q    Isn't that what you told us earlier?

7      A    No.  I said I used to be partner in Star

8  Capital with Oleg Firer, but right now I never said

9  that I'm a partner in that.

10     Q    Did you ever give your interest to

11  someone?

12     A    No.  The company was bankrupt.  It was

13  closed.  I'm not sure bankrupt or not, but we closed

14  the business because we lost all the money.

15     Q    Well, where are the bank records of Star

16  Capital that would show North Star Maritime, Inc.

17  transferred money by wire transfer under this loan

18  that we've marked as Exhibit 5?

19     A    You start asking me the same questions.

20  However, I was not the president of Star Capital.

21  Oleg Firer was.  And this is really questions to

22  him.

23     Q    Mr. Goldstein, did you look for any of

24  those wire transfer records to comply with the

25  judge's order?

---

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1          A     The wire transfers came to Star Capital

2    Fund.   The wire transfers came to account which Oleg

3    had and if there would be some, he may have them.

4          Q     I'm going to ask you again:  Did you, Leon

5    Goldstein, attempt to find the bank records showing

6    those wire transfers to comply with the judge's

7    order?

8          A     I have nothing to do with account of Star

9    Capital where the money came in.

10         Q     Does that mean, no, you did not look for

11   them?

12         A     I cannot if I'm nobody there and the

13   account is closed, how do you want me to look?  The

14   company does not exist.  The account is closed.

15         Q     Did you contact the bank where that

16   account was held and requested the bank statements

17   that would show wire transfers of monies lent under

18   the loan that we've marked as Exhibit 5?

19         A     Do you think the bank will give me

20   anything if I'm nobody in this account.  I'm not --

21   there is not my name in the account where the money

22   --

23         Q     Mr. Goldstein, why can't you answer my

24   question?  Why do you have to ask me a question?

25               Can you just answer:  Did you contact

1   the bank and request those bank statements?

2      A    I'm sorry to say that the question is kind

3   of a funny question.  I cannot -- I cannot look for

4   that because I'm nobody in that account.  Even if

5   I'll come in and say, would you give me that account

6   records.  They will say, who you are?

7      Q    When you testified in this case -- about a

8   year ago you testified that you had a 50 percent

9   interest in Star Capital Fund.  Was that true at the

10  time you testified, November of 2013?

11     A    Yes, I'm still testifying that I used to

12  have 50 percent of the company when the company was

13  existing.  Maybe I still have it, but the company is

14  no longer in business, so --

15     Q    So as a 50 percent owner, irrespective of

16  whether it's open or closed, as a 50 percent owner

17  you did not go to the bank and ask for those bank

18  statements to show that money was actually lent

19  under this loan agreement?

20     A    Being a 50 percent owner doesn't mean that

21  I'm on the account -- that I can have the account.

22  It's on Oleg.  Oleg was the working partner and if

23  we need the money -- because it was not like

24  $13 million came on the account a lump sum.  It came

25  on different wires and when he needs the money, he

1   was asking for the money and the money came in and

2   he took them because he need it for the business.

3        Q    Mr. Goldstein, did you contact the bank or

4   not?

5        A    I'm nobody to that bank.  No, I did not.

6        Q    Okay.  And what bank did Star Capital bank

7   with where the wire transfers were sent?

8        A    I think it's Citibank.

9        Q    Was the money lent under this loan with

10  North Star Maritime, Inc. in any other way other

11  than wire transfers to Star Capital?

12       A    I don't think so.  I cannot say for sure,

13  but mostly probably was done by wire transfer.

14       Q    Can you think of any other way in which

15  money was lent under this Loan and Security

16  Agreement other than wire transfers to Star Capital?

17            MR. SAYRE:  Objection, asked and answered.

18            THE WITNESS:  I will repeat, I don't know.

19       It's a possibility, but because it was eight

20       years ago I need –– but every amount which

21       was –– Star Capital received was logged in and

22       Oleg have all this information.

23  BY MR. REYES:

24       Q    And what was the purpose of this loan to

25  Star Capital?

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1              MR. SAYRE:  Objection.

 2              THE WITNESS:  At that time Star Capital

 3        was doing cash advance and we need the money to

 4        lend to the businesses.

 5  BY MR. REYES:

 6        Q    When you say "at that time," 2007 when

 7  this loan was entered into?

 8        A    At that time means 2007, 2008, 2000 --

 9  maybe '6.  I don't remember.  At that time.

10        Q    Was any portion of the loan repaid?

11        A    No, I don't think so.  I'll take it back.

12  Chaban's loan was repaid.

13        Q    I'm not asking you about Chaban's loan.  I

14  want you to focus just on Exhibit 5, the loan with

15  North Star Maritime, Inc.

16              The amounts that were lent under this

17  loan, which you said were lent to Star Capital, was

18  any of it repaid?

19        A    No.

20        Q    The loan documents reference that they

21  weren't recorded until February of 2013, some six

22  years later.

23              MR. SAYRE:  Objection.

24  BY MR. REYES:

25        Q    Why were these mortgages not recorded
```

1    until February of 2013?

2            MS. MAYERSOHN:  Objection, beyond the

3        scope.

4    BY MR. REYES:

5        Q    And I'm referencing this information right

6    up here.

7        A    What is the question one more time?

8        Q    Why were these mortgages not recorded

9    until six years after the loan was supposedly made?

10       A    I don't know.

11       Q    You said no amount was repaid on the

12   loans.  Was -- did North Star Maritime, Inc. declare

13   a default on the loan?

14       A    You have to ask this question to North

15   Star.

16       Q    You don't know?

17       A    I don't.

18       Q    One of the items that I requested in my

19   request for documents is No. 10:  Any documents

20   evidencing any payment defaults under any loan

21   agreement.  But you don't know whether North Star

22   Maritime, Inc. ever declared a default?

23       A    I don't.

24       Q    Where would such records have been kept if

25   you had received a default notice?

```
 1        A    Certainly not with me.  Probably with

 2   Mikhael Keifitz.  I'm guessing.  Maybe it was

 3   Michael Sayre.  I don't know.

 4        Q    Now you said the money was lent to North

 5   Star.  I'm sorry, the money was lent by North Star

 6   to Star Capital.  Do you recall Star Capital getting

 7   a default notice?

 8             MR. SAYRE:  Objection.

 9             MS. MAYERSOHN:  Object.  Beyond the scope

10        of the depo.

11             MR. REYES:  It's one of the requests I

12        made in the request.

13             THE WITNESS:  I don't know what Oleg did,

14        but I understood we lost the money.  It was

15        very, very sad and what he did with the company

16        I have no idea.

17   BY MR. REYES:

18        Q    How much was lent that you didn't repay?

19        A    Whatever the amounts you have, that's what

20   was -- that was the loan which we made.

21        Q    I want to make sure I understand what you

22   are saying.  If you go to Exhibit 5 again, please.

23   This document on the second page.  The second page.

24   It was a reference here to $13 million.  Do you see

25   that?
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1          A      Yes.

2          Q      Is it your testimony that $13 million was

3   lent?

4          A      I need to see the wire transfers and

5   that's a possibility.

6          Q      Well, how much do you believe was lent?

7          A      I was talking to Oleg at that time and he

8   told me about $10 million, plus or minus.  What plus

9   or minus means, I don't know, but since I give

10  everything away because my assets is less than that,

11  so I really don't care.

12         Q      And none of that $10 million plus or minus

13  was repaid you just said, correct?

14         A      Other than Chaban's loan.

15         Q      I'm not including Chaban in here.

16         A      No.

17         Q      As to North Star lending money, none of

18  the amounts that were lent by North Star was repaid

19  is what you are saying?

20         A      Yes, was nothing paid.

21         Q      And it was $10 million plus or minus,

22  correct?

23         A      That's what I was told by Oleg.  At that

24  time when we lost the money our relation was not --

25  our relationship was not as good because I feel that

```
 1    it's a lot of money we owed and I feel responsible

 2    for that and that's why really we had in a way of

 3    almost broke relationship and that's why -- and you

 4    probably understand that because Yelizarov gave the

 5    money to Star Capital because I was there.  So I

 6    have been told about $10 million.

 7         Q    And Star Capital used the $10 million?

 8              MR. SAYRE:  Objection.

 9    BY MR. REYES:

10         Q    Is that correct?

11         A    Yes.

12         Q    And how did Star Capital lose the $10

13    million?

14              MR. SAYRE:  Objection.  This is beyond the

15         scope of the deposition.  It has nothing to do

16         with documents or trying to find documents.

17              MS. MAYERSOHN:  Same objection.

18    BY MR. REYES:

19         Q    You testified that the money was lost.

20    I'm asking how was it lost?

21         A    At that time it was a financial disaster

22    in the country and a lot of business -- a lot of

23    businesses went out of business, declared

24    bankruptcies and we could not collect.

25         Q    Now if $10 million plus or minus was lent
```

1    to Star Capital and not repaid, why is Pinnacle

2    Three Corporation listed as the borrower instead of

3    Star Capital?

4         A    Because the money Star Capital needs for

5    the business which we did.

6         Q    Okay.  So the real borrower is Star

7    Capital, not Pinnacle Three Corporation; is that

8    fair to say?

9              MR. SAYRE:  Objection.

10             MS. MAYERSOHN:  Same objection, beyond the

11        scope.

12             THE WITNESS:  I cannot tell you because I

13        think you are asking me the question which I'm

14        not sure.  The money was lended (sic) to Star

15        Capital for the business which we did.

16   BY MR. REYES:

17        Q    Okay.  So, in light of your candor, and I

18   appreciate that, why is Pinnacle Three Corporation

19   listed as the borrower instead of Star Capital?

20        A    Because I think at that time we -- that's

21   the collateral which I put in.

22        Q    Lender or borrower?

23        A    Well, I'm the borrower and whatever I had,

24   since it's a lot of money been borrowed, so

25   everything in a way been pledged.  I think that's

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
1    how we did it.  I'm not really positive, but the
2    Pinnacle Three Corporation has nothing to do with
3    the money which went to Star Capital.
4         Q    Okay.
5         A    That's as far as I can answer you that
6    question.
7         Q    I asked you if you received any default
8    notices under the loan.  You said you didn't recall.
9              Were there ever any demands, written
10   demands for repayment from North Star Maritime,
11   Inc.?
12        A    There was a demand.  I'm not sure if it
13   was written or not, but obviously there was a demand
14   for repayment.
15        Q    Who made the demand for repayment?
16        A    The lender.
17        Q    Who on behalf of the lender made the
18   demand?
19        A    It was -- Oleg has that in writing, I
20   would imagine, so I don't know, but we knew that we
21   owed the money.  We don't -- we tried to do
22   everything possible to stay in business, so.  If
23   there would be no financial disaster we probably
24   would have no problems to repay.
25        Q    Are you recollecting then that there was a
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

 1    written demand for repayment from North Star

 2    Maritime?

 3         A    I'm not --

 4              MR. SAYRE:  Objection, asked and answered.

 5         You mischaracterized his testimony.

 6              THE WITNESS:  I said I assume so, but I'm

 7         not sure.

 8    BY MR. REYES:

 9         Q    Would there have been written

10    communications between you and Mr. Yelizarov about

11    the fact that 10 million plus or minus had been lent

12    to Star Capital under this loan agreement that we

13    marked Exhibit 5 and it hasn't been repaid?

14              MR. SAYRE:  Objection.

15              THE WITNESS:  Normally we are not writing

16         each other.  We are talking, so we -- obviously

17         there was a conversation.

18    BY MR. REYES:

19         Q    Are you saying that you and Mr. Yelizarov

20    never communicated in writing about the fact that

21    the loan hadn't been repaid?

22         A    I don't remember.  I don't even -- I don't

23    even -- no.  Take this, no.  I don't remember.

24         Q    Okay.  When you communicate with

25    Mr. Yelizarov in writing, how do you do that?  Do

```
 1    you send him text messages, do you send him e-mails,

 2    do you send him letters, all of the above?

 3              MR. SAYRE:  Objection.

 4    BY MR. REYES:

 5        Q    How do you communicate with him in

 6    writing?

 7              THE WITNESS:  I'm talking to him.  I'm not

 8        --

 9    BY MR. REYES:

10        Q    I'm asking about writing, in writing.

11        A    I'm telling you, we are not doing anything

12    in writing.

13        Q    So you and Mr. Yelizarov have never

14    communicated in writing?

15        A    We are communicating calling each other.

16        Q    Okay.  Irrespective of whether you are

17    calling each other, my question is, have you and he

18    ever communicated in writing?

19        A    I don't think so.

20        Q    You don't believe there was ever a writing

21    between you and him regarding this outstanding loan

22    and whether it was going to be repaid?

23        A    I cannot recall that.  It could be

24    communication between Oleg and him because, like I

25    said, Oleg is conducting business, but I don't think
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    so.

2        Q    When was the money due that you didn't

3    repay?

4            MS. MAYERSOHN:  I'm going to object.  This

5        is beyond the scope.

6            THE WITNESS:  We didn't have a specific

7        date because it was good interest rate for

8        Yelizarov.  It was 18 percent.  So if he will

9        need the money, he probably would call and say,

10       I need some money, but we didn't have the date.

11       We probably would pay him as soon as we can

12       because the interest rate is quite high.

13   BY MR. REYES:

14       Q    So you did not have an obligation to repay

15   him at any particular day?

16           MR. SAYRE:  Objection.  It calls for a

17       legal conclusion.

18           THE WITNESS:  I didn't say that.  I said

19       that we had the money and we have our cycle,

20       which is the money which was lended (sic).

21       Usually it's seven months to a year and that's

22       what we told him how we will pay him, but it

23       didn't happen.

24   BY MR. REYES:

25       Q    So that's my question:  When money was

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    lent under Exhibit 5, which you said it was about

2    $10 million, when was that to be repaid?  Was there

3    a specific point in time that it had to be repaid?

4             MR. SAYRE:  Objection, asked and answered.

5             THE WITNESS:  The money was taken in --

6         not in lump sum.  The money was taken, it could

7         be $100,000, it could be $200,000.  That's

8         accumulation for what, like I said, $10 million

9         plus or minus, but when we borrowed the money

10        we gave them probably -- probably the time

11        between seven months to a year for repay, but

12        if you want to extend it we usually do that.

13   BY MR. REYES:

14        Q    Well, you see that the loan agreement says

15   it's supposed to be paid back in 36 months.  Did you

16   have -- you are saying you had a different agreement

17   with Mr. Yelizarov?

18        A    No, it could be -- we probably -- the

19   business works like that.  You are doing cash

20   advance.  You lend the money and if the money is

21   making the money, then you can reinvest it one more

22   time and one more time and one more time.  Then you

23   have obligation to pay in 36 months.  I will give

24   you an example.  With Chaban, I lend the money for

25   only seven months because it was 24 percent and we

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1    paid him back in this specific time.  Our cycle was

 2    seven months.  Seven months to a year.  So -- but if

 3    we need the money to reinvest it, to double the

 4    money, let's say, so that's why it was probably done

 5    for 36 months, but we can pay it off without

 6    repayment penalty at any time we want.

 7        Q    And why was none of the $10 million paid

 8    back?

 9        A    What is that?

10        Q    Why was none of the $10 million paid back?

11        A    Because we lost it.

12        Q    Let me show you another document.  I'll

13    make this Exhibit --

14             THE COURT REPORTER:  9, I think.

15             MR. REYES:  Am I on 9?  Yes.

16             THE COURT REPORTER:  Yes.

17             (Thereupon, the above-referred to document

18        was marked as Impleaded Defendants' Exhibit No.

19        9 for identification.)

20    BY MR. REYES:

21        Q    I'm showing you what's marked as Exhibit

22    9, Mr. Goldstein.  It's a document called Verified

23    Complaint for Damages in a lawsuit between North

24    Star Maritime, Inc. and Pinnacle Three Corporation

25    and yourself.  And it purports to have been filed
```

```
 1   August 14 in 2013.  Do you see that date across the

 2   top?  Do you see that date of --

 3        A    Yes.

 4        Q    -- August 14, 2013?

 5             Do you recognize this lawsuit that

 6   was filed against you?

 7        A    Yes.

 8        Q    Wouldn't this lawsuit have been a demand

 9   for payment from North Star Maritime, Inc. in

10   response to our request for production of documents?

11        A    What is the question?

12        Q    We asked you to produce to us in response

13   to our request for production of documents any

14   demands for payment from North Star to you or

15   Pinnacle and you produced nothing with respect to

16   demands.  Isn't this lawsuit a demand for payment?

17        A    I think I told you so many times, I give

18   everything I had.  So there is nothing in my

19   possession at all.

20             MS. MAYERSOHN:  I'm going to object.  It

21        calls for a legal conclusion.

22             MR. SAYRE:  It's a public file too.

23   BY MR. REYES:

24        Q    You were represented by Mr. Sexton in this

25   lawsuit; isn't that true?
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1          A     Yes.

 2          Q     And you told me earlier you didn't ask

 3   Mr. Sexton for any documents to comply with our

 4   request for production; is that correct?

 5          A     We owe money to Mr. Sexton.  He is not

 6   answering the phone.

 7          Q     Did you write him a letter and say,

 8   listen, I've been ordered by a federal court judge

 9   to turn over documents and at the risk of being

10   thrown in jail would you please give me the

11   documents?  Did you do that?

12          A     My attorney tried to get a hold of

13   Mr. Sexton.  It was impossible.

14          Q     So the question is:  Did you write him a

15   letter?

16          A     I'm telling you my attorney tried to call

17   him and she said that he will not give us anything

18   at all.

19          Q     Were letters written to anyone requesting

20   the documents?

21          A     Not from me because I knew that he is not

22   answering and he will not respond.

23          Q     Were letters written on your behalf

24   requesting the documents?

25          A     I don't know if my attorney did that, but
```

```
 1    she told me that --
 2             MS. MAYERSOHN:  Okay.  Objection.  It
 3        calls for attorney-client privilege.
 4    BY MR. REYES:
 5        Q    My question is:  Were letters written on
 6    your behalf demanding documents?
 7        A    I did not send anything.  That's why I
 8    hired the attorney to try to resolve the case.
 9        Q    Did you see any letters written on your
10    behalf?
11        A    I have not.
12        Q    Okay.  In this lawsuit -- if you could
13    turn to the second page.  You see in Paragraph 7
14    this lawsuit refers to something called the North
15    Star Loan Agreement that's attached as Exhibit A.
16    Do you see that?
17        A    Yes.
18        Q    And if you were to go to Exhibit A -- it's
19    like nine pages in.  If you could go to Exhibit A.
20        A    Which page?
21        Q    Exhibit A.  Right -- there you go.
22        A    Okay.
23        Q    You can see it's the same loan agreement
24    that we've been looking at here that we've marked as
25    Exhibit 5 and 6.
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
1        A    Yes.

2        Q    Do you see that?

3        A    Yes.

4        Q    Okay.  You said that $10 million was lent

5   and none of it was repaid.

6             Do you know why it is that North Star

7   alleged that only $1.6 million was due and owing?

8             MR. SAYRE:  Objection.  This is outside

9        the scope of what the judge ordered the

10       deposition to go into.

11            MS. MAYERSOHN:  Same objection.

12  BY MR. REYES:

13       Q    Can you go back to, if you would, to the

14  second page.  No, the other way.  The other way.

15  Keep going.

16            You see that in Paragraph 9 that

17  North Star loan -- claims to have loaned money to

18  Pinnacle Florida and Goldstein of approximately

19  $1.6 million under that contract.  Do you see that?

20       A    For how much?

21       Q    You see Paragraph 9 it says --

22       A    Yes.

23       Q    -- 1,595,976.23?  Do you see that?

24       A    Yes.

25       Q    But you told me before that the loan was
```

1    $10 million plus or minus and it was made to Star

2    Capital.

3           Do you know why North Star is

4    alleging it was to Pinnacle Florida and yourself and

5    it was only 1.6 million?

6         MS. MAYERSOHN:  Objection,

7       mischaracterization of the documents and here,

8       I think, just flipping through these --

9         MR. REYES:  Counsel, please stop coaching

10      the witness.

11         MS. MAYERSOHN:  I'm not coaching the

12      witness.

13         MR. REYES:  You are absolutely --

14         MS. MAYERSOHN:  You are trying to tell

15      him --

16         MR. REYES:  I'm reading --

17         MS. MAYERSOHN:  -- facts which aren't in

18       evidence.  I'm looking at this complaint --

19         MR. REYES:  Listen, I'm reading Paragraph

20       9.  You should have found it.  You should have

21       responded to discovery.  It's clearly a demand

22       for payment and I'm asking him why North Star

23       is alleging 1.6 million was lent to Pinnacle if

24       it was 10 million.

25         MS. MAYERSOHN:  Well, you have a second

```
 1        place where it talks about additional amounts.

 2             MR. REYES:  He can either tell me he

 3        doesn't know --

 4             MR. SAYRE:  Is there a document associated

 5        with this somehow that you are asking for?

 6   BY MR. REYES:

 7        Q    Mr. Goldstein, would you answer the

 8   question?

 9             Do you know why North Star is

10   alleging that 1.6 million was lent when you said it

11   was 10 million?

12             MS. MAYERSOHN:  Objection,

13        mischaracterization of evidence beyond the

14        scope.

15             THE WITNESS:  At the Paragraph 8 it says

16        that we owe $13 million.  On Paragraph 9 it

17        says 1.6.  I don't know.

18   BY MR. REYES:

19        Q    Paragraph 8 says the North Star loan

20   agreement provides that North Star would loan

21   Pinnacle Florida and Goldstein up to $13 million.

22   Do you see that, up to?

23        A    Yes.

24        Q    And then Paragraph 9, North Star alleges

25   or swears -- this is sworn to -- by Mr. Yelizarov
```

1    that $1,595,976.23 were lent under the North Star

2    loan agreement.  Do you know why that is?

3        A    I don't.  It could be a mistake.

4        Q    Mr. Goldstein, you agreed in this lawsuit

5    to have a judgment entered against Pinnacle and a

6    judgment entered against you, correct?

7        A    Yes.

8        Q    Okay.  Were there communications between

9    North Star's lawyers and your lawyers about agreeing

10    to entry of those judgments?

11        A    You are asking me if attorney from North

12    Star was talking to my attorney on these judgments?

13        Q    Yes, sir.

14        A    I don't know.

15        Q    Well, it didn't just happen out of thin

16    air, right, there were discussions whereby an

17    agreement was reached to file a lawsuit and get a

18    judgment against you and Pinnacle right away,

19    correct?

20        A    I don't know.  I don't know what the

21    attorneys are talking to each other.  I don't know.

22        Q    Well, this lawsuit was just filed

23    August 14 of 2013, correct?

24        A    Correct.

25        Q    And were there discussions between

1   Mr. Sexton and the lawyers from North Star about

2   agreeing to a judgment under this lawsuit?

3        A    I don't know what Mr. Sayre discussed with

4   maybe Mr. Sexton.  I have no idea what they talked

5   about.

6        Q    Were you copied with any of those

7   communications?

8        A    I didn't have a chance to look at that and

9   probably -- I have not seen that.  Let me put it

10  this way.

11       Q    I'm asking you back in August 2013 through

12  November of 2013, when the judgments were entered,

13  were you copied with communications between the

14  lawyers?

15            MR. SAYRE:  Asked and answered.

16            THE WITNESS:  Maybe Oleg had.  I was in

17       Russia at that time.  I have not seen it.  I

18       don't remember what are you talking about.

19       Oleg is conducting the business.  It could

20       be -- Mr. Sexton was hired by Mr. Firer and it

21       could be communication, but I don't know.

22  BY MR. REYES:

23       Q    Mr. Goldstein, you understand that we

24  specifically asked in our request for production,

25  for communications regarding the defaults under this

1    loan.  Did you make any effort to obtain those

2    communications to comply with the judge's order?

3         A    Yes, we did.  We called --

4         Q    Anything other than what you told me

5    earlier today?

6         A    Well, I don't know what else we could do.

7    If my attorney calling Mr. Sexton and he will not

8    talk to her and he will hang up the phone on her.

9    So how else do you want -- what exactly do you want

10   us to do?

11        Q    Did you contact Mr. Sayre who is sitting

12   here in this room and ask him for those

13   communications?

14        A    Mr. Sayre will not talk to me.

15        Q    He doesn't talk to you?

16        A    I don't think so.

17        Q    You and he have not spoken by phone?

18        A    I didn't ask Mr. Sayre because he is not

19   my attorney.  That's why I hired Leah.

20        Q    My question to you, sir, is --

21        A    Maybe she did.

22        Q    I'm asking you, Leon Goldstein --

23        A    I did not talk to Mr. Sayre.

24        Q    Have you ever spoken to Mr. Sayre by

25   telephone?

1      A    I don't even recall, but maybe if

2    Yelizarov ask me for something, just translate, but

3    I don't think so.

4      Q    Oh, you translate for Mr. Yelizarov when

5    he speaks to Mr. Sayre?

6      A    No, I didn't say that.  You are asking me

7    if I ever talk to Mr. Sayre.  I said, no, because I

8    have nothing to discuss with him, but if there is

9    something which Yelizarov may needed, maybe I did,

10   but I don't.  I did not ask Mr. Sayre for

11   productions, but I think Leah did it.  And why would

12   I if I have the attorney to handle it?  Why do I

13   need to call all the attorneys when I have the

14   attorney who is doing the job for me?

15     Q    Well, before Ms. Mayersohn appeared in

16   this case for you, did you make any efforts to speak

17   with Mr. Sayre to obtain documents responsive to the

18   request for production?

19     A    I was in Russia at the time.  When I came

20   in in two weeks or ten days I hired Leah and that's

21   it.

22     Q    Leah appeared on October 28 for the order

23   to show cause hearing.

24     A    Yes, and I arrived to the country

25   October 7.

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1       Q     Okay.  And my question is:  Between

2   October 7th and October 28th, did you reach out to

3   Mr. Sayre to get documents to respond to the request

4   for production documents?

5       A     No.  First of all, I didn't see them until

6   almost the last minute because my mail went out.  I

7   have not -- I couldn't open the mailbox.  You

8   probably know that.  When you send me all this

9   stuff, it came back because when we are out of the

10  country for six months, all the mail goes back.

11  Nobody took it, so I have not even seen that.

12      Q     In October before you hired Ms. Mayersohn

13  to represent you, did you have conversations with

14  Mr. Sayre about the judge's rulings?

15      A     One more time.

16      MS. MAYERSOHN:  I'm going to object.  This

17      is well beyond the scope of discovery.

18      THE WITNESS:  My answer is, I did not talk

19      to Mr. Sayre and I did not know what I need to

20      provide because I have not seen these things.

21      At the last minute, I would say, when I find

22      out I hired Leah to represent me and then --

23      otherwise I would come to trial before that.  I

24      just was not in the country.

25

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1  BY MR. REYES:

2      Q    Did you have an agreement with

3  Mr. Yelizarov that this lawsuit would be filed and

4  you would agree to a judgment upon its filing?

5      A    I told you --

6          MR. SAYRE:  Objection.  This is outside,

7      way outside the scope.  If you tell me that

8      this relates to a document, I won't object, but

9      this -- I can't see how.

10          MR. REYES:  Well, if he tells me there's

11      such an agreement I'm going to ask him, is it

12      reduced to writing.  I mean, that's why I'm

13      asking for the documents.  They are part of our

14      request.

15          MR. SAYRE:  Well, why don't you start

16      with, is there a document?

17          MR. SHALEK:  Why does he have to do it

18      your way?

19          MR. SAYRE:  Because that's what the order

20      allows.

21          MR. SHALEK:  Either instruct him or don't

22      instruct him, but that's the question.

23  BY MR. REYES:

24      Q    Mr. Goldstein, do you remember the

25  question?

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1      A    You have to repeat it one more time.

2      Q    Did you have an agreement with

3 Mr. Yelizarov that this lawsuit would be filed and

4 you would agree to a judgment against yourself and

5 Pinnacle?

6         MR. SAYRE:  Objection to the extent it

7      doesn't ask whether a document existed

8      reflecting any agreement.

9         MR. SHALEK:  We are all familiar with

10     that.

11         MR. SAYRE:  We are all familiar with what

12     the judge ordered as well.

13 BY MR. REYES:

14      Q    Can you answer the question?

15      A    I told Yelizarov that since we don't have

16 the money to be repaid he can get everything I have

17 and I don't mind and that's why I made confession of

18 judgment and signed everything blindly, whatever

19 Mikhael Keifitz told me to sign.

20      Q    And where are those documents that you

21 signed, why weren't those produced?

22      A    For the thirteenth time, probably at

23 Mikhael Keifitz' office.

24      Q    And did a lawyer accompany you to

25 Mr. Keifitz' office?

```
 1          A    One more time.

 2          Q    Did a lawyer go with you to Mr. Keifitz'

 3   office when you signed these papers that you are

 4   talking about?

 5          A    I don't remember that the lawyer was

 6   there, but Oleg was there probably.

 7          Q    And when was it you went to Mr. Keifitz'

 8   office?

 9          A    A year ago, a year and a half ago.  I

10   forgot when was it.

11          Q    Well, we see the lawsuit is filed

12   August 14, 2013.  Had you already signed those

13   papers by the time the lawsuit was filed?

14          A    I don't remember.  Maybe.

15          Q    At that time you were represented by

16   Mr. Sexton, but you don't think Mr. Sexton went with

17   you to Mr. Keifitz' office?

18          A    He was not there.

19          Q    Was Mr. Firer there with you when you

20   signed the papers?

21          A    I think so.  Mr. Sexton was not paid and

22   he was upset and that's why he did not do anything

23   at all.

24          Q    Was Ms. Mayersohn with you when you signed

25   the documents?
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1        A     No.

 2        Q     Was that all done before she represented

 3   you?

 4        A     Yes.

 5        Q     Were you represented by Ms. Mayersohn

 6   previously to this matter?

 7        A     No.

 8        Q     And you are saying you don't have in your

 9   possession any of the documents associated with this

10   lawsuit where you agreed to judgments?

11        A     I'll do it one more time, I do not have

12   anything in my possession.

13        Q     Let me show you a document.  I'll mark

14   this Exhibit 10.

15              (Thereupon, the above-referred to document

16        was marked as Impleaded Defendants' Exhibit No.

17        10 for identification.)

18   BY MR. REYES:

19        Q     Mr. Goldstein, I'm showing you a document

20   that's called an addendum.  Do you recognize this

21   document?

22        A     Yes.

23        Q     What is this document?

24        A     What's that?

25        Q     What is this document?
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1          A    You are asking me what is this document?

 2          Q    Yes, sir.

 3          A    You want me to read it or what do you want

 4   me to do?

 5          Q    I want to know if you understand what this

 6   document is for.

 7          A    I know the word addendum, but --

 8          Q    Is your signature on this document?

 9          A    It looks like mine.

10          Q    And it purports to have been signed in

11   front of a notary named Yuliya Khazak?

12          A    Yes.

13          Q    Do you know who that person is?

14          A    No.

15          Q    Is that someone in Mr. Keifitz' office?

16          A    I don't know.

17          Q    It's got a date of January 16 of 2013.  Do

18   you see that?

19          A    Yes.

20          Q    Looking at this document, does it help

21   refresh your recollection as to when you would have

22   been in Mr. Keifitz' office to sign documents?

23          A    Okay.  I signed it probably in

24   January 13th -- January 16th, whatever, 2013.

25          Q    Well, it looks like you signed this
```

1   document that I've marked as Exhibit 10, but I'm

2   asking you if looking at this document, does it help

3   refresh your memory if that was the date that you

4   were in Mr. Keifitz' office signing documents?

5        A    I cannot tell you that.  Probably not.

6        Q    Why do you say that?

7        A    I think it's a different notary.

8        Q    This person here is someone different than

9   Mr. Keifitz' office is what you are saying?

10       A    No.  I think whatever I signed before, I

11  don't remember that signature because it looks like

12  you can read the name from the signature.  So it

13  looks to me that it might be a different date, but

14  it's not -- that's -- that's what I can see.

15       Q    The document says created for the purpose

16  of reconfirmation of the mortgage document, quote,

17  note, close quote, first entered and executed on

18  March 1 of 2007.  Did I read that correctly?

19       A    Yes.

20       Q    Do you know what that's referring to?

21       A    No.

22       Q    I had asked you earlier if there were any

23  promissory notes associated with the loan and this

24  is apparently to reconfirm a note.  Do you know what

25  note it's referring to?

1          A     I don't.

2          Q     Do you have any recollection as to why you

3    signed this document?

4          A     I don't have it.  Is there something

5    before that, because maybe there is something before

6    because it looks like the last page of something?

7          Q     Well, remember I told you I took apart the

8    loan agreement that's in your production.

9          A     Oh, that's what it is.

10         Q     And that document I believe is right in

11   the middle of these documents.  Let me see if I can

12   confirm that.  Actually, no, it's attached to the

13   lawsuit.  Excuse me, let me get to the lawsuit.  And

14   the lawsuit that North Star filed against you.

15              MR. REYES:  I don't have a copy of that?

16         It was definitely an exhibit to the suit.  I

17         don't have a copy of that?

18              Jeff, do you have his deposition with you?

19              MR. SHALEK:  Where?  This one?

20              MR. REYES:  Yeah, with the exhibits?

21              MR. SHALEK:  Not with the exhibits.  What

22         are you looking for?

23              MR. REYES:  The affirmation of the note.

24              MR. SHALEK:  The reaf?

25              MR. REYES:  Yeah.

1      MR. SHALEK:  Yeah, I have that.  Right

2   here.

3      MR. REYES:  Wasn't that marked as an

4   exhibit during the depo?

5      MR. SHALEK:  It was produced as

6   Goldstein --

7      MR. REYES:  Because it's not in the

8   lawsuit itself.

9      MR. SHALEK:  It was produced in that

10  deposition -- it was produced by Leon Goldstein

11  as -- you are talking about this addendum?

12     MR. REYES:  That's what I want to see.

13  May I see that?

14     MR. SHALEK:  And just for the record, it's

15  produced as Goldstein 00312 and it's recorded,

16  Book 28497, Page 2435.

17     MS. MAYERSOHN:  In what lawsuit was it?

18     MR. REYES:  This one.  This was his

19  earlier production response to Chaban's

20  discovery, if I remember correctly.

21     MS. MAYERSOHN:  In this case?

22     MR. REYES:  Yeah.

23     MR. SHALEK:  Do you need some copies of it

24  made?

25     MR. REYES:  Well, I may.

```
 1              MS. MAYERSOHN:  Who -- can you tell me

 2       which attorney produced it?

 3              MR. SHALEK:  At that time it was probably

 4       Frank Sexton.

 5              MS. MAYERSOHN:  No wonder I don't have it.

 6       Okay.

 7              MR. SHALEK:  Well, I mean, it's of record.

 8  BY MR. REYES:

 9       Q    I'll get this copied, Mr. Goldstein, but

10  if you could look at this group of documents you'll

11  see the recording information here in the corner and

12  if you page through it you'll see this is initially

13  the mortgage for the million-5 on the condo unit.

14       A    Yes.

15       Q    All right.  So if you page forward.

16       A    So this is -- this is -- this is the --

17       Q    Let's go through it together.  So you have

18  the mortgage.

19       A    Right.

20       Q    You have this addendum?

21       A    Right.

22       Q    That's this document I've marked Exhibit

23  10.  Do you see that?

24       A    Yes.

25       Q    And then behind it you have as Exhibit A
```

1    the Loan and Security Agreement dated as of March 1,

2    2007 and this is the one for the $13 million.  Do

3    you see that?

4        A    Right.  Yes.

5        Q    Okay.  All of these documents were

6    recorded in February of 2013 and you can see the

7    recording information in the corner.  Do you see

8    that?

9        A    Yes.

10       Q    Okay.  And the recording starts from Book

11   28497, Page 2428, and it runs through Page 2459.

12       A    Okay.

13       Q    Do you see that?

14       A    Yes.

15       Q    So I'm not trying to trick you or

16   anything.  Looking at that, since these are

17   documents you've produced to Mr. Shalek earlier on

18   in this deposition, I'm trying to understand what

19   this addendum -- it says you are reconfirming a

20   note.

21            Are you reconfirming the $1.5 million

22   against the condo or the money that was lent up to

23   13 million, which one are you reconfirming in that

24   document?

25       A    I don't know which one.

```
 1        Q    Who was the drafter of this document?

 2        A    Not me.  I don't know.

 3        Q    Was there a lawyer involved in the

 4   drafting of this document?

 5        A     It could be Mikhael Keifitz one more time.

 6   I don't know.

 7        Q    Having looked at the recording

 8   information -- and I don't know if I asked you this

 9   earlier.  Maybe I did -- do you know why this 2007

10   transaction was recorded in February of 2013 for the

11   first time?

12             MR. SHALEK:  Objection.

13             THE WITNESS:  It probably need to record

14        it or I think Yelizarov insist to do that and

15        that's why we did it.

16             MR. SHALEK:  It was me.  I objected.

17             MR. SAYRE:  I'm shocked.

18             MR. SHALEK:  Well, I don't believe it's a

19        2007 transaction.

20             MR. REYES:  Well, the purported -- I'm

21        sorry, the purported March 2007 transaction.

22             MR. SAYRE:  Was that not an inappropriate

23        speaking objection or clarification?

24             MR. SHALEK:  I'm not coaching the witness.

25             MR. SAYRE:  Neither am I.  Making an
```

```
 1        objection.  Making an argument.
 2   BY MR. REYES:
 3        Q    One of the things that we asked for in our
 4   request for production of documents is any records
 5   that would show that the -- that your shares in
 6   Pinnacle Three Corporation were executed upon?
 7        A    Yes.
 8        Q    Do you see that in my request for
 9   production?
10        A    I saw a lot of things, yes.
11        Q    Okay.  And the reason we asked you that is
12   that we had received a letter from Mr. Sayre -- and
13   I'll make this Exhibit 11.
14             (Thereupon, the above-referred to document
15        was marked as Impleaded Defendants' Exhibit No.
16        11 for identification.)
17   BY MR. REYES:
18        Q    I'm showing you a letter dated January 24
19   of 2014 that was addressed to me from Mr. Sayre and
20   I highlighted the language that I wanted to ask you
21   about.
22                  If you can take a moment and read
23   what I highlighted there in yellow.  Did you read
24   that language?
25        A    Yes.
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1        Q    Okay.  Is that language correct?

 2             MR. SAYRE:  Objection.

 3             MS. MAYERSOHN:  Objection.  It calls for a

 4        legal conclusion and beyond the scope.

 5             MR. SAYRE:  I don't see the documents

 6        associated with that section.

 7             THE WITNESS:  It looks like correct.

 8        However, it was written by Mr. Sayre and

 9        sometimes I'm reading and understanding one

10        thing.  It could be a little different, but it

11        looks good to me so far.

12   BY MR. REYES:

13        Q    Okay.  Good.  The reason I asked in the

14   request for production for documents that would show

15   that your shares of Pinnacle were executed upon is

16   this claim that Mr. Sayre made in this letter.  Do

17   you understand that?

18        A    Yes.

19        Q    Okay.  What documents would exist,

20   irrespective of who may have them, that would show

21   that North Star executed on your shares as he claims

22   in this letter?

23        A    I don't know what documents exist.

24             MR. SAYRE:  Objection.  It calls for

25        speculation.
```

```
1              THE WITNESS:  I want you to understand

2         that when you are losing so much money and you

3         owe to the friend of yours this money and they

4         are telling you give us -- because it's still

5         not enough, whatever you have.  I'm signing

6         everything in blind.  I didn't hire an attorney

7         and when you are asking me so many questions

8         about what exists, what does not exist, if I

9         would have them, I would bring it here, but I

10        just don't have them and that is the problem

11        which frustrates me that you are kind of trying

12        to put me in a bad position in front of the

13        judge.

14             Leah, for probably 10 days she is working,

15        just did so many efforts to get as much as she

16        could and finally Oleg came into the country

17        and he probably will get it for you and that is

18        probably the answer to all of it.  If you need

19        them, you have to -- or subpoena Mikhael

20        Keifitz.  I'm not sure what he has, what he

21        doesn't, but I certainly don't have anything to

22        give it to you.

23   BY MR. REYES:

24        Q    Mr. Goldstein, you repeatedly are making

25   that statement.  You understand the judge instructed
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
1    you, sir, to respond and say what documents exist,

2    not to tell us that you spoke to Oleg yesterday and

3    that we should call Oleg.  You understand the judge

4    didn't tell us to do that.  And you have not told us

5    what documents exist and so I'm here today asking

6    you what documents exist.  Do you understand that?

7         A    Yes.

8         Q    Okay.

9         A    And do you understand that I do not know

10   what exists and what does not?

11        Q    So you were the 100 percent owner of

12   Pinnacle.  Mr. Sayre says your shares were seized

13   and you don't know how, when and where that

14   happened?

15        A    I don't want to repeat the long sentence I

16   just did.  I signed everything in blind because I

17   owed the money to the people and I give -- maybe it

18   was exist.  It was maybe a half an hour of signing

19   and I walked away and they said, that's it.  I have

20   nothing.  So to give you the wrong statement I don't

21   want.  It probably exists.  It's probably -- not in

22   my possession.  And the people who I want to get it

23   will not answer the phone calls or anything and you

24   are asking me why didn't I go to the bank, to

25   Citibank which I have no clue where to go and whom
```

1    to talk to.

2         Q    Isn't it a fact, Mr. Goldstein, that you

3    had documents in your possession about the seizing

4    of your shares that you gave to Capital Bank?

5         A    Whatever documents I had I brought it with

6    me and left it and the documents are somewhere and I

7    just cannot get them.  You are asking me for

8    something I cannot do.

9         Q    Do you understand my question, sir?

10        A    You are asking me the question and I'm

11   telling you I don't have anything in possession.  I

12   don't remember a lot of things, but I gave

13   everything I had and that's just the answer.

14        Q    My question -- I will ask it again --

15   isn't it true you had in your possession corporate

16   records of Pinnacle that you gave to Capital Bank

17   about the seizing of your shares?

18             MS. MAYERSOHN:  Objection.  Beyond the

19        scope.  Asked and answered.

20             THE WITNESS:  I don't remember that.

21   BY MR. REYES:

22        Q    You don't recall going to Capital Bank to

23   open an account in which you gave Capital Bank

24   corporate resolutions involving the seizing of your

25   shares?

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1          A     I brought the book with me.  It was

2     Pinnacle Three Corporation.  That's how I opened the

3     account.

4          Q     You opened an account for who?

5          A     In Capital Bank.

6          Q     For who?

7          A     For Pinnacle Three Corporation.

8          Q     You opened an account for Pinnacle Three

9     Corporation?

10         A     Yes.

11         Q     And when did you do that?

12         A     A long time ago.  It's closed already.

13         Q     I'm asking you about what Mr. Sayre

14    alleges in this letter that your shares of stock

15    were seized and I'm asking you for what documents

16    would show that.

17               Didn't you bring corporate records to

18    Capital Bank about the seizure of your shares?

19         A     I don't remember that.  I don't think so.

20         Q     You don't recall that?

21         A     No.

22         Q     Since you haven't produced to us any of

23    the documents that reference the execution of your

24    shares, I'm going to show you some records that were

25    produced by the bank and you can tell us if these

```
 1    were records that you had that you gave to

 2    Mr. Keifitz.  All right?  I will make this

 3    Exhibit --

 4              THE COURT REPORTER:  12.

 5              MR. REYES:  12.

 6              (Thereupon, the above-referred to document

 7         was marked as Impleaded Defendants' Exhibit No.

 8         12 for identification.)

 9    BY MR. REYES:

10         Q    Let me know when you've reviewed it,

11    Mr. Goldstein.  Okay?

12                   Have you reviewed Exhibit 12?

13         A    Yes.

14         Q    Do you recognize Exhibit 12?

15         A    No.

16         Q    Do you see --

17              MR. SAYRE:  Just for the record, before

18         you get to the next question, these documents

19         appear to have been produced by Capital Bank in

20         response to a subpoena.  We made a request on

21         Mr. Shalek for copies of the documents that

22         were responsive to the subpoena on behalf of

23         Capital Bank.  We did not receive those

24         documents.  Mr. Reyes obviously did.  I just

25         want to make that objection -- or note that on
```

1          the record.

2     BY MR. REYES:

3          Q     Going back to Exhibit 12, can we do that,

4     Mr. Goldstein?

5          A     Yeah.  I can see it.

6          Q     This document is entitled North Star

7     Maritime, Inc. Corporate Resolutions.  And if you go

8     to the second page it's dated July 16 of 2013.  Do

9     you see that?

10         A     Yes.

11         Q     And it is signed by Mikhael Keifitz as

12    attorney in fact for Oleksandr Yelizarov as the sole

13    director of North Star Maritime, Inc.  Do you see

14    that?

15         A     Yes.

16         Q     Okay.  And if we go to the first page it

17    references the March 1, 2007 purported loan

18    agreement.  Do you see that in the first recital?

19         A     Yes.

20         Q     And the second recital, it says:  As

21    security for the repayment of the loan, Goldstein

22    agreed to execute and deliver a stock pledge

23    agreement pursuant to which Goldstein pledged to

24    lender all of the issued and outstanding shares of

25    stock in Pinnacle.

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1                You have not produced that stock

 2   pledge agreement to us, correct?

 3        A    I didn't produce it when?

 4        Q    At any time.  Does it exist?

 5        A    I don't know.  You asked me that question

 6   before.  I said I don't know.  Maybe it did.

 7        Q    So this is referring to a stock pledge

 8   agreement, but there may not be any such document,

 9   is that what you are saying?

10        A    When I say I don't know, it maybe exist,

11   it may not.  I don't know.

12        Q    Okay.  Well, let's go down then to where

13   it says:  Now, therefore, be it resolved.  Do you

14   see where I'm pointing?

15        A    Yes.

16        Q    Okay.  It says:  That the board of

17   directors has determined that it's in the best

18   interest of the corporation to proceed with

19   transferring all of the pledged stock in the name of

20   the corporation and hereby authorizes the name North

21   Star Maritime, Inc. to be inserted into the stock

22   transfer form.

23                That stock transfer form hasn't been

24   produced to us either, has it?

25        A    It has not been produced here?
```

1      Q     In response to the judge's order?

2      A     I don't have it.

3      Q     Have you asked anyone for either the stock

4   pledge agreement or the stock transfer form?

5      A     I asked everybody I called.  Nobody gave

6   me anything.  Whatever we produced, that's what we

7   have.  If we will have a little more time, we

8   probably will produce more.  Just need a little more

9   time.

10          MR. SAYRE:  Objection.  This is abusive

11          because this is -- I believe all this

12          information is included on the docket in this

13          case.

14   BY MR. REYES:

15      Q     Mr. Goldstein, you've told me you asked

16   Oleg Firer yesterday to help you and told me you had

17   not spoken to anyone else directly for documents.

18              Are you saying now that you did speak

19   to other people directly for documents?

20      A     No, I didn't say that.  I'm saying the

21   same sentence all the time.  I cannot call Mikhael

22   Keifitz.  I'm not his client.  I cannot call

23   Mr. Sayre.  I'm not his client.  I cannot call

24   Sexton.  I'm not his client.  My attorney did effort

25   to produce whatever you asked for and she produced

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1    whatever you have.  The rest of the papers probably

 2    Mikhael Keifitz have it.

 3         Q    But the judge told you to identify what

 4    documents exist irrespective of whether you had

 5    them.

 6              Why did you not identify either the

 7    stock pledge agreement or the transfer form or this

 8    resolution that supposedly is the basis upon which

 9    your stock was seized?  Why didn't you identify

10    those?

11         A    Because to find all that I need probably

12    to talk to Mikhael Keifitz to find out if it exists

13    or not, but I cannot.  That is my reason.  It's not

14    like I'm ignoring judge order.  I would love to

15    bring you everything you have.

16         Q    All right.  Let's keep looking at this

17    resolution.  It says that you were removed as a

18    director, president and secretary of Pinnacle.  Is

19    that a true statement?

20         A    Yeah.

21         Q    And that Oleksandr Yelizarov was appointed

22    as the sole director and president.  Is that a true

23    statement?

24         A    Yeah.

25         Q    And this is dated July 16 of 2013.
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1                     So is that the day in which

 2   Mr. Yelizarov became the sole director and president

 3   of the company and you were removed?

 4        A    I would imagine so.

 5        Q    Were you the president and secretary and

 6   director of Pinnacle up until this date, July 16,

 7   2013?

 8        A    Yes.

 9        Q    And you would have been a hundred percent

10   owner of Pinnacle Three Corporation up to July 16 of

11   2013?

12        A    I would imagine so.  You are asking me

13   questions from the dates and I'm not sure.  I was

14   the president of Pinnacle Three Corporation.  When I

15   was removed, July or May, I don't know.  I'm giving

16   you the answer, yes, I was president of Pinnacle

17   Three.  I'm not president of Pinnacle Three anymore.

18        Q    Well, I'm just asking you, according to

19   this document your removal and the seizure of your

20   shares occurred on July 16 of 2013.  Does that sound

21   right to you or do you dispute that?

22        A    I don't know.

23             MS. MAYERSOHN:  I object to that

24        characterization.

25             THE WITNESS:  Possibly.
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1          MS. MAYERSOHN:  There are no dates

2      indicated in the stock agreements.  This

3      agreement is just a separate --

4          MR. REYES:  Counsel, it's an improper

5      objection and we are wasting time.

6  BY MR. REYES:

7      Q    The document is dated July 16, 2013, isn't

8  it, Mr. Goldstein?

9      A    That's what it says.  There's not my

10  signature there.  I don't know who signed it.

11  That's what it reads.  I'm reading like you are.

12     Q    And I'm trying to ask you, sir, is that

13  the point in time when your shares were transferred

14  to North Star Maritime, Inc.?

15     A    And I'm answering you, I don't know if

16  that's the point in time.  If that's what you are

17  asking me specifically, I don't know.  I'm telling

18  you that I was the president and I'm not any longer.

19  It could be that date.  It could be another date.

20     Q    But this document appears to be the

21  document by which you were removed and Mr. Yelizarov

22  was put in your place, right?

23     A    You are answering your own questions.

24  Probably.  I don't know.

25     Q    I'm trying to ask you, sir, what you know.

```
 1    You are the one that was a hundred percent owner of

 2    Pinnacle.

 3         A    I need -- if that's what it says there,

 4    that's what it is, but you are asking me for

 5    specific dates and I'm not sure if that's the

 6    specific date.  Maybe it was a little earlier or a

 7    little later, but that's what I'm just trying to

 8    tell you.  If I was removed, then I was removed.

 9              I'm sorry, can we have a break?

10              MR. REYES:  Sure.

11              THE VIDEOGRAPHER:  We are off the record

12         at 2:16.

13              (Thereupon, a recess was taken.)

14              THE VIDEOGRAPHER:  Back on the record at

15         3:24.

16    BY MR. REYES:

17         Q    All right.  Mr. Goldstein, when we took

18    the break we were talking about Exhibit 12 that I

19    left there in front of you.

20         A    Yes.

21         Q    Do you still have it there?

22              And that was a corporate resolution

23    of North Star Maritime, Inc. of July 16, 2013,

24    correct?

25         A    Correct.
```

```
 1         Q     And according to this resolution, this is

 2    when you were removed as a director, president and

 3    secretary of Pinnacle and Mr. Yelizarov was

 4    appointed as the sole director and president,

 5    correct?

 6         A     Correct.

 7         Q     Let me show you another document.  I'll

 8    make this No. 13.

 9              (Thereupon, the above-referred to document

10         was marked as Impleaded Defendants' Exhibit No.

11         13 for identification.)

12    BY MR. REYES:

13         Q     This is a resolution of Pinnacle Three

14    Corporation of the same date, July 16, 2013.

15                 Do you recall seeing this document

16    before today?

17         A     I have.

18         Q     When do you recall seeing this document?

19         A     What did you say?

20         Q     I said -- I asked you if you recalled

21    seeing it and I think you said I have?

22         A     Yes.

23         Q     And so my question is:  When do you recall

24    seeing this document?

25         A     I don't remember when.
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1      Q    Do you believe you were present on

2 July 16, 2013 when Mr. Keifitz was signing all these

3 documents as attorney in fact for Mr. Yelizarov?

4      A    I was the president of Pinnacle Three

5 Corporation.  Was it until July 16?  I don't know.

6 I told you, I don't know.  I don't recall the dates,

7 but --

8           MS. MAYERSOHN:  Leon, he asked you if you

9      were present, not president.

10           THE WITNESS:  Oh, present.

11 BY MR. REYES:

12      Q    Present.

13           Were you present on July 16, 2013

14 when Mr. Keifitz was signing these documents?

15      A    I don't think so.

16      Q    And Mr. Keifitz is signing as attorney in

17 fact for both Pinnacle and North Star Maritime, Inc.

18           Did you give Mr. Keifitz a power of

19 attorney for Pinnacle?  And if so, where is that

20 power of attorney because that hasn't been produced

21 to us either?

22           MR. SAYRE:  Objection.

23           THE WITNESS:  He may have it.

24 BY MR. REYES:

25      Q    Huh?

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1          A     He may have it.

2          Q     Did you give Mr. Keifitz a power of

3    attorney when you were in control of Pinnacle?

4          A     I probably did.  I'm not sure about this,

5    but if he sign it, he is an attorney, he have the

6    authority to sign it, so.

7          Q     But do you remember giving him a power of

8    attorney?

9          A     I remember signing a lot of -- a bunch of

10   papers and one of the papers could be a power of

11   attorney.  I told you, when I went to his office I

12   signed a lot of papers.

13         Q     Well, you don't remember what you signed,

14   though, right?

15         A     No.

16         Q     And both of these resolutions are signed

17   by Mr. Keifitz on behalf of North Star Maritime and

18   on behalf of Pinnacle.  That's why I'm asking if you

19   were present, if this is the same day where you were

20   signing some other documents?

21         A     I don't think I was present.  I told you

22   that, but I could give power of attorney otherwise

23   why would he sign it.

24         Q     You mentioned earlier that you think you

25   signed a confession of judgment.  I think you used

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    that term earlier.  Do you remember that?

2         A    Yes.

3         Q    Do you have an independent recollection of

4    signing a confession of judgment?

5         A    No, I don't, but I know that -- you see,

6    the problem is that I signed everything probably in

7    one day and confession of judgment could be one of

8    the papers and could be power of attorney there.  So

9    I cannot recall when and what I signed at the time.

10        Q    Sitting here, can you recall any of the

11   documents you signed, any of them?

12        A    No.

13        Q    None at all?

14        A    I don't recall.  I signed whatever he told

15   me to sign.

16        Q    And you have a recollection of there being

17   something called a confession of judgment that you

18   signed at some point?

19             MR. SAYRE:  Objection, asked and answered.

20   BY MR. REYES:

21        Q    Or why are you using that term, confession

22   of judgment?

23             MR. SAYRE:  Objection.  Because you raised

24        it.

25             MR. REYES:  He testified about it earlier.

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
1        And stop interrupting my deposition.  This is

2    almost sanctionable the amount of times that

3    you are making comments.

4        MR. SAYRE:  If you would like to get the

5    judge on the phone, get him on any time, Rick.

6        MR. REYES:  We will take your objections

7    up to the court when the time being.  Please

8    stop interrupting.  We are only on the record 3

9    hours and 22 minutes because of the amount of

10   time that was wasted with your nonsense.

11       MR. SAYRE:  That is not true.  It's

12   because you've asked the same question 50

13   times.

14       MR. REYES:  Please stop.

15       MR. SAYRE:  I recommend to you, if you've

16   got an issue that you want to bring before the

17   judge, I've got the judge's phone number.

18       MR. REYES:  I will.  I will file a motion.

19       MR. SAYRE:  I've got the judge's phone

20   number.

21       MR. REYES:  I will file a motion.

22       MR. SAYRE:  Let's get the judge on the

23   phone.

24       MR. REYES:  No, let's not.

25       MR. SAYRE:  No, because you want to
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1        waste --
 2            MR. REYES:  I'm not wasting my deposition
 3        more than you've already wasted.  Let's answer
 4        the question.
 5            MR. SAYRE:  Hold on.  Just for the
 6        record --
 7            MR. REYES:  When it's your turn you can
 8        call him.
 9            MR. SAYRE:  I would like to get the judge
10        on the phone right now.  Mr. Reyes is saying
11        that there is sanctionable conduct going on.
12        Let's get the judge on the phone so he can
13        decide whether there's sanctionable conduct
14        going on.
15            MR. REYES:  I'm not going to waste --
16        because counsel needs to leave and I need to
17        ask my questions.
18            MR. SAYRE:  I'm giving you the opportunity
19        right now, Mr. Reyes, if you think there is an
20        issue for the judge to decide, let's get him on
21        the phone.
22            MR. REYES:  I understand.  I'll file a
23        written motion.
24            MR. SAYRE:  Okay.  You have the
25        opportunity right now to get the judge on the
```

```
 1            phone.
 2                 MR. SHALEK:  He is saying he'd rather file
 3            a written motion.
 4                 MR. REYES:  Are you done?
 5                 MR. SAYRE:  I would like to get the judge
 6            on the phone.
 7                 MR. REYES:  All right.  Can I get to the
 8            question, please.
 9                 MR. SAYRE:  Can we get the judge -- I
10            would like to break the deposition and get the
11            judge on the phone.
12                 MR. REYES:  Well, I'm not agreeing to
13            waste more of my deposition.
14                 MR. SAYRE:  Because you are going beyond
15            the scope and if we are going to have a
16            conversation with the judge I would like to get
17            all this flushed out right now.
18                 (Thereupon, the pending question was read
19            back by the court reporter.)
20       BY MR. REYES:
21            Q    Mr. Goldstein -- I recall the question
22       now -- earlier this morning you used the term
23       confession of judgment.  Do you remember that?
24            A    I may.
25            Q    It wasn't me that came up with that term.
```

1    And I'm asking you why are we using that term?

2              Do you have an independent

3    recollection of having signed a confession of

4    judgment?

5        A    I signed a confession of judgment -- I

6    remember that phrase -- because I give everything I

7    had to the people I owe the money, so I confessed

8    it.

9        Q    So that document today is with who,

10   Mr. Keifitz as well?

11       A    I don't know.

12       Q    You were represented by Mr. Sexton when

13   you did the confession of judgment?

14       A    I don't think so.  I'm not sure.

15       Q    Was it in the context of the lawsuit that

16   we looked at a moment ago?

17       A    What did you say?

18       Q    Wouldn't you have done the confession of

19   judgment in the context of the lawsuit that we

20   looked at a moment ago?

21       A    I don't know when and how I did that, but

22   I did whatever needs to be done to transfer all the

23   assets, which I have, to Mr. Yelizarov in lieu of

24   the money I owed him.

25       Q    From the money that was lent to Star

1    Capital you told me about earlier?

2        A    Star Capital, anything I owed, I give it

3    to him.  So I think they told me confession of

4    judgment.  I said fine and I signed it.

5        Q    You were represented by Mr. Sexton during

6    the lawsuit, I think we established that earlier;

7    isn't that true?

8        A    I told you I was represented, but I'm not

9    sure if Mr. Sexton represent me at that time because

10   timing is different.  It could be.

11            MR. REYES:  Let me make this Exhibit 14.

12            (Thereupon, the above-referred to document

13        was marked as Impleaded Defendants' Exhibit No.

14        14 for identification.)

15   BY MR. REYES:

16       Q    Mr. Goldstein, I'm showing you what's been

17   marked Exhibit 14 in your deposition.  This is a

18   pleading from the lawsuit that we looked at a moment

19   ago.  It's called a Joint Motion for Entry of

20   Stipulated Final Judgment between North Star

21   Maritime, Inc., Pinnacle Three Corporation and Leon

22   Goldstein dated August 26 of 2013.  Do you see that?

23       A    Yes.

24       Q    And I'm showing you this document to see

25   if it helps refresh your recollection if in fact you

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    were represented by Mr. Sexton during the lawsuit

2    when you agreed to entry of judgment.

3         A    Didn't you ask me the same question like

4    one minute ago?

5         Q    You just said a moment ago you weren't

6    sure if Mr. Sexton represented you during the

7    lawsuit, so I'm showing you this joint motion to see

8    if we can confirm that Mr. Sexton did in fact

9    represent you at the time that you agreed to a

10   judgment?

11        A    Okay.  Then he did.

12        Q    This document is signed by Francis Sexton

13   as attorney of Pinnacle Three Corporation and Leon

14   Goldstein, correct?

15        A    Correct.

16        Q    And this is a motion agreeing, 14 days

17   after the lawsuit was filed, to have a judgment

18   entered, correct?  Or is it 12 days after the

19   lawsuit was filed?

20             MS. MAYERSOHN:  For record purposes, can

21        you tell him the date that the lawsuit was

22        filed so he can properly calculate it?

23   BY MR. REYES:

24        Q    Looking at Exhibit 9, the lawsuit was

25   filed on the 14th of August.  So 12 days later you

1    were agreeing to a judgment, correct?

2         A    I guess so.

3         Q    Okay.  And that would have been done

4    through Mr. Sexton?

5         A    If that's what it says, that's what it is.

6         Q    Okay.  So if you had signed a confession

7    of judgment, theoretically it ought to be with

8    Mr. Sexton or he would have been advising you on

9    whether to sign that document?

10        A    Repeat it one more time.

11        Q    The confession of judgment that you are

12   talking about --

13        A    Right.

14        Q    -- would have been done at or about the

15   time you did this joint motion when Mr. Sexton was

16   representing you?

17        A    I don't know.  I can see -- when I can see

18   his signature I know that he was there.  If I don't

19   see his signature, I'm not sure if he was or if he

20   was not.

21        Q    Okay.  Let's go back to Exhibit 13, if we

22   could, please, the resolution for Pinnacle Three

23   Corporation.  This is the one you said you had seen

24   before.  Do you have that one?

25        A    They all look the same.  Did I saw the

```
 1    exact one, I'm not sure, but go ahead.

 2         Q    Through this resolution, North Star

 3    Maritime, Inc. and Pinnacle Three Corporation are

 4    transferring certain assets to North Star Maritime

 5    Miami, LLC.  Do you see that?

 6         A    Yes.

 7         Q    Do you recognize that name, North Star

 8    Maritime Miami, LLC?

 9         A    Yes.

10         Q    Do you have any involvement with North

11    Star Maritime Miami, LLC?

12         A    What do you mean involvement?

13         Q    Are you a manager of North Star Maritime

14    Miami, LLC?

15         A    No, I'm not.

16         Q    Have you ever been a manager of North Star

17    Maritime Miami, LLC?

18         A    No.

19         Q    Are you a member of North Star Maritime

20    Miami, LLC?

21         A    I don't think so.

22         Q    Have you ever been a member of North Star

23    Maritime Miami, LLC?

24         A    I don't think so.

25         Q    Do you have any control over North Star
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    Maritime Miami, LLC?

2         A    No.

3         Q    Have you ever had control over North Star

4    Maritime Miami, LLC?

5         A    No.

6         Q    Were you involved in creating North Star

7    Maritime Miami, LLC?

8         A    No.

9         Q    This resolution, Exhibit 13, in that same

10   paragraph that references North Star Maritime Miami,

11   LLC, has a reference to a Composite Exhibit A.  It

12   says:  In the form of the assignments attached

13   hereto is Composite Exhibit A.  Do you see that?  Do

14   you want me to show you where I'm reading?  Right

15   here.  Do you have those assignments?

16        A    I don't have anything in my possession.

17        Q    Have you ever seen those assignments?

18        A    I don't think so.

19        Q    Do you know if there are any such

20   assignments?

21        A    I don't know.

22        Q    These are assignments of the notes and

23   mortgages that came out of the settlement of the

24   underlying lawsuit that you had with the companies.

25   Do you understand that?

1     A    No, I don't.

2     Q    Okay. Let's read it together then. Let's

3 look at the document. It says: Whereas Pinnacle

4 Three Corporation, a Florida corporation, is the

5 owner and holder of the promissory notes from 40

6 Retail Corporation, Century Drive Retail

7 Corporation, Sterlington Retail Corporation and 75

8 Retail Enterprises, Inc. dated as of March 27, 2013

9 in the original principal amount of 2,100,000 and

10 150,000 and the mortgage securing such notes which

11 are recorded in the public records of Sumter County,

12 Florida; Ouachita Parish, Louisiana; Johnson County,

13 Arkansas, Sebastian County, Arkansas. Do you see

14 that?

15     A    Yes.

16     Q    Okay. And in the next paragraph it says:

17 The company, which is Pinnacle Three Corporation,

18 and its parent now wish to reorganize the assets of

19 the company by transferring certain assets to North

20 Star Maritime Miami, LLC subsidiary which is another

21 subsidiary of the parent company, pursuant to the

22 form of the assignments attached hereto as Composite

23 Exhibit A. Do you see that?

24     A    Yes.

25     Q    Okay. Looking at this resolution, can we

1    agree that Pinnacle was assigning the notes and

2    mortgages that were issued as a result of the

3    settlement of the underlying lawsuit to North Star

4    Maritime Miami, LLC?

5             MR. SAYRE:  Objection.  We are now talking

6         about another lawsuit.  I think we should get

7         the judge on the phone.  I'd like to get the

8         judge on the phone, Mr. Reyes.  If you are

9         saying you are not going to allow me to do it,

10        then that's what your response is.  Is that

11        what your response is?

12            MR. REYES:  I don't think there is any

13        reason to get the judge on the phone other than

14        obstructing my deposition.  I'm trying to get

15        --

16            MR. SAYRE:  You want to comply with the

17        orders, right?

18            MR. REYES:  I am complying.  I'm trying to

19        comply with the order and I -- that's what I'm

20        doing here and my time is getting wasted.

21            MR. SAYRE:  No.  The order per -- the

22        plain language in the order you are limited to

23        request for production.  Now you are talking

24        about assignments in a different case

25        altogether.

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1              MR. REYES:  I'm asking -- this is -- in my

 2       request for production of documents, Counsel --

 3       and I'll have to tell you again -- we asked in

 4       this request for production of documents:  All

 5       documents evidencing the assignment of any of

 6       Pinnacle Florida's, Pinnacle Illinois' or

 7       Goldstein's assets to any of the following,

 8       Yelizarov, North Star, North Star, LLC, Vernal.

 9       And those haven't been produced and I'm trying

10       to identify them so we can take it back to the

11       court --

12              MR. SAYRE:  You have them right there.

13              MR. REYES:  I don't have the assignments.

14       I'm asking the witness for the assignments.

15              MR. SAYRE:  You have the assignments in

16       another case, that case you are talking about.

17              MR. REYES:  Okay.  Are you done?

18              MR. SAYRE:  I mean, are we playing games,

19       Rick?

20              MR. REYES:  I don't know what you are

21       doing.

22              MR. SAYRE:  No, it's what you are doing.

23  BY MR. REYES:

24       Q    Mr. Goldstein --

25              MR. SAYRE:  You have the documents.
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1    BY MR. REYES:

 2         Q    Mr. Goldstein, I want to go back to the

 3    language that we were looking at.  It references

 4    some assignments that were to be attached as

 5    Composite Exhibit A.  They are not here.

 6              So my question to you is:  Were those

 7    assignments documents transferring the notes and

 8    mortgages that were issued in the settlement of the

 9    underlying lawsuit with the companies that you have

10    a one-third interest in?

11         MR. SAYRE:  You know what -- objection.

12    Let's get the judge on the phone.  I really do

13    want to the get the judge on the phone now.

14         MR. REYES:  I'm trying to identify -- I

15    can't --

16         MR. SAYRE:  No, but you have -- well, if

17    you want to do this on the record in front of

18    the witness because you are accusing me of --

19         MR. REYES:  But you want to run out the

20    clock so I can't get the answers to these

21    questions.

22         MR. SAYRE:  I don't want to run out the

23    clock.

24         MR. REYES:  Then stop.  Then stop.

25         MR. SAYRE:  Because if what the judge
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

 1     wants you to do is find the documents and you

 2     already have the documents and are asking

 3     questions on it, then that's not in compliance

 4     with the court's order.

 5          MR. REYES:  Listen, there are, from our

 6     perspective, it's very clear, there are

 7     fraudulent documents all over the place for

 8     this transaction.  I don't have to take

 9     anybody's word that something is legitimate.

10     I'm asking this witness what documents exist

11     and so I'm going to ask it the way I want to

12     ask it.

13          MR. SAYRE:  You asked about assignments,

14     correct?

15          MR. REYES:  Yes.

16          MR. SAYRE:  Okay.  And you have

17     assignments in your possession?

18          MR. REYES:  I have some assignments.  I

19     want to ask him which ones these refer to.

20          MR. SAYRE:  And then you are going to

21     produce the assignment -- you know, what, I

22     think we do need to get the judge on -- given

23     what you just said, let's get the judge on the

24     phone.

25          MR. REYES:  We now wasted another 15

---

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    minutes.

2         MR. SAYRE:  So you are not going to allow

3    me to get the judge phone on the phone?

4         MR. SHALEK:  It's not your remedy under

5    the rules.

6         MR. SAYRE:  If I feel like the questioning

7    is in violation of the court's order I'm not

8    allowed to call the judge?  Is that what you

9    are saying?

10        MR. SHALEK:  No, you have the right to do

11   certain things, but not stop his deposition so

12   that you can get him on the phone.

13        MR. SAYRE:  So the court can ensure that

14   the questioning and the scope of the deposition

15   complies with his order, is that what you are

16   telling me?

17        MR. SHALEK:  I'm just saying that --

18        MR. SAYRE:  Are you refusing to allow me

19   to call the judge?

20        MR. REYES:  I want to continue my

21   deposition.

22        MR. SAYRE:  So you are saying I cannot

23   call the judge --

24        MR. REYES:  There is no reason --

25        MR. SAYRE:  -- because I'm in your office?

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
1              MR. REYES:  There is no reason to contact

2         the court and I want to proceed with this.  I'm

3         asking about documents that were requested in

4         my -- it's Item No. 4.  They weren't brought

5         here today.  They exist, according to these

6         resolutions.  I'm asking about them.  And I

7         want to know if the witness knows about them,

8         so I can identify them.  All I've asked him to

9         do is identify the assignment, are they

10        assignments of the note and mortgage that were

11        issued in the underlying lawsuit.  I don't know

12        why that's so -- why it's so difficult.

13             MR. SAYRE:  But the whole idea, is the

14        order a quest for documents?  Can we agree on

15        that, that the deposition was supposed to be a

16        quest for documents?

17             MR. REYES:  No.  The deposition is for him

18        to identify what efforts he made to find the

19        documents, who has them and why they are not

20        here.  And so I don't need to explain myself

21        and we are wasting time and I'm trying to get

22        this thing as far along as I can before we have

23        to stop.  He has counsel.  Counsel is not

24        objecting.

25             MR. SAYRE:  But I'm a party to this
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    lawsuit.  Okay?  And there is an order entered.

2    And I can try to ensure that your questioning

3    complies with the order.

4         MR. REYES:  I'm going to continue.

5         MR. SAYRE:  So you are not allowing me to

6    call the judge.

7  BY MR. REYES:

8    Q    Mr. Goldstein, can we just try to identify

9  these assignments that you have not produced?

10        What are the assignments that are

11 being referred to here?  Are they assignments of the

12 notes and mortgages that were issued to Pinnacle

13 Three in the state court litigation?

14   A    I don't know.

15   Q    Well, isn't that what's being referenced

16 here, the defined note, in the first paragraph are

17 the notes that were issued to Pinnacle Three as part

18 of the settlement in the underlying lawsuit in the

19 first paragraph?

20   A    I would imagine so.  I didn't sign this

21 paper and I don't know what --

22   Q    Well, what other two point --

23   A    -- you are trying to refer me.  I don't

24 have them.  I gave everything to Mikhael Keifitz and

25 I don't remember what I had, what I don't.  He has

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1    everything you ask me for and I don't know if I'll
 2    say, yes, I saw them, maybe I didn't.
 3         Q    But I haven't asked you if you saw them.
 4    I'm asking you if the assignments that are referred
 5    to here are assignments of the $2.1 million note and
 6    $150,000, are those the ones from the settlement?
 7         A    The settlement, I saw it.  If that's the
 8    question, yes.
 9         Q    Okay.  All right.  So by this document,
10    those notes were being assigned to North Star
11    Maritime Miami, LLC?
12         A    Probably.  Probably, yes.
13         Q    Okay.
14         MS. MAYERSOHN:  Leon, if you don't know,
15         you've got to answer you don't know or you do
16         know.
17         THE WITNESS:  I said I don't know.  We are
18         going word by word.  Did you see that?  I don't
19         know if I saw them.  I know that there is an
20         assignment of the mortgage for $2.1 million.
21         The first paragraph I agreed to and --
22    BY MR. REYES:
23         Q    Well, let's look at the second paragraph.
24    The company is defined as Pinnacle Three
25    Corporation.  Do you see that?
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1          A     Yes.

2          Q     And it says:  Now wishes to reorganize the

3     assets of the company by transferring certain assets

4     to North Star Maritime Miami, LLC pursuant to the

5     form of the assignments attached hereto.

6                     Were the notes being assigned to

7     North Star Maritime Miami, LLC per this document?

8          A     What do you think?

9          Q     What do I think?

10         A     Well, you are reading that.  I don't know.

11    What does it mean?  Yes, probably, yes.

12         Q     And at one time you had these assignments

13    in your possession?

14         A     Do I have them now?

15         Q     No.  At one time you said you had them in

16    your possession?

17         A     I had the settlement in my possession.

18         Q     The assignments that were attached to

19    these resolutions for Pinnacle Three Corporation,

20    did you have those?

21         A     I don't remember that.

22         Q     Let me show you this next resolution for

23    Pinnacle Three Corporation.  This one, I'll make it

24    Exhibit 15?

25                     (Thereupon, the above-referred to document

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1        was marked as Impleaded Defendants' Exhibit No.

 2        15 for identification.)

 3   BY MR. REYES:

 4        Q    This is another corporate resolution for

 5   Pinnacle Three Corporation.  Do you recall this

 6   document?

 7        A    I don't recall the document.  I'm reading

 8   them right now.  So what is the document?

 9        Q    The question was, do you recall having

10   seen this document?

11        A    I don't remember seeing it before.

12        Q    And pursuant to this resolution Pinnacle

13   Three Corporation on July 16 of 2013 is transferring

14   certain property per a special warranty deed that's

15   supposed to be attached as Exhibit A.  Do you see

16   that in the second paragraph?

17        A    Yes.

18        Q    Was there such a deed?

19        A    Such a deed from who to who?

20        Q    Mr. Goldstein, I don't know.  We asked for

21   these documents in discovery.  You haven't produced

22   them to us.  I'm trying to determine what documents

23   are missing to take this matter to the court's

24   attention.  And I'm looking at a resolution for

25   Pinnacle Three Corporation and we asked for all the
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1   minutes and resolutions of Pinnacle Three and we've

2   received none from you.

3              But I'm asking, on this resolution it

4   purports that a deed was signed to transfer certain

5   real estate to North Star Maritime Miami, LLC.  And

6   I'm asking you, was such a deed signed?

7        A    I don't know.

8        Q    Do you know what real estate that Pinnacle

9   Three Corporation owned, what real estate was

10  transferred to North Star Maritime?

11       A    I know the -- yes, I know the land, yes.

12  I know the address.

13       Q    What land was transferred to North Star

14  Maritime Miami, LLC?

15       A    What it says here, 1260 South Venetian

16  Way.

17       Q    I went into the public records to see if I

18  could find -- I guess this would be the wrong date.

19              Who resides at that address, if

20  anyone, 1260 South Venetian Way?

21       A    Who is what?

22       Q    Who lives at that address?

23       A    Nobody.

24       Q    What is on that address?

25       A    Land.

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1         Q    Is it just raw land?

 2         A    Yes.

 3         Q    Well, then let me show you this deed.  The

 4    dates don't reconcile, but maybe this is the same

 5    property.  I'll make this No. 16.

 6              (Thereupon, the above-referred to document

 7         was marked as Impleaded Defendants' Exhibit No.

 8         16 for identification.)

 9    BY MR. REYES:

10         Q    I'm showing you a document called a

11    Quitclaim Deed for a property that has a legal

12    description of Lots 5 and 6 in Block 4 of San Marco

13    and it goes on.  Do you see that legal description?

14         A    Yes.

15         Q    Is that the same property?

16         A    I would imagine so.

17         Q    Why is this two months earlier than the

18    resolution, do you know?

19         A    No.

20         Q    This deed was signed by who on behalf of

21    Pinnacle Three Corporation?

22         A    What is the question?

23         Q    Who signed this deed on behalf of Pinnacle

24    Three Corporation in May of 2013?

25         A    This signature you mean?
```

1    Q    Yes.

2    A    It looks like Yelizarov.

3    Q    So Mr. Yelizarov signed the deed in May of

4    2013 as president of Pinnacle, is that what it says,

5    president of Pinnacle Three Corporation?

6    A    That's what it says.

7    Q    But we looked at Exhibit 12 and

8    Mr. Yelizarov had not become president until July of

9    2013.  How is it he was signing this deed in May of

10   2013?

11          MR. SAYRE:  Objection.

12          THE WITNESS:  You asked me a question on

13       the dates and I told you I don't know if he was

14       president at that time or if it was before.

15       That's why I said I don't know the dates.

16   BY MR. REYES:

17   Q    Before you turned over whatever it was you

18   turned over to Mr. Keifitz, did Pinnacle Three

19   Corporation keep what's called a minute book, a

20   corporate minute book?

21   A    I had the corporate book for Pinnacle

22   Three and I give it to him.  I think it was minutes

23   there.

24   Q    And did it have resolutions similar to

25   what we've been looking at here, Exhibits 12 and 13

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1    and --

 2         A    I don't know.

 3         Q    -- 15?

 4         A    I don't know.

 5         Q    Okay.  I'll make this Exhibit 17?

 6              THE COURT REPORTER:  17.

 7              (Thereupon, the above-referred to document

 8         was marked as Impleaded Defendants' Exhibit No.

 9         17 for identification.)

10    BY MR. REYES:

11         Q    I'm showing you what's marked Exhibit 17

12    for identification.  It's a document called Notice

13    of Assignment of Note and Mortgage.  This is a

14    document that Mr. Sayre produced to us as counsel

15    for North Star.

16              Have you ever seen this document

17    before?

18         A    I don't think so.

19              MR. SAYRE:  Objection.  Again, we are

20         talking about documents from another case now.

21    BY MR. REYES:

22         Q    You believe this is the first time you've

23    seen this document, Mr. Goldstein?

24         A    I have so many documents I saw I cannot

25    recognize which ones I saw, which ones I don't.
```

1    That's why I'm saying to you I don't know.

2        Q    Well, was the note and mortgage that

3    Pinnacle Three Corporation received from the

4    companies in the settlement of the underlying

5    lawsuit, was that assigned out of Pinnacle Three

6    Corporation?

7        A    What is the question one more time?

8            MR. SAYRE:  Okay.  Objection.  This

9        involves your lawsuit -- another lawsuit.  So

10       you are using discovery in this lawsuit to

11       support your claims in another lawsuit.

12           MR. REYES:  Are you done?

13           MR. SAYRE:  That's what's going on.  And,

14       Rick, it's not right.  And it's outside the --

15       it's outside of what the judge ordered.

16   BY MR. REYES:

17       Q    In Item No. 4 of the request for

18   production it says -- I ask for any assignments of

19   Pinnacle Florida's assets, Mr. Goldstein.

20           MR. SAYRE:  I will read it.

21           MR. SHALEK:  You don't have to read it.

22           MR. SAYRE:  It talks about request for

23       production in the order.

24   BY MR. REYES:

25       Q    I'm trying to move along so we can finish,

```
 1    if we can, Mr. Goldstein.  I asked for any documents
 2    that show assignment of Pinnacle Florida's assets.
 3              The note and mortgage that was given
 4    to Pinnacle Three is part of the settlement of the
 5    underlying state court lawsuit.  That note and
 6    mortgage was assigned to North Star Maritime Miami
 7    LLC, correct?
 8        A    Probably.
 9        Q    And that's what this document here, No. 17
10    shows, correct?
11        A    Yes.
12        Q    Would Pinnacle have any records of ever
13    having asked for consent to assign that note and
14    mortgage?
15              MR. SAYRE:  Objection.  This is --
16              MS. MAYERSOHN:  Now that I'm going to
17         object as beyond the scope.
18              MR. SAYRE:  And these are the very
19         arguments being raised by Mr. Reyes in a state
20         court litigation.  He is obviously using this
21         federal court litigation to supplement his
22         discovery in the underlying state court
23         litigation.  And now I will get the judge on
24         the phone and I will do it outside if you will
25         not allow me to do it in here.
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1            MR. REYES:  All right.  It will interrupt

 2      the deposition.  Go ahead.

 3            MR. SAYRE:  I will.  Are you going to let

 4      me do it in here?

 5            MR. REYES:  Call him.

 6            MR. SAYRE:  All right.  Let's do it.  It's

 7      your office, Mr. Reyes, if you can have your

 8      secretary call the judge.  His phone number is

 9      written down right here.  If you want to write

10      it down you can write it down or you want me

11      to --

12            MR. SHALEK:  He is not going to have his

13      secretary do that.

14            MR. REYES:  You have a phone right there.

15            MR. SAYRE:  All right.  So can I use your

16      charger, Mr. Shalek?

17            MR. SHALEK:  Sure, but it's not going to

18      charge your phone.

19            MR. SAYRE:  Oh, this is a -- anybody have

20      an iPhone charger?

21            MR. SHALEK:  My phone is too old.

22            MS. MAYERSOHN:  In my car.  I have an iPad

23      if you need one.

24            MR. SAYRE:  Yeah, let's see if we can --

25            MS. MAYERSOHN:  Not a charger.  An iPad if
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1        you can try to --

 2            MR. SAYRE:  You will have to dial it for

 3        me.

 4            MS. MAYERSOHN:  I think it's a FaceTime

 5        thing.

 6            MR. SAYRE:  Let's get the judge on the

 7        phone on FaceTime.

 8            MR. SHALEK:  On the record, Leah, what

 9        time do you have to leave to catch an airplane?

10            MS. MAYERSOHN:  It's 4 o'clock.

11            MR. SHALEK:  4 o'clock?

12            MS. MAYERSOHN:  No.  No.  No.

13            MR. SHALEK:  So we are going to waste the

14        last --

15            MS. MAYERSOHN:  What I'm saying is, it's

16        currently 4 o'clock.  At this point I'm going

17        to miss my plane, so I might as well just miss

18        it.

19            MR. SAYRE:  And, madam court reporter, if

20        we can have that last question available.

21            MS. MAYERSOHN:  I don't know that it's

22        going to work.

23            MR. SAYRE:  So, Mr. Reyes -- this is

24        causing a further delay because Mr. Reyes will

25        not allow me to use his phone.
```

1      MR. REYES:  There is a speakerphone right

2   there.

3      MR. SAYRE:  All right.  Then let's use it.

4      MR. REYES:  Then use it.

5      MR. SAYRE:  I was told that I couldn't.

6      MR. REYES:  Who said you couldn't use it?

7      MR. SAYRE:  Mr. Shalek.

8      MR. SHALEK:  I don't run this office.  I

9   just said his secretaries are busy.  Dial the

10   number.

11      MS. MAYERSOHN:  Do you want to -- while he

12   is dialing, do you want to go to the next

13   question?

14      MR. REYES:  I can't because he is

15   insisting on getting the judge on the phone,

16   so.

17      MR. SAYRE:  If you want to leave this line

18   of questioning, then I will not get the judge

19   on the phone, but you are asking -- you are

20   using discovery in this case to support your

21   claims in the state court litigation.

22      MR. SHALEK:  Why do you think that this

23   order --

24      MR. SAYRE:  It talks about request for

25   production.

```
 1          MS. MAYERSOHN:  Okay.  It talks about it.
 2     It doesn't limit it.  Does it say limited to?
 3          MR. SAYRE:  Leah, what's your
 4     interpretation?
 5          MR. SHALEK:  This is a deposition.
 6          MR. SAYRE:  You were there as well.
 7          MR. SHALEK:  Here's the Notice of
 8     Deposition --
 9          MS. MAYERSOHN:  The request for
10     production -- the judge -- what I recall the
11     judge saying is that Mr. Goldstein has to
12     identify, if he knows, what documents exist,
13     who is in possession of those documents, if he
14     is not in possession of those documents.  If he
15     didn't know, he doesn't know.
16          MR. SHALEK:  Here's what the order says.
17          MR. REYES:  And I've asked -- the question
18     is pending -- the question pending is, does
19     Pinnacle have documents which would evidence
20     requesting a consent to assign the mortgage?
21          MR. SAYRE:  Can we read the question?
22          MS. MAYERSOHN:  And here is the only
23     problem that I have with any --
24          MR. SHALEK:  And here is what -- Leah,
25     let's look at what the order says.  The order
```

1    says, Mr. Goldstein shall sit for deposition.

2         MS. MAYERSOHN:  Right.

3         MR. SHALEK:  He was noticed for

4    deposition.  The party shall agree on the time

5    and place.  Mr. Goldstein shall be prepared to

6    discuss any questions posed to him regarding

7    the subject request for production.

8         Where does it say that the deposition

9    shall be limited beyond what the deposition is

10   supposed to be under Rule 26, Rule 30 --

11        MR. SAYRE:  We are not under Rule 26 or

12   30.

13        MS. MAYERSOHN:  The only --

14        MR. SAYRE:  They are not a party to our

15   lawsuit.

16        MS. MAYERSOHN:  Guys, for the record --

17        MR. SHALEK:  He is allowed to ask whatever

18   he wants about anything in this deposition.

19        MS. MAYERSOHN:  Guys, for the record --

20        MR. REYES:  It's now 4 o'clock if we waste

21   any more time.

22        MS. MAYERSOHN:  The only issue that I have

23   for the record --

24        MR. REYES:  This time is not counting

25   towards my time on the record.  So we need to,

1    whenever my question was asked, whatever time

2    that was, and this waste of time is not

3    counting towards my questions.

4         MR. SAYRE:  What was the question asked so

5    we are clear?

6         MS. MAYERSOHN:  The only issue that I

7    have -- because I have to make my record now --

8    is that you are asking for -- Leon for

9    documents that obviously were created after he

10   was no longer an officer of the company.  So

11   it's unreasonable to assume that he would be

12   familiar with these documents.  But go ahead

13   and ask.

14        MR. REYES:  Leah, on April of 2014, Leon

15   Goldstein filed documents with Sunbiz as the

16   secretary of Pinnacle.

17        MS. MAYERSOHN:  That was a mistake.  He

18   did not file.

19        MR. REYES:  Listen, we hear about

20   mistakes.  We hear about the wrong date.  We

21   hear about this is an error, that's an error,

22   plus or minus.  There could be a million

23   excuses for all these inconsistencies, but I

24   have a right to ask and I asked for all

25   documents evidencing the assignment of the

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    assets and the question I had was:  Are there

2    documents that would show consent was sought to

3    the assignment that would be part of the

4    assignment process?  He can say I don't know if

5    Pinnacle had those documents.  He can say they

6    exist, I don't have them any longer.  Because

7    the judge told him to familiarize himself where

8    the documents are.  He did none of that before

9    this depo started and all he can say is I gave

10   everything to Keifitz.  He can't even say what

11   he gave Keifitz.  So --

12        MS. MAYERSOHN:  Okay.  That's not correct.

13   He did try to familiarize himself.  You are

14   asking him for stuff that he couldn't possibly

15   know about because he didn't create it.

16   Anyway, why don't you move on with the

17   questioning so we can proceed?

18        MR. REYES:  This is the same -- this

19   document is dated the same day he was removed,

20   the same day.  July 16 --

21        MS. MAYERSOHN:  I think he was removed

22   back in March.

23        MR. REYES:  We just looked at Exhibit 12.

24   He was removed on July 16th of 2013.

25        MS. MAYERSOHN:  I don't think we are in

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
1    agreement with that.  That's your position.

2         MR. REYES:  That's the date of the

3    document.  That's the date of the document,

4    July 16 of 2013.  He is removed.  Yelizarov is

5    appointed.  You-all say it's another mistake.

6    You'll say it was earlier and somebody screwed

7    that date up.

8         MS. MAYERSOHN:  You-all?

9         MR. REYES:  Yeah.

10        MS. MAYERSOHN:  Who are you referring to

11   when you say you-all?

12        MR. REYES:  Your group, Yelizarov and

13   Goldstein.

14        MS. MAYERSOHN:  My group?  I don't think

15   I'm part of his group.

16        MR. REYES:  Okay.  We'll see.  We'll see.

17        The question pending is:  Does Pinnacle

18   have documents on this issue?

19        MR. SAYRE:  No.  No, that's not the

20   question pending.  Can we go back, Madam court

21   Reporter, where I objected and said I want to

22   call the judge?  I'd like the question that was

23   posed --

24        MR. REYES:  Well, you said that like 20

25   times, so --
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1              MR. SAYRE:  Well, the last time before I

 2        tried to use my phone which is almost out of

 3        batteries.

 4              MR. REYES:  There it is right there.

 5              MR. SAYRE:  Specifically it was talking

 6        about --

 7              MR. REYES:  She is going to read it to

 8        you.

 9              (Thereupon, the pending question was read

10        back by the court reporter.)

11              MR. SAYRE:  Records of ever having asked

12        for consent to sign that -- okay.  All right.

13              MR. REYES:  Oh, is that an apology?

14              MR. SAYRE:  Records.

15              MR. REYES:  Okay.  Let's go.

16              MR. SAYRE:  It's not an apology, but you

17        were delving into issues in your case, in your

18        state court litigation, Mr. Reyes, and that's

19        not what we are here about today.

20              MR. REYES:  I disagree.

21              MR. SAYRE:  That's not an issue in your

22        underlying state court litigation?

23              MS. MAYERSOHN:  Guys, please move on.

24              MR. REYES:  These cases have the exact

25        same issue irrespective of that, but I asked
```

```
 1        the question.

 2   BY MR. REYES:

 3        Q    And, Mr. Goldstein, I'd like to have an

 4   answer to the question.

 5        A    The answer is that anything I had in my

 6   possession, every single piece of paper been brought

 7   to Mikhael Keifitz and I left it there and signed

 8   everything he told me to sign and I walked away.  I

 9   don't have anything in my possession.  I don't know

10   exactly which papers I brought to him, but I brought

11   everything I could have possibly bring and right now

12   when you ask me for these things he is not returning

13   my phone calls or my attorney's.  I don't know

14   exactly which papers I did and I had.

15        Q    And you understand the judge required you

16   to familiarize yourself on what documents existed,

17   but when I ask you any particulars about any of

18   these documents, all you can tell me is you took all

19   of Pinnacle's records to Mr. Keifitz and you don't

20   know what was in that group of documents; is that

21   fair to say?

22        A    No, not really.

23        Q    Okay.  What documents did you bring to

24   Mr. Keifitz?

25        A    The whole bunch of documents.
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1        Q      What does that mean?

2        A      Well, let me finish, if I may.  A whole

3   bunch of documents means that I right now if the

4   judge want me to bring my recollection, I need to go

5   to Mr. Keifitz, sit down and go through all the

6   papers and give it to you, but I didn't have the

7   chance.  He will not return my phone calls.  He will

8   not give it to me because I'm not his client and

9   that's what you are talking about for six hours.

10  You are trying to ask me, do I even remember this

11  paper or that paper.  I don't.  They look the same

12  to me.  I owe the money to North Star Maritime and I

13  give everything I have and I signed everything he

14  asked me to sign.

15       Q      I don't want to go over the same things

16  again from this morning.  You told me that you had

17  not tried to get information from Mr. Keifitz after

18  the judge entered the order to produced these

19  documents, that the last time you spoke to him was

20  eight or nine months ago; is that right?

21       A      I told you -- I told you that I will not

22  call him because he already told me like nine months

23  ago not to call him on any legal issues because he

24  is representing somebody else.  However, my

25  attorney, whom I hired, called Mr. Keifitz numerous

1    of times to get these papers and he will not respond

2    and I don't see how else I could have done that.

3    Maybe through Oleg, but he was out of country.  So

4    I'm doing everything possible to satisfy what the

5    judge ask me, but I just cannot open the door when

6    the door is closed.

7        Q    Among the documents that the judge said

8    that you were to respond to -- and you can look at

9    this if you would like.  I'm specifically referring

10   to 16 and 17:  Any documents evidencing the

11   directors, shareholders, owners or principals of

12   Pinnacle Florida or Pinnacle Illinois in 2013 and

13   2014.

14              Do you know what documents exist that

15   would show that information?

16       A    No, I don't.

17       Q    Did you make any effort to try to figure

18   out what documents would exist that would show that

19   information?

20       A    You want me to repeat what I just said?

21       Q    Is it anything different?  Is it the same

22   answer?

23       A    The same answer.  I give everything to one

24   person and I just cannot get it from him.

25       Q    Okay.  Let's look at No. 17.  This asked

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    for any documents evidencing the members, managers,

2    owners or principals of Vernal, which is a defined

3    term for Vernal USA, Inc., North Star, North Star,

4    LLC in 2013 and 2014.

5            Would you have had these documents,

6    Mr. Goldstein?

7        A    I don't know.

8        Q    You don't know?  Did you look to see?

9        A    Maybe I did.  Maybe I didn't.

10       Q    You don't know?  This is not Pinnacle's

11   records now.  These are records of Vernal, North

12   Star, North Star, LLC.

13           Did you attempt to find any of these

14   documents?

15       A    The same answer.  I was trying to get

16   everything the judge want me to give it to you today

17   and it belong to the one person who I'm not a client

18   of his and he will not deal with me at all and I

19   think you understand that.  My attorney called him

20   and he did not respond.  Maybe he is not in the

21   country.  Maybe he is not in town.  I do not know

22   what's happening, but we cannot get it from this

23   person.

24       Q    Are you a shareholder or owner of Vernal

25   USA, Inc.?

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
1          A     No.

2          Q     Have you ever been?

3          A     No.

4          Q     Are you a shareholder or an owner of North

5    Star Maritime, Inc.?

6          A     No.

7          Q     Have you ever been?

8          A     No.

9          Q     Are you an officer or director of either

10   company?

11         A     No.

12         Q     Have you ever been?

13         A     No.

14         Q     I had asked you before if you were

15   involved at all in North Star Maritime Miami, Inc.

16   I think you said no to those?

17         A     Right.

18         Q     To that company.

19               Let me show you a document.  I'll

20   make this Exhibit 18.

21               THE COURT REPORTER:  18.

22               (Thereupon, the above-referred to document

23         was marked as Impleaded Defendants' Exhibit No.

24         18 for identification.)

25
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1    BY MR. REYES:

 2        Q    Do you recognize the e-mail address

 3    Leongoldstein@USA.com?

 4        A    Yes.

 5        Q    Is that your e-mail address?

 6        A    Correct.

 7        Q    Do you still use that e-mail address?

 8        A    Yes.

 9        Q    And this is an e-mail between you and

10    Mr. Keifitz, correct?

11        A    What's that?

12        Q    This is an e-mail between you and

13    Mr. Keifitz, correct?

14        A    It looks like.

15        Q    So at least in May of 2013 you and he were

16    communicating by e-mail, correct?

17        A    Maybe.

18        Q    But you've not produced any of your e-mail

19    communications with Mr. Keifitz, correct?

20            MS. MAYERSOHN:  Please give a time frame.

21    BY MR. REYES:

22        Q    The question is:  You have not produced

23    any of your e-mail communications with Mr. Keifitz;

24    is that a fair statement?

25        A    I did not produce what?
```

1        Q    E-mails between you and Keifitz?

2        A    I don't know.  Maybe.

3        Q    We looked at what you produced.  There are

4   no e-mails in there between you and Mr. Keifitz?

5        A    Okay.  Then it's not.

6        Q    And why haven't you produced your e-mails

7   with Mr. Keifitz?

8        A    What's that?

9        Q    Why haven't you produced your e-mails with

10  Mr. Keifitz?

11       A    Your line of questions are in the way of,

12  how do I remember a year and a half ago did I

13  respond to Mr. Keifitz or not?  How do I remember

14  whom I did call or whom I did not.  If you will show

15  me that I did responded, then I did, but most likely

16  if he is not my attorney, we are not talking about

17  legal issues.  However, we can say hello to each

18  other, Happy Hanukkah and stuff like that because

19  what's wrong with that?  But as far as talking or

20  asking me -- ask him to give me some information

21  which is -- I'm not his client.  He will not talk

22  about that.

23       Q    Mr. Goldstein, my question is:  You did

24  not produce any of your e-mails between you and

25  Mr. Keifitz in response to the judge's order,

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1   correct?

 2        A    Right.

 3        Q    And looking at Exhibit 18 we know that

 4   there is at least an e-mail between you and

 5   Mr. Keifitz, we are looking at it right here,

 6   correct?

 7        A    Okay.

 8        Q    This is an e-mail from MK.legal@Yahoo.com

 9   to Leongoldstein@USA.com, correct?

10        A    Right.

11        Q    And he is forwarding to you an e-mail that

12   he received from the State of Florida regarding the

13   formation of North Star Maritime Miami, LLC on May

14   3rd of 2013, correct?

15        A    A year and a half ago, yes.

16        Q    So Mr. Keifitz is sending to you the

17   confirmation that the State of Florida has received

18   the articles of incorporation for North Star

19   Maritime Miami, LLC?

20        A    Okay.  It's possible.  It doesn't mean

21   that I read this e-mail.

22        Q    Why was Mr. Keifitz sending you

23   confirmation that the North Star Maritime Miami, LLC

24   articles of incorporation were filed with the

25   secretary of state if you had nothing to do with
```

1    North Star Maritime Miami, LLC?

2         A    Why don't you ask him?

3         Q    Why don't you tell me what you know,

4    Mr. Goldstein?

5         A    Well, it's a possibility that I can tell

6    Oleksandr Yelizarov maybe that.  I'm just guessing

7    that.  Why would he do that?  He probably can e-mail

8    me and I will -- he knows that we are friends, so it

9    could be done.  I may not read that e-mail.

10        Q    Or did you help create North Star Maritime

11   Miami, LLC so the Pinnacle assets could be

12   transferred to that company?

13        A    No.

14        Q    Now you said you weren't an owner of North

15   Star Maritime Miami, LLC, correct?

16        A    Correct.

17        Q    Let me show you another document.  I'll

18   make this Exhibit 19.

19             (Thereupon, the above-referred to document

20        was marked as Impleaded Defendants' Exhibit No.

21        19 for identification.)

22   BY MR. REYES:

23        Q    I'm showing you what's marked as Exhibit

24   19, Mr. Goldstein.  It's a record from Capital Bank

25   regarding the opening of an account for North Star

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1    Maritime Miami, LLC.

 2         A    Okay.

 3         Q    And your signature appears on this

 4    document, correct?

 5         A    What is that?

 6         Q    Your signature appears on this document,

 7    correct?

 8         A    That is correct.

 9         Q    This is the account agreement with Capital

10    Bank for the North Star Maritime Miami, LLC account,

11    correct?

12         A    Right.

13         Q    And you signed this document and

14    Mr. Yelizarov signed this document, correct?

15         A    Correct.

16         Q    It was on May 6 of 2013; correct?

17         A    Correct.

18         Q    And you and Mr. Yelizarov are listed as

19    the owners of the bank account; is that correct?

20         A    No, I'm a signor on this account.

21         Q    Well, let's look at the left side of the

22    document.  Who is Owner No. 1, what's his name?

23         A    Oleksandr Yelizarov.

24         Q    Who is Owner No. 2?

25         A    Well --
```

```
 1              MS. MAYERSOHN:  Objection to the

 2         characterization as the document speaks for

 3         itself and says owner/signor which doesn't

 4         indicate whether someone is an owner or a

 5         signor and under relationship it says

 6         authorized signatory.  It doesn't specify who

 7         is an owner.

 8    BY MR. REYES:

 9         Q    Whose name is under owner/signor

10    information No. 2?

11         A    I have been on this account as a signor on

12    this account to pay bills to -- from Yelizarov maybe

13    to his attorney and that's why my signature is

14    there.  I could transfer the funds when he is asking

15    me and do whatever he would tell me to do.

16         Q    So you agree that you are a signatory even

17    today on North Star Maritime Miami, LLC's account?

18         A    I'm saying to you, on this particular

19    account he put me as a signor to pay bills or

20    whatever he wants me to do and that's why my

21    signature is there.

22         Q    But you did not contact Capital Bank to

23    get records to comply with the judge's order,

24    correct?

25         A    I didn't say that.  I --
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1      Q    You told me earlier today you did not

2  contact Capital Bank to obtain records, correct?

3      A    I told you that I called -- well -- you

4  want me to obtain records for this account, that's

5  exactly what you needed?

6      Q    My question is:  Did you contact Capital

7  Bank to try to get records to comply with the

8  judge's order?  That's my question.

9      A    I did call -- what's his name -- Tony and

10  right now they have remodeling in the bank and he is

11  not -- not available.

12      Q    Tony who?

13      A    I forgot his name, last name.

14      Q    What branch?

15      A    The same Capital Bank.

16      Q    Which Capital branch bank -- branch?

17      A    Capital Bank?

18      Q    In Aventura, the one that's listed here?

19      A    Aventura, yeah.

20      Q    The 20295 Northeast 29th Place, Aventura,

21  Florida?

22      A    Yes.

23      Q    And the person you speak to there is Tony?

24      A    I was calling and he was not there a few

25  times.

```
 1        Q    When did you call him to get records to

 2   comply with the judge's order?

 3        A    I don't remember.

 4        Q    Huh?

 5        A    I do not remember when.  Three days ago,

 6   four days.

 7        Q    What number did you call him from?

 8        A    What number?

 9        Q    What number did you use to call him from?

10        A    From my telephone.

11        Q    What number is that?

12        A    (786) 556-5757.

13        Q    Wait.  It's too fast.  (786)?

14        A    556-5757.

15        Q    556-5757?

16        A    Correct.

17        Q    And in our request for production you saw

18   that we asked for documents evidencing

19   communications with Capital Bank and Chase Bank in

20   Nos. 21 and 22?  Do you see that in the request for

21   production of documents?

22        A    Okay.

23             MS. MAYERSOHN:  For record purposes, 21

24        and 22, I had asked you to be more specific

25        because your 21 is in reference to a promissory
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1       note in the aggregate amount of $2.1 million,

2       not in reference to any communications.

3           MR. REYES:  No. 21 reads:  Any documents

4       evidencing communications between Vernal, North

5       Star and North Star, LLC and Capital Bank

6       regarding any deposits of payments made by

7       Century, Sterlington, 40 Retail to Pinnacle

8       Florida or Pinnacle Illinois pursuant to the

9       promissory note in the aggregate principal

10      amount of 21 million -- 2.1 million.  That's

11      what it reads.

12          And 22 says:  Any documents evidencing

13      communications between Vernal, North Star or

14      North Star, LLC and Chase Bank regarding any

15      deposits of payments made by Century,

16      Sterlington or 40 Retail to Pinnacle Florida or

17      Pinnacle Illinois pursuant to the settlement

18      note.  That's what it reads.

19          MS. MAYERSOHN:  You asked for any

20      communications rather than specifically limit

21      it to the settlement note or the promissory

22      note.

23  BY MR. REYES:

24     Q   Mr. Goldstein, you said you called Tony.

25  When did you call Tony to get records from the bank?

```
 1        A    I told you, I don't remember the date.

 2   Three, four, five days ago, six days.

 3        Q    So three to six days ago you called --

 4        A    Maybe three to eight days ago.

 5        Q    Okay.

 6        A    I called him several times.

 7        Q    Several times.  Okay.

 8             And did you leave any voice mail

 9   messages of what you needed from him?

10        A    No, but I was talking to somebody in the

11   branch and left a message to call me.

12        Q    Who did you leave a message with?

13        A    I don't know.

14        Q    Did you ever send Tony an e-mail to say I

15   need these records from the bank?

16        A    No.  I don't know his e-mail.

17        Q    Did you ask anyone at the bank for the

18   e-mail?

19        A    I asked the person to tell him to call me

20   back.

21        Q    Well, let me show you another document

22   that Capital Bank produced.  I'll make this Exhibit

23   20.

24             (Thereupon, the above-referred to document

25        was marked as Impleaded Defendants' Exhibit No.
```

1              20 for identification.)

2      BY MR. REYES:

3          Q     This document is entitled Limited

4      Liability Company Authorization Resolution and it is

5      between Capital Bank and North Star Maritime Miami,

6      LLC.  Do you see that?

7          A     Yes.

8          Q     And it is signed at the bottom by two

9      individuals.  Do you see that?

10         A     What's that?

11         Q     It's signed on the bottom by two

12     individuals.  Do you see the signatures at the

13     bottom?

14         A     Yes.

15         Q     Whose signatures are at the bottom of this

16     Limited Liability Company Resolution?

17         A     Oleksandr Yelizarov as the president and

18     mine as the signor on the account.

19         Q     Okay.  The signature to the left is

20     Mr. Yelizarov's signature; is that right?

21         A     It looks like.

22         Q     And the one to the right is your

23     signature, correct?

24         A     Correct.

25         Q     Under Mr. Yelizarov's signature it reads:

1    Attest by one other manager or designated member,

2    right?

3         A    Right.

4         Q    And under your signature it reads:

5    Manager or designated member, correct?

6         A    Correct.  But I'm the signor of the

7    account.  There is no space where it says signor of

8    the account.  So when he opened the account we said

9    that I want to be a signor and that's where I

10   signed.

11        Q    Did you ever send any writing to Capital

12   Bank to state, hey, you are not a manager or a

13   member of North Star Maritime Miami, LLC if this

14   resolution is wrong?

15        A    I did not.  We opened the account, but

16   I've been the signor on the account.  The only thing

17   I can do is just transfer the money when he will

18   tell me what to do with the money, if he wants to

19   pay lawyers or whatever he wants to do.  He's not in

20   the country.  He needs somebody to take care of

21   things he needs to be taken care of.

22        Q    If you could go back to Exhibit 19 for a

23   second, the one before this one.  On the second page

24   there is a box that says non-individual owner

25   information.  Do you see that?

```
 1          A     No.

 2          Q     On the second page, top right corner.  Out

 3   when the account is being opened for a

 4   non-individual.  Are you with me here on the top

 5   right corner?  Can you see that?

 6          A     Well, I can see it's very small, small

 7   letters, but probably.  Give me a second.

 8          Q     Are these your glasses here?

 9          A     No, but it's okay.  Give me a second.

10          Q     Do you want to use these magnifying

11   glasses?

12          A     Can I?

13          Q     Sure.

14          A     Okay.  What is the question because

15   maybe --

16          Q     All right.  This is -- this box has the

17   contact information for North Star Maritime Miami,

18   LLC; is that right?

19          A     I don't know.  Maybe.

20          Q     And whose phone number is listed there as

21   the phone number for North Star Maritime Miami, LLC?

22          A     Mine.

23          Q     Whose e-mail address is listed there as

24   the e-mail address for North Star Maritime Miami,

25   LLC?
```

1       A    Mine.

2       Q    Whose address is listed as the address for

3 North Star Maritime Miami, LLC?

4       A    First of all, let me see the e-mail

5 address, is it mine?  But right now I can see it's

6 not my address.  So let me see -- where is the

7 e-mail you said?  I'm taking you back because I

8 cannot see.  Is it Leongoldstein@USA.com?

9       Q    It says Leongoldstein@USA.com.

10      A    Okay.  Yeah, it's my e-mail address --

11 e-mail address.  It's the -- that address is Mikhael

12 Keifitz' address.

13      Q    3363 Northeast 163rd Street, Suite 707,

14 North Miami Beach is Mr. Keifitz' address?

15      A    Yes.

16      Q    Isn't that where Star Capital was located?

17      A    No.  In different -- in different

18 apartment or different room number.

19      Q    Is that a yes or a no?  Is that the

20 address for Star Capital?

21      A    No.

22      Q    What was the address for Star Capital?

23      A    I'm telling you 707 is Michael's --

24 Michael's business.

25      Q    And what was the suite number for Star

1   Capital?

2        A    They are next to each other.  This is

3   bank's -- bank's things.  If the bank needs to get a

4   hold of Yelizarov, he is calling me.  So that makes

5   a lot of sense why he put my phone number and my

6   e-mail address.

7        Q    Why doesn't it have Mr. Keifitz' phone

8   number and e-mail address?

9        A    Because Mr. Keifitz will not do any wires

10  for him or anything like that and I will do and if

11  for some reason they say, send the wire and the wire

12  didn't go through, they have to call me, not

13  Mr. Keifitz.  He is an attorney and I'm just his

14  friend and will do whatever he needs me to be done.

15       Q    So you are stating that you are listed on

16  these corporate records of North Star Maritime

17  Miami, LLC to help Mr. Yelizarov as his friend?

18            MR. SAYRE:  Objection.

19            MS. MAYERSOHN:  Objection to

20       characterization as corporate records as

21       opposed to bank records.

22  BY MR. REYES:

23       Q    Can you answer the question?

24       A    I will answer the question.  I will do

25  whatever Mr. Yelizarov want me to do to help him out

```
 1   and if he needs my help to do wires or whatever

 2   needs to be done in Miami while he is in Ukraine,

 3   I'm doing that for him.

 4        Q    Because he is your friend?

 5        A    Yes, for many years.  And he trust me.

 6   That's why he is putting my signature on the account

 7   knowing that I'm not going to steal the money from

 8   his account.

 9        Q    We had talked earlier about Mr. Keifitz

10   having powers of attorney for Pinnacle and I just

11   want to show you a document that Mr. Sayre gave us

12   and ask you if you have seen this before.  This

13   would have been among the records of Pinnacle that

14   you no longer have.  Okay?

15             And I'll make this Exhibit 21.

16        (Thereupon, the above-referred to document

17        was marked as Impleaded Defendants' Exhibit No.

18        21 for identification.)

19   BY MR. REYES:

20        Q    Do you recognize Exhibit 21,

21   Mr. Goldstein?

22        A    What's that?

23        Q    Do you recognize Exhibit 21?

24        A    I don't recognize it.  I can see it.

25        Q    Well, it's a general power of attorney in
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    favor of Mikhael Keifitz.  Do you see that?

2         A    That's right.  Yeah.

3         Q    And it's given to him by Mr. Yelizarov as

4    president and director of Pinnacle Three

5    Corporation.  Do you see that?

6         A    Yes.

7         Q    And this was signed on May 3rd of 2013?

8         A    Okay.

9         Q    Is that -- looking at the document, do you

10   see that date on the second page?

11        A    Yes, I do.

12        Q    Were you present when this power of

13   attorney was given?

14        A    I'm not sure.

15        Q    Are you aware of any other power of

16   attorney with respect to Pinnacle other than this

17   document that we are looking at here as Exhibit 21?

18        A    I'm not aware of what Mikhael Keifitz has

19   for Mr. Yelizarov.  Mr. Yelizarov is client and

20   whatever he has.  It's not my business.

21        Q    When you were the hundred percent owner of

22   Pinnacle Three Corporation, did you give a power of

23   attorney to Mr. Keifitz?

24        A    I cannot recall that.

25        Q    Do you recall giving a power of attorney

1   to anyone to act as -- on your behalf as president

2   of Pinnacle Three Corporation?

3       A    I could have very well given to Oleg

4   because of the relationship, but I could have given

5   to Mikhael Keifitz as well.  When I'm not in the

6   country for half of the year and I need somebody to

7   do something, I could give power of attorney to

8   those people I trust.

9       Q    You made a statement, Mr. Goldstein, that

10  you were out of the country for half the year?

11      A    Well, sometimes, yes.

12      Q    Sometimes.  It's not always; is that

13  correct?

14      A    This time I was like five months out of

15  the year.

16      Q    And so when you are away Oleg Firer is

17  running your affairs?

18          MR. SAYRE:  Objection.

19          THE WITNESS:  Somebody does.

20  BY MR. REYES:

21      Q    Well, who would it be other than Oleg

22  Firer?

23      A    It all depends what kind of affairs.  It

24  all depends.  Mr. Firer, because of his business, he

25  is very well communicated as far as e-mails and all

1    that stuff and if something comes to me it comes to

2    him as well and he can answer the e-mail for me or

3    whatever.

4        Q    But are you just guessing if you are

5    saying you may have given Mr. Firer a power of

6    attorney or do you have a recollection of giving him

7    a power of attorney?

8        A    No, I'm guessing.

9        Q    Okay.

10       A    But I don't see why I shouldn't.

11       Q    Now the power of attorney is signed by

12   Mr. Yelizarov in May of 2013.  Is that his signature

13   there on the second page?

14       A    Okay.

15       Q    Do you recognize that as Mr. Yelizarov's

16   signature in May of 2013?

17            MR. SAYRE:  Objection, it calls for

18       speculation.

19            THE WITNESS:  Yes.  You asked me that

20       question and I said yes.

21   BY MR. REYES:

22       Q    You recognize it?

23       A    I recognize his signature.

24       Q    Okay.  And were you present when he was

25   signing this power of attorney?

```
 1              MS. MAYERSOHN:  Objection, asked and

 2         answered.

 3              THE WITNESS:  You asked me that question

 4         already.  I said I don't remember.

 5    BY MR. REYES:

 6         Q    Do you recognize these witnesses, Emily

 7    English and Rosa Chang?

 8         A    No.

 9         Q    How about the notary, Jessica Saldana?

10         A    I have no idea who these people are?

11         Q    Huh?

12         A    I don't recognize them.

13         Q    We looked earlier at a resolution dated

14    July 16th of 2013 making Mr. Yelizarov the president

15    of Pinnacle.  Do you remember that, Exhibit 12?

16         A    Yes.

17         Q    How was it that he was signing a power of

18    attorney in May of 2013 if he didn't become

19    president until July of 2013?

20         A    I don't know.  You asked me that question.

21    it could be a clerical mistake.  It could be

22    anything.

23         Q    Let me show you another document.  I'll

24    make this 22.

25              (Thereupon, the above-referred to document
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
1        was marked as Impleaded Defendants' Exhibit No.

2        22 for identification.)

3   BY MR. REYES:

4        Q    This is another power of attorney that was

5   given to us by Mr. Sayre.

6             Do you recognize this document?  Do

7   you recognize this document?

8        A    I don't.

9        Q    This is also signed by Mr. Yelizarov on

10  May 3rd of 2013.

11       A    Okay.

12       Q    Now May 3rd, 2013 is the same date that

13  North Star Maritime Miami was created.

14             Do you remember the earlier e-mail

15  between you and Mr. Keifitz?

16       A    From Mr. Keifitz probably e-mail it to me.

17       Q    When he e-mailed you articles -- well, the

18  filing confirmation to you.  Do you remember that

19  e-mail?

20       A    I understand that.  I said I'm not sure if

21  I saw that.  I'm not reading my -- all my e-mails,

22  but go ahead.

23       Q    My question is:  Do you recall seeing this

24  power of attorney?

25       A    I don't.  No, I'm not recalling.
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1      Q    Okay.  The records we looked at as far as

2  the bank -- the opening of the bank account on -- I

3  think it was May 6th, is it, which would have been

4  about three days later after these powers of

5  attorney.

6                Who was the person that provided the

7  bank the documentation that the bank needed to open

8  the account?

9      A    I presume Mikhael Keifitz.

10     Q    Well, you were present when the account

11  was opened, correct?

12     A    Yes.

13     Q    Was Mr. Yelizarov present when the account

14  was opened?

15     A    Yes.

16     Q    And Mr. Keifitz was present when the

17  account was opened?

18     A    No.

19     Q    Sorry.

20                So how was it that Mr. Keifitz

21  provided the documents then?

22     A    I don't know.  By e-mail, by somehow,

23  whatever needs to be done.

24     Q    When you and Mr. Yelizarov went to open

25  the account, did you provide records to the bank?

1      A    Mr. Keifitz provided whatever needs to be

2  provided, whatever bank ask us to provide and we

3  just came in and signed the documents which the bank

4  gave us to sign.

5      Q    Are you saying that Mr. Keifitz contacted

6  the bank first and then you and Mr. Yelizarov came

7  back later to sign the forms?

8      A    I presume so.  I don't remember exactly

9  how it was done, but I don't think I saw Mr. Keifitz

10  at the bank.

11      Q    Did you bring any corporate records of

12  Pinnacle or any corporate records of North Star

13  Maritime Miami, LLC to the bank, you, Leon

14  Goldstein?

15      A    One year ago I don't remember, but it's a

16  possibility that Mr. Keifitz gave me necessary

17  papers to show to the bank to open the account.

18      Q    And what can you remember that Mr. Keifitz

19  gave you that were necessary papers to open the

20  North Star Maritime Miami, LLC bank account?

21      A    I don't remember what exactly it was, but

22  I think the bank ask us certain papers which Mikhael

23  Keifitz gave us to open the account.

24      Q    Did you open the account with this person

25  Tony that you called or did you open it with

1    somebody different?

2         A    I think somebody different.

3         Q    But is Tony your bank relationship at

4    Capital Bank?

5         A    No, they are changing people all the time.

6         Q    Why did you call for Tony the other day?

7         A    Because he is a manager.  The bank is very

8    small right now.  The bank today is probably like

9    all this space, maybe less.  They just cut it down

10   and one -- it's just a real, real small bank right

11   now.  So the only person I knew was Tony, so I

12   called him.

13        Q    Okay.

14             THE VIDEOGRAPHER:  Can we take two

15        minutes?

16             MR. REYES:  Yes.

17             THE VIDEOGRAPHER:  Off the record at 4:37.

18             (Thereupon, a discussion was had off the

19        record, after which the following proceedings

20        were had:)

21             THE VIDEOGRAPHER:  Back on the record at

22        4:53.

23   BY MR. REYES:

24        Q    Mr. Goldstein, you had told me earlier

25   that you have given Mr. Yelizarov everything you had

```
 1    with respect to Pinnacle, correct?

 2              MR. SAYRE:  Objection.

 3              THE WITNESS:  I gave it to Mikhael

 4        Keifitz.

 5    BY MR. REYES:

 6        Q    His attorney, correct?

 7        A    His attorney.

 8        Q    But you did that because you were giving

 9    Mr. Yelizarov everything you owned, correct?

10        A    Yes.

11        Q    You've given Mr. Yelizarov all of your

12    property; is that right?

13        A    I give Mr. Yelizarov whatever they told me

14    to give and I gave it.

15        Q    And you signed, you said, whatever

16    documents Mr. Keifitz gave you to sign, correct?

17        A    Right.

18        Q    And you had no attorney with you at the

19    time you were signing, correct?

20        A    Correct.

21        Q    And you did not retain copies of any of

22    the documents you signed, correct?

23        A    I don't think so.

24        Q    You didn't get copies of those documents

25    for your accountant; is that correct?
```

```
1          A    I think Oleg had some documents.  That's

2     why I said Oleg has things which you may need.

3          Q    So you think when you gave everything you

4     owned to Mr. Yelizarov and you signed documents to

5     do that, that Oleg may have copies of some of the

6     documents you signed, is that what you are saying?

7          A    No, I'm saying for the income tax

8     returns -- I'm not sure what you are referring to --

9     maybe Oleg has it because when I'm doing income tax

10    return I bring to him because he knows more than I

11    do.

12         Q    But, again, I'm going back to your

13    testimony that you went to Mr. Keifitz' office and

14    you signed whatever documents were put in front of

15    you to transfer all your assets to Mr. Yelizarov,

16    right?

17         A    Right.

18         Q    And my question is:  When you sat there

19    and signed all those documents, did you ask for

20    copies for yourself?

21         A    I didn't.

22         Q    And did you ask for copies for Mr. Haft,

23    your accountant?

24         A    I don't think so.  I can get it if I need

25    to do the income tax returns.
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    Q    Did you ask for copies for your attorney

2  at the time, Mr. Sexton?

3    A    I did not.  Maybe -- I did not.

4    Q    Did you ask for copies to be sent to

5  anyone in particular, like Mr. Firer, for example?

6    A    I cannot recall that.

7    Q    Did you ask for copies to be sent to

8  anyone?  I don't want to limit it.  To anybody in

9  the world, did you ask the copies of what you signed

10  be sent to anyone?

11    A    I cannot recall.

12    Q    And when you say you gave everything to

13  Mr. Yelizarov, you gave your ownership in Pinnacle,

14  right?

15    A    I put second mortgage -- I put a mortgage

16  on the PS store, if that's what you are asking me.

17    Q    You gave Mr. Yelizarov your ownership of

18  Pinnacle Three Corporation, correct?

19    A    I give him the -- he put mortgage for

20  $1.5 million for the Tower Suite 2, right.

21    Q    My question is:  You gave Mr. Yelizarov

22  among -- you said you gave him everything so that

23  means you would have given him your shares of

24  Pinnacle Three Corporation, right?

25    A    I gave whatever Mikhael Keifitz said to

1    give it to him and I signed everything Mikhael

2    Keifitz told me to sign.

3        Q    But your testimony here today under oath

4    is that everything that Leon Goldstein owned, either

5    personally or through a company, was transferred to

6    Mr. Yelizarov?

7            MR. SAYRE:  Objection.

8    BY MR. REYES:

9        Q    Right?

10       A    I live in my apartment, which is my

11   homestead.  I didn't transfer to Yelizarov, if

12   that's what you are referring to.

13       Q    Your Homestead, isn't that in the name of

14   Pinnacle Three Corporation too?

15       A    No.

16       Q    It's in your personal name?

17       A    Right.

18       Q    So other than your homestead you are

19   saying you transferred everything else to

20   Mr. Yelizarov?

21       A    I'm repeating what I said.  I signed

22   everything to Yelizarov, whatever Mikhael Keifitz

23   told me to sign.

24       Q    But were you mistaken earlier or did I

25   misunderstand you, I thought you had said you

1    transferred all your assets?

2         A    I don't know what you are referring to.

3    All my assets could be my shoes, could be my

4    clothes.  I don't know.  That's why I'm trying to be

5    specific.  I transferred him whatever Mikhael

6    Keifitz told me to sign.

7         Q    But when you signed the documents that Mr.

8    Keifitz put in front of you you understood that you

9    were transferring your assets other than your

10   homestead to Mr. Yelizarov?

11             MR. SAYRE:  Objection.

12   BY MR. REYES:

13        Q    Do you want me to have it read back to you

14   again?

15        A    No, I heard the question.

16        Q    And the answer?

17        A    I transferred everything Mr. Keifitz asked

18   me to transfer.  That's what I did.

19        Q    And does that mean all your assets other

20   than your homestead or something less than that?

21             MR. SAYRE:  Objection.

22             THE WITNESS:  It looks like it's

23        everything to me as far as the real estate.

24   BY MR. REYES:

25        Q    Was there any -- are there any documents

```
 1    that value those assets that you transferred?

 2         A    Everything is valued.

 3         Q    But are there documents to show the value,

 4    what those assets are worth that you transferred?

 5         A    I cannot recall if we had that.  Maybe

 6    Mikhael Keifitz has it.

 7         Q    Well, do you know if you paid Yelizarov

 8    ten times what you owed him?

 9              MR. SAYRE:  Objection, asked and answered.

10              THE WITNESS:  I know that I owe him more

11         than what my assets were.

12    BY MR. REYES:

13         Q    Say it again.

14         A    I know that I transferred him the assets.

15    It's -- I still owed him, not vice versa.

16         Q    And so was there some kind of credit done?

17    Is there some kind of accounting record that shows

18    after you give credit for your assets how much you

19    still owe him?

20         A    Like I said, it's a question to Mikhael

21    Keifitz.  His attorney.

22         Q    When you gave your life -- all your assets

23    to Mr. Yelizarov, other than your homestead, did you

24    ask for a receipt at least?

25         A    No, but I can do it now if I want.
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    Q    So you gave millions of dollars worth of

2    asset, didn't even ask for a receipt?

3    A    Mr. Yelizarov transfer me a lot of money.

4    He didn't ask for receipts either.  We are doing --

5    we are doing things differently a little.  So if I

6    need the receipt today, I will get it.

7    Q    Was there any document created that says

8    here -- we hereby give a credit to Leon Goldstein in

9    the amount of X dollars for all these assets?

10   A    I think -- I think something like that was

11   created, but I don't have it.

12   Q    Well, what was the amount of the credit

13   that's on that document?

14   A    I don't remember.

15   Q    And again you are saying that these

16   records whereby you conveyed all your assets,

17   Mr. Keifitz will not give them to you?

18   A    What's that?

19   Q    These records that you say you went and

20   signed, you are saying Mr. Keifitz will not give you

21   copies?

22   A    No, I didn't say that.  I cannot get a

23   hold of Keifitz to give you the papers you needed

24   for this deposition.

25   Q    Oh, I thought you said he won't return

```
1    your call or Ms. Mayersohn's calls?

2         A    Well, that's what I'm saying.

3         Q    Okay.  Because you've tried to get those

4    records and he won't provide them is what you are

5    saying?

6         A    Let's talk the records.  The records you

7    are asking me to bring you to this deposition, Leah

8    tried to get a hold of Mr. Keifitz and she was

9    unsuccessful.

10        Q    And that was between the order setting the

11   deposition and today, right?

12        A    I'm saying -- I'm saying when I hired her

13   until today.

14        Q    Is there anything I can show you that

15   would help refresh your recollection when it was you

16   sat down to sign all these documents that you are

17   talking about?

18        A    I don't know what you are going to show

19   me.

20        Q    Well, have you heard of Oceania IV

21   Condominium?

22        A    No.

23        Q    Do you recognize a condominium unit,

24   Penthouse 43?  Does that sound familiar to you?

25        A    What's that?
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1          Q     Does condominium unit, Penthouse 43 in the

2     Oceania IV Condominium, does that sound familiar to

3     you?

4          A     No.

5          Q     Let me show you a document that was on the

6     list of public record documents that Ms. Mayersohn

7     gave us that we looked at earlier today.  I went and

8     pulled those.  She gave us just a list, but I went

9     and pulled those and I'll make this --

10         A     Oh, hold on, hold on.  Probably you are

11    talking about Yelizarov's property.  I think he

12    lives in Penthouse 43, but I have nothing to do with

13    that, if that's what you are asking me.  It's his

14    wife's, I think, condominium.

15         Q     Well, let me show you this document.

16               MR. REYES:  And we left off on what

17         number?

18               THE COURT REPORTER:  23 is next.

19               MR. REYES:  23.

20               THE WITNESS:  I think it's Penthouse 43.

21               MS. MAYERSOHN:  I'm sorry, what exhibit

22         number is it?

23               THE COURT REPORTER:  23.

24               (Thereupon, the above-referred to document

25         was marked as Impleaded Defendants' Exhibit No.

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
1              23 for identification.)

2      BY MR. REYES:

3          Q    Mr. Goldstein, I'm showing you a public

4      record that was recorded in February 16 of 2013.  It

5      is a resolution of Pinnacle Three Corporation

6      whereby Pinnacle Three Corporation is transferring

7      its ownership in Condominium Unit PH-43 in the

8      Oceania IV Condominium to Oleksandr Yelizarov and

9      Vira Khrakovska Yelizarov, if I pronounced that

10     correctly.  And it's signed by you on January 17 of

11     2013.

12         A    Okay.

13         Q    This is the unit you said you had nothing

14     to do with, right, just a moment ago?

15         A    No.

16         Q    I'm sorry?

17         A    It is -- it is their unit.

18         Q    But you signed a deed to make it their

19     unit, right?

20         A    No, it was their unit all the time.

21         Q    So even though it was titled in the name

22     of Pinnacle Three Corporation you are saying it

23     always belonged to them?

24         A    It's always belonged to them.

25         Q    You were holding the title for them?
```

```
 1            A    Yes.

 2            Q    And that resolution provides for executing

 3      a quitclaim deed in their favor.

 4                 MR. REYES:  And let me mark this as

 5            Exhibit 24.

 6                 (Thereupon, the above-referred to document

 7            was marked as Impleaded Defendants' Exhibit No.

 8            24 for identification.)

 9      BY MR. REYES:

10            Q    Do you recognize the quitclaim deed?

11            A    Yes.

12            Q    This is signed by you as well on

13      January 17 of 2013.

14                      Is that the day when you signed over

15      everything, January 17 of 2013?

16            A    No, that has nothing to do with what you

17      are asking me for.

18            Q    So this resolution and quitclaim deed you

19      are saying has nothing to do with the event at

20      Mr. Keifitz' office where you signed whatever he put

21      in front of you to transfer all your assets to

22      Mr. Yelizarov?

23            A    That is correct.

24            Q    This is separate from that?

25            A    It's completely different.
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1        Q     Why was it that on January 17, 2013

2    Pinnacle Three was signing documents to put title in

3    Yelizarov's name?

4        A     Because Yelizarov borrowed the money from

5    the people I knew and they called me and ask me what

6    kind of collateral he can put and I said he got free

7    and clear that Oceania, which I completely forgot,

8    and they told me that they will give the money if he

9    will transfer the title to me for the amount of

10   money which he made the deal and when he would repay

11   it back I will give him the title back and because I

12   know the people and they know me, I told him the

13   apartment is worth much more than they are asking

14   Yelizarov -- than Yelizarov ask them to give him and

15   they said okay, let's do it.  So I did it.  When

16   Yelizarov paid it back I give him back the

17   apartment.

18       Q     I'm not sure I understand your answer.

19   Mr. Yelizarov -- Mr. Yelizarov wanted to borrow

20   money from someone?

21       A     Yelizarov borrowed the money -- that's the

22   city where he lives -- from some people whom I do

23   know, and they called me and I asked them what kind

24   of collateral he was going to put and the collateral

25   was this apartment and they said, how much is worth,

1    and I told them that it's worth over a million

2    dollars, and they said, okay, fine and they lend him

3    the money and they said we want the collateral to be

4    put on your name.  When he will pay the money back,

5    we will release the title.

6        Q    Why did they want the collateral on your

7    name?

8        A    Because they don't live here.  They don't

9    want the title in my name.  They want some

10   collateral.

11       Q    Why didn't they -- but if this belonged to

12   Mr. Yelizarov, why couldn't the title be in

13   Mr. Yelizarov's name if he was the one borrowing the

14   money?

15       A    But Yelizarov borrowed the money.  They

16   want to make sure if he will not give them the money

17   back they can collect the collateral.

18       Q    And why would they be more secure if

19   Pinnacle held the title instead of Mr. Yelizarov?

20       A    Because they know me personally.  They

21   know me personally and they trust me.  That's why.

22       Q    And so you purchased the unit for him or a

23   deed was put into Pinnacle Three?

24       A    The deed was put in as a collateral on

25   Pinnacle Three.  He got the money from them, I think

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    after one year, which when he paid them back I

2    released the unit for them and that is it and he

3    sold it.

4         Q    And who are we talking about, who are

5    these people?

6         A    What is the name of them?

7         Q    Yes.

8         A    One Igor.

9         Q    Igor?

10        A    Yeah.

11        Q    Igor what?

12        A    I don't really remember.  I got two

13   people, Igor and Pasha (phonetic).  They both --

14   they know me very well.

15        Q    They know you very well, but you don't

16   know their last name?

17        A    No, I do, but it's just very complicated.

18        Q    It's very complicated for you to tell me?

19        A    Well, I'll give it to you, but, like I

20   said -- it is Igor and Pasha.  That's good enough,

21   which they call me.  They know me.

22        Q    What is their last name?

23        A    I have to look at it.

24        Q    Go ahead.

25        A    No, but I got new phone and that's the

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    problem.  I got new phone which I don't think I

2    have.  Hold on.  Let me see.  Maybe I do.  I don't

3    have it here.  I call Igor.  That's it.

4         Q    These individuals, they live here in the

5    United States?

6         A    No.

7         Q    They live in Odessa?

8         A    Correct.

9         Q    And they are alive today?

10        A    Yes.

11        Q    Do they come to the U.S.?

12        A    If they want to.  I think they have the

13   visa.

14        Q    But do they travel here, not can they?

15        A    Yes, they was here before probably a year

16   ago.

17        Q    Now going back to this signing over of all

18   your assets to Mr. Yelizarov in Mr. Keifitz' office,

19   when you signed over, were you no longer associated

20   with Pinnacle?

21        A    Yes.

22        Q    You were out of Pinnacle?

23        A    I was not the president anymore, right.

24        Q    Were you a secretary or a director?

25        A    No.

```
 1        Q    Were you an employee any longer?

 2        A    No.

 3        Q    Was your daughter an employee or an

 4   officer or director?

 5        A    No.

 6        Q    And you obviously weren't a shareholder,

 7   you had turned over your shares, right?

 8        A    Right.  I'm not sure when they transferred

 9   my shares.  Maybe -- I don't know which date they

10   transferred the shares.  I may still be a president

11   sometime because I don't see the -- I don't know the

12   dates.  So when you ask me that question, I don't

13   know when I transferred the share and then when I --

14        Q    Well, we looked at a resolution dated

15   July 16 of 2013 --

16        A    Right.

17        Q    -- that says in that document that that's

18   the day it happened and you told me it could have

19   been that day or maybe a couple of months earlier,

20   you said?

21        A    The reason I'm kind of saying I'm not

22   sure, because I don't remember the dates, so.

23        Q    Okay.  So you would have been out of

24   Pinnacle in 2013?

25        A    Yes.
```

```
 1        Q    Okay.  Well, we had asked for records with

 2   respect to Chase Bank in this matter and I know you

 3   told me earlier you didn't contact Chase either; is

 4   that right?

 5        A    Okay.  That's right.

 6        Q    Okay.  But Chase produced some documents

 7   to Mr. Shalek and I want to show you a couple of

 8   these documents, if I could.

 9             MR. REYES:  I'll make this No. 25?

10             THE COURT REPORTER:  25.

11             (Thereupon, the above-referred to document

12        was marked as Impleaded Defendants' Exhibit No.

13        25 for identification.)

14             MR. SAYRE:  Let me just put on the record

15        again that I asked for these documents to be

16        turned over to us over two weeks ago and they

17        were not done -- that was not done.  Obviously

18        they were turned over to Mr. Reyes.

19             MS. MAYERSOHN:  For record purposes, I

20        don't have any of these documents either.

21             MR. SHALEK:  Can I see the documents?

22             MR. REYES:  Yeah.

23   BY MR. REYES:

24        Q    Mr. Goldstein, I'm showing you what's

25   marked Exhibit 25.  It is a business signature card
```

1    for Pinnacle Three Corporation dated March 25 of

2    2014 at Chase Bank.  Do you see that?

3        A    Yes.

4        Q    And you appear as a signatory on this

5    account for Pinnacle Three Corporation; is that

6    correct?

7        A    That is correct.

8        Q    So even though you are telling us that you

9    transferred all your interest in Pinnacle in 2013,

10   is it correct that in 2014 you were still a

11   signatory on Pinnacle Three Corporation accounts?

12       A    That's correct.

13       Q    And the other signatory on the account is

14   Mr. Yelizarov; is that correct?

15       A    That is correct.

16       Q    All right.

17            And why is it you are a signatory on

18   a Pinnacle Three account opened in 2014 if you no

19   longer have anything to do with Pinnacle?

20       A    Because the checks, which are Pinnacle

21   Three receiving from John, needs to be put on

22   Pinnacle Three Corporation.  And since Yelizarov is

23   not in town, not in the country, I'm the one who is

24   doing it and when I'm not in the country I'm asking

25   my daughter to put in this account the 39,000 which

1    I'm receiving every month.  That's why.

2        Q    And you are doing that because

3    Mr. Yelizarov is your friend?

4            MR. SAYRE:  Objection.  Asked and answered

5        five times now.

6    BY MR. REYES:

7        Q    We haven't talked about the Chase account,

8    have we, Mr. Goldstein?

9            MR. SAYRE:  The question is, is

10       Mr. Yelizarov your friend?

11   BY MR. REYES:

12       Q    No.  The question is, are you doing that

13   because Mr. Yelizarov is your friend and that is

14   collecting the checks and depositing them into this

15   Chase account in the name of Pinnacle Three

16   Corporation?

17       A    It used to be that John used to transfer

18   the money to the account by himself, but then when

19   we had the -- when we went through the week court

20   case Mr. Kaplan, I think, said that this service is

21   no longer available and John send the checks to

22   Pinnacle Three Corporation -- to Pinnacle

23   Association where I live.  So somebody need to put

24   the money in the account.  Who can do that?  So I'm

25   the one who lives there and I'm taking checks and

1    going across the street and putting in Chase Bank.

2    That's what I'm doing.

3         Q    Because this Chase account is across the

4    street from your condominium?

5         A    Yes.

6         Q    Now, under the settlement agreement

7    Pinnacle Three Corporation could give instructions

8    to send the payments somewhere else, correct?

9              MR. SAYRE:  Objection.

10             THE WITNESS:  I told you, when we had it

11        before, I received the e-mail from your guys

12        and they said that this service is no longer

13        available and the only way that you can keep

14        track of the checks is just sending them by

15        federal -- by Federal Express to the address

16        where I live and that's -- basically the checks

17        need to be put in the account.

18   BY MR. REYES:

19        Q    Well, you are describing to me that you

20   are providing a favor to your friend to deposit the

21   checks for him, right?

22        A    I'm saying to you that other than

23   friendship this has to be done.  Somebody needs to

24   do it, otherwise the checks will be staying in the

25   concierge, but the check needs to go to the bank.

```
 1    So somebody should do it.  Yes, of course, I'm doing

 2    this as a favor, but I don't see any other

 3    reasons -- any other ways to do that.

 4         Q    But why do you have to be a signatory on

 5    the account to make a deposit?

 6         A    First of all, if I'm not the signatory I'm

 7    not sure if I can even go to the bank.  Secondly, if

 8    Yelizarov may need to transfer the money, or

 9    whatever he may need, I can do it for him.

10         Q    And do you write checks on this account

11    and move money in and out of this account?

12         A    No, I'm not.

13         Q    You haven't written any checks off this

14    Chase account to yourself?

15         A    He didn't ask me to do that, so the Chase

16    account I did not.  Other than putting the money in,

17    he didn't ask me to do anything else.

18         Q    We looked earlier at the documents opening

19    the Capital Bank account and you are a signatory on

20    that account too, right?

21         A    Yes.

22         Q    And I think you signed somewhere as a

23    member or manager, but you testified that you were

24    intending only to sign as a signor, right?

25         A    It's exactly should be done like here,
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1    yes.  It's the same.

 2         Q     Now in that account, as a signor, have you

 3    moved money in and out of that Capital Bank account?

 4         A     Yes.

 5         Q     You wrote checks on that account?

 6         A     No.

 7         Q     I'm talking about the North Star Maritime

 8    Miami, LLC account, did you write checks on that

 9    account?

10         A     I don't think I have checks.

11         Q     Did you transfer money out of that

12    account?

13         A     It could be, yeah.

14         Q     So you had authority to do that?

15         A     Yes, he -- whatever he wants to do he does

16    that.

17         Q     So it's your testimony that whenever you

18    transferred money or used money in that account it

19    was at Mr. Yelizarov's instructions?

20         A     Mr. Yelizarov knows everything --

21    everything happening to that account which he is the

22    president on.

23         Q     But does he specifically give you written

24    instructions on when you can transfer money out of

25    the account?
```

1          A     I told you, we are not doing written

2     instructions.  We are doing everything by the phone.

3     I think I told you this several times.  So if --

4     whatever he needs -- he can say, I need this and

5     that and that's what will happen.

6          Q     Now you told me you do it all verbally.

7                Does Mr. Firer communicate with

8     Yelizarov for you on occasion?

9          A     Mostly I'm doing that, I think.  They can

10     speak to each other, obviously.

11          Q     Well, is Mr. Firer and Yelizarov friends?

12          A     Friends is very -- they are friends.  They

13     are talking to each other.  I'm real friend.  I'm

14     close friend.  If Yelizarov needs some help, I will

15     help him and he will do the same thing to me.

16          Q     Well, the reason I'm asking you that, when

17     I asked you earlier who you had contacted for

18     records, I asked you about Yelizarov and you said he

19     would rather give the documents to Oleg Firer than

20     to you.

21                And so I'm asking you, if he is your

22     close, close long-time friend, why is it that he

23     would give the records to Oleg Firer and not you?

24          A     Because I keep telling you that I'm -- I

25     cannot -- I can lose the papers.  I'm not that

1    organized like Oleg is and that is the whole reason,

2    but if it will come to the point of trusting me more

3    than Oleg, probably he does because I know him for

4    so many, so many years.  But at the same token, Oleg

5    is very, very organized and knows what it is and how

6    and has very good memory and we trust him as well.

7         Q    And do you know if Oleg Firer and

8    Yelizarov communicate by e-mail?

9         A    I don't think Yelizarov is communicating

10   by e-mail, period, to them.  I think everybody --

11   everything he is doing by phone.

12        Q    Do they communicate --

13        A    Maybe he does.  I don't know, but I'm

14   talking to him over the phone.

15        Q    Did you look for e-mail communications

16   between Mr. Firer and Mr. Yelizarov to respond to

17   our request for production?

18        A    I'm not because I know that Yelizarov is

19   not really doing e-mailing.

20        Q    Well, you just said there may be e-mails,

21   which one is it?

22        A    Maybe.  When I'm saying maybe it doesn't

23   mean that there is any.

24        Q    Did you look?

25        A    No.

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1        Q      Did not look, right?

2        A      I didn't look because there is nothing to

3    look for.

4        Q      Although you are telling me there may be

5    e-mails --

6        A      Well, I'm saying maybe because I don't

7    want you to find some e-mail and tell me, listen,

8    you said no, but there is one.  Maybe.  I don't

9    know.

10       Q      Well, you understand the judge told you to

11   look and see if there were e-mails, not me?

12       A      I understand that, but I don't know how

13   to find -- what to look for them if Oleg is out of

14   country.

15       Q      We'll find out what Mr. Firer's

16   availability was before yesterday --

17       A      Of course.

18       Q      -- before he spoke to you.  We know --

19   because you told me earlier you were at his house?

20       A      He what?

21       Q      You told me that he was here and you were

22   at his home.  We talked about that earlier, right?

23       A      You can talk to him.  He will be probably

24   here by the end of the year for sure.

25       Q      Earlier on we looked at the corporate

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1    formation documents for Pinnacle Illinois and

 2    Pinnacle Florida.  Do you recall that?

 3         A    Yes.

 4         Q    And you had given some testimony about the

 5    assets being transferred from Pinnacle Illinois to

 6    Pinnacle Florida?

 7         A    Correct.

 8         Q    And I want to show you a document, see if

 9    we can identify when that occurred and if it was

10    done by this document here.  Okay?  And I'll make

11    this No. 26.

12              (Thereupon, the above-referred to document

13         was marked as Impleaded Defendants' Exhibit No.

14         26 for identification.)

15    BY MR. REYES:

16         Q    Do you recognize this document that I've

17    marked Exhibit 26?  Do you recognize this document?

18         A    Yes.

19         Q    What are you looking for?

20         A    Looking for -- I have eyes.  I'm looking

21    around.

22         Q    This is a -- an assignment of assets

23    between Pinnacle Three Corporation Illinois and

24    Pinnacle Three Corporation Florida, correct?

25         A    Right.
```

```
 1        Q     And this document was signed August 22nd

 2   of 2012, correct?

 3        A     Right.

 4        Q     And it was to be effective on January 1 of

 5   2009, correct?

 6        A     2000 what?

 7        Q     January 1 of 2009.  Do you see the date up

 8   here?

 9        A     Right.

10        Q     So all of the Pinnacle Three assets were

11   in Illinois and they were transferred to Pinnacle

12   Three Corporation Florida effective January 1st,

13   2009; is that correct?

14             MS. MAYERSOHN:  What was this exhibit to?

15        It says Exhibit 5.

16             MR. REYES:  This is Exhibit 26.

17             MS. MAYERSOHN:  I know, but it has Exhibit

18        5 on it.

19             MR. REYES:  That was from -- it was marked

20        in another proceeding.  I don't recall now what

21        it was.

22             THE WITNESS:  Yes.

23             MS. MAYERSOHN:  For record purposes, I

24        think that this document goes beyond the scope

25        because I don't see how it's --
```

```
 1              MR. REYES:  This is a record of assigning

 2         the assets of Pinnacle Illinois to Pinnacle

 3         Florida.  I don't know how that would be beyond

 4         the scope, but I just wanted him to identify

 5         it.

 6   BY MR. REYES:

 7         Q    This is what you were talking about

 8   earlier and I wanted to find this document to show

 9   it to you.

10         A    Okay.

11         Q    Is this the assignment you were referring

12   to earlier today when you said the assets were

13   transferred from Pinnacle Illinois to Pinnacle

14   Florida?

15         A    Probably.

16              MR. REYES:  Let me take a quick break for

17         one second and talk to my client.

18              THE VIDEOGRAPHER:  Off the record at 5:26.

19              (Thereupon, a recess was taken.)

20              THE VIDEOGRAPHER:  We are back on the

21         record at 5:34.

22   BY MR. REYES:

23         Q    Mr. Goldstein, I want to ask you about two

24   specific requests.  I think we've touched on many of

25   the others and I understand your answer, whatever
```

1  you had is in Mr. Keifitz' possession and you can't

2  reach those; is that correct?

3      A    Whatever -- whatever Keifitz asked me to

4  sign and bring the papers, I give it to him and I

5  signed.

6      Q    But whatever you had regarding the loan

7  with North Star or the payments on the loan -- or,

8  I'm sorry, the monies lent and the default on the

9  loan, whatever records existed, those were given to

10  Mr. Keifitz as well, you said?

11      A    There is a house where my wife lives and

12  since we have first and second mortgage and we are

13  kind of upside down, so they didn't ask for that and

14  he knew about it.  I'm not sure what else you are

15  referring to.

16      Q    No, I'm talking about the loan with North

17  Star that we've spent so much time on earlier today.

18      A    Right.

19      Q    Whatever records you had that would show

20  the monies being lent, the wire transfers that you

21  talked about earlier, the records of those loans,

22  you said you've given all those to Mr. Keifitz,

23  correct?

24      A    I give everything to Mr. Keifitz.  Yes.

25      Q    Did you give those documents that you gave

```
 1    Mr. Keifitz, did you give copies of those documents

 2    to anyone else?

 3         A    I don't recall.  No, I give it to him.

 4         Q    Okay.  As you sit here today, do you have

 5    any recollection of copying your documents that you

 6    gave Mr. Keifitz and giving them to anyone else?

 7              MR. SAYRE:  Objection, asked and answered.

 8              THE WITNESS:  Repeat this question.

 9    BY MR. REYES:

10         Q    The set of documents you gave to

11    Mr. Keifitz, did you give that set of documents to

12    anyone else?

13         A    Oh.  No, I don't think so.  Oleg may have

14    them.

15         Q    Oleg may have them?

16         A    May.  I didn't say he does, but he may.

17    But one more time, if he would have whatever you are

18    asking me for you would have it by today.  Since I

19    didn't bring them, so he probably don't have them.

20    I'm just guessing because I ask him that we need all

21    that, but I give everything to Mr. Keifitz because

22    he is the attorney for Mr. Yelizarov.

23         Q    One particular category of documents that

24    we did not talk about today, if you could look at

25    No. 19 on this request.  19 asked for copies of all
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    notices to third parties of any execution on any of

2    Pinnacle Florida's, Pinnacle Illinois' or

3    Goldstein's assets by Vernal, North Star or North

4    Star, LLC.

5            Do you know if any notices were given

6    to anyone that Pinnacle's assets were going to be

7    executed on by North Star?

8        A    I don't know.

9        Q    Do you recall ever seeing any notices to

10   any third parties?

11       A    I don't remember.

12       Q    Did you attempt to find documents

13   responsive to No. 9 -- 19 to comply with the judge's

14   order or is it the same answer?

15       A    Yes.  Yes.

16       Q    It's with Mr. Keifitz and Oleg has to get

17   them for you?

18       A    Whatever I had I give it to Mr. Keifitz.

19   If he doesn't have it, I don't know who has them.

20   Maybe Mr. Sexton has them.  Maybe he does, but he is

21   not answering the phone.

22       Q    In No. 25 we had asked for tax returns and

23   schedules for the years '12 and '13.  Now I know you

24   said that returns hadn't been filed, but you had

25   received K-1s for Pinnacle for the years '12 and

1    '13; is that correct?

2         A    One more time.

3         Q    You told me this morning you received K-1s

4    for Pinnacle for the years '12 and '13 and '14, if I

5    remember correctly your answer this morning.   Where

6    are those K-1s?

7         A    I received the K-1s for the time when I

8    was the president.   I would imagine for the time

9    which I was not the president at Pinnacle, then I

10   probably received K-1s from just 75 Retail,

11   Sterlington or something like that.   So I don't

12   think somebody gave me the Pinnacle K-1s when I

13   was -- I have nothing to do with the company.

14        Q    Why didn't you bring your K-1s -- why

15   didn't you produce the K-1s in response to No. 25 as

16   the judge had ordered you to do?

17        A    Why didn't I produce what?

18        Q    Why didn't you produce the Pinnacle K-1s

19   for '12, '13 and '14?

20        A    When you say why didn't I produce it, what

21   do you mean by that?

22        Q    Why didn't you give us copies of those

23   K-1s given the judge's order to produce all

24   documents?

25        A    Well, sometimes whatever you are asking me

1   it doesn't make any sense.  You are the ones who

2   give it to me.

3       Q    For Pinnacle, that's not correct, is it,

4   Mr. Goldstein?

5       A    Not for Pinnacle.  For whatever you are

6   saying, why didn't I give you the K-1s which you

7   gave it to me.  So you probably have them.  That's

8   why I didn't even --

9       Q    Okay.  I'm asking you about Pinnacle.

10  Maybe you are confused.

11             Pinnacle K-1s are generated by

12  Mr. Haft, right?

13      A    Pinnacle -- the K-1s for Pinnacle, when I

14  was president of Pinnacle, I received.  I don't

15  think it was '14s.  But even though, you are the

16  ones who send it to me, so you are the ones who have

17  them.  Why should I give you something which you

18  send it to me?  So that's the reason I did not

19  brought it -- bring it today.

20      Q    When you say "you," who do you think --

21  when you are saying you --

22      A    Well, K-1s for the income tax returns John

23  is doing and send it to me.  That's how it works.

24      Q    You think John prepares the K-1s for

25  Pinnacle?

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1        A    Of course not.  Well, somebody does --

 2        Q    For Pinnacle.

 3        A    -- on his behalf.

 4        Q    For Pinnacle.

 5        A    For -- not for Pinnacle.  I'm sorry, you

 6   are talking about Pinnacle.  I'm talking about adult

 7   stores.

 8        Q    For Pinnacle, why didn't you get the K-1s

 9   for Pinnacle and produce them as the judge had

10   ordered for No. 25?

11             MS. MAYERSOHN:  Can you clarify the dates

12        on the K-1s you are asking for?

13             THE WITNESS:  I'm a little confused on

14        that thing.  Why didn't I -- I don't know if I

15        have them.  I was under the impression -- I'm

16        sorry -- that the K-1s you are talking about is

17        K-1s from adult stores.  That's what I was

18        thinking about.

19   BY MR. REYES:

20        Q    This request -- where are the K-1s that

21   you received for Pinnacle?

22        A    I don't know.

23        Q    What do you do with them when you get

24   them?

25        A    Well, right now I have nothing to do with
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    Pinnacle so maybe, again, Keifitz has them.

2         Q    Well, you still have to file tax returns

3    with the U.S. government.  Did you not even keep

4    copies of your K-1s to do your tax returns?

5         A    For which years?  For the year '11, '10 or

6    whatever, '09, that's what you are asking me?  I

7    didn't do the income tax on '12 or '13.

8         Q    Exactly.

9              Are you saying you didn't keep those

10   K-1s either?  You gave those to Mr. Keifitz as well

11   too?

12        A    I have to find them.

13        Q    You still have those, correct?

14        A    I don't know.  I have to find them.

15        Q    Or Mr. Haft could regenerate those for

16   you, correct?

17        A    It could be.  I can't recall.

18        Q    And you testified this morning that you

19   had received a 2014 K-1.  You are saying now that

20   you think you did not?

21        A    I was under the impression that we are

22   talking about adult stores.  In speaking that's why

23   I'm a little confused.  That's why I'm asking you,

24   why should I give you K-1s if you send it to me.

25        Q    But this morning you specifically said it

1   was Pinnacle K'1s for 2014?

2        A    I made a mistake.

3        Q    Are you now testifying that you did not

4   receive a K-1 for 2014 for Pinnacle?

5        A    I don't think so.

6        Q    But you did receive one for 2013?

7        A    I think so.  One more time, I'm confused

8   on Pinnacle and adult stores.  That's clearly my

9   mistake.

10       Q    All right.

11            Mr. Goldstein, I'm going to adjourn

12  my portion of the deposition.  I'll let whoever else

13  wants to ask questions.  I don't think that you

14  complied with the judge's order and I will be taking

15  that up with the court.  We don't need to debate

16  whether you did or you didn't.  I think that you had

17  a duty to identify the responsive documents in your

18  response, which you didn't do, and I think you had a

19  duty to try to locate the documents, which you

20  didn't do and, therefore, I can't finish my

21  examination because I was only able to ask you about

22  documents that I found because you didn't give me

23  any documents that were responsive to the request.

24            So be that as it may, at the moment I

25  don't have other questions to ask you until we take

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    that issue up with the court and we get these other

2    documents that you've talked about today that you've

3    not produced.  For example, all the records of

4    Pinnacle, all these records conveying your assets,

5    all your e-mails, the K-1s and the other documents

6    you identified, all these different documents that

7    clearly you could have not only identified in your

8    response, but have produced to us or requested.  So

9    I'm not going to conclude my examination, but I'm

10   going to adjourn it pending obtaining compliance

11   with the court's order.

12       A    Well, the only thing that I can say that I

13   did -- I put all the efforts, and my attorney did

14   the same thing, to give you everything you asked

15   for.  If we could have find them, you would get

16   them.  It looks to me that you have a lot of them,

17   but I cannot -- if nobody will give it to me, I

18   cannot produce them.  That's the only thing I can

19   tell you.

20            MS. MAYERSOHN:  I would just like, for

21       record purposes, to note the time is 5:44 p.m.

22       Can I go?

23            MR. SAYRE:  How long have we been

24       recording deposition?

25            THE VIDEOGRAPHER:  One record says 5 hours

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1    18 minutes.  You could argue however long you

 2    want to take off for --

 3         MR. SAYRE:  Arguing.

 4         THE VIDEOGRAPHER:  For arguing.  So 5

 5    hours 10 minutes, say.

 6         MR. SAYRE:  Okay.  Thank you.

 7         MR. SHALEK:  Well, I, for one, have many

 8    hours worth of deposition testimony.

 9         MR. SAYRE:  You deposed -- you've deposed

10    him for seven hours already.

11         MR. SHALEK:  I don't care.  I'm certainly

12    entitled to cross examine or redirect or do --

13    not redirect, but I'm entitled to examine him

14    based on what he said today.  I'm a party to

15    this lawsuit.

16         MS. MAYERSOHN:  Well, I'm going to go now

17    and then you guys can sort it out.

18         MR. SAYRE:  I'll just -- in regards to

19    Mr. Shalek's comment, just so the record is

20    clear, as I read the order now -- Mr. Shalek

21    and I can disagree on it -- Mr. Goldstein was

22    supposed to appear to provide deposition

23    testimony regarding request for production from

24    Mr. Reyes.  Okay.  That's what he was ordered

25    to appear to answer questions regarding.
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1      Nothing to do with Mr. Shalek's clients,

2      Paladin and Chaban.

3          MR. SHALEK:  My questions will be within

4      the scope of Mr. Reyes' examination.

5          MR. SAYRE:  Go ahead.

6          MS. MAYERSOHN:  If you guys wouldn't mind.

7                  CROSS EXAMINATION

8  BY MS. MAYERSOHN:

9      Q    Mr. Goldstein, is your relationship with

10 Mr. Yelizarov -- can you -- if you want to fix your

11 hearing-aid.  Sorry, I can hear it squeaking.

12     A    Thank you.  So what is that?  What is the

13 question?

14     Q    Is your relationship with Mr. Yelizarov

15 the same as it was before you didn't pay him back

16 the money that you owed him?

17         MR. SHALEK:  Objection to form.

18         THE WITNESS:  Yes.

19 BY MS. MAYERSOHN:

20     Q    Now, Star Capital closed; is that correct?

21     A    That is correct.

22         MR. SHALEK:  Objection to form.

23 BY MS. MAYERSOHN:

24     Q    Were you listed as an officer of Star

25 Capital Fund?

---

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1              MR. SHALEK:  Objection to form.

 2              THE WITNESS:  I was 50 percent owner of

 3         Star Capital Fund.

 4    BY MS. MAYERSOHN:

 5         Q    Do you know whether or not you were an

 6    officer of Star Capital Fund?

 7         A    I do not know that.

 8         Q    Do you know if there are any other

 9    entities which own or owned Star Capital Fund?

10         A    As far as I know, it was only me and Oleg

11    in that company.

12              THE COURT REPORTER:  Sir, can you speak up

13         a little bit because your back is turned to me

14         now.

15              THE WITNESS:  As far -- I'm sorry, as far

16         as I know, it was me and Oleg owned the

17         company.

18    BY MS. MAYERSOHN:

19         Q    Were you a signatory on any bank accounts

20    for Star Capital Fund, if you know?

21         A    I don't think I was.

22         Q    Was that all handled by Oleg?

23              MR. REYES:  Objection.

24              THE WITNESS:  Oleg is the one who was

25         doing all the work for Star Capital and he had
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1        the signatures and the bank accounts.

2    BY MS. MAYERSOHN:

3        Q    Were you an officer of Star Capital

4    Management, LLC?

5        A    I don't know that.

6        Q    What about Star Equities, LLC?

7        A    I know that Oleg opened a lot of companies

8    related to Star Capital and maybe I was their owner,

9    but I don't know that.

10       Q    Do you recall being a signatory on any

11   bank accounts for Star Capital Management or Star

12   Equities?

13       A    No, I was not.

14       Q    Now when you referred to being in business

15   with Yelizarov and having a partnership with him

16   regarding vessels, you separately said that he

17   managed vessels for you.

18            Did he have his own company or did

19   you have a company together?

20            MR. SHALEK:  Object to form.

21            THE WITNESS:  No, he has his own company

22       and he managed my vessels.

23   BY MS. MAYERSOHN:

24       Q    So your partnership was not a traditional

25   partnership in a business sense, but that you worked

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    together?

2              MR. REYES:  Object to the form.

3              THE WITNESS:  That is correct.

4    BY MS. MAYERSOHN:

5         Q    When you first got back from the Ukraine

6    and your travels abroad in October, did you ask Oleg

7    to assist you in getting documents in reference to

8    this discovery response?  It's the end of October.

9         A    This year you are talking about, right?

10        Q    Yes.

11        A    I ask Oleg when I saw him -- I cannot

12   recall he was in the country when I came in or not,

13   but I ask him or he said, he will help me with that,

14   but Oleg is unpredictable as far as his travels, and

15   he told me that he will help me, and then he left.

16   And then he came back and you talked to him

17   yesterday as far as helping you with that.

18        Q    Although Oleg is an officer of Pinnacle,

19   is Oleg an owner of Pinnacle?

20        A    No, he is not.

21        Q    Is Oleg an owner of North Star?

22        A    I don't know.  He's not.

23        Q    Those are owned by Mr. Yelizarov, correct?

24        A    As far as I know.

25        Q    And did Mr. Yelizarov, per your earlier

                PRESTIGE REPORTING SERVICE, INC.
                        (954) 764-7297

1    conversation, delegate authority to make decisions

2    about his case to his lawyers?

3              MR. SHALEK:  Objection to form.

4              MR. REYES:  Join.

5              THE WITNESS:  Yes.

6    BY MS. MAYERSOHN:

7        Q    So if Mr. Yelizarov's lawyers did not want

8    to give you documents that are responsive to this

9    discovery, that would be their choice, correct?

10             MR. REYES:  Can I hear the question again,

11        please?

12             (Thereupon, the pending question was read

13        back by the court reporter.)

14             MR. REYES:  Object to the form.

15             THE WITNESS:  That's correct.

16   BY MS. MAYERSOHN:

17       Q    To the best of your knowledge, who are

18   Mr. Yelizarov's attorneys?

19       A    To the best of my knowledge is Mikhael

20   Keifitz.

21       Q    What about Mr. Sayre?

22       A    I think Mr. Sayre is North Star attorney

23   for Yelizarov.

24       Q    Did you previously contact Mr. Haft

25   regarding the filing of your tax returns when you

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    originally had the hearing on the contempt in this

2    case?

3            MR. SHALEK:  Objection to form.  Which

4        hearing on which contempt?

5            MS. MAYERSOHN:  The original contempt

6        hearing in this particular case.

7            MR. SHALEK:  When Bobby Brochin

8        represented him?

9            MS. MAYERSOHN:  I don't know who that is.

10       When I represented him.

11           MR. SHALEK:  Okay.  So that's not the

12       original.  That's the second contempt hearing.

13           THE WITNESS:  Could you repeat the

14       question?

15   BY MS. MAYERSOHN:

16       Q    Okay.  Did you contact Mr. Haft prior to

17   the contempt hearing, the first one that I

18   represented you in, regarding the accounting

19   documents?

20       A    I was talking to him and -- to help me

21   with all the things.

22       Q    Did he send you an e-mail that he did not

23   do your taxes for the years 2012 or 2013?

24       A    You ask me, did he send me e-mails?

25       Q    Yes.

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
1        A    I'm not sure if he send me the e-mails,

2   but I know that I did not do the income tax which I

3   need to do sooner or later.

4        Q    Did Mr. Haft give you any documents

5   regarding this, regarding this request for

6   production?

7             MR. REYES:  Objection to form.

8             THE WITNESS:  No, he did not.

9   BY MS. MAYERSOHN:

10       Q    Did you tell him what documents you

11  needed?

12       A    I cannot recall exactly what I ask him to

13  do, but he probably didn't have what I need at that

14  time.

15       Q    Now, to the best of your knowledge, you

16  are no longer an officer of Pinnacle Three, correct?

17            MR. REYES:  Are we talking about Florida

18       or Illinois?

19            MS. MAYERSOHN:  Florida.

20            MR. REYES:  The Florida corporation?

21            MS. MAYERSOHN:  Florida, yes.

22            THE WITNESS:  Yes, I'm not.

23  BY MS. MAYERSOHN:

24       Q    Since you are not an officer, are you

25  entitled to get the bank records of Pinnacle Three
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

 1   Corporation?

 2           MR. SHALEK:  Objection to form.

 3           MR. REYES:  Join.

 4           THE WITNESS:  I'm not entitled.

 5   BY MS. MAYERSOHN:

 6       Q    Now why did Mr. Yelizarov make Oleg Firer

 7   secretary of Pinnacle, if you know?

 8           MR. SHALEK:  Objection to form.

 9           THE WITNESS:  Because Oleg Firer is my

10       partner and I trust him and he likes him and

11       that's probably why.

12   BY MS. MAYERSOHN:

13       Q    When you say he is your partner, do you

14   mean that in the past he was partners with you in

15   business?

16           MR. SHALEK:  Objection, leading.

17           MR. REYES:  Object to the form, leading.

18           THE WITNESS:  I'm answering these things

19       for eight hours.  I can make certain mistakes.

20       Of course he is not my partner anymore and Oleg

21       Firer knows Yelizarov as well, and Yelizarov

22       likes him and that's what he made the decision

23       to do.

24   BY MS. MAYERSOHN:

25       Q    So was it Yelizarov's decision to make

1    Oleg the secretary of Pinnacle?

2              MR. SHALEK:  Objection to form.

3              THE WITNESS:  Yes.

4    BY MS. MAYERSOHN:

5         Q    Do you know when you were removed from

6    Pinnacle, what year?

7         A    When I moved from Pinnacle?

8         Q    When you were removed from Pinnacle, yes.

9         A    Well, they said sometime in, I think,

10   July 13th or something like that.

11        Q    So 2013 would be the year; is that

12   correct?

13        A    That is correct.

14        Q    But you are not certain of the exact date?

15        A    I'm not sure.

16        Q    What type of an e-mail account do you

17   have?  Is it a free account or is it a paid account?

18        A    E-mail you are talking about?

19        Q    Yes.

20        A    My e-mail?

21        Q    Yes.

22        A    I thought they were all free, no?

23        Q    Some people pay for a domain.  Like your

24   domain isn't Leongoldstein.com?

25        A    No.  No.  I think mine is free.

1       Q     Okay.  Do you use this -- do you keep your

2   e-mail records for a long period of time or a short

3   period of time or do you not know?

4       A     I don't know.  If I'm changing telephone

5   in the computer sometimes they disappear, but I

6   keep -- if they are there I'm not removing them.

7       Q     Do you know how to search your e-mail for

8   items?

9       A     Not as good.

10      Q     Usually if you need to find something, is

11  Oleg the one who helps you find it?

12      A     That's -- that is correct.

13      Q     When you talked about the loan agreement

14  that was an exhibit today, Exhibit No. 5, for this

15  loan -- I know you mentioned earlier that you

16  thought that Oleg was on the hook for this agreement

17  because of borrowing money?

18           MR. REYES:  Object to the form.

19  BY MS. MAYERSOHN:

20      Q     Do you know whether or not Oleg signed

21  that agreement?

22      A     I don't know if he signed it or not.

23      Q     Did Star Capital Fund have assets in its

24  name when this agreement was entered?

25           MR. SHALEK:  Objection to form.

1        THE WITNESS:  Repeat the question.  Was

2     Star Capital --

3   BY MS. MAYERSOHN:

4        Q    Did Star Capital Fund have assets in its

5   name when this agreement was entered into?

6        A    I don't know.

7        Q    Pinnacle Three Corporation from Florida,

8   did it have assets in its name when this agreement

9   was entered into?

10       A    Pinnacle Three has it, yes.  Had it.

11       Q    I know Mr. Reyes made quite a point about

12  asking you about whether or not this loan was on

13  your tax return.

14            Did you pay any interest on this loan

15  before you defaulted on the loan that you are aware

16  of?

17       A    Well, I didn't do the income tax return, I

18  think, when I was defaulted.  So I did not do

19  anything as far as I know.

20       Q    Are you aware whether or not interest is a

21  deductible expense a business can take?

22       A    I don't know too much about bookkeeping

23  and all that.

24       Q    You rely upon your CPA for advice on what

25  needs to be included on your tax returns?

```
1          A     That is correct.

2          Q     About how old is Mr. Yelizarov?

3          A     Sixty years old.

4          Q     Is Mr. Yelizarov very tech savvy?

5                MR. SHALEK:  Objection to form.

6                THE WITNESS:  What is that?

7    BY MS. MAYERSOHN:

8          Q     Is he good with e-mail?

9                MR. SHALEK:  Objection to form.

10               THE WITNESS:  No, he is not.

11   BY MS. MAYERSOHN:

12         Q     Does Mr. Yelizarov usually call you?

13         A     He does.

14         Q     Did your not paying Mr. Yelizarov the

15   money back when you were supposed to cause problems

16   for him?

17               MR. REYES:  Object to the form.

18               MR. SHALEK:  Objection to form.

19               THE WITNESS:  Yes, obviously it probably

20         does, but I'm still on the hook and I still

21         know that I owe him the money and I probably

22         will pay him sooner or later.

23   BY MS. MAYERSOHN:

24         Q     I know you mentioned that since you are

25   out of the country for six months you had some of
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    your mail returned.  Is that because there was too

2    much mail in your mailbox?

3         A    That is correct.

4         Q    And was a lot of this mail as a result of

5    mailing from Mr. Reyes?

6              MR. SHALEK:  Objection to form.

7              MR. REYES:  Object to the form.

8              THE WITNESS:  I don't know which mail was

9         in the mailbox when I was out, but I presume

10        that a lot of mail came from attorneys and came

11        back.

12   BY MS. MAYERSOHN:

13        Q    Did you ultimately have to buy a new

14   mailbox key when you returned to try to get your

15   mail?

16        A    Yes.  I couldn't find my key because I had

17   the mold in my apartment.  Everything was in the

18   boxes, and, yes, I ordered a key.

19        Q    After you were removed as an officer of

20   Pinnacle Three, were you involved in the operations

21   of Pinnacle Three if you weren't asked to be?

22             MR. SHALEK:  Objection to form.

23             THE WITNESS:  If I would what?

24   BY MS. MAYERSOHN:

25        Q    Were you -- after you were removed as an

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    officer from Pinnacle Three, were you involved in

2    the operations of Pinnacle Three?

3         A    No, I was not.

4         Q    Now you previously talked about a

5    confession of judgment.  Do you know what that is?

6         A    I think I do.

7         Q    What do you think it is?

8         A    I think I'm voluntarily giving what I

9    need, any files or reports.

10        Q    So Exhibit 14, this Joint Motion for Entry

11   of Stipulated Judgment, do you understand that to be

12   a confession of judgment, according to your

13   definition?

14             MR. REYES:  Is that one of our exhibits?

15             MS. MAYERSOHN:  Yes, that's yours.

16             MR. REYES:  What exhibit is it?

17             MS. MAYERSOHN:  No. 15.  No. 14, excuse

18        me.

19             MR. REYES:  And the question is, does he

20        understand that to be the confession of

21        judgment?

22             MS. MAYERSOHN:  Yes.

23             MR. REYES:  Object to the form.

24             THE WITNESS:  So you ask me the question,

25        does --

                PRESTIGE REPORTING SERVICE, INC.
                         (954) 764-7297

1    BY MS. MAYERSOHN:

2         Q    Do you know whether or not that document,

3    Exhibit No. 14, is the confession of judgment that

4    you were talking about earlier or do you not know

5    this?

6         A    I don't -- it doesn't say confession of

7    judgment, so I -- I don't see confession of

8    judgment, so I'm not sure if this is the one.

9         Q    Do you recall signing a different document

10   other than that?

11        A    I cannot recall, but I know that I did

12   sign a confession of judgment and maybe this could

13   be as well.

14        Q    Regarding Exhibit 19, was it your

15   understanding that the purpose of you being a

16   signatory on the account at Capital Bank was so that

17   you could make deposits or assist Mr. Yelizarov in

18   doing whatever he needed you to do rather than to

19   get records?

20             MR. REYES:  Object to the form.

21             THE WITNESS:  This account was open for

22        North Star Maritime and this is not the account

23        that I can put the checks in.  The checks I

24        need to put in Pinnacle Three Corporation.

25        This is the only reason we open two different

```
 1        accounts.  This is something which, if

 2        Yelizarov needs, like I said, pay the

 3        attorneys, he can do that and all kinds of

 4        stuff.

 5   BY MS. MAYERSOHN:

 6        Q    Now, as far as Discovery Request No. 1,

 7   now that you've seen documents from Mr. Reyes, would

 8   it be your understanding that the mortgage that you

 9   previously produced, the Loan and Security

10   Agreement, references a security agreement or a

11   note?

12             MR. SHALEK:  Objection to form.

13             MR. REYES:  Objection to form.  I'm not

14        sure I understand that.

15             THE WITNESS:  So what's the question

16        again?  I'm sorry.  I missed it.

17   BY MS. MAYERSOHN:

18        Q    For Question No. 1 --

19        A    Right.

20        Q    -- now that we've been through deposition

21   and you've seen additional documents from Mr. Reyes,

22   was this the only document that you had that was

23   responsive to No. 1?

24        A    Okay.

25        Q    Is that a yes?
```

```
1                    MR. REYES:  Object to the form.

2                    THE WITNESS:  Um?

3       BY MS. MAYERSOHN:

4            Q    Is that a yes?

5            A    Yeah, I guess so.

6            Q    Okay.  Do you believe that there is a note

7       that was signed in reference to this?

8            A    I don't know that.

9            Q    Do you have any note in your possession?

10           A    No, I don't.

11           Q    Do you believe that there is a security

12      agreement that might have been signed in reference

13      to this request?

14           A    Might be.  I'm not sure.

15           Q    Do you have that in your possession?

16           A    No, I do not.

17           Q    The mortgage that was part of this that

18      they have listed as No. 6, you had this together.

19           A    Okay.

20           Q    These are the only documents that you have

21      in reference to No. 1; is that correct?

22           A    Yes.

23           Q    And the remainder of the documents would

24      have been given to Mr. Keifitz; is that correct?

25           A    I hope, yes.  I think he has all the
```

1    papers.

2            Q    Now, to the best of your knowledge,

3    Mr. Keifitz was contacted regarding this discovery

4    request, correct?

5                MR. SHALEK:  Objection to form.

6                MR. REYES:  Objection.

7                THE WITNESS:  Yes.

8    BY MS. MAYERSOHN:

9            Q    Did Mr. Keifitz provide additional

10   documents for No. 1?

11           A    From what I understood, no.

12           Q    To the best of your knowledge, was

13   Pinnacle contacted regarding this discovery request?

14           A    I hope so.  Yes.  Yes.

15           Q    Okay.  To the best of your knowledge, did

16   Pinnacle provide other documents than what's been

17   provided regarding No. 1?

18           A    No.

19           Q    To the best of your knowledge, was

20   Yelizarov contacted, or his companies, whether it

21   was directly or through his attorneys, regarding

22   this discovery request?

23           A    I don't know that.  I don't know that.  I

24   know that I did because -- or you did because we

25   know who to contact to get all this paperwork.

```
 1        Q    Now, to the best of your knowledge, was

 2   Mr. Sexton contacted regarding documents?

 3        A    Yes.

 4        Q    Did Mr. Sexton provide any documents at

 5   all whatsoever in this case?

 6        A    Yes.

 7        Q    Yes, he provided documents?

 8        A    Oh, you said he provided?  No, of course

 9   not, otherwise we would have them.  I'm sorry.

10        Q    Was Mr. Sexton uncooperative?

11        A    He is.

12             MR. SHALEK:  Objection to form.

13             THE WITNESS:  He was.  As far as

14        Yelizarov, I want to make sure that you

15        understand.  Yelizarov is in Ukraine.  It's not

16        easy to contact his attorney, so usually he is

17        asking me and I'm asking you to do that because

18        I cannot -- or I'm asking Oleg.  That's a

19        little tricky.  So Yelizarov, if he needs

20        something, he's sometimes doing that through

21        Oleg or through me because international is

22        very hard to get a hold of Mikhael Keifitz even

23        when we're in the country.

24   BY MS. MAYERSOHN:

25        Q    Did you discuss any defaults on paying the
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    loan with Mr. Yelizarov?

2        A    Yes.  When you are saying -- when you ask

3    me this question, you are talking about when I could

4    not pay the loan?

5        Q    Correct.

6        A    Yelizarov knew that the company -- that we

7    had some problems and that is the reason we did what

8    he was asking for and I was just giving him

9    everything I had.

10       Q    He didn't send you any e-mails regarding

11   this, correct?

12            MR. SHALEK:  Objection to form.

13            THE WITNESS:  Correct.

14   BY MS. MAYERSOHN:

15       Q    Do you recall getting any e-mails from

16   anyone about this?

17            MR. REYES:  Object to the form.

18            THE WITNESS:  I can't recall.

19   BY MS. MAYERSOHN:

20       Q    Do you recall getting any letters from

21   anyone regarding default?

22       A    No.

23            MS. MAYERSOHN:  Can we take a quick

24       bathroom break?

25            THE VIDEOGRAPHER:  Off the record at 6:16.

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1              (Thereupon, a recess was taken.)

 2              THE VIDEOGRAPHER:  Back on the record at

 3         6:21.

 4    BY MS. MAYERSOHN:

 5         Q    Leon, after you were no longer president

 6    of Pinnacle Three Corporation --

 7              MR. REYES:  Which one are we talking

 8         about, Florida or --

 9              MS. MAYERSOHN:  Florida.  It would be the

10         same for Illinois.

11    BY MS. MAYERSOHN:

12         Q    -- were you involved in corporate

13    resolutions or things of that matter?

14              MR. REYES:  Object to the form.

15              THE WITNESS:  No.

16    BY MS. MAYERSOHN:

17         Q    Were you aware of the operations of the

18    company after you were no longer president?

19         A    No, I don't.

20         Q    So any assignments, deeds, transfers,

21    things of that nature which occurred afterwards,

22    would not be something you would have knowledge of?

23              MR. REYES:  Object to the form.

24    BY MS. MAYERSOHN:

25         Q    Is that correct?
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1                   MR. REYES:  Object to the form.

 2                   THE WITNESS:  That's correct.

 3       BY MS. MAYERSOHN:

 4           Q    Any wire transfers that would have come in

 5       from the loan agreement, to the best of your

 6       knowledge, those went into Star Capital Fund,

 7       correct?

 8           A    Yes.  Maybe some of them did came to

 9       Pinnacle.  It was seven years, eight years ago, so

10       I'm not sure, but mostly should come to Star Capital

11       Fund.

12           Q    You are not a signatory on the bank or

13       banks for Star Capital Fund, correct?

14           A    I'm not.

15           Q    You are not a signatory for the bank or

16       banks for Pinnacle Three Corporation of Florida or

17       Illinois, are you?

18                   MR. REYES:  Object to the form.

19                   THE WITNESS:  Not any more.

20                   MR. SHALEK:  Object to form.

21       BY MS. MAYERSOHN:

22           Q    Are you entitled to get copies of records

23       regarding banks belonging to either Star Capital

24       Fund or Pinnacle Three Corporation of either Florida

25       or Illinois?
```

```
 1                MR. SHALEK:  Object to the form.

 2                MR. REYES:  Object to the form.  Asked and

 3           answered before.  You are kind of repeating

 4           yourself now.

 5                THE WITNESS:  No, I cannot.

 6     BY MS. MAYERSOHN:

 7           Q     Now I know you mentioned you transferred

 8     your assets from Pinnacle to Yelizarov.  Do you also

 9     have a house in Hollywood?

10           A     Yes, I do.

11           Q     How come Yelizarov and/or one of his

12     companies did not take this house, if you know?

13           A     Because I have first and second mortgage

14     on the house and the house is not worth more than

15     the loan -- than the mortgage amount.

16           Q     You are not an officer of Vernal or North

17     Star or North Star, LLC, are you?

18                MR. REYES:  Object to the form.  Asked and

19           answered.

20                THE WITNESS:  I am not.

21     BY MS. MAYERSOHN:

22           Q     I'm sorry?

23           A     I am not.

24           Q     Just because you are signatory at Capital

25     Bank, that does not mean that you have an ownership
```

```
 1    interest in any of North Star Maritime, LLC's bank

 2    accounts, does it?

 3            MR. SHALEK:  Object to form.

 4            MR. REYES:  Join.

 5            THE WITNESS:  That is correct.

 6    BY MS. MAYERSOHN:

 7       Q    Did you do this because you were trying to

 8    assist Mr. Yelizarov after you defaulted on the loan

 9    to him and his company?

10       A    Yes, I did.

11            MR. REYES:  Object to the form.  What is

12       this?

13    BY MS. MAYERSOHN:

14       Q    Did he agree to assist with Capital Bank?

15       A    Yes, I answered that before.  Yes.

16       Q    Have you tried to do everything in your

17    power to get all of the documents that were

18    requested in the request for production, either

19    directly by yourself or by hiring counsel, so that

20    you could comply with the court order?

21       A    Yes, I do -- I did.

22       Q    Do you know who wrote this letter, if it

23    was you or someone else, regarding Pinnacle Three

24    Corporation, part of Exhibit 8?

25       A    I did.
```

1      Q     Was that because Mr. Haft instructed you

2 to do this?

3      A     Yes.  He recommended to do that.

4      Q     Exhibit No. 9, the verified complaint for

5 damages, before today, do you recall seeing this

6 document or is that something that one of your

7 attorneys would have handled for you?

8      A     My attorney should handle it for me.

9      Q     And at the time that this verified

10 complaint for damages was created back August 14,

11 2013, were you trying to cooperate with

12 Mr. Yelizarov and his attorneys so that you could

13 pay him back for the amounts of monies that you

14 borrowed from the loan and security agreement and

15 other attached documents?

16           MR. REYES:  Object to the form.

17           THE WITNESS:  Yes.

18 BY MS. MAYERSOHN:

19      Q     Regarding Exhibit No. 11 from today, do

20 you know when you pledged the shares of Pinnacle

21 Three Corporation?

22      A     Do I know when?

23      Q     When you pledged them to Yelizarov.

24      A     I don't know exactly when was it.

25      Q     Do you know when they executed on the

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1    stock?
 2              MR. REYES:  Are we talking about Pinnacle
 3         Three Corporation?
 4              THE WITNESS:  What was that?
 5              MR. REYES:  Are we talking about Pinnacle
 6         Three Florida?
 7              MS. MAYERSOHN:  Yes, in this letter.  I'm
 8         referring specifically to this letter, Exhibit
 9         11.  Yes.
10              MR. REYES:  But we are talking about the
11         Florida corporation?
12              MS. MAYERSOHN:  Yes, Florida and, I guess,
13         Illinois merged into it.
14              MR. REYES:  It didn't merge.  They are two
15         separate companies.  They are not merged at
16         all.
17              THE WITNESS:  You are referring to
18         March 2007?  That's what you are referring to?
19    BY MS. MAYERSOHN:
20         Q    Yes.
21                   Do you know when the shares were
22    pledged?
23         A    Well, it looks like in March 2007.
24         Q    Do you recall seeing documents after you
25    pledged the shares executing them?
```

```
 1          A    I did not recall.  I don't recall that.

 2          Q    Did you know that that happened or did you

 3     think you just gave them over?

 4          A    I think that happened.

 5          Q    But did you see any documents regarding it

 6     happening?

 7          A    I don't remember that.

 8          Q    Regarding Exhibit No. 18, they are making

 9     a big deal about Mr. Keifitz e-mailing you.

10               Do you know whether or not this is an

11     actual e-mail --

12          MR. REYES:  Object to the form of the

13          question.

14     BY MS. MAYERSOHN:

15          Q    -- to your e-mail address?

16          MR. REYES:  Object to the form of the

17          question.

18          THE WITNESS:  I don't know that.  I may

19          not read it.  I may not see it.  I may not be

20          in the country.  Sometimes -- I can see it's

21          May 3rd, but at this time I may be out, so I

22          cannot recall that.

23     BY MS. MAYERSOHN:

24          Q    So you don't have an independent

25     recollection of this e-mail, correct?
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1        A    I don't know.  Like I said, it was done
 2   when?  In 2013.  So one year ago.  I don't know.
 3        Q    Okay.  When are you usually out of the
 4   country?
 5        A    What?
 6        Q    Is there a particular time of the year
 7   when you are usually out of the country?
 8        A    It's summer.  It could be from May, yeah.
 9   Usually summer.
10        Q    Now, Exhibit 25 -- let me strike that.
11             Do you know the exact amount of money
12   that is owed by you to Yelizarov?
13             MR. REYES:  Object to the form.
14             THE WITNESS:  I answered that question
15        that it is -- the base amount it was in the
16        neighborhood of $10 million, but it was
17        18 percent interest.  It could be twice as big
18        right now.  So that's why I don't know exactly
19        because I gave everything which was much less
20        than I owed him.
21   BY MS. MAYERSOHN:
22        Q    For this type of a loan, do you recall
23   getting any loan statements regarding the amounts
24   that you owed?
25        A    I cannot recall that, no.
```

```
 1        Q     But you still owe whatever debt remains on

 2   this account, correct?

 3             MR. REYES:  Object to the form.

 4             THE WITNESS:  That is correct.

 5   BY MS. MAYERSOHN:

 6        Q     And you still intend to pay this debt?

 7        A     Yes.

 8             MR. REYES:  Object to the form.

 9             MR. SAYRE:  Are you done?

10             MS. MAYERSOHN:  No further questions.  I'm

11        going to -- for the time being I'm going to

12        reserve my right, if Mr. Reyes continues with

13        anything, to recall Mr. Goldstein for any

14        further questions as is necessary to clarify.

15             MR. SAYRE:  How are we on time?

16             THE VIDEOGRAPHER:  6 hours 5 minutes.

17             MR. SHALEK:  That limit is just for

18        Mr. Reyes.  It's not for the deposition.  You

19        can look --

20             MR. REYES:  Yes, it's not a global 7

21        hours.  If that's what you were trying to do,

22        it ain't going to work.

23             MR. SHALEK:  It's not you stretch it out

24        three hours to avoid me from asking questions.

25             MR. SAYRE:  Well, no.  Let's pull the rule
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1        book because he is supposed to sit for seven

 2        hours.

 3             MR. SHALEK:  Okay.  Fine.  I'll go next.

 4             MR. SAYRE:  No, you will not.

 5             MR. SHALEK:  Yes, I am.  Mr. --

 6             MR. SAYRE:  No, you will not.

 7             MR. SHALEK:  Yes.  Well, we can buck up

 8        for it.  Let's play rock, paper, scissor.

 9             MR. SAYRE:  No, I'm asking my questions.

10             MR. SHALEK:  No, I'm going to go next.

11        I'll speak up loud so you can hear me.

12             MR. SAYRE:  Mr. Yelizarov --

13             MR. SHALEK:  Mr. --

14             MR. SAYRE:  Are we going to do this, Jeff?

15             MR. SHALEK:  No.

16             MR. SAYRE:  I'm not trying -- I'm not

17        trying -- I wanted to know how much time I've

18        got left so I can plan my questioning.

19             MR. SHALEK:  You have 7 hours left.

20             MR. SAYRE:  I don't have 7 hours.

21             MR. SHALEK:  You have a full 7 hours.

22             MR. SAYRE:  He has been here for 6 hours

23        and 8 minutes.  I'm not allowed to ask him more

24        than 45 minutes of --

25             MR. SHALEK:  I'm not going to be precluded
```

```
 1      because you are going to ask too many questions

 2      and drag him out here until 7:30 so that I

 3      don't get to ask my questions.  It's not going

 4      happen.

 5           MR. SAYRE:  You've already asked 7 hours

 6      of questions of Mr. Yelizarov -- I'm sorry, of

 7      Mr. Goldstein.

 8           MR. SHALEK:  It has nothing to do with the

 9      examination, you know, with this.

10           MR. SAYRE:  It absolutely does have to do

11      with it.  Okay.  Let me ask you this:  Have I

12      asked any questions of Goldstein's deposition

13      thus far in this case?

14           MR. SHALEK:  I have no idea.

15           MR. SAYRE:  You know I haven't.  You have

16      been in the case.  You have asked 7 hours of

17      deposition.

18           MR. SHALEK:  I don't know.  I don't keep

19      track of what you ask.

20           MR. SAYRE:  All right.  So I'm going to

21      ask my questions.

22           MR. SHALEK:  Mr. Goldstein, let me ask

23      you, sir, --

24           MR. SAYRE:  Jeff, are you going to talk

25      over me?
```

```
1          MR. SHALEK:  Well, are you going to agree

2     that I have an opportunity to examine

3     Mr. Goldstein?

4          MR. SAYRE:  I'm going to say that's for

5     the judge -- how about this, the judge will

6     decide.

7          MR. SHALEK:  You are not stopping this

8     deposition without me asking questions tonight.

9          MR. SAYRE:  The judge will decide.

10          MR. SHALEK:  Well, then you are not going

11    to ask questions and I'll ask my questions and

12    the judge will decide whether or not you get to

13    ask.  Either you are going to stipulate with me

14    that we are both going to ask questions or I'm

15    going to ask my questions first.  It's that

16    simple.

17          MR. SAYRE:  Oh, is it?

18          MR. SHALEK:  Yes, it is.

19          MR. SAYRE:  Let's adjourn the deposition.

20          MR. SHALEK:  Go ahead.

21          MR. SAYRE:  Leah, it's your client.  You

22    can adjourn the deposition, if you'd like.  I

23    interpret the 7 hour limit as a 7 hour limit.

24    Okay?  It's not 7 hours for Mr. Reyes.  It's

25    not 7 hours -- and plus 7 hours for Mr. Shalek,
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1        plus 7 hours for myself.  It's now -- I don't

 2        even know because my phone ran out of

 3        batteries.  What time is it?

 4             MS. MAYERSOHN:  Six hours -- 6:39.

 5             MR. SAYRE:  It's 6:39.  We started this

 6        around 10 in the morning and now it sounds like

 7        Mr. Shalek wants to stay here 'til midnight.

 8             MR. SHALEK:  No, I don't.  I actually

 9        have -- because I have a lot to do, but before

10        we adjourn tonight, Mr. Goldstein, I have maybe

11        four or five questions that I'd like to ask

12        you.  Are you okay with that, sir?

13             THE WITNESS:  I am dead tired and you

14        probably can see that, so.

15             MR. SHALEK:  Well, if it becomes too

16        trying for you, you let me know and I'll save

17        it.  Okay?  They are very simple questions.

18             Sir, you answered about the Windjammer --

19        you mentioned that you paid --

20             MR. SAYRE:  No.  No.  Excuse me.  I

21        started asking questions and you cut me off and

22        now you will not let me continue asking my

23        questions.  You decided unilaterally that you

24        would jump in over me after I asked how much

25        time was left so I could determine how many
```

```
1     questions I'm allowed to ask and properly

2     structure my questions and then you just

3     decided to jump me because I asked that

4     question for some reason.

5          MR. SHALEK:  No, sir.  I'm the plaintiff

6     in the case.  I'm entitled to go next.  And

7     you, sir, represent an impleaded defendant.  So

8     I don't even know that you have the right to

9     ask questions at this deposition.

10         MR. SAYRE:  Is that the position you are

11    taking?

12         MR. SHALEK:  No, but I'm certain that the

13    plaintiff goes next.  That's just the order of

14    taking depositions.

15         MR. SAYRE:  Oh, is it?

16         MR. SHALEK:  Yes, it is.

17         MR. SAYRE:  Well, I did not know.

18         MR. SHALEK:  Well, now you have been

19    informed.

20         MR. SAYRE:  Mr. Goldstein -- are we going

21    to do this?  We'll do it.

22         MR. SHALEK:  Mr. Goldstein --

23         MR. SAYRE:  Mr. Goldstein -- I am

24    allowed -- I started the questioning, you

25    jumped in over me.  You want to stay on the
```

```
 1        record and do this, I will continue doing this

 2        with you.  Do I have to get on the phone with

 3        the judge -- the judge isn't going to be there.

 4             MR. SHALEK:  The judge said he was taking

 5        vacation anyhow this week and next.  So you can

 6        threaten the judge all you want.  It doesn't

 7        matter and I have no problems with you going

 8        first as long as you allow me sufficient

 9        opportunity to ask my four or five questions

10        that I need to ask him tonight.

11             MR. SAYRE:  You can do whatever --

12             MR. SHALEK:  Fine.

13             MR. SAYRE:  If the witness will stay

14        around, that's fine.

15             MR. SHALEK:  That's fine as long as you

16        agree, I don't have a problem.  Go for it.

17             MR. SAYRE:  Thank you.

18                    CROSS EXAMINATION

19   BY MR. SAYRE:

20        Q    Mr. Goldstein, 40 Retail Corporation,

21   Century Drive Retail Corporation, Sterlington Retail

22   Corporation and Texarkana Retail Corporation, do you

23   know these companies?

24        A    Yes, I do.

25        Q    Who are they?
```

```
 1        A     This is adult stores which is -- I own

 2   33 percent.  Used to own.

 3        Q     Who are the owners of these companies?

 4        A     John has two-thirds and I have one-third.

 5        Q     And is John present at the deposition

 6   today?

 7        A     Yes, he is.

 8        Q     Okay.  Now are you -- so was a -- was

 9   there an underlying litigation between you and other

10   parties and these adult bookstores in state court in

11   Florida?

12        A     Yes.

13        Q     And a settlement was reached there?

14        A     Yes, it was.

15        Q     And under that settlement Pinnacle Three

16   is entitled to certain funds from the adult

17   bookstores?

18        A     That is correct.

19        Q     Now are you personally, Leon Goldstein,

20   also entitled to funds under this settlement

21   agreement, distributions from the adult bookstores?

22        A     I would have if I would not owe North Star

23   money.

24        Q     Well, let me -- so as I understand the

25   settlement agreement -- you tell me if I'm wrong --
```

1    the settlement agreement provides for $39,000

2    monthly to Pinnacle Three?

3         A    That is correct.

4         Q    Okay.  Now the settlement agreement, I

5    think, also provides for distributions from the

6    adult bookstores to Leon Goldstein personally as

7    well?

8              MR. REYES:  Object to the form.

9              THE WITNESS:  Yes.  That is correct.

10   BY MR. SAYRE:

11        Q    Is that right?

12             MR. REYES:  Not accurate, but object to

13        the form.

14   BY MR. SAYRE:

15        Q    Okay.  And those distributions are

16   presumably from profits that are reflected in the

17   K-1s at the end of the year?

18        A    That is correct.

19        Q    Have you been provided any funds by the

20   adult bookstores from profits?

21        A    Other than the settlement agreement, no.

22        Q    Okay.  So -- and Mr. Reyes objected that

23   I -- to the alleged mischaracterization of the

24   settlement agreement, but to the extent that the

25   settlement agreement also provides funds to you

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    individually, not just Pinnacle Three?

2         A    That is correct.

3         Q    Okay.  Just to clarify, you haven't

4    received any funds?

5         A    I did not.

6         Q    Now you produced, in response to

7    Mr. Reyes' request for production, some K-1s from

8    the adult bookstores; is that right?

9         A    That's right.

10        Q    Now, have the adult bookstores experienced

11   a decrease in revenue over the last couple of years

12   from previous years?

13        A    Very much so.

14        Q    Are you at all suspicious at this decrease

15   in revenue reflected in the K-1s from recent years?

16        A    That is correct.

17        Q    Do you have any documents -- has the --

18   have the adult bookstores provided you with any

19   documents explaining why there has been this sudden

20   decrease in revenue?

21        A    No, they didn't.

22        Q    Okay.

23             MR. REYES:  Just for the record, I'm not

24        objecting to you asking these questions, but

25        you've gone completely into a subject matter

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    that has nothing do with the request for

2    production.

3         MR. SAYRE:  The K-1s were produced by Mr.

4    --

5         MR. REYES:  No, your question about the

6    terms of the settlement and distributions.  But

7    just so the record is clear, because I am going

8    to have follow-up questions on counsel's

9    exceeding the request for production and you,

10   so.

11        MR. SAYRE:  Well --

12        MR. REYES:  But go ahead.  I don't want to

13   take your time.  I don't want to take your

14   time.  Go.  Go.  Go.

15        MR. SAYRE:  Well, you brought it up.  You

16   kind of chimed in, so I'll respond to that.

17   The K-1s were specifically mentioned in your

18   direct examination of Mr. Goldstein, both the

19   Pinnacle K-1s and the K-1s from the adult

20   bookstores.  So I'm not treading any new

21   ground.

22        MR. REYES:  Don't take my silence as an

23   agreement.  I just want you to keep going.

24        MR. SAYRE:  So you disagree with that

25   statement?

```
 1              MR. REYES:  Absolutely.  Go ahead.  I want
 2         to get done here.  I can't find the rule.
 3              MR. SAYRE:  It's Rule 30.
 4              MR. REYES:  I know, but I don't see it.
 5              MR. SAYRE:  I can't check my phone because
 6         it's out of batteries, but -- I'm sure there is
 7         a rule of civil procedure back there somewhere.
 8              MR. REYES:  Oh, there is, but I don't want
 9         to get up and go get it.
10              MR. SAYRE:  I have no further questions.
11              MR. REYES:  All that fighting.
12              MR. SAYRE:  I didn't know what Jeff was
13         going to do.
14                     CROSS EXAMINATION
15    BY MR. SHALEK:
16         Q    Mr. Goldstein, good evening.  Because of
17    the lateness of the hour, I just want to ask you a
18    couple of questions that I need to know the answer
19    to tonight and then I'm going to reserve my time
20    until the rest of the documents are produced to
21    continue my examination of you in this regard.  But
22    these are some follow-up questions to some answers
23    you gave.
24              You said that the Windjammer home --
25    that's the home in Hollywood, correct, that has the
```

1    first and second mortgage on it?

2        A    That is correct.

3        Q    Is located on Windjammer Way?

4        A    Yes.

5        Q    And, sir, what are the amounts of the

6    mortgage payments that you make every month on

7    those?

8        A    About 14,000.

9        Q    About 14,000?

10       A    Yes.

11       Q    Sir, is the exact number $14,124.16?

12       A    Yes.

13       Q    Sir, where does the money come to pay for

14   that mortgage?

15           MS. MAYERSOHN:  I'm going to object as

16       beyond the scope.

17           THE WITNESS:  Oleg is helping me to pay

18       this amount.

19           THE COURT REPORTER:  I'm sorry.

20           THE WITNESS:  Oleg Firer and some friends,

21       if I need it, are helping me with -- to pay the

22       mortgage.

23   BY MR. SHALEK:

24       Q    Okay.  And would any of those friends that

25   are helping you to pay the mortgage be

1    Mr. Yelizarov?  Does he help you pay the mortgage?

2         A    If I need it I can ask him, but, no, he is

3    not.

4         Q    Okay.  Has he ever instructed you to pay

5    the mortgage out of the Capital Bank account?

6         A    I think he did because if I need it I

7    cannot let it go.

8         Q    Sir, is it true that you paid the mortgage

9    out of that bank account every single month for the

10   last year and a half?

11        A    No, it's not true.

12        Q    Okay.  Sir, your wife -- I had the

13   opportunity of deposing her.  She is a lovely lady.

14             Can you remind me what her name was,

15   please?

16        A    Natalia.

17        Q    Natalia.

18             And Natalia told me at her deposition

19   that she basically charges all of the living

20   expenses for her and your two children on an

21   American Express.  Are you aware of that?

22             MS. MAYERSOHN:  I'm going to object as

23        this is way beyond the scope of the request for

24        production.

25             MR. SHALEK:  Well, we'll see.  Give me a

```
1         little bit of latitude, Leah.  We are getting

2         there.  I promise you.

3   BY MR. SHALEK:

4         Q     Are you aware that she has an American

5   Express account of Pinnacle Three Corporation?

6         A     Not anymore.

7         Q     When did she not stop having an American

8   Express account of Pinnacle Three?

9         A     Quite a bit.  Probably eight months ago,

10  nine months ago.

11        Q     And the payments from that -- for that

12  American Express, do you know where those monies

13  came from?

14        A     I told you in the past that I have friends

15  who are helping me to -- when I have problems.  So I

16  have my niece who lives in Odessa and she is helping

17  me to make payments and Oleg is helping me.  I have

18  some other people who are helping me to stay alive

19  right now.

20        Q     That includes Mr. Yelizarov?

21        A     If I need from Mr. Yelizarov, I probably

22  will ask him and he will not reject me to give me

23  the money if I need it.  Because I did it in the

24  past, he had problems before and I helped him out.

25        Q     Now, sir, if there is a transfer from the
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    Pinnacle Three Capital Bank account to pay the

2    American Express, is that something that you did as

3    a signor on the account?

4          MS. MAYERSOHN:  Same objection as before.

5       This is all way beyond the scope of discovery,

6       way beyond the scope of Mr. Reyes' questions.

7          MR. SHALEK:  With all due respect, he

8       specifically said that he made no payments out

9       of the Capital Bank account without

10      Mr. Yelizarov's permission.  That was his

11      testimony and I'm just testing the veracity of

12      that testimony.

13         THE WITNESS:  No, I said from Pinnacle

14      Corporation, which is in Chase Bank.  I

15      never -- he never told me to do anything.

16   BY MR. SHALEK:

17      Q    Okay.  That's from the Chase Bank account?

18      A    Right.

19      Q    What about the Capital Bank account for

20   Pinnacle Three?

21         MS. MAYERSOHN:  Same objection.

22   BY MR. SHALEK:

23      Q    You were a signor on that account,

24   correct?

25      A    Yes, I am.

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1        Q    And were you -- I believe Mr. Reyes asked

 2   you for both accounts, Chase Bank and Capital

 3   account, whether or not you were authorized to make

 4   any transfers out of the account and --

 5        A    If I need the money --

 6        Q    -- your testimony was no, right?

 7        A    If I need money to pay my bills, I can use

 8   this amount -- this account and Yelizarov will be

 9   paid in Odessa from my cousin, I told you, and from

10   my niece.  That's how it works.

11        Q    Sir, you testified that you were not on

12   any bank accounts for Star Capital Management or

13   Star Capital Equities.

14                  Where were those bank accounts

15   located?  Who did Star Capital bank with?

16        A    What is the question?

17        Q    Ms. Mayersohn --

18        A    Right.

19        Q    -- asked you about bank accounts for Star

20   Capital.  She asked you about Star Capital

21   Management, Star Capital Equities and Star

22   Capital -- I think it was Finance Corporation, the

23   parent company.

24        A    Right.

25        Q    Where were those bank accounts maintained?
```

1          A     I don't know if every account you are

2     mentioning is in the same bank.  I think under Star

3     Capital Fund, which is the main account, we had it

4     in Citibank, but I was not the signor in that

5     account.

6          Q     Do you know whether Star Capital

7     Management had any accounts?

8          A     I don't know.

9          Q     Do you know whether Star Capital Equities

10    had any accounts?

11         A     Maybe they didn't have the account.

12         Q     As promised, sir, I told you I was only

13    going to ask you four or five questions tonight.

14         A     This is the last one.

15         Q     Well, there were a couple of follow-ups.

16    And let me just make certain that there is nothing

17    else I need to ask you tonight.  One last one, I'm

18    sorry.

19                Ms. Mayersohn questioned you about

20    whether or not Yelizarov delegated authority to a

21    lawyer and you said that you were aware that he had

22    delegated authority to a lawyer.  Do you remember?

23         A     To who?

24         Q     To a lawyer.

25         A     Okay.

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1              MR. SHALEK:  Ms. Mayersohn, I can have it
 2        read back.
 3   BY MR. SHALEK:
 4        Q    It was right at the beginning of
 5   her direct -- of her questioning of you.
 6        A    To Mikhael Keifitz?  That's what you
 7   recall?
 8        Q    So it's your understanding that Yelizarov
 9   delegated authority in North Star Maritime to
10   Mikhael Keifitz, right?
11        A    I don't think so.  One more time, from
12   what I know, Mr. Sayre, who is present here in the
13   deposition, is handling North Star, and Mikhael
14   Keifitz, is his personal attorney, but on anything
15   else I don't know.
16        Q    But -- okay.
17              Then was it Pinnacle you were talking
18   about, that the authority was delegated for Pinnacle
19   Three from Yelizarov to Mikhael Keifitz?
20        A    It could be.
21        Q    Okay.  And you said that knew -- you
22   testified that you knew that Yelizarov had done
23   this.  That was Mrs. Mayersohn -- Ms. -- Ms.?  I'm
24   sorry.
25              MS. MAYERSOHN:  Ms.
```

```
1    BY MR. SHALEK:
2         Q    Ms. Mayersohn asked you the question and
3    you said, yes, Yelizarov transferred authority over
4    that business to his lawyer.  Do you remember saying
5    that?
6         A    I didn't say the business.  He is the
7    attorney.  Oleg is the secretary, so how they are
8    handling that, I'm pretty sure that Oleg is probably
9    helping him in that Pinnacle Three Corporation, but
10   if it's a legal question or something like that,
11   then Mikhael Keifitz probably is handling.
12        Q    How are you aware of this?
13        A    I don't.  I said I assume that's how it
14   is.
15        Q    Well, you answered that you were aware of
16   it, sir.  And I'm asking you how you became aware of
17   it?
18        A    Well, I'm aware -- I'm aware that Mikhael
19   Keifitz is his attorney.
20        Q    How did you become aware of that?  Did
21   Yelizarov tell you this?
22        A    Yes.
23        Q    Yelizarov told you that he and Keifitz had
24   conversations where he made Keifitz the attorney for
25   the -- gave him attorney in fact for the business,
```

PRESTIGE REPORTING SERVICE, INC.<br>
(954) 764-7297

1      correct?

2          A    I'm telling you that I don't know if

3      Yelizarov told me.  I know that Keifitz is his

4      attorney.  So I cannot tell you who told me when

5      that happened.  Yelizarov has the attorney, who is

6      Mikhael Keifitz, handling his legal or whatever

7      situation he has.

8          Q    Was he handling the legal situations or is

9      Keifitz the president of the company?

10         A    I don't know that.  You can ask Keifitz or

11     Yelizarov.

12         Q    Well, I'm just asking you who told you

13     what.

14         A    I don't know.

15         Q    You made a statement and I'm just trying

16     to find out a little bit more about this.

17         A    I made statements that Keifitz is

18     Yelizarov's attorney and probably all the paperwork

19     which you are looking for probably in his

20     possession.

21              MR. SHALEK:  Okay.  Thank you.

22              MR. REYES:  I have a couple of follow-up

23         questions of Mr. Goldstein in light of what

24         Ms. Mayersohn asked you.

25                   REDIRECT EXAMINATION

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    BY MR. REYES:

2         Q    She started off asking you that whether

3    your relationship with Yelizarov was different after

4    you defaulted on the loan and you said the

5    relationship was the same after you defaulted on the

6    loan.

7                   What did you mean when you said your

8    relationship with Yelizarov is the same after you

9    defaulted on the loan?

10        A    It didn't broke the friendship.  We --

11   that's what I meant.

12        Q    There is no difference in your

13   relationship with Mr. Yelizarov before the default

14   and after default is what you're saying?

15        A    Yes, because I gave him everything I had

16   and he understood that.  It's not -- it's not --

17   it's not like I stole the money.  Just had financial

18   problem in the United States and a lot of people

19   went out of business, so is Lehman Brothers or

20   whatever.  So we had that big problem.

21        Q    And when you say you had a financial

22   problem in the United States, you are referring to

23   the money that Mr. Yelizarov gave to Star Capital

24   and Star Capital was unable to pay it back; is that

25   right?

```
 1        A     That's what I meant, yes.

 2        Q     Okay.

 3              Your attorney asked you a question

 4    suggesting that you had spoken to Oleg at the end of

 5    October to get documents, but that his travel is

 6    unpredictable, I think you said.

 7              Is it a true statement that in

 8    October you asked Oleg to help you find documents to

 9    comply with the judge's orders in this case?

10        A     I cannot recall when, but I think it's in

11    October -- oh, wait.  I don't remember exactly what

12    time and what date and what month, but I told him to

13    help me with that and he said he will.

14        Q     Okay.  We know you talked to him

15    yesterday.  You were at a restaurant --

16        A     Correct.

17        Q     -- and you called Ms. Mayersohn on the

18    phone when you and Oleg were in person.

19        A     That's correct.

20        Q     Take yesterday out of the equation.

21              Did you ask Oleg to help get you

22    documents to comply with the discovery in this case

23    prior to yesterday?

24        A     I hired Leah --

25        Q     I didn't ask you when you hired her.
```

1          A     Well, I'm just trying to tell you.

2          Q     What did you -- she asked you -- your

3    lawyer asked you a question if you reached out to

4    Oleg in October and I want to confirm, did you reach

5    out to him --

6          A     I was telling him that I will be in

7    deposition and I have to produce a lot of documents

8    and he said he would help me out.

9          Q     Okay.  There was no deposition being

10   discussed in October.  So when you are saying you

11   discussed the deposition, it would have been after

12   we had requested a deposition that you asked Oleg to

13   help you out, correct?

14         A     Yes.

15         Q     Okay.  So it would not have been in

16   October that you asked him for records, it would

17   have been sometime thereafter?

18         A     That's why I said, I don't remember the

19   months, whatever, but he said he would help me.

20         Q     And did you give Oleg a copy of the

21   request for production of documents so he could tell

22   you which he could get you and which he couldn't?

23         A     I can't -- I don't remember that.  I think

24   I answered you that question.  I don't remember.  I

25   said I need some help with all the documents they

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    ask me.  He said, don't worry, we will take care of

2    it or something like that.

3        Q    What I'm asking you is:  Did you actually

4    give him a copy of the document I sent you, the list

5    of documents?

6            MR. SAYRE:  Objection.  That was already

7            asked and answered earlier on today.

8    BY MR. REYES:

9        Q    Did you give it to him?

10       A    Like I said, I don't remember that I did.

11       Q    You said you contacted Mr. Haft in

12   response to your lawyer's questions and that he did

13   not give you any additional documents.

14            Did you give Mr. Haft a copy of the

15   request for production of documents?

16       A    No, I did not.

17       Q    You stated in response to your lawyer's

18   question that you are not entitled to give

19   Pinnacle's bank records.

20            You are a signatory on the Chase

21   account in Pinnacle's name, correct?

22       A    That's correct.

23       Q    You are a signatory at the Capital Bank

24   account in Pinnacle's name; is that correct?

25       A    That is correct.

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1      Q     And is it your belief that a signatory

2   cannot request records?

3      A     That's my belief.

4      Q     Did you attempt with the bank, either

5   bank, to get records as a signatory?

6      A     Like I said, I tried to get a hold of the

7   guy who's the manager whose name is Tony.  I just

8   couldn't get a hold of him.

9      Q     Did you go to the branch and say, I'm a

10  signatory, I need these bank statements, I need

11  these checks, did you do that?

12     A     That's the problem.  He is the only one --

13  that's why I'm referring to him.  He is the only one

14  who is handling.  It's a small bank and that's

15  basically it.

16     Q     All right.  So you did not go to the

17  branch and say, I'm a signatory, may I have these

18  records; is that correct?

19     A     I need to talk to him.  He is the only one

20  who can do that, if he would do that.

21     Q     So your efforts to get bank records was

22  simply placing a call to Tony, Tony didn't call you

23  back, and from that failure to call you back, you

24  are assuming you can't get records as a signatory;

25  is that correct?

```
 1        A    I called him numerous of times to find if

 2   he is not in the bank.  It's not like I'm calling,

 3   and they said Tony, who is the manager, is not in

 4   the bank, but we will tell him to call you back.

 5        Q    But when you called there and he didn't

 6   answer the phone, did you say to the person who

 7   answered the phone, may I obtain bank records on an

 8   account that I'm a signatory for?  Did you ask that

 9   question?

10        A    I did not, because, like I said, I know

11   it's a small bank.  They have like four people

12   working there and he is the only one who knows

13   what's going on.

14        Q    You made a statement in response to your

15   lawyer's questions that when you need to find

16   something you ask Oleg.  What does that mean, that

17   statement you made to your lawyer?

18        A    That means that Oleg is keeping a lot of

19   records and knows a lot of things and he is capable

20   to find something in the computer very quick.

21   That's what I meant.

22        Q    But were you suggesting that Oleg is your

23   representative or your agent to find records for you

24   when you need information?

25             MR. SAYRE:  Objection.
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1              THE WITNESS:  Of course not.  He is not my
 2         agent.  He is a friend of mine and I have been
 3         with him in business and we are still friends
 4         and, like I said, I'm not very organized, but
 5         he is.
 6    BY MR. REYES:
 7         Q    You answered your lawyer's question saying
 8    you are not involved in the operations of Pinnacle
 9    Three the Florida corporation anymore.  Do you
10    remember that answer?
11         A    Yes.
12         Q    But it is correct that you remain a
13    signatory in two accounts, correct?
14         A    That's correct.
15         Q    You opened an account in 2014 for
16    Pinnacle; is that correct?
17         A    That is correct.
18         Q    And you continuously receive and deposit
19    payments for Pinnacle; is that correct?
20         A    That's correct.  I don't feel that this is
21    like helping or making decisions for Pinnacle
22    Corporation, just putting the money in the bank.
23    The reason we opened this account, just to put the
24    money in the bank.  If you remember, you requested,
25    guys, that it has to be Pinnacle -- it has to be
```

1    account for Pinnacle Corporation because I used to

2    put this money in the North Star and we had that big

3    fight out of this.  So we went and opened account,

4    per your request, and I put the money there.  I'm

5    putting the money there.  If not, my daughter is.

6        Q    But what other business does Pinnacle have

7    other than receiving payments from my client and

8    depositing them in a bank account?

9        A    I'm no longer in this business, but

10   Pinnacle is having this settlement and he is

11   receiving the money, I guess.

12       Q    So Pinnacle has one business, collect

13   checks from the companies and you do that; is that

14   right?

15           MR. SAYRE:  Objection.

16           THE WITNESS:  Right now Yelizarov is the

17       president and he may do something else, but so

18       far we are receiving the payments, right.

19   BY MR. REYES:

20       Q    And you are depositing it for him?

21       A    That is correct.

22       Q    And North Star Maritime Miami, LLC, what

23   business does it have?

24           MR. SAYRE:  Objection, it calls for

25       speculation.

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1                 THE WITNESS:  I have no idea because I'm

 2       not part of this company.

 3  BY MR. REYES:

 4       Q    You said you contacted Pinnacle to seek

 5  documents in response to your lawyer's question.

 6                 Who at Pinnacle did you contact?

 7       A    I contacted Pinnacle?

 8       Q    She asked you, did you contact Pinnacle

 9  for records and you said yes.  Who did you contact

10  at Pinnacle for records?

11       A    It's Mikhael Keifitz which we are trying

12  to get a hold of.  That's the only person who

13  probably can give us any records.

14       Q    You didn't contact the secretary of

15  Pinnacle, Mr. Oleg Firer, for Pinnacle's records?

16       A    Of course.  Of course you know that.

17       Q    So when you said you contacted Pinnacle

18  for records, were you referring to Mr. Firer as

19  being Pinnacle or Mr. Keifitz as having a power of

20  attorney for the president of Pinnacle?  Who were

21  you referring to?

22       A    Both.

23       Q    Both.

24                 And you already told me Oleg was

25  yesterday, and Mr. Keifitz, you said your lawyer
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    reached out to because nine months ago you tried to

2    talk to him and he wouldn't give you any

3    information, right?

4         A     I was contacting him.  I told you that he

5    told me that he will not talk to me about business

6    with Pinnacle, whatever Yelizarov has.  This is his

7    client and he will not talk to me about this.

8         Q     That was nine months ago?

9         A     Well, I don't know how many months ago,

10   but it was a while ago and he made it very clear.

11        Q     You were asked by your lawyer if you have

12   e-mails from Mr. Yelizarov and I think you answered

13   you didn't know.

14              Have you deleted any e-mails during

15   the pendency of this matter?

16        A     No.

17        Q     Have you maintained all your e-mails since

18   this dispute arose?

19        A     They are sitting in the computer.

20        Q     They stay in the computer?

21        A     Uh-huh.

22        Q     Will you agree not to destroy any e-mails

23   while we pursue discovery in this case?

24        A     Yes.

25        Q     Your lawyer asked you the question, have

```
 1    you done everything in your power to obtain the

 2    documents that Magistrate O'Sullivan told you to

 3    produce in discovery and you had answered yes, you

 4    did everything in your power.

 5              Do you remember that answer?

 6    A    Yes.

 7    Q    Have you described fully in this

 8    deposition everything you did to respond to the

 9    discovery, obtain documents and comply with the

10    judge's order?

11    A    I did everything possible to get you

12    everything you need.

13    Q    That's not my question.

14              Have you described fully in this

15    deposition today all of your efforts to obtain the

16    documents and comply with the judge's order?

17         MS. MAYERSOHN:  Objection.  It calls for a

18         response which comments on attorney-client

19         privilege.  So other than commenting on items

20         of privilege, you can respond.

21         MR. REYES:  I disagree with that.

22    BY MR. REYES:

23    Q    You answered yes to the question, have you

24    done everything in your power and my question is:

25    Have you described everything you did?
```

```
 1          MS. MAYERSOHN:  And, again, you are asking

 2      him to describe certain things which might be

 3      related to work product or attorney-client

 4      privilege.

 5          MR. REYES:  Are you instructing him not to

 6      answer my question?

 7          MS. MAYERSOHN:  I'm not.

 8  BY MR. REYES:

 9      Q   Okay.  Will you answer?

10          MS. MAYERSOHN:  I'm telling him to answer,

11      subject to -- you know, I don't want him to

12      discuss anything that he and I discussed or --

13          MR. REYES:  I haven't asked him.

14          MS. MAYERSOHN:  -- anything that he and I

15      did together.

16          MR. REYES:  I haven't asked him.

17          MR. SAYRE:  I think your question calls to

18      comment on that.

19  BY MR. REYES:

20      Q   Mr. Goldstein, do you understand my

21  question?

22      A   I understand the question, but I can

23  understand what Leah is telling you because the

24  answer will be I have to involve her and she doesn't

25  want me to do that.
```

```
1        Q     Take out conversations you had with your

2   lawyer.  I haven't asked you.  I want to know what

3   you, Leon Goldstein has done to comply with the

4   judge's order.

5                Have you told us today everything you

6   did to comply with the judge's order or is there

7   anything else you did that you haven't told us

8   about?

9        A     I told you everything I did.

10       Q     Thank you.

11       A     And I'm telling you -- I'll give you a

12   little bigger answer.  Since I cannot talk to

13   attorneys who are not representing me, Leah can do

14   that and she tried to get a hold of Mikhael Keifitz

15   and she was unsuccessful and she said to me that --

16            MS. MAYERSOHN:  Okay.  Objection.  Let's

17        not talk about anything we discussed.  Move to

18        strike.

19   BY MR. REYES:

20       Q     We'll be talking to Mr. Keifitz and we'll

21   find out who asked him what.

22                You were asked by your lawyer when

23   you pledged the shares of Pinnacle Three

24   Corporation, the Florida corporation.  Do you

25   remember her asking you those questions?
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1        A    Okay.

2        Q    And she showed you the loan agreement

3    dated March 1st, 2007.  Do you recall that?

4        A    Right.

5        Q    Okay.  And you answered her that you

6    pledged the shares of Pinnacle Three Corporation,

7    the Florida corporation in March of 2007.  Do you

8    remember that answer?

9        A    I said that I can -- I'm reading that.

10   That's what I said.

11       Q    And is that your belief, that the shares

12   in the Florida corporation were pledged in March of

13   2007, to the best of your knowledge?

14       A    To the best of my knowledge.

15       Q    You were asked by Mr. Sayre about

16   distributions from the adult bookstores that you

17   have a one-third interest in and that there was a

18   sudden drop in revenue.

19            What are you referring to when you

20   say revenue, which figures are you talking about?

21       A    Revenue means that before the settlement I

22   received the checks from 75 Retail and I remember

23   how much their store was produce and right now it's

24   dropped probably three times.

25       Q    Are you talking about gross revenues or

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1   are you talking about revenues after expenses?

2       A    After expense.  Net revenues.

3       Q    Say it again.

4       A    Net revenues.

5       Q    So you are saying you think net revenues

6   have dropped?

7       A    Yes.

8       Q    Okay.  Just want to make sure if you are

9   talking about gross or net.

10      A    No.  Yes.

11      Q    You mentioned that there is a niece that's

12  helping you.  Is that niece in America, in the

13  United States or is that niece in the Ukraine?

14      A    In the Ukraine.

15      Q    What is her name?

16      A    Irena Batalova (phonetic).

17          THE COURT REPORTER:  Can you spell that,

18      please.

19          THE WITNESS:  Irena Batalova.

20  BY MR. REYES:

21      Q    Doesn't she have an account in Capital

22  Bank too?

23      A    She does.

24      Q    And she doesn't reside here?

25      A    She does not.

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1    Q    Now, when you were asked about paying the

2    mortgage for the Windjammer property, you said

3    friends are helping you and you included

4    Mr. Yelizarov helping you sometimes.

5              Did I understand you correctly?

6    A    That's correct.

7    Q    So is it your testimony, sir, that you owe

8    Mr. Yelizarov millions of dollars and yet he is

9    giving you money to pay your bills?

10   A    No, that's not what I said.  I said if I

11   need, let's say, to make a payment and the money

12   from Ukraine is not sometimes easier and I need to

13   do it, I'm paying from Yelizarov and Yelizarov is

14   collecting cash in Ukraine.  Everybody is doing

15   that, so it's not a big deal, so.

16   Q    So when you say paying from Yelizarov, you

17   mean the Pinnacle bank account where my client's

18   checks are being deposited, you are taking funds

19   from that account to pay your personal expenses and

20   then paying Mr. Yelizarov back in the Ukraine?

21   A    No, it's not.  I said this account was

22   never touched.  So this account where you are paying

23   the 39,000 to Yelizarov, I'm not doing anything, but

24   if I need something else, I can always take the

25   money -- basically it's vice versa.  He is getting

1   the money and I'm getting paid.  That's how Irena

2   can transfer.  She can help me this way very easily.

3   She can give him the money and I can, let's say, pay

4   me if I need something, but right now lately I'm

5   doing -- Oleg is helping right now.

6       Q    The payments that have come from the adult

7   bookstores under the settlement were being deposited

8   initially in the Pinnacle Three Capital Bank

9   account, right?

10      A    No.  Chase.

11      Q    Initially it was Capital, wasn't it?

12      A    Well, initially, yes, but a long time ago

13  it was closed.

14      Q    So you had the Capital Bank account.  Then

15  North Star opened a Capital Bank account and

16  payments were deposited there for a period of time,

17  correct?

18      A    Yes.

19      Q    And then a Chase account was opened in

20  Pinnacle's name and the payments were deposited in

21  that account for a period of time, correct?

22      A    That is correct.

23      Q    And do I understand your testimony, sir,

24  that if we were to look at the bank statements of

25  those three accounts we would not see any of your

1     personal expenses being paid from those accounts?

2         A    When you are saying three accounts, what

3     do you mean by three?

4         Q    Two at Capital Bank, one in Pinnacle's

5     name, one in North Star's name and --

6         A    No, I told you there is no Pinnacle

7     account in Capital Bank anymore.

8         Q    Okay.  If we were to look at the bank

9     statements from when that account existed, are you

10    saying that we would not see your personal expenses

11    being paid from that account?

12        A    If it was, it was done the way I'm telling

13    you that if I need the money I'm calling my cousin

14    or his daughter and I'm saying I need the money.

15    They give it to Yelizarov and he can say, okay,

16    take, let's say, 20,000 because he already have it.

17    That's how it works.

18        Q    Okay.  So Mr. Yelizarov will authorize you

19    to take money from these accounts because he is

20    being paid other monies in the Ukraine?

21        A    That's correct.

22        Q    Okay.  And these three accounts are funded

23    exclusively with the settlement payments received

24    from the adult bookstores, correct?

25        A    No.  First of all, it's not three

```
 1   accounts.  Let's talk about two accounts because the
 2   other account is done and the new account, which is
 3   in Chase, and this is -- which the money you are
 4   sending me and I'm putting there.  I'm not touching
 5   this account.  Even I have the signature there, I'm
 6   not touching this account.  That's my answer.
 7        Q    If we were to look at the date when you
 8   transferred your shares to North Star, if that was
 9   July of 2013 or May of 2013 or January of 2013,
10   depending what day we look at, if we look at the
11   date when you transferred your shares, would we see
12   in the bank account at Capital Bank in Pinnacle's
13   name the payment of your personal expenses?
14        A    Like I said one more time, if I need the
15   money I'm asking my cousin or his daughter and they
16   are helping me and the way they are doing is they
17   are giving, let's say, to Yelizarov.  That's the
18   only way they can do it.
19        Q    In the Ukraine?
20        A    In the Ukraine.
21        Q    And then where do you get the money from
22   for what you need here in the States?
23        A    From the account he will tell me, okay,
24   you can take it from there.
25        Q    Take it from the account where the
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
1    settlement payments get deposited or is there some

2    other account?

3        A    From North Star, I think.

4        Q    From the account that was in North Star's

5    name?

6        A    Right.

7        Q    So when the North Star account was created

8    and the settlement payments were being deposited in

9    there, Yelizarov would authorize you to pay your

10   personal expenses and you would have somebody in

11   Ukraine give him money on the other side?

12       A    It is vice versa.  I'm telling you because

13   they are giving him -- I'm calling the cousin.  I

14   say, I need so much money.  Okay, I will give it to

15   Yelizarov.  He will give it to you.  So it's very

16   simple.

17       Q    Is there a ledger that's kept that sees --

18   is there any kind of accounting that shows the money

19   is given to him in the Ukraine which lets you take

20   money out of the accounts here?

21       A    Well, he doesn't have to put any ledger

22   because he is breaking even.  So he is getting

23   10,000, I'm taking 10,000 and with my cousin I have

24   been helped and I have helped him before.

25       Q    Well, how do you remember a year later how
```

1    many ten thousands you gave in the Ukraine and how

2    many ten thousands he took over here?  Don't you

3    keep some kind of ledger?

4         A    My brother does.  My cousin.

5         Q    Your brother or your cousin?

6         A    Well, they call -- in Russia it's brother,

7    but in America is cousin.

8         Q    And where does this individual reside?

9         A    In Ukraine.

10        Q    And he keeps --

11        A    Odessa city.  They know each other very

12   well.

13        Q    And he keeps a ledger in accounting?

14        A    Of course.

15        Q    And if you were to call your brother --

16   what's your brother's name?

17        A    Leon.

18        Q    Leon 2?

19        A    Uh-huh.

20        Q    Okay.  And if you were to call Leon 2 and

21   say, can you send me a copy of this ledger, would he

22   send it to you?

23        A    I'm Leon 2.  He is Leon 1.

24        Q    Okay.  So if you call Leon 1 for a copy of

25   the ledger, will he give it to you?

1 A He may, yeah.

2   MR. REYES:  All right.  I have no other

3 questions for you, Mr. Goldstein, other than

4 the issue with what's missing here today.

5   You have a right to read this deposition.

6 I'm going to transcribe it.

7   Do you wish to read that -- the deposition

8 when it's transcribed?

9   MS. MAYERSOHN:  Yes.

10   MR. REYES:  Okay.  Then you will be

11 contacted or your lawyer will be contacted to

12 give you an opportunity to review it.

13   THE WITNESS:  Thank you.

14   THE VIDEOGRAPHER:  Off the record at 7:17.

15

16   (Thereupon, with formalities having not

17 been waived, the deposition was concluded

18 at 7:17 p.m. and the witness was excused.)

19

20

21

22

23

24

25

```
1                    PRESTIGE REPORTING SERVICE
                        633 SOUTH ANDREWS AVENUE
2                             SUITE 202
                       FORT LAUDERDALE, FL 33301
3

4     January 4, 2015

5     Leon Goldstein
      c/o Leah Mayersohn, Esq.
6     101 Northeast 3rd Avenue, Suite 1250
      Fort Lauderdale, Florida 33301
7
      Re:  PALADIN SHIPPING vs. STAR CAPITAL, et al.
8
      Dear Leon Goldstein,
9
      Please be advised that the transcript of your
10    deposition taken on December 22, 2014 in the above
      referenced matter is available at our office for
11    reading, the making or any corrections, additions or
      alterations and signing.
12
      Please call our office at (954) 764-7297 to make an
13    appointment to sign same, or if you wish to waive
      signing of deposition, please so advise.
14
      If this deposition transcript has not been signed by
15    February 10, 2015, we shall conclude that the
      reading and signing are waived and proceed to file
16    or forward the deposition to the attorney ordering
      same.
17

18    Sincerely,

19

20    Sonia Rogers
      Court Reporter
21

22    cc:  Ricardo Reyes, Esq.
           Leah Mayersohn, Esq.
23

24

25
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

1                       READING AND SIGNING

2

3          I have read the above transcript, pages 1

4     through 358, and I find:  (MARK ONE)

5

6     (  )  The transcript is true, correct, and

7     completely accurate.

8

9     (  )  The transcript is true, correct, and accurate,

10    except as set forth in my List of Corrections

11    attached hereto, citing page, line, and reason for

12    the correction realizing that, for this purpose,

13    I am still under oath.

14

15    _____       _____

16         (DATE)                    (WITNESS)

17

18    Sworn to and subscribed before me
      this    day of    , 2015.

19

20                        _____

21                        Notary Public
                          State of Florida at Large

22

23

24

25

                   PRESTIGE REPORTING SERVICE, INC.
                         (954) 764-7297

1                              CORRECTIONS

2      PAGE LINE

3      ____  ____

4      _____

5      ____  ____

6      _____

7      ____  ____

8      _____

9      ____  ____

10     _____

11     ____  ____

12     _____

13     ____  ____

14     _____

15     ____  ____

16     _____

17     ____  ____

18     _____

19     ____  ____

20     _____

21     ____  ____

22     _____

23     ____  ____

24     _____

25

```
 1   TO BE EXECUTED BY THE NOTARY IF THE DEPONENT DOES
     NOT SIGN:
 2

 3

         I hereby certify that a letter with reference
 4
     to reading and signing deposition was mailed to
 5
     the witness through his attorney, on
 6
     _____, 2015, and that the
 7
     witness
 8
     (  )  Witness refused to sign, giving the following
 9
     reason:
10
     (  )  Neither the witness nor his attorney has
11   responded to request to read and sign.

12

13   _____   _____

14       (DATE)                Notary Public

15   MY COMMISSION EXPIRES:

16

17

18

19

20

21

22

23

24

25
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297

```
 1                    CERTIFICATE

 2    STATE OF FLORIDA     )

 3                         ) SS

 4    COUNTY OF BROWARD    )

 5        I, SONIA ROGERS, a Registered Professional

 6    Reporter and a Notary Public in and for the State of

 7    Florida at Large,

 8        DO HEREBY CERTIFY that the foregoing deposition

 9    was taken before me at the time and place therein

10    designated and the foregoing pages 1 through 357

11    inclusive, are a true and correct record of the

12    testimony given by the witness.

13        I FURTHER CERTIFY that I am not a relative or

14    employee of any of the parties, nor relative or

15    employee of such attorney or counsel, or financially

16    interested in the foregoing action.

17        WITNESS MY HAND AND SEAL this 4th day of

18    January, 2015, in the City of Fort Lauderdale,

19    County of Broward, State of Florida.

20

21                      --------------------------
                        Notary Public
22                      State of Florida at Large

23

24

25
```

PRESTIGE REPORTING SERVICE, INC.
(954) 764-7297