Date: 11/14/2014                                                                     Time: 10:05 PM

Party Name: GOLDSTEIN LEON

| Img | Clerk's File No | Doc Type | Rec Date | Plat Book/Page | Rec Book/Page | Blk | Legal | Misc Ref | First Party (Code) / Second Party (Code) |
|---|---|---|---|---|---|---|---|---|---|
| | 1960 R 202298 | DEE | 11/18/60 | N/A | 2353/498 | | | | GOLDSTEIN LEONARD S (R) / MT VERNON HOMES INC |
| | 1961 R 80295 | DEE | 05/16/61 | N/A | 2628/630 | | | | GOLDSTEIN LEONARD S (D) / PIERCE ROLAND R |
| | 1968 R 178859 | DEE | 10/31/68 | N/A | 6151/384 | | | | GOLDSTEIN LEONARD (D) / GONZALES GUSTAVO |
| | 1972 R 226901 | DEE | 10/10/72 | 64/1110 | 7930/641 | 3 | LOT 5 | | GOLDSTEIN LEONARD &W (R) / SCHLEICHER WILLIAM F JR &W |
| | 1974 R 4991 | DEE | 01/07/74 | 68/80 | 8555/1814 | 1 | LOT 1 | | GOLDSTEIN LEONARD (R) / PIERCE ROLAND R & W |
| | 1976 R 32413 | AFF | 02/11/76 | N/A | 9233/178 | | | | GOLDSTEIN LEONARD & ANNETTA (D) / WHOM CONCERNED |
| | 1976 R 32414 | DEE | 02/11/76 | 64/1110 | 9233/179 | 3 | LOT 5 PB 64/111 | | GOLDSTEIN LEONARD &W ANNETTA (D) / HAWA MAURICE B &W JEAN M |
| | 1977 R 85978 | MOR | 04/12/77 | 68/80 | 9646/1169 | 1 | LOT 1 PB 68/8 | | GOLDSTEIN LEONARD (D) / EAGLE FIN CORP |
| | 1977 R 119542 | MOR | 05/19/77 | 5372/362 | 9685/398 | | UNIT N-402 ORB 5372/362 CP 6/8 | | GOLDSTEIN LEON L &W EMILY (R) / DANIS MAX &W BELLE |
| | 1977 R 175653 | MOR | 07/19/77 | 68/80 | 9744/1176 | 1 | LOT 1 PB 68/8 | | GOLDSTEIN LEONARD (D) / EAGLE FIN CORP |
| | 1977 R 188907 | SMO | 08/02/77 | N/A | 9758/742 | | | | GOLDSTEIN LEONARD (R) |

I.D. EXHIBIT 4
WITNESS 9e (illegible)
DATE: 12-22-14
SONIA ROGERS, RPR

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | EAGLE FIN CORP |
| | 1977 R 246069 | MOR | 10/04/77 | 68/80 | 9819/927 | 1 | LOT 1 PB 68/8 | GOLDSTEIN LEONARD S (D) |
| | | | | | | | | BISCAYNE FED SV&L ASSN |
| | 1977 R 277213 | SMO | 11/08/77 | N/A | 9851/1259 | | | GOLDSTEIN LEONARD S (R) |
| | | | | | | | | LAZARUS GERALDINE |
| | 1977 R 277325 | FST | 11/08/77 | N/A | 9851/1425 | | 4050 SW 98 CT MIA,FLA | GOLDSTEIN LEONARD S (D) |
| | | | | | | | | SEARS ROEBUCK & CO |
| | 1977 R 305558 | FST | 12/09/77 | N/A | 9882/176 | | TERM - 77R277325 | GOLDSTEIN LEONARD (R) |
| | | | | | | | | SEARS ROEBUCK & CO |
| | 1977 R 322121 | SMO | 12/29/77 | N/A | 9899/447 | | | GOLDSTEIN LEONARD (R) |
| | | | | | | | | EAGLE FIN CORP |
| | 1978 R 42855 | DEE | 02/15/78 | 8926/1046 | 9948/98 | | UNIT 3 ORB 8926/1046 CP 43/22 | GOLDSTEIN LEONARD J (R) |
| | | | | | | | | W L PHILBRICK INC |
| | 1978 R 42856 | QCD | 02/15/78 | 8926/1046 | 9948/101 | | UNIT 3 ORB 8926/1046 CP 43/22 | GOLDSTEIN LEONARD J (R) |
| | | | | | | | | PHILBRICK W L &W CHRISTINE J |
| | 1978 R 93707 | DEE | 04/11/78 | 4936/386 | 10002/35 | | UNIT E-506 ORB 4936/386 CP 4/17 | GOLDSTEIN LEON &W EMILY (R) |
| | | | | | | | | SAKS MARY |
| | 1979 R 266132 | MOR | 09/20/79 | 68/80 | 10520/400 | 1 | LOT 1 PB 68/8 | GOLDSTEIN LEONARD S (D) |
| | | | | | | | | EAGLE FIN CORP |
| | 1979 R 311559 | DEE | 11/02/79 | 10531/925 | 10561/1722 | | UNIT 313W ORB 10531/925 CP 84/1 | GOLDSTEIN LEONARD H (R) |
| | | | | | | | | KENNETH DAVID PROP INC |
| | 1981 R 201861 | DEE | 07/30/81 | 11107/1310 | 11171/1506 | | UNIT 315 ORB 11107/1310 CP 122/6 | GOLDSTEIN LEON &W FANNY (R) |
| | | | | | | | | F & R BLDR INC |
| | 1981 R 201862 | MOR | 07/30/81 | 11107/1310 | 11171/1507 | | UNIT 315 ORB 11107/1310 CP 122/6 | GOLDSTEIN LEON &W FANNY (D) |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | CHASE FED SV&L ASSN |
| 🖼 | 1981 R 252388 | DOR | 09/25/81 | N/A | 11224/1024 | | 2930 PNT E DR N MIA BCH | GOLDSTEIN LEON (D) |
| | | | | | | | | WHOM CONCERNED |
| 🖼 | 1982 R 160506 | MOR | 07/16/82 | 89/790 | 11499/1798 | 64 | LOT 9 PB 89/79 | GOLDSTEIN LEONARD H (R) |
| | | | | | | | | PERSAUD BISSOONDIAL &W BHIJAI K |
| 🖼 | 1982 R 265333 | SMO | 11/22/82 | N/A | 11621/552 | | | GOLDSTEIN LEONARD S (R) |
| | | | | | | | | EAGLE FIN CORP |
| 🖼 | 1983 R 149111 | DEE | 06/08/83 | 4936/386 | 11812/894 | | UNIT E506 ORB 4936/386 CP 4/17 | GOLDSTEIN LEON &W EMILY (D) |
| | | | | | | | | GOLDBERG DAVID H &W ANNA |
| 🖼 | 1983 R 149112 | MOR | 06/08/83 | 4936/386 | 11812/897 | | UNIT E506 ORB 4936/386 CP 4/17 | GOLDSTEIN LEON &W EMILY (R) |
| | | | | | | | | GOLDBERG DAVID H &W ANNA |
| 🖼 | 1983 R 153294 | DEE | 06/13/83 | 4936/386 | 11815/1071 | | UNIT E601 ORB 4936/386 CP 4/17 | GOLDSTEIN LEON &W EMILY (R) |
| | | | | | | | | ELLEN MORRIS S EST OF |
| 🖼 | 1983 R 250621 | DEE | 09/09/83 | 89/480 | 11902/942 | | LOT 1 PB 89/48 | GOLDSTEIN LEONARD ET AL (R) |
| | | | | | | | | BUENROSTLO ROGELIO ET AL |
| 🖼 | 1984 R 154999 | SMO | 05/22/84 | N/A | 12154/3214 | | | GOLDSTEIN LEONARD H (D) |
| | | | | | | | | PERSAUD BISSOONDIAL ET AL |
| 🖼 | 1984 R 388028 | DEE | 12/26/84 | 8/790 | 12364/836 | | LOT 7 PB 8/79 | GOLDSTEIN LEONARD H (R) |
| | | | | | | | | SMITH GLORIA & LAWRENCE ET AL |
| 🖼 | 1985 R 39466 | DEE | 02/08/85 | 7942/1 | 12409/1305 | | UNIT 1006 ORB 7942/1 CP 24/8 | GOLDSTEIN LEONARD ET AL (R) |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | KIRSCH BESSIE EST OF |
| 📷 | 1986 R 95783 | SMO | 03/26/86 | N/A | 12833/1904 | | | ETC | GOLDSTEIN LEONARD (D) |
| | | | | | | | | | SILVERFINE JULIUS &W FRIEDA M ET AL |
| 📷 | 1986 R 95783 | SMO | 03/26/86 | N/A | 12833/1904 | | | | GOLDSTEIN LEONARD (D) |
| | | | | | | | | | SILVERFINE JULIUS &W FRIEDA M ET AL |
| 📷 | 1986 R 95785 | SMO | 03/26/86 | N/A | 12833/1906 | | | ETC | GOLDSTEIN LEONARD & BERNARD &W PATRICIA A (D) |
| | | | | | | | | | SILVERFINE JULIUS &W FRIEDA M ET AL |
| 📷 | 1987 R 99409 | DEE | 03/16/87 | 9067/931 | 13213/495 | | UNIT 527 ORB 9067/931 CP 46/11 | | GOLDSTEIN LEON &W ZIPPORAH (R) |
| | | | | | | | | | LEDERMAN JACOBO U &W DORA |
| 📷 | 1988 R 189036 | MOR | 05/31/88 | 68/80 | 13696/2328 | 1 | LOT 1 PB 68/8 | | GOLDSTEIN LEONARD ET AL (D) |
| | | | | | | | | | EQUITABLE MTG & INVEST CO |
| 📷 | 1988 R 198959 | AMO | 06/07/88 | N/A | 13705/1993 | | | | GOLDSTEIN LEONARD ET AL (D) |
| | | | | | | | | | HALBERG MAX &W ESTHER & HOWARD &W JEANNE JEANNE |
| 📷 | 1989 R 59251 | SMO | 02/21/89 | N/A | 14003/2587 | | | | GOLDSTEIN LEON & EMILY (D) |
| | | | | | | | | | GOLDBERG DAVID H &W ANNA |
| 📷 | 1989 R 164443 | QCD | 05/10/89 | 4936/386 | 14101/1529 | | UNIT E-505 ORB 4936/386 | | GOLDSTEIN LEON (R) |
| | | | | | | | | | STONE EDNA |
| 📷 | 1989 R 164445 | DEE | 05/10/89 | 4936/386 | 14101/1531 | | UNIT E-505 ORB 4936/386 | | GOLDSTEIN LEON (R) |
| | | | | | | | | | STONE GERALD |
| 📷 | 1989 R 188707 | DEE | 05/26/89 | 89/480 | 14123/1572 | 14 | LOT 1 | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | GOLDSTEIN LEONARD ET AL (D) |
| | | | | | | | | SANCHEZ ELADIO & ROSA |
| 🖼 | 1989 R 188708 | MOR | 05/26/89 | 89/480 | 14123/1573 | 14 | LOT 1 | | GOLDSTEIN LEONARD ET AL (R) |
| | | | | | | | | SANCHEZ ELADIO & ROSA |
| 🖼 | 1989 R 274862 | DEE | 08/02/89 | 4936/386 | 14203/141 | | UNIT E601 ORB 4936/386 | GOLDSTEIN LEON &W EMILY (D) |
| | | | | | | | | BRODERICK JAMES J |
| 🖼 | 1989 R 274863 | MOR | 08/02/89 | 4936/386 | 14203/144 | | UNIT E601 ORB 4936/386 | GOLDSTEIN LEON &W EMILY (R) |
| | | | | | | | | BRODERICK JAMES |
| 🖼 | 1990 R 470769 | MOR | 12/31/90 | 68/80 | 14840/3471 | 1 | LOT 1 | | GOLDSTEIN LEONARD S ET AL (D) |
| | | | | | | | | RETCO RLTY INC |
| 🖼 | 1990 R 145840084 | CVP | 06/12/90 | N/A | 14584/84 | | | 88051183CA01 ODIS | GOLDSTEIN LEON (D) |
| | | | | | | | | GONTAINEBLEAU HILTON |
| 🖼 | 1991 R 396630 | DEE | 11/13/91 | 15139/2731 | 15268/1535 | | UNIT 801 ORB 15139/2731 SPECIAL | GOLDSTEIN LEONARD M &W ADRIENNE (R) |
| | | | | | | | | K-SITE 700 ASSOC |
| 🖼 | 1991 R 396631 | MOR | 11/13/91 | 15139/2731 | 15268/1536 | | UNIT 801 ORB 15139/2731 | GOLDSTEIN LEONARD M &W ADRIENNE (D) |
| | | | | | | | | COASTAL STATES MTG CORP |
| 🖼 | 1991 R 424790 | SMO | 12/05/91 | N/A | 15297/858 | | | | GOLDSTEIN LEON L &W EMILY (D) |
| | | | | | | | | DANIS MAX &W BELLE |
| 🖼 | 1991 R 149392447 | CVP | 03/05/91 | N/A | 14939/2447 | | | 90004335SP25 FJUD | GOLDSTEIN LEONARD (R) |
| | | | | | | | | LE LONG |
| 🖼 | 1991 R 150380717 | CVP | 05/21/91 | N/A | 15038/717 | | | 91004293SP05 FJDF | GOLDSTEIN LEONARD (R) |

Miami-Dade County Clerk - County Recorder's Official Record Search Results                Page 6 of 27

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | DADE MORTGAGE SVC INC |
| 🖾 | 1992 R 134143 | QCD | 04/10/92 | 7074/444 | 15467/3609 | | UNIT 503 ORB 7074/444 TOWER IV | GOLDSTEIN LEONARD M (R) |
| | | | | | | | | GOLDSTEIN ALAN |
| 🖾 | 1992 R 260633 | QCD | 07/08/92 | 7933/909 | 15579/4331 | | UNIT 305 ORB 7933/909 | GOLDSTEIN LEONARD M & JOEL (R) |
| | | | | | | | | GUTSTEIN LILLIAN |
| 🖾 | 1992 R 308565 | DEE | 08/10/92 | 7074/444 | 15618/379 | | UNIT 503 TOWER IV SOUTH BLDG ORB 7074/444 | GOLDSTEIN LEONARD M (D) |
| | | | | | | | | KAIRUZ JORGE L &W MIRIAM S |
| 🖾 | 1992 R 413858 | AMO | 11/04/92 | N/A | 15702/1444 | | | GOLDSTEIN LEONARD M &W ADRIENNE ET AL (D) |
| | | | | | | | | CITY NATL BNK OF FLA |
| 🖾 | 1993 R 26922 | AFF | 01/19/93 | N/A | 15784/388 | | | GOLDSTEIN LEON (D) |
| | | | | | | | | WHOM CONCERNED |
| 🖾 | 1993 R 26924 | DEE | 01/19/93 | 11107/1310 | 15784/391 | | UNIT 315 ORB 11107/1310 | GOLDSTEIN LEON &W FANNY ET AL (D) |
| | | | | | | | | GARCIA ARMANDO |
| 🖾 | 1993 R 116355 | SMO | 03/08/93 | N/A | 15837/1669 | | | GOLDSTEIN LEON &W FANNY ET AL (R) |
| | | | | | | | | CHASE FED BNK |
| 🖾 | 1993 R 261381 | MOR | 05/25/93 | 68/80 | 15926/4285 | 1 | LOT 1 | GOLDSTEIN LEONARD ET AL (D) |
| | | | | | | | | METROPOLITAN MTG CO |
| 🖾 | 1993 R 321642 | AFF | 06/29/93 | N/A | 15966/1701 | | | GOLDSTEIN LEONARD (D) |
| | | | | | | | | WHOM CONCERNED |
| 🖾 | 1993 R 341431 | AMO | 07/12/93 | N/A | 15978/2064 | | | GOLDSTEIN LEONARD ET AL (D) |
| | | | | | | | | BLUMBERG LARRY |
| 🖾 | 1993 R 386798 | SMO | 08/05/93 | N/A | 16007/2862 | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | GOLDSTEIN LEONARD S ET AL (R) |
| | | | | | | | | RETCO RLTY INC |
| 🖼 | 1994 R 81889 | AMO | 02/18/94 | N/A | 16252/2355 | | | GOLDSTEIN LEONARD ET AL (D) |
| | | | | | | | | BLUMBERG ESTERITA |
| 🖼 | 1994 R 123560 | DEE | 03/15/94 | 8434/996 | 16283/2080 | UNIT 216 BLDG 4 ORB 8434/996 | | GOLDSTEIN LEON &W FANNY (R) |
| | | | | | | | | FIRST SOL &W BARBARA |
| 🖼 | 1994 R 217790 | DEE | 05/04/94 | 14070/219 | 16351/1551 | UNIT T H 101A ORB 14070/219 | | GOLDSTEIN LEON (R) |
| | | | | | | | | PRISTINE DEV INC |
| 🖼 | 1994 R 217791 | AFF | 05/04/94 | N/A | 16351/1553 | | | GOLDSTEIN LEON (D) |
| | | | | | | | | WHOM CONCERNED |
| 🖼 | 1994 R 217792 | MOR | 05/04/94 | 14070/219 | 16351/1554 | UNIT T H 101 A ORB 14070/219 REREC ORB 16351/1554 | | GOLDSTEIN LEON (D) |
| | | | | | | | | UNISTAR MTG OF AMERICA |
| 🖼 | 1994 R 227769 | PAY | 05/10/94 | N/A | 16358/450 | | | GOLDSTEIN LEONARD (R) |
| | | | | | | | | GOLDSTEIN JOEL |
| 🖼 | 1994 R 227770 | AFF | 05/10/94 | N/A | 16358/451 | | | GOLDSTEIN LEONARD M (D) |
| | | | | | | | | WHOM CONCERNED |
| 🖼 | 1994 R 227772 | DEE | 05/10/94 | 7933/909 | 16358/453 | UNIT 305 ORB 7933/909 | | GOLDSTEIN LEONARD M & JOEL (D) |
| | | | | | | | | UGARTE DAVID E &W ALICIA B M |
| 🖼 | 1994 R 240194 | MOR | 05/17/94 | 14070/219 | 16367/495 | UNIT T H 101 A REREC ORB 16351/1554 | | GOLDSTEIN LEON (D) |
| | | | | | | | | UNISTAR MTG OF AMERICA |
| 🖼 | 1994 R 536188 | DEE | 11/17/94 | 14648/1569 | 16584/645 | UNIT 1214 ORB 14648/1569 | | GOLDSTEIN LEON M &W MARY R (R) |
| | | | | | | | | VERDELLI DANILO V ET AL |

Miami-Dade County Clerk - County Recorder's Official Record Search Results             Page 8 of 27

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1994 R 536190 | MOR | 11/17/94 | 14648/1569 | 16584/650 | | UNIT 1214 ORB 14648/1569 | GOLDSTEIN LEON M &W MARY R (D) |
| | | | | | | | | PRIME MTG INVEST INC |
| | 1994 R 544583 | DEE | 11/23/94 | 4936/386 | 16588/2829 | | UNIT E 505 ORB 4936/386 | GOLDSTEIN LEON &W EMILY (D) |
| | | | | | | | | REICHERT ARTHUR |
| | 1995 R 6201 | AMO | 01/05/95 | N/A | 16638/313 | | 1 | GOLDSTEIN LEON ET AL (D) |
| | | | | | | | | TRANSWORLD MTG CORP |
| | 1995 R 6201 | AMO | 01/05/95 | N/A | 16638/313 | | 2 | GOLDSTEIN LEON ET AL (D) |
| | | | | | | | | TRANSWORLD MTG CORP |
| | 1995 R 6202 | AMO | 01/05/95 | N/A | 16638/314 | | 1 | GOLDSTEIN LEON ET AL (D) |
| | | | | | | | | SOUTHERN PACIFIC THRIFT & LOAN ASSN |
| | 1995 R 6202 | AMO | 01/05/95 | N/A | 16638/314 | | 2 | GOLDSTEIN LEON ET AL (D) |
| | | | | | | | | SOUTHERN PACIFIC THRIFT & LOAN ASSN |
| | 1995 R 93013 | SMO | 03/09/95 | N/A | 16707/1990 | | 1 | GOLDSTEIN LEONARD &W ANNETTA (R) |
| | | | | | | | | CORAL GABLES FED SV&L ASSN |
| | 1995 R 93013 | SMO | 03/09/95 | N/A | 16707/1990 | | 2 | GOLDSTEIN LEONARD &W ANNETTA (R) |
| | | | | | | | | CORAL GABLES FED SV&L ASSN |
| | 1995 R 370314 | NCO | 09/12/95 | 68/80 | 16915/3270 | 1 | LOT 1 | GOLDSTEIN LEONARD ET AL (D) |
| | | | | | | | | WHOM CONCERNED |
| | 1995 R 401964 | QCD | 10/03/95 | 7942/1 | 16939/3903 | | UNIT 1006 ORB 7942/1 | GOLDSTEIN LEONARD ET AL (R) |
| | | | | | | | | KIRSCH SAMUEL |
| | 1995 R 401965 | DEE | 10/03/95 | 7942/1 | 16939/3905 | | UNIT 1006 ORB 7942/1 | GOLDSTEIN LEONARD &W PHYLLIS (D) |

Miami-Dade County Clerk - County Recorder's Official Record Search Results          Page 9 of 27

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | KELLY PHYLLIS &H JERRY |
| 🖼 | 1995 R 166394911 | FCP | 01/09/95 | N/A | 16639/4911 | | 93028186FC04 VOLD | GOLDSTEIN LEON (D) — GOLDSTEIN MAYA VICTORIA |
| | 1995 R 167542761 | FCP | 04/14/95 | N/A | 16754/2761 | | 95001783CP02 PADM | GOLDSTEIN LEONARD HOWARD (R) — GOLDSTEIN FAY |
| | 1995 R 167542764 | FCP | 04/26/95 | N/A | 16754/2764 | | 95001783CP02 OAWP | GOLDSTEIN LEONARD HOWARD (R) — GOLDSTEIN FAY |
| | 1995 R 167542765 | FCP | 04/14/95 | N/A | 16754/2765 | | 95001783CP02 WILL | GOLDSTEIN LEONARD HOWARD (R) — GOLDSTEIN FAY |
| | 1995 R 169744820 | FCP | 11/15/95 | N/A | 16974/4820 | | 95001783CP02 NTCT | GOLDSTEIN LEONARD HOWARD (R) — GOLDSTEIN FAY |
| 🖼 | 1996 R 114968 | AMO | 03/19/96 | N/A | 17131/3057 | | | GOLDSTEIN LEON ET AL (D) — IMPERIAL CR IND INC |
| 🖼 | 1996 R 114969 | AMO | 03/19/96 | N/A | 17131/3059 | | | GOLDSTEIN LEON ET AL (D) — SOUTHERN PACIFIC THRIFT & LOAN ASSN |
| 🖼 | 1996 R 126056 | AMO | 03/25/96 | N/A | 17140/3003 | | | GOLDSTEIN LEON ET AL (D) — ICI FD CORP |
| 🖼 | 1996 R 142075 | QCD | 04/03/96 | 8434/996 | 17152/1246 | UNIT 216 BLDG 4 ORB 8434/996 | | GOLDSTEIN LEON &W FANNY (D) — COHEN ARLETTE |
| 🖼 | 1996 R 535251 | LIS | 11/22/96 | 14070/219 | 17435/4724 | UNIT T H 101 ORB 14070/219 CASE NO 96 23694 CA 02 | | GOLDSTEIN LEON ET AL (R) — IMPERIAL CR IND |
| 🖼 | 1996 R 543065 | DEE | 11/27/96 | 10120/827 | 17441/3504 | UNIT 201D ORB 10120/827 | | GOLDSTEIN LEONARD H ET AL (R) — GOLDSTEIN FAY EST OF |

Miami-Dade County Clerk - County Recorder's Official Record Search Results          Page 10 of 27

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ▥ | 1996 R 543066 | DEE | 11/27/96 | 8295/618 | 17441/3505 | | UNIT C4-J ORB 8295/618 | GOLDSTEIN LEONARD H (R) / GOLDSTEIN FAY EST OF |
| ▥ | 1996 R 590010 | DEE | 12/30/96 | 10120/827 | 17478/4001 | | UNIT 201D ORB 10120/827 | GOLDSTEIN LEONARD H ET AL (D) / LONDONO ELSA |
| | 1996 R 172360341 | FCP | 06/04/96 | N/A | 17236/341 | | 95001783CP02 PDCH | GOLDSTEIN LEONARD HOWARD (R) / GOLDSTEIN FAY |
| | 1996 R 172601537 | FCP | 07/02/96 | N/A | 17260/1537 | | 95001783CP02 FORD | GOLDSTEIN LEONARD HOWARD (R) / GOLDSTEIN FAY |
| ▥ | 1997 R 87091 | DEE | 02/27/97 | 14648/1569 | 17544/285 | | UNIT 1214 | GOLDSTEIN LEON M &W MARY R (D) / SALES R E INVEST CORP |
| ▥ | 1997 R 87092 | AFF | 02/27/97 | N/A | 17544/287 | | | GOLDSTEIN LEON M (D) / WHOM CONCERNED |
| ▥ | 1997 R 165956 | MOR | 04/16/97 | 68/80 | 17603/3748 | 1 | LOT 1 | GOLDSTEIN LEONARD ET AL (D) / METROPOLITAN MTG CO |
| ▥ | 1997 R 191727 | SMO | 05/01/97 | N/A | 17622/1266 | | | GOLDSTEIN LEON M &W MARY R (R) / PRIME MTG INVEST INC |
| ▥ | 1997 R 248461 | AMO | 06/04/97 | N/A | 17663/1700 | | | GOLDSTEIN LEON ET AL (D) / BANKERS TRU CO OF CALIFORNIA NA TRU |
| ▥ | 1997 R 295366 | AMO | 07/02/97 | N/A | 17699/217 | | | GOLDSTEIN LEON ET AL (D) / BANKERS TRU CO OF CALIFORNIA N A TRU |
| ▥ | 1997 R 319214 | SMO | 07/16/97 | N/A | 17714/4240 | | | GOLDSTEIN LEON (R) |

| | | | | | | | | | ICI FD CORP |
|---|---|---|---|---|---|---|---|---|---|
| 🖼 | 1997 R 335283 | MOR | 07/25/97 | 68/80 | 17728/3354 | 1 | LOT 1 | | GOLDSTEIN LEONARD ET AL (D) |
| | | | | | | | | | METROPOLITAN MTG CO |
| 🖼 | 1997 R 429759 | SMO | 09/22/97 | N/A | 17798/3823 | | | | GOLDSTEIN LEONARD ET AL (R) |
| | | | | | | | | | METROPOLITAN MTG CO |
| 🖼 | 1997 R 462773 | DEE | 10/10/97 | 8/790 | 17822/4789 | 1 | LOT 7 LESS N20' | | GOLDSTEIN LEONARD H &W ROBERTA L (D) |
| | | | | | | | | | 4H INVEST CO |
| 🖼 | 1997 R 462774 | AFF | 10/10/97 | N/A | 17822/4790 | | | | GOLDSTEIN LEONARD H (D) |
| | | | | | | | | | WHOM CONCERNED |
| 🖼 | 1997 R 533089 | SMO | 11/20/97 | N/A | 17876/3784 | | | | GOLDSTEIN LEONARD S ET AL (R) |
| | | | | | | | | | CITIBANK FSB |
| 🖼 | 1997 R 175091551 | CVP | 01/27/97 | N/A | 17509/1551 | | | 96023694CA01 DRLP | GOLDSTEIN LEON (R) |
| | | | | | | | | | IMPERIAL CREDIT INDUSTRIES |
| | 1997 R 177231100 | FCP | 07/17/97 | N/A | 17723/1100 | | | 97003375CP02 PSAD | GOLDSTEIN LEONARD (R) |
| | | | | | | | | | GOLDSTEIN ROSE POSNER |
| | 1997 R 177231103 | FCP | 07/17/97 | N/A | 17723/1103 | | | 97003375CP02 RDOC | GOLDSTEIN LEONARD (R) |
| | | | | | | | | | GOLDSTEIN ROSE POSNER |
| | 1997 R 177231113 | FCP | 07/17/97 | N/A | 17723/1113 | | | 97003375CP02 PADM | GOLDSTEIN LEONARD (R) |
| | | | | | | | | | GOLDSTEIN ROSE POSNER |
| | 1997 R 177423610 | FCP | 08/14/97 | N/A | 17742/3610 | | | 97003375CP02 OSUA | GOLDSTEIN LEONARD (R) |
| | | | | | | | | | GOLDSTEIN ROSE POSNER |
| 🖼 | 1997 R 177690610 | CVP | 08/11/97 | N/A | 17769/610 | | | 96015791SP23 FWOP | GOLDSTEIN LEONARD (R) |
| | | | | | | | | | CORREA JOSE F |
| 🖼 | 1999 R 135325 | DEE | 03/16/99 | 15139/2731 | 18519/1033 | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | UNIT 801 PARKING SPACE B 51 | GOLDSTEIN LEONARD M &W ADRIENNE (D) |
| | | | | | | | WAKS JAIME L ET AL |
| 🖼 | 1999 R 147476 | DEE | 03/22/99 | 18334/990 | 18529/1569 | UNIT 3702 SPECIAL | GOLDSTEIN LEON ET AL (R) |
| | | | | | | | AQUAMAR 176 INC |
| 🖼 | 1999 R 201802 | SMO | 04/20/99 | N/A | 18570/738 | 15268/1536 | GOLDSTEIN LEONARD M &W ADRIENNE (R) |
| | | | | | | | CITY NATL BNK OF FLA |
| 🖼 | 1999 R 492569 | DEE | 09/23/99 | 8926/1046 | 18792/3173 | UNIT 3 | GOLDSTEIN LEONARD J (D) |
| | | | | | | | LEONARD J GOLDSTEIN REVOCABLE TRU TRU FOR |
| | 1999 R 188200796 | FCP | 09/23/99 | N/A | 18820/796 | 99004167CP02 PADM | GOLDSTEIN LEONARD J (R) |
| | | | | | | | GOLDSTEIN GRATIAN |
| | 1999 R 188200798 | FCP | 10/04/99 | N/A | 18820/798 | 99004167CP02 OAWP | GOLDSTEIN LEONARD J (R) |
| | | | | | | | GOLDSTEIN GRATIAN |
| | 1999 R 188200799 | FCP | 09/23/99 | N/A | 18820/799 | 99004167CP02 WILL | GOLDSTEIN LEONARD J (R) |
| | | | | | | | GOLDSTEIN GRATIAN |
| | 1999 R 188200811 | FCP | 10/04/99 | N/A | 18820/811 | 99004167CP02 OREP | GOLDSTEIN LEONARD J (R) |
| | | | | | | | GOLDSTEIN GRATIAN |
| | 1999 R 188200812 | FCP | 10/04/99 | N/A | 18820/812 | 99004167CP02 LADM | GOLDSTEIN LEONARD J (R) |
| | | | | | | | GOLDSTEIN GRATIAN |
| 🖼 | 2000 R 114632 | QCD | 03/09/00 | 14070/219 | 19018/3231 | UNIT T H 101A | GOLDSTEIN LEON (D) |
| | | | | | | | GOLDSTEIN LEON & ANZHELIQUA |
| 🖼 | 2000 R 114632 | QCD | 03/09/00 | 14070/219 | 19018/3231 | UNIT T H 101A | GOLDSTEIN LEON & ANZHELIQUA (R) |

| | | | | | | | | GOLDSTEIN LEON |
|---|---|---|---|---|---|---|---|---|
| 📷 | 2000 R 185930 | QCD | 04/19/00 | 18334/990 | 19075/4457 | | UNIT 3702 | GOLDSTEIN LEON (R) |
| | | | | | | | | GOLDSTEIN LEON ET AL |
| 📷 | 2000 R 185930 | QCD | 04/19/00 | 18334/990 | 19075/4457 | | UNIT 3702 | GOLDSTEIN LEON ET AL (D) |
| | | | | | | | | GOLDSTEIN LEON |
| 📷 | 2000 R 618792 | AMO | 12/26/00 | N/A | 19424/576 | | | GOLDSTEIN LEONARD (D) |
| | | | | | | | | BANK ONE NA TRU |
| | 2000 R 193420717 | FCP | 09/29/00 | N/A | 19342/717 | | 99004167CP02 RDOC | GOLDSTEIN LEONARD J (R) |
| | | | | | | | | GOLDSTEIN GRATIAN |
| | 2000 R 193420718 | FCP | 10/26/00 | N/A | 19342/718 | | 99004167CP02 RDOC | GOLDSTEIN LEONARD J (R) |
| | | | | | | | | GOLDSTEIN GRATIAN |
| | 2000 R 193420719 | FCP | 09/29/00 | N/A | 19342/719 | | 99004167CP02 RDOC | GOLDSTEIN LEONARD J (R) |
| | | | | | | | | GOLDSTEIN GRATIAN |
| | 2000 R 193420722 | FCP | 10/26/00 | N/A | 19342/722 | | 99004167CP02 FORD | GOLDSTEIN LEONARD J (R) |
| | | | | | | | | GOLDSTEIN GRATIAN |
| 📷 | 2001 R 216386 | NCO | 04/30/01 | N/A | 19632/2587 | | PROP LOCATED AT 17555 COLLINS AVE SUNNY ISLES | GOLDSTEIN LEON (D) |
| | | | | | | | | WHOM CONCERNED |
| 📷 | 2002 R 191652 | AMO | 03/28/02 | N/A | 20296/581 | | | GOLDSTEIN LEON (R) |
| | | | | | | | | ALLIED MTG & FIN CORP |
| 📷 | 2002 R 191656 | AMO | 03/28/02 | N/A | 20296/599 | | | GOLDSTEIN LEON (R) |
| | | | | | | | | ALLIED MTG & FIN CORP |
| 📷 | 2002 R 471208 | DEE | 07/30/02 | 68/80 | 20560/1132 | 1 | LOT 1 | GOLDSTEIN LEONARD S (D) |
| | | | | | | | | RODRIGUEZ MANUEL O |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | 2002 R 531748 | LIE | 08/27/02 | N/A | 20617/777 | | WARRANT | GOLDSTEIN LEONARD H (R) |
| | | | | | | | | STATE OF FLA |
|  | 2002 R 555076 | PRM | 09/06/02 | N/A | 20640/3423 | | | GOLDSTEIN LEON (D) |
| | | | | | | | | G & R ENTERP LLC |
|  | 2002 R 555077 | PRM | 09/06/02 | N/A | 20640/3424 | | | GOLDSTEIN LEON (D) |
| | | | | | | | | G & R ENTERP LLC |
|  | 2002 R 557390 | SMO | 09/07/02 | N/A | 20642/3762 | | | GOLDSTEIN LEONARD (R) |
| | | | | | | | | BANK ONE N A TRU |
|  | 2002 R 592223 | MOR | 09/24/02 | 18334/990 | 20675/1455 | UNIT TS 4 | | GOLDSTEIN LEON (R) |
| | | | | | | | | SERADILLA LEASING CORP |
|  | 2002 R 673953 | PRM | 10/30/02 | N/A | 20761/1029 | | | GOLDSTEIN LEON (D) |
| | | | | | | | | G & R ENTERP LLC |
|  | 2002 R 716266 | MOR | 11/16/02 | 18334/990 | 20809/1240 | UNIT TS 2 | | GOLDSTEIN LEON (R) |
| | | | | | | | | DBD CORP |
| | 2002 R 203851701 | FCP | 04/25/02 | N/A | 20385/1701 | | 02001791CP02 PADM | GOLDSTEIN LEONARD (R) |
| | | | | | | | | PIERCE IRENE |
| | 2002 R 204031374 | FCP | 05/17/02 | N/A | 20403/1374 | | 02001791CP02 RDOC | GOLDSTEIN LEONARD (R) |
| | | | | | | | | PIERCE IRENE |
| | 2002 R 204471888 | FCP | 06/11/02 | N/A | 20447/1888 | | 02001791CP02 OREP | GOLDSTEIN LEONARD (R) |
| | | | | | | | | PIERCE IRENE |
| | 2002 R 204471895 | FCP | 06/11/02 | N/A | 20447/1895 | | 02001791CP02 RDOC | GOLDSTEIN LEONARD (R) |
| | | | | | | | | PIERCE IRENE |
| | 2002 R 204471897 | FCP | 06/11/02 | N/A | 20447/1897 | | 02001791CP02 RDOC | GOLDSTEIN LEONARD (R) |
| | | | | | | | | PIERCE IRENE |
| | 2002 R 204471900 | FCP | 06/11/02 | N/A | 20447/1900 | | 02001791CP02 RDOC | GOLDSTEIN LEONARD (R) |
| | | | | | | | | PIERCE IRENE |
| | 2002 R 204471901 | FCP | 06/11/02 | N/A | 20447/1901 | | 02001791CP02 LADM | GOLDSTEIN LEONARD (R) |

Miami-Dade County Clerk – County Recorder's Official Record Search Results     Page 15 of 27

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | PIERCE IRENE |
| | 2002 R 204730899 | FCP | 06/11/02 | N/A | 20473/899 | | 02001791CP02 OAWP | GOLDSTEIN LEONARD (R) |
| | | | | | | | | PIERCE IRENE |
| | 2002 R 204730901 | FCP | 04/25/02 | N/A | 20473/901 | | 02001791CP02 WILL | GOLDSTEIN LEONARD (R) |
| | | | | | | | | PIERCE IRENE |
| | 2002 R 204734941 | FCP | 06/27/02 | N/A | 20473/4941 | | 02001791CP02 RDOC | GOLDSTEIN LEONARD (R) |
| | | | | | | | | PIERCE IRENE |
| | 2002 R 205681216 | FCP | 08/06/02 | N/A | 20568/1216 | | 02001791CP02 RDOC | GOLDSTEIN LEONARD (R) |
| | | | | | | | | PIERCE IRENE |
| | 2002 R 205681219 | FCP | 08/06/02 | N/A | 20568/1219 | | 02001791CP02 RDOC | GOLDSTEIN LEONARD (R) |
| | | | | | | | | PIERCE IRENE |
| | 2002 R 205681221 | FCP | 08/06/02 | N/A | 20568/1221 | | 02001791CP02 RDOC | GOLDSTEIN LEONARD (R) |
| | | | | | | | | PIERCE IRENE |
| | 2002 R 205681223 | FCP | 08/06/02 | N/A | 20568/1223 | | 02001791CP02 RDOC | GOLDSTEIN LEONARD (R) |
| | | | | | | | | PIERCE IRENE |
| | 2002 R 205681224 | FCP | 08/06/02 | N/A | 20568/1224 | | 02001791CP02 ODHO | GOLDSTEIN LEONARD (R) |
| | | | | | | | | PIERCE IRENE |
| 🖼 | 2002 R 207762715 | CVP | 11/07/02 | N/A | 20776/2715 | | 01024431CA01 ORDR | GOLDSTEIN LEONARD (D) |
| | | | | | | | | CALIFORNIA CLOSET CO |
| 🖼 | 2003 R 162742 | QCD | 03/10/03 | 18334/990 | 21084/600 | UNIT TS 2 | | GOLDSTEIN LEON (R) |
| | | | | | | | | DBD CORP |
| 🖼 | 2003 R 165623 | QCD | 03/11/03 | 18334/990 | 21086/3327 | UNIT TS-4 | | GOLDSTEIN LEON (R) |
| | | | | | | | | SERADILLA LEASING CORP |
| 🖼 | 2003 R 228017 | LIS | 04/08/03 | 18334/990 | 21153/2412 | UNIT TS4 CASE NO 03 8222 CA23 | | GOLDSTEIN LEON (R) |
| | | | | | | | | MORTGAGE ELECTRONIC REGISTRATION SYSTEMS |
| 🖼 | 2003 R 271183 | LIS | 04/25/03 | 18334/990 | 21196/1895 | UNIT TS 2 CASE NO 03 9535 CA25 | | GOLDSTEIN LEON (R) |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC |
|  | 2003 R 289925 | SMO | 05/04/03 | N/A | 21216/1823 | | | GOLDSTEIN LEON (D) |
| | | | | | | | | TERZARIMA INVEST CORP |
|  | 2003 R 308549 | MOR | 05/12/03 | 18334/990 | 21244/1716 | | UNIT TS 6 | GOLDSTEIN LEON (R) |
| | | | | | | | | TERZARIMA INVEST CORP |
|  | 2003 R 323887 | QCD | 05/20/03 | 18334/990 | 21267/4536 | | UNIT TS 2 | GOLDSTEIN LEON (R) |
| | | | | | | | | TCHERNKYN OLEG |
|  | 2003 R 323888 | QCD | 05/20/03 | 18334/990 | 21267/4537 | | UNIT TS 4 | GOLDSTEIN LEON (R) |
| | | | | | | | | TCHERNKYN OLEG |
|  | 2003 R 435148 | SMO | 06/27/03 | N/A | 21375/2870 | | | GOLDSTEIN LEON (D) |
| | | | | | | | | TERZARIMA INVEST CORP |
|  | 2003 R 212553407 | CVP | 05/16/03 | N/A | 21255/3407 | | 01024431CA01 ORDR | GOLDSTEIN LEONARD (D) |
| | | | | | | | | CALIFORNIA CLOSET CO |
| | 2003 R 218862204 | FCP | 12/30/03 | N/A | 21886/2204 | | 02001791CP02 FORD | GOLDSTEIN LEONARD (R) |
| | | | | | | | | PIERCE IRENE |
|  | 2004 R 83092 | MOR | 02/05/04 | 2000/410 | 22025/3401 | 18 | LOT 3 N125' | GOLDSTEIN LEON (R) |
| | | | | | | | | CONSOLIDATED INVESTMENT CORP |
|  | 2004 R 195404 | QCD | 03/23/04 | 129/510 | 22142/4762 | 1 | LOT 8 | GOLDSTEIN LEONARD (D) |
| | | | | | | | | CLOSET EMPORIUM INC |
|  | 2004 R 779805 | DEE | 09/08/04 | 8926/1046 | 22634/2579 | | UNIT 3 SEE DOC FOR LIFE EST CLAUSE | GOLDSTEIN LEONARD J (D) |
| | | | | | | | | BARSH HARRY E JR |
|  | 2004 R 779806 | AFF | 09/08/04 | N/A | 22634/2581 | | | GOLDSTEIN LEONARD J TRU (D) |

| | | | | | | | | WHOM CONCERNED |
|---|---|---|---|---|---|---|---|---|
| 📷 | 2004 R 925928 | SMO | 10/21/04 | N/A | 22752/3000 | | | GOLDSTEIN LEON (D) |
| | | | | | | | | MOZO MARIANO &W |
| 📷 | 2004 R 1146918 | DEE | 12/22/04 | 22147/1871 | 22930/4195 | | UNIT 1913 SPECIAL | GOLDSTEIN LEONARD &W (R) |
| | | | | | | | | M 1 LTD PARTNERSHIP |
| 📷 | 2004 R 1146919 | AFF | 12/22/04 | N/A | 22930/4197 | | | GOLDSTEIN LEONARD (D) |
| | | | | | | | | WHOM CONCERNED |
| 📷 | 2004 R 221391291 | CVP | 03/18/04 | N/A | 22139/1291 | | 01024431CA01 ODIS | GOLDSTEIN LEONARD (D) |
| | | | | | | | | CALIFORNIA CLOSET CO |
| 📷 | 2005 R 54295 | MOR | 01/18/05 | 9/210 | 23006/302 | 4 | LOTS 5 & 6 | GOLDSTEIN LEON (D) |
| | | | | | | | | TURNBERRY BNK |
| 📷 | 2005 R 157716 | JUD | 02/16/05 | N/A | 23089/4268 | | 05 181 SP26 | GOLDSTEIN LEON (D) |
| | | | | | | | | VARALLO GARY |
| 📷 | 2005 R 185757 | DEE | 02/24/05 | 21269/2887 | 23112/4561 | | UNIT 2401 | GOLDSTEIN LEON (R) |
| | | | | | | | | SCHAUB MAX &W |
| 📷 | 2005 R 258680 | CVP | 03/15/05 | N/A | 23172/2836 | | 05000181SP26 FJUD | GOLDSTEIN LEON (D) |
| | | | | | | | | VARALLO GARY |
| 📷 | 2005 R 338660 | MOR | 04/06/05 | 21269/2887 | 23241/1737 | | UNIT 2401 | GOLDSTEIN LEON (D) |
| | | | | | | | | WASHINGTON MUTUAL BNK FA |
| 📷 | 2005 R 563807 | SMO | 06/02/05 | N/A | 23433/4332 | | | GOLDSTEIN LEON (D) |
| | | | | | | | | CONSOLIDATED INVEST CORP |
| 📷 | 2005 R 1104236 | SMO | 10/19/05 | N/A | 23891/4731 | | | GOLDSTEIN LEON (R) |
| | | | | | | | | TURNBERRY BNK |
| 📷 | 2006 R 933296 | CVP | 08/28/06 | N/A | 24862/702 | | 06007024CA01 SUJU | GOLDSTEIN LEON (R) |
| | | | | | | | | CAMILLE A COOLIDGE (PA) |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2006 R 1358050 | LIE | 12/21/06 | N/A | 25213/4645 | | | GOLDSTEIN LEON (R) |
| | | | | | | | | OCEAN THREE CONDO ASSN INC |
| | 2007 R 150827 | DEE | 02/12/07 | 21269/2887 | 25359/821 | UNIT 2401 | | GOLDSTEIN LEON &W (D) |
| | | | | | | | | BELIJAR LTD |
| | 2007 R 150828 | AFF | 02/12/07 | N/A | 25359/824 | | | GOLDSTEIN LEON (D) |
| | | | | | | | | WHOM CONCERNED |
| | 2007 R 190517 | SMO | 02/23/07 | N/A | 25389/2345 | | | GOLDSTEIN LEON (R) |
| | | | | | | | | WASHINGTON MUTUAL BNK FA |
| | 2007 R 248004 | REL | 03/11/07 | N/A | 25436/3694 | | | GOLDSTEIN LEON (R) |
| | | | | | | | | OCEAN THREE CONDO ASSN INC |
| | 2007 R 445696 | CVP | 05/03/07 | N/A | 25585/1866 | | 04017723CC05 VOLD | GOLDSTEIN LEONARD (R) |
| | | | | | | | | KOCH REISS & CO (P A) |
| | 2007 R 744370 | MOR | 07/27/07 | 10939/2094 | 25812/771 | UNIT 403 | | GOLDSTEIN LEON (R) |
| | | | | | | | | VAKHOVSKY FELIX |
| | 2007 R 806867 | CVP | 08/15/07 | N/A | 25857/2785 | | 06007024CA01 FORC | GOLDSTEIN LEON (R) |
| | | | | | | | | CAMILLE A COOLIDGE (PA) |
| | 2008 R 82684 | LIS | 01/31/08 | 10939/2094 | 26189/1030 | UNIT 403 CASE NO 08 04504 CA 32 | | GOLDSTEIN LEON (D) |
| | | | | | | | | VAKHOVSKY FELIX |
| | 2008 R 428451 | CVP | 05/23/08 | N/A | 26396/121 | | 08004504CA01 SUJU | GOLDSTEIN LEON (D) |
| | | | | | | | | VAKHOVSKY FELIX |
| | 2008 R 542419 | NCO | 07/01/08 | 9067/931 | 26459/2228 | UNIT 527 | | GOLDSTEIN LEON (D) |
| | | | | | | | | WHOM CONCERNED |
| | 2008 R 551563 | CVP | 07/07/08 | N/A | 26464/3576 | | 08004504CA01 ORDR | GOLDSTEIN LEON (D) |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | VAKHOVSKY FELIX |
| | 2008 R 685693 | CVP | 08/22/08 | N/A | 26533/4684 | | 08004084CC05 RDOC | GOLDSTEIN LEON (R) |
| | | | | | | | | DEWITT STERN IMPERATORE LTD |
| | 2008 R 741723 | CVP | 09/10/08 | N/A | 26562/3810 | | 08004504CA01 AFJU | GOLDSTEIN LEON (D) |
| | | | | | | | | VAKHOVSKY FELIX |
| | 2008 R 770194 | CVP | 09/19/08 | N/A | 26576/2290 | | 08004084CC05 ODIS | GOLDSTEIN LEON (R) |
| | | | | | | | | DEWITT STERN IMPERATORE LTD |
| | 2008 R 1018151 | LIS | 12/22/08 | 26518/4566 | 26693/2621 | UNIT 3305 CASE NO 08 67467 CA01 | | GOLDSTEIN LEON (D) |
| | | | | | | | | FORTUNE BCH LLC |
| | 2008 R 1018152 | LIS | 12/22/08 | 26518/4566 | 26693/2622 | UNIT 4508 CASE NO 08 67467 CA01 | | GOLDSTEIN LEON (D) |
| | | | | | | | | FORTUNE BCH LLC |
| | 2009 R 46563 | CVP | 01/22/09 | N/A | 26725/1484 | | 08067467CA01 DJUD | GOLDSTEIN LEON (D) |
| | | | | | | | | FORTUNE BCH (LLC) |
| | 2009 R 270371 | CLP | 04/14/09 | N/A | 26827/3655 | | | GOLDSTEIN LEON (D) |
| | | | | | | | | FORTUNE BCH LLC |
| | 2010 R 3654 | DEE | 01/05/10 | 50/650 | 27138/3 | 1 | BEG AT SWLY COR OF LOT 11 SEE DOC FOR FULL DESC & EXCPTS | SPECIAL | GOLDSTEIN LEONARD H (R) |
| | | | | | | | | DEVILLE RALPH W |
| | 2010 R 3654 | DEE | 01/05/10 | 50/650 | 27138/3 | 1 | LOTS 10 & 11 SEE DOC FOR FULL DESC & EXCPTS | SPECIAL | GOLDSTEIN LEONARD H (R) |
| | | | | | | | | DEVILLE RALPH W |
| | 2010 R 31881 | CVP | 01/19/10 | N/A | 27151/3375 | | 09078628CA01 ORDR | GOLDSTEIN LEON (R) |
| | | | | | | | | SGI GROUP (LLC) |
| | 2010 R 119214 | CVP | 02/23/10 | N/A | 27190/3491 | | 08067467CA01 VOLD | GOLDSTEIN LEON (D) |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | FORTUNE BCH (LLC) |
| 📄 | 2010 R 809974 | TCP | 12/02/10 | N/A | 27507/3944 | | | 7900XEJ | GOLDSTEIN LEON (R) |
| | | | | | | | | STATE OF FLA |
| 📄 | 2011 R 18131 | JUD | 01/10/11 | N/A | 27548/747 | | | 09 78628 CA13 | GOLDSTEIN LEON (R) |
| | | | | | | | | SGI GRP LLC |
| 📄 | 2011 R 25795 | CVP | 01/12/11 | N/A | 27551/2039 | | | 09078628CA01 FJUD | GOLDSTEIN LEON (R) |
| | | | | | | | | SGI GROUP (LLC) |
| 📄 | 2011 R 133640 | CVP | 03/01/11 | N/A | 27601/4262 | | | 09078628CA01 OVJG | GOLDSTEIN LEON (R) |
| | | | | | | | | SGI GROUP (LLC) |
| 📄 | 2011 R 147072 | DEE | 03/07/11 | 22147/1871 | 27608/1895 | UNIT 1913 | | | GOLDSTEIN LEONARD B &W (D) |
| | | | | | | | | BARBATO NETO HUMBERTO |
| 📄 | 2011 R 147073 | AFF | 03/07/11 | N/A | 27608/1898 | | | | GOLDSTEIN LEONARD (D) |
| | | | | | | | | WHOM CONCERNED |
| 📄 | 2011 R 174572 | CVP | 03/18/11 | N/A | 27621/2314 | | | 09078628CA01 NAPP | GOLDSTEIN LEON (R) |
| | | | | | | | | SGI GROUP (LLC) |
| 📄 | 2011 R 174582 | CVP | 03/18/11 | N/A | 27621/2332 | | | 09078628CA01 NAPP | GOLDSTEIN LEON (R) |
| | | | | | | | | SGI GROUP (LLC) |
| 📄 | 2011 R 416421 | LIE | 06/27/11 | N/A | 27734/173 | | | | GOLDSTEIN LEON (R) |
| | | | | | | | | PINNACLE CONDO ASSN INC |
| 📄 | 2011 R 416422 | LIE | 06/27/11 | N/A | 27734/174 | | | | GOLDSTEIN LEON (R) |
| | | | | | | | | PINNACLE CONDO ASSN INC |
| 📄 | 2011 R 433258 | CVP | 07/01/11 | N/A | 27741/2597 | | | 09078628CA01 RDOC | GOLDSTEIN LEON (R) |
| | | | | | | | | SGI GROUP (LLC) |
| 📄 | 2011 R 482677 | LIE | 07/21/11 | N/A | 27764/1469 | | | | GOLDSTEIN LEON (R) |
| | | | | | | | | PINNACLE CONDO ASSN INC |

Miami-Dade County Clerk - County Recorder's Official Record Search Results          Page 21 of 27

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2011 R 522130 | DEE | 08/05/11 | 18334/990 | 27782/1533 | | UNIT TS 4 | | GOLDSTEIN LEON (D) |
| | | | | | | | | CHOUEIRI SAMIR E |
| | 2011 R 522131 | SMO | 08/05/11 | N/A | 27782/1536 | | | | GOLDSTEIN LEON (D) |
| | | | | | | | | SERADILLA LEASING CORP |
| | 2011 R 526144 | DOR | 08/08/11 | N/A | 27784/1810 | | | | GOLDSTEIN LEON (D) |
| | | | | | | | | WHOM CONCERNED |
| | 2011 R 542671 | CVP | 08/15/11 | N/A | 27791/3835 | | 09078628CA01 SJUD | | GOLDSTEIN LEON (R) |
| | | | | | | | | SGI GROUP (LLC) |
| | 2011 R 603178 | REL | 09/08/11 | N/A | 27819/1299 | | | | GOLDSTEIN LEON (R) |
| | | | | | | | | PINNACLE CONDO ASSN INC |
| | 2011 R 603307 | SJU | 09/08/11 | N/A | 27819/1612 | | | | GOLDSTEIN LEON (R) |
| | | | | | | | | SGI GRP LLC |
| | 2011 R 721655 | CVP | 10/26/11 | N/A | 27872/1929 | | 08040125CA01 ROGM | | GOLDSTEIN LEON (D) |
| | | | | | | | | PINNACLE CONDO ASSN (THE) |
| | 2011 R 721661 | CVP | 10/26/11 | N/A | 27872/1947 | | 08040125CA01 ROGM | | GOLDSTEIN LEON (D) |
| | | | | | | | | PINNACLE CONDO ASSN (THE) |
| | 2011 R 819838 | CVP | 12/07/11 | N/A | 27918/2076 | | 08040125CA01 ROGM | | GOLDSTEIN LEON (D) |
| | | | | | | | | PINNACLE CONDO ASSN (THE) |
| | 2012 R 32164 | JUD | 01/17/12 | N/A | 27963/658 | | 10 21612 CIV | | GOLDSTEIN LEON (R) |
| | | | | | | | | PALADIN SHIPPING CO LTD |
| | 2012 R 236153 | CVP | 04/03/12 | N/A | 28058/2631 | | 08040125CA01 VOLD | | GOLDSTEIN LEON (D) |
| | | | | | | | | PINNACLE CONDO ASSN (THE) |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2012 R 236416 | CVP | 04/03/12 | N/A | 28058/3548 | | 08O40125CA01 ORDR | GOLDSTEIN LEON (D) |
| | | | | | | | | PINNACLE CONDO ASSN (THE) |
| | 2012 R 285692 | CVP | 04/23/12 | N/A | 28082/2042 | | 11O09717CA01 ORDR | GOLDSTEIN LEON (R) |
| | | | | | | | | METROPOLITAN FINANCIAL CORP |
| | 2012 R 292868 | CVP | 04/25/12 | N/A | 28085/3295 | | 10058483CA01 ROGM | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
| | 2012 R 326165 | CVP | 05/08/12 | N/A | 28102/2177 | | 10058483CA01 ROGM | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
| | 2012 R 326170 | CVP | 05/08/12 | N/A | 28102/2194 | | 10058483CA01 ROGM | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
| | 2012 R 348984 | CVP | 05/16/12 | N/A | 28113/1986 | | 10058483CA01 ROGM | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
| | 2012 R 370006 | CVP | 05/24/12 | N/A | 28123/4441 | | 10058483CA01 ROGM | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
| | 2012 R 386231 | CVP | 06/01/12 | N/A | 28132/432 | | 10058483CA01 ORGM | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
| | 2012 R 386234 | CVP | 06/01/12 | N/A | 28132/436 | | 10058483CA01 ORGM | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
| | 2012 R 405955 | CVP | 06/08/12 | N/A | 28142/3020 | | 10058483CA01 ORGM | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
| | 2012 R 420089 | QCD | 06/14/12 | 14070/219 | 28149/2049 | | | |

Miami-Dade County Clerk - County Recorder's Official Record Search Results   Page 23 of 27

| | | | | | | | UNIT T H 101A | GOLDSTEIN LEON (D) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | ZALKIN ANZHELIQUA |
|  | 2012 R 447196 | CVP | 06/25/12 | N/A | 28162/4698 | | | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
|  | 2012 R 447200 | CVP | 06/25/12 | N/A | 28162/4710 | | | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
|  | 2012 R 447211 | CVP | 06/25/12 | N/A | 28162/4730 | | | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
|  | 2012 R 472110 | CVP | 07/05/12 | N/A | 28175/3762 | | | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
|  | 2012 R 476176 | CVP | 07/06/12 | N/A | 28177/3977 | | | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
|  | 2012 R 476188 | CVP | 07/06/12 | N/A | 28177/4019 | | | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
|  | 2012 R 476193 | CVP | 07/06/12 | N/A | 28177/4047 | | | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
|  | 2012 R 483369 | CVP | 07/10/12 | N/A | 28181/3623 | | | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
|  | 2012 R 483371 | CVP | 07/10/12 | N/A | 28181/3632 | | | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
|  | 2012 R 483374 | CVP | 07/10/12 | N/A | 28181/3642 | | | |

Note: The "10058483CA01 ROGM" reference appears in a column between the book/page column and the name column for each record row.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | 10058483CA01 ROGM | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
| | 2012 R 483383 | CVP | 07/10/12 | N/A | 28181/3655 | | 10058483CA01 ROGM | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
| | 2012 R 490134 | CVP | 07/12/12 | N/A | 28185/1185 | | 10058483CA01 ROGM | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
| | 2012 R 490138 | CVP | 07/12/12 | N/A | 28185/1212 | | 10058483CA01 ROGM | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
| | 2012 R 490143 | CVP | 07/12/12 | N/A | 28185/1233 | | 10058483CA01 ROGM | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
| | 2012 R 516951 | CVP | 07/24/12 | N/A | 28199/1827 | | 10058483CA01 ROGM | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
| | 2012 R 518055 | CVP | 07/24/12 | N/A | 28199/4678 | | 10058483CA01 ROGM | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
| | 2012 R 639285 | CVP | 09/10/12 | N/A | 28263/3882 | | 10051421CA01 FWOP | GOLDSTEIN LEON (D) |
| | | | | | | | | BROWARD MOTORSPORTS INC |
| | 2012 R 643462 | CVP | 09/11/12 | N/A | 28266/553 | | 11009717CA01 VOLD | GOLDSTEIN LEON (R) |
| | | | | | | | | METROPOLITAN FINANCIAL CORP |
| | 2012 R 682912 | CVP | 09/26/12 | N/A | 28287/767 | | 11009717CA01 ORDR | GOLDSTEIN LEON (R) |
| | | | | | | | | METROPOLITAN FINANCIAL CORP |
| | 2012 R 756207 | CVP | 10/23/12 | N/A | 28325/63 | | 10058483CA01 ROGM | GOLDSTEIN LEON (D) |

Miami-Dade County Clerk - County Recorder's Official Record Search Results          Page 25 of 27

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | EVS INVESTMENTS INC |
| | 2012 R 770154 | CVP | 10/29/12 | N/A | 28331/4302 | | 09078628CA01 FWOP | GOLDSTEIN LEON (R) |
| | | | | | | | | SGI GROUP (LLC) |
| | 2012 R 780373 | CVP | 10/31/12 | N/A | 28337/1754 | | 10058483CA01 ROGM | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
| | 2012 R 787954 | CVP | 11/02/12 | N/A | 28340/4932 | | 10058483CA01 ORGM | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
| | 2012 R 787960 | CVP | 11/02/12 | N/A | 28340/4945 | | 10058483CA01 ROGM | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
| | 2012 R 787968 | CVP | 11/02/12 | N/A | 28340/4970 | | 10058483CA01 ROGM | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
| | 2012 R 934890 | CVP | 12/27/12 | N/A | 28418/2118 | | 10058483CA01 ROGM | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
| | 2013 R 129214 | AIN | 02/16/13 | N/A | 28493/804 | | AUTHORIZATION | GOLDSTEIN LEON (R) |
| | | | | | | | | PINNACLE THREE CORP |
| | 2013 R 137292 | MOR | 02/20/13 | 18334/990 | 28497/2428 | UNIT TS 2 | | GOLDSTEIN LEON (D) |
| | | | | | | | | NORTH STAR MARITIME INC |
| | 2013 R 145890 | CVP | 02/22/13 | N/A | 28502/506 | | 10058483CA01 ROGM | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
| | 2013 R 200383 | JUD | 03/15/13 | N/A | 28531/1552 | | 1021612 CIV | GOLDSTEIN LEON (R) |
| | | | | | | | | PALADIN SHIPPING CO LTD |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 📄 | 2013 R 260878 | FST | 04/05/13 | N/A | 28565/3471 | | RE REC | GOLDSTEIN LEON (D) |
| | | | | | | | | NORTH STAR MARITIME INC |
| 📄 | 2013 R 260878 | FST | 04/05/13 | N/A | 28565/3471 | | 17555 COLLINS AVE UNIT 3702 SUNNY ISL BCH FLA | GOLDSTEIN LEON (D) |
| | | | | | | | | NORTH STAR MARITIME INC |
| 📄 | 2013 R 278482 | CVP | 04/10/13 | N/A | 28574/4779 | | 11032638CA01 FORD | GOLDSTEIN LEON (D) |
| | | | | | | | | SOULIAGUINE EVGUENI |
| 📄 | 2013 R 278502 | CVP | 04/10/13 | N/A | 28574/4818 | | 10058483CA01 FORD | GOLDSTEIN LEON (D) |
| | | | | | | | | EVS INVESTMENTS INC |
| 📄 | 2013 R 692577 | CVP | 08/30/13 | N/A | 28799/3502 | | 13026657CA01 ODIS | GOLDSTEIN LEON (R) |
| | | | | | | | | NORTH STAR MARITIME INC |
| 📄 | 2013 R 692589 | CVP | 08/30/13 | N/A | 28799/3537 | | 13026657CA01 ODIS | GOLDSTEIN LEON (R) |
| | | | | | | | | NORTH STAR MARITIME INC |
| 📄 | 2013 R 889941 | CVP | 11/08/13 | N/A | 28904/1735 | | 13026657CA01 ORDR | GOLDSTEIN LEON (R) |
| | | | | | | | | NORTH STAR MARITIME INC |
| 📄 | 2013 R 890457 | CVP | 11/08/13 | N/A | 28904/2923 | | 13026657CA01 ORDR | GOLDSTEIN LEON (R) |
| | | | | | | | | NORTH STAR MARITIME INC |
| 📄 | 2013 R 979860 | JUD | 12/13/13 | N/A | 28951/2614 | | 13 26657 CA01 | GOLDSTEIN LEON (R) |
| | | | | | | | | NORTH STAR MARITIME INC |
| 📄 | 2014 R 108870 | DEE | 02/12/14 | 9067/931 | 29027/4388 | UNIT 527 | | GOLDSTEIN LEON &W (D) |
| | | | | | | | | GOLDSTEIN DONNA L |
| 📄 | 2014 R 189771 | CVP | 03/14/14 | N/A | 29068/3421 | | 08067467CA01 MEDR | GOLDSTEIN LEON (D) |
| | | | | | | | | FORTUNE BCH LLC |
| 📄 | 2014 R 192884 | CVP | 03/17/14 | N/A | 29070/104 | | 10023294CA01 MEDR | GOLDSTEIN LEON (D) |

Miami-Dade County Clerk - County Recorder's Official Record Search Results          Page 27 of 27

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | FORTUNE OCEAN LLLP |
| | 2014 R 240237 | CVP | 04/03/14 | N/A | 29094/3408 | | 08067467CA01 VOLD | GOLDSTEIN LEON (D) / FORTUNE BCH LLC |
| | 2014 R 240550 | CVP | 04/03/14 | N/A | 29094/4129 | | 10023294CA01 VOLD | GOLDSTEIN LEON (D) / FORTUNE OCEAN LLLP |
| | 2014 R 252889 | CVP | 04/09/14 | N/A | 29101/2001 | | 08067467CA01 ORDR | GOLDSTEIN LEON (D) / FORTUNE BCH (LLC) |
| | 2014 R 255407 | CVP | 04/09/14 | N/A | 29102/3495 | | 10023294CA01 ORDR | GOLDSTEIN LEON (D) / FORTUNE OCEAN (LLLP) |
| | 2014 R 306650 | CVP | 04/29/14 | N/A | 29129/673 | | 10058483CA01 ORGM | GOLDSTEIN LEON (D) / EVS INVESTMENTS INC |
| | 2014 R 452380 | LIE | 06/25/14 | N/A | 29206/690 | | | GOLDSTEIN LEON (R) / PINNACLE CONDO ASSN INC |
| | 2014 R 579107 | REL | 08/19/14 | N/A | 29275/2622 | | | GOLDSTEIN LEON (R) / PINNACLE CONDO ASSN INC |
| | 2014 R 715357 | CVP | 10/15/14 | N/A | 29349/4439 | | 10058483CA01 ROGM | GOLDSTEIN LEON (D) / EVS INVESTMENTS INC |

**Please be advised:** The Clerk's Office makes every effort to ensure the accuracy of the following information; however it makes no warranties or representations whatsoever regarding the completeness, accuracy, or timeliness of such information and data. Information on this website has been posted with the intent that it be readily available for personal and public non-commercial (educational) use and to provide the public with direct online access to information in the Miami-Dade Clerk's Office information systems. Other than making limited copies of this website's content, you may not reproduce, retransmit, redistribute, upload or post any part of this website, including the contents thereof, in any form or by any means, or store it in any information storage and retrieval system, without prior written permission from the Miami-Dade Clerk's Office.

If you are interested in obtaining permission to reproduce, retransmit or store any part of this website beyond that which you may use for personal use, as defined above, visit the Contact Us section of our web site. The information available through this website is not an official or certified record. To review the complete Miami-Dade County Disclaimer, follow this link: http://www.miamidade.gov/info/disclaimer.asp

LOAN AND SECURITY AGREEMENT

DATED AS OF MARCH 1, 2007

BETWEEN

PINNACLE THREE CORPORATION,
A FLORIDA CORPORATION

AND

LEON GOLDSTEIN,
INDIVIDUAL RESIDING IN THE STATE OF FLORIDA,

COLLECTIVELY AS "BORROWER",

AND

NORTH STAR MARITIME, INC.
A PANAMA CORPORATION

AS "LENDER"

LOAN AND SECURITY AGREEMENT

THIS AGREEMENT (the "Agreement"), dated as of March 1, 2007 is entered into by and between Pinnacle Three Corporation, a Florida corporation having a principal place of business at 1445 Windjammer Way, Hollywood, FL 33019 and Leon Goldstein, individual residing in the state of Florida with a residence at 17555 Collins Avenue, Apt. 3702, Sunny Isles Beach, FL 33160 (collectively the "Borrower") and North Star Maritime, Inc., a Panama corporation having a principal place of business at 30th Street and Balboa Avenue, Bldg. No. 39, City of Panama, Republic of Panama (the "Lender").

In consideration of the mutual agreements contained herein, the parties hereto agree as follows:

WHEREAS, Borrower desires to borrow from the Lender hereunder the amount of THIRTEEN MILLION and 00/100 DOLLARS ($13,000,000.00) (as the same may from time to time be amended, modified, supplemented or revised, the "Loan"), which would be evidenced by Secured Promissory Notes(s) document executed by Borrower substantially in the form of Exhibit A hereto (as the same may from time to time be amended, modified, supplemented or restated the "Note(s)").

WHEREAS, Included in the loan amount listed above there are shall be Mortgage for ONE MILLION FIVE HUNDRED THOSAND DOLLARS ($1,500,000.00), which would be evidenced by MORTGAGE instrument executed by Borrower as a separate document.

NOW, THEREFORE, it is agreed:

SECTION 1. DEFINITIONS

Unless otherwise defined herein, the following capitalized terms shall have the following meanings (such meanings being equally applicable to both the singular and plural form of the terms defined):

1.1  "Account" means any "account," as such term is defined in Section 9106 of the UCC, now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest and, in any event, shall include, without limitation, all accounts receivable, book debts and other forms of obligations (other than forms of obligations evidenced by Chattel Paper, Documents or Instruments) now owned or hereafter received or acquired by or belonging or owing to Borrower (including, without limitation, under any trade name, style or division thereof) whether arising out of goods sold or services rendered by Borrower or from any other transaction, whether or not the same involves the sale of goods or services by Borrower (including, without limitation, any such obligation which may be characterized as an account or contract right under the UCC) and all of Borrower's rights in, to and under

2

all purchase orders or receipts now owned or hereafter acquired by it for goods or services, and all of Borrower's rights to any goods represented by any of the foregoing (including, without limitation, unpaid seller's rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods), and all monies due or to become due to Borrower under all purchase orders and contracts for the sale of goods or the performance of services or both by Borrower (whether or not yet earned by performance on the part of Borrower or in connection with any other transaction), now in existence or hereafter occurring, including, without limitation, the right to receive the proceeds of said purchase orders and contracts, and all collateral security and guarantees of any kind given by any Person with respect to any of the foregoing.

1.2  "Account Debtor" means any "account debtor," as such term is defined in Section 9105(1)(a) of the UCC.

1.3  "Advance" means each installment made by the Lender to Borrower pursuant to the Loan to be evidenced by the Note(s) secured by the Collateral.

1.4  "Advance Date" means the funding date of any Advance of the Loan.

1.5.  "Advance Request" means the request by Borrower for an Advance under the Loan, each to be substantially in the form of Exhibit B attached hereto, as submitted by Borrower to Lender from time to time.

1.6  "Chattel Paper" means any "chattel paper," as such term is defined in Section 9105(1)(b) of the UCC, now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest.

1.7  "Closing Date" means the date of this Agreement.

1.8  "Collateral" shall have the meaning assigned to such term in Section 3 of this Agreement.

1.9  "Commitment Amount" means Thirteen Million Dollars ($13,000,000).

1.10 "Contracts" means all contracts, undertakings, franchise agreements or other agreements (other than rights evidenced by Chattel Paper, Documents or Instruments) in or under which Borrower may now or hereafter have any right, title or interest, including, without limitation, with respect to an Account, any agreement relating to the terms of payment or the terms of performance thereof.

1.11 "Copyrights" means all of the following now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest: (i) all copyrights, whether

3

registered or unregistered, held pursuant to the laws of the United States, any State thereof or of any other country; (ii) registrations, applications and recordings in the United States Copyright Office or in any similar office or agency of the United States, any state thereof or any other country; (iii) any continuations, renewals or extensions thereof; and (iv) any registrations to be issued in any pending applications.

1.12 "Copyright License" means any written agreement granting any right to use any Copyright or Copyright registration now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest.

1.13 "Documents" means any "documents," as such term is defined in Section 9105(1)(f) of the UCC, now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest.

1.14 "Equipment" means any "equipment," as such term is defined in Section 9109(2) of the UCC, now or hereafter owned or acquired by Borrower or in which Borrower now holds or hereafter acquires any interest and any and all additions, substitutions and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto.

1.15 "Facility Fee" means one percent (1.0%) of the principal amount of the Loan, along with the due diligence, transaction, and legal expense fee in the amount of $7,500.00, due at the Closing Date, less commitment fee in the amount of $20,000.00 paid with check no. 7516.

1.16 "Fixtures" means any "fixtures", as such term is defined in Section 9313(1)(a) of the UCC, now or hereafter owned or acquired by Borrower or in which Borrower now holds or hereafter acquires any interest and, now or hereafter attached or affixed to or constituting a part of, or located in or upon, real property wherever located, together with all right, title and interest of Borrower in and to all extensions, improvements, betterments, renewals, substitutes, and replacements of, and all additions and appurtenances to any of the foregoing property, and all conversions of the security constituted thereby, immediately upon any acquisition or release thereof or any such conversion, as the case may be.

1.17 "General Intangibles" means any "general intangibles," as such term is defined in Section 9106 of the UCC, now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest and, in any event, shall include, without limitation, all right, title and interest which Borrower may now or hereafter have in or under any contract, all customer lists, Copyrights, Trademarks, Patents, rights to Intellectual Property, interests in partnerships, joint ventures and other business associations, Licenses, permits, trade secrets,

4

proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, software, data bases, data, skill, expertise, recipes, experience, processes, models, drawings, materials and records, goodwill (including, without limitation, the goodwill associated with any Trademark, Trademark registration or Trademark licensed under any Trademark License), claims in or under insurance policies, including unearned premiums, uncertificated securities, cash and other forms of money or currency, deposit accounts (including as defined in Section 9105(e) of the UCC), rights to sue for past, present and future infringement of Copyrights, Trademarks and Patents, rights to receive tax refunds and other payments and rights of indemnification.

1.18 "Instruments" means any "instrument," as such term is defined in Section 9105(1)(i) of the UCC, now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest.

1.19 "Intellectual Property" means all Copyrights, Trademarks, Patents, rights to Intellectual Property, Licenses, trade secrets, source codes, customer lists, proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, software, data bases, skill, expertise, experience, processes, models, drawings, materials and records.

1.20 "Inventory" means any "inventory," as such term is defined in Section 9109(4) of the UCC, wherever located, now or hereafter owned or acquired by Borrower or in which Borrower now holds or hereafter acquires any interest, and, in any event, shall include, without limitation, all inventory, goods and other personal property which are held by or on behalf of Borrower for sale or lease or are furnished or are to be furnished under a contract of service or which constitute raw materials, work in process or materials used or consumed or to be used or consumed in Borrower's business, or the processing, packaging, promotion, delivery or shipping of the same, and all furnished goods whether or not such inventory is listed on any schedules, assignments or reports furnished to Lender from time to time and whether or not the same is in transit or in the constructive, actual or exclusive occupancy or possession of Borrower or is held by Borrower or by others for Borrower's account, including, without limitation, all goods covered by purchase orders and contracts with suppliers and all goods billed and held by suppliers and all inventory which may be located on premises of Borrower or of any carriers, forwarding agents, truckers, warehousemen, vendors, selling agents or other persons.

1.21 "License" means any Copyright License, Patent License, Trademark License or other license of rights or interests now held or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest and any renewals or extensions thereof.

5

1.22 "Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment for security, security interest, encumbrance, levy, lien or charge of any kind, whether voluntarily incurred or arising by operation of law or otherwise, against any property, any conditional sale or other title retention agreement, any lease in the nature of a security interest, and the filing of any financing statement (other than a precautionary financing statement with respect to a lease that is not in the nature of a security interest) under the UCC or comparable law of any jurisdiction.

1.23 "Material Adverse Effect" means a material adverse effect upon: (i) the business, operations, properties, assets or financial conditions of Borrower; or (ii) the ability of Borrower to perform, or of Lender to enforce, the Secured Obligations.

1.24 "Maturity Date" means the date thirty six (36) months from the Advance Date of each installment of the Loan.

1.25 "Patent License" means any written agreement granting any right with respect to any invention on which a Patent is in existence now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest.

1.26 "Patents" means all of the following now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest:(a) letters patent of, or rights corresponding thereto in, the United States or any other county, all registrations and recordings thereof, and all applications for letters patent of, or rights corresponding thereto in the United States or any other country, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country;(b) all reissues, continuations, continuations-in-part or extensions thereof; (c) all petty patents, divisionals, and patents of addition; and (d) all patents to issue in any such applications.

1.27 "Permitted Liens" means:

(i)     liens in favor of Lender;

(ii)    liens securing the payment of taxes or other governmental charges not yet delinquent or being contested in good faith by appropriate proceeding, for which adequate reserves are maintained in accordance with generally accepted accounting principles;

(iii)   liens securing claims or demands of materialism, mechanics, carriers, warehousemen, landlords and other like persons imposed without action of such parties, provided that the payment thereof is not yet required;

6

(iv)     liens incurred or deposits made in the ordinary course of Borrower's or a subsidiary's business in connection with workers compensation, unemployment insurance, social security and other like laws;

(v)     purchase money security interests in personal property acquired after the date of this Agreement, provided such are limited to the personal property so acquired and proceeds, thereof;

(vi)     any liens existing as of the date hereof and specifically disclosed by Borrower to Lender herein;

(vii)     leases, subleases, licenses and sublicenses granted to others in the ordinary course of business not interfering in any material respect with the conduct of the business of any Borrower;

(viii)     liens arising from judgments, decrees or attachments to the extent and only so long as such judgment, decree or attachment as not caused or resulted in a Event of Default;

(ix)     liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(x)     liens which constitute rights of set-off of a customary nature or bankers' liens with respect to amounts on deposit, whether arising by operation of law or by contract, in connection with arrangements entered into with banks in the ordinary course of business;

(xi)     liens incurred in connection with the extension, renewal or refinancing of the indebtedness secured by liens of the type described in clause (vii) above, provided that any extensions, renewal or replacement lien shall be limited to the property encumbered by the existing lien and the principal amount of the indebtedness being extended, renewed or refinanced does not increase.

1.28  "Proceeds" means "proceeds," as such term is defined in Section 9306(1) of the UCC and, in any event, shall include, without limitation, (a) any and all Accounts, Chattel Paper, Instruments, cash or other forms of money or currency or other proceeds payable to Borrower from time to time in respect of the Collateral, (b) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Borrower from time to time with respect to any of the Collateral, (c) any and all payments (in any form whatsoever) made or due and payable to Borrower from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture

7

of all or any part of the Collateral by any governmental authority (or any Person acting under color of governmental authority), (d) any claim of Borrower against third parties (i) for past, present or future infringement of any Copyright, Patent or Patent License or (ii) for past, present or future infringement or dilution of any Trademark or Trademark License or for injury to the goodwill associated with any Trademark,

Trademark registration or Trademark licensed under any Trademark License and (e) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

1.29   "Receivables" shall mean and include all of the Borrowers accounts, instruments, documents, chattel paper and general intangibles whether secured or unsecured, whether now existing or hereafter created or arising, and whether or not specifically sold or assigned to Lender hereunder.

1.30   "Secured Obligations" shall mean and include all principal, interest, fees, costs, or other liabilities or obligations for monetary amounts owed by Borrower to Lender, whether due or to become due, matured or unmatured, liquidated or unliquidated, contingent or non-contingent, and all covenants and duties regarding such amounts, of any kind of nature, present or future, arising under this Agreement, the Note(s), or any of the other Loan Documents, whether or not evidenced by any Note(s), Agreement or other instrument, as the same may from time to time be amended, modified, supplemented or restated.

1.31   "Trademark License" means any written agreement granting any right to use any Trademark or Trademark registration now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest.

1.32   "Trademarks" means any of the following now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest: (a) any and all trademarks, tradenames, corporate names, business names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and any applications in connection therewith, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof and (b) any reissues, extensions or renewals thereof.

1.33   "UCC" shall mean the Uniform Commercial Code as the same may, from time to time, be in effect in the State of Florida. Unless otherwise defined herein, terms that are defined in the UCC and used herein shall have the meanings given to them in the UCC.

8

1.34   "Warrant Agreement(s)" if applicable, shall mean those agreements entered into in connection with the Loan, substantially in the form attached hereto as Exhibit C pursuant to which Borrower granted Lender the right to purchase shares of the Borrower's entity.

SECTION 2.   THE LOAN

2.1   Subject to the terms and conditions set forth herein, Lender shall make Loans to Borrower in an aggregate amount not to exceed the Commitment Amount. Each Advance, together with interest at the rate of eighteen percent (18%) per annum, shall be payable in 36 monthly installments as set forth in the Note(s).

2.2 Upon the occurrence of and during an Event of Default (as defined herein), interest shall thereafter be calculated at a rate of five percent (5%) in excess of the rate that would otherwise be applicable ("Default Rate"). All such interest shall be due and payable in arrears, on the first day of the following month.

2.3 Notwithstanding any provision in this Agreement, the Note(s), or any other "Loan Document" (as defined herein), it is not the parties' intent to contract for, charge or receive interest at a rate that is greater than the maximum rate permissible by law which a court of competent jurisdiction shall deem applicable hereto (which under the laws of the State of Florida shall be deemed to be the laws relating to permissible rates of interest on commercial loans) (the "Maximum Rate"). If the Borrower actually pays Lender an amount of interest, chargeable on the total aggregate principal Secured Obligations of Borrower under this Agreement and the Note(s) (as said rate is calculated over a period of time that is the longer of (i) the time from the date of this Agreement through the maturity time as set forth on the Note(s), or (ii) the entire period of time that any principal is outstanding on the Note(s)), which amount of interest exceeds interest calculated at the Maximum Rate on said principal chargeable over said period of time, then such excess interest actually paid by Borrower shall be applied first, to the payment of principal outstanding on the Note(s); second, after all principal is repaid, to the payment of Lender's out of pocket costs, expenses, and professional fees which are owed by Borrower to Lender under this Agreement or the Loan Documents; and third, after all principal, costs, expenses, and professional fees owed by Borrower to Lender are repaid, the excess (if any) shall be refunded to Borrower.

2.4 In the event any interest is not paid when due hereunder, delinquent interest shall be added to principal and shall bear interest on interest, compounded at the rate set forth in Section 2.1.

2.5 Upon and during the continuation of an Event of Default hereunder (as defined herein), all Secured Obligations, including principal, interest, compounded interest, and reasonable

9

professional fees, shall bear interest at a rate per annum equal to the Default Rate.

2.6 Borrower shall have the option to prepay the Loan, in whole or in part, without penalty or premium, after 12 months from the Closing Date by paying the principal amount thereon together with all accrued and unpaid interest with respect to such principal amount, as of the date of such prepayment, without premium. In the event Borrower prepays the Note(s) within 12 months from the Closing Date hereof, Borrower shall pay the principal amount together with all accrued and unpaid interest and a prepayment premium equal to 1% of the then outstanding principal amount ("the Prepayment Penalty"), provided, however, in the event of an initial public offering of Borrower's stock, the Prepayment Penalty shall not apply.

2.7 If the Borrower has not repaid the outstanding principal amount under the Loan in its entirety by the Maturity Date (as defined in the applicable Note(s)), then for each additional month, or portion thereof, thereafter that the outstanding principal is not paid, Lender shall have the right to purchase from the Borrower, at the Exercise Price (adjusted, as set forth and defined in the Warrant Agreement), an additional number of shares of Preferred Stock (as defined in the Warrant Agreement) which number shall be determined by (i) multiplying the outstanding principal amount which is due but unpaid by 1% and (ii) dividing the product thereof by the Exercise Price.

2.8 Notwithstanding anything in this Agreement to the contrary, Lender's obligations to provide the Loan(s) shall terminate on the earlier of

(i)     March 1, 2012 or (ii) the occurrence of a Material Adverse Effect pursuant to Section 1.22, and no Advance Requests shall be accepted after such date, unless otherwise waived by Lender ("Draw Period").

As security for the prompt, complete and indefeasible payment when due   (whether at stated payment dates or otherwise) of all the Secured Obligations and in order to induce Lender to make the Loan upon the terms and subject to the conditions of the Note(s), Borrower hereby assigns, conveys, mortgages, pledges, hypothecates and transfers to Lender for security purposes only, and hereby grants to Lender a security interest in, all of Borrower's right, title and interest in, to and under each of the following (all of which being hereinafter collectively called the "Collateral"):

(a)    All Receivables;

(b)    All Equipment;

(c)    All Fixtures;

(d)    All General Intangibles;

10

(e)   All Inventory;

(f)   All other goods and personal property of Borrower whether tangible or intangible and whether now or hereafter owned or existing, leased, consigned by or to, or acquired by, Borrower and wherever located; and

(g)   the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing.

Notwithstanding the foregoing, Lender agrees to release all Receivables necessary for the sole purpose of Borrower securing an accounts receivable/factoring facility against executed firm orders with Orthodontists and Dentists for Borrower's dental products, provided, however, Lender has the right of first refusal to provide such receivable/factoring facility.

SECTION 4. REPRESENTATIONS AND WARRANTIES OF BORROWER

The Borrower represents, warrants and agrees that:

4.1 it has good title in and to the Collateral, free of all liens, security interests, encumbrances and claims whatsoever, except for the interest of the Lender therein;

4.2 it has the full power and authority to, and does hereby grant and convey to the Lender, a valid first priority perfected security interest in the Collateral as security for the Secured Obligations, free of all liens, security interests, encumbrances and claims, and shall execute such Uniform Commercial Code financing statements in connection herewith as the Lender may reasonably request. Except for Permitted Liens, no other lien, security interest, adverse claim or encumbrance has been created by Borrower or is known by Borrower to exist with respect to any Collateral;

4.3 it is a corporation duly organized, legally existing and in good standing under the laws of the State of Delaware, and is duly qualified as a foreign corporation in all jurisdictions where the failure to so qualify would have a Material Adverse Effect on the Collateral or the business of the Borrower taken as a whole;

4.4 the execution, delivery and performance of the Note(s), this Agreement, the Warrant Agreement(s), and all financing statements, certificates and other documents required to be delivered or executed in connection herewith (collectively, the "Loan Documents") have been duly authorized by all necessary corporate action of Borrower, the individual or individuals executing the Loan Documents were duly authorized to do so, and the Loan Documents constitute legal, valid and binding obligations of the Borrower, enforceable in accordance with their respective terms,

11

claims arising at or caused by Lender's gross negligence or willful misconduct.

SECTION 6. COVENANTS OF BORROWER

Borrower covenants and agrees as follows at all times while any of the Secured Obligations remain outstanding:

6.1 Borrower shall furnish to Lender the financial statements listed hereinafter, each prepared in accordance with generally accepted accounting principles consistently applied (the "Financial Statements"):

 (a) as soon as practicable (and in any event within thirty (30) days) after the end of each month, unaudited interim financial statements as of the end of such month (prepared on a consolidated and consolidating basis, if applicable), including balance sheet and related statements of income and cash flows accompanied by a report detailing any material contingencies (including the commencement of any material litigation by or against Borrower) or any other occurrence that could reasonably be expected to have a Material Adverse Effect, all certified by Borrower's Chief Executive Officer or Chief Financial Officer to be true and correct in all material respects;

 (b) as soon as practicable (and in any event within ninety (90) days) after the end of each fiscal year, unqualified audited financial statements as of the end of such year (prepared on a consolidated and consolidating basis, if applicable), including balance sheet and related statements of income and cash flows, and setting forth in comparative form the corresponding figures for the preceding fiscal year, certified by a firm of independent certified public accountants selected by Borrower and reasonably acceptable to Lender, accompanied by any management report from such accountants;

 (c) promptly after the sending or filing thereof, as the case may be, copies of any proxy statements, financial statements or reports which Borrower has made available to its shareholders and copies of any regular, periodic and special reports or registration statements which Borrower files with the Securities and Exchange Commission or any governmental authority which may be substituted therefor, or any national securities exchange; and

 (d) promptly, any additional information, financial or otherwise(including, but not limited, to tax returns and names of principal creditors) as Lender

13

reasonably believes necessary to evaluate Borrower's continuing ability to meet its financial obligations.

(e)   Borrower shall permit any authorized representative of Lender and its attorneys and accountants on reasonable notice to inspect, examine and make copies and abstracts of the books of account and records of Borrower at reasonable times during normal business hours provided, that not more than two such inspections or examinations shall take place in any calendar year except upon the occurrence and continuation of an Event of Default. In addition, such representative of Lender and its attorneys and accountants shall have the right to meet with management and officers of the Company to discuss such books of account and records.

6.3 Borrower will from time to time execute, deliver and file, alone or with Lender, any financing statements, security agreements or other documents; procure any instruments or documents as may be reasonably requested by Lender; and take all further action that may be necessary or desirable, or that Lender may reasonably request, to confirm, perfect, preserve and protect the security interests intended to be granted hereby, and in addition, and for such purposes only, Borrower hereby authorizes Lender to execute and deliver on behalf of Borrower and to file such financing statements, security agreement and other documents without the signature of Borrower either in Lender's name or in the name of Borrower as agent and attorney-in-fact for Borrower. The parties agree that a carbon, photographic or other reproduction of this Agreement shall be sufficient as a financing statement and may be filed in any appropriate office in lieu thereof.

6.4 Borrower shall protect and defend Borrower's title as well as the interest of the Lender against all persons claiming any interest adverse to Borrower or Lender and shall at all times keep the Collateral free and clear from any legal process, liens or encumbrances whatsoever (except any placed thereon by Lender and other Permitted Liens) and shall give Lender immediate written notice thereof.

6.5 Without Lender's prior written consent, such consent to be given no later than four (4) days after Lender receives notice by Borrower, Borrower shall not, outside the ordinary course of business, but not to exceed $250,000, (a) grant any material extension of the time of payment of any of the Receivables, (b) to any material extent, compromise, compound or settle the same for less than the full amount thereof, (c) release, wholly or partly, any person liable for the payment thereof, or allow any credit or discount whatsoever thereon other than trade discounts granted in the ordinary course of business of Borrower.

14

6.6 Borrower shall maintain and protect its properties, assets and facilities, including without limitation, its Equipment and Fixtures, in good order and working repair and condition (taking into consideration ordinary wear and tear) and from time to time make or cause to be made all necessary and proper repairs, renewals and replacements thereto and shall competently manage and care for its property in accordance with prudent industry practices.

6.7 Borrower shall not merge with and into any other entity; or sell or convey all or substantially all of its assets or stock to any other person or entity without notifying Lender a minimum of twenty (20) days prior to the closing date and requesting Lender's consent to the assignment of all of Borrower's Secured Obligations hereunder to the successor entity in form and substance satisfactory to Lender. In the event Lender does not consent to such assignment the parties agree Borrower shall prepay the Loan in accordance with Section 2.6 hereof. Notwithstanding the foregoing, Lender hereby consents to any Merger in which the surviving entity has cash and marketable securities of at least ten (10) times the remaining Loan payments and Lender shall not unreasonably withhold its consent to a Merger in other cases.

For purposes of this Agreement, a "Merger" shall mean any consolidation or merger of the Borrower with or into any other corporation or entity, any sale or conveyance of an or substantially all of the assets or stock of the Borrower by or to any other person or entity in which Borrower is not the surviving entity.

6.8 Borrower shall not, without the prior written consent of Lender, such consent not to be unreasonably withheld, declare or pay any cash dividend or make a distribution on any class of stock, other than pursuant to employee repurchase plans upon an employee's death or termination of employment or transfer, sell, lease, lend or in any other manner convey any equitable, beneficial or legal interest in any material portion of the assets of Borrower (except inventory sold in the normal course of business).

6.9 Upon the request of Lender, Borrower shall, during business hours, make the Inventory and Equipment available to Lender for inspection at the place where it is normally located and shall make Borrower's log and maintenance records pertaining to the Inventory and Equipment available to Lender for inspection. Borrower shall take all action necessary to maintain such logs and maintenance records in a correct and complete fashion.

6.10 Borrower covenants and agrees to pay when due, all taxes, fees or other charges of any nature whatsoever (together with any related interest or penalties) now or hereafter imposed or assessed against Borrower, Lender or the Collateral or upon Borrower's ownership, possession, use, operation or disposition thereof or upon Borrower's rents, receipts or earnings arising therefrom. Borrower shall file on or before the due date therefor all personal property tax returns in respect of the Collateral. Notwithstanding the foregoing, Borrower may contest, in good faith and by appropriate

15

proceedings, taxes for which Borrower maintains adequate reserves therefor.

6.11 Borrower shall not relocate any item of the Collateral (other than sale of inventory in the ordinary course of business) except: (i) with prior written notice of the Lender not to be unreasonably withheld; and (ii) if such relocation shall be within the continental United States. If permitted to relocate Collateral pursuant to the foregoing sentence, unless otherwise agreed in writing by Lender, Borrower shall first (a) cause to be filed and/or delivered to the Lender all Uniform Commercial Code financing statements, certificates or other documents or instruments necessary to continue in effect the perfected security interest of the Lender in the Collateral, and (b) have given the Lender no less than fifteen (15) days prior written notice of such relocation.

6.12 Borrower shall not incur any indebtedness senior to Lender's position without the prior written consent of Lender.

SECTION 7. CONDITIONS PRECEDENT TO LOAN

The obligation of Lender to fund the Loan on each Advance Date shall be   subject to Lender's discretion and satisfactory completion of its due diligence and approval process, and satisfaction by Borrower or waiver by Lender, in Lender's reasonable discretion, of the following conditions:

7.1 Document Delivery. Borrower, on prior to the Closing Date, shall have delivered to Lender the following:

(a)    executed originals of the Agreement, the Warrant Agreement, and any documents reasonably required by Lender to effectuate the liens of Lender, with respect to all Collateral;

(b)    certified copy of resolutions of Borrower's board of directors evidencing approval of the borrowing and other transactions evidenced by the Loans Documents;

(c)    certified copies of the Certificate of Incorporation and the Bylaws of Borrower, as amended through the Closing Date;

(d)    certificate of good standing for Borrower from its state of incorporation and similar certificates from all other jurisdictions in which it does business and where the failure to be qualified would have a Material Adverse Effect;

(e)    payment of the Facility Fee less transaction and due diligence expenses (not to exceed $7,500) shall be applied to the Facility Fee; and

16

     (f)    such other documents as Lender may reasonably request.

**7.3 Advance Request.**

    (a)    During Draw Period, Borrower, on or prior to each Advance Date, shall have delivered to Lender the following:

        i.  a minimum of five (5) business days prior to the Advance Date, written notice in the form of an Advance Request, or as otherwise specified by Lender from time to time, specifying amount of such Advance and wire transfer instructions

       ii.  executed original of the Note(s); and

     iii.  such other documents as Lender may reasonably request.

    (b)    During Extended Draw Period, Borrower on or prior to each Advance Date, shall have delivered to Lender the following:

        i.  a minimum of five (5) business days to the Advance Date, written notice in the form of an Advance Request, or as otherwise specified by Lender from time to time, specifying amount of such Advance and wire instructions

       ii.  executed original of the Note(s);

     iii.  a Warrant Agreement executed in accordance with Section 2.8 herein, and in a form substantially identical to the Warrant Agreement attached hereto as Exhibit C, and

     iv.  such other documents as Lender may reasonably request.

**7.4 Perfection of Security Interests.** Borrower shall have taken or caused to be taken such actions reasonably requested by Lender to grant Lender a first priority perfected security interest in the Collateral. Such actions shall include, without limitation, the delivery to Lender of all appropriate financing statements, executed by Borrower, as to the Collateral granted by Borrower for all jurisdictions as may be necessary or desirable to perfect the security interest of Lender in such Collateral

**7.5 Absence of Events of Defaults.** As of the Closing Date or the Advance Date, no fact or condition exists that would (or would, with the passage of time, the giving of notice, or both) constitute an Event of Default under this Agreement or any of the Loan Documents.

17

7.6 Material Adverse Effect. As of the Closing Date or the Advance Date, no event which has had or could reasonably be expected to have a Material Adverse Effect has occurred and is continuing.

SECTION 8. ASSIGNMENT BY LENDER

8.1 Borrower acknowledges and understands that Lender may sell and assign all or a part of its interest hereunder and under the Note(s) and Loan Documents to any person or entity (an "Assignee"). After such assignment the term Lender shall mean such Assignee, and such Assignee shall be vested with all rights, powers and remedies of Lender hereunder with respect to the interest so assigned; but with respect to any such interest not so transferred, the Lender shall retain all rights, powers and remedies hereby given. No such assignment by Lender shall relieve Borrower of any of its obligations hereunder. Borrower shall acknowledge such assignment or assignments as shall be designated by written notice given by Lender to Borrower. The Lender agrees that in the event of any transfer by it of the Note(s), it will endorse thereon a notation as to the portion of the principal of the Note(s) which shall have been paid at the time of such transfer and as to the date to which interest shall have been last paid thereon.

SECTION 9. DEFAULT

The occurrence of any one or more of the following events (herein called "Events of Default") shall constitute a default hereunder and under the Note(s):

9.1 The Borrower defaults in the payment of any principal or interest payable under the Note(s) and such default continues for more than five (5) days after the due date thereof;

9.2 The Borrower defaults in the payment or performance of any other covenant or obligation of the Borrower hereunder or under the Note(s) or any other Loan Documents for more than ten (10) days after the Lender has given notice of such default to the Borrower;

9.3 Any representation or warranty as of the date made herein by the Borrower shall prove to have been false or misleading in any material respect;

9.4 The making of an assignment by Borrower for the benefit of its creditors or the admission by Borrower in writing of its inability to pay its debts as they become due, or the insolvency of Borrower, or the filing by Borrower of a voluntary petition in bankruptcy, or the adjudication of Borrower as a bankrupt, or the filing by Borrower of any petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future statute, law or regulation, or the filing of any answer by Borrower admitting, or the failure by Borrower to deny, the material

18

allegations of a petition filed against it for any such relief, or the seeking or consenting by Borrower to, or acquiescence by Borrower in, the appointment of any trustee, receiver or liquidator of Borrower or of all or any substantial part of the properties of Borrower, or the inability of Borrower to pay its debts when due, or the commission by Borrower of any act of bankruptcy as defined in the Federal Bankruptcy Act, as amended;

9.5 The failure by Borrower, within sixty (60) days after the commencement of any proceeding against Borrower seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, to obtain the dismissal of such proceeding or, within sixty (60) days after the appointment, without the written consent or acquiescence of Lender, of any trustee, receiver or liquidator of Borrower or of all or any substantial part of the properties of Borrower, to vacate such appointment;

9.6 The default by Borrower under any other notes or other agreement for borrowed money, lease or other agreement between Borrower and Lender; or

9.7 The occurrence of any default under any lease or other agreement or obligation of Borrower involving an amount in excess of $100,000.00 or having a Material Adverse Effect; or the entry of any judgment against Borrower involving an award in excess of $100,000.00 that would have a Material Adverse Effect, that has not been bonded or stayed on appeal within thirty (30) days.

SECTION 10. REMEDIES

Upon the occurrence and continuation hereof of any one or more Events of Default, Lender, at its option, may declare the Note(s) to be accelerated and immediately due and payable, (provided, that upon the occurrence of an Event of Default of the type described in 9.4 or 9.5, the Note(s) and all other Secured Obligations shall automatically be accelerated and made due and payable without any further act) whereupon the unpaid principal of and accrued interest on such Note shall become immediately due and payable, and shall thereafter bear interest at the Default Rate and calculated in accordance with Section 2.2. Lender may exercise all rights and remedies with respect to the Collateral granted pursuant hereto for such Note(s), or otherwise available to it under applicable law, including the right to release, hold or otherwise dispose of all or any part of the Collateral and the right to utilize, process and commingle the Collateral.

Upon the happening and during the continuance of any Event of Default, Lender may then, or at any time thereafter and from time to time, apply, collect, sell in one or more sales, lease or otherwise dispose of, any or all of the Collateral, in its then condition or following any commercially reasonably preparation or processing, in such order as Lender may elect, and any such sale may be made either at public or private sale at its place of business or elsewhere.

19

Borrower agrees that any such public or private sale may occur upon five (5) calendar day's notice to Borrower. Lender may require Borrower to assemble the Collateral and make it available to Lender at a place designated by Lender, which is reasonably convenient to Lender and Borrower. The proceeds of any sale, disposition or other realization upon all or any part of the collateral shall be distributed by Lender in the following order of priorities:

First, to Lender in an amount sufficient to pay in full Lender's reasonable costs and professionals' and advisors' fees and expenses;

Second, to Lender in an amount equal to the then unpaid amount of the Secured Obligations in such order and priority as Lender may choose in its sole discretion; and

Finally, upon payment in full of all of the Secured Obligations, to Borrower or its representatives or as a court of competent jurisdiction may direct.

The Lender shall return to the Borrower any surplus collateral remaining after payment of all Secured Obligations.

SECTION 11. MISCELLANEOUS

11.1 Borrower shall remain liable to Lender for any unpaid Secured Obligations, advances, costs, charges and expenses, together with interest thereon and shall pay the same immediately to Lender at Lender's offices.

11.2 The powers conferred upon Lender by this Agreement are solely to protect its interest in the Collateral and shall not impose any duty upon Lender to exercise any such powers.

11.3 This is a continuing Agreement and the grant of a security interest hereunder shall remain in full force and effect and all the rights, powers and remedies of Lender hereunder shall continue to exist until the Secured Obligations are paid in full as the same become due and payable. When Borrower has paid in full all Secured Obligations, Lender will, promptly but in no event later than ten (10) days, upon request of Borrower, execute a written termination Statement, reassigning to Borrower, without recourse, the Collateral and all rights conveyed hereby and return possession (if Lender has possession) of the Collateral to Borrower. The rights, powers and remedies of Lender hereunder shall be in addition to all rights, powers and remedies given by statute or rule of law and are cumulative. The exercise of any one or more of the rights, powers and remedies provided herein shall not be construed as a waiver of any other rights, powers and remedies of Lender. Furthermore, regardless of whether or not the UCC is in effect in the jurisdiction where such rights, powers and remedies are asserted, Lender shall have the rights, powers and remedies of a secured party under the UCC.

20

11.4 Upon payment in full of all Secured Obligations, the Lender shall cancel the Note(s), this Agreement and all UCC financing statements, if any, and shall promptly deliver all such canceled documents to the Borrower.

11.5 GOVERNING LAW. This Agreement, the Note(s) and the other Loan Documents have been negotiated and delivered to Lender in the State of Florida and shall not become effective until accepted by Lender in the State of Florida. Payment to Lender by Borrower of the Secured Obligations is due in the State of Florida. This Agreement shall be governed by, and construed and enforced in accordance with the laws of the State of Florida excluding conflict of laws principles that would cause the application of laws of any other jurisdiction.

11.6 CONSENT TO JURISDICTION AND VENUE. All judicial proceedings arising in or under or related to this Agreement, the Note or any of the other Loan Documents may be brought in any state or federal court of competent jurisdiction located in the State of Florida. By execution and delivery of this Agreement, each party hereto generally and unconditionally: (a) consents to personal jurisdiction in Cook County, State of Florida; (b) waives any objection as to jurisdiction or venue in the aforesaid courts; and (d) irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement, the Note(s) and the other Loan Documents. Service of process on any party hereto in any action arising out of or relating to this Agreement shall be effective if given in accordance with the requirements for notice set forth in Section 11.8 below and shall be deemed effective and received as set forth in Section 11.8 below. Nothing herein shall affect the right to serve process in any other manner permitted by law or shall limit the right of either party to bring proceedings in the courts of any other jurisdiction.

11.7 Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under such law, such provision shall be ineffective only to the extent and duration of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

11.8 Except as otherwise provided herein, all notices and service of process required, contemplated, or permitted to have been validly served, or hereunder shall be in writing and shall be deemed given or delivered upon the earlier of: (i) the first business day after transmission by facsimile or hand delivery or deposit with an overnight express service or overnight mail delivery service; or (ii) or three (3) calendar days after mailed, postage prepaid, in each case, and shall be addressed to the designated recipient, as follows:

      (a)    If to Lender:
              ------------

21

North Star Maritime, Inc.
30th Street and Balboa Avenue, Bldg. No. 39
City of Panama, Republic of Panama


(b)   If to Borrower:
      --------------

Pinnacle Three Corporation
17555 Collins Avenue, Apt 3702
Sunny Isles Beach, FL 33160
Tel. 786-556-5757


With a Copy to:
--------------

Leon Goldstein
17555 Collins Avenue, Apt 3702
Sunny Isles Beach, FL 33160

or to such other address as each party may designate for itself by
like notice.

11.9 Lender and Borrower acknowledge that there are no
agreements or understandings, written or oral, between Lender and
Borrower with respect to the Loan, other than as set forth herein,
in the Note(s) and the other Loan Documents and that this Agreement,
the Note(s) and the other Loan Documents contain the entire
agreement between Lender and Borrower with respect thereto. None of
the terms of this Agreement, the Note(s) and the other Loan
Documents may be amended except by an instrument executed by each of
the parties hereto.

11.10 No omission, or delay, by Lender at any time to enforce
any right or remedy reserved to it, or to require performance of any
of the terms, covenants or provisions hereof by Borrower at any time
designated, shall be a waiver of any such right or remedy to which
Lender is entitled, nor shall it in any way affect the right of
Lender to enforce such provisions thereafter.

11.11 All agreements, representations and warranties contained
in this Agreement or the Note, or in any Loan Documents delivered
pursuant hereto or in connection herewith shall be for the benefit
of Lender and any Assignee and shall survive the execution and
delivery of this Agreement or the Note and the expiration or other
termination of this Agreement or the Note.

11.12 This Agreement may be executed in any number of
counterparts, each of which shall be deemed an original, but all
such counterparts together shall constitute but one and the same
instrument.

22

11.13 CONFIDENTIALITY. Lender acknowledges that certain items of Collateral, including, but not limited to trade secrets, source codes, customer lists and certain other items of intellectual Property, and any Financial Statements provided pursuant to Section 6 hereof, constitute proprietary and confidential information of the Borrower (the "Confidential Information"). Accordingly, lender agrees that any Confidential Information it may obtain in the course of acquiring, perfecting or foreclosing on the Collateral or otherwise provided under this Agreement, provided such Confidential Information is marked as confidential by Borrower at the time of disclosure or is oral information which is confirmed in writing and marked as confidential with thirty (30) days following disclosure, shall be received in the strictest confidence and will not be disclosed to any other person or entity in any manner whatsoever, in whole or in part, without the prior written consent of the Borrower, unless and until Lender has acquired indefeasible title thereto.

11.14 This Agreement shall be binding upon, and shall inure to the benefit of, Borrower and its permitted assigns (if any). Borrower shall not assign its obligations under this Agreement, the Note(s) or any of the other Loan Documents without Lender's express written consent and any such attempted assignment shall be void and of no effect. Any assignment by Borrower in connection with a "Merger" (as defined below) shall be subject to Lender's prior consent. Any consent granted by Lender shall be conditioned upon such surviving entity or transferee assuming Borrower's Secured Obligations hereunder pursuant to assignment documents reasonably acceptable to Lender. If Lender reasonably withholds its consent to such assignment in connection with a Merger, the outstanding principal and accrued and unpaid interest shall be prepaid in whole in accordance with Section 2.6 hereof.

For purposes of this Agreement, a "Merger" shall mean any consolidation or merger of the Borrower with or into any other corporation or entity, any sale or conveyance of an or substantially all of the assets or stock of the Borrower by or to any other person or entity in which Borrower is not the surviving entity.

IN WITNESS WHEREOF, the Borrower and the Lender have duly executed and delivered this Agreement as of the day and year first above written.

BORROWER: PINNACLE THREE CORPORATION

By: _____

Title: PRESidEN

Date: 3 / 01 / 2007

23

BORROWER: LEON GOLDSTEIN

By: _____

Date: _____

LENDER:   NORTH STAR MARITIME, INC.

By: _____

Date: _____

WITNESS: _____

24

EXHIBIT A
SECURED PROMISSORY NOTE

$_____                          Date:_____

                                          Due :_____

        FOR VALUE RECEIVED, Pinnacle Three Corporation and Leon
Goldstein (the "Borrower") hereby promises to pay to the order of
North Star Maritime, Inc., a Panama corporation (the "Lender") at
30th Street and Balboa Avenue, Bldg. No. 39, City of Panama, Republic
of Panama or such other place of payment as the holder of this
Secured Promissory Note (this "Note") may specify from time to time
in writing, in lawful money of the United States of America, the
principal amount of _____ and 00/100 Dollars ($_____)
together with interest at eighteen percent (18.0%) per annum from
the date of this Note to maturity of each installment on the
principal hereof remaining from time to time unpaid, such principal
and interest to be paid in 36 equal monthly installments of
$_____ each, commencing _____ and on the same day of
each month thereafter to and including _____, such
installments to be applied first to accrued and unpaid interest and
the balance to unpaid principal. Interest shall be computed on the
basis of a year consisting of twelve months of thirty days each.

This Note is the Note referred to in, and is executed and delivered
in connection with, that certain Loan and Security Agreement of
dated as of _____, 20__ herewith by and between Borrower and
Lender (as the same may from time to time be amended, modified or
supplemented in accordance with its terms, the "Loan Agreement"),
and is entitled to the benefit and security of the Loan
Agreement and the other Loan Documents (as defined in the Loan
Agreement), to which reference is made for a statement of all of the
terms and conditions thereof. All terms defined in the Loan
Agreement shall have the same definitions when used herein, unless
otherwise defined herein.

The Borrower waives presentment and demand for payment, notice of
dishonor, protest and notice of protest and any other notice as
permitted under the UCC or any applicable law.

This Note has been delivered to Lender and is payable in the State
of Florida, and shall not become effective until accepted by Lender
in the State of Florida. This Note shall be governed by and
construed and enforced in accordance with, the laws of the State of
Florida, excluding any conflicts of law rules or principles that
would cause the application of the laws of any other jurisdiction.

Signatures on the following page:___

25

EXHIBIT B
ADVANCE REQUEST

Date: _____

To Lender:      North Star Maritime, Inc.
                30th Street and Balboa Avenue, Bldg. No. 39
                City of Panama, Republic of Panama

Borrower hereby requests from North Star Maritime, Inc. ("Lender")
an Advance in the amount of $_____ under that Loan and
Security Agreement between Borrower and Lender dated _____, 20__
(the "Agreement").

     Please:
     ------

     (a)      Issue a check payable to Borrower      _____

                                or

     (b)      Wire Funds to Borrower's account       _____

              Bank:        _____
              Address:     _____
                           _____
              ABA Number:  _____
              Account Number: _____
              Account Name: _____

Borrower hereby affirms that all Representations and Warranties of
Borrower set forth in Section 4 and all Conditions Precedent to Loan
set forth in Section 7 of the Agreement remain true and correct in
all material respects as of the date hereof.

     Executed this ____ day of _____, 20__ by:

              BORROWER:     PINNACLE THREE CORPORATION

              BY:      _____

              TITLE:   _____

              PRINT:   _____

27

MORTGAGE

THIS INDENTURE, made as of the 1st day of March 2007, by and between LEON GOLDSTEIN, of Florida hereinafter called "Mortgagor", and NORTH STAR MARITIME, INC. of Panama, hereinafter called "Mortgagee".

W I T N E S S E T H:

AMOUNT OF LIEN: "NOTE"

WHEREAS, Mortgagor is justly indebted to Mortgagee in the sum of ONE MILLION FIVE HUNDRED THOSAND DOLLARS ($1,500,000.00) in lawful money of the United States, and has agreed to pay the same, with interest thereon, according to the terms of a certain note (the "Note") given by Mortgagor to Mortgagee, bearing even date herewith.

DESCRIPTION OF PROPERTY SUBJECT TO LIEN: "PREMISES".

NOW, THEREFORE, in consideration of the premises and the sum hereinabove set forth, and to secure the payment of the Secured Indebtedness as defined herein, Mortgagor has granted, bargained, sold and conveyed, and by these presents does grant, bargain, sell and convey unto Mortgagee property situate in Miami Dade County, more particularly described in Exhibit "A" attached hereto and by this reference made a part hereof and having legal description as follows:

THE PINNACLE CONDO UNIT TS-2 UNDIV 0.49231 INT IN COMMON ELEMENTS OFF REC 18334-990 OR 21267-4536 05 2003 4

TOGETHER with all buildings, structures and other improvements now or hereafter located on, above or below the surface of the property hereinbefore described, or any part and parcel thereof; and,

TOGETHER with all and singular the tenements, hereditaments, easements, riparian and littoral rights, and appurtenances thereunto belonging or in anywise appertaining, whether now owned or hereafter acquired by Mortgagor, and including all rights of ingress and egress to and from adjoining property (whether such rights now exist or subsequently arise) together with the reversion or reversions, remainder and remainders, rents, issues and profits thereof; and also all the estate, right, title, interest, claim and demand whatsoever of Mortgagor of, in and to the same and of, in and to every part and parcel thereof; and,

TOGETHER with all machinery, apparatus, equipment, fittings, fixtures, whether actually or constructively attached to said property and including all trade, domestic and ornamental fixtures, and articles of personal property of every kind and nature whatsoever (hereinafter collectively called "Equipment"), now or hereafter located in, upon or under said property or any part thereof and used or usable in connection with any present or future operation of said property and now owned or hereafter acquired by Mortgagor; and,

TOGETHER with all the common elements appurtenant to any parcel, unit or lot which is all or part of the Premises; and, ALL the foregoing encumbered by this Mortgage being collectively referred to herein as the "Premises";

TO HAVE AND TO HOLD the Premises hereby granted to the use, benefit and behalf of the Mortgagee, forever.

## U.C.C. SECURITY AGREEMENT

It is agreed that if any of the property herein mortgaged is of a nature so that a security interest therein can be perfected under the Uniform Commercial Code, this instrument shall constitute a Security Agreement and Mortgagor agrees to join with the Mortgagee in the execution of any financing statements and to execute any and all other instruments that may be required for the perfection or renewal of such security interest under the Uniform Commercial Code.

## EQUITY OF REDEMPTION

Conditioned, however, that if Mortgagor shall promptly pay or cause to be paid to Mortgagee, at its address listed in the Note, or at such other place which may hereafter be designated by Mortgagee, its or their successors or assigns, with interest, the principal sum of ONE MILLION FIVE HUNDRED THOSAND DOLLARS ($1,500,000.00) with final maturity, if not sooner paid, as stated in said Note unless amended or extended according to the terms of the Note executed by Mortgagor and payable to the order of Mortgagee, then these presents shall cease and be void, otherwise these presents shall remain in full force and effect.

ARTICLE ONE

COVENANTS OF MORTGAGOR

Mortgagor covenants and agrees with Mortgagee as follows:

1.01     Secured Indebtedness.

This Mortgage is given as security for the Note and also as security for any and all other sums, indebtedness, obligations and liabilities of any and every kind arising, under the Note or this Mortgage, as amended or modified or supplemented from time to time, and any and all renewals, modifications or extensions of any or all of the foregoing (all of which are collectively referred to herein as the "Secured Indebtedness"), the entire Secured Indebtedness being equally secured with and having the same priority as any amounts owed at the date hereof.

1.02     Performance of Note, Mortgage, Etc.

Mortgagor shall perform, observe and comply with all provisions hereof and of the Note and shall promptly pay, in lawful money of the United States of America, to Mortgagee the

Secured Indebtedness with interest thereon as provided in the Note, this Mortgage and all other documents constituting the Secured Indebtedness.

1.03     Extent Of Payment Other Than Principal And Interest.

Mortgagor shall pay, when due and payable, (1) all taxes, assessments, general or special, and other charges levied on, or assessed, placed or made against the Premises, this instrument or the Secured Indebtedness or any interest of the Mortgagee in the Premises or the obligations secured hereby; (2) premiums on policies of fire and other hazard insurance covering the Premises, as required herein; (3) ground rents or other lease rentals; and (4) other sums related to the Premises or the indebtedness secured hereby, if any, payable by Mortgagor.

1.04     Insurance.

Mortgagor shall, at its sole cost and expense, keep the Premises insured against all hazards as is customary and reasonable for properties of similar type and nature located in Miami Dade County, Florida.

1.05     Care of Property.

Mortgagor shall maintain the Premises in good condition and repair and shall not commit or suffer any material waste to the Premises.

1.06    Prior Mortgage.

With regard to the Prior Mortgage, Mortgagor hereby agrees to:

(i)  Pay promptly, when due, all installments of principal and interest and all other sums and charges made payable by the Prior Mortgage;

(ii) Promptly perform and observe all of the terms, covenants and conditions required to be performed and observed by Mortgagor under the Prior Mortgage, within the period provided in said Prior Mortgage;

(iii) Promptly notify Mortgagee of any default, or notice claiming any event of default by Mortgagor in the performance or observance of any term, covenant or condition to be performed or observed by Mortgagor under any such Prior Mortgage.

(iv) Mortgagor will not request nor will it accept any voluntary future advances under the Prior Mortgage without Mortgagee's prior written consent, which consent shall not be unreasonably withheld.

ARTICLE TWO

DEFAULTS

2.01    Event of Default.

The occurrence of any one of the following events which shall not be cured within 30 days after written notice of the occurrence of the event, if the default is monetary, or which shall not be cured within 30 days after written notice from Mortgagee, if the default is non-monetary, shall constitute an "Event of Default":

(a)  Mortgagor fails to pay the Secured Indebtedness, or any part thereof, or the taxes, insurance and other charges, as hereinbefore provided, when and as the same shall become due and payable;

(b)  Any material warranty of Mortgagor herein contained, or contained in the Note, proves untrue or misleading in any material respect;

(c)   Mortgagor materially fails to keep, observe, perform, carry out and execute the covenants, agreements, obligations and conditions set out in this Mortgage, or in the Note;

(d)   Foreclosure proceedings (whether judicial or otherwise) are instituted on any mortgage or any lien of any kind secured by any portion of the Premises and affecting the priority of this Mortgage.

2.02     Options Of Mortgagee Upon Event Of Default.

Upon the occurrence of any Event of Default, the Mortgagee may immediately do any one or more of the following:

(a)   Declare the total Secured Indebtedness, including without limitation all payments for taxes, assessments, insurance premiums, liens, costs, expenses and attorney's fees herein specified, without notice to Mortgagor (such notice being hereby expressly waived), to be due and collectible at once, by foreclosure or otherwise;

(b)   Pursue any and all remedies available under the Uniform Commercial Code; it being hereby agreed that ten (10) days' notice as to the time, date and place of any proposed sale shall be reasonable;

(c)   In the event that Mortgagee elects to accelerate the maturity of the Secured Indebtedness and declares the Secured Indebtedness to be due and payable in full at once as provided for in Paragraph 2.02(a) hereinabove, or as may be provided for in the Note, or any other provision or term of this Mortgage, then Mortgagee shall have the right to pursue all of Mortgagee's rights and remedies for the collection of such Secured Indebtedness, whether such rights and remedies are granted by this Mortgage, any other agreement, law, equity or otherwise, to include, without limitation, the institution of foreclosure proceedings against the Premises under the terms of this Mortgage and any applicable state or federal law.

ARTICLE THREE

MISCELLANEOUS PROVISIONS

3.01     Prior Liens.

Mortgagor shall keep the Premises free from all prior liens (except for those consented to by Mortgagee).

3.02     Notice, Demand and Request.

Every provision for notice and demand or request shall be deemed fulfilled by written notice and demand or request delivered in accordance with the provisions of the Note relating to notice.

    3.03      Meaning of Words.

The words "Mortgagor" and "Mortgagee" whenever used herein shall include all individuals, corporations (and if a corporation, its officers, employees or agents), trusts and any and all other persons or entities, and the respective heirs, executors, administrators, legal representatives, successors and assigns of the parties hereto, and all those holding under either of them. The pronouns used herein shall include, when appropriate, gender and both singular and plural.  The word "Note" shall also include one or more notes and the grammatical construction of sentences shall conform thereto.

    3.04      Severability.

If any provision of this Mortgage or any other Loan Document or the application thereof shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of the instrument in which such provision is contained, nor the application of the provision to other persons, entities or circumstances, nor any other instrument referred to hereinabove shall be affected thereby, but instead shall be enforced to the maximum extent permitted by law.

    3.05      Governing Law.

The terms and provisions of this Mortgage are to be governed by the laws of the State of Florida. No payment of interest or in the nature of interest for any debt secured in part by this Mortgage shall exceed the maximum amount permitted by law. Any payment in excess of the maximum amount shall be applied or disbursed as provided in the Note in regard to such amounts which are paid by the Mortgagor or received by the Mortgagee.

    3.06      Descriptive Headings.

The descriptive headings used herein are for convenience of reference only, and they are not intended to have any effect whatsoever in determining the rights or obligations of the Mortgagor or Mortgagee and they shall not be used in the interpretation or construction hereof.

    3.07      Attorney's Fees.

As used in this Mortgage, attorneys' fees shall include, but not be limited to, fees incurred in all matters of collection and enforcement, construction and interpretation, before, during and after suit, trial, proceedings and appeals. Attorneys' fees shall

also include hourly charges for paralegals, law clerks and other staff members operating under the supervision of an attorney.

    3.08    Exculpation.

    Notwithstanding anything contained herein to the contrary, the Note which this Mortgage secures is a non-recourse Note and such Note shall be enforced against Mortgagor only to the extent of Mortgagor's interest in the Premises as described herein and to the extent of Mortgagor's interest in any personally as may be described herein.

    IN WITNESS WHEREOF, the Mortgagor has caused this instrument to be duly executed as of the day and year first above written.

Mortgagor:

_____
LEON GOLDSTEIN

Mortgagee:

_____
NORTH STAR MARITIME, INC.

Witness 1:

_____

Witness 2:

_____



**FLORIDA DEPARTMENT OF STATE**
**DIVISION OF CORPORATIONS**

## Detail by Entity Name

<u>**Florida Profit Corporation**</u>

NORTH STAR MARITIME, INC.

<u>**Filing Information**</u>

| | |
|---|---|
| **Document Number** | P93000005481 |
| **FEI/EIN Number** | 650382387 |
| **Date Filed** | 01/25/1993 |
| **State** | FL |
| **Status** | ACTIVE |
| **Last Event** | REINSTATEMENT |
| **Event Date Filed** | 02/10/2000 |
| **Event Effective Date** | NONE |

<u>**Principal Address**</u>

916 COCONUT DRIVE
FT LAUDERDALE, FL 33315

Changed: 05/14/2001

<u>**Mailing Address**</u>

916 COCONUT DRIVE
FT LAUDERDALE, FL 33315

Changed: 02/18/2010

<u>**Registered Agent Name & Address**</u>

O'BRIEN, ROBIN
916 COCONUT DRIVE
FT LAUDERDALE, FL 33315

<u>**Officer/Director Detail**</u>

**Name & Address**

Title P

O'BRIEN, ROBIN
916 COCONUT DRIVE
FT LAUDERDALE, FL 33315

Title VP

O'BRIEN, PATRICK

916 COCONUT DRIVE
FT LAUDERDALE, FL 33315

**Annual Reports**

| Report Year | Filed Date |
|-------------|------------|
| 2012 | 01/13/2012 |
| 2013 | 04/14/2013 |
| 2014 | 01/11/2014 |

**Document Images**

| | |
|---|---|
| 01/11/2014 -- ANNUAL REPORT | View image in PDF format |
| 04/14/2013 -- ANNUAL REPORT | View image in PDF format |
| 01/13/2012 -- ANNUAL REPORT | View image in PDF format |
| 03/11/2011 -- ANNUAL REPORT | View image in PDF format |
| 02/18/2010 -- ANNUAL REPORT | View image in PDF format |
| 01/28/2009 -- ANNUAL REPORT | View image in PDF format |
| 01/24/2008 -- ANNUAL REPORT | View image in PDF format |
| 02/26/2007 -- ANNUAL REPORT | View image in PDF format |
| 01/20/2006 -- ANNUAL REPORT | View image in PDF format |
| 03/11/2005 -- ANNUAL REPORT | View image in PDF format |
| 02/23/2004 -- ANNUAL REPORT | View image in PDF format |
| 01/27/2003 -- ANNUAL REPORT | View image in PDF format |
| 04/28/2002 -- ANNUAL REPORT | View image in PDF format |
| 05/14/2001 -- ANNUAL REPORT | View image in PDF format |
| 02/10/2000 -- REINSTATEMENT | View image in PDF format |
| 04/10/1998 -- ANNUAL REPORT | View image in PDF format |
| 04/15/1997 -- ANNUAL REPORT | View image in PDF format |
| 03/15/1996 -- ANNUAL REPORT | View image in PDF format |
| 05/26/1995 -- ANNUAL REPORT | View image in PDF format |

Copyright © and Privacy Policies
State of Florida, Department of State




**FLORIDA DEPARTMENT OF STATE
DIVISION OF CORPORATIONS**

# Detail by Entity Name

**Florida Limited Liability Company**

NORTH STAR MARITIME MIAMI, LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L13000065550 |
| **FEI/EIN Number** | APPLIED FOR |
| **Date Filed** | 05/03/2013 |
| **State** | FL |
| **Status** | ACTIVE |
| **Effective Date** | 05/03/2013 |

**Principal Address**

3363 NE 163 STREET
707
NORTH MIAMI BEACH, FL 33160

**Mailing Address**

3363 NE 163 STREET
707
NORTH MIAMI BEACH, FL 33160

**Registered Agent Name & Address**

KEIFITZ, MIKHAEL E, ESQ
3363 NE 163 STREET
708
NORTH MIAMI BEACH, FL 33160

**Authorized Person(s) Detail**

**Name & Address**

Title MGRM

NORTH STAR MARITIME, INC
3363 NE 163 STREET, SUITE # 707
NORTH MIAMI BEACH, FL 33160

Title MGRM

YELIZAROV, OLEKSANDR
3363 NE 163 STREET, SUITE # 707
NORTH MIAMI BEACH, FL 33160

**Annual Reports**

| Report Year | Filed Date |
|---|---|
| 2014 | 04/16/2014 |

**Document Images**

| | |
|---|---|
| 04/16/2014 -- ANNUAL REPORT | View image in PDF format |
| 05/03/2013 -- Florida Limited Liability | View image in PDF format |

Copyright © and Privacy Policies
State of Florida, Department of State

# PROMISSORY NOTE

$150,000.00                                                     March 27, 2013

FOR VALUE RECEIVED, the undersigned 40 RETAIL CORPORATION, a Florida corporation, CENTURY DRIVE RETAIL CORPORATION, a Florida corporation and STERLINGTON RETAIL CORPORATION, a Florida corporation (collectively "Borrower"), jointly and severally, promise to pay to the order of PINNACLE THREE CORPORATION, a Florida corporation ("Lender"), with payment to be made to Pinnacle Three Corporation and sent to: 17555 Collins Avenue, #3702, Sunny Isles, FL 33130, or at such other place as Lender may from time to time designate to Borrower in writing, with a signature of Lender notarized by an attestation admissible in a Florida Court, in lawful money of the United States of America the principal sum of ONE HUNDRED FIFTY THOUSAND and 00/100 DOLLARS ($150,000.00), in the manner provided herein. This Promissory Note ("Note") is secured by certain guarantees, mortgage(s), deed(s) of trust, security agreement(s) and UCC-1 Financing Statement(s) (collectively, the "Security Documents").

1.      Payment. The entire principal amount hereunder shall be due and payable in full on the 13th day of May, 2013 (the "Maturity Date"). If payment in full is not made on or before the Maturity Date, or upon the occurrence of any other Event of Default, interest will accrue on the unpaid principal amount at the lesser of (i) 18% per annum or (ii) the maximum rate permitted by applicable law ("Default Rate"), and shall be due and payable ON DEMAND. Any judgment obtained by Lender against Borrower as to any amounts due under this Note shall also bear interest at the Default Rate.

2.      Prepayment. Borrower may, without premium or penalty, at any time and from time to time, prepay all or any portion of the outstanding principal balance due hereunder.

3.      Set-off. Borrower will have no right to withhold and set-off against any amount due hereunder the amount of any claim for indemnification or payment of damages to which Borrower may be entitled from Lender.

4.      Default.

4.1.    The occurrence of anyone or more of the following events will constitute an event of default hereunder ("Event of Default"):

(a)     If Borrower fails to pay when due any payment due under this Note; and if such payment is not made within two (2) business days after Lender's delivery to Borrower of written notice of such failure, except no notice shall be required in the event of any bankruptcy or similar proceedings affecting any Borrower, or if notice of a late payment has already been provided once in the last six (6) months.

(b)     The occurrence of any Event of Default under that certain promissory note in the principal amount of $2,100,000.00 executed by Borrower in favor of Lender dated as of even date herewith.



(c)    The occurrence of any Event of Default under (i) that certain promissory note in the principal amount of $900,000.00 executed by ATM Express, Inc., a Florida corporation ("ATM"), Speedway Video, Inc., a Florida corporation ("Speedway") and Augusta Video, Inc., a Georgia corporation ("Augusta") in favor of Aidar Saifoutdinov ("Aidar") dated as of even date herewith and/or (ii) that certain promissory note in the principal amount of $1,900,000.00 executed by ATM, Speedway and Augusta in favor of Aidar dated as of even date herewith.

(d)    The occurrence of any Event of Default under any of the Security Documents.

4.2.    Upon the occurrence of an Event of Default, Lender may, at its option: (a) declare the entire unpaid principal balance of this Note (together with all interest accrued thereon) immediately due and payable; and (b) exercise any and all rights and remedies available to it under applicable law, including, the right to collect from Borrower all sums due under this Note and the Security Documents; and (c) exercise its rights under the Security Documents.  The rights and remedies of Lender under this Note and the Security Documents are cumulative.  No waiver by Lender of any right or remedy under this Note will be effective unless in writing signed by Lender.  Neither the failure nor any delay in exercising any right, power or privilege under this Note will operate as a waiver of such right, power or privilege and no single or partial exercise of any such right, power or privilege by Lender will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.

4.3.    Borrower will pay on demand all costs and expenses incurred by or on behalf of Lender in connection with Lender's exercise of any or all of its rights and remedies under this Note and/or the Security Documents after an Event of Default, including reasonable attorneys' fees, expenses and disbursements.  In the event of any litigation, the prevailing party shall be entitled to reasonable attorney's fees and costs.

4.4.    Borrower hereby waives presentment, demand, protest and notice of dishonor and protest.

5.    Notices.  All notices, demands and communications given or made hereunder or pursuant hereto shall be in writing and shall be delivered by Federal Express, UPS or other national courier via overnight delivery, addressed in each case as follows and shall be deemed to have been given or made when so delivered:

To Lender:        Pinnacle Three Corporation
                  17555 Collins Avenue, #3702
                  Sunny Isles, FL  33130

2



With a copy to:          Michael P. Hamaway, Esquire
                         Mombach, Boyle & Hardin, P.A.
                         500 East Broward Boulevard, Suite 1950
                         Fort Lauderdale, FL 33394

To Borrower:             40 Retail Corporation
                         3469 NE 169th Street
                         North Miami Beach, FL 33160
                         Attn: Evgueni Souliaguine

                         Century Drive Retail Corporation
                         3469 NE 169th Street
                         North Miami Beach, FL 33160
                         Attn: Evgueni Souliaguine

                         Sterlington Retail Corporation
                         3469 NE 169th Street
                         North Miami Beach, FL 33160
                         Attn: Evgueni Souliaguine

With a copy to:          Ricardo A. Reyes, Esq.
                         Tobin & Reyes, P.A.
                         5355 Town Center Road, Suite 204
                         Boca Raton, FL 33486

or to such other address or to such other person as any party shall designate to the others for such purposes in the manner hereinabove set forth.

6.    _Governing Law; Consent to Jurisdiction._ (a) This Agreement will be governed by the law of the State of Florida without giving effect to the conflict of laws principles thereof. (b) Borrower and Lender hereby consent to the jurisdiction of the State Courts of Miami-Dade County for all purposes in connection with any dispute or controversy arising hereunder.

7.    _Non Assignability._  This Note shall not be assigned or transferred by Lender without the written consent of Borrower. This Note shall not be assigned or transferred by Borrower (including by operation of law) without the express written consent of Lender.

8.    _Stamp Tax._ DOCUMENTARY STAMP TAX IS BEING PAID BY BORROWER AND REMITTED TO THE FLORIDA DEPARTMENT OF REVENUE WITH THE RECORDATION OF THE MORTGAGE/DEED OF TRUST SECURING THIS NOTE.

9.    _WAIVER OF JURY TRIAL._ BORROWER AND LENDER HEREBY MUTUALLY, KNOWINGLY, WILLINGLY, AND VOLUNTARILY WAIVE THEIR RIGHT TO TRIAL BY JURY AND NO PARTY NOR ANY ASSIGNEE, SUCCESSOR, HEIR, OR LEGAL REPRESENTATIVE OF THE PARTIES (ALL OF WHOM ARE HEREINAFTER COLLECTIVELY REFERRED TO AS THE "PARTIES") SHALL SEEK A JURY TRIAL IN ANY LAWSUIT, PROCEEDING, COUNTERCLAIM OR ANY OTHER LITIGATION

3



PROCEEDING BASED UPON OR ARISING OUT OF THIS NOTE OR THE OTHER LOAN DOCUMENTS OR ANY INSTRUMENT EVIDENCING, SECURING OR RELATING TO THIS NOTE OR THE OTHER LOAN DOCUMENTS, THE INDEBTEDNESS OR OTHER OBLIGATIONS REFERRED TO HEREIN OR ANY RELATED AGREEMENT OR INSTRUMENT, ANY OTHER COLLATERAL FOR THE INDEBTEDNESS REFERRED TO HEREIN OR ANY COURSE OF ACTION, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS RELATING TO THE LOAN OR TO THIS NOTE.   THE PARTIES ALSO WAIVE ANY RIGHT TO CONSOLIDATE ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL HAS NOT BEEN WAIVED.   THE PROVISIONS OF THIS PARAGRAPH HAVE BEEN FULLY NEGOTIATED BY THE PARTIES.   THE WAIVER CONTAINED HEREIN IS IRREVOCABLE, CONSTITUTES A KNOWING AND VOLUNTARY WAIVER, AND SHALL BE SUBJECT TO NO EXCEPTIONS.

IN WITNESS WHEREOF, Borrower has executed and delivered this Note as of the date first above written.

**BORROWER:**

40 RETAIL CORPORATION, a Florida corporation

By:_____

Name:_____

Title:_____

(Corporate Seal)

CENTURY DRIVE RETAIL CORPORATION, a Florida corporation

By:_____

Name:_____

Title:_____

(Corporate Seal)

4

STERLINGTON RETAIL CORPORATION, a
Florida corporation

By: _____

Name: _____

Title: _____

(Corporate Seal)

N:\msp\Sekevitchsk, Rodion\SETTLEMENT\Promissory Note $150,000 Note.doc

CORP/LLC - File Detail Report                                                                    Page 1 of 1



## CORPORATION FILE DETAIL REPORT

| | | | |
|---|---|---|---|
| Entity Name | PINNACLE THREE CORPORATION | File Number | 63114537 |
| Status | DISSOLVED | | |
| Entity Type | CORPORATION | Type of Corp | DOMESTIC BCA |
| Incorporation Date (Domestic) | 09/25/2003 | State | ILLINOIS |
| Agent Name | NATIONAL REGISTERED AGENTS INC | Agent Change Date | 08/29/2012 |
| Agent Street Address | 200 WEST ADAMS STREET | President Name & Address | LEON GOLDSTEIN 1445 WINDJAMMER WAY HOLLYWOOD FL 33019 |
| Agent City | CHICAGO | Secretary Name & Address | INVOLUNTARY DISSOLUTION 02 14 14 |
| Agent Zip | 60606 | Duration Date | PERPETUAL |
| Annual Report Filing Date | 00/00/0000 | For Year | 2013 |

Return to the Search Screen

BACK TO CYBERDRIVEILLINOIS.COM HOME PAGE

http://www.ilsos.gov/corporatellc/CorporateLlcController                              11/14/2014

261 09/10/2014 1:19 PM Pg 43

HIXSON, MARIN, DESANCTIS & COMPANY, P.A.
20900 W DIXIE HWY
AVENTURA, FL 33180-1131

LEON GOLDSTEIN
17555 COLLINS AVENUE, SUITE 3702
SUNNY ISLES, FL 33160

261 09/10/2014 1:19 PM Pg 44

# HIXSON, MARIN, DESANCTIS & COMPANY, P.A.
## 20900 W DIXIE HWY
## AVENTURA, FL 33180-1131
## 305-944-7001

September 10, 2014

**CONFIDENTIAL**

LEON GOLDSTEIN
17555 COLLINS AVENUE, SUITE 3702
SUNNY ISLES, FL  33160

Dear Shareholder:

We have prepared the enclosed copy of Form 1120S, Schedule K-1 for 40 RETAIL
CORPORATION. It contains your share of the corporation's items of income (loss), credits and
deductions, and other information for the corporation's tax year ended December 31, 2013. These
items are to be reported on your federal income tax return; therefore, this Schedule should be
retained with your tax records and documentation.

Also enclosed is state K-1 information, if applicable. This information should also be retained
with your tax records and documentation.

Also enclosed is shareholder basis information. This information consists of your stock and loan
basis in the corporation and, if applicable, your share of any suspended or disallowed losses.
Retain this information with your tax records; it may be needed to complete your federal income
tax return.

If you have any questions, or if we can be of assistance in any way, please do not hesitate to call.

Sincerely,


HIXSON, MARIN, DESANCTIS & COMPANY, P.A.

671113

| Final K-1 | Amended K-1 |

OMB No. 1545-0130

## Schedule K-1 (Form 1120S)
Department of the Treasury
Internal Revenue Service

**2013**

For calendar year 2013, or tax

year beginning _____

ending _____

### Shareholder's Share of Income, Deductions, Credits, etc.
▶ See back of form and separate instructions.

**Part I    Information About the Corporation**

**A** Corporation's employer identification number
20-3385449

**B** Corporation's name, address, city, state, and ZIP code
**40 RETAIL CORPORATION**

**C/O HMD 20900 WEST DIXIE HIGHWAY**
**AVENTURA          FL 33180**

**C** IRS Center where corporation filed return
E-FILE

**Part II    Information About the Shareholder**

**D** Shareholder's identifying number
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

**E** Shareholder's name, address, city, state, and ZIP code
**LEON GOLDSTEIN**
**17555 COLLINS AVENUE, SUITE 3702**

**SUNNY ISLES         FL 33160**

**F** Shareholder's percentage of stock ownership for tax year .................... **33.000000** %

For IRS Use Only

**Part III    Shareholder's Share of Current Year Income, Deductions, Credits, and Other Items**

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss)<br>−95,102 | 13 | Credits |
| 2 | Net rental real estate income (loss) | | |
| 3 | Other net rental income (loss) | | |
| 4 | Interest income | | |
| 5a | Ordinary dividends | | |
| 5b | Qualified dividends | 14 | Foreign transactions |
| 6 | Royalties | | |
| 7 | Net short-term capital gain (loss) | | |
| 8a | Net long-term capital gain (loss) | | |
| 8b | Collectibles (28%) gain (loss) | | |
| 8c | Unrecaptured section 1250 gain | | |
| 9 | Net section 1231 gain (loss) | | |
| 10 | Other income (loss) | 15 | Alternative minimum tax (AMT) items |
| 11 | Section 179 deduction | 16 | Items affecting shareholder basis |
| 12 | Other deductions | | |
| | | 17 | Other information |

\* See attached statement for additional information.

For Paperwork Reduction Act Notice, see Instructions for Form 1120S.    IRS.gov/form1120s

Schedule K-1 (Form 1120S) 2013

DAA

Schedule K-1 (Form 1120S) 2013

This list identifies the codes used on Schedule K-1 for all shareholders and provides summarized reporting information for shareholders who file Form 1040. For detailed reporting and filing information, see the separate Shareholder's Instructions for Schedule K-1 and the instructions for your income tax return.



1. **Ordinary business income (loss)** Determine whether the income (loss) is passive or nonpassive and enter on your return as follows:

| | Report on |
|---|---|
| Passive loss | See the Shareholder's Instructions |
| Passive income | Schedule E, line 28, column (g) |
| Nonpassive loss | Schedule E, line 28, column (h) |
| Nonpassive income | Schedule E, line 28, column (j) |

2. **Net rental real estate income (loss)** — See the Shareholder's Instructions

3. **Other net rental income (loss)**
   - Net income — Schedule E, line 28, column (g)
   - Net loss — See the Shareholder's Instructions

4. **Interest income** — Form 1040, line 8a

5a. **Ordinary dividends** — Form 1040, line 9a

5b. **Qualified dividends** — Form 1040, line 9b

6. **Royalties** — Schedule E, line 4

7. **Net short-term capital gain (loss)** — Schedule D, line 5

8a. **Net long-term capital gain (loss)** — Schedule D, line 12

8b. **Collectibles (28%) gain (loss)** — 28% Rate Gain Worksheet, line 4 (Schedule D instructions)

8c. **Unrecaptured section 1250 gain** — See the Shareholder's Instructions

9. **Net section 1231 gain (loss)** — See the Shareholder's Instructions

10. **Other income (loss)**

   Code
   - A Other portfolio income (loss) — See the Shareholder's Instructions
   - B Involuntary conversions — See the Shareholder's Instructions
   - C Sec. 1256 contracts & straddles — Form 6781, line 1
   - D Mining exploration costs recapture — See Pub. 535
   - E Other income (loss) — See the Shareholder's Instructions

11. **Section 179 deduction** — See the Shareholder's Instructions

12. **Other deductions**
   - A Cash contributions (50%)
   - B Cash contributions (30%)
   - C Noncash contributions (50%)
   - D Noncash contributions (30%)
   - E Capital gain property to a 50% organization (30%)
   - F Capital gain property (20%)
   - G Contributions (100%)

   See the Shareholder's Instructions

   - H Investment interest expense — Form 4952, line 1
   - I Deductions—royalty income — Schedule E, line 19
   - J Section 59(e)(2) expenditures — See the Shareholder's Instructions
   - K Deductions—portfolio (2% floor) — Schedule A, line 23
   - L Deductions—portfolio (other) — Schedule A, line 28
   - M Preproductive period expenses — See the Shareholder's Instructions
   - N Commercial revitalization deduction from rental real estate activities — See Form 8582 instructions
   - O Reforestation expense deduction — See the Shareholder's Instructions
   - P Domestic production activities information — See Form 8903 instructions
   - Q Qualified production activities income — Form 8903, line 7b
   - R Employer's Form W-2 wages — Form 8903, line 17
   - S Other deductions — See the Shareholder's Instructions

13. **Credits**
   - A Low-income housing credit (section 42(j)(5)) from pre-2008 buildings
   - B Low-income housing credit (other) from pre-2008 buildings
   - C Low-income housing credit (section 42(j)(5)) from post-2007 buildings
   - D Low-income housing credit (other) from post-2007 buildings

   See the Shareholder's Instructions

   - E Qualified rehabilitation expenditures (rental real estate)
   - F Other rental real estate credits
   - G Other rental credits
   - H Undistributed capital gains credit — Form 1040, line 71, box a
   - I Biofuel producer credit
   - J Work opportunity credit
   - K Disabled access credit
   - L Empowerment zone employment credit

   See the Shareholder's Instructions

   - M Credit for increasing research activities

---

| | Code | | Report on |
|---|---|---|---|
| | N | Credit for employer social security and Medicare taxes | See the Shareholder's Instructions |
| | O | Backup withholding | |
| | P | Other credits | |

14. **Foreign transactions**
   - A Name of country or U.S. possession
   - B Gross income from all sources — Form 1116, Part I
   - C Gross income sourced at shareholder level

   Foreign gross income sourced at corporate level
   - D Passive category
   - E General category — Form 1116, Part I
   - F Other

   Deductions allocated and apportioned at shareholder level
   - G Interest expense — Form 1116, Part I
   - H Other — Form 1116, Part I

   Deductions allocated and apportioned at corporate level to foreign source income
   - I Passive category
   - J General category — Form 1116, Part I
   - K Other

   Other information
   - L Total foreign taxes paid — Form 1116, Part II
   - M Total foreign taxes accrued — Form 1116, Part II
   - N Reduction in taxes available for credit — Form 1116, line 12
   - O Foreign trading gross receipts — Form 8873
   - P Extraterritorial income exclusion — Form 8873
   - Q Other foreign transactions — See the Shareholder's Instructions

15. **Alternative minimum tax (AMT) items**
   - A Post-1986 depreciation adjustment
   - B Adjusted gain or loss
   - C Depletion (other than oil & gas)
   - D Oil, gas, & geothermal—gross income
   - E Oil, gas, & geothermal—deductions
   - F Other AMT items

   See the Shareholder's Instructions and the Instructions for Form 6251

16. **Items affecting shareholder basis**
   - A Tax-exempt interest income — Form 1040, line 8b
   - B Other tax-exempt income
   - C Nondeductible expenses
   - D Distributions
   - E Repayment of loans from shareholders

   See the Shareholder's Instructions

17. **Other Information**
   - A Investment income — Form 4952, line 4a
   - B Investment expenses — Form 4952, line 5
   - C Qualified rehabilitation expenditures (other than rental real estate) — See the Shareholder's Instructions
   - D Basis of energy property
   - E Recapture of low-income housing credit (section 42(j)(5)) — Form 8611, line 8
   - F Recapture of low-income housing credit (other) — Form 8611, line 8
   - G Recapture of investment credit — See Form 4255
   - H Recapture of other credits — See the Shareholder's Instructions
   - I Look-back interest—completed long-term contracts — See Form 8697
   - J Look-back interest—income forecast method — See Form 8866
   - K Dispositions of property with section 179 deductions
   - L Recapture of section 179 deduction
   - M Section 453(l)(3) information
   - N Section 453A(c) information
   - O Section 1260(b) information
   - P Interest allocable to production expenditures
   - Q CCF nonqualified withdrawals
   - R Depletion information—oil and gas
   - S Amortization of reforestation costs
   - T Section 108(i) information
   - U Net investment income
   - V Other information

   See the Shareholder's Instructions

DAA

## Shareholder's Basis Worksheet Page 1

| Form **1120S** | | | **2013** |
|---|---|---|---|
| **Schedule K-1** | For calendar year 2013 or tax year beginning | , ending | |

| Name | **40 RETAIL CORPORATION** | Taxpayer Identification Number | **20-3385449** |
|---|---|---|---|
| | **LEON GOLDSTEIN** | | **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** |

### Stock Basis

| | | |
|---|---|---:|
| 1. | Beginning of year stock basis | 23,477 |
| 2. | Capital contributions | |
| | **Additions:** | |
| 3. | Ordinary business income | |
| 4. | Net rental income | |
| 5. | Interest, dividends, royalties and net capital gains | |
| 6. | Net section 1231 gain | |
| 7. | Tax-exempt interest and other income | |
| 8. | Other income | |
| 9. | Gain on disposal of Section 179 assets | |
| 10. | Other increases | |
| 11. | Subtotal (Add line 1 through line 10) | 23,477 |
| | **Subtractions:** | |
| 12. | Distributions | |
| 13. | Total losses and deductions applied against stock basis (See Shareholder's Basis Worksheet Page 2) | 23,477 |
| 14. | Other decreases | |
| 15. | Amount used to restore loan basis | |
| 16. | End of year stock basis (Subtract the sum of lines 12 through 15 from line 11) | 0 |

### Loan Basis

| | | |
|---|---|---:|
| 17. | Beginning of year loan basis | |
| 18. | Loans to corporation | |
| 19. | Loan basis restored - amount used in prior years to offset losses | |
| 20. | Other increases | |
| 21. | Loan repayments | |
| 22. | Total losses and deductions applied against loan basis (See Shareholder's Basis Worksheet Page 2) | |
| 23. | Other decreases | |
| 24. | End of year loan basis (Subtract the sum of lines 21 through 23 from the sum of lines 17 through 20) | 0 |
| 25. | End of year stock and loan basis (Add line 16 and line 24) | 0 |
| | Principal amount of loan owed to shareholder at end of the year | 0 |

### Gain Recognized on Excess Distributions

| | | |
|---|---|---:|
| 26. | Distributions | |
| 27. | Stock basis before distributions and loss items | |
| 28. | Gain recognized on excess distributions (Subtract line 27 from line 26) | |

### Gain Recognized on Repayment of Shareholder Loan

| | | |
|---|---|---:|
| 29. | Loan basis at beginning of tax year | |
| 30. | Loan basis restored - amount used in prior years to offset losses | |
| 31. | Loan basis before loan repayment (Add line 29 and line 30) | |
| 32. | Shareholder loan at beginning of tax year | |
| 33. | Loan repayments to shareholder during tax year | |
| 34. | Nontaxable return of loan basis ((Line 31 divided by line 32) multiplied by line 33) | |
| 35. | Gain recognized on repayment of shareholder loan (Subtract line 34 from line 33) | |

Note to shareholder:  This worksheet was prepared based on corporation records. Please consult with your tax advisor for adjustments.

261 09/10/2014 1:19 PM

| Form **1120S** Schedule K-1 | **Shareholder's Basis Worksheet Page 2** | **2013** |

For calendar year 2013 or tax year beginning _____, ending _____

| Name | Taxpayer Identification Number |
| **40 RETAIL CORPORATION** <br> **LEON GOLDSTEIN** | 20-3385449 <br> 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 |

## Loss Allocated to Stock and Loan Basis

| | Suspended Losses | Current Year Loss | Total Loss | Percent | Allowed Stock Loss | Disallowed Loss | Percent | Allowed Loan Loss | Loss to Carryforward | Total Allowed Loss |
|---|---|---|---|---|---|---|---|---|---|---|
| Nondeductible noncap expenses | | | | | | | | | | |
| Deductible items: | | | | | | | | | | |
| Ordinary business loss ........ | | 95,102 | 95,102 | 100.00 | 23,477 | 71,625 | 100.00 | | 71,625 | 23,477 |
| Net rental real estate loss ..... | | | | | | | | | | |
| Other net rental loss .......... | | | | | | | | | | |
| Short-term capital loss ........ | | | | | | | | | | |
| Long-term capital loss ........ | | | | | | | | | | |
| Net section 1231 loss ......... | | | | | | | | | | |
| Other portfolio loss ........... | | | | | | | | | | |
| Other losses ................. | | | | | | | | | | |
| Section 179 expense .......... | | | | | | | | | | |
| Cash contributions (50%) ..... | | | | | | | | | | |
| Cash contributions (30%) ..... | | | | | | | | | | |
| Noncash contributions (50%) . | | | | | | | | | | |
| Qual conserv contrib (50%) ... | | | | | | | | | | |
| Noncash contributions (30%) . | | | | | | | | | | |
| Cap gain prop 50% org (30%) . | | | | | | | | | | |
| Cap gain prop (20%) ......... | | | | | | | | | | |
| Qual conserv contrib (100%) . | | | | | | | | | | |
| Portfolio deductions (2% floor) | | | | | | | | | | |
| Portfolio deductions (other) ... | | | | | | | | | | |
| Investment interest expense .. | | | | | | | | | | |
| Deductions-royalty income .... | | | | | | | | | | |
| Section 59(e)(2) expend ....... | | | | | | | | | | |
| Preproductive period exp ...... | | | | | | | | | | |
| Commercial revitalization ded . | | | | | | | | | | |
| Reforestation expense ded .... | | | | | | | | | | |
| Other deductions .............. | | | | | | | | | | |
| Foreign taxes ................ | | | | | | | | | | |
| Loss on disposal of 179 assets | | | | | | | | | | |
| Total deductible items ....... | | 95,102 | 95,102 | 100.00 | 23,477 | 71,625 | 100.00 | | 71,625 | 23,477 |
| Total nonded and deductible items | | 95,102 | 95,102 | | 23,477 | 71,625 | | | 71,625 | 23,477 |

Note to shareholder:  This worksheet was prepared based on corporation records. Please consult with your tax advisor for adjustments.

261 09/10/2014 1:19 PM

| Form **AR1100S** | AR Shareholder Income, Deductions & Credits Worksheet, Page 1 | **2013** |
|---|---|---|

Tax Year beginning **01/01/13** , and ending **12/31/13**

| Shareholder's identifying number **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** | Corporation's identifying number **20-3385449** |
|---|---|
| Shareholder's name, address, and ZIP code | Corporation's name, address, and ZIP code |
| **LEON GOLDSTEIN**<br>**17555 COLLINS AVENUE, SUITE 3702**<br>**SUNNY ISLES       FL   33160** | **40 RETAIL CORPORATION**<br>**C/O HMD 20900 WEST DIXIE HIGHWAY**<br>**AVENTURA            FL   33180** |

Final return ............................................................
Exempt from withholding ................................... **[X]**
Ownership percentage ........................ **33.000000**

Withholding ....................................................... ☐
Composite filer .................................................
Arkansas apportionment percentage ............... **100.000000**

## Shareholder's Share of Arkansas Income and Deductions

Income
Ordinary income .................................................................. **-95,102**
Interest income ..................................................................
Dividend income ..................................................................
Rental income ..................................................................
Royalty income ..................................................................
Net short-term capital gain or loss ..................................
Net long-term capital gain or loss ..................................
Net 1231 gain or loss ........................................................
Section 108(i) deferred income ..................................
Other income (loss) ..................................................................
Total income ..................................................................... **-95,102**

Deductions
Charitable contributions ..................................................................
Section 179 expense deduction ..................................
Section 108(i) deferred expense ..................................
Other expenses (adjustments) .............. **SEE STMT 1**  **571**
Total deductions ..................................................................... **571**

## Apportioned and Allocated Income

Arkansas apportioned income ................................ **-95,673**
Arkansas allocated income ..................................................................
Net income or loss ..................................................... **-95,673**

## Taxes

Taxes withheld or paid on behalf of nonresident shareholder ..................................
Composite tax ..................................................................

## Other Information

Supplemental information ..................................................................

261  40 RETAIL CORPORATION
20-3385449
FYE: 12/31/2013

**Arkansas Statements**
**LEON GOLDSTEIN**
**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**

9/10/2014  1:19 PM

## Statement 1 - Shareholder Worksheet - Other Expenses

| Description | Total Amount | Adjustment | Total Adjusted Amount |
|---|---|---|---|
| DEPRECIATION ADJUSTMENT | $ | $       1,732 | $       1,732 |
| S CORPORATION TOTAL: | 0 | | 1,732 |
| LESS ROUNDING ADJUSTMENT: | | | 1 |
| SUBTOTAL: | | | 1,731 |
| SHAREHOLDER PERCENTAGE: | | | X    33.000000% |
| SHAREHOLDER AMOUNT: | | | 571 |

1

521 09/10/2014 2:05 PM Pg 49

HIXSON, MARIN, DESANCTIS & COMPANY, P.A.
20900 W DIXIE HWY
AVENTURA, FL 33180-1131


LEON GOLDSTEIN
17555 COLLINS AVENUE, SUITE 3702
SUNNY ISLES, FL 33160

521 09/10/2014 2:05 PM Pg 50

# HIXSON, MARIN, DESANCTIS & COMPANY, P.A.
## 20900 W DIXIE HWY
## AVENTURA, FL 33180-1131
## 305-944-7001

September 10, 2014

**CONFIDENTIAL**

LEON GOLDSTEIN
17555 COLLINS AVENUE, SUITE 3702
SUNNY ISLES, FL  33160

Dear Shareholder:

We have prepared the enclosed copy of Form 1120S, Schedule K-1 for 75 RETAIL
ENTERPRISES, INC.. It contains your share of the corporation's items of income (loss), credits
and deductions, and other information for the corporation's tax year ended December 31, 2013.
These items are to be reported on your federal income tax return; therefore, this Schedule should
be retained with your tax records and documentation.

Also enclosed is state K-1 information, if applicable. This information should also be retained
with your tax records and documentation.

Also enclosed is shareholder basis information. This information consists of your stock and loan
basis in the corporation and, if applicable, your share of any suspended or disallowed losses.
Retain this information with your tax records; it may be needed to complete your federal income
tax return.

If you have any questions, or if we can be of assistance in any way, please do not hesitate to call.

Sincerely,


HIXSON, MARIN, DESANCTIS & COMPANY, P.A.

521 09/10/2014 2:05 PM

671113

☐ Final K-1    ☐ Amended K-1

OMB No. 1545-0130

**Schedule K-1**
**(Form 1120S)**
Department of the Treasury
Internal Revenue Service

**2013**

For calendar year 2013, or tax
year beginning _____
ending _____

**Shareholder's Share of Income, Deductions, Credits, etc.** ▶ See back of form and separate instructions.

| Part III | Shareholder's Share of Current Year Income, Deductions, Credits, and Other Items |
|---|---|

| 1 | Ordinary business income (loss) | 13 | Credits |
|---|---|---|---|
| | **144,363** | | |
| 2 | Net rental real estate income (loss) | | |
| 3 | Other net rental income (loss) | | |
| 4 | Interest income | | |
| | **22,026** | | |
| 5a | Ordinary dividends | | |
| 5b | Qualified dividends | 14 | Foreign transactions |
| 6 | Royalties | | |
| 7 | Net short-term capital gain (loss) | | |
| 8a | Net long-term capital gain (loss) | | |
| 8b | Collectibles (28%) gain (loss) | | |
| 8c | Unrecaptured section 1250 gain | | |
| 9 | Net section 1231 gain (loss) | | |
| 10 | Other income (loss) | 15 | Alternative minimum tax (AMT) items |

**Part I   Information About the Corporation**

A  Corporation's employer identification number
**65-1158703**

B  Corporation's name, address, city, state, and ZIP code
**75 RETAIL ENTERPRISES, INC.**

**C/O HMD, 20900 WEST DIXIE HIGHWAY**
**AVENTURA            FL 33180**

C  IRS Center where corporation filed return
**E-FILE**

**Part II   Information About the Shareholder**

D  Shareholder's identifying number
**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**

E  Shareholder's name, address, city, state, and ZIP code
**LEON GOLDSTEIN**
**17555 COLLINS AVENUE, SUITE 3702**

**SUNNY ISLES          FL 33160**

F  Shareholder's percentage of stock
ownership for tax year  **33.000000 %**

| 11 | Section 179 deduction | 16 | Items affecting shareholder basis |
|---|---|---|---|
| | | **C\*** | **20** |
| 12 | Other deductions | | |

| 17 | Other information |
|---|---|
| **A** | **22,026** |

For IRS Use Only

\* See attached statement for additional information.

DAA

521 09/10/2014 2:05 PM

This list identifies the codes used on Schedule K-1 for all shareholders and provides summarized reporting Information for shareholders who file Form 1040. For detailed reporting and filing information, see the separate Shareholder's Instructions for Schedule K-1 and the instructions for your income tax return.

**1. Ordinary business income (loss).** Determine whether the income (loss) is passive or nonpassive and enter on your return as follows:

| | Report on |
|---|---|
| Passive loss | See the Shareholder's Instructions |
| Passive income | Schedule E, line 28, column (g) |
| Nonpassive loss | Schedule E, line 28, column (h) |
| Nonpassive income | Schedule E, line 28, column (j) |

**2. Net rental real estate income (loss)**   See the Shareholder's Instructions

**3. Other net rental income (loss)**

| | |
|---|---|
| Net income | Schedule E, line 28, column (g) |
| Net loss | See the Shareholder's Instructions |

**4. Interest income**   Form 1040, line 8a

**5a. Ordinary dividends**   Form 1040, line 9a

**5b. Qualified dividends**   Form 1040, line 9b

**6. Royalties**   Schedule E, line 4

**7. Net short-term capital gain (loss)**   Schedule D, line 5

**8a. Net long-term capital gain (loss)**   Schedule D, line 12

**8b. Collectibles (28%) gain (loss)**   28% Rate Gain Worksheet, line 4 (Schedule D instructions)

**8c. Unrecaptured section 1250 gain**   See the Shareholder's Instructions

**9. Net section 1231 gain (loss)**   See the Shareholder's Instructions

**10. Other income (loss)**

| Code | | |
|---|---|---|
| A | Other portfolio income (loss) | See the Shareholder's Instructions |
| B | Involuntary conversions | See the Shareholder's Instructions |
| C | Sec. 1256 contracts & straddles | Form 6781, line 1 |
| D | Mining exploration costs recapture | See Pub. 535 |
| E | Other income (loss) | See the Shareholder's Instructions |

**11. Section 179 deduction**   See the Shareholder's Instructions

**12. Other deductions**

| | | |
|---|---|---|
| A | Cash contributions (50%) | |
| B | Cash contributions (30%) | |
| C | Noncash contributions (50%) | |
| D | Noncash contributions (30%) | |
| E | Capital gain property to a 50% organization (30%) | See the Shareholder's Instructions |
| F | Capital gain property (20%) | |
| G | Contributions (100%) | |
| H | Investment interest expense | Form 4952, line 1 |
| I | Deductions—royalty income | Schedule E, line 19 |
| J | Section 59(e)(2) expenditures | See the Shareholder's Instructions |
| K | Deductions—portfolio (2% floor) | Schedule A, line 23 |
| L | Deductions—portfolio (other) | Schedule A, line 28 |
| M | Preproductive period expenses | See the Shareholder's Instructions |
| N | Commercial revitalization deduction from rental real estate activities | See Form 8582 instructions |
| O | Reforestation expense deduction | See the Shareholder's Instructions |
| P | Domestic production activities information | See Form 8903 instructions |
| Q | Qualified production activities income | Form 8903, line 7b |
| R | Employer's Form W-2 wages | Form 8903, line 17 |
| S | Other deductions | See the Shareholder's Instructions |

**13. Credits**

| | | |
|---|---|---|
| A | Low-income housing credit (section 42(j)(5)) from pre-2008 buildings | |
| B | Low-income housing credit (other) from pre-2008 buildings | |
| C | Low-income housing credit (section 42(j)(5)) from post-2007 buildings | See the Shareholder's Instructions |
| D | Low-income housing credit (other) from post-2007 buildings | |
| E | Qualified rehabilitation expenditures (rental real estate) | |
| F | Other rental real estate credits | |
| G | Other rental credits | |
| H | Undistributed capital gains credit | Form 1040, line 71, box a |
| I | Biofuel producer credit | |
| J | Work opportunity credit | |
| K | Disabled access credit | See the Shareholder's Instructions |
| L | Empowerment zone employment credit | |
| M | Credit for increasing research activities | |

**Code**   **Report on**

| | | |
|---|---|---|
| N | Credit for employer social security and Medicare taxes | See the Shareholder's Instructions |
| O | Backup withholding | |
| P | Other credits | |

**14. Foreign transactions**

| | | |
|---|---|---|
| A | Name of country or U.S. possession | |
| B | Gross income from all sources | Form 1116, Part I |
| C | Gross income sourced at shareholder level | |

Foreign gross income sourced at corporate level

| | | |
|---|---|---|
| D | Passive category | |
| E | General category | Form 1116, Part I |
| F | Other | |

Deductions allocated and apportioned at shareholder level

| | | |
|---|---|---|
| G | Interest expense | Form 1116, Part I |
| H | Other | Form 1116, Part I |

Deductions allocated and apportioned at corporate level to foreign source income

| | | |
|---|---|---|
| I | Passive category | |
| J | General category | Form 1116, Part I |
| K | Other | |

Other information

| | | |
|---|---|---|
| L | Total foreign taxes paid | Form 1116, Part II |
| M | Total foreign taxes accrued | Form 1116, Part II |
| N | Reduction in taxes available for credit | Form 1116, line 12 |
| O | Foreign trading gross receipts | Form 8873 |
| P | Extraterritorial income exclusion | Form 8873 |
| Q | Other foreign transactions | See the Shareholder's Instructions |

**15. Alternative minimum tax (AMT) items**

| | | |
|---|---|---|
| A | Post-1986 depreciation adjustment | |
| B | Adjusted gain or loss | See the Shareholder's Instructions and the Instructions for Form 6251 |
| C | Depletion (other than oil & gas) | |
| D | Oil, gas, & geothermal—gross income | |
| E | Oil, gas, & geothermal—deductions | |
| F | Other AMT items | |

**16. Items affecting shareholder basis**

| | | |
|---|---|---|
| A | Tax-exempt interest income | Form 1040, line 8b |
| B | Other tax-exempt income | |
| C | Nondeductible expenses | See the Shareholder's Instructions |
| D | Distributions | |
| E | Repayment of loans from shareholders | |

**17. Other information**

| | | |
|---|---|---|
| A | Investment income | Form 4952, line 4a |
| B | Investment expenses | Form 4952, line 5 |
| C | Qualified rehabilitation expenditures (other than rental real estate) | See the Shareholder's Instructions |
| D | Basis of energy property | See the Shareholder's Instructions |
| E | Recapture of low-income housing credit (section 42(j)(5)) | Form 8611, line 8 |
| F | Recapture of low-income housing credit (other) | Form 8611, line 8 |
| G | Recapture of investment credit | See Form 4255 |
| H | Recapture of other credits | See the Shareholder's Instructions |
| I | Look-back interest—completed long-term contracts | See Form 8697 |
| J | Look-back interest—income forecast method | See Form 8866 |
| K | Dispositions of property with section 179 deductions | |
| L | Recapture of section 179 deduction | |
| M | Section 453(l)(3) information | |
| N | Section 453A(c) information | |
| O | Section 1260(b) information | |
| P | Interest allocable to production expenditures | See the Shareholder's Instructions |
| Q | CCF nonqualified withdrawals | |
| R | Depletion information—oil and gas | |
| S | Amortization of reforestation costs | |
| T | Section 108(i) information | |
| U | Net investment income | |
| V | Other information | |

DAA

521  75 RETAIL ENTERPRISES, INC.               9/10/2014  2:05 PM
65-1158703
FYE: 12/31/2013

## Federal Statements
### LEON GOLDSTEIN
### 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

## Schedule K-1, Box 16, Code C - Nondeductible Expenses

| Description | Shareholder Amount |
|---|---|
| PAGE 1 MEALS/ENTERTAINMENT | $ 20 |
| TOTAL | $ 20 |

521 09/10/2014 2:05 PM

| | | |
|---|---|---|
| **Shareholder's Basis Worksheet Page 1** | | **2013** |
| Form **1120S** Schedule **K-1** For calendar year 2013 or tax year beginning , ending | | |
| Name  75 RETAIL ENTERPRISES, INC. LEON GOLDSTEIN | Taxpayer Identification Number | 65-1158703 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 |

## Stock Basis

| | | |
|---|---|---|
| 1. Beginning of year stock basis | | 192,356 |
| 2. Capital contributions | | |
| Additions: | | |
| 3. Ordinary business income | 144,363 | |
| 4. Net rental income | | |
| 5. Interest, dividends, royalties and net capital gains | 22,026 | |
| 6. Net section 1231 gain | | |
| 7. Tax-exempt interest and other income | | |
| 8. Other income | | |
| 9. Gain on disposal of Section 179 assets | | 166,389 |
| 10. Other increases | | |
| 11. Subtotal (Add line 1 through line 10) | | 358,745 |
| Subtractions: | | |
| 12. Distributions | | |
| 13. Total losses and deductions applied against stock basis (See Shareholder's Basis Worksheet Page 2) | | 20 |
| 14. Other decreases | | |
| 15. Amount used to restore loan basis | | |
| 16. End of year stock basis (Subtract the sum of lines 12 through 15 from line 11) | | 358,725 |

## Loan Basis

| | | |
|---|---|---|
| 17. Beginning of year loan basis | | |
| 18. Loans to corporation | | |
| 19. Loan basis restored - amount used in prior years to offset losses | | |
| 20. Other increases | | |
| 21. Loan repayments | | |
| 22. Total losses and deductions applied against loan basis (See Shareholder's Basis Worksheet Page 2) | | |
| 23. Other decreases | | |
| 24. End of year loan basis (Subtract the sum of lines 21 through 23 from the sum of lines 17 through 20) | | 0 |
| 25. End of year stock and loan basis (Add line 16 and line 24) | | 358,725 |
| Principal amount of loan owed to shareholder at end of the year | | 0 |

## Gain Recognized on Excess Distributions

| | |
|---|---|
| 26. Distributions | |
| 27. Stock basis before distributions and loss items | |
| 28. Gain recognized on excess distributions (Subtract line 27 from line 26) | |

## Gain Recognized on Repayment of Shareholder Loan

| | |
|---|---|
| 29. Loan basis at beginning of tax year | |
| 30. Loan basis restored - amount used in prior years to offset losses | |
| 31. Loan basis before loan repayment (Add line 29 and line 30) | |
| 32. Shareholder loan at beginning of tax year | |
| 33. Loan repayments to shareholder during tax year | |
| 34. Nontaxable return of loan basis ((Line 31 divided by line 32) multiplied by line 33) | |
| 35. Gain recognized on repayment of shareholder loan (Subtract line 34 from line 33) | |

Note to shareholder:  This worksheet was prepared based on corporation records. Please consult with your tax advisor for adjustments.

521 09/10/2014 2:05 PM

| Form **1120S** Schedule K-1 | **Shareholder's Basis Worksheet Page 2** For calendar year 2013 or tax year beginning                , ending | **2013** |

| Name 75 RETAIL ENTERPRISES, INC. LEON GOLDSTEIN | Taxpayer Identification Number 65-1158703 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 |

## Loss Allocated to Stock and Loan Basis

| | Suspended Losses | Current Year Loss | Total Loss | Percent | Allowed Stock Loss | Disallowed Loss | Percent | Allowed Loan Loss | Loss to Carryforward | Total Allowed Loss |
|---|---|---|---|---|---|---|---|---|---|---|
| Nondeductible noncap expenses | | 20 | 20 | 100.00 | 20 | | | | | 20 |
| Deductible items: | | | | | | | | | | |
| Ordinary business loss ....... | | | | | | | | | | |
| Net rental real estate loss .... | | | | | | | | | | |
| Other net rental loss ......... | | | | | | | | | | |
| Short-term capital loss ........ | | | | | | | | | | |
| Long-term capital loss ........ | | | | | | | | | | |
| Net section 1231 loss ......... | | | | | | | | | | |
| Other portfolio loss ........... | | | | | | | | | | |
| Other losses ............. | | | | | | | | | | |
| Section 179 expense .......... | | | | | | | | | | |
| Cash contributions (50%) ..... | | | | | | | | | | |
| Cash contributions (30%) ..... | | | | | | | | | | |
| Noncash contributions (50%) . | | | | | | | | | | |
| Qual conserv contrib (50%) ... | | | | | | | | | | |
| Noncash contributions (30%) . | | | | | | | | | | |
| Cap gain prop 50% org (30%) | | | | | | | | | | |
| Cap gain prop (20%) .......... | | | | | | | | | | |
| Qual conserv contrib (100%) . | | | | | | | | | | |
| Portfolio deductions (2% floor) | | | | | | | | | | |
| Portfolio deductions (other) ... | | | | | | | | | | |
| Investment interest expense .. | | | | | | | | | | |
| Deductions-royalty income ... | | | | | | | | | | |
| Section 59(e)(2) expend ....... | | | | | | | | | | |
| Preproductive period exp ..... | | | | | | | | | | |
| Commercial revitalization ded . | | | | | | | | | | |
| Reforestation expense ded ... | | | | | | | | | | |
| Other deductions ............. | | | | | | | | | | |
| Foreign taxes ................. | | | | | | | | | | |
| Loss on disposal of 179 assets | | | | | | | | | | |
| Total deductible items ...... | | | | | | | | | | |
| Total nonded and deductible items | | 20 | 20 | | 20 | | | | | 20 |

Note to shareholder:  This worksheet was prepared based on corporation records. Please consult with your tax advisor for adjustments.

197 09/10/2014 1:58 PM Pg 48

HIXSON, MARIN, DESANCTIS & COMPANY, P.A.
20900 W DIXIE HWY
AVENTURA, FL 33180-1131

LEON GOLDSTEIN
17555 COLLINS AVENUE, SUITE 3702
SUNNY ISLES, FL 33160

197 09/10/2014 1:58 PM Pg 49

# HIXSON, MARIN, DESANCTIS & COMPANY, P.A.
## 20900 W DIXIE HWY
## AVENTURA, FL 33180-1131
## 305-944-7001

September 10, 2014

**CONFIDENTIAL**

LEON GOLDSTEIN
17555 COLLINS AVENUE, SUITE 3702
SUNNY ISLES, FL 33160

Dear Shareholder:

We have prepared the enclosed copy of Form 1120S, Schedule K-1 for CENTURY DRIVE RETAIL CORPORATION. It contains your share of the corporation's items of income (loss), credits and deductions, and other information for the corporation's tax year ended December 31, 2013. These items are to be reported on your federal income tax return; therefore, this Schedule should be retained with your tax records and documentation.

Also enclosed is state K-1 information, if applicable. This information should also be retained with your tax records and documentation.

Also enclosed is shareholder basis information. This information consists of your stock and loan basis in the corporation and, if applicable, your share of any suspended or disallowed losses. Retain this information with your tax records; it may be needed to complete your federal income tax return.

If you have any questions, or if we can be of assistance in any way, please do not hesitate to call.

Sincerely,


HIXSON, MARIN, DESANCTIS & COMPANY, P.A.

197 09/10/2014 1:58 PM

671113

| ☐ Final K-1 | ☐ Amended K-1 | OMB No. 1545-0130 |

**Schedule K-1**
**(Form 1120S)**
Department of the Treasury
Internal Revenue Service

**2013**

For calendar year 2013, or tax
year beginning _____
ending _____

## Shareholder's Share of Income, Deductions, Credits, etc. ▶ See back of form and separate instructions.

| Part III | Shareholder's Share of Current Year Income, Deductions, Credits, and Other Items |

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) **-49,877** | 13 | Credits |
| 2 | Net rental real estate income (loss) | | |
| 3 | Other net rental income (loss) | | |
| 4 | Interest income | | |
| 5a | Ordinary dividends | | |
| 5b | Qualified dividends | 14 | Foreign transactions |
| 6 | Royalties | | |
| 7 | Net short-term capital gain (loss) | | |
| 8a | Net long-term capital gain (loss) | | |
| 8b | Collectibles (28%) gain (loss) | | |
| 8c | Unrecaptured section 1250 gain | | |
| 9 | Net section 1231 gain (loss) | | |
| 10 | Other income (loss) | 15 | Alternative minimum tax (AMT) items |
| 11 | Section 179 deduction | 16 **C\*** | Items effecting shareholder basis **6** |
| 12 | Other deductions | | |
| | | 17 | Other information |

### Part I   Information About the Corporation

**A** Corporation's employer identification number
20-4530511

**B** Corporation's name, address, city, state, and ZIP code
CENTURY DRIVE RETAIL CORPORATION

C/O HMD, 20900 WEST DIXIE HIGHWAY
AVENTURA          FL 33180

**C** IRS Center where corporation filed return
E-FILE

### Part II   Information About the Shareholder

**D** Shareholder's identifying number
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

**E** Shareholder's name, address, city, state, and ZIP code
LEON GOLDSTEIN
17555 COLLINS AVENUE, SUITE 3702

SUNNY ISLES          FL 33160

**F** Shareholder's percentage of stock ownership for tax year ........................ **33.000000 %**

For IRS Use Only

\* See attached statement for additional information.

For Paperwork Reduction Act Notice, see Instructions for Form 1120S.   IRS.gov/form1120s

Schedule K-1 (Form 1120S) 2013

DAA

197 09/10/2014 1:58 PM

Schedule K-1 (Form 1120S) 2013 — Page 2

**This list identifies the codes used on Schedule K-1 for all shareholders and provides summarized reporting information for shareholders who file Form 1040. For detailed reporting and filing information, see the separate Shareholder's Instructions for Schedule K-1 and the instructions for your income tax return.**



| | | Report on |
|---|---|---|
| **1.** | **Ordinary business income (loss).** Determine whether the income (loss) is passive or nonpassive and enter on your return as follows: | |
| | Passive loss | See the Shareholder's Instructions |
| | Passive income | Schedule E, line 28, column (g) |
| | Nonpassive loss | Schedule E, line 28, column (h) |
| | Nonpassive income | Schedule E, line 28, column (j) |
| **2.** | **Net rental real estate income (loss)** | See the Shareholder's Instructions |
| **3.** | **Other net rental income (loss)** | |
| | Net income | Schedule E, line 28, column (g) |
| | Net loss | See the Shareholder's Instructions |
| **4.** | **Interest income** | Form 1040, line 8a |
| **5a.** | **Ordinary dividends** | Form 1040, line 9a |
| **5b.** | **Qualified dividends** | Form 1040, line 9b |
| **6.** | **Royalties** | Schedule E, line 4 |
| **7.** | **Net short-term capital gain (loss)** | Schedule D, line 5 |
| **8a.** | **Net long-term capital gain (loss)** | Schedule D, line 12 |
| **8b.** | **Collectibles (28%) gain (loss)** | 28% Rate Gain Worksheet, line 4 (Schedule D instructions) |
| **8c.** | **Unrecaptured section 1250 gain** | See the Shareholder's Instructions |
| **9.** | **Net section 1231 gain (loss)** | See the Shareholder's Instructions |
| **10.** | **Other income (loss)** | |
| | Code | |
| A | Other portfolio income (loss) | See the Shareholder's Instructions |
| B | Involuntary conversions | See the Shareholder's Instructions |
| C | Sec. 1256 contracts & straddles | Form 6781, line 1 |
| D | Mining exploration costs recapture | See Pub. 535 |
| E | Other income (loss) | See the Shareholder's Instructions |
| **11.** | **Section 179 deduction** | See the Shareholder's Instructions |
| **12.** | **Other deductions** | |
| A | Cash contributions (50%) | |
| B | Cash contributions (30%) | |
| C | Noncash contributions (50%) | |
| D | Noncash contributions (30%) | |
| E | Capital gain property to a 50% organization (30%) | See the Shareholder's Instructions |
| F | Capital gain property (20%) | |
| G | Contributions (100%) | |
| H | Investment interest expense | Form 4952, line 1 |
| I | Deductions—royalty income | Schedule E, line 19 |
| J | Section 59(e)(2) expenditures | See the Shareholder's Instructions |
| K | Deductions—portfolio (2% floor) | Schedule A, line 23 |
| L | Deductions—portfolio (other) | Schedule A, line 28 |
| M | Preproductive period expenses | See the Shareholder's Instructions |
| N | Commercial revitalization deduction from rental real estate activities | See Form 8582 instructions |
| O | Reforestation expense deduction | See the Shareholder's Instructions |
| P | Domestic production activities information | See Form 8903 instructions |
| Q | Qualified production activities income | Form 8903, line 7b |
| R | Employer's Form W-2 wages | Form 8903, line 17 |
| S | Other deductions | See the Shareholder's Instructions |
| **13.** | **Credits** | |
| A | Low-income housing credit (section 42(j)(5)) from pre-2008 buildings | |
| B | Low-income housing credit (other) from pre-2008 buildings | |
| C | Low-income housing credit (section 42(j)(5)) from post-2007 buildings | See the Shareholder's Instructions |
| D | Low-income housing credit (other) from post-2007 buildings | |
| E | Qualified rehabilitation expenditures (rental real estate) | |
| F | Other rental real estate credits | |
| G | Other rental credits | |
| H | Undistributed capital gains credit | Form 1040, line 71, box a |
| I | Biofuel producer credit | |
| J | Work opportunity credit | |
| K | Disabled access credit | See the Shareholder's Instructions |
| L | Empowerment zone employment credit | |
| M | Credit for increasing research activities | |

| | | Report on |
|---|---|---|
| N | Credit for employer social security and Medicare taxes | See the Shareholder's Instructions |
| O | Backup withholding | |
| P | Other credits | |
| **14.** | **Foreign transactions** | |
| A | Name of country or U.S. possession | |
| B | Gross income from all sources | Form 1116, Part I |
| C | Gross income sourced at shareholder level | |
| | Foreign gross income sourced at corporate level | |
| D | Passive category | |
| E | General category | Form 1116, Part I |
| F | Other | |
| | Deductions allocated and apportioned at shareholder level | |
| G | Interest expense | Form 1116, Part I |
| H | Other | Form 1116, Part I |
| | Deductions allocated and apportioned at corporate level to foreign source income | |
| I | Passive category | |
| J | General category | Form 1116, Part I |
| K | Other | |
| | Other information | |
| L | Total foreign taxes paid | Form 1116, Part II |
| M | Total foreign taxes accrued | Form 1116, Part II |
| N | Reduction in taxes available for credit | Form 1116, line 12 |
| O | Foreign trading gross receipts | Form 8873 |
| P | Extraterritorial income exclusion | Form 8873 |
| Q | Other foreign transactions | See the Shareholder's Instructions |
| **15.** | **Alternative minimum tax (AMT) items** | |
| A | Post-1986 depreciation adjustment | |
| B | Adjusted gain or loss | See the Shareholder's Instructions and the Instructions for Form 6251 |
| C | Depletion (other than oil & gas) | |
| D | Oil, gas, & geothermal—gross income | |
| E | Oil, gas, & geothermal—deductions | |
| F | Other AMT items | |
| **16.** | **Items affecting shareholder basis** | |
| A | Tax-exempt interest income | Form 1040, line 8b |
| B | Other tax-exempt income | |
| C | Nondeductible expenses | See the Shareholder's Instructions |
| D | Distributions | |
| E | Repayment of loans from shareholders | |
| **17.** | **Other Information** | |
| A | Investment income | Form 4952, line 4a |
| B | Investment expenses | Form 4952, line 5 |
| C | Qualified rehabilitation expenditures (other than rental real estate) | See the Shareholder's Instructions |
| D | Basis of energy property | See the Shareholder's Instructions |
| E | Recapture of low-income housing credit (section 42(j)(5)) | Form 8611, line 8 |
| F | Recapture of low-income housing credit (other) | Form 8611, line 8 |
| G | Recapture of investment credit | See Form 4255 |
| H | Recapture of other credits | See the Shareholder's Instructions |
| I | Look-back interest—completed long-term contracts | See Form 8697 |
| J | Look-back interest—income forecast method | See Form 8866 |
| K | Dispositions of property with section 179 deductions | |
| L | Recapture of section 179 deduction | |
| M | Section 453(l)(3) information | |
| N | Section 453A(c) information | |
| O | Section 1260(b) information | |
| P | Interest allocable to production expenditures | See the Shareholder's Instructions |
| Q | CCF nonqualified withdrawals | |
| R | Depletion information—oil and gas | |
| S | Amortization of reforestation costs | |
| T | Section 108(i) information | |
| U | Net investment income | |
| V | Other information | |

DAA

197  CENTURY DRIVE RETAIL CORPORATION                              9/10/2014  1:58 PM
20-4530511                          **Federal Statements**
FYE: 12/31/2013                     **LEON GOLDSTEIN**
                                    **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**

### Schedule K-1, Box 16, Code C - Nondeductible Expenses

| Description | Shareholder Amount |
|---|---|
| PAGE 1 MEALS/ENTERTAINMENT | $          6 |
| TOTAL | $          6 |

197 09/10/2014 1:58 PM

| Form **1120S**<br>**Schedule K-1** | **Shareholder's Basis Worksheet Page 1** | | **2013** |
|---|---|---|---|
| | For calendar year 2013 or tax year beginning | , ending | |

| Name **CENTURY DRIVE RETAIL CORPORATION**<br>**LEON GOLDSTEIN** | Taxpayer Identification Number | **20-4530511**<br>**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** |
|---|---|---|

## Stock Basis

| | | |
|---|---|---|
| 1. | Beginning of year stock basis | 0 |
| 2. | Capital contributions | |
| | **Additions:** | |
| 3. | Ordinary business income | |
| 4. | Net rental income | |
| 5. | Interest, dividends, royalties and net capital gains | |
| 6. | Net section 1231 gain | |
| 7. | Tax-exempt interest and other income | |
| 8. | Other income | |
| 9. | Gain on disposal of Section 179 assets | |
| 10. | Other increases | |
| 11. | Subtotal (Add line 1 through line 10) | |
| | **Subtractions:** | |
| 12. | Distributions | |
| 13. | Total losses and deductions applied against stock basis (See Shareholder's Basis Worksheet Page 2) | |
| 14. | Other decreases | |
| 15. | Amount used to restore loan basis | |
| 16. | End of year stock basis (Subtract the sum of lines 12 through 15 from line 11) | 0 |

## Loan Basis

| | | |
|---|---|---|
| 17. | Beginning of year loan basis | |
| 18. | Loans to corporation | |
| 19. | Loan basis restored - amount used in prior years to offset losses | |
| 20. | Other increases | |
| 21. | Loan repayments | |
| 22. | Total losses and deductions applied against loan basis (See Shareholder's Basis Worksheet Page 2) | |
| 23. | Other decreases | |
| 24. | End of year loan basis (Subtract the sum of lines 21 through 23 from the sum of lines 17 through 20) | 0 |
| 25. | End of year stock and loan basis (Add line 16 and line 24) | 0 |
| | Principal amount of loan owed to shareholder at end of the year | 0 |

## Gain Recognized on Excess Distributions

| | | |
|---|---|---|
| 26. | Distributions | |
| 27. | Stock basis before distributions and loss items | |
| 28. | Gain recognized on excess distributions (Subtract line 27 from line 26) | |

## Gain Recognized on Repayment of Shareholder Loan

| | | |
|---|---|---|
| 29. | Loan basis at beginning of tax year | |
| 30. | Loan basis restored - amount used in prior years to offset losses | |
| 31. | Loan basis before loan repayment (Add line 29 and line 30) | |
| 32. | Shareholder loan at beginning of tax year | |
| 33. | Loan repayments to shareholder during tax year | |
| 34. | Nontaxable return of loan basis ((Line 31 divided by line 32) multiplied by line 33) | |
| 35. | Gain recognized on repayment of shareholder loan (Subtract line 34 from line 33) | |

Note to shareholder: This worksheet was prepared based on corporation records. Please consult with your tax advisor for adjustments.

197 09/10/2014 1:58 PM

| Form **1120S**<br>Schedule K-1 | **Shareholder's Basis Worksheet Page 2** | **2013** |
|---|---|---|
| | For calendar year 2013 or tax year beginning                          , ending | |

| Name<br>CENTURY DRIVE RETAIL CORPORATION<br>LEON GOLDSTEIN | Taxpayer Identification Number<br>20-4530511<br>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 |
|---|---|

## Loss Allocated to Stock and Loan Basis

| | Suspended Losses | Current Year Loss | Total Loss | Percent | Allowed Stock Loss | Disallowed Loss | Percent | Allowed Loan Loss | Loss to Carryforward | Total Allowed Loss |
|---|---|---|---|---|---|---|---|---|---|---|
| Nondeductible noncap expenses | | 6 | 6 | 100.00 | | 6 | 100.00 | | 6 | |
| Deductible items: | | | | | | | | | | |
| Ordinary business loss ........ | 71,643 | 49,877 | 121,520 | 96.94 | | 121,520 | 96.94 | | 121,520 | |
| Net rental real estate loss .... | | | | | | | | | | |
| Other net rental loss .......... | | | | | | | | | | |
| Short-term capital loss ........ | | | | | | | | | | |
| Long-term capital loss ........ | | | | | | | | | | |
| Net section 1231 loss ......... | | | | | | | | | | |
| Other portfolio loss ........... | | | | | | | | | | |
| Other losses .................. | | | | | | | | | | |
| Section 179 expense .......... | 3,838 | | 3,838 | 3.06 | | 3,838 | 3.06 | | 3,838 | |
| Cash contributions (50%) ..... | | | | | | | | | | |
| Cash contributions (30%) ..... | | | | | | | | | | |
| Noncash contributions (50%) . | | | | | | | | | | |
| Qual conserv contrib (50%) ... | | | | | | | | | | |
| Noncash contributions (30%) . | | | | | | | | | | |
| Cap gain prop 50% org (30%) . | | | | | | | | | | |
| Cap gain prop (20%) .......... | | | | | | | | | | |
| Qual conserv contrib (100%) . | | | | | | | | | | |
| Portfolio deductions (2% floor) | | | | | | | | | | |
| Portfolio deductions (other) ... | | | | | | | | | | |
| Investment interest expense .. | | | | | | | | | | |
| Deductions-royalty income ... | | | | | | | | | | |
| Section 59(e)(2) expend ........ | | | | | | | | | | |
| Preproductive period exp ..... | | | | | | | | | | |
| Commercial revitalization ded . | | | | | | | | | | |
| Reforestation expense ded ... | | | | | | | | | | |
| Other deductions ............. | | | | | | | | | | |
| Foreign taxes ................. | | | | | | | | | | |
| Loss on disposal of 179 assets | | | | | | | | | | |
| Total deductible items ...... | 75,481 | 49,877 | 125,358 | 100.00 | | 125,358 | 100.00 | | 125,358 | |
| Total nonded and deductible items | 75,481 | 49,883 | 125,364 | | | 125,364 | | | 125,364 | |

Note to shareholder:  This worksheet was prepared based on corporation records. Please consult with your tax advisor for adjustments.

197 09/10/2014 1:58 PM

| Form **AR1100S** | **AR Shareholder Income, Deductions & Credits Worksheet, Page 1** | **2013** |
|---|---|---|

Tax Year beginning **01/01/13**, and ending **12/31/13**

| Shareholder's identifying number **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** | Corporation's identifying number **20-4530511** |
|---|---|
| Shareholder's name, address, and ZIP code | Corporation's name, address, and ZIP code **CENTURY DRIVE RETAIL CORPORATION** |
| **LEON GOLDSTEIN** **17555 COLLINS AVENUE, SUITE 3702** **SUNNY ISLES      FL   33160** | **C/O HMD, 20900 WEST DIXIE HIGHWAY** **AVENTURA          FL   33180** |

Final return ......................................................

Exempt from withholding ................................... [X]

Ownership percentage ................................. **33.000000**

Withholding ....................................................... ☐

Composite filer

Arkansas apportionment percentage ............ **100.000000**

## Shareholder's Share of Arkansas Income and Deductions

| Income | |
|---|---|
| Ordinary income | **-49,877** |
| Interest income | |
| Dividend income | |
| Rental income | |
| Royalty income | |
| Net short-term capital gain or loss | |
| Net long-term capital gain or loss | |
| Net 1231 gain or loss | |
| Section 108(i) deferred income | |
| Other income (loss) | |
| Total income | **-49,877** |
| Deductions | |
| Charitable contributions | |
| Section 179 expense deduction | |
| Section 108(i) deferred expense | |
| Other expenses (adjustments) | |
| Total deductions | |

## Apportioned and Allocated Income

| | |
|---|---|
| Arkansas apportioned income | **-49,877** |
| Arkansas allocated income | |
| Net income or loss | **-49,877** |

## Taxes

| | |
|---|---|
| Taxes withheld or paid on behalf of nonresident shareholder | |
| Composite tax | |

## Other Information

| | |
|---|---|
| Supplemental information | |

HIXSON, MARIN, DESANCTIS & COMPANY, P.A.
20900 W DIXIE HWY
AVENTURA, FL 33180-1131


LEON GOLDSTEIN
17555 COLLINS AVENUE, SUITE 3702
SUNNY ISLES, FL 33160

536 09/10/2014 11:54 AM Pg 52

# HIXSON, MARIN, DESANCTIS & COMPANY, P.A.
## 20900 W DIXIE HWY
## AVENTURA, FL 33180-1131
## 305-944-7001

September 10, 2014

**CONFIDENTIAL**

LEON GOLDSTEIN
17555 COLLINS AVENUE, SUITE 3702
SUNNY ISLES, FL 33160

Dear Shareholder:

We have prepared the enclosed copy of Form 1120S, Schedule K-1 for STERLINGTON RETAIL CORPORATION. It contains your share of the corporation's items of income (loss), credits and deductions, and other information for the corporation's tax year ended December 31, 2013. These items are to be reported on your federal income tax return; therefore, this Schedule should be retained with your tax records and documentation.

Also enclosed is state K-1 information, if applicable. This information should also be retained with your tax records and documentation.

Also enclosed is shareholder basis information. This information consists of your stock and loan basis in the corporation and, if applicable, your share of any suspended or disallowed losses. Retain this information with your tax records; it may be needed to complete your federal income tax return.

If you have any questions, or if we can be of assistance in any way, please do not hesitate to call.

Sincerely,


HIXSON, MARIN, DESANCTIS & COMPANY, P.A.

536 09/10/2014 11:54 AM

671113

☐ Final K-1          ☐ Amended K-1          OMB No. 1545-0130

**Schedule K-1**
**(Form 1120S)**          **2013**
Department of the Treasury
Internal Revenue Service

For calendar year 2013, or tax
year beginning _____
ending _____

**Shareholder's Share of Income, Deductions, Credits, etc.**          ▶ See back of form and separate instructions.

| Part I | Information About the Corporation |
|---|---|

A  Corporation's employer identification number
**20-4984345**

B  Corporation's name, address, city, state, and ZIP code
**STERLINGTON RETAIL CORPORATION**

**C/O HMD 20900 WEST DIXIE HIGHWAY**
**AVENTURA          FL 33180**

C  IRS Center where corporation filed return
**E-FILE**

| Part II | Information About the Shareholder |
|---|---|

D  Shareholder's identifying number
**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**

E  Shareholder's name, address, city, state, and ZIP code
**LEON GOLDSTEIN**
**17555 COLLINS AVENUE, SUITE 3702**

**SUNNY ISLES          FL 33160**

F  Shareholder's percentage of stock
ownership for tax year ................. **33.000000 %**

| Part III | Shareholder's Share of Current Year Income, Deductions, Credits, and Other Items |
|---|---|

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss)  **5,222** | 13 | Credits |
| 2 | Net rental real estate income (loss) | | |
| 3 | Other net rental income (loss) | | |
| 4 | Interest income | | |
| 5a | Ordinary dividends | | |
| 5b | Qualified dividends | 14 | Foreign transactions |
| 6 | Royalties | | |
| 7 | Net short-term capital gain (loss) | | |
| 8a | Net long-term capital gain (loss) | | |
| 8b | Collectibles (28%) gain (loss) | | |
| 8c | Unrecaptured section 1250 gain | | |
| 9 | Net section 1231 gain (loss) | | |
| 10 | Other income (loss) | 15 | Alternative minimum tax (AMT) items |
| 11 | Section 179 deduction | 16 | Items affecting shareholder basis  **C***  **4** |
| 12 | Other deductions | | |
| | | 17 | Other information |

* See attached statement for additional information.

For IRS Use Only

For Paperwork Reduction Act Notice, see Instructions for Form 1120S.   IRS.gov/form1120s          Schedule K-1 (Form 1120S) 2013

DAA

536 09/10/2014 11:54 AM

Schedule K-1 (Form 1120S) 2013                                                                **Page 2**

**This list identifies the codes used on Schedule K-1 for all shareholders and provides summarized reporting information for shareholders who file Form 1040. For detailed reporting and filing information, see the separate Shareholder's Instructions for Schedule K-1 and the instructions for your income tax return.**



| | | Report on |
|---|---|---|
| 1. | **Ordinary business income (loss)** Determine whether the income (loss) is passive or nonpassive and enter on your return as follows: | |
| | Passive loss | See the Shareholder's Instructions |
| | Passive income | Schedule E, line 28, column (g) |
| | Nonpassive loss | Schedule E, line 28, column (h) |
| | Nonpassive income | Schedule E, line 28, column (j) |
| 2. | **Net rental real estate income (loss)** | See the Shareholder's Instructions |
| 3. | **Other net rental income (loss)** | |
| | Net income | Schedule E, line 28, column (g) |
| | Net loss | See the Shareholder's Instructions |
| 4. | **Interest income** | Form 1040, line 8a |
| 5a. | **Ordinary dividends** | Form 1040, line 9a |
| 5b. | **Qualified dividends** | Form 1040, line 9b |
| 6. | **Royalties** | Schedule E, line 4 |
| 7. | **Net short-term capital gain (loss)** | Schedule D, line 5 |
| 8a. | **Net long-term capital gain (loss)** | Schedule D, line 12 |
| 8b. | **Collectibles (28%) gain (loss)** | 28% Rate Gain Worksheet, line 4 (Schedule D instructions) |
| 8c. | **Unrecaptured section 1250 gain** | See the Shareholder's Instructions |
| 9. | **Net section 1231 gain (loss)** | See the Shareholder's Instructions |
| 10. | **Other income (loss)** | |
| | Code | |
| | A   Other portfolio income (loss) | See the Shareholder's Instructions |
| | B   Involuntary conversions | See the Shareholder's Instructions |
| | C   Sec. 1256 contracts & straddles | Form 6781, line 1 |
| | D   Mining exploration costs recapture | See Pub. 535 |
| | E   Other income (loss) | See the Shareholder's Instructions |
| 11. | **Section 179 deduction** | See the Shareholder's Instructions |
| 12. | **Other deductions** | |
| | A   Cash contributions (50%) | |
| | B   Cash contributions (30%) | |
| | C   Noncash contributions (50%) | |
| | D   Noncash contributions (30%) | |
| | E   Capital gain property to a 50% organization (30%) | See the Shareholder's Instructions |
| | F   Capital gain property (20%) | |
| | G   Contributions (100%) | |
| | H   Investment interest expense | Form 4952, line 1 |
| | I   Deductions—royalty income | Schedule E, line 19 |
| | J   Section 59(e)(2) expenditures | See the Shareholder's Instructions |
| | K   Deductions—portfolio (2% floor) | Schedule A, line 23 |
| | L   Deductions—portfolio (other) | Schedule A, line 28 |
| | M   Preproductive period expenses | See the Shareholder's Instructions |
| | N   Commercial revitalization deduction from rental real estate activities | See Form 8582 instructions |
| | O   Reforestation expense deduction | See the Shareholder's Instructions |
| | P   Domestic production activities information | See Form 8903 instructions |
| | Q   Qualified production activities income | Form 8903, line 7b |
| | R   Employer's Form W-2 wages | Form 8903, line 17 |
| | S   Other deductions | See the Shareholder's Instructions |
| 13. | **Credits** | |
| | A   Low-income housing credit (section 42(j)(5)) from pre-2008 buildings | |
| | B   Low-income housing credit (other) from pre-2008 buildings | |
| | C   Low-income housing credit (section 42(j)(5)) from post-2007 buildings | See the Shareholder's Instructions |
| | D   Low-income housing credit (other) from post-2007 buildings | |
| | E   Qualified rehabilitation expenditures (rental real estate) | |
| | F   Other rental real estate credits | |
| | G   Other rental credits | |
| | H   Undistributed capital gains credit | Form 1040, line 71, box a |
| | I   Biofuel producer credit | |
| | J   Work opportunity credit | |
| | K   Disabled access credit | See the Shareholder's Instructions |
| | L   Empowerment zone employment credit | |
| | M   Credit for increasing research activities | |

| | | Code | | Report on |
|---|---|---|---|---|
| | N   Credit for employer social security and Medicare taxes | | | |
| | O   Backup withholding | | | See the Shareholder's Instructions |
| | P   Other credits | | | |
| 14. | **Foreign transactions** | | | |
| | A   Name of country or U.S. possession | | | |
| | B   Gross income from all sources | | | Form 1116, Part I |
| | C   Gross income sourced at shareholder level | | | |
| | Foreign gross income sourced at corporate level | | | |
| | D   Passive category | | | |
| | E   General category | | | Form 1116, Part I |
| | F   Other | | | |
| | Deductions allocated and apportioned at shareholder level | | | |
| | G   Interest expense | | | Form 1116, Part I |
| | H   Other | | | Form 1116, Part I |
| | Deductions allocated and apportioned at corporate level to foreign source income | | | |
| | I   Passive category | | | |
| | J   General category | | | Form 1116, Part I |
| | K   Other | | | |
| | Other information | | | |
| | L   Total foreign taxes paid | | | Form 1116, Part II |
| | M   Total foreign taxes accrued | | | Form 1116, Part II |
| | N   Reduction in taxes available for credit | | | Form 1116, line 12 |
| | O   Foreign trading gross receipts | | | Form 8873 |
| | P   Extraterritorial income exclusion | | | Form 8873 |
| | Q   Other foreign transactions | | | See the Shareholder's Instructions |
| 15. | **Alternative minimum tax (AMT) items** | | | |
| | A   Post-1986 depreciation adjustment | | | See the Shareholder's Instructions and the Instructions for Form 6251 |
| | B   Adjusted gain or loss | | | |
| | C   Depletion (other than oil & gas) | | | |
| | D   Oil, gas, & geothermal—gross income | | | |
| | E   Oil, gas, & geothermal—deductions | | | |
| | F   Other AMT items | | | |
| 16. | **Items affecting shareholder basis** | | | |
| | A   Tax-exempt interest income | | | Form 1040, line 8b |
| | B   Other tax-exempt income | | | |
| | C   Nondeductible expenses | | | See the Shareholder's Instructions |
| | D   Distributions | | | |
| | E   Repayment of loans from shareholders | | | |
| 17. | **Other information** | | | |
| | A   Investment income | | | Form 4952, line 4a |
| | B   Investment expenses | | | Form 4952, line 5 |
| | C   Qualified rehabilitation expenditures (other than rental real estate) | | | See the Shareholder's Instructions |
| | D   Basis of energy property | | | See the Shareholder's Instructions |
| | E   Recapture of low-income housing credit (section 42(j)(5)) | | | Form 8611, line 8 |
| | F   Recapture of low-income housing credit (other) | | | Form 8611, line 8 |
| | G   Recapture of investment credit | | | Form 4255 |
| | H   Recapture of other credits | | | See the Shareholder's Instructions |
| | I   Look-back interest—completed long-term contracts | | | See Form 8697 |
| | J   Look-back interest—income forecast method | | | See Form 8866 |
| | K   Dispositions of property with section 179 deductions | | | |
| | L   Recapture of section 179 deduction | | | |
| | M   Section 453(l)(3) information | | | |
| | N   Section 453A(c) information | | | |
| | O   Section 1260(b) information | | | |
| | P   Interest allocable to production expenditures | | | See the Shareholder's Instructions |
| | Q   CCF nonqualified withdrawals | | | |
| | R   Depletion information—oil and gas | | | |
| | S   Amortization of reforestation costs | | | |
| | T   Section 108(i) information | | | |
| | U   Net investment income | | | |
| | V   Other information | | | |

DAA

536  STERLINGTON RETAIL CORPORATION                         9/10/2014  11:54 AM
20-4984345                         **Federal Statements**
FYE: 12/31/2013                    **LEON GOLDSTEIN**
                                   **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**

### Schedule K-1, Box 16, Code C - Nondeductible Expenses

| Description | Shareholder Amount |
|---|---|
| PAGE 1 MEALS/ENTERTAINMENT | $          4 |
| TOTAL | $          4 |

536 09/10/2014 11:54 AM

| | | **Shareholder's Basis Worksheet Page 1** | | **2013** |
|---|---|---|---|---|

| Form **1120S** Schedule **K-1** | For calendar year 2013 or tax year beginning | , ending | |
|---|---|---|---|

| Name | STERLINGTON RETAIL CORPORATION LEON GOLDSTEIN | Taxpayer Identification Number | 20-4984345 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 |
|---|---|---|---|

## Stock Basis

| | | | |
|---|---|---|---|
| 1. | Beginning of year stock basis | | 93,425 |
| 2. | Capital contributions | | |
| | **Additions:** | | |
| 3. | Ordinary business income | 5,222 | |
| 4. | Net rental income | | |
| 5. | Interest, dividends, royalties and net capital gains | | |
| 6. | Net section 1231 gain | | |
| 7. | Tax-exempt interest and other income | | |
| 8. | Other income | | |
| 9. | Gain on disposal of Section 179 assets | | 5,222 |
| 10. | Other increases | | |
| 11. | Subtotal (Add line 1 through line 10) | | 98,647 |
| | **Subtractions:** | | |
| 12. | Distributions | | |
| 13. | Total losses and deductions applied against stock basis (See Shareholder's Basis Worksheet Page 2) | | 4 |
| 14. | Other decreases | | |
| 15. | Amount used to restore loan basis | | |
| 16. | End of year stock basis (Subtract the sum of lines 12 through 15 from line 11) | | 98,643 |

## Loan Basis

| | | |
|---|---|---|
| 17. | Beginning of year loan basis | |
| 18. | Loans to corporation | |
| 19. | Loan basis restored - amount used in prior years to offset losses | |
| 20. | Other increases | |
| 21. | Loan repayments | |
| 22. | Total losses and deductions applied against loan basis (See Shareholder's Basis Worksheet Page 2) | |
| 23. | Other decreases | |
| 24. | End of year loan basis (Subtract the sum of lines 21 through 23 from the sum of lines 17 through 20) | 0 |
| 25. | End of year stock and loan basis (Add line 16 and line 24) | 98,643 |

| | |
|---|---|
| Principal amount of loan owed to shareholder at end of the year | 0 |

## Gain Recognized on Excess Distributions

| | |
|---|---|
| 26. | Distributions |
| 27. | Stock basis before distributions and loss items |
| 28. | Gain recognized on excess distributions (Subtract line 27 from line 26) |

## Gain Recognized on Repayment of Shareholder Loan

| | |
|---|---|
| 29. | Loan basis at beginning of tax year |
| 30. | Loan basis restored - amount used in prior years to offset losses |
| 31. | Loan basis before loan repayment (Add line 29 and line 30) |
| 32. | Shareholder loan at beginning of tax year |
| 33. | Loan repayments to shareholder during tax year |
| 34. | Nontaxable return of loan basis ((Line 31 divided by line 32) multiplied by line 33) |
| 35. | Gain recognized on repayment of shareholder loan (Subtract line 34 from line 33) |

Note to shareholder:  This worksheet was prepared based on corporation records. Please consult with your tax advisor for adjustments.

536 09/10/2014 11:54 AM

| Form **1120S** Schedule K-1 | **Shareholder's Basis Worksheet Page 2** | **2013** |
| --- | --- | --- |

For calendar year 2013 or tax year beginning _____ , ending _____

Name
**STERLINGTON RETAIL CORPORATION**
**LEON GOLDSTEIN**

Taxpayer Identification Number
**20-4984345**
**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**

## Loss Allocated to Stock and Loan Basis

| | Suspended Losses | Current Year Loss | Total Loss | Percent | Allowed Stock Loss | Disallowed Loss | Percent | Allowed Loan Loss | Loss to Carryforward | Total Allowed Loss |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Nondeductible noncap expenses | | 4 | 4 | 100.00 | 4 | | | | | 4 |
| Deductible items: | | | | | | | | | | |
|   Ordinary business loss ........ | | | | | | | | | | |
|   Net rental real estate loss ..... | | | | | | | | | | |
|   Other net rental loss ......... | | | | | | | | | | |
|   Short-term capital loss ........ | | | | | | | | | | |
|   Long-term capital loss ......... | | | | | | | | | | |
|   Net section 1231 loss ......... | | | | | | | | | | |
|   Other portfolio loss ........... | | | | | | | | | | |
|   Other losses ................. | | | | | | | | | | |
|   Section 179 expense .......... | | | | | | | | | | |
|   Cash contributions (50%) ..... | | | | | | | | | | |
|   Cash contributions (30%) ..... | | | | | | | | | | |
|   Noncash contributions (50%) . | | | | | | | | | | |
|   Qual conserv contrib (50%) ... | | | | | | | | | | |
|   Noncash contributions (30%) . | | | | | | | | | | |
|   Cap gain prop 50% org (30%) . | | | | | | | | | | |
|   Cap gain prop (20%) .......... | | | | | | | | | | |
|   Qual conserv contrib (100%) . | | | | | | | | | | |
|   Portfolio deductions (2% floor) . | | | | | | | | | | |
|   Portfolio deductions (other) ... | | | | | | | | | | |
|   Investment interest expense .. | | | | | | | | | | |
|   Deductions-royalty income .... | | | | | | | | | | |
|   Section 59(e)(2) expend ...... | | | | | | | | | | |
|   Preproductive period exp ..... | | | | | | | | | | |
|   Commercial revitalization ded . | | | | | | | | | | |
|   Reforestation expense ded .... | | | | | | | | | | |
|   Other deductions ............. | | | | | | | | | | |
|   Foreign taxes ................ | | | | | | | | | | |
|   Loss on disposal of 179 assets | | | | | | | | | | |
|     Total deductible items ....... | | | | | | | | | | |
| Total nonded and deductible items | | 4 | 4 | | 4 | | | | | 4 |

Note to shareholder:  This worksheet was prepared based on corporation records. Please consult with your tax advisor for adjustments.

561 09/10/2014 11:24 AM Pg 38

HIXSON, MARIN, DESANCTIS & COMPANY, P.A.
20900 W DIXIE HWY
AVENTURA, FL 33180-1131

LEON GOLDSTEIN
17555 COLLINS AVENUE, SUITE 3702
SUNNY ISLES, FL 33160

# HIXSON, MARIN, DESANCTIS & COMPANY, P.A.
## 20900 W DIXIE HWY
## AVENTURA, FL 33180-1131
## 305-944-7001

September 10, 2014

**CONFIDENTIAL**

LEON GOLDSTEIN
17555 COLLINS AVENUE, SUITE 3702
SUNNY ISLES, FL  33160

Dear Shareholder:

We have prepared the enclosed copy of Form 1120S, Schedule K-1 for TEXARKANA RETAIL CORPORATION. It contains your share of the corporation's items of income (loss), credits and deductions, and other information for the corporation's tax year ended December 31, 2013. These items are to be reported on your federal income tax return; therefore, this Schedule should be retained with your tax records and documentation.

Also enclosed is state K-1 information, if applicable. This information should also be retained with your tax records and documentation.

Also enclosed is shareholder basis information. This information consists of your stock and loan basis in the corporation and, if applicable, your share of any suspended or disallowed losses. Retain this information with your tax records; it may be needed to complete your federal income tax return.

If you have any questions, or if we can be of assistance in any way, please do not hesitate to call.

Sincerely,


HIXSON, MARIN, DESANCTIS & COMPANY, P.A.

561 08/10/2014 11:24 AM

671113

**Schedule K-1**
**(Form 1120S)**
Department of the Treasury
Internal Revenue Service

**2013**

For calendar year 2013, or tax
year beginning _____
ending _____

OMB No. 1545-0130

☐ Final K-1   ☐ Amended K-1

## Shareholder's Share of Income, Deductions, Credits, etc.

▶ See back of form and separate instructions.

| Part I | Information About the Corporation |
|---|---|

**A** Corporation's employer identification number
20-4977425

**B** Corporation's name, address, city, state, and ZIP code
TEXARKANA RETAIL CORPORATION

C/O HMD 20900 WEST DIXIE HIGHWAY
AVENTURA          FL 33180

**C** IRS Center where corporation filed return
E-FILE

| Part II | Information About the Shareholder |
|---|---|

**D** Shareholder's identifying number
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

**E** Shareholder's name, address, city, state, and ZIP code
LEON GOLDSTEIN
17555 COLLINS AVENUE, SUITE 3702

SUNNY ISLES          FL 33160

**F** Shareholder's percentage of stock
ownership for tax year .................... 33.000000 %

For IRS Use Only

| Part III | Shareholder's Share of Current Year Income, Deductions, Credits, and Other Items |
|---|---|
| 1 Ordinary business income (loss) | 13 Credits |
| **168,132** | |
| 2 Net rental real estate income (loss) | |
| 3 Other net rental income (loss) | |
| 4 Interest income | |
| 5a Ordinary dividends | |
| 5b Qualified dividends | 14 Foreign transactions |
| 6 Royalties | |
| 7 Net short-term capital gain (loss) | |
| 8a Net long-term capital gain (loss) | |
| 8b Collectibles (28%) gain (loss) | |
| 8c Unrecaptured section 1250 gain | |
| 9 Net section 1231 gain (loss) | |
| 10 Other income (loss) | 15 Alternative minimum tax (AMT) items |
| 11 Section 179 deduction | 16 Items affecting shareholder basis |
| | **B** **11,220** |
| 12 Other deductions | |
| | 17 Other information |
| | * See attached statement for additional information. |

For Paperwork Reduction Act Notice, see Instructions for Form 1120S.   IRS.gov/form1120s          Schedule K-1 (Form 1120S) 2013

DAA

661 Ued 02/14/2014 11:24 AM

Schedule K-1 (Form 1120S) 2013

Page 2

This list identifies the codes used on Schedule K-1 for all shareholders and provides summarized reporting information for shareholders who file Form 1040. For detailed reporting and filing information, see the separate Shareholder's Instructions for Schedule K-1 and the instructions for your income tax return.



| | | Report on |
|---|---|---|
| 1. | Ordinary business income (loss) Determine whether the income (loss) is passive or nonpassive and enter on your return as follows: | |
| | | Report on |
| | Passive loss | See the Shareholder's Instructions |
| | Passive income | Schedule E, line 28, column (g) |
| | Nonpassive loss | Schedule E, line 28, column (h) |
| | Nonpassive income | Schedule E, line 28, column (j) |
| 2. | Net rental real estate income (loss) | See the Shareholder's Instructions |
| 3. | Other net rental income (loss) | |
| | Net income | Schedule E, line 28, column (g) |
| | Net loss | See the Shareholder's Instructions |
| 4. | Interest income | Form 1040, line 8a |
| 5a. | Ordinary dividends | Form 1040, line 9a |
| 5b. | Qualified dividends | Form 1040, line 9b |
| 6. | Royalties | Schedule E, line 4 |
| 7. | Net short-term capital gain (loss) | Schedule D, line 5 |
| 8a. | Net long-term capital gain (loss) | Schedule D, line 12 |
| 8b. | Collectibles (28%) gain (loss) | 28% Rate Gain Worksheet, line 4 (Schedule D Instructions) |
| 8c. | Unrecaptured section 1250 gain | See the Shareholder's Instructions |
| 9. | Net section 1231 gain (loss) | See the Shareholder's Instructions |
| 10. | Other income (loss) | |
| | Code | |
| | A  Other portfolio income (loss) | See the Shareholder's Instructions |
| | B  Involuntary conversions | See the Shareholder's Instructions |
| | C  Sec. 1256 contracts & straddles | Form 6781, line 1 |
| | D  Mining exploration costs recapture | See Pub. 535 |
| | E  Other income (loss) | See the Shareholder's Instructions |
| 11. | Section 179 deduction | See the Shareholder's Instructions |
| 12. | Other deductions | |
| | A  Cash contributions (50%) | |
| | B  Cash contributions (30%) | |
| | C  Noncash contributions (50%) | |
| | D  Noncash contributions (30%) | |
| | E  Capital gain property to a 50% organization (30%) | See the Shareholder's Instructions |
| | F  Capital gain property (20%) | |
| | G  Contributions (100%) | |
| | H  Investment interest expense | Form 4952, line 1 |
| | I  Deductions—royalty income | Schedule E, line 19 |
| | J  Section 59(e)(2) expenditures | See the Shareholder's Instructions |
| | K  Deductions—portfolio (2% floor) | Schedule A, line 23 |
| | L  Deductions—portfolio (other) | Schedule A, line 28 |
| | M  Preproductive period expenses | See the Shareholder's Instructions |
| | N  Commercial revitalization deduction from rental real estate activities | See Form 8582 instructions |
| | O  Reforestation expense deduction | See the Shareholder's Instructions |
| | P  Domestic production activities information | See Form 8903 instructions |
| | Q  Qualified production activities income | Form 8903, line 7b |
| | R  Employer's Form W-2 wages | Form 8903, line 17 |
| | S  Other deductions | See the Shareholder's Instructions |
| 13. | Credits | |
| | A  Low-income housing credit (section 42(j)(5)) from pre-2008 buildings | |
| | B  Low-income housing credit (other) from pre-2008 buildings | |
| | C  Low-income housing credit (section 42(j)(5)) from post-2007 buildings | See the Shareholder's Instructions |
| | D  Low-income housing credit (other) from post-2007 buildings | |
| | E  Qualified rehabilitation expenditures (rental real estate) | |
| | F  Other rental real estate credits | |
| | G  Other rental credits | |
| | H  Undistributed capital gains credit | Form 1040, line 71, box a |
| | I  Biofuel producer credit | |
| | J  Work opportunity credit | |
| | K  Disabled access credit | See the Shareholder's Instructions |
| | L  Empowerment zone employment credit | |
| | M  Credit for increasing research activities | |

| | | Report on |
|---|---|---|
| | Code | |
| | N  Credit for employer social security and Medicare taxes | See the Shareholder's Instructions |
| | O  Backup withholding | |
| | P  Other credits | |
| 14. | Foreign transactions | |
| | A  Name of country or U.S. possession | |
| | B  Gross income from all sources | Form 1116, Part I |
| | C  Gross income sourced at shareholder level | |
| | Foreign gross income sourced at corporate level | |
| | D  Passive category | |
| | E  General category | Form 1116, Part I |
| | F  Other | |
| | Deductions allocated and apportioned at shareholder level | |
| | G  Interest expense | Form 1116, Part I |
| | H  Other | Form 1116, Part I |
| | Deductions allocated and apportioned at corporate level to foreign source income | |
| | I  Passive category | |
| | J  General category | Form 1116, Part I |
| | K  Other | |
| | Other information | |
| | L  Total foreign taxes paid | Form 1116, Part II |
| | M  Total foreign taxes accrued | Form 1116, Part II |
| | N  Reduction in taxes available for credit | Form 1116, line 12 |
| | O  Foreign trading gross receipts | Form 8873 |
| | P  Extraterritorial income exclusion | Form 8873 |
| | Q  Other foreign transactions | See the Shareholder's Instructions |
| 15. | Alternative minimum tax (AMT) items | |
| | A  Post-1986 depreciation adjustment | |
| | B  Adjusted gain or loss | See the Shareholder's Instructions and the instructions for Form 6251 |
| | C  Depletion (other than oil & gas) | |
| | D  Oil, gas & geothermal—gross income | |
| | E  Oil, gas, & geothermal—deductions | |
| | F  Other AMT items | |
| 16. | Items affecting shareholder basis | |
| | A  Tax-exempt interest income | Form 1040, line 8b |
| | B  Other tax-exempt income | |
| | C  Nondeductible expenses | See the Shareholder's Instructions |
| | D  Distributions | |
| | E  Repayment of loans from shareholders | |
| 17. | Other Information | |
| | A  Investment income | Form 4952, line 4a |
| | B  Investment expenses | Form 4952, line 5 |
| | C  Qualified rehabilitation expenditures (other than rental real estate) | See the Shareholder's Instructions |
| | D  Basis of energy property | See the Shareholder's Instructions |
| | E  Recapture of low-income housing credit (section 42(j)(5)) | Form 8611, line 8 |
| | F  Recapture of low-income housing credit (other) | Form 8611, line 8 |
| | G  Recapture of investment credit | See Form 4255 |
| | H  Recapture of other credits | See the Shareholder's Instructions |
| | I  Look-back interest—completed long-term contracts | See Form 8697 |
| | J  Look-back interest—income forecast method | See Form 8866 |
| | K  Dispositions of property with section 179 deductions | |
| | L  Recapture of section 179 deduction | |
| | M  Section 453(l)(3) information | |
| | N  Section 453A(c) information | |
| | O  Section 1260(b) information | |
| | P  Interest allocable to production expenditures | See the Shareholder's Instructions |
| | Q  CCF nonqualified withdrawals | |
| | R  Depletion information—oil and gas | |
| | S  Amortization of reforestation costs | |
| | T  Section 108(i) information | |
| | U  Net investment income | |
| | V  Other information | |

DAA

561 09/10/2014 11:24 AM

| Form **1120S**<br>**Schedule K-1** | **Shareholder's Basis Worksheet Page 1** | | **2013** |
|---|---|---|---|
| | For calendar year 2013 or tax year beginning | , ending | |

| Name | **TEXARKANA RETAIL CORPORATION**<br>**LEON GOLDSTEIN** | Taxpayer Identification Number | **20-4977425**<br>**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** |
|---|---|---|---|

## Stock Basis

1. Beginning of year stock basis
2. Capital contributions
   **Additions:**
3. Ordinary business income ............................................. **168,132**
4. Net rental income
5. Interest, dividends, royalties and net capital gains
6. Net section 1231 gain
7. Tax-exempt interest and other income ............................ **11,220**
8. Other income
9. Gain on disposal of Section 179 assets .................................................. **179,352**
10. Other increases

11. Subtotal (Add line 1 through line 10) ........................................................ **179,352**
    **Subtractions:**
12. Distributions
13. Total losses and deductions applied against stock basis (See Shareholder's Basis Worksheet Page 2) ......... **142,267**
14. Other decreases

15. Amount used to restore loan basis
16. End of year stock basis (Subtract the sum of lines 12 through 15 from line 11) ..................... **37,085**

## Loan Basis

17. Beginning of year loan basis
18. Loans to corporation
19. Loan basis restored - amount used in prior years to offset losses
20. Other increases

21. Loan repayments
22. Total losses and deductions applied against loan basis (See Shareholder's Basis Worksheet Page 2)
23. Other decreases

24. End of year loan basis (Subtract the sum of lines 21 through 23 from the sum of lines 17 through 20) ........... **0**
25. End of year stock and loan basis (Add line 16 and line 24) ................................. **37,085**

Principal amount of loan owed to shareholder at end of the year ........................................ **0**

## Gain Recognized on Excess Distributions

26. Distributions
27. Stock basis before distributions and loss items
28. Gain recognized on excess distributions (Subtract line 27 from line 26)

## Gain Recognized on Repayment of Shareholder Loan

29. Loan basis at beginning of tax year
30. Loan basis restored - amount used in prior years to offset losses
31. Loan basis before loan repayment (Add line 29 and line 30)
32. Shareholder loan at beginning of tax year
33. Loan repayments to shareholder during tax year
34. Nontaxable return of loan basis ((Line 31 divided by line 32) multiplied by line 33)
35. Gain recognized on repayment of shareholder loan (Subtract line 34 from line 33)

Note to shareholder:  This worksheet was prepared based on corporation records. Please consult with your tax advisor for adjustments.

561 09/10/2014 11:24 AM

| Form **1120S** Schedule K-1 | **Shareholder's Basis Worksheet Page 2** | **2013** |
|---|---|---|
| | For calendar year 2013 or tax year beginning                    , ending | |

| Name | Taxpayer Identification Number |
|---|---|
| TEXARKANA RETAIL CORPORATION | 20-4977425 |
| LEON GOLDSTEIN | 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 |

## Loss Allocated to Stock and Loan Basis

| | Suspended Losses | Current Year Loss | Total Loss | Percent | Allowed Stock Loss | Disallowed Loss | Percent | Allowed Loan Loss | Loss to Carryforward | Total Allowed Loss |
|---|---|---|---|---|---|---|---|---|---|---|
| Nondeductible noncap expenses | | | | | | | | | | |
| Deductible items: | | | | | | | | | | |
| Ordinary business loss ........ | 142,267 | | 142,267 | 100.00 | 142,267 | | | | | 142,267 |
| Net rental real estate loss ..... | | | | | | | | | | |
| Other net rental loss ......... | | | | | | | | | | |
| Short-term capital loss ........ | | | | | | | | | | |
| Long-term capital loss ......... | | | | | | | | | | |
| Net section 1231 loss ......... | | | | | | | | | | |
| Other portfolio loss ........... | | | | | | | | | | |
| Other losses .................. | | | | | | | | | | |
| Section 179 expense .......... | | | | | | | | | | |
| Cash contributions (50%) ..... | | | | | | | | | | |
| Cash contributions (30%) ..... | | | | | | | | | | |
| Noncash contributions (50%) . | | | | | | | | | | |
| Qual conserv contrib (50%) ... | | | | | | | | | | |
| Noncash contributions (30%) . | | | | | | | | | | |
| Cap gain prop 50% org (30%) . | | | | | | | | | | |
| Cap gain prop (20%) .......... | | | | | | | | | | |
| Qual conserv contrib (100%) .. | | | | | | | | | | |
| Portfolio deductions (2% floor) | | | | | | | | | | |
| Portfolio deductions (other) ... | | | | | | | | | | |
| Investment interest expense .. | | | | | | | | | | |
| Deductions-royalty income .... | | | | | | | | | | |
| Section 59(e)(2) expend ....... | | | | | | | | | | |
| Preproductive period exp ...... | | | | | | | | | | |
| Commercial revitalization ded . | | | | | | | | | | |
| Reforestation expense ded .... | | | | | | | | | | |
| Other deductions .............. | | | | | | | | | | |
| Foreign taxes ................. | | | | | | | | | | |
| Loss on disposal of 179 assets | | | | | | | | | | |
| Total deductible items ....... | 142,267 | | 142,267 | 100.00 | 142,267 | | | | | 142,267 |
| Total nonded and deductible items | 142,267 | | 142,267 | | 142,267 | | | | | 142,267 |

Note to shareholder:  This worksheet was prepared based on corporation records. Please consult with your tax advisor for adjustments.

861 09/10/2014 11:24 AM

## AR Shareholder Income, Deductions & Credits Worksheet, Page 1

**Form AR1100S**                                                                           **2013**

Tax Year beginning **01/01/13** , and ending **12/31/13**

| Shareholder's identifying number | 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 | Corporation's identifying number | 20-4977425 |
|---|---|---|---|

Shareholder's name, address, and ZIP code

LEON GOLDSTEIN
17555 COLLINS AVENUE, SUITE 3702
SUNNY ISLES        FL   33160

Corporation's name, address, and ZIP code

**TEXARKANA RETAIL CORPORATION**

C/O HMD 20900 WEST DIXIE HIGHWAY
AVENTURA          FL   33180

| | | | |
|---|---|---|---|
| Final return | | Withholding | ☐ |
| Exempt from withholding | ☒ | Composite filer | |
| Ownership percentage | 33.000000 | Arkansas apportionment percentage | 100.000000 |

## Shareholder's Share of Arkansas Income and Deductions

Income
| | |
|---|---|
| Ordinary income | 168,132 |
| Interest income | |
| Dividend income | |
| Rental income | |
| Royalty income | |
| Net short-term capital gain or loss | |
| Net long-term capital gain or loss | |
| Net 1231 gain or loss | |
| Section 108(i) deferred income | |
| Other income (loss) | |
| Total income | 168,132 |

Deductions
| | |
|---|---|
| Charitable contributions | |
| Section 179 expense deduction | |
| Section 108(i) deferred expense | |
| Other expenses (adjustments) | |
| Total deductions | |

## Apportioned and Allocated Income

| | |
|---|---|
| Arkansas apportioned income | 168,132 |
| Arkansas allocated income | |
| Net income or loss | 168,132 |

## Taxes

| | |
|---|---|
| Taxes withheld or paid on behalf of nonresident shareholder | |
| Composite tax | |

## Other Information

| | |
|---|---|
| Supplemental information | |

**1**

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 10-58483 CA 40

RODION SOKROVICHTCHOUK, et al.,

   Plaintiffs,

vs.

EVS INVESTMENTS, INC., et al.,

   Defendants.

_____/

Dade County Courthouse
73 West Flagler Street
Miami, FL 33031
March 26, 2014
9:05 a.m. - 11:35 a.m.

B E F O R E :

The Honorable Richard Yale Feder, Senior Judge

TRANSCRIPT
OF
PROCEEDINGS

**2**

APPEARANCES:
TOBIN & REYES, P.A.
BY:  RICARDO A. REYES, ESQ.
COUNSEL FOR THE DEFENDANTS

HELLER WALDMAN, P.L.
BY:  MICHAEL A. SAYRE, ESQ.
   JASON GORDON, ESQ.
COUNSEL FOR PINNACLE THREE

PHILLIPS, CANTOR, SHALEK, RUBEN & PFISTER, P.A.
BY:  JEFFREY SHALEK, ESQ.
COUNSEL FOR PALADIN SHIPPING COMPANY LIMITED AND
ANATOLIY CHABAN

MOMBACH, BOYLE, HARDIN & SIMMONS
BY:  JASON SMITH, ESQ.
FORMER COUNSEL FOR PINNACLE THREE AND LEON
GOLDSTEIN

**3**

1    (Thereupon, the following proceedings
2  were had:)
3    THE COURT:  In order to do this, I guess
4  alphabetically or appropriately, the first
5  thing I would like to have a discussion of is
6  who is paying me and at what rate.
7    I was told by Judge Thornton that that's
8  between you and me, you being plural.
9    MR. SAYRE:  We, to tell you the truth,
10  have not discussed that, Your Honor.
11    THE COURT:  Well, I think we better
12  discuss it before we get started.  I don't
13  work for nothing.
14    MR. REYES:  Your Honor, my name is Rick
15  Reyes.  I represent the corporate defendants
16  that filed the motion to deposit in the
17  registry.
18    I believe Judge Thornton did mention
19  that senior judges are compensated, but we
20  did not establish with him.  I guess my
21  question to Your Honor would be what do you
22  normally charge?  And I suppose it would be
23  split when somebody would seek that to
24  recover when Your Honor makes an award, if
25  Your Honor makes an award, in the case.

**4**

1    THE COURT:  Well, it depends.  When I
2  sit as a mediator, I get 450 an hour.  When I
3  sit as a judge, it depends what the business
4  is and what the people want to pay.  I can
5  tell you this.  I've read this.  I've read
6  this.  And somebody is going to pay for the
7  time it took to read all this garbage.
8  Garbage being an appropriate term.
9    Anyone got a suggestion?
10    MR. SAYRE:  Do you want to establish
11  this before we get into the --
12    THE COURT:  I think so.  It would make
13  me feel easier to know what I'm getting.
14    MR. REYES:  Your Honor, why don't we use
15  your mediation rate; would that be
16  acceptable?
17    THE COURT:  That's fine.
18    MR. REYES:  Would that be acceptable to
19  Your Honor?
20    THE COURT:  That's fine with me.
21    MR. REYES:  We're kind of going off the
22  cuff here.
23    MR. SAYRE:  Yeah, I haven't talked to my
24  client.
25    MR. REYES:  I haven't spoken to my

**5**

1  client either.
2      MR. SHALEK:  Does the court
3  administration have a set rate for
4  compensating senior judges?  Is there a
5  courthouse rate for it?  What do the other
6  judges get?
7      We're blind in this.  And certainly
8  we're in no position to sit here and horse
9  trade and negotiate Your Honor's rate.
10      THE COURT:  No, I'm not asking you to.
11      MR. SHALEK:  If there's an
12  administrative rate used in the courthouse
13  that is usual and customary, we can --
14      THE COURT:  I don't know.  I haven't
15  been sitting as a senior judge for a while
16  because they ran out of money to pay for
17  senior judges so I don't know.  But your
18  suggestion is acceptable to me.
19      MR. REYES:  What do you think,
20  gentlemen?
21      I suppose there's two parties presently.
22  There's a party seeking to intervene so I
23  guess it would go three ways if Your Honor
24  grants the intervention.
25      THE COURT:  Divide it as many as you

**6**

1  wish.
2      MR. SAYRE:  The one point I would raise,
3  and I was going to raise it in argument, is
4  that Judge Thornton has referred three
5  motions to Your Honor.  The motion to
6  intervene was not included among that
7  referral so I don't know how that affects
8  things.
9      THE COURT:  I think John will be
10  delighted for me to handle that, too.
11      MR. SHALEK:  As a matter of fact, when
12  we filed in front of Judge Thornton, he
13  specifically said set it at the same time as
14  this in front of you.
15      THE COURT:  Okay.
16      MR. SHALEK:  While there's not a
17  written -- I would agree that while there is
18  not a written referral, we filed it and sent
19  it to you as instructed by Judge Thornton's
20  chambers.
21      MR. SAYRE:  So then it would be a
22  three-way split, Your Honor, and 450 -- I
23  mean, obviously we have clients that have to
24  confirm.  I'm sure Mr. Reyes would want to
25  confirm.  But if that's the rate, that's the

**7**

1  rate.
2      THE COURT:  All right.  The next thing
3  we have to discuss is your motion.
4      MR. SHALEK:  I think it would be a
5  three-way split if I'm permitted to intervene
6  in the case.  If not, I'm not party and then
7  it's a two-way split.
8      THE COURT:  Tell me about your motion to
9  intervene.  I didn't get a motion so I
10  haven't had a chance to read it.
11      MR. SHALEK:  Would you like a copy?
12      THE COURT:  Please.
13      MR. SHALEK:  It's not very complicated
14  or complex.
15      THE COURT:  Why don't we start with
16  names so that I know who is who.
17      MR. REYES:  Your Honor, Rick Reyes on
18  behalf of the four corporate entities that
19  have moved to enforce the underlying
20  settlement.
21      MR. SAYRE:  Michael Sayre and Jason
22  Gordon on behalf of Pinnacle Three.
23      MR. SMITH:  Jason Smith, Your Honor.
24  I'm here from Mombach, Boyle.  We were former
25  counsel to Pinnacle and Leon Goldstein.

**8**

1      I'm here strictly because we have
2  possession of the original promissory note.
3      MR. SHALEK:  Your Honor, Jeffrey Shalek,
4  Phillips, Cantor, Shalek, Ruben, Pfister on
5  behalf of the proposed interveners Paladin
6  Shipping Company Limited and Anatoliy Chaban.
7      With regard to our motion to intervene,
8  Your Honor, judgment creditors Paladin
9  Shipping Company and Anatoliy Chaban were
10  involved in a three-day federal trial against
11  Leon Goldstein that we won that case but we
12  weren't happy with the amount of money that
13  we won at the time, $145,000.  We appealed
14  that amount and Judge Altonaga ultimately was
15  reversed with instructions that we be -- that
16  she recalculate the damages.  And as a
17  result, we now hold a judgment in the amount of
18  attached to the motion in the amount of
19  $1,055,572 against Leon Goldstein.
20      THE COURT:  That sounds better than
21  $145,000.
22      MR. SHALEK:  We were pleased with that
23  decision.
24      We then sought to intervene in this
25  action because Leon Goldstein at the time was

## 9

1  a defendant in this action and at the time
2  had filed an affidavit in this action stating
3  that he owned 100 percent of another company
4  called Pinnacle Three corporation --
5      THE COURT:  Right.
6      MR. SHALEK:  -- in this action.  At the
7  time we originally moved, which was actually
8  one year to the date today, Leon Goldstein in
9  the federal court filed a motion for
10  reconsideration of the judgment that was not
11  finished, and Judge Thornton indicated that
12  while he would like to allow us to intervene
13  he can't because he will only do it once the
14  judgment is final.
15      Since that time and the time it took
16  Judge Altonaga to rule on the motion for
17  consideration and for some time for that to,
18  you know, to rule on that motion for
19  consideration, the parties in this case
20  settled the litigation according to the
21  settlement that was in dispute now.
22      Under that settlement a portion of it is
23  that Pinnacle Three, the company wholly owned
24  by Leon Goldstein, was to get roughly
25  $2 million or so over a long period of time.

## 10

1  We are again seeking to intervene in this
2  case to assert our rights to that money.
3      The issue has come up now in this case
4  whereby, and in the federal case, by the way,
5  whereby Goldstein claims he no longer owns
6  the stock.  He assigned the stock to a
7  company called North Star Maritime.  And
8  despite the fact that he signed an affidavit
9  in 2012 stating that he was the owner of the
10  stock, he's now claiming that he assigned
11  that stock back in 2007.  Ironically 2007
12  being a time where Pinnacle Three didn't have
13  any assets, yet someone gave him the stock as
14  a security for they're alleging like a
15  $7 million loan.
16      We are seeking to intervene.  We want
17  our piece of this settlement or at least have
18  the right to our piece of this settlement and
19  to contest the transfer to the extent that
20  there is a legitimate transfer of stock of
21  Leon Goldstein's stock in Pinnacle Three to
22  North Star.  We're going to seek to set that
23  aside.
24      The rules of intervention are fairly
25  straightforward.  Under Rule 1.230 anyone

## 11

1  claiming an interest in pending litigation
2  may at any time be permitted to assert a
3  right by intervention, but the intervention
4  shall be subordinate to, and in recognition
5  of, the propriety of the main proceeding.
6      Your Honor, I'm sure is familiar with
7  that.
8      Clearly by the fact that we have a
9  judgment against the party that is supposed
10  to be paid under this settlement agreement or
11  a corporation that he allegedly is the sole
12  owner of, we have a right to, at the very
13  least procedurally, and that's all we're
14  asking for today.  We're not asking for an
15  award.  We're asking for the procedural right
16  to be a party in this litigation at this
17  time.
18      The judgment creditors routinely in the
19  state of Florida are permitted to intervene
20  in lawsuits to assert their rights to any
21  settlement proceeds.  It's not novel.  It's
22  not unique.  Clearly Your Honor is not going
23  to resolve the dispute between us and Leon
24  Goldstein and Pinnacle Three today.  This is
25  just purely a procedural request, Your Honor.

## 12

1      THE COURT:  Okay.
2      MR. REYES:  Your Honor, from the
3  perspective of the corporate defendants --
4      MR. SAYRE:  Hold on.
5      MR. REYES:  -- I would just point out
6  that in addition to what Mr. Shalek stated,
7  we were added to that collection action in a
8  proceeding supplementary which is we are
9  defendants at least for the purpose of
10  turning over stock, turning over shares of
11  stock that Mr. Goldstein owns.  And Judge
12  Altonaga is dealing with those issues with
13  respect to what shares Mr. Goldstein owns and
14  turning those over, etcetera, in their
15  efforts to collect on their judgment.  We've
16  been brought into that proceeding.
17      So that's one of the reasons why we've
18  been so cautious with respect to all of the
19  irregularities in the transfers of the
20  ownership interests and why we sought to
21  enforce a settlement for breaching by
22  assigning without our consent.  And we, as
23  I'll explain to Your Honor a little bit
24  later, still haven't received all of the
25  information we need.

13

1  So I think they make a basis to
2  intervene and I think it might be prudent so
3  that everyone is protected and everyone is
4  heard.
5  THE COURT:  Okay.
6  MR. SAYRE:  Your Honor, Mr. Shalek said
7  a couple things.  I want to start off by
8  saying this motion was set on Friday night.
9  I would like a chance to respond because Mr.
10  Shalek made some representations about how
11  procedurally it's definitely okay.  I
12  disagree and I want to respond to that.
13  That's number one.
14  This, you know, I would be happy to have
15  this heard at a different time with Your
16  Honor obviously presiding.  But addressing
17  some of the merits as well, he says that he's
18  a judgment creditor of Pinnacle Three.  He is
19  not a judgment creditor of Pinnacle Three.
20  He is a judgment creditor of Leon Goldstein.
21  Okay.  This involves Pinnacle Three, not Leon
22  Goldstein so that's not correct.
23  He wants to make a jump but he has to
24  make that jump.  And he should be making that
25  jump in federal court.  This is not where

14

1  this should be decided.  He's made similar
2  representations in federal court about
3  improper conveyance.  We have dared him to
4  bring some sort of fraudulent conveyance
5  claim.  He refuses to do it for some reason
6  because he doesn't have the proof because it
7  didn't happen.  It was all on the up and up.
8  And that's about it.  To the extent that
9  he wants to make the arguments regarding
10  fraudulent conveyance, that's in federal
11  court.  For some reason he won't do it.  And
12  Pinnacle Three is not the -- he does not have
13  a judgment against Pinnacle Three.  He has a
14  judgment against Leon Goldstein.
15  THE COURT:  Is that correct?
16  MR. SHALEK:  Your Honor, our judgment is
17  against Leon Goldstein.  Leon Goldstein has
18  filed an affidavit in this case saying in
19  2012 claiming to be 100 percent owner of
20  Pinnacle Three.
21  THE COURT:  He also claims he sold it in
22  2007.
23  MR. SHALEK:  Well, that certainly is
24  quite a coincidence and that therein lies the
25  fraud.  Why would someone who gave away his

15

1  shares in 2007 induce Mr. Reyes' clients to
2  enter into a settlement by filing an
3  affidavit five years later in 2012 stating
4  that he is the 100 percent owner of the
5  company, number one.
6  Number two, he says he dares me.  Well,
7  I double dare him to answer the complaint.
8  You know, it's a wonderful thing, but I can
9  assure you that the fraudulent conveyance
10  claim under Florida Statute 726 and the
11  proceeding supplemental under 56.29 is better
12  left as a state court remedy in state court
13  and not federal court.
14  I have my option in which -- I'm the
15  Plaintiff.  I get to decide where I want to
16  bring the claim.  The defendant doesn't tell
17  me where to sue him.  I decide where I'm
18  going to sue the defendant.  And it belongs
19  in this court because it's this court that is
20  going to be dealing with the distribution of
21  the settlement proceeds.  And to the extent
22  that Leon Goldstein fraudulently has this
23  agreement saying that in 2007 he gave his
24  stock --
25  THE COURT:  100 percent.

16

1  MR. SHALEK:  Right, then this court is
2  going to hear it and that's all we're asking
3  for.
4  The last thing about the fact that I
5  gave this notice on Friday, I served my
6  notice on the 26th.  It was basically the
7  same day, maybe Mr. Reyes served his notice
8  on the 25th, when we all decided that you
9  were going to be hearing this.  This is the
10  date.  And to say, well, my notice is a date
11  late, only Friday, and Mr. Sayre, you know,
12  didn't have the same five days to prepare as
13  he did for the others is just disingenuous,
14  Your Honor.
15  Procedurally let's intervene and let's
16  hash this out and see what's going on.
17  MR. SAYRE:  Your Honor, they brought
18  proceedings supplementary in federal court.
19  He mentioned he has the right to bring
20  proceedings supplementary.  He's brought that
21  in federal court.  I don't know why he's
22  trying to now bring it in state court.  I
23  mean, are you to drop your federal court
24  proceedings supplementary?
25  MR. SHALEK:  I haven't brought it

17

1  against your client.
2     MR. SAYRE:  Pinnacle Three is a party.
3     MR. SHALEK:  That's not who I'm going to
4  bring it against.
5     MR. SAYRE:  You're going to bring it
6  against Leon Goldstein.
7     MR. SHALEK:  Leon Goldstein is a
8  defendant.  Pinnacle Three is a defendant.
9     MR. SAYRE:  Your Honor, this is being
10  litigated in federal court.
11     MR. SHALEK:  No.
12     MR. SAYRE:  We are here -- If Your Honor
13  indulges me, we are here on Mr. Reyes' motion
14  to enforcement settlement agreement.
15     MR. REYES:  Motion to deposit in the
16  registry.
17     MR. SAYRE:  Oh, I'm sorry, I'm sorry.
18     THE COURT:  That's not what I read.
19     MR. SAYRE:  We are here on the motion to
20  deposit in the registry, but that was in
21  conjunction with Mr. Reyes' motion to enforce
22  settlement agreement.  And Mr. Reyes very
23  clearly in his motion to enforce settlement
24  agreement says that Pinnacle Three has not
25  met three obligations under the settlement

18

1  agreement.
2     And, Your Honor, I've got because it
3  gets --
4     MR. SHALEK:  He's getting off the issue,
5  Your Honor.
6     THE COURT:  Hold on.  One at a time.
7     MR. SAYRE:  It may get confusing so I've
8  created a little chart.
9     MR. SHALEK:  May I have one?
10     MR. SAYRE:  Here you go.
11     At the bottom left, Your Honor, those
12  are the three items that Mr. Reyes' clients
13  are saying that Pinnacle Three didn't do,
14  execute a partial release, return an original
15  $150,000 note marked paid in full, and
16  improperly assigned notes and mortgages.
17  That's what the motion to enforce is about
18  and that's what the motion to deposit is in
19  conjunction with.
20     We've done all those things except for
21  the original note which Mr. Reyes, we were
22  trying to satisfy him.  He wouldn't respond
23  to Mr. Hamaway's office who has the original
24  note.  The original note is here.  And we
25  will -- A representative of Pinnacle Three

19

1  will mark it cancelled.
2     So we've basically satisfied all of Mr.
3  Reyes' issues in the motion to enforce which
4  is what the motion to deposit is made in
5  conjunction with.
6     So, I mean, that's what we're here
7  about.  We're not here about fraudulent
8  conveyances.  We're not here about that.  Mr.
9  Reyes raised three alleged breaches of the
10  settlement agreement.  Those three breaches,
11  alleged breaches, have been fixed because we
12  just don't want to fight about it.  I mean,
13  we disagree with some of what he said.  But,
14  as far as we're concerned, we do not want to
15  fight.  This fight is already occurring in
16  federal court.
17     So that's our position, Your Honor.
18     And in regards to -- I guess I'm
19  switching topics now.  We're getting off the
20  motion to intervene.  But the motion to
21  deposit, beyond the fact that the motion to
22  enforce is moot which the motion to deposit
23  was filed in conjunction with --
24     MR. REYES:  I don't think he should be
25  arguing for me, Your Honor.  I'm the movant

20

1  and counsel is trying to make my argument.
2     MR. SAYRE:  You can tell me I'm wrong.
3  You can tell me I'm wrong.
4     MR. REYES:  Well, I think I should argue
5  it first.
6     MR. SAYRE:  The motion to enforce -- I'm
7  sorry, the motion to deposit is really a
8  mandatory injunction.  And that's the very
9  thing that Mr. Shalek's clients tried to do
10  in front of Judge Altonaga.  These very
11  settlement funds they tried to deposit in the
12  court registry.
13     Initially they were successful but then
14  Judge Altonaga realized that she was wrong
15  and she can't do that because it's a
16  mandatory injunction and they haven't
17  satisfied the requirements and so she
18  reversed herself.  And so now that money that
19  was being held in the court registry, really
20  Mr. Shalek's trust account which was acting
21  as the court registry, has now been returned
22  to Mr. Reyes.  So what they're trying to do
23  here by virtue of this motion to deposit has
24  really already been decided and they're
25  trying to get a second bite at the apple.

21

1  MR. REYES:  Your Honor, if I may, we
2  were discussing Mr. Shalek's motion to
3  intervene and, you know, counsel's recitation
4  of the evidence we dispute.  I would like to
5  be heard --
6  THE COURT:  Go ahead.
7  MR. REYES:  -- with respect to those
8  issues, but I don't know if Your Honor wants
9  to hear any further on the motion to
10  intervene before we get onto my motion to
11  deposit.  If not, I'll proceed with that.
12  THE COURT:  Anything else on the motion
13  to intervene?
14  MR. SHALEK:  If it's necessary, Your
15  Honor, I want to point out the following:
16  The motion to intervene is designed to set
17  aside the transfer, the alleged transfer of
18  the shares from Leon Goldstein to North Star
19  Maritime.  The motion to intervene, once
20  allowed to intervene, will be followed by a
21  proceeding supplemental against North Star
22  Maritime.  With respect to the proceeding
23  supplementary in the federal case, North Star
24  Maritime is not a party.  In fact, Your
25  Honor, North Star Maritime, and Mr. Sayre

22

1  will tell you because he did it, through Mr.
2  Sayre filed its own motion to intervene in
3  the federal case.  And Judge Altonaga said,
4  no, we're not allowing that party in the
5  federal case.  To the extent that there's a
6  problem there, it must be brought here
7  because that judge already ruled that North
8  Star Maritime will not be a party in the
9  federal case.
10  He brought the motion to intervene.  He
11  sought to bring North Star Maritime into that
12  case.  Judge Altonaga in federal court said
13  no.  Now I need to set aside that fraudulent
14  transfer and at least allege it.  Maybe I'll
15  be able to do it.  Mr. Sayre says no.  He
16  dares me to do it.  We'll be happy to take up
17  his dare.  But I need a forum to do it and
18  this is the forum that we're going to elect
19  to do it.  And that party is not a party in
20  the federal case.
21  MR. SAYRE:  I would just say something,
22  Your Honor.  North Star Maritime is not a
23  party here.
24  MR. SHALEK:  I understand that.  I'm
25  going to implead them through 56.29 once I'm

23

1  a party in this to get the fraudulent
2  transfer of the shares and the award of the
3  $2 million settlement to me instead of him.
4  That's my procedural remedy.
5  MR. SAYRE:  Mr. Shalek's clients were
6  not involved in this case at all.  Now they
7  want to come in and they want to create a
8  fraudulent conveyance litigation in these
9  post-judgment proceedings.  This is why I
10  want to file a response because this -- I'm
11  sure the law is that he can't do that,
12  especially when he's got the ability to do
13  that in federal court and this thing is being
14  litigated in federal court and he's just not
15  happy that he lost on a motion in front of
16  Judge Altonaga and he doesn't want to bring
17  it there.
18  THE COURT:  I don't blame you for that.
19  MR. SHALEK:  I've won motions and I've
20  lost motions.  I've had her appealed and
21  reversed.  She gave me $1.55 million.  I won
22  hearings.  I have no fear of Judge Altonaga.
23  She's a wonderful lady.
24  THE COURT:  She's a good judge.
25  MR. SHALEK:  She's a good judge but it's

24

1  not where this hearing in this case needs to
2  be where the settlement is.  The settlement
3  proceeds and the settlement is being enforced
4  by this court, not that court.
5  THE COURT:  If I rule with you, where
6  does that put you?
7  MR. SHALEK:  It puts me without the
8  ability to set aside the fraudulent transfer
9  from Goldstein to North Star Maritime.  It
10  has to be done in this case.
11  Given that I have the judgment, the
12  judgment of $1.55 million against Leon
13  Goldstein and the shares are in the hands of
14  Leon Goldstein.  It wasn't Pinnacle that
15  transferred the shares.  Leon was the owner
16  of the shares of Pinnacle Three.  Pinnacle
17  Three is receiving the benefits of the
18  settlement in this case.  Right.  Leon
19  allegedly signed his stock to North Star
20  Maritime.  I need to file a 56.29
21  supplemental proceeding to unwind that.  This
22  is the proper jurisdiction to do it.
23  MR. SAYRE:  Your Honor --
24  MR. SHALEK:  This is the jurisdiction
25  that has to control.

---

**25**

1    THE COURT: Why didn't you file it?
2    MR. SHALEK: I'm not a party. I need to
3  be a party in this case to do it. I'm asking
4  to intervene. I have an interest. My
5  interest is the judgment. I have that
6  interest. And under the law, under Rule
7  1.230, anybody with a litigable interest in
8  the case should be permitted to intervene and
9  intervention should be liberally permitted.
10  This is just becoming a party. I'm not
11  asking this court to decide anything today.
12    MR. SAYRE: Your Honor, Jason Gordon my
13  colleague, a very smart man, read my mind and
14  wrote a note to me. Mr. Shalek's right. Our
15  intervention was denied in the federal court
16  case. But that does not prevent him from
17  doing exactly what he's attempting to do here
18  in the federal court case. If he wants to
19  bring a claim against North Star in federal
20  court for alleged fraudulent transfer, there
21  is nothing stopping him. I mean, I can't
22  come back and say, Your Honor, he can't do
23  that because remember you denied our motion
24  to intervene. He can do that in federal
25  court where this is currently being

---

**26**

1  litigated. There's nothing preventing him
2  from doing that. If Mr. Shalek wants to
3  correct me, he can, but I don't think he
4  will.
5    MR. GORDON: Your Honor, may I add
6  something to that --
7    THE COURT: Sure.
8    MR. GORDON: -- since he was nice enough
9  to say nice things about me?
10    Your Honor, what Mr. Shalek is
11  indicating he'd like to do here, which is
12  bring an action to set aside what he claims
13  is an improper transfer of shares, this case
14  was settled last year. This case has no
15  bearing on the shares of Pinnacle Three
16  stock. They were not at issue in this case.
17  They were not any issue as to the settlement
18  of it.
19    What Mr. Shalek would like to do is come
20  into a settled case. He claims there's
21  pending litigation. There isn't litigation,
22  Your Honor. This is settled. The court has
23  jurisdiction to enforce the settlement terms.
24  He would like to apparently reopen this case
25  and now bring a claim that has nothing to do

---

**27**

1  with the case as far as putting aside an
2  alleged transfer of shares he has an issue
3  with. It has no relation to this litigation.
4  Aside from everything else that has been said
5  why he can't do that, with a case that has
6  been resolved you don't get to come in and
7  bring brand new claims when you had nothing
8  to do with the case to begin with. That just
9  simply isn't how it works. He has a forum in
10  federal court to do that. He's currently
11  doing it in federal court. There have been
12  many filings by both parties here of the
13  issues related to these shares that we're
14  talking about where we have noted why it is
15  we have them. We have priority. He disputes
16  it. And that is being dealt with there quite
17  well by Judge Altonaga at this point. She's
18  taking care of that.
19    So I don't see how you open this case
20  for something that has nothing to do with it
21  and say I want now to set aside shares of
22  parties. You fundamentally can't do that.
23  You've got a forum to do that. You don't get
24  to litigate in two forums. He's trying to
25  litigate in two forums. The case is sitting

---

**28**

1  in federal court. So you don't open a
2  settled claim and bring these sort of claims,
3  Your Honor. It doesn't work.
4    MR. SHALEK: That's not what Judge
5  Thornton said the last time we were in front
6  of him. He said that the only reason I
7  wasn't allowed to intervene at that time was
8  because our judgment wasn't final at that
9  time. Now we're back. The judgment is final
10  and we're back. The $2 million is under the
11  jurisdiction of this court.
12    THE COURT: What are you intervening in?
13    MR. SHALEK: We're intervening in the
14  case of Rodion -- I can't say his last name.
15    THE COURT: If you can pronounce it,
16  you're a better man than I am.
17    MR. REYES: Sokrovichtchouk.
18    MR. SHALEK: Sokrovichtchouk versus EVS
19  Investments. There's current motions to
20  enforce to deposit the funds which are our
21  funds or are going to be our funds.
22    THE COURT: But aren't all of those
23  motions dealing with the settlement?
24    MR. SHALEK: That's correct. They are
25  absolutely dealing with the settlement. But

---

29

1  the settlement is -- the settlement itself,
2  as you're going to hear from Mr. Reyes, and
3  maybe you should hear from Mr. Reyes.
4      MR. REYES:  I was just going to say
5  that.
6      MR. SHALEK:  Let him explain to you why.
7      MR. REYES:  May I explain to Your Honor
8  why I need an evidentiary hearing on the
9  motion to enforce the settlement, why it
10  should be deposited and then it might make
11  some -- It will explain our concern about
12  this money going to the right person so we're
13  not subjected to a double liability,
14  etcetera, because these folks are suing us
15  and pursuing these moneys.  It's significant
16  moneys.  It's almost $40,000 a month on a
17  $2.1 million note over seven years.  Okay.
18  So perhaps that would be the best way to
19  proceed, if I could go that way, Your Honor.
20      THE COURT:  Go ahead.
21      MR. REYES:  Your Honor, we filed a
22  motion to enforce the settlement after
23  considerable communications and letter
24  writing campaign between the parties where we
25  were asking for information with respect to

31

1  sell Mr. Kaplan and his co-counsel sell
2  Michael Hamaway for two-and-a-half years.
3  And Mr. Goldstein was deposed six times.
4      MR. SMITH:  Sounds about right.
5      MR. REYES:  I want to say six times.
6  And his interests and his assets and
7  relationships with others were explored to
8  various degrees.  His accountant was deposed.
9      Okay.  The entity that we're moving to
10  enforce against is an entity called Pinnacle
11  Three Corporation, a Florida corporation.
12  I'll represent to Your Honor that there are
13  two Pinnacles.  There is a Pinnacle Three
14  Corporation, an Illinois corporation.  The
15  Illinois corporation was first.  Pinnacle
16  Three Florida did not come into existence,
17  and I went on Sunbiz this morning just to
18  bring it with me, Pinnacle Three Florida did
19  not come into existence until January 31,
20  2008.  I have a copy here of the Sunbiz, if
21  Your Honor would like to see that.
22      Now, the interest by which North Star
23  claims to have -- to now possess the Pinnacle
24  shares through a subsidiary, because you also
25  have two layers of North Star.  You have

30

1  this conveyance of the notes and the security
2  instruments under the settlement, and we
3  could not get documentation given to us which
4  forced us to file the motion to enforce the
5  settlement.  That was after we also had
6  demanded the release of the collateral that
7  was mandated by the settlement.  It wasn't
8  even something we had to ask for.  And it was
9  after they refused to return the original --
10      THE COURT:  Note.
11      MR. REYES:  There was a $150,000 and a
12  2.1 note.  That note was paid early in the
13  settlement.  They wouldn't return that to us.
14  And so we had to file the motion to enforce
15  the settlement.
16      We asked for an evidentiary hearing,
17  Your Honor, because the conveyance is very
18  suspect, from our perspective.  And we want
19  to make sure that we're not exposed to a
20  double liability when we look at these
21  documents.
22      If Your Honor would indulge me, I just
23  want to show Your Honor a few things because
24  I lived this case for -- Well, Mr. Smith and
25  I lived this case along with my co-counsel

32

1  North Star Maritime, Inc., Panamanian
2  company.  And then you have an entity, I
3  think it's a subsidiary, it might be an
4  affiliate, we don't know, North Star Maritime
5  Miami, LLC.  These entities are controlled by
6  Mr. Goldstein's -- one of Mr. Goldstein's
7  closest friends, Oleksandr Yelizarov.  I'll
8  have to get you the spelling of that.
9      Now, they claim, and this is what was
10  produced in the federal case.  This is the
11  loan documents at issue.  March 1 of 2007 is
12  -- These instruments allegedly were entered
13  into between Mr. Goldstein and North Star
14  Maritime, Inc. in March 1 of 2007.
15      Your Honor will note that it wasn't
16  recorded until six years later.  So it was
17  apparently an unrecorded interest of some
18  kind.  And I tabbed for Your Honor a few
19  pages that are questionable.  I don't know
20  what they mean, but there was an addendum to
21  reaffirm this obligation in January of last
22  year prior to our settlement.  And then if I
23  look at the next tab, this is the most
24  important one, Your Honor, this one called
25  Exhibit A, the loan and security agreement.

33

1  back in March 1 of '07 was against Pinnacle
2  Three Corporation, a Florida corporation,
3  when it didn't exist because the only one at
4  that time was the Illinois company.
5      Okay.  So it concerns us.  And then I
6  see the last thing I tabbed here for Your
7  Honor, is something called an Exhibit A-1,
8  this last tab, which purports to be part of
9  the '07 document, and it's talking about real
10  estate and it's got Miami real estate tax
11  records for 2011 and 2012.  It's five years
12  later.  It's attached to the '07 instrument.
13      So, again, we look at this and we don't
14  know.  We don't know what's going on.  Then I
15  do know from the underlying litigation, Your
16  Honor, that Pinnacle Three Corporation, the
17  Florida entity, did not have any assets in it
18  because this was a big issue in dispute in
19  our case, and Mr. Smith can verify this.
20  There was no assets in Florida, the Pinnacle
21  Three Florida, until 2012, August 22 of 2012.
22      These assignments, and let me show this
23  to Your Honor, were documents that were
24  generated during the litigation that Mr.
25  Smith and I were involved in where Mr.

34

1  Goldstein assigned all of the assets of
2  Illinois to Florida and he did an assignment
3  initially effective December 31 of '08.  And
4  then that didn't work because of what his tax
5  returns said so he did an amended, which is
6  attached, or a corrected amended and restated
7  assignment for the next day, January 1 of
8  2009.
9      But these were signed, and it's
10  undisputed, in August of 2012 backdating them
11  to that point in time.  But the earliest date
12  that one could even contend Pinnacle Three
13  Florida had assets in it was either
14  December 31 of '08 or January 1 of '09.  Yet
15  North Star purportedly took a lien against
16  Florida when it didn't exist and would not
17  have taken it against Illinois when Illinois
18  held all the assets, including this loan that
19  my clients had.
20      At that time the loan was unsecured.  It
21  was like a money lent scenario.  Part of the
22  settlement the loan was amortized and secured
23  with collateral.
24      Then with this irregularity we asked --
25  we're learned -- we're told that the note and

35

1  mortgage have been assigned.  And that's when
2  counsel and I begin or my firm and counsel
3  begin communicating, well, show us the
4  documentation.  Where is the assignment?
5      And so we initially get a letter where
6  there is a notice of an assignment.  We get
7  this in January.  This precedes our motion.
8  It says the assignment was effective July of
9  2013.  The document's attached.
10      I didn't bring enough copies of this
11  one, Michael.  This is the one you sent me.
12      There's a document called a notice of
13  assignment attached to it that says the
14  assignment was effective July 16 of 2013.
15  Okay.  And the shares of Pinnacle are in an
16  entity called North Star Maritime Miami, LLC.
17      The cover letter says that the
18  obligation was owed to North Star Maritime,
19  Inc., not the LLC, and that Maritime executed
20  on Goldstein's assets and that's how it got
21  the Pinnacle shares purportedly.  Yet they're
22  in this entity.  We don't know how.  It's in
23  this entity North Star Maritime Miami, LLC.
24      And then to add more to the mystery,
25  this documentation is signed on behalf of

36

1  Pinnacle Three Corporation by a lawyer named
2  Mikhael Keifitz with an attorney of fact --
3  apparently with a power of attorney for
4  Oleksandr Yelizarov.
5      Now, the power of attorney, we asked
6  counsel would you give us the power of
7  attorney?  Right.  We get a power of attorney
8  just the other day and the power of attorney,
9  if you look at this power of attorney, Your
10  Honor, it says this lawyer is given the
11  authority to act on behalf of Mr. Yelizarov
12  as president of Pinnacle, let me show it to
13  Your Honor, for the assets attached in
14  Exhibit A, which, you know, he apparently
15  conveyed our note and mortgage to North Star
16  Maritime Miami, LLC.  There's no Exhibit A to
17  the power of attorney.  And it's been
18  confirmed to me there's no Exhibit A to the
19  power of attorney.
20      So first we have the question of is Mr.
21  Yelizarov the president of Pinnacle?  We
22  don't know that.  I've asked for corporate
23  resolutions.  I've asked is there any
24  documentation that shows Yelizarov is the
25  president of Pinnacle Three Corporation?  On

37

1  Sunbiz Leon still appears as the director and
2  secretary. And this gentleman -- this lawyer
3  Mikhael Keifitz has filed an amendment with
4  Sunbiz listing Yelizarov as the president,
5  but no documentation has been given to us
6  showing us that he is the president.
7      Then you have the question of can the
8  president of a company, let's assume he is
9  the president of the company, can a president
10 of a company sign a power of attorney to a
11 lawyer to perform all of the functions of the
12 president of the company?
13     I asked counsel is there a board
14 resolution? Did the board of directors of
15 the company, Leon still being a director,
16 authorize this lawyer to now be the president
17 of the company?
18     Now, I'll represent to Your Honor I did
19 some research and I couldn't find this
20 question answered whether a president could
21 delegate all of his authority to run a
22 company to an attorney in fact. I could not
23 find that. But the delegation -- the right
24 to delegate has to either be in the bylaws of
25 the company or as ordered by or permitted by

38

1  the board of directors.
2      None of this information has been
3  provided to us. Okay. And then again
4  there's no Exhibit A that should have listed
5  the note and mortgage as assets that could
6  have been conveyed.
7      Okay. Now, we've asked for all this
8  information and it won't be provided to us.
9  We're very concerned -- Oh, and I want to
10 point out one other thing. Just the other
11 day they said, well, here are the assignments
12 that went from Pinnacle to North Star
13 Maritime Miami, LLC. Okay. And this was in
14 an e-mail to me from Mr. Gordon just on the
15 10th and I'll give it to Your Honor.
16     Remember I just showed Your Honor that
17 it was allegedly effective as of July of
18 2013. Well, there were different assignment
19 instruments than the one I just showed Your
20 Honor. And at least one of them was in May
21 of 2013.
22     Now, where did that -- why is there
23 earlier assignments than the notice we
24 received that said the effective day was July
25 of 2013?

39

1      Here at least on one of these
2  instruments, and this is assigning I believe
3  the security instruments that are in Sumter
4  County, was recorded back in May. So this
5  would have been earlier than when they said
6  that it was done.
7      So with all of this irregularity -- Oh,
8  and the last fact I would like to point out
9  to Your Honor is when we make checks out to
10 Pinnacle Three Corporation per the
11 settlement, we've been trying to make our
12 payments per the settlement, they are being
13 improperly endorsed on every occasion by
14 North Star.
15     What North Star did was they went and
16 they registered a fictitious name in the
17 public record. Their fictitious name is
18 Pinnacle Three Co. I think it's Co. I'll
19 tell you right now. I guess so the bank
20 won't notice. And they endorse the checks.
21 Yes, here it is. I just sent this to counsel
22 the other day. I have the endorsements in
23 the back of this. So while we're still
24 making payments to Pinnacle, they're still
25 being intercepted by North Star with this

40

1  questionable endorsement.
2      If Your Honor sees there, Pinnacle Three
3  Co., that is a fictitious name for North Star
4  and the money is going into a North Star
5  account.
6      So what do we have, Your Honor? We have
7  a scenario of an admitted breach of the
8  settlement. They're trying to tell you we
9  fixed it. So that admits that they broke it
10 if they're trying to fix it. They never
11 returned the note. They haven't tendered a
12 release to us. And now what are they asking
13 Your Honor? They're saying, oh, Your Honor,
14 we're going to undo this. We're going to put
15 it back. Well, can they put it back?
16     We need our discovery and to find out
17 was this ever properly out of Pinnacle to
18 North Star because now supposedly North Star
19 Maritime Miami, LLC owns the note and
20 mortgage that we pay under. And they're
21 saying they're going to put it back. And
22 then I guess they're going to record new
23 instruments in these various counties where
24 the mortgages are and put it back into
25 Pinnacle.

**41**

1    And the question is can they do that?
2 Was it ever in North Star to begin with?  Was
3 that a proper conveyance?  And now can they
4 undo it with the same power of attorney from
5 the lawyer.
6    There is in the documents that were just
7 filed yesterday, I know I wrote Your Honor a
8 letter about getting this last minute motion
9 on Monday, if Mr. Shalek was late, it's
10 interesting because Mr. Sayre filed one even
11 later than Mr. Shalek.
12    MR. SAYRE:  What Mr. Reyes fails to
13 mention is that yesterday we reached an
14 agreement because he raised a valid point.  I
15 said I understand and if we can agree that
16 Mr. Shalek's motion will not be heard, I will
17 agree to postpone my motion to enforce
18 settlement.  Mr. Reyes agreed to that and Mr.
19 Shalek refused.
20    MR. REYES:  It was an aside.  It wasn't
21 what I was talking about.
22    But the acknowledgments in those
23 documents, and I guess these things are done
24 in haste because their paperwork is so --
25 there's all these issues that I'm pointing

**42**

1 out to Your Honor.  The acknowledgment says
2 Keifitz has got a power of attorney for the
3 companies.  I haven't seen that.  Supposedly
4 he has a power of attorney for Yelizarov, but
5 yet the notary signs for him as AIF of the
6 entities.  Well, I haven't seen -- That's a
7 new one now if he actually has a power of
8 attorney for the companies.  The other thing
9 is there's one signature where he signs as
10 the managing member of Pinnacle.  Pinnacle is
11 a corporation.  It doesn't have a managing
12 member.  So the execution is questionable.
13    And then they want -- When Leon
14 Goldstein joins in on these documents, they
15 want it to say only as a signatory to the
16 settlement, even though Leon Goldstein is
17 still, according to Sunbiz, a secretary and a
18 director of Pinnacle Florida.
19    So, Your Honor, there's a lot of facts.
20 It ought to be evidentiary.  I am proffering
21 to Your Honor.  I understand I'm not under
22 oath and there would have to be witnesses to
23 present this.  The law is pretty clear that
24 motions to enforce settlement are to be
25 evidentiary.  That's where we started with

**43**

1 Judge Thornton.  We put in a request for an
2 evidentiary hearing and we asked that the
3 payments go into the registry.
4    I think the law that counsel is citing
5 to Your Honor in opposition to putting in the
6 registry are inapplicable.  Those cases deal
7 where a party against their will is required
8 by a judge to put money into the registry
9 prejudgment.  You're suing somebody for money
10 and the court says, well, pony it up and
11 we'll protect it.  And the appellate courts
12 have said no.
13    I am the payor.  I want to put the money
14 that I have to pay into the registry.  I am
15 voluntarily willing to do it.  It's a
16 different scenario.  I cited to Your Honor at
17 least three cases that they acknowledge in
18 their response when you're dealing with
19 settlements can be done.
20    I think we all know as attorneys the law
21 of first breach performance is excused.
22 Since they have breached, my performance
23 should be excused.  I don't want to take the
24 risk of merely stop making $40,000 payments
25 on a $2.1 million note until it's heard.  So

**44**

1 I'm protecting them.  An argument could be
2 made that I could just stop paying because
3 performance should be excused by the first
4 breach and then we can open a whole new
5 Pandora's box of acceleration and all those
6 issues.  So I said put it in the registry.
7 It protects them.  If, in fact, the court
8 finds that my performance is only partially
9 excused, temporarily excused and not
10 permanently excused, and that money should go
11 to them when they cure less whatever I could
12 be awarded for fees and costs if it's cured,
13 then that could be done.  But it is permitted
14 by Rule 1.600.  I am asking to put my money
15 into -- my client's money into the registry.
16    They are acknowledging -- they're
17 acknowledging before Your Honor that they
18 breached.  They are saying they have fixed
19 it.  I represent to Your Honor we need an
20 evidentiary hearing.  These documents I just
21 got yesterday or Monday afternoon have issues
22 with them.  I haven't even been able to go
23 over them with my client because he's not in
24 Florida.  He won't be back until Sunday.  But
25 we still have all these other issues, how did

45

1  it get into maritime to begin with and can
2  Maritime just put it back?  Can they just
3  unring this bell?
4      And then of course you have this issue,
5  I have a judgment creditor who is looking to
6  get to Leon's assets.  Leon for all intents
7  and purposes was Pinnacle.  Pinnacle was
8  created to create a corporate shield but it
9  really had no function.  During our
10  litigation, Mr. Smith can tell you this if
11  I'm mistaken, it held some real estate and it
12  was the entity through which Mr. Goldstein
13  would fund the money that was lent to these
14  various entities and he was 100 percent of
15  Pinnacle.  And it was all done through
16  Illinois and then he started doing it through
17  Florida and that issue arose in 2012, as I
18  pointed out to Your Honor.  Yet they claim to
19  have a lien against Pinnacle Florida back in
20  '07 when it didn't exist.
21      There's something going on here, Your
22  Honor.  We want to be safe.  We want to play
23  this safe.  It's a big obligation.  I don't
24  want to have a situation where I have a
25  judgment creditor saying to me you shouldn't

46

1  have paid the money to them.  You knew or
2  should have known that there was a fraudulent
3  transfer and you're conveying it to the wrong
4  party.  There have been already multiple
5  intercepts of this money by North Star even
6  though we're making it paid to Pinnacle.
7  Even the last payments were intercepted.
8      We just want the protection to put our
9  money in the registry until we have the
10  evidentiary hearing, both the money that
11  Judge Altonaga said to return to us, which I
12  got that check Monday, I told Mr. Sayre I
13  think it was Monday, and it was made out to
14  my trust account so I've deposited it and I'm
15  prepared to send it wherever it needs to go.
16  And then there's payments due the 29th of
17  this month.  They're due every 29th of the
18  month.  We put them in the registry.  If they
19  will respond to my request to produce where
20  I've asked for the documentation showing when
21  was it that Inc. executed on Leon's shares
22  because that's an interesting statement in
23  itself, Your Honor.  If they executed on
24  Leon's shares, I hadn't received notice of
25  any execution proceeding.  I don't know that

47

1  Chaban got notice who is another credit out
2  there.  Even if they were first, if those
3  shares were worth more than their judgment,
4  where did the surplus go?
5      Then when I said, what proceeding by
6  which did you execute?  Well, we really
7  didn't execute.  We possessed them so we just
8  kept them.  Then they're in Maritime, LLC.
9  We don't know how that happened.  I said show
10  me the documents on how it went to LLC.  The
11  resolutions authorizing the power of
12  attorney, the resolutions making Yelizarov
13  the president.
14      We just want to know what's going on
15  because this transaction never came up or
16  certainly was not something that -- Put it
17  the other way.  This transaction was
18  something that I think would have come up in
19  the underlying case.  It's an '07 loan
20  unrecorded.  It got recorded in '13 at or
21  about the time a million dollar judgment is
22  coming against Mr. Goldstein against an
23  entity that didn't exist.
24      I won't repeat myself, but I just would
25  like the court to allow us to deposit in the

48

1  registry.  The case law they cite is
2  inapplicable because it deals with the court
3  making somebody who doesn't want to put their
4  money in the registry.  This is our money.
5  The law allows that.  It's settlement
6  proceeds.  There has been a breach by
7  admission and then let's have the evidentiary
8  hearing.
9      MR. SAYRE:  Number one, no breach has
10  been admitted.  I just want to make that
11  clear for the record.
12      I sat here patiently as Mr. Reyes went
13  on for a long time.  I'll redirect Your Honor
14  to this chart.  There's two motions before
15  Your Honor, the motion to deposit and motion
16  to enforce settlement.
17      Mr. Reyes just said a lot of stuff and
18  kind of repeated what Mr. Shalek said before
19  Judge Altonaga when he tried to get the money
20  -- the settlement funds deposited into the
21  court registry and weaved a very complicated
22  web and made it seem like we're up to all
23  this.  And really it convinced Judge Altonaga
24  initially, too, until she looked at the law
25  and said I was wrong to do that.  I shouldn't

**49**

1  have done it.  Mr. Shalek, you led me into
2  error.  That's what her order says which,
3  Your Honor, we included in the binder.
4  That's exactly what's going on here.
5      This motion to deposit is a motion for
6  injunction.  And for the very reasons that
7  Judge Altonaga said that you couldn't do it,
8  Your Honor respectfully cannot do it.
9      Now, onto Mr. Reyes' story.  None of
10 this was in his motion.  We're here on a
11 motion to enforce settlement agreement.
12 There are three -- And it's in the chart.
13 There are three purported breaches in that
14 motion to enforce settlement agreement.
15 Failure to provide a partial release.  It's
16 right there in the chart.  Return of the 150
17 K note which is here.  Mr. Reyes was
18 unwilling to allow us to return it to him.
19 And improper assignments which we disagree
20 that they were improper but because we don't
21 want to deal with this, frankly, we'll assign
22 it back.
23     So Mr. Reyes is saying a lot of stuff
24 but the fact is if Your Honor approves of the
25 assignment back, Mr. Reyes all he's doing is

**50**

1  doing what the settlement agreement requires,
2  what it originally required.  All he has to
3  do and all his obligation is under that
4  settlement agreement, his client's obligation
5  is to send a check every month to Pinnacle
6  Three Corporation.
7      THE COURT:  On the 29th.
8      MR. SAYRE:  On the 29th.
9      What Mr. Reyes' clients have been doing
10 is sending a check to Pinnacle Three
11 Corporation on the 29th.  So he's complying
12 with the agreement and we're complying --
13 Pinnacle Three is complying with our end of
14 the settlement agreement in that we're not
15 pursuing our claims because the settlement
16 agreement is like you will not pursue your
17 claims in exchange for these payments.
18     So Mr. Reyes said a lot of stuff, but
19 the fact is nothing has changed.  He's making
20 his payments to the same address, to the same
21 company, and the only issue --
22     THE COURT:  They're not depositing it.
23     MR. SAYRE:  What's that?  Well, Pinnacle
24 Three, and I don't want to get into this
25 because it's really not important, but North

**51**

1  Star took over Pinnacle Three's stocks.  So
2  North Star is Pinnacle Three for all intents
3  and purposes.
4      Okay.  Now, Your Honor, if it would make
5  Your Honor sleep easier at night, we can open
6  up a Pinnacle Three account because we have
7  the ability to open up a Pinnacle Three
8  account and so those checks will be deposited
9  in a Pinnacle Three account.  If that will
10 make Mr. Reyes happy, I will talk to my
11 clients and I will make them do it.  Okay.
12     But, again, Your Honor, this all started
13 with a motion -- I don't know how we got
14 here.  This all started with a motion to
15 enforce settlement agreement for three
16 breaches, alleged breaches, which now the
17 motion to approve is to approve the
18 assignments back to Pinnacle Three and to
19 approve the partial release which is what he
20 was saying we didn't provide him.  And then
21 the original note, it's here.  Everything is
22 solved.  I really don't know -- This has
23 gotten way out of hand.
24     THE COURT:  Mr. Reyes, let me ask you.
25     MR. REYES:  Yes, Your Honor.

**52**

1      THE COURT:  If, in fact, the checks that
2  you sent and the checks that you are sending
3  are deposited to Pinnacle Three Corporation
4  which is the person to which -- not person,
5  the identity to which your checks are
6  written, correct?
7      MR. REYES:  That is, yes.
8      THE COURT:  What's the problem?
9      MR. REYES:  The note is in North Star
10 Maritime Miami, LLC.
11     THE COURT:  Assuming that we put that
12 note back into where it was, which is
13 Pinnacle Three, isn't it?
14     MR. REYES:  The note was with Pinnacle
15 Three, the Florida corporation.
16     THE COURT:  Correct.
17     MR. REYES:  Okay.
18     THE COURT:  If it gets back in there,
19 now what harm has occurred to you?
20     MR. REYES:  Well, one would be the
21 question of I have a judgment creditor
22 pursuing me as a supplemental proceeding
23 defendant and whether this transaction into
24 North Star, out of North Star is --
25     THE COURT:  If, in fact, the three

53

1  reasons that you originally brought your
2  motion to deposit are disposed of, what
3  action is there for anybody to intervene?
4      MR. REYES:  If they are disposed of, we
5  don't have that yet today.
6      THE COURT:  I understand.
7      MR. REYES:  Because we haven't even --
8  Other than Monday counsel attaching documents
9  that he says he's going to give to us which
10  he's yet to give to us and the breach --
11     THE COURT:  He hasn't made them up yet.
12     MR. REYES:  The breach of this -- The
13  settlement agreement, clearly one of the big
14  points of contention during the settlement
15  negotiations was that the obligation be
16  nonassignable and they could not assign
17  without our consent.
18     THE COURT:  I understand.
19     MR. REYES:  And they assigned without
20  our consent.  So there clearly is a breach.
21  Now they're going to undo it with these
22  questionable powers of attorneys.  Will that
23  stand until we know what happened in the
24  transaction?
25     As long as my client is protected, Your

54

1  Honor, then I agree with you if I am
2  protected.  But the release that's been
3  signed to release the collateral is not
4  properly signed just at a first blush when I
5  looked at it Monday.  I have to go over it
6  with my real estate partner and my client who
7  will return next Sunday.  And then these
8  assignments by power of attorney, whether or
9  not that power of attorney is valid is an
10  issue that has to be dealt with.  And then
11  the original note I'm hearing is going to be
12  given to me.  I didn't refuse to accept it.
13  They wanted to give it to Mr. Sayre as the
14  representative of Pinnacle.  Well, they're
15  only a representative of Pinnacle if they
16  properly hold Pinnacle shares through North
17  Star.  I didn't want to be complicit in that
18  arrangement because I don't know if it's
19  valid or not.  Okay.  I wanted it to be
20  returned to us by Pinnacle Three without
21  condition.  And I've never refused to accept
22  the note.
23     So I guess in a roundabout way to answer
24  Your Honor's question is if we got a proper
25  assignment -- I'm sorry, proper release, the

55

1  form is not correct, and it was legitimately
2  back in Pinnacle Three and Pinnacle Three was
3  receiving the funds and we got the original
4  note back, we would ask the court for fees
5  with respect to having to move to enforce,
6  then the issues would be resolved.
7      Now, having said that, I'm kind of
8  neutral on the intervention but to answer
9  your question because you did ask me, because
10  there are proceeds in this matter of $40,000
11  a month that is still going to be going to
12  North Star because they claim to hold North
13  Star shares --
14     MR. SAYRE:  We'll open up a Pinnacle
15  Three account.
16     MR. SHALEK:  No.
17     MR. REYES:  Well, but the money will go
18  into this Pinnacle Three account and it will
19  come out.  I think a judgment creditor could
20  challenge the propriety of North Star
21  controlling the Pinnacle Three account and
22  withdrawing money from the account.
23     So they still could -- I didn't research
24  the question.  It's not my question.  But I
25  think a judgment creditor can pursue assets

56

1  wherever they may be and the shares of
2  Pinnacle are assets that are being pursued so
3  they could because they're really alterego.
4  Pinnacle and Leon Goldstein are alteregos,
5  Your Honor.  I don't think anybody would
6  dispute that the entity really had no
7  function except to receive cash and hold some
8  deeds.  So I think a judgment creditor could
9  still pursue those, just to answer.  I wanted
10  to answer your question.
11     MR. SHALEK:  Thank you, Your Honor.  I'm
12  hearing what you're saying and I just want to
13  point out that Mr. Reyes has provided you
14  with evidence that make out at the very least
15  a prima facie case for fraud.  I understand
16  this isn't an evidentiary hearing but that's
17  what he's asking for.  And what your
18  suggestion is, well, let's just undo it.
19  Okay.  You cannot unwind a fraud in the state
20  of Florida.  Once a fraud has been committed,
21  it sticks like glue.  It's on you and you
22  cannot undo a fraud.  A fraud is a fraud.
23  It's not like a simple breach of contract.  I
24  gave you $1,000.  You give me a trumpet.  You
25  forgot to give me the trumpet.  I can fix

## 57

1  that. Here's the trumpet. That's a
2  different story. This is a fraud. These are
3  people that in 2007 are alleged are
4  submitting fraudulent documents asking the
5  court to rely on them, asking parties to rely
6  on them. You know, a 2007 assignment from a
7  corporation that doesn't exist and that
8  doesn't hold assets until 2012 and all of
9  that is the basis of all of this. But
10 they're not telling you is that Leon
11 Goldstein only lives in Florida for a couple
12 months out of the year. Beyond that he lives
13 in Odessa, Ukraine. And who does he live
14 with in Odessa, Ukraine? He lives with
15 Oleksandr Yelizarov. This is what he
16 testified at his depositions in our case.
17     This money, once it's gone, if you don't
18 grant Mr. Reyes' motion, once this money is
19 in the hands of Leon Goldstein or Oleksandr
20 Yelizarov it is gone. It is out of this
21 country. It's being spent in Odessa.
22     THE COURT: It's a pretty city.
23     MR. SHALEK: It's a beautiful city and I
24 recently read that it had the most beautiful
25 women in the world above Paris and New York.

## 58

1  I would love to visit it.
2      I hear what you're trying to say. Okay.
3  Let's just undo the assignment, redo the
4  assignment. And what this court is allowing
5  is the unwinding of a fraud as a judicial
6  remedy. You can't do that, Judge. That's
7  not an option for a court. This court
8  doesn't have the authority to allow that
9  option anymore. They committed a fraud. Now
10 it's been brought to the court's attention.
11 And I like Mr. Sayre. He's a nice guy, but
12 his clients Mr. Yelizarov and Mr.
13 Goldstein --
14     THE COURT: Send him a copy of that.
15     MR. SHALEK: Yeah, he is a nice guy. We
16 all get along fine. But their clients
17 committed a fraud and he's doing a great job
18 trying to convince this court to allow them
19 to unwind a fraud, but that's not a judicial
20 remedy to fraud. Fraud gets punished. It
21 doesn't get unwound.
22     MR. SAYRE: Is there an order around
23 here that says a fraud was committed, a
24 finding that a fraud was committed?
25     THE COURT: Not that I know of.

## 59

1      MR. SAYRE: There's some allegations.
2  Mr. Shalek is acting as though -- By the way,
3  I completely disagree with everything they're
4  saying, but I don't want to get into it
5  because it really doesn't matter. Okay.
6  There's no finding of fraud. We've dared
7  them to bring a fraud claim in federal court.
8  They will not do it because they don't have
9  any evidence of fraud because none existed.
10     Now, Mr. Reyes did raise a point I'm
11 worried about the judgment creditors coming
12 after me about this money. Guess what?
13 Judge Altonaga said I don't care about that.
14 You don't get to keep the money. The money
15 keeps on flowing as it was before. So the
16 judgment creditors can't come after him.
17     And then the assignments back, we just
18 want to put things -- Your Honor had it
19 right. We just want to put it back to the
20 way things are. We don't necessarily agree
21 that we have to. We do not want to fight.
22 If he keeps on complying with his obligations
23 under the settlement agreement, there's
24 nothing that anybody can do to him. There's
25 nothing that the judgment creditors can do to

## 60

1  him.
2      In private conversation Mr. Reyes raised
3  some concerns about Leon Goldstein, the one
4  that they've mentioned, coming after him
5  somehow. Your Honor, in federal court where
6  all of this is being litigated, mind you, Mr.
7  Goldstein filed this where he says, and it's
8  three paragraphs --
9      MR. REYES: It's by his lawyer, not him,
10 right?
11     MR. SAYRE: His lawyer is him for all
12 intents and purposes.
13     MR. REYES: It's not under oath. His
14 lawyer is representing what Leon told him.
15     MR. SAYRE: He said it under oath in
16 deposition that I sent to Mr. Reyes last
17 night. Same thing. And that's, by the way,
18 where Mr. Reyes is getting a lot of what he
19 told you. Mr. Reyes asked me for
20 information. And I said, listen, sure.
21 Here's the deposition that he took of Mr.
22 Goldstein in the federal court. That's where
23 everything that he just handed you or most of
24 what he just handed you came from, me saying,
25 here, take a look.

---

**61**

1   MR. REYES: That is inaccurate.
2   MR. SAYRE: Okay. He said -- Mr.
3   Goldstein's lawyer says, in the order this
4   court directs Goldstein to, A, turn over any
5   Pinnacle Three Corporation Florida stock
6   certificates in his possession. And, B, to
7   the extent Pinnacle Three has not issued
8   shares, cause Pinnacle Three to issue shares.
9   Goldstein advises this court that he cannot
10  comply with either directive. Goldstein does
11  not have possession of the shares of Pinnacle
12  Three stock since those shares are owned and
13  held by North Star Maritime, Inc. Moreover,
14  Goldstein is not in control of Pinnacle
15  Three, thus, he cannot cause Pinnacle Three
16  to issue additional shares of stock,
17  parenthetical, not that the order requires
18  him to do so since it only requires Goldstein
19  to cause shares to be issued if they were
20  issued in the first place, end parenthetical.
21  That's the end.
22  So Mr. Reyes' concern that Goldstein is
23  going to come after him, it's his attorney
24  but his attorney represents Mr. Goldstein and
25  plus Mr. Goldstein said the same thing in

---

**62**

1   deposition testimony in the federal case
2   which I forwarded to Mr. Reyes. So Mr.
3   Reyes' concerns are really not concerns. Mr.
4   Reyes has raised three points regarding
5   breach of settlement agreement. All of those
6   we've undone those three purported breaches.
7   We're back in the same spot we were. He has
8   to continue paying money. That's the motion
9   to enforce.
10  Motion to deposit is an improper
11  mandatory injunction that's really already
12  been ruled on by Judge Altonaga. They
13  weren't happy with the ruling so now they're
14  trying to deposit the funds here in state
15  court.
16  That's it, Your Honor. Everything is
17  back to normal or the way it was when the
18  settlement agreement was signed.
19  THE COURT: Deposits in court are
20  controlled by Florida law, not federal law.
21  MR. SAYRE: But federal law was being
22  applied -- I'm sorry. I think federal courts
23  apply Florida law when addressing this issue.
24  MR. GORDON: Your Honor, can I --
25  MR. REYES: Let me explain the

---

**63**

1   difference. I didn't know they were going to
2   tag team me.
3   MR. GORDON: Can I address the question
4   raised, the important one, controlled by
5   Florida law?
6   Your Honor, what Mr. Shalek has
7   represented and asked you to do with throwing
8   out a bunch of allegations as he said in his
9   view of the world that he's going to get a
10  judgment, that there was this massive fraud
11  committed and because of that he would like
12  you to lock up money because if you don't
13  Leon Goldstein is going to run to the nice
14  country of Odessa and take it with him.
15  That is the epitome of a prejudgment
16  writ. Your Honor is probably well familiar
17  with the Conover line of cases. I forget the
18  exact name. It's 511 So. 2d something.
19  The line after it that says a long line of
20  Florida cases provided you can't lock up
21  money prejudgment just because you're
22  concerned that when you come to collect it's
23  not going to be there.
24  That is what we cited when Your Honor
25  asked about Florida law controls. This is

---

**64**

1   what we cited to Judge Altonaga in this
2   Florida line of cases saying, Judge,
3   respectfully, you can't lock up this money
4   because it's a prejudgment writ issue.
5   That is exactly what Mr. Shalek has
6   asked you to do here and there is no basis in
7   Florida law to do it just because he's
8   concerned he's going to have to try and
9   collect and whether he'll be able to at some
10  point.
11  So if Your Honor is going to do this,
12  respectfully, it's against this very long
13  line of cases that says the court doesn't
14  have jurisdiction to do it. You can't lock
15  up this money under Florida law.
16  MR. REYES: Your Honor, I'm the party
17  asking, not Mr. Shalek. That is a very
18  significant difference.
19  Judge Altonaga reversed herself because
20  she said this judgment creditor could not
21  come into court and get that relief until a
22  determination had been made.
23  Okay. That's not what's occurring here.
24  I, the party who owns the money who is
25  obligated to pay under the settlement, is

---

65

1  asking the court for permission to put it in
2  the registry until a determination is made if
3  I have to pay because of their prior breach.
4  That is the exact scenario that 1.600 was
5  intended for.
6      I meant to cite this to Your Honor.
7  This is a Third District.  It's a case called
8  Fiscal Operations versus Metropolitan Dade
9  County, let me give that to Your Honor, where
10  it distinguishes Conover and deals with a
11  scenario where a party has a payment
12  obligation and there is a dispute.  When that
13  party who has the payment obligation asked to
14  put it in the registry, it's the proper
15  result under 1.600 to let the party put it in
16  the registry when that dispute exists.  I
17  highlighted some of the relevant language in
18  this case.
19      MR. GORDON:  Your Honor, can I have a
20  moment since this wasn't in their paper since
21  I haven't read it?
22      THE COURT:  Sure.
23      MR. GORDON:  Your Honor, a few things,
24  just having read it here, forgive me, but
25  I'll do my best.

66

1      Number one, the issue that seems to be
2  in this case as to application under 1.600
3  was whether or not third-party defendants had
4  been sued and money could be put in this.
5  But the line that I find I guess relevant
6  here is the purpose of the lawsuit was to
7  determine to whom the moneys are owed.
8      The purpose of the lawsuit that we have
9  currently before us Mr. Shalek is not a
10  party.  He's trying to intervene.  He's
11  brought forth his version of the world.  What
12  is going on here, the issue is not to whom
13  moneys are owed.  That's not the purpose of
14  this lawsuit.  As Mr. Reyes acknowledges and
15  Mr. Sayre has made quite clear, his
16  obligation is to pay the moneys to Pinnacle
17  Three every month.  That's to whom the moneys
18  are owed.
19      Respectfully, and we have discussed this
20  with Mr. Reyes, the fact that the shareholder
21  of a company says once the checks are written
22  I would like to have them paid over here,
23  with all due respect to him, is none of his
24  business.  The company can endorse a check to
25  whom it wants to endorse it to.  He's made

67

1  his payment.  That's the end of his
2  obligation.
3      So to say the money should be locked up
4  based on this case and distinguishes Conover,
5  Conover is addressing, I acknowledge, what
6  Mr. Shalek had just brought up which is he's
7  trying to convince you why he thinks you
8  should lock up the money for his own purposes
9  because his motion to intervene he's brought
10  it forth today so we have to respond to that.
11  For his purposes there's no Florida law
12  that's going to allow you to do that.
13      As far as what Mr. Reyes said, Your
14  Honor rightfully points out if the money is
15  paid to Pinnacle Three and these other issues
16  are taken of care, how are you harmed?  Where
17  is the issue?
18      If I may briefly just give the timeline
19  here of what we have given and not given
20  because in fairness I think Your Honor should
21  know.  We were given a form of partial
22  release that they provided me on
23  February 27th.  They gave it to me in Word so
24  I could make some changes.  I made a few
25  changes to it.  They were minor.  Here's an

68

1  important one they forgot to include.
2  They're still obligated to pay under the $2.1
3  million note.  Important condition.  I put
4  that in.  They didn't.  The only issue, the
5  one sentence that was disputed, what capacity
6  Goldstein is signing in.  Here's why we said
7  we need that in the release, a very good
8  reason, because down the street in Judge
9  Altonaga's court (indicating) there's many
10  filings that we have --
11      THE COURT:  That way (indicating).
12      MR. GORDON:  I'm confused which
13  direction.
14      We have made very clear our position
15  which Goldstein said in there that North Star
16  has the shares based on the loan agreement it
17  executed upon collateral.
18      Mr. Shalek loves to say Goldstein's
19  owned it all along.  That's not disputed.  We
20  were given the shares as collateral.  We
21  executed upon collateral.  Collateral is not
22  ownership.  They are distinct concepts.
23      So this is the position we've taken in
24  federal court.  I can't have our client sign
25  documents that have Mr. Goldstein sign

**69**

1 something that gives an impression he still
2 has this in some manner. We need clarity. I
3 think that's reasonable for us to be asking
4 for.
5     I sent back that release on March 5th
6 with this change. I sent two forms. I got
7 back a brand new release. They said the form
8 that we drafted for you, Mr. Gordon, we don't
9 like that form anymore. Here's a new form.
10 Okay. I'll go with your new form with that
11 same clarification, Mr. Goldstein is signing
12 as a party to the settlement agreement. I
13 haven't gotten a response whether they'll
14 agree to that. That was debated on
15 March 10th. It's now March 26th.
16     So the issue of the release is
17 incorrect. I don't know if they agree to it
18 or not. They haven't told me. What I have
19 now heard is they don't like the capacity in
20 which people signed it. That seems to be the
21 issue. Okay. Well, we've been given the
22 power of attorney as the issue. It doesn't
23 say what property.
24     Your Honor, if I can point out one line.
25 The power of attorney says Mr. Keifitz is

**70**

1 given full power and authority to do and
2 perform all and every act and thing
3 whatsoever requisite and necessary to be done
4 in and about the corporate matters of the
5 company. The company listed is Pinnacle
6 Three.
7     The fact that they may have forgot to
8 attach Exhibit A to describe some property
9 does not matter. He's got the right to do
10 everything for the company. What's the
11 reason? It's quite simple, Your Honor. As
12 pointed out, the person who signed the power
13 of attorney was giving it, Mr. Yelizarov,
14 lives in Ukraine most of the year. He's not
15 here. He wanted someone who is here to deal
16 with the entity. He's entitled to do that.
17 It makes sense because otherwise you have to
18 go and try and get someone to sign documents
19 in the Ukraine and that takes a little bit of
20 time. So for the sake of just making things
21 easy, that's done. He's got the right to
22 sign it. So we gave them the release. I
23 don't know if they object. They haven't told
24 me. We have the assignments. He said he's
25 entitled to them.

**71**

1     Your Honor, what I haven't heard, what
2 haven't seen in the papers is a single legal
3 authority that says for the purposes of
4 motion to enforce a settlement agreement you
5 get to give all sorts of discovery and go dig
6 around in my corporate matters and think
7 you're entitled to every document I have
8 because you want them. I would love to see
9 the legal authority. I haven't seen it that
10 allows that. Still we gave them documents.
11     The assignments as noted in our papers,
12 and it's an important point, you can't
13 unreasonably withhold consent even it says
14 you must have consent in writing. You can't
15 unreasonably withhold. The basis that they
16 say they don't want to, they don't know who
17 the entities are. Fine. I'll make it easy,
18 Judge. I'm going to hand it back.
19     How can you say you're not going to
20 consent to me handing it back and fixing your
21 problem? How is that not unreasonably
22 withholding consent? You say that this is an
23 alleged breach. I'm fixing what you claim is
24 the issue. I haven't heard whether they're
25 going to agree with that.

**72**

1     We gave them a signed assignment. He's
2 had the form of assignment for a few weeks.
3 I said the one that was signed from Pinnacle
4 Three to North Star, it's going to be the
5 same exact form. We're going to put it right
6 back for you. Fix your problem. I don't
7 know if they agree with that.
8     And then the closing note. I think two
9 weeks ago Mr. Hamaway had asked Mr. Reyes,
10 are you okay with having the note sent to us
11 and we'll sign it for you?
12     If he wants us to sign it saying marked
13 in full, we need to have it. No response to
14 that.
15     MR. REYES: You don't know what
16 conversation I had with Mr. Hamaway. I
17 wouldn't make that statement. You don't know
18 what I spoke to Mr. Hamaway about.
19     MR. GORDON: If I may finish.
20     MR. REYES: Don't make representations
21 that are inaccurate.
22     MR. GORDON: I can make representations
23 based on what I know from conversations with
24 Mr. Hamaway which was Mr. Reyes told you that
25 he's okay with your giving the note to us?

**73**

1 And in e-mails we have with Mr. Hamaway he
2 said, no, he hasn't responded to that. I
3 think there is a reason why we have someone
4 from Mr. Hamaway's office here today.
5     MR. SAYRE:  Is there anything we're
6 saying incorrect?
7     MR. SMITH:  I was informed by Mr.
8 Hamaway that he did not have a response and
9 that's really the reason why I'm here with
10 the original note.
11     MR. SAYRE:  A response from Mr. Reyes'
12 office?
13     MR. SMITH:  Correct.
14     MR. GORDON:  If there was an issue of
15 handing it to us, that could have been
16 expressed. It hasn't been.
17     There is a reason I gave Your Honor the
18 timeline briefly because what's be said is
19 we're not fixing what was done or we don't
20 want to fix or we don't fix it properly.
21 They cannot claim that we allegedly breached
22 and prevent us from trying to fix the issues.
23 You can't do that. You can't ignore someone
24 for two weeks and say do you want me to turn
25 over the original note and not do it and he

**74**

1 has to come down here from Fort Lauderdale to
2 bring the note because they won't respond.
3     You can't tell me if you don't agree
4 with my one sentence in a release that says
5 Goldstein is signing in this capacity and
6 then come in and say that they're not doing
7 what they need to and tell me you don't agree
8 with my assignments because if you
9 unreasonably withhold consent, you yourself
10 are breaching. They breached it. So now we
11 both have breaches. Okay. What do we do?
12     Your Honor, you made it quite simple and
13 that's really all it boils down to. This can
14 easily be fixed. We've offered to do it.
15 Things are signed. We're ready to do it.
16 They're not harmed if they make the payments
17 just like you said. That simple. That's the
18 bottom line. But what you can't do is lock
19 up this money as they've asked you to do.
20     Thank you for indulging me. I
21 appreciate it.
22     MR. REYES:  Your Honor, I don't want to
23 rehash the same grounds, but let me just make
24 out a couple points to the court. We have
25 the issue in this case as to whether payments

**75**

1 should be made which is why Fiscal Operations
2 versus Metropolitan Dade County is
3 applicable. I, the party who is the payor,
4 because of their breach am excused from
5 performing which is why I want to put it into
6 the registry which is exactly what that case
7 is about and it's completely distinguishable
8 from Conover where somebody wants to take
9 money away from somebody and put it in the
10 registry while the issue is being adjudicated
11 is the complete opposite and this law is what
12 applies.
13     It wasn't until Monday afternoon's
14 filing where all of these promises are being
15 made to undo whatever they had done in the
16 past. Okay. So I don't want Your Honor to
17 get the misconception that they have been --
18 that they were going to do these things weeks
19 ago. Monday was the day that they had
20 attached it to a pleading and said they were
21 going to do these things.
22     When I spoke to Mr. Hamaway, I was
23 concerned about this note being cancelled by
24 anybody other than Leon Goldstein because of
25 this questionable transaction. I don't want

**76**

1 to be complicit, Your Honor, in a fraud. I
2 don't want to stand here today and say there
3 has been a fraud or there has not been a
4 fraud. I can tell Your Honor what I know.
5 I've pointed out to Your Honor very
6 questionable facts. I'm an officer of the
7 court. I have a duty. I am concerned and I
8 don't want to be complicit in assignments
9 out, assignments in, parties cancelling notes
10 by powers of attorney that are questionable
11 in themselves.
12     Counsel reads to you, well, he has any
13 authority to do whatever -- whatever
14 corporate matter exists. Well, was conveying
15 the assets of the company a corporate
16 approved matter? We don't know that. The
17 fact that he has a power of attorney with
18 that boilerplate, did the company itself by
19 resolution, board resolution or shareholder
20 consent, authorize the conveyance of its
21 assets? We don't know that. But apparently
22 there was conveyance of some assets, this
23 note and mortgage.
24     It says the -- When it does talk about
25 conveying assets, it says those assets on

**77**

1  Exhibit A, and there's no Exhibit A. This is
2  highly irregular. This isn't as simple.
3  They want Your Honor to just ignore all this
4  questionable conduct. I've had to bring a
5  motion to enforce because they wouldn't give
6  it to me voluntarily. I've had to serve a
7  request for production. They told me they're
8  not going to give me the information. It's
9  not due yet, but they told me they're not
10 going to give me the information. So I'm
11 presented with this scenario.
12     And the checks that I write are being
13 endorsed improperly under Article 3. There's
14 a missing endorsement on these checks. That
15 was not pointed out to Your Honor. When they
16 say they can endorse it to whomever they
17 want, Pinnacle Three has to endorse the
18 check, then that can occur. That's not
19 happening here. These payments are being
20 endorsed by North Star with a fictitious name
21 Pinnacle Three Co. That is I think obvious
22 so the bank doesn't know what's going on.
23 But that's an improper endorsement. It's a
24 fraudulent endorsement.
25     So I'm being asked to be complicit in

**78**

1  all these activities and I don't want to be
2  complicit in these activities. Plus I have a
3  judgment creditor suing me.
4      Your Honor, this can be done in orderly
5  fashion. They're not prejudiced in any way.
6  The money will only be in the registry until
7  we have this hearing and then we can get this
8  information. If Mr. Shalek is right that
9  there was a fraud here, it's correct that
10 Your Honor can't be used to conceal that or
11 fix it. It has to be dealt with
12 appropriately. So the money goes into the
13 registry. We will have the discovery and we
14 will know and we will establish if it was
15 merely a breach because they assigned without
16 our consent and that breach has been cured.
17 Then Your Honor will decide whether we're
18 entitled to an award of fees and costs, are
19 we to continue to make payments thereafter,
20 or Your Honor will decide what is the result
21 of that breach. But I think we do this in
22 orderly fashion and we be allowed to deposit
23 it. That's what the case law allows. We
24 deposit it. We'll have the evidentiary
25 hearing. Have them produce the documents and

**79**

1  see if this transaction is legitimate. Let
2  us see these resolutions. What was the
3  assets of the company allowed to be conveyed
4  out? And then we can decide. But I think
5  given what's happened here and a motion to
6  intervene by a judgment creditor alleging
7  fraud, I mean, I think I have to proceed
8  cautiously and I think I had to file these
9  motions. They wouldn't give me the
10 information.
11     You heard North Star -- The statement
12 was made North Star, Inc. is Pinnacle. Yet
13 the LLC is the one doing the conveyances.
14 Well, how did it move from North Star, Inc.
15 to LLC?
16     I guess they're going to tell you North
17 Star, Inc. and North Star, LLC are the same
18 thing. Where is that?
19     You know, we have formalities in
20 Florida, as all the other states do. Are
21 they followed? I don't know. And so
22 it was executed. It was assigned. It was
23 possessed. Different verbs are being used.
24 They all have different meanings. So was
25 there an execution of assets? Was there a

**80**

1  pledge of assets? Was there a repo of
2  assets? Who has them? How did it get from
3  entity to the other? Who has the right to
4  act on behalf of those entities? I think
5  that if they would share that and it's all
6  rises from a loan in '07 that wasn't recorded
7  until '13 with an entity that didn't exist.
8      I think that we have enough here that
9  warrants Your Honor acting conservatively
10 under 1.600. Let us put the money in the
11 registry. Let us have this minimal discovery
12 and we'll have the hearing.
13     I think we've beaten a dead horse
14 enough.
15     MR. SAYRE: Mine is 30 seconds, Your
16 Honor.
17     Three breaches. I didn't hear Mr. Reyes
18 mention any of those three breaches in what
19 he just said. It sounds like he wants Your
20 Honor to determine whether there was a
21 fraudulent conveyance. Not proper here.
22 This is a motion to enforce settlement
23 agreement. Not proper here at all. If
24 anywhere, federal court where Mr. Shalek has
25 the ability to sue North Star if he wants to.

81

1  He can bring these supplementals.  It's
2  really where he should be bringing these
3  supplemental proceedings.  We begged him to
4  do it.
5       Mr. Reyes, his motion said nothing about
6  all this.  Now he's just amended his motion
7  to say he wants Your Honor to determine
8  whether there was a fraudulent conveyance.
9  He's just done an ore tenus motion.  I would
10 love to brief that, Your Honor, because
11 that's not proper.  This is a motion to
12 enforce settlement agreement.  Three alleged
13 breaches.  We fixed all three of those
14 breaches.  We're done.  That's the motion to
15 enforce.
16      Motion to deposit, it's an improper
17 injunction.  Mr. Gordon looking at the case
18 for 10 seconds that wasn't presented to us
19 until the middle of the hearing pointed that
20 out to Your Honor.
21      The federal court has already denied
22 this relief.  They are trying to find a new
23 court to grand it.  Your Honor shouldn't
24 allow that to happen.  This should end.  It's
25 now becoming clear.  Mr. Reyes, it sounds

82

1  like -- We've tried to fix these things.
2  He's not allowing us to.  It sounds like he's
3  going to try to get his fees for all this
4  work that he's doing even though we've said,
5  here, your issues, we don't necessarily agree
6  with, we're going to fix them because we
7  don't want to deal with it.  Now it sounds
8  like he's going to try to go after his fees
9  on top of it.  I think I caught in there
10 because we didn't execute a partial release
11 on $161,000 of the $2.1 million that was owed
12 and because we didn't hand him the original
13 note, it sounds like he's trying to get out
14 of a $2.1 million obligation.
15      I mean, yeah, you can stop performing
16 under a contract if there's a material
17 breach.  Assigning something, not giving a
18 release on $160,000, that equates to not
19 having to pay $2.1 million, this is the first
20 time I'm hearing that.
21      MR. REYES:  You have to read my motion.
22 It's in my motion.
23      MR. SAYRE:  It's not in your motion.
24      MR. REYES:  Your Honor, the
25 nonassignability of these obligations was

83

1  almost a deal breaker.  Again, until we can
2  have an evidentiary hearing, I can't prove
3  that to Your Honor.  But I attached to my
4  motion e-mail communications with Mr.
5  Hamaway's office and our side, I believe it
6  was my office, it may have been Mr. Kaplan's
7  office, but where we were adamant that this
8  not be assigned because Leon Goldstein is a
9  minority shareholder in these entities that
10 I'm here on behalf of today.  It was very
11 important to us.  There's a noncompete in the
12 settlement.  There is this obligation to
13 release collateral.  It's not the $161,000.
14 This is collateral worth millions of dollars
15 that my client owns that we don't want to
16 have encumbered one day more than the
17 settlement requires.  And it wasn't until
18 Monday that they sent this release that they
19 said they will sign that as I explained to
20 Your Honor is improperly executed and I need
21 to go over it with my client which they
22 hadn't given to me until Monday.  I don't
23 want to belabor that.  It's an undisputed
24 fact.
25      But the settlement agreement had very,

84

1  very important terms.  And consenting to an
2  assignment, we don't know who is our
3  assignee.  Are they going to honor the terms
4  of the settlement?  Am I going to have a
5  situation where I have -- I have Leon and
6  Pinnacle have been stripped of their assets
7  having the obligations under the settlement
8  and now some other entity holding the note
9  and mortgage saying, well, I'm not bound to
10 that settlement agreement.  I'm not going to
11 honor the settlement agreement.  I'm not
12 going to do what the settlement agreement
13 requires.
14      So there was a reason why we did not
15 want assignment of the obligations under the
16 settlement agreement, the noncompete and
17 performance of the settlement agreement so
18 it's --
19      THE COURT:  Can someone show me a case
20 where the language of fair and reasonable
21 doesn't control language in a contract that
22 you can't assign?
23      MR. GORDON:  Your Honor, we've shown you
24 the cases that say that there's an implied
25 duty of good faith if there's no standards

85

1  for the assignment.  You have to abide by
2  that and you cannot unreasonably withhold
3  consent.  We have put these in our papers --
4      THE COURT:  That's my understanding of
5  the law.
6      MR. GORDON:  What they haven't done
7  is -- What's interesting I just heard is we
8  don't want an assignment.  We don't want it.
9  We were concerned about competition.  Our
10  client is not in their business.  If you
11  don't want the assignment --
12      THE COURT:  My problem with the language
13  that says that in the cases deals with
14  usually unilateral refusal to assign.  Here
15  you've got a bilateral refusal.  Both sides
16  have the right to refuse.  I don't know
17  whether that fair and reasonable still
18  controls.
19      MR. REYES:  Let me just answer you.
20      THE COURT:  But I'm not sure it really
21  matters.
22      MR. GORDON:  I think it would apply to
23  either party's interest in assigning even if
24  it was bilateral.  I don't have cases on it.
25      THE COURT:  If either party wants to

86

1  assign and wants to use the fair and
2  reasonable, then they've got to show to whom
3  they're assigning it, why they're assigning
4  it, and why it's reasonable to do so.
5      MR. GORDON:  Great.  Then we can put it
6  back and fix it.  That's what we're trying to
7  do.
8      MR. REYES:  To answer your question,
9  Your Honor, when a contract says
10  nonassignable without consent, consent cannot
11  be unreasonably withheld.  That's the law.
12      THE COURT:  Right.
13      MR. REYES:  They assigned it without
14  asking us first.  Breach.  Then we said give
15  us information so we can decide whether we
16  can consent to the assignment.
17      THE COURT:  You're entitled to it.
18      MR. REYES:  It's not been forthcoming.
19  As I sit here today on the assignment issue,
20  it has not been forthcoming.  Instead they
21  said we're going to undo it.  They went and
22  recorded instruments in various states.
23  They're going to undo it.  They're going
24  unrecord those.  They're going to record new
25  ones.  They're going to undo this transaction

87

1  without ever having shown us anything, and
2  somehow that's going to moot their breach of
3  the settlement agreement is what they say
4  they're going to do.  Yet that initial breach
5  hasn't been addressed.  And was that initial
6  breach the result of fraudulent transfers and
7  fraudulent documents and those issues that
8  Your Honor is hearing about today, which I
9  wanted to point out to you.  I point those
10  out to Your Honor not because I'm suing --
11      THE COURT:  Why wasn't the failure to
12  notify about the assignment and why you're
13  assigning, why wasn't that a breach?
14      MR. SAYRE:  Well, Your Honor, because
15  they have to -- they have to reasonably
16  consent.  So let's say we did it without
17  notifying them.  They have to come up with a
18  good reason why they would object to it.
19      THE COURT:  Who shifts the burden?  The
20  burden is on you to show that it's fair and
21  reasonable, isn't it?
22      MR. SHALEK:  Of course.
23      MR. SAYRE:  Well, that their rejection
24  of the assignment was --
25      THE COURT:  Is unfair.

88

1      MR. SAYRE:  -- was unfair.
2      THE COURT:  Okay.  The burden is on you,
3  not on them.
4      MR. SAYRE:  Okay.  That's fine.  So
5  we're now saying that the assignment that you
6  apparently have an issue with, we're going to
7  put it back with Pinnacle Three and
8  everything so the assignment is as it didn't
9  exist.  I wish I could just cancel the
10  assignment, but my real estate people say I
11  can't do that.  I have to assign it back.  If
12  I could just cancel it, I would cancel it but
13  I'm just assigning it back because, to tell
14  you the truth, Your Honor, I don't want to
15  fight.  I wasn't involved with the underlying
16  settlement agreement.  Mr. Reyes says it was
17  a point of contention because of competition.
18      THE COURT:  Doesn't matter.
19      MR. SAYRE:  North Star is not competing.
20      Do you have any reason to believe that
21  North Star is competing with you guys?
22      MR. REYES:  I don't know what North Star
23  does.  That's one of the things we asked you,
24  too.  I don't know what North Star does.
25      MR. SAYRE:  North Star owns Pinnacle.

89

1    MR. SHALEK: Commits frauds.
2    MR. SAYRE: But, Your Honor, so we're
3  just trying -- I mean, in our minds we want
4  to reach the simplest end. It's just an ends
5  to a mean. We don't want to fight with
6  parties with whom we settled. We hear what
7  they're saying. Okay. Let's say they're
8  concerns are valid. We're saying, here, the
9  concerns, let's wipe those concerns right
10  away. If I could cancel, I would cancel but
11  I can't my real estate people tell me. I've
12  got to return it to Pinnacle Three. I've got
13  to reassign it back and that's what we're
14  doing.
15    What Mr. Reyes is saying is we don't
16  want to agree to that because we're afraid
17  that we're participating in some sort of
18  fraud. That's an unreasonable -- No fraud
19  has been -- These are allegations.
20    Again, it sounds like Mr. Reyes wants
21  you to determine, wants you to make a
22  determination that there was fraud. It
23  sounds like all this discovery is related to
24  you determining there was a fraudulent
25  conveyance. Not proper here.

90

1    We're trying to do the right thing.
2  We're trying to just give the stock back to
3  Pinnacle Three -- I'm sorry, reassign the
4  stuff to Pinnacle Three so that Mr. Reyes'
5  clients are happy. I've tried to make Mr.
6  Reyes happy from the time -- even before the
7  motion to enforce in reality. I've tried to
8  work with him and I thought we were going to
9  reach some sort of agreement but every time I
10  say here's the, they come up with an issue.
11  They ask for documents. I give them
12  documents, the POA, all this stuff, the
13  depositions, and then he tries to turn it
14  around and comes up with more issues. So I
15  don't really want to give him any more
16  documents because every document I give him
17  he has an issue with.
18    All right. So we're trying to not waste
19  the court's time, not waste our time and our
20  clients. The clients have to pay us money to
21  do all this. And now Mr. Reyes wants us to
22  pay his bills on top of it. Even though
23  we're trying to simplify the issues, he wants
24  to complicate them and have us pay for his
25  attorney time in the process of complicating

91

1  them for something that really has already
2  been solved.
3    They keep throwing around fraud. Again,
4  Your Honor, this is not the place to
5  determine whether -- There hasn't been fraud.
6  But this is not the place to determine
7  whether there's been fraud. To the extent
8  that that needs to be determined, it's in
9  federal court. That's not here. Your Honor
10  is to address the breaches alleged in the
11  motion to enforce, not to determine whether
12  there was a fraudulent conveyance. It's
13  whether there were breaches.
14    Now, Your Honor pointed out that you
15  thought there was something with the
16  assignment. If you find that there was a
17  breach there, we'll disagree. We'll hash
18  that out through the motion to enforce. But
19  that's along the lines of what Your Honor is
20  to be deciding. It's not whether there was a
21  fraudulent conveyance. So what Your Honor
22  will be deciding is those three alleged
23  breaches which we'll address in the motion to
24  enforce. I'd be happy to address them.
25  We'll disagree, but I'd be happy to address

92

1  them. It's not fraudulent conveyance.
2  That's the motion to enforce. I'm sorry we
3  keep bouncing around.
4    The motion to deposit, I think it's been
5  briefed. I mean, it's an improper
6  injunction. This case does nothing to void
7  that fact and that's where we're at, Your
8  Honor.
9    MR. SHALEK: May I just address the
10  motion to intervene one last time?
11    I want to thank Mr. Sayre for advising
12  me that my claim should be brought in federal
13  court. I'm going to after the hearing see if
14  I could put him on salary.
15    THE COURT: He'll send you a bill.
16    MR. SHALEK: Sure. I'm the plaintiff in
17  that case. I have the right to bring it in
18  either court. We choose and elect, as you
19  can tell from this motion to intervene, that
20  we're going to bring it here in this
21  courthouse. It's not wasting the court's
22  time. It's what the court is here for,
23  frankly, is to resolve these types of issues
24  and there's millions of dollars at stake in
25  this thing.

93

1      He's saying that his client is trying to
2  do the right thing.  Well, they weren't
3  trying to do the right thing for the last two
4  years.  They got caught trying to do the
5  wrong thing and now they're trying to unwind
6  it and do the right thing.  But we need to as
7  part of the fundamental basis of our
8  judiciary system to determine what is the
9  right thing to do here.  The only way that
10 this court can achieve that goal of figuring
11 out what is the right thing is to bring all
12 the parties before the court to preserve the
13 status quo of the race before it goes to the
14 Ukraine to protect the only -- what appears
15 to be the most innocent party in this action
16 which is the person that just wants to make
17 the payments but doesn't want to get sucked
18 into additional actions.
19     He's not saying I'm not making the
20 payments.  He's saying here, here is the
21 money, I'm putting it into the court and let
22 the court decide what's the right thing to do
23 with it and not let's give the money to Mr.
24 Goldstein and Mr. Yelizarov and never see it
25 again.

95

1  that says the mere fact that money may
2  disappear is not a basis to put it into the
3  registry of the court.
4      MR. SHALEK:  I agree with that.  And I'm
5  not asking you to put it into the registry of
6  the court.  Mr. Reyes is.
7      THE COURT:  I understand.
8      MR. SHALEK:  He's given you reasons why.
9  And I think his reasons are correct and
10 valid.  All I'm asking you for, sir, is
11 permission, and this should be an easy one,
12 to appear in this action and bring my claims.
13     THE COURT:  Anybody else have anything
14 to say?
15     MR. REYES:  Just one last point.  The
16 only legal argument given to Your Honor that
17 it would be a mandatory injunction to grant
18 my relief, it would be basically me asking
19 for an injunction against myself.  That's why
20 that law doesn't apply, Your Honor.  It's
21 very obvious.  I have the right to invoke
22 under 1.600 under this dispute to put the
23 money in the registry.  I cited to Your Honor
24 three settlement dispute matters.  I cited to
25 Your Honor this case where a third party had

94

1      My client is not asking for an
2  injunction.  That's what Judge Altonaga ruled
3  that we did previously.  She said this whole
4  case smells and her gut reaction was to tie
5  up the money and then thought as a matter of
6  law she couldn't do that for my client.  It's
7  not my client that's asking it here.
8      Maybe I shouldn't be sitting next to Mr.
9  Reyes because Mr. Sayre wants you to think
10 that we're on the same side.  Maybe I should
11 be down here with Mr. Hamaway because I'm not
12 on Mr. Reyes side.  I've sued Mr. Reyes'
13 clients, every one of them.  I'm adverse to
14 Mr. Reyes.  Did I choose the wrong seat to
15 sit in?
16     The common interest here is one thing
17 and we all want it.  We all want the same
18 thing.  And that's the money.
19     Are we going to decide today that one
20 party gets it to the detriment of the others
21 when you have these massive problems between
22 the parties?  I think that that would be a
23 very, very poor use of the court's equitable
24 powers given what it heard today.
25     THE COURT:  It seems to me there's law

96

1  a payment obligation and there was a dispute
2  whether the payment obligation needed to be
3  made or not and the third DCA affirmed Judge
4  Chavez, I'm not sure if I'm pronouncing that
5  right, when he ruled that it was proper to
6  put the money in the registry with that
7  pending.
8      It's not a mandatory injunction.  It's
9  not me telling somebody else to put the money
10 in.  It's our funds.  We want to put them in
11 while this is being decided.  They're not
12 prejudiced in any way.  I don't understand
13 it.  And we need to deal with the breaches of
14 contract.  We need to deal with them.
15     I only pointed out to Your Honor the
16 fraud.  Not that I'm asking you to prove a
17 fraud.  I'm just pointing out to the court
18 why we're so concerned with the assignment in
19 breach of the contract.  It wasn't just some
20 technical question.  We didn't want it at the
21 time and then we know the circumstances of
22 how it arose and I feel duty bound to bring
23 them to Your Honor's attention.  We've
24 characterized it as a breach of contract.  It
25 is a breach of contract because they didn't

97

1  ask for our consent. I think Your Honor has
2  caught onto that. It's very simple. But I
3  point out to Your Honor the circumstances
4  where it came from which is why we've asked
5  for the details to make sure that we're not
6  being sucked into something that we don't
7  want to be a part of.
8      I'll leave it at that. We've all spoken
9  on these different issues so I'll let Your
10  Honor decide.
11     THE COURT: Tell me why 1.600 doesn't
12  apply.
13     MR. GORDON: Your Honor, to the extent
14  that it's deemed by the courts as a voluntary
15  procedure. I understand the distinguishing
16  points that Mr. Reyes makes. He wants to put
17  the money in and, therefore, he's agreeing
18  there's no issue. I have a different view of
19  the rule and how it should apply, which is
20  his belief that we're not prejudiced. Your
21  Honor, I don't know about you, but if someone
22  was taking almost $40,000 out of my pocket a
23  month I would feel a little prejudiced, quite
24  frankly.
25     Judge Altonaga had locked up money for

98

1  two months and now released it and it's now
2  sitting with Mr. Reyes. So Pinnacle Three
3  has not had the money since December and they
4  would like to lock it up more. So I think
5  locking up hundreds of thousands of dollars
6  is slightly prejudicial.
7      If you're going to come into court, as
8  they've done, and file a motion to enforce
9  the settlement, if you seek to enforce an
10  obligation you don't also at the same time
11  get to claim that I'm not bound by it and I
12  don't have to perform as well. You make a
13  choice like you do with a fraud claim. You
14  seek to rescind or you seek damages. If you
15  seek damages, you're abiding by the
16  agreement. They want to enforce this
17  agreement now. They want us to do things.
18  We're saying we'll do them. Then you're
19  bound by your payment obligations as well.
20     So there's no reason why the money
21  should not be given to us while they want to
22  seek to enforce it. 1.600 if it's deemed a
23  voluntary procedure, I believe that would
24  apply equally to both parties here which is
25  are we agreeing -- simple example, real

99

1  estate commission dispute. Who should get
2  the commission, who is entitled to it, if
3  anyone. Fair to say while we're going to go
4  figure it out, let's put it in the registry
5  and let it sit while we go fight it out.
6      There's not a dispute of whether
7  Pinnacle is entitled to the money. The
8  agreement says that it is. They don't
9  dispute it. They write the checks every
10  month. So part of it I believe under 1.600
11  is whether we're agreeing while we fight this
12  out we'll let the money sit there while we
13  work it out. We're not agreeing. I don't
14  think that allows for the court to do it
15  under 1.600. Judge Altonaga said she didn't
16  think where it's not being called a mandatory
17  injunction, I understand it's a different
18  party, she didn't think she had the authority
19  to do it. She unlocked the money basically.
20     So if you come in and want to enforce
21  the agreement, you've got to keep performing.
22  You have to keep paying. And you can't tie
23  our hands and say I'm not going to agree to
24  anything you've done to try and cure. I'm
25  not going to agree to your form of

100

1  assignment. I'm not going to agree to the
2  release which they drafted. I'm not going to
3  tell someone if they can return an original
4  note, but at the same time I would like you
5  to lock up money. I don't see how you do
6  that. It's a great scenario for his client,
7  but I don't see how you do it. You can't
8  stop me from fixing it and say you get to
9  lock up my money but you're not really
10  prejudiced. You won't miss $38,000 a month.
11  No big deal.
12     MR. SAYRE: That's been locked up by
13  another court for a couple months and then
14  only just recently released and now they're
15  trying to lock it up again in another court
16  because it was released over there.
17     MR. GORDON: And their motion did not
18  address the money that Judge Altonaga just
19  released which has now been given to them.
20  It addressed future payments. So could they
21  sit here and say they want to amend their
22  motion ore tenus to address it, they could.
23  I think Judge Altonaga unlocked that money in
24  the fact that the money is due to us. And if
25  it's not paid to us, quite frankly, it's a

### 101

1  default of this obligation and we're going to
2  be back in front of some judge, whether you
3  or Judge Thornton, with a default of that
4  obligation because they're not paying.
5      So I don't think you can enforce it and
6  then say you don't have to make the payments
7  to us that are due to us.
8      MR. SHALEK:  If I --
9      MR. REYES:  I don't want to cut Mr.
10  Shalek off, Your Honor.  I just want to point
11  out to the court, you know, I don't like to
12  just to say things for the heck of saying
13  them.  There's representations made about
14  what I'm seeking in this case.  It's in
15  writing.  I don't know why counsel says what
16  they say.  Paragraph 20 of my motion to
17  enforce the settlement, Your Honor, reads,
18  based on Pinnacle's prior material breach of
19  the agreement the borrower should be released
20  from any further payment obligations under
21  the agreement and loan documents.  And I
22  quoted the Tsusho case and I said, when a
23  nonbreaching party to a contract is
24  confronted with a breach by the other party,
25  the nonbreaching party may stop performance,

### 102

1  treating the breach as a discharge of its
2  contractual liability.
3      This is under a heading that reads the
4  borrower should be released from its payment
5  obligation under the agreement and excused
6  from making the payment until the breaches
7  are cured.
8      I filed a motion to deposit in the
9  registry because my motion asks for that
10  relief.  And so because it is a dispute on
11  whether I have to continue to make payments
12  permanently or temporarily while breaches are
13  pending, that's exactly what 1.600 was
14  intended for.
15      And when I say they're not prejudiced,
16  Your Honor, what I mean is under the line of
17  authority where there's a first breach I
18  could stop paying.  The law in Florida.  I'm
19  asking to put -- I'm going to keep making the
20  payments but put them in the registry because
21  there's a question of a first breach that
22  excuses my performance.  And so they're being
23  benefited in the sense of rather than
24  excusing performance I am putting in the
25  registry both what the judge ordered returned

### 103

1  to me this month and the months that follow,
2  however long before we get to Your Honor, on
3  the breaches of contract.  That's what the
4  law requires.  That's the relief I'm seeking.
5  So no matter how things are characterized, I
6  just want to read it to Your Honor and that
7  is exactly what we're doing here and that's
8  exactly what the rule was intended for.  And
9  they can't get around -- They want to keep
10  saying mandatory injunction.  I'm not asking
11  for an injunction against myself.  We should
12  just let that go.  It doesn't even make
13  sense.
14      The Fiscal case is a great illustration.
15  A party with a payment obligation.  There's a
16  dispute whether it needs to be paid or not.
17  The court said put it in the registry if that
18  party who has the payment obligation is
19  willing to do so.  I am willing to do so.  So
20  that's where we have to end up and then we'll
21  have the hearing and then we'll deal with the
22  issues.  If it can be done quickly, then it's
23  one payment that goes in.  If it goes longer,
24  it's two payments.  But we'll get it resolved
25  and there is a prevailing party fee provision

### 104

1  and that issue has to be dealt with as well.
2  This motion was filed when we couldn't get it
3  resolved.
4      Anyway, those are issues that have to be
5  dealt with.  And so I think it's evident and
6  I think that we should just put the money --
7  What we started this whole thing is put it in
8  the registry.  Your Honor sets an evidentiary
9  hearing when Your Honor is available to do so
10  after we've gotten the limited discovery
11  we've asked for.  And then the other issues,
12  if Your Honor allows an intervention, will be
13  the other issues and we'll follow whatever
14  the court tells us to do with respect to
15  that.
16      MR. SHALEK:  The very last thing, Your
17  Honor, and then let's try and wrap this up
18  because we've been going in circles forever.
19      What Judge Altonaga did, and let's be
20  clear about what Judge Altonaga did, I filed
21  a motion to compel --
22      THE COURT:  I love Cecelia but it
23  doesn't matter to me.
24      MR. SHALEK:  Okay.  We filed a motion to
25  compel.  The judge required that the money be

105

1  paid into my trust account. Okay. They
2  filed a motion for reconsideration saying
3  that it was an improper injunction. The
4  judge entered an order vacating her previous
5  order. That's it. Then there was a dispute.
6  Mr. Reyes filed his motion in state
7  court to deposit his money into the registry
8  of the state court. Mr. Sayre filed a motion
9  in front of Judge Altonaga saying that I'm a
10  horrible human being because I haven't
11  returned the money to them. I responded by
12  saying, Your Honor --
13  MR. SAYRE: You're not a horrible human
14  being.
15  MR. SHALEK: I said, Your Honor, the
16  court didn't instruct me what to do with the
17  money, but in light of Mr. Reyes' motion what
18  should I do with the money? Please instruct
19  us. They filed a reply. The order -- The
20  reason that Mr. Reyes has that money is
21  because Judge Altonaga said specifically
22  don't give it to them. Give it back to the
23  person that gave it to you. That's why it's
24  there. We have a specific instruction. I
25  didn't choose who to give the money to. I

106

1  didn't flip a coin and say should Mr. Sayre
2  get it or should Mr. Reyes get it. We have
3  an order from the federal court stating give
4  it back to Mr. Reyes' clients because of the
5  problems going on and so forth.
6  MR. SAYRE: That's not what it said at
7  all. It basically says give it back to Mr.
8  Reyes' clients because they're the ones who
9  sent it to you. I mean, that's what it said.
10  MR. SHALEK: That wasn't the gist of the
11  motion.
12  MR. SAYRE: The order is right here.
13  MR. SHALEK: That's not what was
14  briefed. Judge Altonaga can be very brief in
15  her orders but her orders reflect the
16  arguments of counsel.
17  THE COURT: I read the order.
18  MR. SAYRE: To tell you the truth, Mr.
19  Reyes is saying he can do whatever he wants.
20  It's his money. It's not a mandatory
21  injunction like it's not our money somehow
22  even though it's owed to us. Fine. If he
23  deposits it in the registry of the court,
24  then we have every right to default him
25  because he owes money on the 29th. So if

107

1  he's saying it's his money, we'll just turn
2  around, respectfully obviously, but we'll
3  default him and then he's in breach and then
4  we'll get our fees.
5  MR. REYES: I don't think they can
6  violate your order, Your Honor.
7  MR. SAYRE: It's not a violation.
8  MR. REYES: If you allow payment to the
9  registry in lieu of payment per the note, we
10  would not be in breach for doing so. So
11  depending on what Your Honor instructs, both
12  the $87,000 or so that I received from Mr.
13  Shalek's office and the next payments will go
14  to the registry or be paid. We don't intend
15  to not make payments. But if Your Honor
16  allows it to the registry of the court, it
17  can't be a default if we followed a court
18  order. I don't know if there's frustration
19  or desperation but that can't be the result
20  if we comply with your order, Your Honor.
21  THE COURT: He's free to do what he can
22  try.
23  MR. SAYRE: The other thing is regarding
24  the $80,000 that was held up, at least one of
25  these alleged breaches didn't occur when that

108

1  payment obligation was due. So I don't
2  understand how -- Mr. Reyes' motion, as Mr.
3  Gordon pointed out, was as to future
4  obligations as to future payments. The
5  80,000 was past payments, two past payments.
6  So I don't know how he also gets to lock that
7  money up as well, especially since at least
8  one of these breaches, alleged breaches,
9  didn't occur until after that payment
10  obligation was due.
11  MR. REYES: Let me just tell Your Honor
12  what that money represents. It represents
13  two payments. I think it's September and
14  October or August and September.
15  MR. GORDON: December, January.
16  MR. REYES: December and January, yes,
17  you're right. We're in March. I'm sorry.
18  Your Honor, there was money sent to us
19  by one of the banks. We had advised the
20  banks of these fraudulent endorsements and
21  10,000 something was returned to us and we
22  sent it to Mr. Shalek's firm and then we put
23  it in trust. So part of that money went to
24  -- It's part of that $87,000, right?
25  MR. SHALEK: I'm sure we sent you the

109

1  accounting when we sent you the money back.
2      MR. REYES:  Yes.  So it's two payments
3  plus $10,000 and change that capital Bank --
4  No, Bank of America, one of the banks, had
5  because of a fraudulent endorsement returned
6  a portion of the money to us.  I don't know
7  what they did to Pinnacle and North Star on
8  the other side.  But when that came to us, we
9  put it in their trust account.
10     THE COURT:  The evidentiary hearing that
11 you want is to determine what?
12     MR. REYES:  Whether the contract was
13 breached and what remedies Your Honor will
14 award from that breach.
15     MR. SAYRE:  Those are the three
16 breaches.  That's how we resolve them.  I
17 don't know why we need an evidentiary hearing
18 or why we need a hearing at all.
19     Mr. Reyes just said that he didn't want
20 Your Honor to determine whether there was a
21 fraudulent conveyance.  All the discovery
22 he's asking for is related to that direct
23 fact.
24     MR. REYES:  Counsel seems to want to
25 blurt out and laugh at the case whenever he

110

1  feels like it.  I think it's disrespectful to
2  me and to the court.
3      MR. SAYRE:  It's ridiculous.
4      MR. REYES:  Well, that's your opinion,
5  counsel, but you should show a little respect
6  I think.
7      The contract's been breached.  A consent
8  to an assignment wasn't sought.  We asked for
9  this information to determine whether it was
10 properly assigned, whether we need to
11 consent.
12     They're saying they're going to put it
13 back.  It hasn't been put back.  There are
14 breaches as we sit here today.  We want to
15 have a hearing set.  Counsel can pooh-pooh it
16 as much as he wants.  We just want a hearing
17 set.  There are breaches pending as we sit
18 here today and we want a motion to prove
19 those to Your Honor.  And because they
20 assigned without our consent, we've asked for
21 that information to determine wether it was
22 properly assigned to begin with.
23     If they put it back, Your Honor will
24 decide what effect that has, whether it was
25 properly put back, can they put it back, but

111

1  I want to see those documents.  It goes to
2  the breach of the contract.  An hour ago
3  counsel said we'll have the evidentiary
4  hearing and he'll show you.  Now it's what do
5  we need one for.
6      MR. SAYRE:  If you want, I'll do it
7  obviously.  But the breaches have been fixed
8  and so I would just say I would want before
9  the evidentiary hearing is had, and I want it
10 done quickly, is we've got a pending motion
11 to approve the release and the assignment,
12 that's two of the breaches.  So I think if
13 Your Honor rules favorably in our favor on
14 that issue, you knock two breaches out right
15 there.  What's left is the original note,
16 which we have here.  It's here right now,
17 Your Honor.  That's one of the breaches.
18 What will satisfy Mr. Reyes?
19     THE COURT:  Let me see the note.
20     What's your problem with this note?
21     MR. REYES:  I haven't seen it, Your
22 Honor.
23     THE COURT:  Take a look.
24     MR. GORDON:  Your Honor, the issue is
25 how we mark it paid, satisfied and paid in

112

1  full.  We didn't have it.  It was with Mr.
2  Goldstein's former counsel.  So when we
3  located it, we asked for the note to be sent
4  to us so we can mark it.  The issue is they
5  haven't consented to it being sent to us so
6  we can actually mark it to address the
7  breach.
8      MR. REYES:  The breach, Your Honor, is
9  who is going to mark it cancelled and
10 returning it, Mr. Goldstein?
11     THE COURT:  To whom is the note?
12     MR. REYES:  The note is Pinnacle Three
13 Corporation.  And the whole issue is who is
14 Pinnacle Three Corporation today.  And the
15 only thing I said to them was they were going
16 to give it to Mr. Sayre to cancel it and I'm
17 saying there's an entire dispute on Pinnacle
18 Three Corporation on who is Pinnacle Three
19 Corporation, who controls Pinnacle Three
20 Corporation, and would there be some
21 corporate resolution that I could see that
22 would authorize whoever cancels it to cancel
23 so I would know it was properly canceled and
24 this obligation's been --
25     THE COURT:  Why isn't that appropriate?

113

1    MR. GORDON: Mr. Goldstein is not part
2  of Pinnacle. He's not signing it and he
3  can't. I've taken that position quite
4  clearly in federal court.
5    If I may make a suggestion, Your Honor,
6  there is protection under Statute 607 for
7  production of corporate records.
8  Shareholders are entitled to them. There's a
9  whole procedure. They would like to
10  circumvent that procedure and say because we
11  don't agree with what you're doing, we're not
12  sure. We want all kinds of documents. We
13  have to protect the corporation and assert
14  its right to say you're not entitled to
15  these.
16    I can make a suggestion. If there's
17  documents other than what we've already given
18  them, which frankly we didn't they were
19  entitled to but we would like to get this
20  resolved, if the court would like them as an
21  in-camera inspection, I think we can probably
22  convince our client to do it that way. But,
23  Your Honor, for the sake of protection of a
24  corporation, at some point a line has to be
25  drawn saying you're trying to enforce a

114

1  settlement agreement. You don't have rights
2  to all these documents. If you are still in
3  the lawsuit and suing people every which way,
4  maybe you've got a basis. I'm not sure then.
5  But they are not shareholders. If Your Honor
6  wants to look at the documents, we can ask
7  our clients. Maybe that's the resolution.
8  Your Honor can see the fact that these were
9  signed and there's proper basis, but a
10  corporation doesn't have to just open up its
11  door to someone who is not a shareholder who
12  says I want the documents.
13    Look, I want all kinds of things, Judge,
14  but I'm not entitled to them.
15    THE COURT: Since you have assigned from
16  Pinnacle Three Corporation to various other
17  entities, doesn't he have a right to see who
18  is going to sign that cancellation? Pinnacle
19  Three can't do it.
20    MR. GORDON: No, I would respectfully
21  disagree that it can't. The obligation, as
22  far as if he's saying he's entitled to the
23  records, if the assignment was still sitting
24  with North Star and we said North Star has it
25  and you want Pinnacle Three to sign it and

115

1  you're concerned about North Star, that's one
2  thing. But we said we're just going to put
3  it right back to Pinnacle where it was in the
4  first place so it never really even frankly
5  happened. So the same entity is going to
6  sign it. The fact that North Star is a
7  shareholder of Pinnacle doesn't change that
8  fact and the fact that Mr. Yelizarov is now
9  the president of it doesn't change it.
10  That's who is listed. That's who runs it.
11  That's who signs it. Goldstein isn't. He's
12  not signing it.
13    MR. REYES: This is Sunbiz, Your Honor.
14  Goldstein is still listed with the company as
15  a director and a secretary.
16    MR. GORDON: Your Honor, I understand
17  that. Can I address that?
18    There are corporate resolutions, Your
19  Honor, which I said we'll give you. What was
20  done, we looked at it last week, and it was
21  perhaps a misunderstanding of what Sunbiz
22  would do. Mr. Yelizarov was put in with the
23  change. I guess the thought was, mistakenly
24  so, the change would also delete Goldstein
25  because we put in Mr. Yelizarov as president.

116

1  You don't have two presidents. What should
2  have been on the form, which has been done to
3  correct it, was remove Goldstein as well.
4  There was some misunderstanding of what
5  Sunbiz was going to do for whoever did the
6  form. I guess our assistant misunderstood
7  it. You don't have two presidents. So he's
8  been removed. There's resolutions that
9  removed him. We have those. If Your Honor
10  wants to see them, they're from last year,
11  we'll provide them to Your Honor. I don't
12  think Mr. Reyes is frankly entitled to them.
13  If you ultimately say he is, we of course
14  will comply with that, but there has to be
15  some level of protection for a company that
16  they don't get to dig around in every
17  corporate record.
18    So I think I can address the issue. If
19  Your Honor wants the documents, we'll provide
20  them to Your Honor. I would just like to
21  confer with the client. But if you order us,
22  we'll do it. But I think that probably is a
23  reasonable solution. We can do that. And
24  that will address his concerns. Your Honor
25  can see what was done there, that this was

## 117

1  properly done with resolutions by the
2  company. But a nonshareholder doesn't come
3  in and say I want your resolutions.
4  　　MR. REYES: We can do a confidentiality
5  agreement that the documents requested --
6  　　MR. GORDON: Your Honor, we don't agree
7  to that.
8  　　MR. REYES: I haven't even finished
9  speaking. I don't understand the
10  interruptions.
11  　　MR. GORDON: It doesn't matter.
12  　　MR. REYES: May I speak now?
13  　　MR. GORDON: You can but I'm not going
14  to agree to it.
15  　　MR. REYES: Are you going to interrupt
16  me too while I speak?
17  　　MR. GORDON: No, I just said I won't
18  agree to it.
19  　　MR. REYES: If Your Honor were to order
20  a confidentiality order, what's produced in
21  this case will be used only in this case,
22  then we can get the documentation that we're
23  asking for. It's the documents regarding
24  these conveyances. It's not every corporate
25  document. It's the documents regarding these

## 118

1  conveyances. They're telling you they're
2  going to put it back. It hasn't occurred
3  yet. It's in North Star Maritime Miami, LLC.
4  　　THE COURT: LLC.
5  　　MR. REYES: Which we don't know how it
6  got there because they said North Star, Inc.
7  had the shares. So we don't know how it got
8  there, but it's there now. They're going to
9  undo it. So who is going to cancel this
10  right now? I guess it's going to be North
11  Star Maritime Miami because they're the
12  controller of Pinnacle. It's going to go
13  back to Pinnacle and then who from Pinnacle
14  is going to do it? And then is it going to
15  be done by this power of attorney of this
16  lawyer? Power of attorneys are strictly
17  construed. Is that authorized by the board?
18  　　I just want to know what's going on,
19  Your Honor, that I'm not stuck with something
20  later on. When we're asking for these
21  resolutions, it's to know who has authority
22  and for what and was it done initially. And
23  I think it's not unfair when I have a
24  $2.1 million obligation that I'm paying the
25  right party, that I'm protected. I've paid

## 119

1  this off. It has to be canceled by the right
2  person so someone doesn't say this negotiable
3  instrument still exists.
4  　　These aren't unreasonable requests, Your
5  Honor. We can do a confidentiality order.
6  It will be used in this case and then
7  everyone is protected.
8  　　MR. SAYRE: Your Honor, when you see the
9  corporate resolutions that -- I don't why
10  Your Honor can't look at the corporation
11  resolutions. Why Mr. Reyes has to see the
12  corporate resolutions in order to -- If Your
13  Honor sees them and sees that it is what we
14  say it is, why does Mr. Reyes need to see it?
15  By the way, I would ask Mr. Reyes, who does
16  he want to sign? We're trying to -- This is
17  again us trying to comply.
18  　　THE COURT: All he's entitled to is
19  Pinnacle Three Corporation.
20  　　MR. SAYRE: Exactly. And that's who we
21  are. He just disagrees with that.
22  　　MR. REYES: I don't know who is Pinnacle
23  Three.
24  　　THE COURT: He doesn't know who it is
25  because of your assignments.

## 120

1  　　MR. REYES: And the defects in the
2  various documents.
3  　　MR. SHALEK: Just asking the court to
4  look at it doesn't allow anybody with an
5  adversarial eye to look at it.
6  　　MR. SAYRE: The assignment was from
7  Pinnacle Three to North Star Maritime Miami,
8  right?
9  　　MR. GORDON: The assignment of the
10  interest?
11  　　MR. SAYRE: No, the assignment of the
12  notes and mortgages.
13  　　MR. GORDON: It was from Pinnacle Three
14  to North Star Maritime Miami. The simple
15  reason, just two seconds, North Star Maritime
16  is a Panamanian corporation. They had set up
17  a Miami corporation which is North Star
18  Maritime Miami just to deal with it in Miami.
19  It's not complicated. It's not fraud.
20  Locally it's easier to have an entity here so
21  North Star Maritime Panamanian wanted the
22  Miami entity to hold it because it's here,
23  we're here, the power of attorney is here.
24  So it's as simple as that.
25  　　MR. SAYRE: I'm trying to piece together

---

**121**

1  what Mr. Reyes is saying. So now he's saying
2  that the notes are with North Star Miami so
3  Pinnacle Three can't sign it because the
4  notes are with North Star Miami. We'd be
5  happy for North Star Miami to sign the
6  cancellation of the original note. We're
7  trying to assign it back to Pinnacle Three so
8  Pinnacle Three can sign it but he doesn't
9  want to allow us to do that. Whoever he
10 wants to sign, we'll have them sign. Okay.
11 Leon Goldstein is actually represented by
12 counsel. Now, Leon Goldstein is not an
13 officer anymore. That's by corporate
14 resolution. So he can't sign as an officer
15 but he can sign as a party to the settlement
16 agreement if his counsel agrees. I've got to
17 talk to him. It's his Frank Sexton. I don't
18 know if you've dealt with Frank, but he
19 represents Leon and I can ask whether he's
20 okay with Leon signing it. Leon knows that
21 North Star owns Pinnacle Three now. I mean,
22 I'm just trying to comply with Mr. Reyes'
23 request.
24      MR. REYES: It's interesting, they're
25 asking me what I think they should do to fix

---

**122**

1  the errors in their documents. That's not my
2  place as the borrower. I've asked to see
3  what they did to understand how we got here.
4  But they're saying to me, well, we'll put it
5  back. Why doesn't that satisfy you? Well, I
6  don't know how it got there to tell you if
7  that's going to take care of the problem and
8  you won't show me who the parties are and
9  what authority they had.
10      You just heard they set up a company in
11 Miami. What does that mean? Is it a
12 subsidiary? It's an LLC so is the Panamanian
13 entity the managing member of that entity?
14 Is someone else? Is it parent subsidiary? I
15 don't know what they -- they set one up to
16 deal with it here.
17      How would the Panamanian company
18 executed on the shares did those shares get
19 to this Miami, LLC? I don't know. How did
20 they execute on it to begin with? And we
21 went over that before. We don't know any of
22 these things.
23      Now they're saying to me Mr. Reyes won't
24 let me put it back. I'm not saying you can't
25 put it back or put it back. I don't know if

---

**123**

1  that's proper. But I'm not going to be the
2  one to bless it. If they're going to undo an
3  assignment and go record it in different
4  states, they'll have to make that decision
5  but not for me to decide it for them,
6  especially when they won't show me the
7  documents. But when they're saying to me on
8  the note, all I'm asking is that it be
9  cancelled by an authorized representative of
10 Pinnacle Three Corporation and that there be
11 a resolution authorizing that person to
12 cancel it so that I'm protected and that the
13 person who signs the resolution be the person
14 who is authorized to act for the board of
15 that company.
16      We don't know any of those facts. We've
17 seen a partial power of attorney, missing
18 exhibits, appointing a lawyer to perform the
19 functions of the president. Presuming that's
20 even valid under 607 because a board has to
21 authorize delegations. We don't even know
22 any of those things. So all I've said
23 continuously with the note that it be
24 cancelled across each page by somebody
25 authorized to do so with a resolution

---

**124**

1  approved by the board and I haven't been
2  given that. I don't think it's an
3  unreasonable request. And on the assignments
4  they can't put to me, Mr. Reyes, will you
5  bless the putting it back? Well, I don't
6  know if it was proper to put it where you put
7  it. If you put it back, it will be at the
8  advice of your lawyers to your client and
9  we'll deal with it at that point in time. It
10 hasn't been put back. We sit with a breach
11 of the settlement as we sit here today.
12 They're going to put something back signed by
13 whomever who purports to have authority.
14 We'll look and see the authority. We still
15 need to see the authority to see if it was
16 done right.
17      All right. So that's what we're looking
18 at. He keeps turning to me what will I
19 accept. That's not how this works. They
20 have to have done it correctly. They didn't
21 in the beginning. Now they're trying to undo
22 it. We can't be the ones to tell them how to
23 do it.
24      MR. SAYRE: The court can and we've got
25 a motion to approve what we're trying to do

---

125

1  and that was actually set for today.  If Your
2  Honor doesn't want to rule on it, I
3  understand.  But Mr. Reyes is saying it's not
4  his job to tell us what to do.  We think
5  we're doing it correctly but we don't want to
6  do it and then Mr. Reyes come back and say we
7  did it improperly.  So that's why we've asked
8  Your Honor to approve what we're doing.
9      THE COURT:  You will provide to me
10  within the next 10 days corporate resolution
11  or whatever to establish how it got from
12  Pinnacle Three Corporation to the Maritime
13  LLC or Miami or whatever in between.  And if
14  I approve what I see by way of corporate
15  resolution, I will advise you who will sign
16  the cancellation of this note and how long
17  you have to cancel.  If this is the original,
18  you better hold onto it.
19      MR. SMITH:  Mr. Reyes has the original.
20      MR. REYES:  The original is right here.
21      THE COURT:  Oh, sorry.
22      MR. SMITH:  Your Honor, my firm is no
23  longer counsel of record.  The only purpose
24  for coming to the hearing was to turn over
25  the original note.  I would like to do so.

126

1      THE COURT:  All right.  Then I'll hold
2  it.
3      MR. SAYRE:  No objection, Your Honor.
4      MR. REYES:  Just so the record is clear,
5  the court file or Your Honor will hold the
6  $150,000 note.
7      THE COURT:  Right.
8      MR. REYES:  So later on a year from now
9  when someone is reading this which one was
10  being held.
11      THE COURT:  Who can I assign it to?
12      MR. SAYRE:  We will do that, Your Honor.
13      MR. SHALEK:  Just assign it to my
14  client.
15      MR. REYES:  It's been paid though.
16  That's why I don't want it assigned at all.
17  That was another breach, Your Honor.  They
18  assigned it after it was paid.
19      Anyway, I know Your Honor wants to rule.
20  We've been going for two hours.
21      THE COURT:  I think it is obvious,
22  although we haven't had an evidentiary
23  hearing, but I don't think anyone is arguing
24  that somebody provided an assignment and a
25  reason, therefore, to Mr. Reyes' clients.

127

1  That was a breach.  Your agreement says you
2  can't assign.  It's a nonassignable note.  It
3  doesn't mean you can't assign it, but it
4  means you have to establish the legal
5  requirements to do so.  And I guess we'll
6  have to have an evidentiary hearing to
7  determine what occurred.
8      As far as the paid moneys which do not
9  contain a signature of Pinnacle Three
10  Corporation but some Pinnacle Co., who it is
11  and where it is I don't know.  I guess we'll
12  eventually have to have testimony to prove
13  who and what it is and how it got there.  But
14  the agreement calls for payment to Pinnacle
15  Three Corporation.  That was done by the
16  debtor, but it wasn't endorsed properly or
17  deposited properly by the creditor.  Pinnacle
18  Co. is not Pinnacle Three Corporation.
19  Maritime from Panama or Maritime, LLC has no
20  place in it as far as I've been established
21  up to now.
22      What else is missing?
23      MR. REYES:  So I take it that, Your
24  Honor, we can put the money in the registry?
25      THE COURT:  Well, I haven't gotten there

128

1  yet.
2      MR. SAYRE:  So the money, the $80,000.
3      THE COURT:  $87,000.
4      MR. SAYRE:  The $87,000, that wasn't
5  deposited by Pinnacle Co.  That's been
6  sitting in Mr. Shalek's trust account.  So
7  those checks weren't deposited by anybody
8  other than being deposited into Mr. Shalek's
9  trust account.
10      MR. REYES:  Well, 10,000 of it was by an
11  improper endorsement.
12      MR. SAYRE:  So the $10,000 is what Your
13  Honor is talking about?
14      MR. REYES:  What Mr. Shalek was holding
15  was two installments under the note per Judge
16  Altonaga's order and then 10,500 or so that I
17  returned.
18      THE COURT:  December, January and the
19  10,000.
20      MR. REYES:  When we advised the bank of
21  a missing endorsement, they sent half of a
22  payment.  I don't even know how that
23  happened, but that's what the bank sent back
24  to us.
25      MR. SAYRE:  So Your Honor's order as to

---

**129**

1  that -- You mentioned Pinnacle Company
2  depositing it so I guess that's the $10,500
3  that Your Honor is referring to. But I guess
4  that leaves the issue of the $80,000 that was
5  being held by Mr. Shalek's firm under Judge
6  Altonaga's order but has just been returned
7  to Mr. Reyes' firm but those funds were never
8  deposited by anybody at Pinnacle Three.
9  THE COURT: Same thing. It's got to be
10  paid to Pinnacle Three.
11  MR. SAYRE: So those checks should be
12  issued to Pinnacle Three?
13  THE COURT: Correct.
14  MR. SAYRE: Okay. And then that leaves
15  the motion to deposit, the motion we were
16  here on, the motion to deposit future
17  payments. The next one is due on March 29th,
18  I believe. I think we've made our position
19  clear. We won't repeat it.
20  THE COURT: I don't see it as a
21  mandatory injunction.
22  MR. SAYRE: I obviously respect Your
23  Honor. Judge Altonaga didn't see it that
24  way.
25  MR. REYES: It was a different party

---

**130**

1  asking, Your Honor. I don't know that we
2  need to go over the arguments again.
3  THE COURT: If it was a motion by you,
4  it might be. But a motion by the debtor, I
5  don't see it as a mandatory injunction.
6  MR. REYES: So may we deposit it, Your
7  Honor, until the hearing?
8  MR. SAYRE: I would just say if you
9  didn't order it right now, they would have to
10  pay it to us.
11  MR. REYES: That's exactly --
12  MR. SAYRE: It would be our money. So I
13  just draw that distinction because Mr. Reyes
14  says it's our money. We can do with it what
15  we want. It's not a mandatory injunction on
16  that basis. But without you --
17  THE COURT: I think you're correct. It
18  is not his money as of the 29th.
19  MR. SAYRE: And so it is our money and
20  so it is a mandatory injunction.
21  MR. REYES: But it's not, Your Honor,
22  because -- I give counsel credit. He never
23  stops arguing and repeats over and over the
24  same points.
25  THE COURT: He's a good lawyer.

---

**131**

1  MR. REYES: But it forces me to keep
2  reinforcing the same issues, Your Honor.
3  They're in breach so our payment obligation
4  is excused. I'm being conservative in
5  putting it in the registry as the payor of
6  the -- the holder of the funds, the payor of
7  the funds, pending Your Honor's ruling on
8  those breaches and that's what the rule is
9  intended for. It's being miscued here about
10  a mandatory injunction making them do
11  something. It's not making them do anything.
12  There's a breach. Payment's excused. And
13  we're saying let's put it in the registry.
14  That's exactly what it was for. That's a
15  whole different circumstance.
16  MR. GORDON: Your Honor, you can't seek
17  to enforce the agreement and then say you
18  don't have to perform. The cases don't allow
19  that.
20  MR. REYES: That's exactly --
21  MR. GORDON: If you elect --
22  THE COURT: One at a time.
23  MR. GORDON: If you elect your remedy,
24  which is I want to enforce the agreement, and
25  you're abiding by it and affirming it and

---

**132**

1  saying I'm entitled to certain things if this
2  was the agreement, whatever it is, then you
3  have to abide by your obligations as well.
4  You must pay. You can't have it both ways.
5  You can't say I'm going to enforce it but,
6  hey, I don't have to perform. It's not what
7  the case law provides. So they've elected
8  their remedy. They didn't have to seek to
9  enforce this. They could have frankly
10  continued to resolve with us. They made
11  their choice. They now have to live with
12  that choice. They seek to enforce. You
13  continue to perform. We're entitled to those
14  payments. They have to pay us. That's the
15  choice they made. I didn't make it. They
16  did.
17  MR. REYES: That's completely opposite,
18  Your Honor. When you breach, the performance
19  is excused. We're moving to enforce to
20  establish the breaches of contract. That's
21  exactly what we're doing. And then Your
22  Honor will decide is the payment obligation
23  excused until the breaches are cured, is the
24  payment obligation excused. That's exactly
25  how it works. We're just saying to put it in

---

133

1  the registry until Your Honor has made that
2  ruling. That's what the rule is for. That's
3  what 1.600 is for.
4      MR. GORDON: Your Honor, the motion to
5  enforce is not to establish the breaches as
6  they claim. They want this original note
7  signed and paid in full. That's enforcing
8  the terms. They claim they're entitled to
9  that note signed in full. They say they're
10 entitled to a partial release. They want us
11 to do something. That's enforcing what's in
12 the agreement, not establishing a breach. If
13 they want us to do what's in the agreement,
14 they must also do what's in the agreement
15 which is write us a check on the 29th.
16 That's how that works.
17     MR. REYES: Basically, Your Honor, they
18 can breach and then have all the benefits of
19 the contract is what they're asking for.
20     MR. SAYRE: No, if there's damages
21 eventually, then you get them.
22     MR. REYES: They're asking Your Honor
23 even though they're in breach to get the
24 benefits of the contract. I think Your Honor
25 has the right to put the money in the

134

1  registry and we'll have the hearing. If Your
2  Honor establishes what requires to cure the
3  breaches, the breaches will be cured and Your
4  Honor will decide how the proceeds will be
5  distributed and how future payments will be
6  made. It's really equitable and
7  straightforward.
8      MR. SAYRE: As I see it, if there's a
9  breach of contract -- You're seeking to
10 pursue the contract. If there's a breach of
11 contract, you get damages. Okay. And so
12 that's to the extent that Mr. Reyes is
13 ultimately successful, he gets damages.
14 Okay. He doesn't -- he doesn't get to stop
15 performing under the contract. He gets his
16 damages.
17     MR. REYES: And I'm performing. I'm
18 putting it in the registry pending Your
19 Honor's ruling. It's exactly what we're
20 talking about.
21     MR. SAYRE: So, in essence, that turns
22 into a prejudgment. I will be 10 seconds.
23 How does that not turn into a prejudgment
24 injunction as to having funds to pay damages
25 that he's trying to -- in a contract that

135

1  he's trying to enforce?
2      THE COURT: Well, his motion also calls
3  for cancellation of his obligations under the
4  contract.
5      MR. SAYRE: Oh, if he wants to rescind,
6  that's a whole other thing. Now, if he wants
7  to do that, then we're picking up this suit
8  again. This settlement goes bye-bye and
9  we're suing him again.
10     MR. REYES: That's not necessarily the
11 outcome, Your Honor. But anyway that's
12 neither here nor there for today. Excuse
13 further performance doesn't rescind the
14 settlement.
15     MR. SAYRE: By the way, that equates to
16 because we assigned something that he didn't
17 want us to assign, he no longer has to pay
18 $2.1 million.
19     THE COURT: Could be if I consider that
20 a sufficient breach.
21     MR. SAYRE: Okay. Your Honor.
22     THE COURT: No, I'm not going to deposit
23 into the registry of the court.
24     MR. GORDON: Your Honor, regarding the
25 $87,000 or so that Mr. Shalek has now sent to

136

1  Mr. Reyes --
2      THE COURT: It should be paid to Pinnace
3  Three.
4      MR. GORDON: It's to be paid to Pinnacle
5  Three. Can I ask when Mr. Reyes is to make
6  that payment to us? Is there a timeframe
7  that we can have that payment by, a certain
8  number of days he has to turn that over?
9      THE COURT: It depends how long it takes
10 for him to get the money.
11     MR. GORDON: He's deposited the check.
12 I think he has it.
13     MR. REYES: We got a check. We
14 deposited it either yesterday or the day
15 before.
16     MR. GORDON: Can we say we'll have it
17 within?
18     THE COURT: Within seven days.
19     MR. GORDON: That's fine.
20     MR. SHALEK: My motion for intervention,
21 Your Honor?
22     THE COURT: Depending upon what happens
23 in the evidentiary hearing, there may be
24 nothing for you to join into.
25     Am I not correct?

137

1     So I won't rule on your motion until the
2  evidentiary hearing is complete.
3     MR. SAYRE:  So it's denied without
4  prejudice?
5     THE COURT:  Denied without prejudice to
6  be renewed or reserved.
7     What are you doing Monday?
8     MR. REYES:  Your Honor, we need the
9  documents to be able to prepare for the
10  hearing.  We're in the complete dark here.
11     THE COURT:  Okay.  First let's find out
12  if they're available Monday.
13     MR. GORDON:  The only thing is if it's
14  evidentiary, to the extent that we need
15  witnesses we may need to check their
16  availability as well depending on how we're
17  going to proceed.  I'm available.  Maybe we
18  can pick a date or two and then we can check
19  with our clients and confer with the court.
20     THE COURT:  Okay.  Are you available?
21     MR. REYES:  I have hearings in the
22  morning in Palm Beach, but they're motion
23  calendar hearings.  But my client isn't
24  returning until Monday.  I can't even speak
25  to him.  He returns late Sunday night or

138

1  Monday morning.
2     Your Honor, what I would request is that
3  we be given the documents and then decide if
4  that answers the questions or if there's any
5  limited depositions that are necessary and
6  then we would have a hearing.  Perhaps we can
7  set a schedule rather than having a hearing
8  so quickly, particularly if you're not
9  requiring me to deposit -- not permitting me
10  to deposit, then we can have the hearing when
11  we've had the discovery.  It wouldn't have to
12  be so urgent.  I can see it being done
13  urgently if the payments were going into the
14  registry.  I served the request a day last
15  week.  Maybe they'll expedite the response.
16  That would great.  But we would like to get
17  those and decide if it requires any further
18  discovery or not.
19     THE COURT:  What would it take to
20  present to him how it got from Pinnacle down
21  the line?
22     MR. SAYRE:  Well, as I understood it,
23  Your Honor, we're giving you those documents.
24  That's how we're getting this original note.
25  We're deciding who can sign the original

139

1  note.  So we're giving those documents to
2  you, Your Honor.  I will go back to the
3  office and we'll start right away.  What I
4  understand Mr. Reyes to be saying is he wants
5  the documents that Your Honor ordered you
6  would look at which I think is what the plan
7  was, for you to look at.
8     MR. REYES:  Your Honor asked for certain
9  documents to determine who signed --
10     THE COURT:  The problem is he's got a
11  right to either show that these are phony or
12  fraudulent, if he can, which is impossible if
13  he doesn't get to look at them.
14     MR. REYES:  Exactly.
15     MR. SAYRE:  We can set up a schedule.  I
16  may have some thoughts on this, but I agree
17  with setting up a schedule.
18     Mr. Gordon raised some issues in regards
19  to 607 and those requirements so there may be
20  some issues there.
21     THE COURT:  Okay.
22     MR. SAYRE:  For purposes of today, I
23  would be happy to set up a schedule, whatever
24  Your Honor wants to do.
25     THE COURT:  Okay.  I'll give you 10 days

140

1  to set up a schedule with counsel or, if not,
2  I will.
3     As far as the trial is concerned,
4  depending upon the schedule that you work out
5  I'm pretty available.
6     MR. REYES:  Okay.  So we'll see how --
7     THE COURT:  I don't want to hold it up
8  any longer than necessary.
9     MR. REYES:  We'll see how we can deal
10  with the discovery issues and then we'll know
11  when we can do the evidentiary hearing.
12     MR. SAYRE:  Your Honor, for purposes of
13  today's hearing because I know sometimes
14  there's disputes between parties as to what
15  the order says, I would be happy to agree to
16  an order that says the order is consistent
17  with the transcript that was taken.
18     THE COURT:  That's fine.  That's fine.
19     If not, submit a copy to counsel and if
20  he has any problems submit it to me with your
21  objections.
22     MR. SAYRE:  And Mr. Shalek is not in the
23  case as of right now?
24     THE COURT:  As of right now, no.  He's
25  only hanging in the wind.

141

1    MR. SAYRE:  The order will just say
2  consistent with Your Honor's ruling as made
3  on the record.  That's it.
4    THE COURT:  Correct.
5    MR. REYES:  As to the discovery and the
6  scheduling and all those things --
7    THE COURT:  I've already ruled.
8    MR. REYES:  Yeah, the ruling is on the
9  record.
10    THE COURT:  The two of you will try to
11  work out a schedule and if you can't, let me
12  know and I'll work one out.
13    MR. SAYRE:  Thank you, Your Honor.
14  I've got something off the record.
15    COURT REPORTER:  Are we off?
16    MR. SAYRE:  This is regarding Your
17  Honor's payment.  I think we had -- I don't
18  know where we left it.  I want to make sure.
19    COURT REPORTER:  Are we off or on?
20    MR. SAYRE:  Does everybody agree to be
21  off?
22    THE COURT:  I don't see a problem.
23    (Discussion held off the record).
24    THE COURT:  Back on.
25    MR. SAYRE:  Why don't we do a single

142

1  order that says consistent with --
2    MR. REYES:  Is this an order on what
3  though?
4    MR. SHALEK:  Just my motion for
5  intervention.  It's deferred until the court
6  rules on the motion to enforce.
7    THE COURT:  Correct.
8    MR. SHALEK:  It shouldn't be disputed.
9  We can all agree to that.
10    MR. GORDON:  Did you see it?
11    MR. REYES:  I wasn't shown it.
12    MR. SAYRE:  Let's do our order right now
13  then just consistent with so we don't argue
14  about it later.
15    Jeff, is there a blank order?
16    MR. REYES:  I brought a blank order
17  here.
18    THE COURT:  Let me ask you one question.
19    MR. REYES:  The handwriting is tough to
20  read.
21    MR. SHALEK:  My handwriting is tough to
22  read.
23    THE COURT:  I spent two days reading all
24  of this.
25    MR. SAYRE:  Okay.

143

1    THE COURT:  I think I should get another
2  couple hours for that.
3    MR. SAYRE:  That's fair enough.  Your
4  Honor sends an invoice?
5    MR. REYES:  I've never dealt with that
6  before.
7    MR. SAYRE:  And I'll pass it by Mr.
8  Reyes and we'll pay it.
9    MR. REYES:  I have an order with me
10  somewhere.
11    MR. SAYRE:  Do you mind if I step out?
12  Maybe there's an order out here.
13    MR. SHALEK:  Although it shouldn't say
14  order.  It should say recommended, right?
15  Does this court order or does it recommend?
16    THE COURT:  I order.  I'm still a judge.
17    MR. GORDON:  He's effectively Judge
18  Thornton for all intents and purposes.
19    MR. SHALEK:  So you're not a master?
20    THE COURT:  No, no, I'm a circuit judge,
21  senior circuit judge.
22    MR. SHALEK:  Off the record.
23    COURT REPORTER:  Off?
24    THE COURT:  Yes.
25    (Discussion held off the record).

144

1    MR. SHALEK:  I just want to go on the
2  record as saying that it's my opinion that
3  the order signed by the judge is or maybe I'm
4  confused about what it is, whether or not
5  it's an order or if it's a report and
6  recommendation, and what my appellate rights
7  may or may not be to appeal this decision or
8  whether to bring them to Judge Thornton under
9  the rules of orders or recommendations.
10    I was not at the hearing when this was
11  done.  We filed this motion and Judge
12  Thornton advised us -- his chambers advised
13  us to have Senior Judge Feder hear it.  Based
14  on the fact that we are to compensate Judge
15  Feder financially, I have to believe that he
16  can only be sitting as a magistrate or a
17  special magistrate because it would be
18  improper to pay a state court judge for a
19  ruling, not that payment would influence his
20  ruling.  I'm not trying to say that he's done
21  anything improper, but I think the procedure
22  of using a senior judge and having to pay a
23  senior judge for his services would be
24  improper.  We don't pay judges.  We pay
25  magistrates.  And I just want to go on the

145

1  record as seeking a clarification.

2      Judge, I believe you are seeking

3  compensation for your services from the

4  parties, correct?

5      THE COURT:  Correct.  I was told to by

6  Judge Thornton.

7      MR. GORDON:  I'm not sure Mr. Shalek has

8  a basis to object as his motion is denied and

9  not being a party, but I understand him

10 wanting to preserve that.  Nonetheless, we

11 will defer to what it is that Judge Thornton

12 rules in that regard.

13     It was our understanding based on the

14 discussions that the parties had with him and

15 the original referral to a senior judge that

16 the senior judge steps into the shoes of

17 Judge Thornton and was effectively playing

18 Judge Thornton's role for all intents and

19 purposes.  I believe it was mentioned during

20 that discussion that the senior judge would

21 be compensated.  We will again defer to Judge

22 Thornton on that and simply may be a function

23 of that the court system doesn't have the

24 funds to pay the senior judge and, therefore,

25 the parties are left with that obligation.

146

1  So we will, if need be, get clarification

2  from Judge Thornton on that point.  I'll just

3  note as to the reference to magistrate or

4  special magistrates being paid, magistrate

5  within this courthouse is paid through the

6  court system, not by the parties separately.

7  A special master may be paid necessarily by

8  the parties which is not what we told to us

9  by Judge Thornton was the assignment to a

10 senior judge.

11     MR. REYES:  Your Honor, I think we

12 probably should ask the court for

13 clarification.  Judge Thornton did make a

14 statement that we would have to pay for a

15 senior judge as well as for a magistrate and

16 we did not discuss details.  They weren't

17 brought to our attention.  We don't know how

18 they work.

19     I understand that Your Honor should be

20 compensated for your time so maybe we ought

21 to ask Judge Thornton the procedere.

22     THE COURT:  Fine with me.

23     MR. REYES:  We'll let him know.

24     MR. SHALEK:  Or the status, whether he

25 can act as a circuit judge.  I don't believe

147

1  under Florida constitutional law that he can

2  act as a circuit judge and receive

3  compensation at the same time from the

4  parties.  I think it's unconstitutional.

5      MR. REYES:  Mr. Shalek raises an

6  interesting point.  I don't know the answer

7  and I don't want to disrespect the court.

8  Does Your Honor know if that's been dealt

9  with?

10     THE COURT:  I have no idea.

11     MR. REYES:  So we'll bring it to Judge

12 Thornton and ask him for guidance on that

13 point.

14     We are stating in the order the request

15 to deposit is being denied for the reasons

16 stated on the record but I don't know that

17 Your Honor gave a reason for denying.  Should

18 we put that on the record if the order is

19 going to say that, what Your Honor's basis

20 was?

21     THE COURT:  I think that's sufficient.

22     MR. SAYRE:  I think, Your Honor, it's

23 clear.

24     MR. REYES:  Well, Your Honor said you

25 were going to deny it at this time.  I don't

148

1  know that you had given us a reason.

2      THE COURT:  Right now I don't recall,

3  but I'm not going to go through it again.

4      MR. REYES:  Okay.

5      MR. GORDON:  You can add there the money

6  is --

7      MR. SAYRE:  Go ahead, if you want to,

8  but I think it's on the record.

9      MR. GORDON:  It's on the record.

10     MR. SAYRE:  He wanted to make sure the

11 87-K within seven days is paid is in there.

12 If you want to include it, you can.  It was

13 clearly on the record.

14     MR. REYES:  What I wrote, Your Honor, is

15 that the motion to deposit denied, parties to

16 set discovery schedule within 10 days.

17 Thereafter the parties will schedule an

18 evidentiary hearing with senior judge.

19 Motion denied for reasons stated on record.

20     THE COURT:  Fine.

21     (Thereupon, at 11:35 a.m. the

22 proceedings concluded).

149

```
 1              REPORTER'S CERTIFICATE
 2
    STATE OF FLORIDA  )
 3              SS.
    COUNTY OF BROWARD )
 4
 5
 6        I, COLLEEN FOOTE, Court Reporter and
 7   Notary Public, certify that I was authorized to
 8   and did stenographically report the foregoing
 9   proceedings; and that the transcript is a true and
10   complete record of my stenographic notes.
11        I further certify that I am not a
12   relative, employee, attorney, or counsel of any of
13   the parties, nor am I a relative or employee of
14   any of the parties' attorney or counsel connected
15   with the action, nor am I financially interested
16   in the action.
17        Dated this 7th day of April, 2014.
18
19
20
21        _____
22        COLLEEN FOOTE, Court Reporter
23
24
25
```

## $

**$1,000** [1] - 56:24
**$1,055,572** [1] - 8:19
**$1.55** [2] - 23:21, 24:12
**$10,000** [2] - 109:3, 128:12
**$10,500** [1] - 129:2
**$145,000** [2] - 8:13, 8:21
**$150,000** [3] - 18:15, 30:11, 126:6
**$160,000** [1] - 82:18
**$161,000** [2] - 82:11, 83:13
**$38,000** [1] - 100:10
**$40,000** [4] - 29:16, 43:24, 55:10, 97:22
**$80,000** [3] - 107:24, 128:2, 129:4
**$87,000** [5] - 107:12, 108:24, 128:3, 128:4, 135:25

## '

**'07** [6] - 33:1, 33:9, 33:12, 45:20, 47:19, 80:6
**'08** [2] - 34:3, 34:14
**'09** [1] - 34:14
**'13** [2] - 47:20, 80:7

## 1

**1** [5] - 32:11, 32:14, 33:1, 34:7, 34:14
**1.230** [2] - 10:25, 25:7
**1.600** [12] - 44:14, 65:4, 65:15, 66:2, 80:10, 95:22, 97:11, 98:22, 99:10, 99:15, 102:13, 133:3
**10** [5] - 81:18, 125:10, 134:22, 139:25, 148:16
**10,000** [3] - 108:21, 128:10, 128:19
**10,500** [1] - 128:16
**10-58483** [1] - 1:3
**100** [5] - 9:3, 14:19, 15:4, 15:25, 45:14
**10th** [2] - 38:15, 69:15
**11:35** [2] - 1:13, 148:21
**11TH** [1] - 1:1
**150** [1] - 49:16
**16** [1] - 35:14

## 2

**2** [3] - 9:25, 23:3, 28:10
**2.1** [9] - 29:17, 30:12, 43:25, 68:2, 82:11, 82:14, 82:19, 118:24, 135:18
**20** [1] - 101:16
**2007** [9] - 10:11, 14:22, 15:1, 15:23, 32:11, 32:14, 57:3, 57:6
**2008** [1] - 31:20
**2009** [1] - 34:8
**2011** [1] - 33:11
**2012** [9] - 10:9, 14:19, 15:3, 33:11, 33:21, 34:10, 45:17, 57:8
**2013** [5] - 35:9, 35:14, 38:18, 38:21, 38:25
**2014** [2] - 1:12, 149:17
**22** [1] - 33:21
**25th** [1] - 16:8
**26** [1] - 1:12
**26th** [2] - 16:6, 69:15
**27th** [1] - 67:23
**29th** [9] - 46:16, 46:17, 50:7, 50:8, 50:11, 106:25, 129:17, 130:18, 133:15
**2d** [1] - 63:18

## 3

**3** [1] - 77:13
**30** [1] - 80:15
**31** [3] - 31:19, 34:3, 34:14
**33031** [1] - 1:12

## 4

**40** [1] - 1:3
**450** [2] - 4:2, 6:22

## 5

**511** [1] - 63:18
**56.29** [3] - 15:11, 22:25, 24:20
**5th** [1] - 69:5

## 6

**607** [3] - 113:6, 123:20, 139:19

## 7

**7** [1] - 10:15
**726** [1] - 15:10
**73** [1] - 1:11
**7th** [1] - 149:17

## 8

**80,000** [1] - 108:5
**87-K** [1] - 148:11

## 9

**9:05** [1] - 1:13

## A

**A-1** [1] - 33:7
**a.m** [3] - 1:13, 148:21
**abide** [2] - 85:1, 132:3
**abiding** [2] - 98:15, 131:25
**ability** [4] - 23:12, 24:8, 51:7, 80:25
**able** [4] - 22:15, 44:22, 64:9, 137:9
**absolutely** [1] - 28:25
**acceleration** [1] - 44:5
**accept** [3] - 54:12, 54:21, 124:19
**acceptable** [4] - 4:16, 4:18, 5:18
**according** [2] - 9:20, 42:17
**account** [14] - 20:20, 40:5, 46:14, 51:6, 51:8, 51:9, 55:15, 55:18, 55:21, 55:22, 105:1, 109:9, 128:6, 128:9
**accountant** [1] - 31:8
**accounting** [1] - 109:1
**achieve** [1] - 93:10
**acknowledge** [2] - 43:17, 67:5
**acknowledges** [1] - 66:14
**acknowledging** [2] - 44:16, 44:17
**acknowledgment** [1] - 42:1
**acknowledgments** [1] - 41:22
**act** [6] - 36:11, 70:2, 80:4, 123:14, 146:25, 147:2
**acting** [3] - 20:20, 59:2, 80:9
**action** [11] - 8:25, 9:1,

9:2, 9:6, 12:7, 26:12, 53:3, 93:15, 95:12, 149:15, 149:16
**actions** [1] - 93:18
**activities** [2] - 78:1, 78:2
**adamant** [1] - 83:7
**add** [3] - 26:5, 35:24, 148:5
**added** [1] - 12:7
**addendum** [1] - 32:20
**addition** [1] - 12:6
**additional** [2] - 61:16, 93:18
**address** [13] - 50:20, 63:3, 91:10, 91:23, 91:24, 91:25, 92:9, 100:18, 100:22, 112:6, 115:17, 116:18, 116:24
**addressed** [2] - 87:5, 100:20
**addressing** [3] - 13:16, 62:23, 67:5
**adjudicated** [1] - 75:10
**administration** [1] - 5:3
**administrative** [1] - 5:12
**admission** [1] - 48:7
**admits** [1] - 40:9
**admitted** [2] - 40:7, 48:10
**adversarial** [1] - 120:5
**adverse** [1] - 94:13
**advice** [1] - 124:8
**advise** [1] - 125:15
**advised** [4] - 108:19, 128:20, 144:12
**advises** [1] - 61:9
**advising** [1] - 92:11
**affects** [1] - 6:7
**affidavit** [4] - 9:2, 10:8, 14:18, 15:3
**affiliate** [1] - 32:4
**affirmed** [1] - 96:3
**affirming** [1] - 131:25
**afraid** [1] - 89:16
**afternoon** [1] - 44:21
**afternoon's** [1] - 75:13
**ago** [2] - 72:9, 75:19, 111:2
**agree** [25] - 6:17, 41:15, 41:17, 54:1, 59:20, 69:14, 69:17, 71:25, 72:7, 74:3, 74:7, 82:5, 89:16, 95:4, 99:23, 99:25, 100:1, 113:11,

117:6, 117:14, 117:18, 139:16, 140:15, 141:20, 142:9
**agreed** [1] - 41:18
**agreeing** [4] - 97:17, 98:25, 99:11, 99:13
**agreement** [53] - 11:10, 15:23, 17:14, 17:22, 17:24, 18:1, 19:10, 32:25, 41:14, 49:11, 49:14, 50:1, 50:4, 50:12, 50:14, 50:16, 51:15, 53:13, 59:23, 62:5, 62:18, 68:16, 69:12, 71:4, 80:23, 81:12, 83:25, 84:10, 84:11, 84:12, 84:16, 84:17, 87:3, 88:16, 90:9, 98:16, 98:17, 99:8, 99:21, 101:19, 101:21, 102:5, 114:1, 117:5, 121:16, 127:1, 127:14, 131:17, 131:24, 132:2, 133:12, 133:13, 133:14
**agrees** [1] - 121:16
**ahead** [3] - 21:6, 29:20, 148:7
**AIF** [1] - 42:5
**al** [2] - 1:5, 1:8
**allegations** [3] - 59:1, 63:8, 89:19
**allege** [1] - 22:14
**alleged** [13] - 19:9, 19:11, 21:17, 25:20, 27:2, 51:16, 57:3, 71:23, 81:12, 91:10, 91:22, 107:25, 108:8
**allegedly** [5] - 11:11, 24:19, 32:12, 38:17, 73:21
**alleging** [2] - 10:14, 79:6
**allow** [11] - 9:12, 47:25, 49:18, 58:8, 58:18, 67:12, 81:24, 107:8, 120:4, 121:9, 131:18
**allowed** [4] - 21:20, 28:7, 78:22, 79:3
**allowing** [1] - 22:4, 58:4, 82:2
**allows** [6] - 48:5, 71:10, 78:23, 99:14, 104:12, 107:16
**almost** [3] - 29:16, 83:1, 97:22

**alphabetically** [1] - 3:4
**alterego** [1] - 56:3
**alteregos** [1] - 56:4
**Altonaga** [29] - 8:14, 9:16, 12:12, 20:10, 20:14, 22:3, 22:12, 23:16, 23:22, 27:17, 46:11, 48:19, 48:23, 49:7, 59:13, 62:12, 64:1, 64:19, 94:2, 97:25, 99:15, 100:18, 100:23, 104:19, 104:20, 105:9, 105:21, 106:14, 129:23
**Altonaga's** [3] - 68:9, 128:16, 129:6
**amend** [1] - 100:21
**amended** [3] - 34:5, 34:6, 81:6
**amendment** [1] - 37:3
**America** [1] - 109:4
**amortized** [1] - 34:22
**amount** [3] - 8:12, 8:14, 8:18
**ANATOLIY** [1] - 2:8
**Anatoliy** [2] - 8:6, 8:9
**AND** [3] - 1:1, 2:7, 2:10
**answer** [8] - 15:7, 54:23, 55:8, 56:9, 56:10, 85:19, 86:8, 147:6
**answered** [1] - 37:20
**answers** [1] - 138:4
**anyway** [3] - 104:4, 126:19, 135:11
**appeal** [1] - 144:7
**appealed** [2] - 8:13, 23:20
**appear** [1] - 95:12
**APPEARANCES** [1] - 2:1
**appellate** [2] - 43:11, 144:6
**apple** [1] - 20:25
**applicable** [1] - 75:3
**application** [1] - 66:2
**applied** [1] - 62:22
**applies** [1] - 75:12
**apply** [6] - 62:23, 85:22, 95:20, 97:12, 97:19, 98:24
**appointing** [1] - 123:18
**appreciate** [1] - 74:21
**appropriate** [2] - 4:8, 112:25
**appropriately** [2] -

3:4, 78:12
**approve** [7] - 51:17, 51:19, 111:11, 124:25, 125:8, 125:14
**approved** [2] - 76:16, 124:1
**approves** [1] - 49:24
**April** [1] - 149:17
**argue** [2] - 20:4, 142:13
**arguing** [3] - 19:25, 126:23, 130:23
**argument** [4] - 6:3, 20:1, 44:1, 95:16
**arguments** [2] - 14:9, 106:16, 130:2
**arose** [2] - 45:17, 96:22
**arrangement** [1] - 54:18
**Article** [1] - 77:13
**aside** [9] - 10:23, 21:17, 22:13, 24:8, 26:12, 27:1, 27:4, 27:21, 41:20
**assert** [4] - 10:2, 11:2, 11:20, 113:13
**assets** [24] - 10:13, 31:6, 33:17, 33:20, 34:1, 34:13, 34:18, 35:20, 36:13, 38:5, 45:6, 55:25, 56:2, 57:8, 76:15, 76:21, 76:22, 76:25, 79:3, 79:25, 80:1, 80:2, 84:6
**assign** [12] - 49:21, 53:16, 84:22, 85:14, 86:1, 88:11, 121:7, 126:11, 126:13, 127:2, 127:3, 135:17
**assigned** [17] - 10:6, 10:10, 18:16, 34:1, 35:1, 53:19, 78:15, 79:22, 83:8, 86:13, 110:10, 110:20, 110:22, 114:15, 126:16, 126:18, 135:16
**assignee** [1] - 84:3
**assigning** [8] - 12:22, 39:2, 82:17, 85:23, 86:3, 87:13, 88:13
**assignment** [39] - 34:2, 34:7, 35:4, 35:6, 35:8, 35:13, 35:14, 38:18, 49:25, 54:25, 57:6, 58:3, 58:4, 72:1, 72:2,

84:2, 84:15, 85:1, 85:8, 85:11, 86:16, 86:19, 87:12, 87:24, 88:5, 88:8, 88:10, 91:16, 96:18, 100:1, 110:8, 111:11, 114:23, 120:6, 120:9, 120:11, 123:3, 126:24, 146:9
**assignments** [14] - 33:22, 38:11, 38:23, 49:19, 51:18, 54:8, 59:17, 70:24, 71:11, 74:8, 76:8, 76:9, 119:25, 124:3
**assistant** [1] - 116:6
**assume** [1] - 37:8
**assuming** [1] - 52:11
**assure** [1] - 15:9
**attach** [1] - 70:8
**attached** [8] - 8:18, 33:12, 34:6, 35:9, 35:13, 36:13, 75:20, 83:3
**attaching** [1] - 53:8
**attempting** [1] - 25:17
**attention** [3] - 58:10, 96:23, 146:17
**attorney** [31] - 36:2, 36:3, 36:5, 36:7, 36:8, 36:9, 36:17, 36:19, 37:10, 37:22, 41:4, 42:2, 42:4, 42:8, 47:12, 54:8, 54:9, 61:23, 61:24, 69:22, 69:25, 70:13, 76:10, 76:17, 90:25, 118:15, 120:23, 123:17, 149:12, 149:14
**attorneys** [3] - 43:20, 53:22, 118:16
**August** [3] - 33:21, 34:10, 108:14
**authority** [14] - 36:11, 37:21, 58:8, 70:1, 71:3, 71:9, 76:13, 99:18, 102:17, 118:21, 122:9, 124:13, 124:14, 124:15
**authorize** [4] - 37:16, 76:20, 112:22, 123:21
**authorized** [5] - 118:17, 123:9, 123:14, 123:25, 149:7
**authorizing** [2] - 47:11, 123:11

**availability** [1] - 137:16
**available** [5] - 104:9, 137:12, 137:17, 137:20, 140:5
**award** [6] - 3:24, 3:25, 11:15, 23:2, 78:18, 109:14
**awarded** [1] - 44:12

## B

**backdating** [1] - 34:10
**bank** [4] - 39:19, 77:22, 128:20, 128:23
**Bank** [2] - 109:3, 109:4
**banks** [3] - 108:19, 108:20, 109:4
**based** [6] - 67:4, 68:16, 72:23, 101:18, 144:13, 145:13
**basis** [11] - 13:1, 57:9, 64:6, 71:15, 93:7, 95:2, 114:4, 114:9, 130:16, 145:8, 147:19
**Beach** [1] - 137:22
**bearing** [1] - 26:15
**beaten** [1] - 80:13
**beautiful** [2] - 57:23, 57:24
**becoming** [2] - 25:10, 81:25
**begged** [1] - 81:3
**begin** [7] - 27:8, 35:2, 35:3, 41:2, 45:1, 110:22, 122:20
**beginning** [1] - 124:21
**behalf** [7] - 7:18, 7:22, 8:5, 35:25, 36:11, 80:4, 83:10
**belabor** [1] - 83:23
**belief** [1] - 97:20
**bell** [1] - 45:3
**belongs** [1] - 15:18
**benefited** [1] - 102:23
**benefits** [3] - 24:17, 133:18, 133:24
**best** [2] - 29:18, 65:25
**better** [5] - 3:11, 8:20, 15:11, 28:16, 125:18
**between** [7] - 3:8, 11:23, 29:24, 32:13, 94:21, 125:13, 140:14
**beyond** [2] - 19:21, 57:12

**big** [4] - 33:18, 45:23, 53:13, 100:11
**bilateral** [2] - 85:15, 85:24
**bill** [1] - 92:15
**bills** [1] - 90:22
**binder** [1] - 49:3
**bit** [2] - 12:23, 70:19
**bite** [1] - 20:25
**blame** [1] - 23:18
**blank** [2] - 142:15, 142:16
**bless** [2] - 123:2, 124:5
**blind** [1] - 5:7
**blurt** [1] - 109:25
**blush** [1] - 54:4
**board** [8] - 37:13, 37:14, 38:1, 76:19, 118:17, 123:14, 123:20, 124:1
**boilerplate** [1] - 76:18
**boils** [1] - 74:13
**borrower** [3] - 101:19, 102:4, 122:2
**bottom** [2] - 18:11, 74:18
**bouncing** [1] - 92:3
**bound** [4] - 84:9, 96:22, 98:11, 98:19
**box** [1] - 44:5
**Boyle** [1] - 7:24
**BOYLE** [1] - 2:9
**brand** [2] - 27:7, 69:7
**breach** [49] - 40:7, 43:21, 44:4, 48:6, 48:9, 53:10, 53:12, 53:20, 56:23, 62:5, 65:3, 71:23, 75:4, 78:15, 78:16, 78:21, 82:17, 86:14, 87:2, 87:4, 87:6, 87:13, 91:17, 96:19, 96:24, 96:25, 101:18, 101:24, 102:1, 102:17, 102:21, 107:3, 107:10, 109:14, 111:2, 112:7, 112:8, 124:10, 126:17, 127:1, 131:3, 131:12, 132:18, 133:12, 133:18, 133:23, 134:9, 134:10, 135:20
**breached** [6] - 43:22, 44:18, 73:21, 74:10, 109:13, 110:7
**breaches** [35] - 19:9, 19:10, 19:11, 49:13,

51:16, 62:6, 74:11,
80:17, 80:18, 81:13,
81:14, 91:10, 91:13,
91:23, 96:13, 102:6,
102:12, 103:3,
107:25, 108:8,
109:16, 110:14,
110:17, 111:7,
111:12, 111:14,
111:17, 131:8,
132:20, 132:23,
133:5, 134:3
**breaching** [2] - 12:21,
74:10
**breaker** [1] - 83:1
**brief** [2] - 81:10,
106:14
**briefed** [2] - 92:5,
106:14
**briefly** [2] - 67:18,
73:18
**bring** [26] - 14:4,
15:16, 16:19, 16:22,
17:4, 17:5, 22:11,
23:16, 25:19, 26:12,
26:25, 27:7, 28:2,
31:18, 35:10, 59:7,
74:2, 77:4, 81:1,
92:17, 92:20, 93:11,
95:12, 96:22, 144:8,
147:11
**bringing** [1] - 81:2
**broke** [1] - 40:9
**brought** [14] - 12:16,
16:17, 16:20, 16:25,
22:6, 22:10, 53:1,
58:10, 66:11, 67:6,
67:9, 92:12, 142:16,
146:17
**BROWARD** [1] - 149:3
**bunch** [1] - 63:8
**burden** [3] - 87:19,
87:20, 88:2
**business** [3] - 4:3,
66:24, 85:10
**BY** [4] - 2:2, 2:4, 2:7,
2:9
**bye** [2] - 135:8
**bye-bye** [1] - 135:8
**bylaws** [1] - 37:24

**C**

**CA** [1] - 1:3
**calendar** [1] - 137:23
**camera** [1] - 113:21
**campaign** [1] - 29:24
**cancel** [10] - 88:9,
88:12, 89:10,
112:16, 112:22,

118:9, 123:12,
125:17
**canceled** [2] - 112:23,
119:1
**cancellation** [4] -
114:18, 121:6,
125:16, 135:3
**cancelled** [5] - 19:1,
75:23, 112:9, 123:9,
123:24
**cancelling** [1] - 76:9
**cancels** [1] - 112:22
**cannot** [4] - 49:8,
56:19, 56:22, 61:9,
61:15, 73:21, 85:2,
86:10
**Cantor** [1] - 8:4
**CANTOR** [1] - 2:6
**capacity** [3] - 68:5,
69:19, 74:5
**capital** [1] - 109:3
**care** [4] - 27:18, 59:13,
67:16, 122:7
**CASE** [1] - 1:3
**case** [64] - 3:25, 7:6,
8:11, 9:19, 10:2,
10:3, 10:4, 14:18,
21:23, 22:3, 22:5,
22:9, 22:12, 22:20,
23:6, 24:1, 24:10,
24:18, 25:3, 25:8,
25:16, 25:18, 26:13,
26:14, 26:16, 26:20,
26:24, 27:1, 27:5,
27:8, 27:19, 27:25,
28:14, 30:24, 30:25,
32:10, 33:19, 47:19,
48:1, 56:15, 57:16,
62:1, 65:7, 65:18,
66:2, 67:4, 74:25,
75:6, 78:23, 81:17,
84:19, 92:6, 92:17,
94:4, 95:25, 101:14,
101:22, 103:14,
109:25, 117:21,
119:6, 132:7, 140:23
**cases** [10] - 43:6,
43:17, 63:17, 63:20,
64:2, 64:13, 84:24,
85:13, 85:24, 131:18
**cash** [1] - 56:7
**caught** [3] - 82:9,
93:4, 97:2
**cautious** [1] - 12:18
**cautiously** [1] - 79:8
**Cecelia** [1] - 104:22
**certain** [3] - 132:1,
136:7, 139:8
**certainly** [3] - 5:7,
14:23, 47:16

**CERTIFICATE** [1] -
149:1
**certificates** [1] - 61:6
**certify** [2] - 149:7,
149:11
**CHABAN** [1] - 2:8
**Chaban** [3] - 8:6, 8:9,
47:1
**challenge** [1] - 55:20
**chambers** [2] - 6:20,
144:12
**chance** [2] - 7:10, 13:9
**change** [6] - 69:6,
109:3, 115:7, 115:9,
115:23, 115:24
**changed** [1] - 50:19
**changes** [2] - 67:24,
67:25
**characterized** [2] -
96:24, 103:5
**charge** [1] - 3:22
**chart** [4] - 18:8, 48:14,
49:12, 49:16
**Chavez** [1] - 96:4
**check** [10] - 46:12,
50:5, 50:10, 66:24,
77:18, 133:15,
136:11, 136:13,
137:15, 137:18
**checks** [12] - 39:9,
39:20, 51:8, 52:1,
52:2, 52:5, 66:21,
77:12, 77:14, 99:9,
128:7, 129:11
**choice** [4] - 98:13,
132:11, 132:12,
132:15
**choose** [3] - 92:18,
94:14, 105:25
**circles** [1] - 104:18
**CIRCUIT** [2] - 1:1, 1:1
**circuit** [4] - 143:20,
143:21, 146:25,
147:2
**circumstance** [1] -
131:15
**circumstances** [2] -
96:21, 97:3
**circumvent** [1] -
113:10
**cite** [2] - 48:1, 65:6
**cited** [5] - 43:16,
63:24, 64:1, 95:23,
95:24
**citing** [1] - 43:4
**city** [2] - 57:22, 57:23
**claim** [17] - 14:5,
15:10, 15:16, 25:19,
26:25, 28:2, 32:9,
45:18, 55:12, 59:7,

71:23, 73:21, 92:12,
98:11, 98:13, 133:6,
133:8
**claiming** [3] - 10:10,
11:1, 14:19
**claims** [10] - 10:5,
14:21, 26:12, 26:20,
27:7, 28:2, 31:23,
50:15, 50:17, 95:12
**clarification** [4] -
69:11, 145:1, 146:1,
146:13
**clarity** [1] - 69:2
**clear** [9] - 42:23,
48:11, 66:15, 68:14,
81:25, 104:20,
126:4, 129:19,
147:23
**clearly** [7] - 11:8,
11:22, 17:23, 53:13,
53:20, 113:4, 148:13
**client** [20] - 4:24, 5:1,
17:1, 44:23, 53:25,
54:6, 68:24, 83:15,
83:21, 85:10, 93:1,
94:1, 94:6, 94:7,
100:6, 113:22,
116:21, 124:8,
126:14, 137:23
**client's** [2] - 44:15,
50:4
**clients** [19] - 6:23,
15:1, 18:12, 20:9,
23:5, 34:19, 50:9,
51:11, 58:12, 58:16,
90:5, 90:20, 94:13,
106:4, 106:8, 114:7,
126:25, 137:19
**closest** [1] - 32:7
**closing** [1] - 72:8
**Co** [7] - 39:18, 40:3,
77:21, 127:10,
127:18, 128:5
**co** [2] - 30:25, 31:1
**co-counsel** [2] -
30:25, 31:1
**coin** [1] - 106:1
**coincidence** [1] -
14:24
**collateral** [9] - 30:6,
34:23, 54:3, 68:17,
68:20, 68:21, 83:13,
83:14
**colleague** [1] - 25:13
**collect** [3] - 12:15,
63:22, 64:9
**collection** [1] - 12:7
**COLLEEN** [2] - 149:6,
149:22
**coming** [4] - 47:22,

59:11, 60:4, 125:24
**commission** [2] -
99:1, 99:2
**commits** [1] - 89:1
**committed** [6] - 56:20,
58:9, 58:17, 58:23,
58:24, 63:11
**common** [1] - 94:16
**communicating** [1] -
35:3
**communications** [2] -
29:23, 83:4
**companies** [2] - 42:3,
42:8
**Company** [3] - 8:6,
8:9, 129:1
**COMPANY** [1] - 2:7
**company** [29] - 9:3,
9:23, 10:7, 15:5,
32:2, 33:4, 37:8,
37:9, 37:10, 37:12,
37:15, 37:17, 37:22,
37:25, 50:21, 66:21,
66:24, 70:5, 70:10,
76:15, 76:18, 79:3,
115:14, 116:15,
117:2, 122:10,
122:17, 123:15
**compel** [1] - 104:21,
104:25
**compensate** [1] -
144:14
**compensated** [3] -
3:19, 145:21, 146:20
**compensating** [1] -
5:4
**compensation** [2] -
145:3, 147:3
**competing** [1] - 88:19,
88:21
**competition** [2] - 85:9,
88:17
**complaint** [1] - 15:7
**complete** [4] - 75:11,
137:2, 137:10,
149:10
**completely** [3] - 59:3,
75:7, 132:17
**complex** [1] - 7:14
**complicate** [1] - 90:24
**complicated** [3] -
7:13, 48:21, 120:19
**complicating** [1] -
90:25
**complicit** [5] - 54:17,
76:1, 76:8, 77:25,
78:2
**comply** [5] - 61:10,
107:20, 116:14,
119:17, 121:22

**complying** [4] - 50:11, 50:12, 50:13, 59:22
**conceal** [1] - 78:10
**concepts** [1] - 68:22
**concern** [2] - 29:11, 61:22
**concerned** [10] - 19:14, 38:9, 63:22, 64:8, 75:23, 76:7, 85:9, 96:18, 115:1, 140:3
**concerns** [8] - 33:5, 60:3, 62:3, 89:8, 89:9, 116:24
**concluded** [1] - 148:22
**condition** [2] - 54:21, 68:3
**conduct** [1] - 77:4
**confer** [2] - 116:21, 137:19
**confidentiality** [3] - 117:4, 117:20, 119:5
**confirm** [2] - 6:24, 6:25
**confirmed** [1] - 36:18
**confronted** [1] - 101:24
**confused** [2] - 68:12, 144:4
**confusing** [1] - 18:7
**conjunction** [4] - 17:21, 18:19, 19:5, 19:23
**connected** [1] - 149:14
**Conover** [5] - 63:17, 65:10, 67:4, 67:5, 75:8
**consent** [19] - 12:22, 53:17, 53:20, 71:13, 71:14, 71:20, 71:22, 74:9, 76:20, 78:16, 85:3, 86:10, 86:16, 87:16, 97:1, 110:7, 110:11, 110:20
**consented** [1] - 112:5
**consenting** [1] - 84:1
**conservative** [1] - 131:4
**conservatively** [1] - 80:9
**consider** [1] - 135:19
**considerable** [1] - 29:23
**consideration** [2] - 9:17, 9:19
**consistent** [4] - 140:16, 141:2, 142:1, 142:13

**constitutional** [1] - 147:1
**construed** [1] - 118:17
**contain** [1] - 127:9
**contend** [1] - 34:12
**contention** [2] - 53:14, 88:17
**contest** [1] - 10:19
**continue** [4] - 62:8, 78:19, 102:11, 132:13
**continued** [1] - 132:10
**continuously** [1] - 123:23
**contract** [21] - 56:23, 82:16, 84:21, 86:9, 96:14, 96:19, 96:24, 96:25, 101:23, 103:3, 109:12, 111:2, 132:20, 133:19, 133:24, 134:9, 134:10, 134:11, 134:15, 134:25, 135:4
**contract's** [1] - 110:7
**contractual** [1] - 102:2
**control** [3] - 24:25, 61:14, 84:21
**controlled** [3] - 32:5, 62:20, 63:4
**controller** [1] - 118:12
**controlling** [1] - 55:21
**controls** [3] - 63:25, 85:18, 112:19
**conversation** [2] - 60:2, 72:16
**conversations** [1] - 72:23
**conveyance** [17] - 14:3, 14:4, 14:10, 15:9, 23:8, 30:1, 30:17, 41:3, 76:20, 76:22, 80:21, 81:8, 89:25, 91:12, 91:21, 92:1, 109:21
**conveyances** [4] - 19:8, 79:13, 117:24, 118:1
**conveyed** [3] - 36:15, 38:6, 79:3
**conveying** [3] - 46:3, 76:14, 76:25
**convince** [3] - 58:18, 67:7, 113:22
**convinced** [1] - 48:23
**copies** [1] - 35:10
**copy** [4] - 7:11, 31:20, 58:14, 140:19
**corporate** [19] - 3:15, 7:18, 12:3, 36:22,

45:8, 70:4, 71:6, 76:14, 76:15, 112:21, 113:7, 115:18, 116:17, 117:24, 119:9, 119:12, 121:13, 125:10, 125:14
**Corporation** [23] - 31:11, 31:14, 33:2, 33:16, 36:1, 36:25, 39:10, 50:6, 50:11, 52:3, 61:5, 112:13, 112:14, 112:18, 112:19, 112:20, 114:16, 119:19, 123:10, 125:12, 127:10, 127:15, 127:18
**corporation** [15] - 9:4, 11:11, 31:11, 31:14, 31:15, 33:2, 42:11, 52:15, 57:7, 113:13, 113:24, 114:10, 119:10, 120:16, 120:17
**correct** [18] - 13:22, 14:15, 26:3, 28:24, 52:6, 52:16, 55:1, 73:13, 78:9, 95:9, 116:3, 129:13, 130:17, 136:25, 141:4, 142:7, 145:4, 145:5
**corrected** [1] - 34:6
**correctly** [2] - 124:20, 125:5
**costs** [2] - 44:12, 78:18
**counsel** [27] - 7:25, 20:1, 30:25, 31:1, 35:2, 36:6, 37:13, 39:21, 43:4, 53:8, 76:12, 101:15, 106:16, 109:24, 110:5, 110:15, 111:3, 112:2, 121:12, 121:16, 125:23, 130:22, 140:1, 140:19, 149:12, 149:14
**COUNSEL** [4] - 2:3, 2:5, 2:7, 2:10
**counsel's** [1] - 21:3
**counties** [1] - 40:23
**country** [2] - 57:21, 63:14
**COUNTY** [2] - 1:2, 149:3
**County** [4] - 1:11, 39:4, 65:9, 75:2

**couple** [5] - 13:7, 57:11, 74:24, 100:13, 143:2
**course** [3] - 45:4, 87:22, 116:13
**Court** [2] - 149:6, 149:22
**COURT** [138] - 1:1, 3:3, 3:11, 4:1, 4:12, 4:17, 4:20, 5:10, 5:14, 5:25, 6:9, 6:15, 7:2, 7:8, 7:12, 7:15, 8:20, 9:5, 12:1, 13:5, 14:15, 14:21, 15:25, 17:18, 18:6, 21:6, 21:12, 23:18, 23:24, 24:5, 25:1, 26:7, 28:12, 28:15, 28:22, 29:20, 30:10, 50:7, 50:22, 51:24, 52:1, 52:8, 52:11, 52:16, 52:18, 52:25, 53:6, 53:11, 53:18, 57:22, 58:14, 58:25, 62:19, 65:22, 68:11, 84:19, 85:4, 85:12, 85:20, 85:25, 86:12, 86:17, 87:11, 87:19, 87:25, 88:2, 88:18, 92:15, 94:25, 95:7, 95:13, 97:11, 104:22, 106:17, 107:21, 109:10, 111:19, 111:23, 112:11, 112:25, 114:15, 118:4, 119:18, 119:24, 125:9, 125:21, 126:1, 126:7, 126:11, 126:21, 127:25, 128:3, 128:18, 129:9, 129:13, 129:20, 130:3, 130:17, 130:25, 131:22, 135:2, 135:19, 135:22, 136:2, 136:9, 136:18, 136:22, 137:5, 137:11, 137:20, 138:19, 139:10, 139:21, 139:25, 140:7, 140:18, 140:24, 141:4, 141:7, 141:10, 141:15, 141:19, 141:22, 141:24, 142:7, 142:18, 142:23, 143:1, 143:16, 143:20, 143:23, 143:24, 145:5,

146:22, 147:10, 147:21, 148:2, 148:20
**court** [103] - 5:2, 9:9, 13:25, 14:2, 14:11, 15:12, 15:13, 15:19, 16:1, 16:18, 16:21, 16:22, 16:23, 17:10, 19:16, 20:12, 20:19, 20:21, 22:12, 23:13, 23:14, 24:4, 25:11, 25:15, 25:18, 25:20, 25:25, 26:22, 27:10, 27:11, 28:1, 28:11, 43:10, 44:7, 47:25, 48:2, 48:21, 55:4, 57:5, 58:4, 58:7, 58:18, 59:7, 60:5, 60:22, 61:4, 61:9, 62:15, 62:19, 64:13, 64:21, 65:1, 68:9, 68:24, 74:24, 76:7, 80:24, 81:21, 81:23, 91:9, 92:13, 92:18, 92:22, 93:10, 93:12, 93:21, 93:22, 95:3, 95:6, 96:17, 98:7, 99:14, 100:13, 100:15, 101:11, 103:17, 104:14, 105:7, 105:8, 105:16, 106:3, 106:23, 107:16, 107:17, 110:2, 113:4, 113:20, 120:3, 124:24, 126:5, 135:23, 137:19, 142:5, 143:15, 144:18, 145:23, 146:6, 146:12, 147:7
**court's** [4] - 58:10, 90:19, 92:21, 94:23
**Courthouse** [1] - 1:11
**courthouse** [4] - 5:5, 5:12, 92:21, 146:5
**courts** [3] - 43:11, 62:22, 97:14
**cover** [1] - 35:17
**create** [2] - 23:7, 45:8
**created** [1] - 18:8, 45:8
**credit** [2] - 47:1, 130:22
**creditor** [13] - 13:18, 13:19, 13:20, 45:5, 45:25, 52:21, 55:19, 55:25, 56:8, 64:20, 78:3, 79:6, 127:17
**creditors** [5] - 8:8,

11:18, 59:11, 59:16, 59:25
**cuff** [1] - 4:22
**cure** [3] - 44:11, 99:24, 134:2
**cured** [5] - 44:12, 78:16, 102:7, 132:23, 134:3
**current** [1] - 28:19
**customary** [1] - 5:13
**cut** [1] - 101:9

# D

**DADE** [1] - 1:2
**Dade** [3] - 1:11, 65:8, 75:2
**damages** [8] - 8:16, 98:14, 98:15, 133:20, 134:11, 134:13, 134:16, 134:24
**dare** [2] - 15:7, 22:17
**dared** [2] - 14:3, 59:6
**dares** [2] - 15:6, 22:16
**dark** [1] - 137:10
**date** [5] - 9:8, 16:10, 34:11, 137:18
**Dated** [1] - 149:17
**days** [8] - 16:12, 125:10, 136:8, 136:18, 139:25, 142:23, 148:11, 148:16
**DCA** [1] - 96:3
**dead** [1] - 80:13
**deal** [13] - 43:6, 49:21, 70:15, 82:7, 83:1, 96:13, 96:14, 100:11, 103:21, 120:18, 122:16, 124:9, 140:9
**dealing** [5] - 12:12, 15:20, 28:23, 28:25, 43:18
**deals** [3] - 48:2, 65:10, 85:13
**dealt** [8] - 27:16, 54:10, 78:11, 104:1, 104:5, 121:18, 143:5, 147:8
**debated** [1] - 69:14
**debtor** [2] - 127:16, 130:4
**December** [6] - 34:3, 34:14, 98:3, 108:15, 108:16, 128:18
**decide** [16] - 15:15, 15:17, 25:11, 78:17, 78:20, 79:4, 86:15,

93:22, 94:19, 97:10, 110:24, 123:5, 132:22, 134:4, 138:3, 138:17
**decided** [4] - 14:1, 16:8, 20:24, 96:11
**deciding** [3] - 91:20, 91:22, 138:25
**decision** [3] - 8:23, 123:4, 144:7
**deeds** [1] - 56:8
**deemed** [2] - 97:14, 98:22
**default** [5] - 101:1, 101:3, 106:24, 107:3, 107:17
**defects** [1] - 120:1
**defendant** [5] - 9:1, 15:16, 15:18, 17:8, 52:23
**defendants** [4] - 3:15, 12:3, 12:9, 66:3
**Defendants** [1] - 1:9
**DEFENDANTS** [1] - 2:3
**defer** [2] - 145:11, 145:21
**deferred** [1] - 142:5
**definitely** [1] - 13:11
**degrees** [1] - 31:8
**delegate** [2] - 37:21, 37:24
**delegation** [1] - 37:23
**delegations** [1] - 123:21
**delete** [1] - 115:24
**delighted** [1] - 6:10
**demanded** [1] - 30:6
**denied** [9] - 25:15, 25:23, 81:21, 137:3, 137:5, 145:8, 147:15, 148:15, 148:19
**deny** [1] - 147:25
**denying** [1] - 147:17
**deposed** [2] - 31:3, 31:8
**deposit** [32] - 3:16, 17:15, 17:20, 18:18, 19:4, 19:21, 19:22, 20:7, 20:11, 20:23, 21:11, 28:20, 47:25, 48:15, 49:5, 53:2, 62:10, 62:14, 78:22, 78:24, 81:16, 92:4, 102:8, 105:7, 129:15, 129:16, 130:6, 135:22, 138:9, 138:10, 147:15, 148:15

**deposited** [12] - 29:10, 46:14, 48:20, 51:8, 52:3, 127:17, 128:5, 128:7, 128:8, 129:8, 136:11, 136:14
**depositing** [2] - 50:22, 129:2
**deposition** [3] - 60:16, 60:21, 62:1
**depositions** [3] - 57:16, 90:13, 138:5
**deposits** [2] - 62:19, 106:23
**describe** [1] - 70:8
**designed** [1] - 21:16
**desperation** [1] - 107:19
**despite** [1] - 10:8
**details** [2] - 97:5, 146:16
**determination** [3] - 64:22, 65:2, 89:22
**determine** [14] - 66:7, 80:20, 81:7, 89:21, 91:5, 91:6, 91:11, 93:8, 109:11, 109:20, 110:9, 110:21, 127:7, 139:9
**determined** [1] - 91:8
**determining** [1] - 89:24
**detriment** [1] - 94:20
**difference** [2] - 63:1, 64:18
**different** [12] - 13:15, 38:18, 43:16, 57:2, 79:23, 79:24, 97:9, 97:18, 99:17, 123:3, 129:25, 131:15
**dig** [2] - 71:5, 116:16
**direct** [1] - 109:22
**direction** [1] - 68:13
**directive** [1] - 61:10
**director** [4] - 37:1, 37:15, 42:18, 115:15
**directors** [2] - 37:14, 38:1
**directs** [1] - 61:4
**disagree** [7] - 13:12, 19:13, 49:19, 59:3, 91:17, 91:25, 114:21
**disagrees** [1] - 119:21
**disappear** [1] - 95:2
**discharge** [1] - 102:1
**discovery** [12] - 40:16, 71:5, 78:13, 80:11, 89:23, 104:10, 109:21, 138:11, 138:18, 140:10, 141:5, 148:16

**discuss** [3] - 3:12, 7:3, 146:16
**discussed** [2] - 3:10, 66:19
**discussing** [1] - 21:2
**Discussion** [1] - 141:23
**discussion** [3] - 3:5, 143:25, 145:20
**discussions** [1] - 145:14
**disingenuous** [1] - 16:13
**disposed** [2] - 53:2, 53:4
**dispute** [17] - 9:21, 11:23, 21:4, 33:18, 56:6, 65:12, 65:16, 95:22, 95:24, 96:1, 99:1, 99:6, 99:9, 102:10, 103:16, 105:5, 112:17
**disputed** [3] - 68:5, 68:19, 142:8
**disputes** [2] - 27:15, 140:14
**disrespect** [1] - 147:7
**disrespectful** [1] - 110:1
**distinct** [1] - 68:22
**distinction** [1] - 130:13
**distinguishable** [1] - 75:7
**distinguishes** [2] - 65:10, 67:4
**distinguishing** [1] - 97:15
**distributed** [1] - 134:5
**distribution** [1] - 15:20
**District** [1] - 65:7
**divide** [1] - 5:25
**document** [5] - 33:9, 35:12, 71:7, 90:16, 117:25
**document's** [1] - 35:9
**documentation** [7] - 30:3, 35:4, 35:25, 36:24, 37:5, 46:20, 117:22
**documents** [38] - 30:21, 32:11, 33:23, 41:6, 41:23, 42:14, 44:20, 47:10, 53:8, 57:4, 68:25, 70:18, 71:10, 78:25, 87:7, 90:11, 90:12, 90:16, 101:21, 111:1, 113:12, 113:17,

114:2, 114:6, 114:12, 116:19, 117:5, 117:23, 117:25, 120:2, 122:1, 123:7, 137:9, 138:3, 138:23, 139:1, 139:5, 139:9
**dollar** [1] - 47:21
**dollars** [3] - 83:14, 92:24, 98:5
**done** [32] - 18:20, 24:10, 39:6, 41:23, 43:19, 44:13, 45:15, 49:1, 70:3, 70:21, 73:19, 75:15, 78:4, 81:9, 81:14, 85:6, 98:8, 99:24, 103:22, 111:10, 115:20, 116:2, 116:25, 117:1, 118:15, 118:22, 124:16, 124:20, 127:15, 138:12, 144:11, 144:20
**door** [1] - 114:11
**double** [3] - 15:7, 29:13, 30:20
**down** [5] - 68:8, 74:1, 74:13, 94:11, 138:20
**drafted** [2] - 69:8, 100:2
**draw** [1] - 130:13
**drawn** [1] - 113:25
**drop** [1] - 16:23
**due** [9] - 46:16, 46:17, 66:23, 77:9, 100:24, 101:7, 108:1, 108:10, 129:17
**during** [4] - 33:24, 45:9, 53:14, 145:19
**duty** [3] - 76:7, 84:25, 96:22

# E

**e-mail** [2] - 38:14, 83:4
**e-mails** [1] - 73:1
**earliest** [1] - 34:11
**early** [1] - 30:12
**easier** [3] - 4:13, 51:5, 120:20
**easily** [1] - 74:14
**easy** [3] - 70:21, 71:17, 95:11
**effect** [1] - 110:24
**effective** [5] - 34:3, 35:8, 35:14, 38:17, 38:24
**effectively** [2] - 143:17, 145:17

**efforts** [1] - 12:15
**either** [9] - 5:1, 34:13, 37:24, 61:10, 85:23, 85:25, 92:18, 136:14, 139:11
**elect** [4] - 22:18, 92:18, 131:21, 131:23
**elected** [1] - 132:7
**employee** [2] - 149:12, 149:13
**encumbered** [1] - 83:16
**end** [7] - 50:13, 61:20, 61:21, 67:1, 81:24, 89:4, 103:20
**endorse** [5] - 39:20, 66:24, 66:25, 77:16, 77:17
**endorsed** [4] - 39:13, 77:13, 77:20, 127:16
**endorsement** [7] - 40:1, 77:14, 77:23, 77:24, 109:5, 128:11, 128:21
**endorsements** [2] - 39:22, 108:20
**ends** [1] - 89:4
**enforce** [50] - 7:19, 12:21, 17:21, 17:23, 18:17, 19:3, 19:22, 20:6, 26:23, 28:20, 29:9, 29:22, 30:4, 30:14, 31:10, 41:17, 42:24, 48:16, 49:11, 49:14, 51:15, 55:5, 62:9, 71:4, 77:5, 80:22, 81:12, 81:15, 90:7, 91:11, 91:18, 91:24, 92:2, 98:8, 98:9, 98:16, 98:22, 99:20, 101:5, 101:17, 113:25, 131:17, 131:24, 132:5, 132:9, 132:12, 132:19, 133:5, 135:1, 142:6
**enforced** [1] - 24:3
**enforcement** [1] - 17:14
**enforcing** [2] - 133:7, 133:11
**enter** [1] - 15:2
**entered** [2] - 32:12, 105:4
**entire** [1] - 112:17
**entities** [8] - 7:18, 32:5, 42:6, 45:14, 71:17, 80:4, 83:9, 114:17

**entitled** [18] - 70:16, 70:25, 71:7, 78:18, 86:17, 99:2, 99:7, 113:8, 113:14, 113:19, 114:14, 114:22, 116:12, 119:18, 132:1, 132:13, 133:8, 133:10
**entity** [19] - 31:9, 31:10, 32:2, 33:17, 35:16, 35:22, 35:23, 45:12, 47:23, 56:6, 70:16, 80:3, 80:7, 84:8, 115:5, 120:20, 120:22, 122:13
**epitome** [1] - 63:15
**equally** [1] - 98:24
**equates** [2] - 82:18, 135:15
**equitable** [2] - 94:23, 134:6
**error** [1] - 49:2
**errors** [1] - 122:1
**especially** [3] - 23:12, 108:7, 123:6
**ESQ** [5] - 2:2, 2:4, 2:5, 2:7, 2:9
**essence** [1] - 134:21
**establish** [7] - 3:20, 4:10, 78:14, 125:11, 127:4, 132:20, 133:5
**established** [1] - 127:20
**establishes** [1] - 134:2
**establishing** [1] - 133:12
**estate** [7] - 33:10, 45:11, 54:6, 88:10, 89:11, 99:1
**et** [2] - 1:5, 1:8
**etcetera** [2] - 12:14, 29:14
**eventually** [2] - 127:12, 133:21
**evidence** [3] - 21:4, 56:14, 59:9
**evident** [1] - 104:5
**evidentiary** [23] - 29:8, 30:16, 42:20, 42:25, 43:2, 44:20, 46:10, 48:7, 56:16, 78:24, 83:2, 104:8, 109:10, 109:17, 111:3, 111:9, 126:22, 127:6, 136:23, 137:2, 137:14, 140:11, 148:18
**EVS** [2] - 1:8, 28:18

**exact** [3] - 63:18, 65:4, 72:5
**exactly** [15] - 25:17, 49:4, 64:5, 75:6, 102:13, 103:7, 103:8, 119:20, 130:11, 131:14, 131:20, 132:21, 132:24, 134:19, 139:14
**example** [1] - 98:25
**except** [2] - 18:20, 56:7
**exchange** [1] - 50:17
**excuse** [1] - 135:12
**excused** [13] - 43:21, 43:23, 44:3, 44:9, 44:10, 75:4, 102:5, 131:4, 131:12, 132:19, 132:23, 132:24
**excuses** [1] - 102:22
**excusing** [1] - 102:24
**execute** [5] - 18:14, 47:6, 47:7, 82:10, 122:20
**executed** [8] - 35:19, 46:21, 46:23, 68:17, 68:21, 79:22, 83:20, 122:18
**execution** [3] - 42:12, 46:25, 79:25
**Exhibit** [9] - 32:25, 33:7, 36:14, 36:16, 36:18, 38:4, 70:8, 77:1
**exhibits** [1] - 123:18
**exist** [7] - 33:3, 34:16, 45:20, 47:23, 57:7, 80:7, 88:9
**existed** [1] - 59:9
**existence** [2] - 31:16, 31:19
**exists** [3] - 65:16, 76:14, 119:3
**expedite** [1] - 138:15
**explain** [5] - 12:23, 29:6, 29:7, 29:11, 62:25
**explained** [1] - 83:19
**explored** [1] - 31:7
**exposed** [1] - 30:19
**expressed** [1] - 73:16
**extent** [9] - 10:19, 14:8, 15:21, 22:5, 61:7, 91:7, 97:13, 134:12, 137:14
**eye** [1] - 120:5

**F**

**facie** [1] - 56:15
**fact** [27] - 6:11, 10:8, 11:8, 16:4, 19:21, 21:24, 36:2, 37:22, 39:8, 44:7, 49:24, 50:19, 52:1, 52:25, 66:20, 70:7, 76:17, 83:24, 92:7, 95:1, 100:24, 109:23, 114:8, 115:6, 115:8, 144:14
**facts** [3] - 42:19, 76:6, 123:16
**fails** [1] - 41:12
**failure** [2] - 49:15, 87:11
**fair** [6] - 84:20, 85:17, 86:1, 87:20, 99:3, 143:3
**fairly** [1] - 10:24
**fairness** [1] - 67:20
**faith** [1] - 84:25
**familiar** [2] - 11:6, 63:16
**far** [7] - 19:14, 27:1, 67:13, 114:22, 127:8, 127:20, 140:3
**fashion** [2] - 78:5, 78:22
**favor** [1] - 111:13
**favorably** [1] - 111:13
**fear** [1] - 23:22
**February** [1] - 67:23
**Feder** [3] - 1:16, 144:13, 144:15
**federal** [42] - 8:10, 9:9, 10:4, 13:25, 14:2, 14:10, 15:13, 16:18, 16:21, 16:23, 17:10, 19:16, 21:23, 22:3, 22:5, 22:9, 22:12, 22:20, 23:13, 23:14, 25:15, 25:18, 25:19, 25:24, 27:10, 27:11, 28:1, 32:10, 59:7, 60:5, 60:22, 62:1, 62:20, 62:21, 62:22, 68:24, 80:24, 81:21, 91:9, 92:12, 106:3, 113:4
**fee** [1] - 103:25
**fees** [6] - 44:12, 55:4, 78:18, 82:3, 82:8, 107:4
**few** [5] - 30:23, 32:18, 65:23, 67:24, 72:2
**fictitious** [4] - 39:16, 39:17, 40:3, 77:20

**fight** [8] - 19:12, 19:15, 59:21, 88:15, 89:5, 99:5, 99:11
**figure** [1] - 99:4
**figuring** [1] - 93:10
**file** [18] - 23:10, 24:20, 25:1, 30:4, 30:14, 79:8, 98:8, 126:5
**filed** [22] - 3:16, 6:12, 6:18, 9:2, 9:9, 14:18, 19:23, 22:2, 29:21, 37:3, 41:7, 41:10, 60:7, 102:8, 104:2, 104:20, 104:24, 105:2, 105:6, 105:8, 105:19, 144:11
**filing** [2] - 15:2, 75:14
**filings** [2] - 27:12, 68:10
**final** [3] - 9:14, 28:8, 28:9
**financially** [2] - 144:15, 149:15
**fine** [11] - 4:17, 4:20, 58:16, 71:17, 88:4, 106:22, 136:19, 140:18, 146:22, 148:20
**finish** [1] - 72:19
**finished** [2] - 9:11, 117:8
**firm** [5] - 35:2, 108:22, 125:22, 129:5, 129:7
**first** [15] - 3:4, 20:5, 31:15, 36:20, 43:21, 44:3, 47:2, 54:4, 61:20, 82:19, 86:14, 102:17, 102:21, 115:4, 137:11
**Fiscal** [3] - 65:8, 75:1, 103:14
**five** [3] - 15:3, 16:12, 33:11
**fix** [11] - 40:10, 56:25, 72:6, 73:20, 73:22, 78:11, 82:1, 82:6, 86:6, 121:25
**fixed** [6] - 19:11, 40:9, 44:18, 74:14, 81:13, 111:7
**fixing** [4] - 71:20, 71:23, 73:19, 100:8
**FL** [1] - 1:12
**Flagler** [1] - 1:11
**flip** [1] - 106:1
**Florida** [32] - 11:19, 15:10, 31:11, 31:16, 31:18, 33:2, 33:17, 33:20, 33:21, 34:2, 34:13, 34:16, 42:18,

44:24, 45:17, 45:19,
52:15, 56:20, 57:11,
61:5, 62:20, 62:23,
63:5, 63:20, 63:25,
64:2, 64:7, 64:15,
67:11, 79:20,
102:18, 147:1
**FLORIDA** [2] - 1:2,
149:2
**flowing** [1] - 59:15
**folks** [1] - 29:14
**follow** [2] - 103:1,
104:13
**followed** [3] - 21:20,
79:21, 107:17
**following** [2] - 3:1,
21:15
**FOOTE** [2] - 149:6,
149:22
**FOR** [5] - 1:2, 2:3, 2:5,
2:7, 2:10
**forced** [1] - 30:4
**forces** [1] - 131:1
**foregoing** [1] - 149:8
**forever** [1] - 104:18
**forget** [1] - 63:17
**forgive** [1] - 65:24
**forgot** [3] - 56:25,
68:1, 70:7
**form** [11] - 55:1, 67:21,
69:7, 69:9, 69:10,
72:2, 72:5, 99:25,
116:2, 116:6
**formalities** [1] - 79:19
**former** [2] - 7:24,
112:2
**FORMER** [1] - 2:10
**forms** [1] - 69:6
**Fort** [1] - 74:1
**forth** [3] - 66:11,
67:10, 106:5
**forthcoming** [2] -
86:18, 86:20
**forum** [4] - 22:17,
22:18, 27:9, 27:23
**forums** [2] - 27:24,
27:25
**forwarded** [1] - 62:2
**four** [1] - 7:18
**Frank** [2] - 121:17,
121:18
**frankly** [8] - 49:21,
92:23, 97:24,
100:25, 113:18,
115:4, 116:12, 132:9
**fraud** [35] - 14:25,
56:15, 56:19, 56:20,
56:22, 57:2, 58:5,
58:9, 58:17, 58:19,
58:20, 58:23, 58:24,

59:6, 59:7, 59:9,
63:10, 76:1, 76:3,
76:4, 78:9, 79:7,
89:18, 89:22, 91:3,
91:5, 91:7, 96:16,
96:17, 98:13, 120:19
**frauds** [1] - 89:1
**fraudulent** [24] - 14:4,
14:10, 15:9, 19:7,
22:13, 23:1, 23:8,
24:8, 25:20, 46:2,
57:4, 77:24, 80:21,
81:8, 87:6, 87:7,
89:24, 91:12, 91:21,
92:1, 108:20, 109:5,
109:21, 139:12
**fraudulently** [1] -
15:22
**free** [1] - 107:21
**Friday** [3] - 13:8, 16:5,
16:11
**friends** [1] - 32:7
**front** [7] - 6:12, 6:14,
20:10, 23:15, 28:5,
101:2, 105:9
**frustration** [1] -
107:18
**full** [6] - 18:15, 70:1,
72:13, 112:1, 133:7,
133:9
**function** [3] - 45:9,
56:7, 145:22
**functions** [2] - 37:11,
123:19
**fund** [1] - 45:13
**fundamental** [1] - 93:7
**fundamentally** [1] -
27:22
**funds** [13] - 20:11,
28:20, 28:21, 48:20,
55:3, 62:14, 96:10,
129:7, 131:6, 131:7,
134:24, 145:24
**future** [5] - 100:20,
108:3, 108:4,
129:16, 134:5

**G**

**garbage** [2] - 4:7, 4:8
**generated** [1] - 33:24
**gentleman** [1] - 37:2
**gentlemen** [1] - 5:20
**gist** [1] - 106:10
**given** [22] - 24:11,
30:3, 36:10, 37:5,
54:12, 67:19, 67:21,
68:20, 69:21, 70:1,
79:5, 83:22, 94:24,
95:8, 95:16, 98:21,

100:19, 113:17,
124:2, 138:3, 148:1
**glue** [1] - 56:21
**goal** [1] - 93:10
**Goldstein** [61] - 7:25,
8:11, 8:19, 8:25, 9:8,
9:24, 10:5, 11:24,
12:11, 12:13, 13:20,
13:22, 14:14, 14:17,
15:22, 17:6, 17:7,
21:18, 24:9, 24:13,
24:14, 31:3, 32:13,
34:1, 42:14, 42:16,
45:12, 47:22, 56:4,
57:11, 57:19, 58:13,
60:3, 60:7, 60:22,
61:4, 61:9, 61:10,
61:14, 61:18, 61:22,
61:24, 61:25, 63:13,
68:6, 68:15, 68:25,
69:11, 74:5, 75:24,
83:8, 93:24, 112:10,
113:1, 115:11,
115:14, 115:24,
116:3, 121:11,
121:12
**GOLDSTEIN** [1] - 2:10
**Goldstein's** [7] -
10:21, 32:6, 35:20,
61:3, 68:18, 112:2
**GORDON** [43] - 2:5,
26:5, 26:8, 62:24,
63:3, 65:19, 65:23,
68:12, 72:19, 72:22,
73:14, 84:23, 85:6,
85:22, 86:5, 97:13,
100:17, 108:15,
111:24, 113:1,
114:20, 115:16,
117:6, 117:11,
117:13, 117:17,
120:9, 120:13,
131:16, 131:21,
131:23, 133:4,
135:24, 136:4,
136:11, 136:16,
136:19, 137:13,
142:10, 143:17,
145:7, 148:5, 148:9
**Gordon** [7] - 7:22,
25:12, 38:14, 69:8,
81:17, 108:3, 139:18
**grand** [1] - 81:23
**grant** [2] - 57:18,
95:17
**grants** [1] - 5:24
**great** [5] - 58:17, 86:5,
100:6, 103:14,
138:16
**grounds** [1] - 74:23

**guess** [18] - 3:3, 3:20,
5:23, 19:18, 39:19,
40:22, 41:23, 54:23,
59:12, 66:5, 79:16,
115:23, 116:6,
118:10, 127:5,
127:11, 129:2, 129:3
**guidance** [1] - 147:12
**gut** [1] - 94:4
**guy** [2] - 58:11, 58:15
**guys** [1] - 88:21

**H**

**half** [2] - 31:2, 128:21
**hamaway** [1] - 73:1
**Hamaway** [8] - 31:2,
72:9, 72:16, 72:18,
72:24, 73:8, 75:22,
94:11
**hamaway's** [1] - 18:23
**Hamaway's** [2] - 73:4,
83:5
**hand** [3] - 51:23,
71:18, 82:12
**handed** [2] - 60:23,
60:24
**handing** [2] - 71:20,
73:15
**handle** [1] - 6:10
**hands** [3] - 24:13,
57:19, 99:23
**handwriting** [2] -
142:19, 142:21
**hanging** [1] - 140:25
**happy** [8] - 8:12,
13:14, 22:16, 23:15,
51:10, 62:13, 90:5,
90:6, 91:24, 91:25,
121:5, 139:23,
140:15
**HARDIN** [1] - 2:9
**harm** [1] - 52:19
**harmed** [2] - 67:16,
74:16
**hash** [2] - 16:16, 91:17
**haste** [1] - 41:24
**heading** [1] - 102:3
**hear** [8] - 16:2, 21:9,
29:2, 29:3, 58:2,
80:17, 89:6, 144:13
**heard** [12] - 13:4,
13:15, 21:5, 41:16,
43:25, 69:19, 71:1,
71:24, 79:11, 85:7,
94:24, 122:10
**hearing** [43] - 16:9,
24:1, 29:8, 30:16,
43:2, 44:20, 46:10,
48:8, 54:11, 56:12,

56:16, 78:7, 78:25,
80:12, 81:19, 82:20,
83:2, 87:8, 92:13,
103:21, 104:9,
109:10, 109:17,
109:18, 110:15,
110:16, 111:4,
111:9, 125:24,
126:23, 127:6,
130:7, 134:1,
136:23, 137:2,
137:10, 138:6,
138:7, 138:10,
140:11, 140:13,
144:10, 148:18
**hearings** [3] - 23:22,
137:21, 137:23
**heck** [1] - 101:12
**held** [9] - 20:19, 34:18,
45:11, 61:13,
107:24, 126:10,
129:5, 141:23,
143:25
**HELLER** [1] - 2:4
**herself** [2] - 20:18,
64:19
**highlighted** [1] - 65:17
**highly** [1] - 77:2
**hold** [12] - 8:17, 12:4,
18:6, 54:16, 55:12,
56:7, 57:8, 120:22,
125:18, 126:1,
126:5, 140:7
**holder** [1] - 131:6
**holding** [2] - 84:8,
128:14
**Honor** [247] - 3:10,
3:14, 3:21, 3:24,
3:25, 4:14, 4:19,
5:23, 6:5, 6:22, 7:17,
7:23, 8:3, 8:8, 11:6,
11:22, 11:25, 12:2,
12:23, 13:6, 13:16,
14:16, 16:14, 16:17,
17:9, 17:12, 18:2,
18:5, 18:11, 19:17,
19:25, 21:1, 21:8,
21:15, 21:25, 22:24,
24:23, 25:12, 25:22,
26:5, 26:10, 26:22,
28:3, 29:7, 29:19,
29:21, 30:17, 30:22,
30:23, 31:12, 31:21,
32:15, 32:18, 32:24,
33:7, 33:16, 33:23,
36:10, 36:13, 37:18,
38:15, 38:16, 38:20,
39:9, 40:2, 40:6,
40:13, 41:7, 42:1,
42:19, 42:21, 43:5,

43:16, 44:17, 44:19, 45:18, 45:22, 46:23, 48:13, 48:15, 49:3, 49:8, 49:24, 51:4, 51:5, 51:12, 51:25, 54:1, 56:5, 56:11, 59:18, 60:5, 62:16, 62:24, 63:6, 63:16, 63:24, 64:11, 64:16, 65:6, 65:9, 65:19, 65:23, 67:14, 67:20, 69:24, 70:11, 71:1, 73:17, 74:12, 74:22, 75:16, 76:1, 76:4, 76:5, 77:3, 77:15, 78:4, 78:10, 78:17, 78:20, 80:9, 80:16, 80:20, 81:7, 81:10, 81:20, 81:23, 82:24, 83:3, 83:20, 84:23, 86:9, 87:8, 87:10, 87:14, 88:14, 89:2, 91:4, 91:9, 91:14, 91:19, 91:21, 92:8, 95:16, 95:20, 95:23, 95:25, 96:15, 97:1, 97:3, 97:10, 97:13, 97:21, 101:10, 101:17, 102:16, 103:2, 103:6, 104:8, 104:9, 104:12, 104:17, 105:12, 105:15, 107:6, 107:11, 107:15, 107:20, 108:11, 108:18, 109:13, 109:20, 110:19, 110:23, 111:13, 111:17, 111:22, 111:24, 112:8, 113:5, 113:23, 114:5, 114:8, 115:13, 115:16, 115:19, 116:9, 116:11, 116:19, 116:20, 116:24, 117:6, 117:19, 118:19, 119:5, 119:8, 119:10, 119:13, 125:2, 125:8, 125:22, 126:3, 126:5, 126:12, 126:17, 126:19, 127:24, 128:13, 129:3, 129:23, 130:1, 130:7, 130:21, 131:2, 131:16, 132:18, 132:22, 133:1, 133:4, 133:17, 133:22,

133:24, 134:2, 134:4, 135:11, 135:21, 135:24, 136:21, 137:8, 138:2, 138:23, 139:2, 139:5, 139:8, 139:24, 140:12, 141:13, 143:4, 146:11, 146:19, 147:8, 147:17, 147:22, 147:24, 148:14
**honor** [2] - 84:3, 84:11
**Honor's** [9] - 5:9, 54:24, 96:23, 128:25, 131:7, 134:19, 141:2, 141:17, 147:19
**Honorable** [1] - 1:16
**horrible** [2] - 105:10, 105:13
**horse** [2] - 5:8, 80:13
**hour** [2] - 4:2, 111:2
**hours** [2] - 126:20, 143:2
**human** [2] - 105:10, 105:13
**hundreds** [1] - 98:5

### I

**idea** [1] - 147:10
**identity** [1] - 52:5
**ignore** [2] - 73:23, 77:3
**Illinois** [7] - 31:14, 31:15, 33:4, 34:2, 34:17, 45:16
**illustration** [1] - 103:14
**implead** [1] - 22:25
**implied** [1] - 84:24
**important** [8] - 32:24, 50:25, 63:4, 68:1, 68:3, 71:12, 83:11, 84:1
**impossible** [1] - 139:12
**impression** [1] - 69:1
**improper** [13] - 14:3, 26:13, 49:19, 49:20, 62:10, 77:23, 81:16, 92:5, 105:3, 128:11, 144:18, 144:21, 144:24
**improperly** [5] - 18:16, 39:13, 77:13, 83:20, 125:7
**IN** [2] - 1:1, 1:1
**in-camera** [1] - 113:21

**inaccurate** [2] - 61:1, 72:21
**inapplicable** [2] - 43:6, 48:2
**Inc** [9] - 32:1, 32:14, 35:19, 46:21, 61:13, 79:12, 79:14, 79:17, 118:6
**INC** [1] - 1:8
**include** [2] - 68:1, 148:12
**included** [2] - 6:6, 49:3
**including** [1] - 34:18
**incorrect** [2] - 69:17, 73:6
**indicated** [1] - 9:11
**indicating** [2] - 26:11, 68:9
**indicating)** [1] - 68:11
**induce** [1] - 15:1
**indulge** [1] - 30:22
**indulges** [1] - 17:13
**indulging** [1] - 74:20
**influence** [1] - 144:19
**information** [12] - 12:25, 29:25, 38:2, 38:8, 60:20, 77:8, 77:10, 78:8, 79:10, 86:15, 110:9, 110:21
**informed** [1] - 73:7
**initial** [2] - 87:4, 87:5
**injunction** [21] - 20:8, 20:16, 49:6, 62:11, 81:17, 92:6, 94:2, 95:17, 95:19, 96:8, 99:17, 103:10, 103:11, 105:3, 106:21, 129:21, 130:5, 130:15, 130:20, 131:10, 134:24
**innocent** [1] - 93:15
**inspection** [1] - 113:21
**installments** [1] - 128:15
**instead** [2] - 23:3, 86:20
**instruct** [2] - 105:16, 105:18
**instructed** [1] - 6:19
**instruction** [1] - 105:24
**instructions** [1] - 8:15
**instructs** [1] - 107:11
**instrument** [1] - 33:12, 119:3
**instruments** [7] - 30:2, 32:12, 38:19,

39:2, 39:3, 40:23, 86:22
**intend** [1] - 107:14
**intended** [4] - 65:5, 102:14, 103:8, 131:9
**intents** [5] - 45:6, 51:2, 60:12, 143:18, 145:18
**intercepted** [2] - 39:25, 46:7
**intercepts** [1] - 46:5
**interest** [10] - 11:1, 25:4, 25:5, 25:6, 25:7, 31:22, 32:17, 85:23, 94:16, 120:10
**interested** [1] - 149:15
**interesting** [5] - 41:10, 46:22, 85:7, 121:24, 147:6
**interests** [2] - 12:20, 31:6
**interrupt** [1] - 117:15
**interruptions** [1] - 117:10
**intervene** [31] - 5:22, 6:6, 7:5, 7:9, 8:7, 8:24, 9:12, 10:1, 10:16, 11:19, 13:2, 16:15, 19:20, 21:3, 21:10, 21:13, 21:16, 21:19, 21:20, 22:2, 22:10, 25:4, 25:8, 25:24, 28:7, 53:3, 66:10, 67:9, 79:6, 92:10, 92:19
**interveners** [1] - 8:5
**intervening** [2] - 28:12, 28:13
**intervention** [10] - 5:24, 10:24, 11:3, 25:9, 25:15, 55:8, 104:12, 136:20, 142:5
**INVESTMENTS** [1] - 1:8
**Investments** [1] - 28:19
**invoice** [1] - 143:4
**invoke** [1] - 95:21
**involved** [4] - 8:10, 23:6, 33:25, 88:15
**involves** [1] - 13:21
**ironically** [1] - 10:11
**irregular** [1] - 77:2
**irregularities** [1] - 12:19
**irregularity** [2] - 34:24, 39:7
**issue** [38] - 10:3, 18:4, 26:16, 26:17, 27:2,

32:11, 33:18, 45:4, 45:17, 50:21, 54:10, 61:8, 61:16, 62:23, 64:4, 66:1, 66:12, 67:17, 68:4, 69:16, 69:21, 69:22, 71:24, 73:14, 74:25, 75:10, 86:19, 88:6, 90:10, 90:17, 97:18, 104:1, 111:14, 111:24, 112:4, 112:13, 116:18, 129:4
**issued** [4] - 61:7, 61:19, 61:20, 129:12
**issues** [25] - 12:12, 19:3, 21:8, 27:13, 41:25, 44:6, 44:21, 44:25, 55:6, 67:15, 73:22, 82:5, 87:7, 90:14, 90:23, 92:23, 97:9, 103:22, 104:4, 104:11, 104:13, 131:2, 139:18, 139:20, 140:10
**items** [1] - 18:12
**itself** [3] - 29:1, 46:23, 76:18

### J

**January** [8] - 31:19, 32:21, 34:7, 34:14, 35:7, 108:15, 108:16, 128:18
**JASON** [2] - 2:5, 2:9
**Jason** [3] - 7:21, 7:23, 25:12
**Jeff** [1] - 142:15
**JEFFREY** [1] - 2:7
**Jeffrey** [1] - 8:3
**job** [2] - 58:17, 125:4
**John** [1] - 6:9
**join** [1] - 136:24
**joins** [1] - 42:14
**judge** [27] - 4:3, 5:15, 22:7, 23:24, 23:25, 43:8, 101:2, 102:25, 104:25, 105:4, 143:16, 143:20, 143:21, 144:3, 144:18, 144:22, 144:23, 145:2, 145:15, 145:16, 145:20, 145:24, 146:10, 146:15, 146:25, 147:2, 148:18
**Judge** [62] - 1:16, 3:7, 3:18, 6:4, 6:12, 6:19, 8:14, 9:11, 9:16,

12:11, 20:10, 20:14,
22:3, 22:12, 23:16,
23:22, 27:17, 28:4,
43:1, 46:11, 48:19,
48:23, 49:7, 58:6,
59:13, 62:12, 64:1,
64:2, 64:19, 68:8,
71:18, 94:2, 96:3,
97:25, 99:15,
100:18, 100:23,
101:3, 104:19,
104:20, 105:9,
105:21, 106:14,
114:13, 128:15,
129:5, 129:23,
143:17, 144:8,
144:11, 144:13,
144:14, 145:6,
145:11, 145:17,
145:18, 145:21,
146:2, 146:9,
146:13, 146:21,
147:11
**judges** [5] - 3:19, 5:4,
5:6, 5:17, 144:24
**judgment** [34] - 8:8,
8:17, 9:10, 9:14,
11:9, 11:18, 12:15,
13:18, 13:19, 13:20,
14:13, 14:14, 14:16,
23:9, 24:11, 24:12,
25:5, 28:8, 28:9,
45:5, 45:25, 47:3,
47:21, 52:21, 55:19,
55:25, 56:8, 59:11,
59:16, 59:25, 63:10,
64:20, 78:3, 79:6
**JUDICIAL** [1] - 1:1
**judicial** [2] - 58:5,
58:19
**judiciary** [1] - 93:8
**July** [4] - 35:8, 35:14,
38:17, 38:24
**jump** [3] - 13:23,
13:24, 13:25
**jurisdiction** [5] -
24:22, 24:24, 26:23,
28:11, 64:14

## K

**Kaplan** [1] - 31:1
**Kaplan's** [1] - 83:6
**keep** [8] - 59:14, 91:3,
92:3, 99:21, 99:22,
102:19, 103:9, 131:1
**keeps** [3] - 59:15,
59:22, 124:18
**Keifitz** [4] - 36:2, 37:3,
42:2, 69:25

**kept** [1] - 47:8
**kind** [4] - 4:21, 32:18,
48:18, 55:7
**kinds** [2] - 113:12,
114:13
**knock** [1] - 111:14
**known** [1] - 46:2
**knows** [1] - 121:20

## L

**lady** [1] - 23:23
**language** [4] - 65:17,
84:20, 84:21, 85:12
**last** [18] - 16:4, 26:14,
28:5, 28:14, 32:21,
33:6, 33:8, 39:8,
41:8, 46:7, 60:16,
92:10, 93:3, 95:15,
104:16, 115:20,
116:10, 138:14
**late** [3] - 16:11, 41:9,
137:25
**Lauderdale** [1] - 74:1
**laugh** [1] - 109:25
**law** [28] - 23:11, 25:6,
42:23, 43:4, 43:20,
48:1, 48:5, 48:24,
62:20, 62:21, 62:23,
63:5, 63:25, 64:7,
64:15, 67:11, 75:11,
78:23, 85:5, 86:11,
94:6, 94:25, 95:20,
102:18, 103:4,
132:7, 147:1
**lawsuit** [4] - 66:6,
66:8, 66:14, 114:3
**lawsuits** [1] - 11:20
**lawyer** [9] - 36:1,
36:10, 37:2, 37:11,
37:16, 41:5, 60:9,
60:11, 60:14, 61:3,
118:16, 123:18,
130:25
**lawyers** [1] - 124:8
**layers** [1] - 31:25
**learned** [1] - 34:25
**least** [10] - 10:17,
11:13, 12:9, 22:14,
38:20, 39:1, 43:17,
56:14, 107:24, 108:7
**leave** [1] - 97:8
**leaves** [2] - 129:4,
129:14
**led** [1] - 49:1
**left** [5] - 15:12, 18:11,
111:15, 141:18,
145:25
**legal** [4] - 71:2, 71:9,
95:16, 127:4

**legitimate** [2] - 10:20,
79:1
**legitimately** [1] - 55:1
**lent** [2] - 34:21, 45:13
**Leon** [40] - 7:25, 8:11,
8:19, 8:25, 9:8, 9:24,
10:21, 11:23, 13:20,
13:21, 14:14, 14:17,
15:22, 17:6, 17:7,
21:18, 24:12, 24:14,
24:15, 24:18, 37:1,
37:15, 42:13, 42:16,
45:6, 56:4, 57:10,
57:19, 60:3, 60:14,
63:13, 75:24, 83:8,
84:5, 121:11,
121:12, 121:19,
121:20
**LEON** [1] - 2:10
**Leon's** [3] - 45:6,
46:21, 46:24
**less** [1] - 44:11
**letter** [4] - 29:23, 35:5,
35:17, 41:8
**level** [1] - 116:15
**liability** [3] - 29:13,
30:20, 102:2
**liberally** [1] - 25:9
**lien** [2] - 34:15, 45:19
**lies** [1] - 14:24
**lieu** [1] - 107:9
**light** [1] - 105:17
**LIMITED** [1] - 2:7
**limited** [2] - 104:10,
138:5
**Limited** [1] - 8:6
**line** [11] - 63:17,
63:19, 64:2, 64:13,
66:5, 69:24, 74:18,
102:16, 113:24,
138:21
**lines** [1] - 91:19
**listed** [4] - 38:4, 70:5,
115:10, 115:14
**listen** [1] - 60:20
**listing** [1] - 37:4
**litigable** [1] - 25:7
**litigate** [2] - 27:24,
27:25
**litigated** [4] - 17:10,
23:14, 26:1, 60:6
**litigation** [10] - 9:20,
11:1, 11:16, 23:8,
26:21, 27:3, 33:15,
33:24, 45:10
**live** [2] - 57:13, 132:11
**lived** [2] - 30:24, 30:25
**lives** [4] - 57:11,
57:12, 57:14, 70:14
**LLC** [19] - 32:5, 35:16,

35:19, 35:23, 36:16,
38:13, 40:19, 47:8,
47:10, 52:10, 79:13,
79:15, 79:17, 118:3,
118:4, 122:12,
122:19, 125:13,
127:19
**loan** [10] - 10:15,
32:11, 32:25, 34:18,
34:20, 34:22, 47:19,
68:16, 80:6, 101:21
**locally** [1] - 120:20
**located** [1] - 112:3
**lock** [11] - 63:12,
63:20, 64:3, 64:14,
67:8, 74:18, 98:4,
100:5, 100:9,
100:15, 108:6
**locked** [3] - 67:3,
97:25, 100:12
**locking** [1] - 98:5
**Look** [1] - 114:13
**look** [14] - 30:20,
32:23, 33:13, 36:9,
60:25, 111:23,
114:6, 119:10,
120:4, 120:5,
124:14, 139:6,
139:7, 139:13
**looked** [3] - 48:24,
54:5, 115:20
**looking** [3] - 45:5,
81:17, 124:17
**lost** [2] - 23:15, 23:20
**love** [4] - 58:1, 71:8,
81:10, 104:22
**loves** [1] - 68:18

## M

**magistrate** [5] -
144:16, 144:17,
146:3, 146:4, 146:15
**magistrates** [2] -
144:25, 146:4
**mail** [2] - 38:14, 83:4
**mails** [1] - 73:1
**main** [1] - 11:5
**man** [2] - 25:13, 28:16
**managing** [3] - 42:10,
42:11, 122:13
**mandated** [1] - 30:7
**mandatory** [13] - 20:8,
20:16, 62:11, 95:17,
96:8, 99:16, 103:10,
106:20, 129:21,
130:5, 130:15,
130:20, 131:10
**manner** [1] - 69:2
**March** [9] - 1:12,

32:11, 32:14, 33:1,
69:5, 69:15, 108:17,
129:17
**Maritime** [33] - 10:7,
21:19, 21:22, 21:24,
21:25, 22:8, 22:11,
22:22, 24:9, 24:20,
32:1, 32:4, 32:14,
35:16, 35:18, 35:19,
35:23, 36:16, 38:13,
40:19, 45:2, 47:8,
52:10, 61:13, 118:3,
118:11, 120:7,
120:14, 120:15,
120:18, 120:21,
125:12, 127:19
**maritime** [2] - 45:1,
127:19
**mark** [5] - 19:1,
111:25, 112:4,
112:6, 112:9
**marked** [2] - 18:15,
72:12
**massive** [2] - 63:10,
94:21
**master** [2] - 143:19,
146:7
**material** [2] - 82:16,
101:18
**matter** [11] - 6:11,
55:10, 59:5, 70:9,
76:14, 76:16, 88:18,
94:5, 103:5, 104:23,
117:11
**matters** [4] - 70:4,
71:6, 85:21, 95:24
**mean** [16] - 6:23,
16:23, 19:6, 19:12,
25:21, 32:20, 79:7,
82:15, 89:3, 89:5,
92:5, 102:16, 106:9,
121:21, 122:11,
127:3
**meanings** [1] - 79:24
**means** [1] - 127:4
**meant** [1] - 65:6
**mediation** [1] - 4:15
**mediator** [1] - 4:2
**member** [3] - 42:10,
42:12, 122:13
**mention** [3] - 3:18,
41:13, 80:18
**mentioned** [4] - 16:19,
60:4, 129:1, 145:19
**mere** [1] - 95:1
**merely** [2] - 43:24,
78:15
**merits** [1] - 13:17
**met** [1] - 17:25
**Metropolitan** [2] -

65:8, 75:2
**MIAMI** [1] - 1:2
**Miami** [23] - 1:12, 32:5, 33:10, 35:16, 35:23, 36:16, 38:13, 40:19, 52:10, 118:3, 118:11, 120:7, 120:14, 120:17, 120:18, 120:22, 121:2, 121:4, 121:5, 122:11, 122:19, 125:13
**MIAMI-DADE** [1] - 1:2
**Michael** [3] - 7:21, 31:2, 35:11
**MICHAEL** [1] - 2:4
**middle** [1] - 81:19
**might** [4] - 13:2, 29:10, 32:3, 130:4
**Mikhael** [2] - 36:2, 37:3
**million** [15] - 9:25, 10:15, 23:3, 23:21, 24:12, 28:10, 29:17, 43:25, 47:21, 68:3, 82:11, 82:14, 82:19, 118:24, 135:18
**millions** [2] - 83:14, 92:24
**mind** [3] - 25:13, 60:6, 143:11
**minds** [1] - 89:3
**mine** [1] - 80:15
**minimal** [1] - 80:11
**minor** [1] - 67:25
**minority** [1] - 83:9
**minute** [1] - 41:8
**misconception** [1] - 75:17
**miscued** [1] - 131:9
**miss** [1] - 100:10
**missing** [4] - 77:14, 123:17, 127:22, 128:21
**mistaken** [1] - 45:11
**mistakenly** [1] - 115:23
**misunderstanding** [2] - 115:21, 116:4
**misunderstood** [1] - 116:6
**MOMBACH** [1] - 2:9
**Mombach** [1] - 7:24
**moment** [1] - 65:20
**Monday** [14] - 41:9, 44:21, 46:12, 46:13, 53:8, 54:5, 75:13, 75:19, 83:18, 83:22, 137:7, 137:12, 137:24, 138:1

**money** [91] - 5:16, 8:12, 10:2, 20:18, 29:12, 34:21, 40:4, 43:8, 43:9, 43:13, 44:10, 44:14, 44:15, 45:13, 46:1, 46:5, 46:9, 46:10, 48:4, 48:19, 55:17, 55:22, 57:17, 57:18, 59:12, 59:14, 62:8, 63:12, 63:21, 64:3, 64:15, 64:24, 66:4, 67:3, 67:8, 67:14, 74:19, 75:9, 78:6, 78:12, 80:10, 90:20, 93:21, 93:23, 94:5, 94:18, 95:1, 95:23, 96:6, 96:9, 97:17, 97:25, 98:3, 98:20, 99:7, 99:12, 99:19, 100:5, 100:9, 100:18, 100:23, 100:24, 104:6, 104:25, 105:7, 105:11, 105:17, 105:18, 105:20, 105:25, 106:20, 106:21, 106:25, 107:1, 108:7, 108:12, 108:18, 108:23, 109:1, 109:6, 127:24, 128:2, 130:12, 130:14, 130:18, 130:19, 133:25, 136:10, 148:5
**moneys** [7] - 29:15, 29:16, 66:7, 66:13, 66:16, 66:17, 127:8
**month** [10] - 29:16, 46:17, 46:18, 50:5, 55:11, 66:17, 97:23, 99:10, 100:10, 103:1
**months** [4] - 57:12, 98:1, 100:13, 103:1
**moot** [2] - 19:22, 87:2
**moreover** [1] - 61:13
**morning** [3] - 31:17, 137:22, 138:1
**mortgage** [6] - 35:1, 36:15, 38:5, 40:20, 76:23, 84:9
**mortgages** [3] - 18:16, 40:24, 120:12
**most** [5] - 32:23, 57:24, 60:23, 70:14, 93:15
**motion** [116] - 3:16, 6:5, 7:3, 7:8, 7:9, 8:7, 8:18, 9:9, 9:16,

9:18, 13:8, 17:13, 17:15, 17:19, 17:21, 17:23, 18:17, 18:18, 19:3, 19:4, 19:20, 19:21, 19:22, 20:6, 20:7, 20:23, 21:2, 21:9, 21:10, 21:12, 21:16, 21:19, 22:2, 22:10, 23:15, 25:23, 29:9, 29:22, 30:4, 30:14, 35:7, 41:8, 41:16, 41:17, 48:15, 49:5, 49:10, 49:11, 49:14, 51:13, 51:14, 51:17, 53:2, 57:18, 62:8, 62:10, 67:9, 71:4, 77:5, 79:5, 80:22, 81:5, 81:6, 81:9, 81:11, 81:14, 81:16, 82:21, 82:22, 82:23, 83:4, 90:7, 91:11, 91:18, 91:23, 92:2, 92:4, 92:10, 92:19, 98:8, 100:17, 100:22, 101:16, 102:8, 102:9, 104:2, 104:21, 104:24, 105:2, 105:6, 105:8, 105:17, 106:11, 108:2, 110:18, 111:10, 124:25, 129:15, 129:16, 130:3, 130:4, 133:4, 135:2, 136:20, 137:1, 137:22, 142:4, 142:6, 144:11, 145:8, 148:15, 148:19
**motions** [8] - 6:5, 23:19, 23:20, 28:19, 28:23, 42:24, 48:14, 79:9
**movant** [1] - 19:25
**move** [2] - 55:5, 79:14
**moved** [2] - 7:19, 9:7
**moving** [2] - 31:9, 132:19
**MR** [316] - 3:9, 3:14, 4:10, 4:14, 4:18, 4:21, 4:23, 4:25, 5:2, 5:11, 5:19, 6:2, 6:11, 6:16, 6:21, 7:4, 7:11, 7:13, 7:17, 7:21, 7:23, 8:3, 8:22, 9:6, 12:2, 12:4, 12:5, 13:6, 14:16, 14:23, 16:1, 16:17, 16:25, 17:2, 17:3, 17:5, 17:7, 17:9, 17:11, 17:12, 17:15, 17:17,

17:19, 18:4, 18:7, 18:9, 18:10, 19:24, 20:2, 20:4, 20:6, 21:1, 21:7, 21:14, 22:21, 22:24, 23:5, 23:19, 23:25, 24:7, 24:23, 24:24, 25:2, 25:12, 26:5, 26:8, 28:4, 28:13, 28:17, 28:18, 28:24, 29:4, 29:6, 29:7, 29:21, 30:11, 31:4, 31:5, 41:12, 41:20, 48:9, 50:8, 50:23, 51:25, 52:7, 52:9, 52:14, 52:17, 52:20, 53:4, 53:7, 53:12, 53:19, 55:14, 55:16, 55:17, 56:11, 57:23, 58:15, 58:22, 59:1, 60:9, 60:11, 60:13, 60:15, 61:1, 61:2, 62:21, 62:24, 62:25, 63:3, 64:16, 65:19, 65:23, 68:12, 72:15, 72:19, 72:20, 72:22, 73:5, 73:7, 73:11, 73:13, 73:14, 74:22, 80:15, 82:21, 82:23, 82:24, 84:23, 85:6, 85:19, 85:22, 86:5, 86:8, 86:13, 86:18, 87:14, 87:22, 87:23, 88:1, 88:4, 88:19, 88:22, 88:25, 89:1, 89:2, 92:9, 92:16, 95:4, 95:8, 95:15, 97:13, 100:12, 100:17, 101:8, 101:9, 104:16, 104:24, 105:13, 105:15, 106:6, 106:10, 106:12, 106:13, 106:18, 107:5, 107:7, 107:8, 107:23, 108:11, 108:15, 108:16, 108:25, 109:2, 109:12, 109:15, 109:24, 110:3, 110:4, 111:6, 111:21, 111:24, 112:8, 112:12, 113:1, 114:20, 115:13, 115:16, 117:4, 117:6, 117:8, 117:11, 117:12, 117:13, 117:15, 117:17, 117:19, 118:5, 119:8, 119:20, 119:22,

120:1, 120:3, 120:6, 120:9, 120:11, 120:13, 120:25, 121:24, 124:24, 125:19, 125:20, 125:22, 126:3, 126:4, 126:8, 126:12, 126:13, 126:15, 127:23, 128:2, 128:4, 128:10, 128:12, 128:14, 128:20, 128:25, 129:11, 129:14, 129:22, 129:25, 130:6, 130:8, 130:11, 130:12, 130:19, 130:21, 131:1, 131:16, 131:20, 131:21, 131:23, 132:17, 133:4, 133:17, 133:20, 133:22, 134:8, 134:17, 134:21, 135:5, 135:10, 135:15, 135:21, 135:24, 136:4, 136:11, 136:13, 136:16, 136:19, 136:20, 137:3, 137:8, 137:13, 137:21, 138:22, 139:8, 139:14, 139:15, 139:22, 140:6, 140:9, 140:12, 140:22, 141:1, 141:5, 141:8, 141:13, 141:16, 141:20, 141:25, 142:2, 142:4, 142:8, 142:10, 142:11, 142:12, 142:16, 142:19, 142:21, 142:25, 143:3, 143:5, 143:7, 143:9, 143:11, 143:13, 143:17, 143:19, 143:22, 144:1, 145:7, 146:11, 146:23, 146:24, 147:5, 147:11, 147:22, 147:24, 148:4, 148:5, 148:7, 148:9, 148:10, 148:14
**multiple** [1] - 46:4
**must** [4] - 22:6, 71:14, 132:4, 133:14
**mystery** [1] - 35:24

# N

**name** [7] - 3:14, 28:14, 39:16, 39:17, 40:3, 63:18, 77:20
**named** [1] - 36:1
**names** [1] - 7:16
**necessarily** [4] - 59:20, 82:5, 135:10, 146:7
**necessary** [4] - 21:14, 70:3, 138:5, 140:8
**need** [27] - 12:25, 22:13, 22:17, 24:20, 25:2, 29:8, 40:16, 44:19, 68:7, 69:2, 72:13, 74:7, 83:20, 93:6, 96:13, 96:14, 109:17, 109:18, 110:10, 111:5, 119:14, 124:15, 130:2, 137:8, 137:14, 137:15, 146:1
**needed** [1] - 96:2
**needs** [4] - 24:1, 46:15, 91:8, 103:16
**negotiable** [1] - 119:2
**negotiate** [1] - 5:9
**negotiations** [1] - 53:15
**neutral** [1] - 55:8
**never** [8] - 40:10, 47:15, 54:21, 93:24, 115:4, 129:7, 130:22, 143:5
**New** [1] - 57:25
**new** [9] - 27:7, 40:22, 42:7, 44:4, 69:7, 69:9, 69:10, 81:22, 86:24
**next** [8] - 7:2, 32:23, 34:7, 54:7, 94:8, 107:13, 125:10, 129:17
**nice** [5] - 26:8, 26:9, 58:11, 58:15, 63:13
**night** [4] - 13:8, 51:5, 60:17, 137:25
**NO** [1] - 1:3
**nonassignability** [1] - 82:25
**nonassignable** [3] - 53:16, 86:10, 127:2
**nonbreaching** [2] - 101:23, 101:25
**noncompete** [2] - 83:11, 84:16
**none** [4] - 38:2, 49:9, 59:9, 66:23

**nonetheless** [1] - 145:10
**nonshareholder** [1] - 117:2
**normal** [1] - 62:17
**normally** [1] - 3:22
**North** [73] - 10:7, 10:22, 21:18, 21:21, 21:23, 21:25, 22:7, 22:11, 22:22, 24:9, 24:19, 25:19, 31:22, 31:25, 32:1, 32:4, 32:13, 34:15, 35:16, 35:18, 35:23, 36:15, 38:12, 39:14, 39:15, 39:25, 40:3, 40:4, 40:18, 41:2, 46:5, 50:25, 51:2, 52:9, 52:24, 54:16, 55:12, 55:20, 61:13, 68:15, 72:4, 77:20, 79:11, 79:12, 79:14, 79:16, 79:17, 80:25, 88:19, 88:21, 88:22, 88:24, 88:25, 109:7, 114:24, 115:1, 115:6, 118:3, 118:6, 118:10, 120:7, 120:14, 120:15, 120:17, 120:21, 121:2, 121:4, 121:5, 121:21
**Notary** [1] - 149:7
**notary** [1] - 42:5
**note** [57] - 8:2, 18:15, 18:21, 18:24, 25:14, 29:17, 30:10, 30:12, 32:15, 34:25, 36:15, 38:5, 40:11, 40:19, 43:25, 49:17, 51:21, 52:9, 52:12, 52:14, 54:11, 54:22, 55:4, 68:3, 72:8, 72:10, 72:25, 73:10, 73:25, 74:2, 75:23, 76:23, 82:13, 84:8, 100:4, 107:9, 111:5, 111:19, 111:20, 112:3, 112:11, 112:12, 121:6, 123:8, 123:23, 125:16, 125:25, 126:6, 127:2, 128:15, 133:6, 133:9, 138:24, 139:1, 146:3
**noted** [2] - 27:14, 71:11
**notes** [7] - 18:16, 30:1, 76:9, 120:12,

121:2, 121:4, 149:10
**nothing** [12] - 3:13, 25:21, 26:1, 26:25, 27:7, 27:20, 50:19, 59:24, 59:25, 81:5, 92:6, 136:24
**notice** [10] - 16:5, 16:6, 16:7, 16:10, 35:6, 35:12, 38:23, 39:20, 46:24, 47:1
**notify** [1] - 87:12
**notifying** [1] - 87:17
**novel** [1] - 11:21
**number** [6] - 13:13, 15:5, 15:6, 48:9, 66:1, 136:8

# O

**oath** [3] - 42:22, 60:13, 60:15
**object** [3] - 70:23, 87:18, 145:8
**objection** [1] - 126:3
**objections** [1] - 140:21
**obligated** [2] - 64:25, 68:2
**obligation** [28] - 32:21, 35:18, 45:23, 50:3, 50:4, 53:15, 65:12, 65:13, 66:16, 67:2, 82:14, 83:12, 96:1, 96:2, 98:10, 101:1, 101:4, 102:5, 103:15, 103:18, 108:1, 108:10, 114:21, 118:24, 131:3, 132:22, 132:24, 145:25
**obligation's** [1] - 112:24
**obligations** [10] - 17:25, 59:22, 82:25, 84:7, 84:15, 98:19, 101:20, 108:4, 132:3, 135:3
**obvious** [3] - 77:21, 95:21, 126:21
**obviously** [5] - 6:23, 13:16, 107:2, 111:7, 129:22
**occasion** [1] - 39:13
**occur** [3] - 77:18, 107:25, 108:9
**occurred** [2] - 52:19, 118:2, 127:7
**occurring** [2] - 19:15, 64:23
**October** [1] - 108:14

**Odessa** [4] - 57:13, 57:14, 57:21, 63:14
**OF** [4] - 1:1, 1:22, 149:2, 149:3
**offered** [1] - 74:14
**office** [8] - 18:23, 73:4, 73:12, 83:5, 83:6, 83:7, 107:13, 139:3
**officer** [3] - 76:6, 121:13, 121:14
**Oleksandr** [4] - 32:7, 36:4, 57:15, 57:19
**once** [7] - 9:13, 21:19, 22:25, 56:20, 57:17, 57:18, 66:21
**one** [56] - 6:2, 9:8, 12:17, 13:13, 15:5, 18:19, 32:6, 32:24, 33:3, 34:12, 35:11, 38:10, 38:19, 38:20, 39:1, 41:10, 42:7, 42:9, 48:9, 52:20, 53:13, 60:3, 63:4, 66:1, 68:1, 68:5, 69:24, 72:3, 74:4, 79:13, 83:16, 88:23, 92:10, 94:13, 94:16, 94:19, 95:11, 95:15, 103:23, 107:24, 108:8, 108:19, 109:4, 111:5, 111:17, 115:1, 122:15, 123:2, 126:9, 129:17, 131:22, 141:12, 142:18
**ones** [3] - 86:25, 106:8, 124:22
**open** [7] - 27:19, 28:1, 44:4, 51:5, 51:7, 55:14, 114:10
**Operations** [2] - 65:8, 75:1
**opinion** [2] - 110:4, 144:2
**opposite** [2] - 75:11, 132:17
**opposition** [1] - 43:5
**option** [3] - 15:14, 58:7, 58:9
**order** [41] - 3:3, 49:2, 58:22, 61:3, 61:17, 105:4, 105:5, 105:19, 106:3, 106:12, 106:17, 107:6, 107:18, 107:20, 116:21, 117:19, 117:20, 119:5, 119:12,

128:16, 128:25, 129:6, 130:9, 140:15, 140:16, 141:1, 142:1, 142:2, 142:12, 142:15, 142:16, 143:9, 143:12, 143:14, 143:15, 143:16, 144:3, 144:5, 147:14, 147:18
**ordered** [3] - 37:25, 102:25, 139:5
**orderly** [2] - 78:4, 78:22
**orders** [3] - 106:15, 144:9
**ore** [2] - 81:9, 100:22
**original** [23] - 8:2, 18:14, 18:21, 18:23, 18:24, 30:9, 51:21, 54:11, 55:3, 73:10, 73:25, 82:12, 100:3, 111:15, 121:6, 125:17, 125:19, 125:20, 125:25, 133:6, 138:24, 138:25, 145:15
**originally** [3] - 9:7, 50:2, 53:1
**otherwise** [1] - 70:17
**ought** [2] - 42:20, 146:20
**outcome** [1] - 135:11
**owed** [6] - 35:18, 66:7, 66:13, 66:18, 82:11, 106:22
**owes** [1] - 106:25
**own** [2] - 22:2, 67:8
**owned** [4] - 9:3, 9:23, 61:12, 68:19
**owner** [5] - 10:9, 11:12, 14:19, 15:4, 24:15
**ownership** [2] - 12:20, 68:22
**owns** [8] - 10:5, 12:11, 12:13, 40:19, 64:24, 83:15, 88:25, 121:21

# P

**P.A** [2] - 2:2, 2:6
**P.L** [1] - 2:4
**page** [1] - 123:24
**pages** [1] - 32:19
**paid** [25] - 11:10, 18:15, 30:12, 46:1, 46:6, 66:22, 67:15, 100:25, 103:16, 105:1, 107:14,

111:25, 118:25, 126:15, 126:18, 127:8, 129:10, 133:7, 136:2, 136:4, 146:4, 146:5, 146:7, 148:11
**PALADIN** [1] - 2:7
**Paladin** [2] - 8:5, 8:8
**Palm** [1] - 137:22
**Panama** [1] - 127:19
**Panamanian** [5] - 32:1, 120:16, 120:21, 122:12, 122:17
**Pandora's** [1] - 44:5
**paper** [1] - 65:20
**papers** [3] - 71:2, 71:11, 85:3
**paperwork** [1] - 41:24
**paragraph** [1] - 101:16
**paragraphs** [1] - 60:8
**parent** [1] - 122:14
**parenthetical** [2] - 61:17, 61:20
**Paris** [1] - 57:25
**part** [8] - 33:8, 34:21, 93:7, 97:7, 99:10, 108:23, 108:24, 113:1
**partial** [7] - 18:14, 49:15, 51:19, 67:21, 82:10, 123:17, 133:10
**partially** [1] - 44:8
**participating** [1] - 89:17
**particularly** [1] - 138:8
**parties** [22] - 5:21, 9:19, 27:12, 27:22, 29:24, 57:5, 76:9, 89:6, 93:12, 94:22, 98:24, 122:8, 140:14, 145:4, 145:14, 145:25, 146:6, 146:8, 147:4, 148:15, 148:17, 149:13
**parties'** [1] - 149:14
**partner** [1] - 54:6
**party** [41] - 5:22, 7:6, 11:9, 11:16, 17:2, 21:24, 22:4, 22:8, 22:19, 22:23, 23:1, 25:2, 25:3, 25:10, 43:7, 46:4, 64:16, 64:24, 65:11, 65:13, 65:15, 66:3, 66:10, 69:12, 75:3, 85:25, 93:15, 94:20, 95:25, 99:18, 101:23,

101:24, 101:25, 103:15, 103:18, 103:25, 118:25, 121:15, 129:25, 145:9
**party's** [1] - 85:23
**pass** [1] - 143:7
**past** [3] - 75:16, 108:5
**patiently** [1] - 48:12
**pay** [25] - 4:4, 4:6, 5:16, 40:20, 43:14, 64:25, 65:3, 66:16, 68:2, 82:19, 90:20, 90:22, 90:24, 130:10, 132:4, 132:14, 134:24, 135:17, 143:8, 144:18, 144:22, 144:24, 145:24, 146:14
**paying** [7] - 3:6, 44:2, 62:8, 99:22, 101:4, 102:18, 118:24
**payment** [25] - 65:11, 65:13, 67:1, 96:1, 96:2, 98:19, 101:20, 102:4, 102:6, 103:15, 103:18, 103:23, 107:8, 107:9, 108:1, 108:9, 127:14, 128:22, 131:3, 132:22, 132:24, 136:6, 136:7, 141:17, 144:19
**payment's** [1] - 131:12
**payments** [30] - 39:12, 39:24, 43:3, 43:24, 46:7, 46:16, 50:17, 50:20, 74:16, 74:25, 77:19, 78:19, 93:17, 93:20, 100:20, 101:6, 102:11, 102:20, 103:24, 107:13, 107:15, 108:4, 108:5, 108:13, 109:2, 129:17, 132:14, 134:5, 138:13
**payor** [4] - 43:13, 75:3, 131:5, 131:6
**pending** [8] - 11:1, 26:21, 96:7, 102:13, 110:17, 111:10, 131:7, 134:18
**people** [6] - 4:4, 57:3, 69:20, 88:10, 89:11, 114:3
**per** [4] - 39:10, 39:12, 107:9, 128:15

**percent** [5] - 9:3, 14:19, 15:4, 15:25, 45:14
**perform** [7] - 37:11, 70:2, 98:12, 123:18, 131:18, 132:6, 132:13
**performance** [10] - 43:21, 43:22, 44:3, 44:8, 84:17, 101:25, 102:22, 102:24, 132:18, 135:13
**performing** [5] - 75:5, 82:15, 99:21, 134:15, 134:17
**perhaps** [3] - 29:18, 115:21, 138:6
**period** [1] - 9:25
**permanently** [2] - 44:10, 102:12
**permission** [2] - 65:1, 95:11
**permitted** [7] - 7:5, 11:2, 11:19, 25:8, 25:9, 37:25, 44:13
**permitting** [1] - 138:9
**person** [10] - 29:12, 52:4, 70:12, 93:16, 105:23, 119:2, 123:11, 123:13
**perspective** [2] - 12:3, 30:18
**PFISTER** [1] - 2:6
**Pfister** [1] - 8:4
**Phillips** [1] - 8:4
**PHILLIPS** [1] - 2:6
**phony** [1] - 139:11
**pick** [1] - 137:18
**picking** [1] - 135:7
**piece** [3] - 10:17, 10:18, 120:25
**Pinnace** [1] - 136:2
**Pinnacle** [134] - 7:22, 7:25, 9:4, 9:23, 10:12, 10:21, 11:24, 13:18, 13:19, 13:21, 14:12, 14:13, 14:20, 17:2, 17:8, 17:24, 18:13, 18:25, 24:14, 24:16, 26:15, 31:10, 31:13, 31:15, 31:18, 31:23, 33:1, 33:16, 33:20, 34:12, 35:15, 35:21, 36:1, 36:12, 36:21, 36:25, 38:12, 39:10, 39:18, 39:24, 40:2, 40:17, 40:25, 42:10, 42:18, 45:7, 45:15, 45:19, 46:6, 50:5, 50:10, 50:13,

50:23, 51:1, 51:2, 51:6, 51:7, 51:9, 51:18, 52:3, 52:13, 52:14, 54:14, 54:15, 54:16, 54:20, 55:2, 55:14, 55:18, 55:21, 56:2, 56:4, 61:5, 61:7, 61:8, 61:11, 61:14, 61:15, 66:16, 67:15, 70:5, 72:3, 77:17, 77:21, 79:12, 84:6, 88:7, 88:25, 89:12, 90:3, 90:4, 98:2, 99:7, 109:7, 112:12, 112:14, 112:17, 112:18, 112:19, 113:2, 114:16, 114:18, 114:25, 115:3, 115:7, 118:12, 118:13, 119:19, 119:22, 120:7, 120:13, 121:3, 121:7, 121:8, 121:21, 123:10, 125:12, 127:9, 127:10, 127:14, 127:17, 127:18, 128:5, 129:1, 129:8, 129:10, 129:12, 136:4, 138:20
**PINNACLE** [2] - 2:5, 2:10
**Pinnacle's** [1] - 101:18
**Pinnacles** [1] - 31:13
**place** [6] - 61:20, 91:4, 91:6, 115:4, 122:2, 127:20
**Plaintiff** [1] - 15:15
**plaintiff** [1] - 92:16
**Plaintiffs** [1] - 1:6
**plan** [1] - 139:6
**play** [1] - 45:22
**playing** [1] - 145:17
**pleading** [1] - 75:20
**pleased** [1] - 8:22
**pledge** [1] - 80:1
**plural** [1] - 3:8
**plus** [3] - 61:25, 78:2, 109:3
**POA** [1] - 90:12
**pocket** [1] - 97:22
**point** [24] - 6:2, 12:5, 21:15, 27:17, 34:11, 38:10, 39:8, 41:14, 56:13, 59:10, 64:10, 69:24, 71:12, 87:9, 88:17, 95:15, 97:3, 101:10, 113:24,

124:9, 146:2, 147:6, 147:13
**pointed** [8] - 45:18, 70:12, 76:5, 77:15, 81:19, 91:14, 96:15, 108:3
**pointing** [2] - 41:25, 96:17
**points** [6] - 53:14, 62:4, 67:14, 74:24, 97:16, 130:24
**pony** [1] - 43:10
**pooh** [2] - 110:15
**pooh-pooh** [1] - 110:15
**poor** [1] - 94:23
**portion** [2] - 9:22, 109:6
**position** [6] - 5:8, 19:17, 68:14, 68:23, 113:3, 129:18
**possess** [1] - 31:23
**possessed** [2] - 47:7, 79:23
**possession** [3] - 8:2, 61:6, 61:11
**post** [1] - 23:9
**post-judgment** [1] - 23:9
**postpone** [1] - 41:17
**Power** [1] - 118:16
**power** [24] - 36:3, 36:5, 36:6, 36:7, 36:8, 36:9, 36:17, 36:19, 37:10, 41:4, 42:2, 42:4, 42:7, 47:11, 54:8, 54:9, 69:22, 69:25, 70:1, 70:12, 76:17, 118:15, 120:23, 123:17
**powers** [3] - 53:22, 76:10, 94:24
**precedes** [1] - 35:7
**prejudgment** [6] - 43:9, 63:15, 63:21, 64:4, 134:22, 134:23
**prejudice** [2] - 137:4, 137:5
**prejudiced** [6] - 78:5, 96:12, 97:20, 97:23, 100:10, 102:15
**prejudicial** [1] - 98:6
**prepare** [1] - 16:12, 137:9
**prepared** [1] - 46:15
**present** [2] - 42:23, 138:20
**presented** [2] - 77:11, 81:18

presently [1] - 5:21
preserve [2] - 93:12, 145:10
president [15] - 36:12, 36:21, 36:25, 37:4, 37:6, 37:8, 37:9, 37:12, 37:16, 37:20, 47:13, 115:9, 115:25, 123:19
presidents [2] - 116:1, 116:7
presiding [1] - 13:16
presuming [1] - 123:19
pretty [3] - 42:23, 57:22, 140:5
prevailing [1] - 103:25
prevent [2] - 25:16, 73:22
preventing [1] - 26:1
previous [1] - -105:4
previously [1] - 94:3
prima [1] - 56:15
priority [1] - 27:15
private [1] - 60:2
problem [9] - 22:6, 52:8, 71:21, 72:6, 85:12, 111:20, 122:7, 139:10, 141:22
problems [3] - 94:21, 106:5, 140:20
procedere [1] - 146:21
procedural [3] - 11:15, 11:25, 23:4
procedurally [3] - 11:13, 13:11, 16:15
procedure [5] - 97:15, 98:23, 113:9, 113:10, 144:21
proceed [4] - 21:11, 29:19, 79:7, 137:17
proceeding [10] - 11:5, 12:8, 12:16, 15:11, 21:21, 21:22, 24:21, 46:25, 47:5, 52:22
PROCEEDINGS [1] - 1:23
proceedings [8] - 3:1, 16:18, 16:20, 16:24, 23:9, 81:3, 148:22, 149:9
proceeds [6] - 11:21, 15:21, 24:3, 48:6, 55:10, 134:4
process [1] - 90:25
produce [2] - 46:19, 78:25
produced [2] - 32:10,

117:20
production [2] - 77:7, 113:7
proffering [1] - 42:20
promises [1] - 75:14
promissory [1] - 8:2
pronounce [1] - 28:15
pronouncing [1] - 96:4
proof [1] - 14:6
proper [13] - 24:22, 41:3, 54:24, 54:25, 65:14, 80:21, 80:23, 81:11, 89:25, 96:5, 114:9, 123:1, 124:6
properly [11] - 40:17, 54:4, 54:16, 73:20, 110:10, 110:22, 110:25, 112:23, 117:1, 127:16, 127:17
property [2] - 69:23, 70:8
proposed [1] - 8:5
propriety [2] - 11:5, 55:20
protect [3] - 43:11, 93:14, 113:13
protected [6] - 13:3, 53:25, 54:2, 118:25, 119:7, 123:12
protecting [1] - 44:1
protection [4] - 46:8, 113:6, 113:23, 116:15
protects [1] - 44:7
prove [4] - 83:2, 96:16, 110:18, 127:12
provide [5] - 49:15, 51:20, 116:11, 116:19, 125:9
provided [6] - 38:3, 38:8, 56:13, 63:20, 67:22, 126:24
provides [1] - 132:7
provision [1] - 103:25
prudent [1] - 13:2
public [1] - 39:17
Public [1] - 149:7
punished [1] - 58:20
purely [1] - 11:25
purported [2] - 49:13, 62:6
purportedly [2] - 34:15, 35:21
purports [2] - 33:8, 124:13
purpose [5] - 12:9, 66:6, 66:8, 66:13,

125:23
purposes [10] - 45:7, 51:3, 60:12, 67:8, 67:11, 71:3, 139:22, 140:12, 143:18, 145:19
pursue [4] - 50:16, 55:25, 56:9, 134:10
pursued [1] - 56:2
pursuing [3] - 29:15, 50:15, 52:22
put [69] - 24:6, 40:14, 40:15, 40:21, 40:24, 43:1, 43:8, 43:13, 44:6, 44:14, 45:2, 46:8, 46:18, 48:3, 52:11, 59:18, 59:19, 65:1, 65:14, 65:15, 66:4, 68:3, 72:5, 75:5, 75:9, 80:10, 85:3, 86:5, 88:7, 92:14, 95:2, 95:5, 95:22, 96:6, 96:9, 96:10, 97:16, 99:4, 102:19, 102:20, 103:17, 104:6, 104:7, 108:22, 109:9, 110:12, 110:13, 110:23, 110:25, 115:2, 115:22, 115:25, 118:2, 122:4, 122:24, 122:25, 124:4, 124:6, 124:7, 124:10, 124:12, 127:24, 131:13, 132:25, 133:25, 147:18
Put [1] - 47:16
puts [1] - 24:7
putting [7] - 27:1, 43:5, 93:21, 102:24, 124:5, 131:5, 134:18

Q

questionable [8] - 32:19, 40:1, 42:12, 53:22, 75:25, 76:6, 76:10, 77:4
questions [1] - 138:4
quickly [3] - 103:22, 111:10, 138:8
quite [8] - 14:24, 27:16, 66:15, 70:11, 74:12, 97:23, 100:25, 113:3
quo [1] - 93:13
quoted [1] - 101:22

R

race [1] - 93:13
raise [3] - 6:2, 6:3, 59:10
raised [6] - 19:9, 41:14, 60:2, 62:4, 63:4, 139:18
raises [1] - 147:5
ran [1] - 5:16
rate [3] - 3:6, 4:15, 5:3, 5:5, 5:9, 5:12, 6:25, 7:1
rather [2] - 102:23, 138:7
reach [2] - 89:4, 90:9
reached [1] - 41:13
reaction [1] - 94:4
read [7] - 4:5, 4:7, 7:10, 17:18, 25:13, 57:24, 65:21, 65:24, 82:21, 103:6, 106:17, 142:20, 142:22
reading [2] - 126:9, 142:23
reads [3] - 76:12, 101:17, 102:3
ready [1] - 74:15
reaffirm [1] - 32:21
real [7] - 33:9, 33:10, 45:11, 54:6, 88:10, 89:11, 98:25
reality [1] - 90:7
realized [1] - 20:14
really [22] - 20:7, 20:19, 20:24, 45:9, 47:6, 48:23, 50:25, 51:22, 56:3, 56:6, 59:5, 62:3, 62:11, 73:9, 74:13, 81:2, 85:20, 90:15, 91:1, 100:9, 115:4, 134:6
reason [17] - 14:5, 14:11, 28:6, 68:8, 70:11, 73:3, 73:9, 73:17, 84:14, 87:18, 88:20, 98:20, 105:20, 120:15, 126:25, 147:17, 148:1
reasonable [7] - 69:3, 84:20, 85:17, 86:2, 86:4, 87:21, 116:23
reasonably [1] - 87:15
reasons [7] - 12:17, 49:6, 53:1, 95:8, 95:9, 147:15, 148:19
reassign [1] - 89:13, 90:3

recalculate [1] - 8:16
receive [2] - 56:7, 147:2
received [4] - 12:24, 38:24, 46:24, 107:12
receiving [1] - 24:17, 55:3
recently [1] - 57:24, 100:14
recitation [1] - 21:3
recognition [1] - 11:4
recommend [1] - 143:15
recommendation [1] - 144:6
recommendations [1] - 144:9
recommended [1] - 143:14
reconsideration [2] - 9:10, 105:2
record [21] - 39:17, 40:22, 48:11, 86:24, 116:17, 123:3, 125:23, 126:4, 141:3, 141:9, 141:14, 143:22, 144:2, 145:1, 147:16, 147:18, 148:8, 148:9, 148:13, 148:19, 149:10
record) [2] - 141:23, 143:25
recorded [5] - 32:16, 39:4, 47:20, 80:6, 86:22
records [3] - 33:11, 113:7, 114:23
recover [1] - 3:24
redirect [1] - 48:13
redo [1] - 58:3
reference [1] - 146:3
referral [5] - 6:7, 6:18, 145:15
referred [1] - 6:4
referring [1] - 129:3
reflect [1] - 106:15
refusal [2] - 85:14, 85:15
refuse [2] - 54:12, 85:16
refused [3] - 30:9, 41:19, 54:21
refuses [1] - 14:5
regard [2] - 8:7, 145:12
regarding [7] - 14:9, 62:4, 107:23, 117:23, 117:25,

135:24, 141:16
**regards** [2] - 19:18, 139:18
**registered** [1] - 39:16
**registry** [48] - 3:17, 17:16, 17:20, 20:12, 20:19, 20:21, 43:3, 43:6, 43:8, 43:14, 44:6, 44:15, 46:9, 46:18, 48:1, 48:4, 48:21, 65:2, 65:14, 65:16, 75:6, 75:10, 78:6, 78:13, 80:11, 95:3, 95:5, 95:23, 96:6, 99:4, 102:9, 102:20, 102:25, 103:17, 104:8, 105:7, 106:23, 107:9, 107:14, 107:16, 127:24, 131:5, 131:13, 133:1, 134:1, 134:18, 135:23, 138:14
**rehash** [1] - 74:23
**reinforcing** [1] - 131:2
**rejection** [1] - 87:23
**related** [3] - 27:13, 89:23, 109:22
**relation** [1] - 27:3
**relationships** [1] - 31:7
**relative** [2] - 149:12, 149:13
**release** [22] - 18:14, 30:6, 40:12, 49:15, 51:19, 54:2, 54:3, 54:25, 67:22, 68:7, 69:5, 69:7, 69:16, 70:22, 74:4, 82:10, 82:18, 83:13, 83:18, 100:2, 111:11, 133:10
**released** [6] - 98:1, 100:14, 100:16, 100:19, 101:19, 102:4
**relevant** [2] - 65:17, 66:5
**relief** [5] - 64:21, 81:22, 95:18, 102:10, 103:4
**rely** [2] - 57:5
**remedies** [1] - 109:13
**remedy** [6] - 15:12, 23:4, 58:6, 58:20, 131:23, 132:8
**remember** [2] - 25:23, 38:16
**remove** [1] - 116:3

**removed** [2] - 116:8, 116:9
**renewed** [1] - 137:6
**reopen** [1] - 26:24
**repeat** [2] - 47:24, 129:19
**repeated** [1] - 48:18
**repeats** [1] - 130:23
**reply** [1] - 105:19
**repo** [1] - 80:1
**report** [2] - 144:5, 149:8
**Reporter** [2] - 149:6, 149:22
**REPORTER** [3] - 141:15, 141:19, 143:23
**REPORTER'S** [1] - 149:1
**represent** [4] - 3:15, 31:12, 37:18, 44:19
**representations** [5] - 13:10, 14:2, 72:20, 72:22, 101:13
**representative** [4] - 18:25, 54:14, 54:15, 123:9
**represented** [2] - 63:7, 121:11
**representing** [1] - 60:14
**represents** [4] - 61:24, 108:12, 121:19
**request** [9] - 11:25, 43:1, 46:19, 77:7, 121:23, 124:3, 138:2, 138:14, 147:14
**requested** [1] - 117:5
**requests** [1] - 119:4
**required** [3] - 43:7, 50:2, 104:25
**requirements** [3] - 20:17, 127:5, 139:19
**requires** [8] - 50:1, 61:17, 61:18, 83:17, 84:13, 103:4, 134:2, 138:17
**requiring** [1] - 138:9
**requisite** [1] - 70:3
**rescind** [2] - 98:14, 135:5, 135:13
**research** [2] - 37:19, 55:23
**reserved** [1] - 137:6
**resolution** [11] - 37:14, 76:19, 112:21, 114:7, 121:14, 123:11, 123:13, 123:25,

125:10, 125:15
**resolutions** [12] - 36:23, 47:11, 47:12, 79:2, 115:18, 116:8, 117:1, 117:3, 118:21, 119:9, 119:11, 119:12
**resolve** [4] - 11:23, 92:23, 109:16, 132:10
**resolved** [5] - 27:6, 55:6, 103:24, 104:3, 113:20
**respect** [10] - 12:13, 12:18, 21:7, 21:22, 29:25, 55:5, 66:23, 104:14, 110:5, 129:22
**respectfully** [6] - 49:8, 64:3, 64:12, 66:19, 107:2, 114:20
**respond** [6] - 13:9, 13:12, 18:22, 46:19, 67:10, 74:2
**responded** [2] - 73:2, 73:6
**response** [7] - 23:10, 43:18, 69:13, 72:13, 73:8, 73:11, 138:15
**restated** [1] - 34:6
**result** [5] - 8:17, 65:15, 78:20, 87:6, 107:19
**return** [9] - 18:14, 30:9, 30:13, 46:11, 49:16, 49:18, 54:7, 89:12, 100:3
**returned** [9] - 20:21, 40:11, 54:20, 102:25, 105:11, 108:21, 109:5, 128:17, 129:6
**returning** [2] - 112:10, 137:24
**returns** [2] - 34:5, 137:25
**reversed** [4] - 8:15, 20:18, 23:21, 64:19
**Reyes** [68] - 3:15, 6:24, 7:17, 16:7, 17:22, 18:21, 19:9, 20:22, 29:2, 29:3, 41:12, 41:18, 48:12, 48:17, 49:17, 49:23, 49:25, 50:18, 51:10, 51:24, 56:13, 59:10, 60:2, 60:18, 60:19, 62:2, 62:4, 66:14, 66:20, 67:13, 72:9, 72:24, 80:17, 81:5,

81:25, 88:16, 89:15, 89:20, 90:6, 90:21, 94:9, 94:12, 94:14, 95:6, 97:16, 98:2, 105:6, 105:20, 106:2, 106:19, 109:19, 111:18, 116:12, 119:11, 119:14, 119:15, 121:1, 122:23, 124:4, 125:3, 125:6, 125:19, 130:13, 134:12, 136:1, 136:5, 139:4, 143:8
**reyes** [1] - 60:16
**REYES** [113] - 2:2, 2:2, 3:14, 4:14, 4:18, 4:21, 4:25, 5:19, 7:17, 12:2, 12:5, 17:15, 19:24, 20:4, 21:1, 21:7, 28:17, 29:4, 29:7, 29:21, 30:11, 31:5, 41:20, 51:25, 52:7, 52:9, 52:14, 52:17, 52:20, 53:4, 53:7, 53:12, 53:19, 55:17, 60:9, 60:13, 61:1, 62:25, 64:16, 72:15, 72:20, 74:22, 82:21, 82:24, 85:19, 86:8, 86:13, 86:18, 88:22, 95:15, 101:9, 107:5, 107:8, 108:11, 108:16, 109:2, 109:12, 109:24, 110:4, 111:21, 112:8, 112:12, 115:13, 117:4, 117:8, 117:12, 117:15, 117:19, 118:5, 119:22, 120:1, 121:24, 125:20, 126:4, 126:8, 126:15, 127:23, 128:10, 128:14, 128:20, 129:25, 130:6, 130:11, 130:21, 131:1, 131:20, 132:17, 133:17, 133:22, 134:17, 135:10, 136:13, 137:8, 137:21, 139:8, 139:14, 140:6, 140:9, 141:5, 141:8, 142:2, 142:11, 142:16, 142:19, 143:5, 143:9, 146:11, 146:23, 147:5, 147:11,

147:24, 148:4, 148:14
**Reyes'** [20] - 15:1, 17:13, 17:21, 18:12, 19:3, 49:9, 50:9, 57:18, 61:22, 62:3, 73:11, 90:4, 94:12, 105:17, 106:4, 106:8, 108:2, 121:22, 126:25, 129:7
**RICARDO** [1] - 2:2
**Richard** [1] - 1:16
**Rick** [2] - 3:14, 7:17
**ridiculous** [1] - 110:3
**rightfully** [1] - 67:14
**rights** [4] - 10:2, 11:20, 114:1, 144:6
**rises** [1] - 80:6
**risk** [1] - 43:24
**RODION** [1] - 1:5
**Rodion** [1] - 28:14
**role** [1] - 145:18
**roughly** [1] - 9:24
**roundabout** [1] - 54:23
**routinely** [1] - 11:18
**RUBEN** [1] - 2:6
**Ruben** [1] - 8:4
**Rule** [3] - 10:25, 25:6, 44:14
**rule** [10] - 9:16, 9:18, 24:5, 97:19, 103:8, 125:2, 126:19, 131:8, 133:2, 137:1
**ruled** [5] - 22:7, 62:12, 94:2, 96:5, 141:7
**rules** [5] - 10:24, 111:13, 142:6, 144:9, 145:12
**ruling** [8] - 62:13, 131:7, 133:2, 134:19, 141:2, 141:8, 144:19, 144:20
**run** [2] - 37:21, 63:13
**runs** [1] - 115:10

## S

**safe** [2] - 45:22, 45:23
**sake** [2] - 70:20, 113:23
**salary** [1] - 92:14
**sat** [1] - 48:12
**satisfied** [3] - 19:2, 20:17, 111:25
**satisfy** [3] - 18:22, 111:18, 122:5
**Sayre** [15] - 7:21,

16:11, 21:25, 22:2,
22:15, 41:10, 46:12,
54:13, 58:11, 66:15,
92:11, 94:9, 105:8,
106:1, 112:16
**SAYRE** [99] - 2:4, 3:9,
4:10, 4:23, 6:2, 6:21,
7:21, 12:4, 13:6,
16:17, 17:2, 17:5,
17:9, 17:12, 17:17,
17:19, 18:7, 18:10,
20:2, 20:6, 22:21,
23:5, 24:23, 25:12,
41:12, 48:9, 50:8,
50:23, 55:14, 58:22,
59:1, 60:11, 60:15,
61:2, 62:21, 73:5,
73:11, 80:15, 82:23,
87:14, 87:23, 88:1,
88:4, 88:19, 88:25,
89:2, 100:12,
105:13, 106:6,
106:12, 106:18,
107:7, 107:23,
109:15, 110:3,
111:6, 119:8,
119:20, 120:6,
120:11, 120:25,
124:24, 126:3,
126:12, 128:2,
128:4, 128:12,
128:25, 129:11,
129:14, 129:22,
130:8, 130:12,
130:19, 133:20,
134:8, 134:21,
135:5, 135:15,
135:21, 137:3,
138:22, 139:15,
139:22, 140:12,
140:22, 141:1,
141:13, 141:16,
141:20, 141:25,
142:12, 142:25,
143:3, 143:7,
143:11, 147:22,
148:7, 148:10
**scenario** [7] - 34:21,
40:7, 43:16, 65:4,
65:11, 77:11, 100:6
**schedule** [9] - 138:7,
139:15, 139:17,
139:23, 140:1,
140:4, 141:11,
148:16, 148:17
**scheduling** [1] - 141:6
**seat** [1] - 94:14
**second** [1] - 20:25
**seconds** [4] - 80:15,
81:18, 120:15,

134:22
**secretary** [3] - 37:2,
42:17, 115:15
**secured** [1] - 34:22
**security** [4] - 10:14,
30:1, 32:25, 39:3
**see** [35] - 16:16, 27:19,
31:21, 33:6, 71:8,
79:1, 79:2, 92:13,
93:24, 100:5, 100:7,
111:1, 111:19,
112:21, 114:8,
114:17, 116:10,
116:25, 119:8,
119:11, 119:14,
122:2, 124:14,
124:15, 125:14,
129:20, 129:23,
130:5, 134:8,
138:12, 140:6,
140:9, 141:22,
142:10
**seek** [10] - 3:23, 10:22,
98:9, 98:14, 98:15,
98:22, 131:16,
132:8, 132:12
**seeking** [8] - 5:22,
10:1, 10:16, 101:14,
103:4, 134:9, 145:1,
145:2
**seem** [1] - 48:22
**sees** [3] - 40:2, 119:13
**sell** [2] - 31:1
**send** [4] - 46:15, 50:5,
58:14, 92:15
**sending** [2] - 50:10,
52:2
**sends** [1] - 143:4
**Senior** [2] - 1:16,
144:13
**senior** [14] - 3:19, 5:4,
5:15, 5:17, 143:21,
144:22, 144:23,
145:15, 145:16,
145:20, 145:24,
146:10, 146:15,
148:18
**sense** [3] - 70:17,
102:23, 103:13
**sent** [19] - 6:18, 35:11,
39:21, 52:2, 60:16,
69:5, 69:6, 72:10,
83:18, 106:9,
108:18, 108:22,
108:25, 109:1,
112:3, 112:5,
128:21, 128:23,
135:25
**sentence** [2] - 68:5,
74:4

**separately** [1] - 146:6
**September** [2] -
108:13, 108:14
**serve** [1] - 77:6
**served** [3] - 16:5, 16:7,
138:14
**services** [2] - 144:23,
145:3
**set** [20] - 5:3, 6:13,
10:22, 13:8, 21:16,
22:13, 24:8, 26:12,
27:21, 110:15,
110:17, 120:16,
122:10, 122:15,
125:1, 138:7,
139:15, 139:23,
140:1, 148:16
**sets** [1] - 104:8
**setting** [1] - 139:17
**settled** [6] - 9:20,
26:14, 26:20, 26:22,
28:2, 89:6
**settlement** [82] - 7:20,
9:21, 9:22, 10:17,
10:18, 11:10, 11:21,
12:21, 15:2, 15:21,
17:14, 17:22, 17:23,
17:25, 19:10, 20:11,
23:3, 24:2, 24:3,
24:18, 26:17, 26:23,
28:23, 28:25, 29:1,
29:9, 29:22, 30:2,
30:5, 30:7, 30:13,
30:15, 32:22, 34:22,
39:11, 39:12, 40:8,
41:18, 42:16, 42:24,
48:5, 48:16, 48:20,
49:11, 49:14, 50:1,
50:4, 50:14, 50:15,
51:15, 53:13, 53:14,
59:23, 62:5, 62:18,
64:25, 69:12, 71:4,
80:22, 81:12, 83:12,
83:17, 83:25, 84:4,
84:7, 84:10, 84:11,
84:12, 84:16, 84:17,
87:3, 88:16, 95:24,
98:9, 101:17, 114:1,
121:15, 124:11,
135:8, 135:14
**settlements** [1] -
43:19
**seven** [3] - 29:17,
136:18, 148:11
**Sexton** [1] - 121:17
**SHALEK** [61] - 2:6,
2:7, 5:2, 5:11, 6:11,
6:16, 7:4, 7:11, 7:13,
8:3, 8:22, 9:6, 14:16,
14:23, 16:1, 16:25,

17:3, 17:7, 17:11,
18:4, 18:9, 21:14,
22:24, 23:19, 23:25,
24:7, 24:24, 25:2,
28:4, 28:13, 28:18,
28:24, 29:6, 55:16,
56:11, 57:23, 58:15,
87:22, 89:1, 92:9,
92:16, 95:4, 95:8,
101:8, 104:16,
104:24, 105:15,
106:10, 106:13,
108:25, 120:3,
126:13, 136:20,
142:4, 142:8,
142:21, 143:13,
143:19, 143:22,
144:1, 146:24
**Shalek** [28] - 8:3, 8:4,
12:6, 13:6, 13:10,
26:2, 26:10, 26:19,
41:9, 41:11, 41:19,
48:18, 49:1, 59:2,
63:6, 64:5, 64:17,
66:9, 67:6, 68:18,
78:8, 80:24, 101:10,
128:14, 135:25,
140:22, 145:7, 147:5
**Shalek's** [10] - 20:9,
20:20, 21:2, 23:5,
25:14, 41:16,
108:22, 128:6,
128:8, 129:5
**shalek's** [1] - 107:13
**shall** [1] - 11:4
**share** [1] - 80:5
**shareholder** [5] -
66:20, 76:19, 83:9,
114:11, 115:7
**shareholders** [2] -
113:8, 114:5
**shares** [33] - 12:10,
12:13, 15:1, 21:18,
23:2, 24:13, 24:15,
24:16, 26:13, 26:15,
27:2, 27:13, 27:21,
31:24, 35:15, 35:21,
46:21, 46:24, 47:3,
54:16, 55:13, 56:1,
61:8, 61:11, 61:12,
61:16, 61:19, 68:16,
68:20, 118:7, 122:18
**shield** [1] - 45:8
**shifts** [1] - 87:19
**SHIPPING** [1] - 2:7
**Shipping** [2] - 8:6, 8:9
**shoes** [1] - 145:16
**show** [13] - 30:23,
33:22, 35:3, 36:12,
47:9, 84:19, 86:2,

87:20, 110:5, 111:4,
122:8, 123:6, 139:11
**showed** [2] - 38:16,
38:19
**showing** [2] - 37:6,
46:20
**shown** [3] - 84:23,
87:1, 142:11
**shows** [1] - 36:24
**side** [4] - 83:5, 94:10,
94:12, 109:8
**sides** [1] - 85:15
**sign** [21] - 37:10,
68:24, 68:25, 70:18,
70:22, 72:11, 72:12,
83:19, 114:18,
114:25, 115:6,
119:16, 121:3,
121:5, 121:8,
121:10, 121:14,
121:15, 125:15,
138:25
**signatory** [1] - 42:15
**signature** [2] - 42:9,
127:9
**signed** [18] - 10:8,
24:19, 34:9, 35:25,
54:3, 54:4, 62:18,
69:20, 70:12, 72:1,
72:3, 74:15, 114:9,
124:12, 133:7,
133:9, 139:9, 144:3
**significant** [2] - 29:15,
64:18
**signing** [6] - 68:6,
69:11, 74:5, 113:2,
115:12, 121:20
**signs** [4] - 42:5, 42:9,
115:11, 123:13
**similar** [1] - 14:1
**SIMMONS** [1] - 2:9
**simple** [9] - 56:23,
70:11, 74:12, 74:17,
77:2, 97:2, 98:25,
120:14, 120:24
**simplest** [1] - 89:4
**simplify** [1] - 90:23
**simply** [2] - 27:9,
145:22
**single** [2] - 71:2,
141:25
**sit** [12] - 4:2, 4:3, 5:8,
86:19, 94:15, 99:5,
99:12, 100:21,
110:14, 110:17,
124:10, 124:11
**sitting** [7] - 5:15,
27:25, 94:8, 98:2,
114:23, 128:6,
144:16

**situation** [2] - 45:24, 84:5
**six** [3] - 31:3, 31:5, 32:16
**sleep** [1] - 51:5
**slightly** [1] - 98:6
**smart** [1] - 25:13
**smells** [1] - 94:4
**Smith** [5] - 7:23, 30:24, 33:19, 33:25, 45:10
**SMITH** [7] - 2:9, 7:23, 31:4, 73:7, 73:13, 125:19, 125:22
**SOKROVICHTCHOU K** [1] - 1:5
**Sokrovichtchouk** [2] - 28:17, 28:18
**sold** [1] - 14:21
**sole** [1] - 11:11
**solution** [1] - 116:23
**solved** [2] - 51:22, 91:2
**someone** [13] - 10:13, 14:25, 70:15, 70:18, 73:3, 73:23, 84:19, 97:21, 100:3, 114:11, 119:2, 122:14, 126:9
**sometimes** [1] - 140:13
**somewhere** [1] - 143:10
**sorry** [9] - 17:17, 20:7, 54:25, 62:22, 90:3, 92:2, 108:17, 125:21
**sort** [4] - 14:4, 28:2, 89:17, 90:9
**sorts** [1] - 71:5
**sought** [4] - 8:24, 12:20, 22:11, 110:8
**sounds** [9] - 8:20, 31:4, 80:19, 81:25, 82:2, 82:7, 82:13, 89:20, 89:23
**speaking** [1] - 117:9
**special** [3] - 144:17, 146:4, 146:7
**specific** [1] - 105:24
**specifically** [2] - 6:13, 105:21
**spelling** [1] - 32:8
**spent** [2] - 57:21, 142:23
**split** [4] - 3:23, 6:22, 7:5, 7:7
**spoken** [2] - 4:25, 97:8
**spot** [1] - 62:7
**SS** [1] - 149:3

**stake** [1] - 92:24
**stand** [2] - 53:23, 76:2
**standards** [1] - 84:25
**Star** [73] - 10:7, 10:22, 21:18, 21:21, 21:23, 21:25, 22:8, 22:11, 22:22, 24:9, 24:19, 25:19, 31:22, 31:25, 32:1, 32:4, 32:13, 34:15, 35:16, 35:18, 35:23, 36:15, 38:12, 39:14, 39:15, 39:25, 40:3, 40:4, 40:18, 41:2, 46:5, 51:1, 51:2, 52:9, 52:24, 54:17, 55:12, 55:13, 55:20, 61:13, 68:15, 72:4, 77:20, 79:11, 79:12, 79:14, 79:17, 80:25, 88:19, 88:21, 88:22, 88:24, 88:25, 109:7, 114:24, 115:1, 115:6, 118:3, 118:6, 118:11, 120:7, 120:14, 120:15, 120:17, 120:21, 121:2, 121:4, 121:5, 121:21
**start** [3] - 7:15, 13:7, 139:3
**started** [6] - 3:12, 42:25, 45:16, 51:12, 51:14, 104:7
**STATE** [1] - 149:2
**state** [9] - 11:19, 15:12, 16:22, 56:19, 62:14, 105:6, 105:8, 144:18
**statement** [4] - 46:22, 72:17, 79:11, 146:14
**states** [3] - 79:20, 86:22, 123:4
**stating** [5] - 9:2, 10:9, 15:3, 106:3, 147:14
**status** [2] - 93:13, 146:24
**Statute** [2] - 15:10, 113:6
**stenographic** [1] - 149:10
**stenographically** [1] - 149:8
**step** [1] - 143:11
**steps** [1] - 145:16
**sticks** [1] - 56:21
**still** [20] - 12:24, 37:1, 37:15, 39:23, 39:24, 42:17, 44:25, 55:11, 55:23, 56:9, 68:2, 69:1, 71:10, 85:17,

114:2, 114:23, 115:14, 119:3, 124:14, 143:16
**stock** [16] - 10:6, 10:10, 10:11, 10:13, 10:20, 10:21, 12:10, 12:11, 15:24, 24:19, 26:16, 61:5, 61:12, 61:16, 90:2
**stocks** [1] - 51:1
**stop** [7] - 43:24, 44:2, 82:15, 100:8, 101:25, 102:18, 134:14
**stopping** [1] - 25:21
**stops** [1] - 130:23
**story** [2] - 49:9, 57:2
**straightforward** [2] - 10:25, 134:7
**Street** [1] - 1:11
**street** [1] - 68:8
**strictly** [2] - 8:1, 118:16
**stripped** [1] - 84:6
**stuck** [1] - 118:19
**stuff** [5] - 48:17, 49:23, 50:18, 90:4, 90:12
**subjected** [1] - 29:13
**submit** [2] - 140:19, 140:20
**submitting** [1] - 57:4
**subordinate** [1] - 11:4
**subsidiary** [4] - 31:24, 32:3, 122:12, 122:14
**successful** [2] - 20:13, 134:13
**sucked** [2] - 93:17, 97:6
**sue** [3] - 15:17, 15:18, 80:25
**sued** [2] - 66:4, 94:12
**sufficient** [2] - 135:20, 147:21
**suggestion** [5] - 4:9, 5:18, 56:18, 113:5, 113:16
**suing** [6] - 29:14, 43:9, 78:3, 87:10, 114:3, 135:9
**suit** [1] - 135:7
**Sumter** [1] - 39:3
**Sunbiz** [8] - 31:17, 31:20, 37:1, 37:4, 42:17, 115:13, 115:21, 116:5
**Sunday** [3] - 44:24, 54:7, 137:25
**supplemental** [5] - 15:11, 21:21, 24:21,

52:22, 81:3
**supplementals** [1] - 81:1
**supplementary** [5] - 12:8, 16:18, 16:20, 16:24, 21:23
**suppose** [2] - 3:22, 5:21
**supposed** [1] - 11:9
**supposedly** [2] - 40:18, 42:3
**surplus** [1] - 47:4
**suspect** [1] - 30:18
**switching** [1] - 19:19
**system** [3] - 93:8, 145:23, 146:6

**T**

**tab** [2] - 32:23, 33:8
**tabbed** [2] - 32:18, 33:6
**tag** [1] - 63:2
**tax** [2] - 33:10, 34:4
**team** [1] - 63:2
**technical** [1] - 96:20
**temporarily** [2] - 44:9, 102:12
**tendered** [1] - 40:11
**tenus** [2] - 81:9, 100:22
**term** [1] - 4:8
**terms** [4] - 26:23, 84:1, 84:3, 133:8
**testified** [1] - 57:16
**testimony** [2] - 62:1, 127:12
**THE** [137] - 1:1, 2:3, 3:3, 3:11, 4:1, 4:12, 4:17, 4:20, 5:10, 5:14, 5:25, 6:9, 6:15, 7:2, 7:8, 7:12, 7:15, 8:20, 9:5, 12:1, 13:5, 14:15, 14:21, 15:25, 17:18, 18:6, 21:6, 21:12, 23:18, 23:24, 24:5, 25:1, 26:7, 28:12, 28:15, 28:22, 29:20, 30:10, 50:7, 50:22, 51:24, 52:1, 52:8, 52:11, 52:16, 52:18, 52:25, 53:6, 53:11, 53:18, 57:22, 58:14, 58:25, 62:19, 65:22, 68:11, 84:19, 85:4, 85:12, 85:20, 85:25, 86:12, 86:17, 87:11, 87:19, 87:25, 88:2, 88:18, 92:15, 94:25, 95:7, 95:13,

97:11, 104:22, 106:17, 107:21, 109:10, 111:19, 111:23, 112:11, 112:25, 114:15, 118:4, 119:18, 119:24, 125:9, 125:21, 126:1, 126:7, 126:11, 126:21, 127:25, 128:3, 128:18, 129:9, 129:13, 129:20, 130:3, 130:17, 130:25, 131:22, 135:2, 135:19, 135:22, 136:2, 136:9, 136:18, 136:22, 137:5, 137:11, 137:20, 138:19, 139:10, 139:21, 139:25, 140:7, 140:18, 140:24, 141:4, 141:7, 141:10, 141:22, 141:24, 142:7, 142:18, 142:23, 143:1, 143:16, 143:20, 143:24, 144:5, 146:22, 147:10, 147:21, 148:2, 148:20
**themselves** [1] - 76:11
**thereafter** [2] - 78:19, 148:17
**therefore** [3] - 97:17, 126:25, 145:24
**therein** [1] - 14:24
**thereupon** [1] - 3:1
**Thereupon** [1] - 148:21
**they've** [5] - 60:4, 74:19, 86:2, 98:8, 132:7
**thinks** [1] - 67:7
**Third** [1] - 65:7
**third** [3] - 66:3, 95:25, 96:3
**third-party** [1] - 66:3
**Thornton** [20] - 3:7, 3:18, 6:4, 6:12, 9:11, 28:5, 43:1, 101:3, 143:18, 144:8, 144:12, 145:6, 145:11, 145:17, 145:22, 146:2, 146:9, 146:13, 146:21, 147:12
**Thornton's** [2] - 6:19, 145:18

thoughts [1] - 139:16
thousands [1] - 98:5
three [24] - 5:23, 6:4, 6:22, 7:5, 8:10, 17:25, 18:12, 19:9, 19:10, 43:17, 49:12, 49:13, 51:15, 52:25, 60:8, 62:4, 62:6, 80:17, 80:18, 81:12, 81:13, 91:22, 95:24, 109:15
THREE [2] - 2:5, 2:10
Three [94] - 7:22, 9:4, 9:23, 10:12, 10:21, 11:24, 13:18, 13:19, 13:21, 14:12, 14:13, 14:20, 17:2, 17:8, 17:24, 18:13, 18:25, 24:16, 24:17, 26:15, 31:11, 31:13, 31:16, 31:18, 33:2, 33:16, 33:21, 34:12, 36:1, 36:25, 39:10, 39:18, 40:2, 50:6, 50:10, 50:13, 50:24, 51:2, 51:6, 51:7, 51:9, 51:18, 52:3, 52:13, 52:15, 54:20, 55:2, 55:15, 55:18, 55:21, 61:5, 61:7, 61:8, 61:12, 61:15, 66:17, 67:15, 70:6, 72:4, 77:17, 77:21, 88:7, 89:12, 90:3, 90:4, 98:2, 112:12, 112:14, 112:18, 112:19, 114:16, 114:19, 114:25, 119:19, 119:23, 120:7, 120:13, 121:3, 121:7, 121:8, 121:21, 123:10, 125:12, 127:9, 127:15, 127:18, 129:8, 129:10, 129:12, 136:3, 136:5
Three's [1] - 51:1
three-day [1] - 8:10
three-way [1] - 6:22, 7:5
throwing [2] - 63:7, 91:3
tie [2] - 94:4, 99:22
timeframe [1] - 136:6
timeline [2] - 67:18, 73:18
TOBIN [1] - 2:2
today [20] - 9:8, 11:14, 11:24, 25:11, 53:5, 67:10, 73:4, 76:2,

83:10, 86:19, 87:8, 94:19, 94:24, 110:14, 110:18, 112:14, 124:11, 125:1, 135:12, 139:22
today's [1] - 140:13
together [1] - 120:25
took [5] - 4:7, 9:15, 34:15, 51:1, 60:21
top [2] - 82:9, 90:22
topics [1] - 19:19
tough [2] - 142:19, 142:21
trade [1] - 5:9
transaction [7] - 47:15, 47:17, 52:23, 53:24, 75:25, 79:1, 86:25
TRANSCRIPT [1] - 1:22
transcript [2] - 140:17, 149:9
transfer [11] - 10:19, 10:20, 21:17, 22:14, 23:2, 24:8, 25:20, 26:13, 27:2, 46:3
transferred [1] - 24:15
transfers [2] - 12:19, 87:6
treating [1] - 102:1
trial [2] - 8:10, 140:3
tried [6] - 20:9, 20:11, 48:19, 82:1, 90:5, 90:7
tries [1] - 90:13
true [1] - 149:9
trumpet [3] - 56:24, 56:25, 57:1
trust [7] - 20:20, 46:14, 105:1, 108:23, 109:9, 128:6, 128:9
truth [3] - 3:9, 88:14, 106:18
try [8] - 64:8, 70:18, 82:3, 82:8, 99:24, 104:17, 107:22, 141:10
trying [39] - 16:22, 18:22, 20:1, 20:22, 20:25, 27:24, 39:11, 40:8, 40:10, 58:2, 58:18, 62:14, 66:10, 67:7, 73:22, 81:22, 82:13, 86:6, 89:3, 90:1, 90:2, 90:18, 90:23, 93:1, 93:3, 93:4, 93:5, 100:15, 113:25, 119:16,

119:17, 120:25, 121:7, 121:22, 124:21, 124:25, 134:25, 135:1, 144:20
Tsusho [1] - 101:22
turn [7] - 61:4, 73:24, 90:13, 107:1, 125:24, 134:23, 136:8
turning [4] - 12:10, 12:14, 124:18
turns [1] - 134:21
two [28] - 5:21, 7:7, 15:6, 27:24, 27:25, 31:2, 31:13, 31:25, 48:14, 69:6, 72:8, 73:24, 93:3, 98:1, 103:24, 108:5, 108:13, 109:2, 111:12, 111:14, 116:1, 116:7, 120:15, 126:20, 128:15, 137:18, 141:10, 142:23
two-and-a-half [1] - 31:2
two-way [1] - 7:7
types [1] - 92:23

### U

Ukraine [6] - 57:13, 57:14, 70:14, 70:19, 93:14
ultimately [3] - 8:14, 116:13, 134:13
unconstitutional [1] - 147:4
under [42] - 9:22, 10:25, 11:10, 15:10, 15:11, 17:25, 25:6, 28:10, 30:2, 40:20, 42:21, 50:3, 59:23, 60:13, 60:15, 64:15, 64:25, 65:15, 66:2, 68:2, 77:13, 80:10, 82:16, 84:7, 84:15, 95:22, 99:10, 99:15, 101:20, 102:3, 102:5, 102:16, 113:6, 123:20, 128:15, 129:5, 134:15, 135:3, 144:8, 147:1
underlying [4] - 7:19, 33:15, 47:19, 88:15
understood [1] - 138:22
undisputed [2] -

34:10, 83:23
undo [13] - 40:14, 41:4, 53:21, 56:18, 56:22, 58:3, 75:15, 86:21, 86:23, 86:25, 118:9, 123:2, 124:21
undone [1] - 62:6
unfair [3] - 87:25, 88:1, 118:23
unilateral [1] - 85:14
unique [1] - 11:22
unlocked [2] - 99:19, 100:23
unreasonable [3] - 89:18, 119:4, 124:3
unreasonably [6] - 71:13, 71:15, 71:21, 74:9, 85:2, 86:11
unrecord [1] - 86:24
unrecorded [2] - 32:17, 47:20
unring [1] - 45:3
unsecured [1] - 34:20
unwilling [1] - 49:18
unwind [4] - 24:21, 56:19, 58:19, 93:5
unwinding [1] - 58:5
unwound [1] - 58:21
up [46] - 10:3, 14:7, 22:16, 43:10, 47:15, 47:18, 48:22, 51:6, 51:7, 53:11, 55:14, 63:12, 63:20, 64:3, 64:15, 67:3, 67:6, 67:8, 74:19, 87:17, 90:10, 90:14, 94:5, 97:25, 98:4, 98:5, 100:5, 100:9, 100:12, 100:15, 103:20, 104:17, 107:24, 108:7, 114:10, 120:16, 122:10, 122:15, 127:21, 135:7, 139:15, 139:17, 139:23, 140:1, 140:7
urgent [1] - 138:12
urgently [1] - 138:13
usual [1] - 5:13

### V

vacating [1] - 105:4
valid [6] - 41:14, 54:9, 54:19, 89:8, 95:10, 123:20
various [6] - 31:8, 40:23, 45:14, 86:22, 114:16, 120:2
verbs [1] - 79:23

verify [1] - 33:19
version [1] - 66:11
versus [3] - 28:18, 65:8, 75:2
view [2] - 63:9, 97:18
violate [1] - 107:6
violation [1] - 107:7
virtue [1] - 20:23
visit [1] - 58:1
void [1] - 92:6
voluntarily [2] - 43:15, 77:6
voluntary [2] - 97:14, 98:23
vs [1] - 1:7

### W

WALDMAN [1] - 2:4
wants [31] - 13:23, 14:9, 21:8, 25:18, 26:2, 66:25, 72:12, 75:8, 80:19, 80:25, 81:7, 85:25, 86:1, 89:20, 89:21, 90:21, 90:23, 93:16, 94:9, 97:16, 106:19, 110:16, 114:6, 116:10, 116:19, 121:10, 126:19, 135:5, 135:6, 139:4, 139:24
warrants [1] - 80:9
waste [2] - 90:18, 90:19
wasting [1] - 92:21
ways [2] - 5:23, 132:4
weaved [1] - 48:21
web [1] - 48:22
week [2] - 115:20, 138:15
weeks [4] - 72:2, 72:9, 73:24, 75:18
West [1] - 1:11
wether [1] - 110:21
whatsoever [1] - 70:3
whereby [2] - 10:4, 10:5
whole [7] - 44:4, 94:3, 104:7, 112:13, 113:9, 131:15, 135:6
wholly [1] - 9:23
willing [3] - 43:15, 103:19
wind [1] - 140:25
wipe [1] - 89:9
wish [2] - 6:1, 88:9
withdrawing [1] - 55:22
withheld [1] - 86:11

**withhold** [4] - 71:13,
71:15, 74:9, 85:2
**withholding** [1] -
71:22
**witnesses** [2] - 42:22,
137:15
**women** [1] - 57:25
**won** [4] - 8:11, 8:13,
23:19, 23:21
**wonderful** [2] - 15:8,
23:23
**Word** [1] - 67:23
**works** [4] - 27:9,
124:19, 132:25,
133:16
**world** [3] - 57:25,
63:9, 66:11
**worried** [1] - 59:11
**worth** [2] - 47:3, 83:14
**wrap** [1] - 104:17
**writ** [2] - 63:16, 64:4
**write** [3] - 77:12, 99:9,
133:15
**writing** [3] - 29:24,
71:14, 101:15
**written** [4] - 6:17,
6:18, 52:6, 66:21
**wrote** [3] - 25:14,
41:7, 148:14

## Y

**Yale** [1] - 1:16
**year** [7] - 9:8, 26:14,
32:22, 57:12, 70:14,
116:10, 126:8
**years** [6] - 15:3, 29:17,
31:2, 32:16, 33:11,
93:4
**Yelizarov** [16] - 32:7,
36:4, 36:11, 36:21,
36:24, 37:4, 42:4,
47:12, 57:15, 57:20,
58:12, 70:13, 93:24,
115:8, 115:22,
115:25
**yesterday** [4] - 41:7,
41:13, 44:21, 136:14
**York** [1] - 57:25
**yourself** [1] - 74:9