Electronically Filed 08/14/2013 10 51 35 AM ET

IN THE CIRCUIT COURT IN AND FOR
THE ELEVENTH JUDICIAL CIRCUIT
MIAMI-DADE COUNTY FLORIDA

CASE NO

NORTH STAR MARITIME, INC ,
a Panama corporation

       Plaintiff,

vs

PINNACLE THREE CORPORATION,
a Florida corporation, and LEON
GOLDSTEIN

       Defendants

_____/

## VERIFIED COMPLAINT FOR DAMAGES

Plaintiff, NORTH STAR MARITIME, INC , by and through its undersigned counsel
hereby sues PINNACLE THREE CORPORATION and LEON GOLDSTEIN, and alleges as
follows

## JURISDICTION AND VENUE

1     This is a complaint for damages in excess of $15,000, exclusive of attorney's fees
and costs, and within the jurisdictional limits of this Court

2     Venue for this action lies in Miami Dade County, Florida, pursuant to § 11 6 of
the parties' Loan and Security Agreements upon which this lawsuit is based

## PARTIES

3     Plaintiff, NORTH STAR MARITIME, INC ("North Star"), is a Panama
corporation with its principal place of business located in Panama

I.D. EXHIBIT 9
witi goldstein
Date: 12-22-14

HELLER WALDMAN P L
3250 MARY STREET SUITE 102 • COCONUT GROVE FLORIDA 33133

{00096816 DOCX }

**EXHIBIT A**

4      Defendant, PINNACLE THREE CORPORATION ("Pinnacle Florida") is a Florida corporation with its principal place of business located at 1445 Windjammer Way, Hollywood, FL 33019

5      Defendant, LEON GOLDSTEIN ("Goldstein") is an individual believed to be residing in Broward County, Florida

6      All conditions precedent have been met or have been waived

## FACTUAL ALLEGATIONS

A      <u>The Loan Agreement Between North Star, Pinnacle Three and Goldstein</u>

7      On or about March 1, 2007, North Star entered into a Loan and Security Agreement ("North Star Loan Agreement") with Pinnacle Florida and Goldstein   A copy of the North Star Loan Agreement is attached hereto as Exhibit "A"

8      The North Star Loan Agreement provides that North Star would loan Pinnacle Florida and Goldstein up to $13,000,000   *See* first Whereas clause of Exhibit "A" at p 2

9      North Star loaned Pinnacle Florida and Goldstein $1,595,976 23 pursuant to the terms of the North Star Loan Agreement   The monies were loaned as follows

| DATE | AMOUNT |
|------|--------|
| 12/28/2008 | $440,000 |
| 8/27/2008 | $702,878 05 |
| 9/23/2008 | $126,098 18 |
| 11/4/2009 | $323,000 |

10      Interest on monies loaned under the North Star Loan Agreement was to accrue at a rate of eighteen (18%) percent per year   *See* § 2 1 of Exhibit "A"

2

{00096816 DOCX }

11      The loan was to be paid in thirty-six (36) monthly installments   *See* § 2 1 of Exhibit "A"

12      Pinnacle Florida and Goldstein granted North Star a security interest in the following as collateral for the loan

      a)      All receivables,

      b)      All equipment,

      c)      All fixtures,

      d)      All general intangibles,

      e)      All inventory,

      f)      "All other goods and personal property of Borrower whether tangible or intangible and whether now or hereafter owned or existing, leased, consigned by or to, or acquired by, Borrower and wherever located", and

      g)      "the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing"

*See* § 2 8 of Exhibit "A"

13      Pinnacle Florida and Goldstein have failed to pay the principal and interest due on the loan

14      An Event of Default under the North Star Loan Agreement includes failure to pay principal or interest due on the loan for a period of five (5) days from the date such payments are due   *See* § 9 1 of Exhibit "A"

15      The amount due and owing on the loan is $1,595,976 23, plus interest in the amount of $1,458,563 82, as of August 14, 2013

3

B.  Loan Agreement Between Bonito Shipping Corp. and Pinnacle Three (Illinois)

16      North Star is also the holder of rights under a separate loan agreement between Bonito Shipping Corp., A Panama corporation ("Bonito") and Pinnacle Three Corporation, an Illinois corporation ("Pinnacle Illinois").  Bonito assigned its rights under the Bonito Loan Agreement to North Star.  A copy of the Assignment is attached hereto as Exhibit "B".

17      On September 10, 2004, Bonito and Pinnacle Illinois entered into a Loan Agreement ("Bonito Loan Agreement").  A copy of the Bonito Loan Agreement is attached hereto as Exhibit "C".

18      Pursuant to the terms of the Bonito Loan Agreement, Bonito provided to Pinnacle Illinois a credit facility in the amount of $800,000.  Interest was to accrue at a rate of ten (10%) percent per year.  *See* § 3.2 of Exhibit "C".

19      On the date the Bonito Loan Agreement was entered, Pinnacle Illinois drew on the full amount of the credit facility.  Indeed, on September 10, 2004, Bonito transferred $800,000 to Pinnacle Illinois.

20      Following the transfer of $800,000, Bonito loaned additional funds to Pinnacle Illinois under the same terms as the Bonito Loan Agreement.  Bonito transferred funds to Pinnacle Illinois on the dates and in the amounts listed below.

| DATE | AMOUNT |
| --- | --- |
| 9/19/2005 | $1,048,491 |
| 1/29/2007 | $   200,000 |
| 12/3/2009 | $   425,000 |
| 12/14/2009 | $    75,000 |

4

| 12/17/2009 | $ 100,000 |
|------------|-----------|

21    Pinnacle Illinois assigned its rights and obligations under the Bonito Loan Agreement to Pinnacle Florida

22    Pinnacle Florida has failed to make the required payments under the Bonito Loan Agreement    This non-payment constitutes a default under § 5 1(a) of the Bonito Loan Agreement

23    Pursuant to § 5 2 of the Bonito Loan Agreement, Bonito has made demand upon Pinnacle Florida for the outstanding amounts owed    As such, all amounts owed under the Bonito Loan Agreement are immediately due and payable

24    The amount due and owing on the loan is $2,648,491, plus interest in the amount of $1,894,485 17, as of August 14, 2013

25    North Star has hired the law firm of Heller Waldman and has agreed to pay them a reasonable fee for its services in this matter which it is entitled to receive from Defendants pursuant to § 10 of the North Star Loan Agreement

### COUNT I – BREACH OF LOAN AGREEMENT BETWEEN NORTH STAR AND PINNACLE FLORIDA
(Against Pinnacle Florida and Goldstein)

26    Plaintiff realleges the allegations set forth in paragraph nos  1 through 25 above as though fully set forth herein

27    Pursuant to the terms of the North Star Loan Agreement, North Star loaned to Pinnacle Florida and Goldstein $1,595,976 23

28    Pinnacle Florida and Goldstein have failed to pay the principal amount of the loan, along with interest at the rate of eighteen (18%) percent per year as provided for under the

5

North Star Loan Agreement

29     By failing to pay the principal and interest due under the North Star Loan Agreement, Pinnacle Florida and Goldstein breached the terms of the North Star Loan Agreement

WHEREFORE, Plaintiff, NORTH STAR MARITIME, INC , demands entry of a judgment against Defendant, PINNACLE THREE CORPORATION (FLORIDA) and LEON GOLDSTEIN

a)     in the amount of $1,595,976 23,

b)     attorney's fees,

c)     costs,

d)     prejudgment interest ($1,458,563 82 as of August 14, 2013), and

e)     all such other relief as this Court deems just and proper

## COUNT II – BREACH OF LOAN AGREEMENT BETWEEN BONITO SHIPPING AND PINNACLE FLORIDA
### (Against Pinnacle Florida)

30     Plaintiff realleges the allegations set forth in paragraph nos  1 through 25 above as though fully set forth herein

31     Pursuant to the terms of the Bonito Loan Agreement, Bonito loaned to Pinnacle Illinois, which assigned its rights and obligations to Pinnacle Florida, $2,648,491 plus interest

32     Pinnacle Three and Goldstein have failed to pay the principal amount of the loan along with interest at the rate of ten (10%) percent per year as provided for under the Bonito Loan Agreement

33     By failing to pay the principal and interest due under the Bonito Loan Agreement,

HELLER WALDMAN P L
3250 MARY STREET  SUITE 102 ● COCONUT GROVE  FLORIDA 33133

{00096816 DOCX }

Pinnacle Three and Goldstein breached the terms of the Bonito Loan Agreement

WHEREFORE, Plaintiff, NORTH STAR MARITIME, INC , demands entry of a judgment against Defendant, PINNACLE THREE CORPORATION (Florida)

a)  in the amount of $2,648,491,

b)  costs,

c)  prejudgment interest ($1,894,485 17 as of August 14, 2013), and

d)  all such other relief as this Court deems just and proper

{00096816 DOCX }

## **VERIFICATION**

Under penalty of perjury, the undersigned declares that she has read the foregoing Complaint and that the facts set forth herein are true and correct to the best of her knowledge and belief

By _____

Respectfully submitted on this 14th day of August, 2013

HELLER WALDMAN, P L
3250 Mary Street, Suite 102
Coconut Grove, Florida 33133
Telephone  (305) 448-4144
Telecopier  (305) 448 4155

By _____
   Glen H  Waldman, Esq
   Fla  Bar No  618624
   Michael Sayre, Esq
   Fla  Bar No  17607

\

{00096816 DOCX }

LOAN AND SECURITY AGREEMENT


DATED AS OF MARCH 1, 2007


BETWEEN


PINNACLE THREE CORPORATION,
A FLORIDA CORPORATION


AND


LEON GOLDSTEIN,
INDIVIDUAL RESIDING IN THE STATE OF FLORIDA,

COLLECTIVELY AS `BORROWER ,


AND


NORTH STAR MARITIME, INC
A PANAMA CORPORATION

AS "LENDER"


**EXHIBIT**
'A'


1

LOAN AND SECURITY AGREEMENT

THIS AGREEMENT (the "Agreement ), dated as of March 1, 2007 is entered into by and between Pinnacle Three Corporation, a Florida corporation having a principal place of business at 1445 Windjammer Way, Hollywood, FL 33019 and Leon Goldstein, individual residing in the state of Florida with a residence at 17555 Collins Avenue, Apt 3702, Sunny Isles Beach, FL 33160 (collectively the "Borrower") and North Star Maritime, Inc , a Panama corporation having a principal place of business at 30th Street and Balboa Avenue, Bldg No 39, City of Panama, Republic of Panama (the "Lender")

In consideration of the mutual agreements contained herein, the parties hereto agree as follows

WHEREAS, Borrower desires to borrow from the Lender hereunder the amount of THIRTEEN MILLION and 00/100 DOLLARS ($13,000,000 00) (as the same may from time to time be amended, modified, supplemented or revised, the "Loan"), which would be evidenced by Secured Promissory Notes(s) document executed by Borrower substantially in the form of Exhibit A hereto (as the same may from time to time be amended, modified, supplemented or restated the "Note(s)")

WHEREAS, Included in the loan amount listed above there are shall be Mortgage for ONE MILLION FIVE HUNDRED THOSAND DOLLARS ($1,500,000 00), which would be evidenced by MORTGAGE instrument executed by Borrower as a separate document

NOW, THEREFORE, it is agreed

SECTION 1  DEFINITIONS

Unless otherwise defined herein, the following capitalized terms shall have the following meanings (such meanings being equally applicable to both the singular and plural form of the terms defined)

1 1  "Account  means any "account," as such term is defined in Section 9106 of the UCC, now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest and, in any event, shall include, without limitation, all accounts receivable, book debts and other forms of obligations (other than forms of obligations evidenced by Chattel Paper, Documents or Instruments) now owned or hereafter received or acquired by or belonging or owing to Borrower (including, without limitation, under any trade name, style or division thereof) whether arising out of goods sold or services rendered by Borrower or from any other transaction, whether or not the same involves the sale of goods or services by Borrower (including, without limitation, any such obligation which may be characterized as an account or contract right under the UCC) and all of Borrower's rights in, to and under

2

all purchase orders or receipts now owned or hereafter acquired by it for goods or services, and all of Borrower's rights to any goods represented by any of the foregoing (including, without limitation, unpaid seller's rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods), and all monies due or to become due to Borrower under all purchase orders and contracts for the sale of goods or the performance of services or both by Borrower (whether or not yet earned by performance on the part of Borrower or in connection with any other transaction), now in existence or hereafter occurring, including, without limitation, the right to receive the proceeds of said purchase orders and contracts, and all collateral security and guarantees of any kind given by any Person with respect to any of the foregoing

1 2  "Account Debtor" means any "account debtor," as such term is defined in Section 9105(1)(a) of the UCC

1 3  "Advance" means each installment made by the Lender to Borrower pursuant to the Loan to be evidenced by the Note(s) secured by the Collateral

1 4  "Advance Date" means the funding date of any Advance of the Loan

1 5  "Advance Request" means the request by Borrower for an Advance under the Loan, each to be substantially in the form of Exhibit B attached hereto, as submitted by Borrower to Lender from time to time

1 6  "Chattel Paper" means any "chattel paper," as such term is defined in Section 9105(1)(b) of the UCC, now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest

1 7  "Closing Date" means the date of this Agreement

1 8  "Collateral" shall have the meaning assigned to such term in Section 3 of this Agreement

1 9  "Commitment Amount" means Thirteen Million Dollars ($13,000,000)

1 10 "Contracts" means all contracts, undertakings, franchise agreements or other agreements (other than rights evidenced by Chattel Paper, Documents or Instruments) in or under which Borrower may now or hereafter have any right, title or interest, including, without limitation, with respect to an Account, any agreement relating to the terms of payment or the terms of performance thereof

1 11 "Copyrights' means all of the following now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest  (i) all copyrights, whether

3

registered or unregistered, held pursuant to the laws of the United
States, any State thereof or of any other country  (ii)
registrations, applications and recordings in the United States
Copyright Office or in any similar office or agency of the United
States, any state thereof or any other country, (iii) any
continuations, renewals or extensions thereof, and (iv) any
registrations to be issued in any pending applications

    1 12 "Copyright License" means any written agreement granting
any right to use any Copyright or Copyright registration now owned
or hereafter acquired by Borrower or in which Borrower now holds or
hereafter acquires any interest

    1 13 "Documents" means any "documents," as such term is defined
in Section 9105(1)(f) of the UCC, now owned or hereafter acquired by
Borrower or in which Borrower now holds or hereafter acquires any
interest

    1 14 "Equipment" means any "equipment," as such term is defined
in Section 9109(2) of the UCC, now or hereafter owned or acquired by
Borrower or in which Borrower now holds or hereafter acquires any
interest and any and all additions, substitutions and replacements
of any of the foregoing, wherever located, together with all
attachments, components, parts, equipment and accessories installed
thereon or affixed thereto

    1 15 'Facility Fee" means one percent (1 0%) of the principal
amount of the Loan, along with the due diligence, transaction, and
legal expense fee in the amount of $7,500 00, due at the Closing
Date, less commitment fee in the amount of $20,000 00 paid with
check no  7516

    1 16 "Fixtures" means any "fixtures", as such term is defined
in Section 9313(1)(a) of the UCC, now or hereafter owned or acquired
by Borrower or in which Borrower now holds or hereafter acquires any
interest and, now or hereafter attached or affixed to or
constituting a part of, or located in or upon, real property
wherever located, together with all right, title and interest of
Borrower in and to all extensions, improvements, betterments,
renewals, substitutes, and replacements of, and all additions and
appurtenances to any of the foregoing property, and all conversions
of the security constituted thereby, immediately upon any
acquisition or release thereof or any such conversion, as the case
may be

    1 17 "General Intangibles" means any 'general intangibles," as
such term is defined in Section 9106 of the UCC, now owned or
hereafter acquired by Borrower or in which Borrower now holds or
hereafter acquires any interest and, in any event, shall include,
without limitation, all right, title and interest which
Borrower may now or hereafter have in or under any contract, all
customer lists, Copyrights, Trademarks, Patents, rights to
Intellectual Property, interests in partnerships, joint ventures and
other business associations, Licenses, permits, trade secrets,

proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, software, data bases, data, skill, expertise, recipes, experience, processes, models, drawings, materials and records, goodwill (including, without limitation, the goodwill associated with any Trademark, Trademark registration or Trademark licensed under any Trademark License), claims in or under insurance policies, including unearned premiums, uncertificated securities, cash and other forms of money or currency, deposit accounts (including as defined in Section 9105(e) of the UCC), rights to sue for past, present and future infringement of Copyrights, Trademarks and Patents, rights to receive tax refunds and other payments and rights of indemnification

1 18 "Instruments" means any "instrument,' as such term is defined in Section 9105(1)(i) of the UCC, now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest

1 19 "Intellectual Property" means all Copyrights, Trademarks, Patents, rights to Intellectual Property, Licenses, trade secrets, source codes, customer lists, proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, software, data bases, skill, expertise, experience, processes, models, drawings, materials and records

1 20 "Inventory" means any "inventory," as such term is defined in Section 9109(4) of the UCC, wherever located, now or hereafter owned or acquired by Borrower or in which Borrower now holds or hereafter acquires any interest, and, in any event, shall include, without limitation, all inventory, goods and other personal property which are held by or on behalf of Borrower for sale or lease or are furnished or are to be furnished under a contract of service or which constitute raw materials, work in process or materials used or consumed or to be used or consumed in Borrower's business, or the processing, packaging, promotion, delivery or shipping of the same, and all furnished goods whether or not such inventory is listed on any schedules, assignments or reports furnished to Lender from time to time and whether or not the same is in transit or in the constructive, actual or exclusive occupancy or possession of Borrower or is held by Borrower or by others for Borrower's account, including, without limitation, all goods covered by purchase orders and contracts with suppliers and all goods billed and held by suppliers and all inventory which may be located on premises of Borrower or of any carriers, forwarding agents, truckers, warehousemen, vendors, selling agents or other persons

1 21 "License" means any Copyright License, Patent License, Trademark License or other license of rights or interests now held or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest and any renewals or extensions thereof

5

1 22 'Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment for security, security interest, encumbrance, levy, lien or charge of any kind, whether voluntarily incurred or arising by operation of law or otherwise, against any property, any conditional sale or other title retention agreement, any lease in the nature of a security interest, and the filing of any financing statement (other than a precautionary financing statement with respect to a lease that is not in the nature of a security interest) under the UCC or comparable law of any jurisdiction

1 23 "Material Adverse Effect" means a material adverse effect upon  (i) the business, operations, properties, assets or financial conditions of Borrower  or (ii) the ability of Borrower to perform, or of Lender to enforce, the Secured Obligations

1 24 "Maturity Date" means the date thirty six (36) months from the Advance Date of each installment of the Loan

1 25 "Patent License" means any written agreement granting any right with respect to any invention on which a Patent is in existence now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest

1 26 "Patents" means all of the following now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest (a) letters patent of, or rights corresponding thereto in, the United States or any other county, all registrations and recordings thereof, and all applications for letters patent of, or rights corresponding thereto in the United States or any other country, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country, (b) all reissues, continuations, continuations-in-part or extensions thereof, (c) all petty patents, divisionals, and patents of addition, and (d) all patents to issue in any such applications

1 27 "Permitted Liens" means

(i)     liens in favor of Lender

(ii)    liens securing the payment of taxes or other governmental charges not yet delinquent or being contested in good faith by appropriate proceeding, for which adequate reserves are maintained in accordance with generally accepted accounting principles,

(iii)   liens securing claims or demands of materialism, mechanics, carriers, warehousemen, landlords and other like persons imposed without action of such parties, provided that the payment thereof is not yet required,

(iv)    liens incurred or deposits made in the ordinary course
         of Borrower's or a subsidiary's business in connection
         with workers compensation, unemployment insurance,
         social security and other like laws

(v)     purchase money security interests in personal property
         acquired after the date of this Agreement, provided
         such are limited to the personal property so acquired
         and proceeds, thereof

(vi)    any liens existing as of the date hereof and
         specifically disclosed by Borrower to Lender herein,

(vii)   leases, subleases, licenses and sublicenses granted to
         others in the ordinary course of business not
         interfering in any material respect with the conduct
         of the business of any Borrower

(viii)  liens arising from judgments, decrees or attachments
         to the extent and only so long as such judgment,
         decree or attachment as not caused or resulted in a
         Event of Default,

(ix)    liens in favor of customs and revenue authorities
         arising as a matter of law to secure payment of
         customs duties in connection with the importation of
         goods

(x)     liens which constitute rights of set-off of a
         customary nature or bankers' liens with respect to
         amounts on deposit, whether arising by operation of
         law or by contract, in connection with arrangements
         entered into with banks in the ordinary course of
         business,

(xi)    liens incurred in connection with the extension,
         renewal or refinancing of the indebtedness secured by
         liens of the type described in clause (vii) above,
         provided that any extensions, renewal or replacement
         lien shall be limited to the property encumbered by
         the existing lien and the principal amount of the
         indebtedness being extended, renewed or refinanced
         does not increase

    1 28  "Proceeds" means "proceeds," as such term is defined in
Section 9306(1) of the UCC and, in any event, shall include, without
limitation, (a) any and all Accounts, Chattel Paper, Instruments,
cash or other forms of money or currency or other proceeds payable
to Borrower from time to time in respect of the Collateral, (b) any
and all proceeds of any insurance, indemnity, warranty or guaranty
payable to Borrower from time to time with respect to any of the
Collateral, (c) any and all payments (in any form whatsoever) made
or due and payable to Borrower from time to time in connection with
any requisition, confiscation, condemnation, seizure or forfeiture

                                                                    7

of all or any part of the Collateral by any governmental authority (or any Person acting under color of governmental authority), (d) any claim of Borrower against third parties (i) for past, present or future infringement of any Copyright, Patent or Patent License or (ii) for past, present or future infringement or dilution of any Trademark or Trademark License or for injury to the goodwill associated with any Trademark,

Trademark registration or Trademark licensed under any Trademark License and (e) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral

1 29   "Receivables' shall mean and include all of the Borrowers accounts, instruments, documents, chattel paper and general intangibles whether secured or unsecured, whether now existing or hereafter created or arising, and whether or not specifically sold or assigned to Lender hereunder

1 30   "Secured Obligations" shall mean and include all principal, interest, fees, costs, or other liabilities or obligations for monetary amounts owed by Borrower to Lender, whether due or to become due, matured or unmatured, liquidated or unliquidated, contingent or non-contingent, and all covenants and duties regarding such amounts, of any kind of nature, present or future, arising under this Agreement, the Note(s), or any of the other Loan Documents, whether or not evidenced by any Note(s), Agreement or other instrument, as the same may from time to time be amended, modified, supplemented or restated

1 31   "Trademark License" means any written agreement granting any right to use any Trademark or Trademark registration now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest

1 32   "Trademarks" means any of the following now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest  (a) any and all trademarks, tradenames, corporate names, business names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and any applications in connection therewith, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof and (b) any reissues, extensions or renewals thereof

1 33   "UCC" shall mean the Uniform Commercial Code as the same may, from time to time, be in effect in the State of Florida  Unless otherwise defined herein, terms that are defined in the UCC and used herein shall have the meanings given to them in the UCC

8

1 34    "Warrant Agreement(s)" if applicable, shall mean those agreements entered into in connection with the Loan, substantially in the form attached hereto as Exhibit C pursuant to which Borrower granted Lender the right to purchase shares of the Borrower's entity

SECTION 2    THE LOAN

2 1    Subject to the terms and conditions set forth herein, Lender shall make Loans to Borrower in an aggregate amount not to exceed the Commitment Amount  Each Advance, together with interest at the rate of eighteen percent (18%) per annum, shall be payable in 36 monthly installments as set forth in the Note(s)

2 2  Upon the occurrence of and during an Event of Default (as defined herein), interest shall thereafter be calculated at a rate of five percent (5%) in excess of the rate that would otherwise be applicable ("Default Rate")  All such interest shall be due and payable in arrears, on the first day of the following month

2 3 Notwithstanding any provision in this Agreement, the Note(s), or any other "Loan Document  (as defined herein), it is not the parties' intent to contract for, charge or receive interest at a rate that is greater than the maximum rate permissible by law which a court of competent jurisdiction shall deem applicable hereto (which under the laws of the State of Florida shall be deemed to be the laws relating to permissible rates of interest on commercial loans) (the "Maximum Rate")  If the Borrower actually pays Lender an amount of interest, chargeable on the total aggregate principal Secured Obligations of Borrower under this Agreement and the Note(s) (as said rate is calculated over a period of time that is the longer of (1) the time from the date of this Agreement through the maturity time as set forth on the Note(s), or (11) the entire period of time that any principal is outstanding on the Note(s)), which amount of interest exceeds interest calculated at the Maximum Rate on said principal chargeable over said period of time, then such excess interest actually paid by Borrower shall be applied first, to the payment of principal outstanding on the Note(s)  second, after all principal is repaid, to the payment of Lender's out of pocket costs, expenses, and professional fees which are owed by Borrower to Lender under this Agreement or the Loan Documents, and third, after all principal, costs, expenses, and professional fees owed by Borrower to Lender are repaid, the excess (if any) shall be refunded to Borrower

2 4 In the event any interest is not paid when due hereunder, delinquent interest shall be added to principal and shall bear interest on interest, compounded at the rate set forth in Section 2 1

2 5 Upon and during the continuation of an Event of Default hereunder (as defined herein), all Secured Obligations, including principal, interest, compounded interest, and reasonable

professional fees, shall bear interest at a rate per annum equal to the Default Rate

2 6 Borrower shall have the option to prepay the Loan, in whole or in part, without penalty or premium, after 12 months from the Closing Date by paying the principal amount thereon together with all accrued and unpaid interest with respect to such principal amount, as of the date of such prepayment, without premium  In the event Borrower prepays the Note(s) within 12 months from the Closing Date hereof, Borrower shall pay the principal amount together with all accrued and unpaid interest and a prepayment premium equal to 1% of the then outstanding principal amount ("the Prepayment Penalty"), provided, however, in the event of an initial public offering of Borrower's stock, the Prepayment Penalty shall not apply

2 7 If the Borrower has not repaid the outstanding principal amount under the Loan in its entirety by the Maturity Date (as defined in the applicable Note(s)), then for each additional month, or portion thereof, thereafter that the outstanding principal is not paid, Lender shall have the right to purchase from the Borrower, at the Exercise Price (adjusted, as set forth and defined in the Warrant Agreement), an additional number of shares of Preferred Stock (as defined in the Warrant Agreement) which number shall be determined by (i) multiplying the outstanding principal amount which is due but unpaid by 1% and (ii) dividing the product thereof by the Exercise Price

2 8 Notwithstanding anything in this Agreement to the contrary, Lender's obligations to provide the Loan(s) shall terminate on the earlier of

    (i)       March 1, 2012 or (ii) the occurrence of a Material Adverse Effect pursuant to Section 1 22, and no Advance Requests shall be accepted after such date, unless otherwise waived by Lender ("Draw Period")

As security for the prompt, complete and indefeasible payment when due   (whether at stated payment dates or otherwise) of all the Secured Obligations and in order to induce Lender to make the Loan upon the terms and subject to the conditions of the Note(s), Borrower hereby assigns, conveys, mortgages, pledges, hypothecates and transfers to Lender for security purposes only, and hereby grants to Lender a security interest in, all of Borrower's right, title and interest in, to and under each of the following (all of which being hereinafter collectively called the "Collateral')

    (a)     All Receivables,

    (b)     All Equipment,

    (c)     All Fixtures,

    (d)     All General Intangibles,

       (e)   All Inventory,

       (f)   All other goods and personal property of Borrower whether tangible or intangible and whether now or hereafter owned or existing, leased, consigned by or to, or acquired by, Borrower and wherever located, and

       (g)   the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing

Notwithstanding the foregoing, Lender agrees to release all Receivables necessary for the sole purpose of Borrower securing an accounts receivable/factoring facility against executed firm orders with Orthodontists and Dentists for Borrower's dental products, provided, however, Lender has the right of first refusal to provide such receivable/factoring facility

SECTION 4   REPRESENTATIONS AND WARRANTIES OF BORROWER

The Borrower represents, warrants and agrees that

4 1 it has good title in and to the Collateral, free of all liens, security interests, encumbrances and claims whatsoever, except for the interest of the Lender therein,

4 2 it has the full power and authority to, and does hereby grant and convey to the Lender, a valid first priority perfected security interest in the Collateral as security for the Secured Obligations, free of all liens, security interests, encumbrances and claims, and shall execute such Uniform Commercial Code financing statements in connection herewith as the Lender may reasonably request  Except for Permitted Liens, no other lien, security interest, adverse claim or encumbrance has been created by Borrower or is known by Borrower to exist with respect to any Collateral

4 3 it is a corporation duly organized, legally existing and in good standing under the laws of the State of Delaware, and is duly qualified as a foreign corporation in all jurisdictions where the failure to so qualify would have a Material Adverse Effect on the Collateral or the business of the Borrower taken as a whole,

4 4 the execution, delivery and performance of the Note(s), this Agreement, the Warrant Agreement(s), and all financing statements, certificates and other documents required to be delivered or executed in connection herewith (collectively, the "Loan Documents") have been duly authorized by all necessary corporate action of Borrower, the individual or individuals executing the Loan Documents were duly authorized to do so, and the Loan Documents constitute legal, valid and binding obligations of the Borrower, enforceable in accordance with their respective terms,

11

claims arising at or caused by Lender's gross negligence or willful misconduct

SECTION 6  COVENANTS OF BORROWER

Borrower covenants and agrees as follows at all times while any of the Secured Obligations remain outstanding

6 1 Borrower shall furnish to Lender the financial statements listed hereinafter, each prepared in accordance with generally accepted accounting principles consistently applied (the "Financial Statements")

(a)  as soon as practicable (and in any event within thirty (30) days) after the end of each month, unaudited interim financial statements as of the end of such month (prepared on a consolidated and consolidating basis, if applicable), including balance sheet and related statements of income and cash flows accompanied by a report detailing any material contingencies (including the commencement of any material litigation by or against Borrower) or any other occurrence that could reasonably be expected to have a Material Adverse Effect, all certified by Borrower's Chief Executive Officer or Chief Financial Officer to be true and correct in all material respects,

(b)  as soon as practicable (and in any event within ninety (90) days) after the end of each fiscal year, unqualified audited financial statements as of the end of such year (prepared on a consolidated and consolidating basis, if applicable), including balance sheet and related statements of income and cash flows, and setting forth in comparative form the corresponding figures for the preceding fiscal year, certified by a firm of independent certified public accountants selected by Borrower and reasonably acceptable to Lender, accompanied by any management report from such accountants,

(c)  promptly after the sending or filing thereof, as the case may be, copies of any proxy statements, financial statements or reports which Borrower has made available to its shareholders and copies of any regular, periodic and special reports or registration statements which Borrower files with the Securities and Exchange Commission or any governmental authority which may be substituted therefor, or any national securities exchange  and

(d)  promptly, any additional information, financial or otherwise(including, but not limited, to tax returns and names of principal creditors) as Lender

13

reasonably believes necessary to evaluate Borrower's continuing ability to meet its financial obligations

(e) Borrower shall permit any authorized representative of Lender and its attorneys and accountants on reasonable notice to inspect, examine and make copies and abstracts of the books of account and records of Borrower at reasonable times during normal business hours provided, that not more than two such inspections or examinations shall take place in any calendar year except upon the occurrence and continuation of an Event of Default In addition, such representative of Lender and its attorneys and accountants shall have the right to meet with management and officers of the Company to discuss such books of account and records

6 3 Borrower will from time to time execute, deliver and file, alone or with Lender, any financing statements, security agreements or other documents, procure any instruments or documents as may be reasonably requested by Lender, and take all further action that may be necessary or desirable, or that Lender may reasonably request, to confirm, perfect, preserve and protect the security interests intended to be granted hereby, and in addition, and for such purposes only, Borrower hereby authorizes Lender to execute and deliver on behalf of Borrower and to file such financing statements, security agreement and other documents without the signature of Borrower either in Lender's name or in the name of Borrower as agent and attorney-in-fact for Borrower  The parties agree that a carbon, photographic or other reproduction of this Agreement shall be sufficient as a financing statement and may be filed in any appropriate office in lieu thereof

6 4 Borrower shall protect and defend Borrower's title as well as the interest of the Lender against all persons claiming any interest adverse to Borrower or Lender and shall at all times keep the Collateral free and clear from any legal process, liens or encumbrances whatsoever (except any placed thereon by Lender and other Permitted Liens) and shall give Lender immediate written notice thereof

6 5 Without Lender's prior written consent, such consent to be given no later than four (4) days after Lender receives notice by Borrower, Borrower shall not, outside the ordinary course of business, but not to exceed $250,000, (a) grant any material extension of the time of payment of any of the Receivables, (b) to any material extent, compromise, compound or settle the same for less than the full amount thereof, (c) release, wholly or partly, any person liable for the payment thereof, or allow any credit or discount whatsoever thereon other than trade discounts granted in the ordinary course of business of Borrower

14

proceedings, taxes for which Borrower maintains adequate reserves
therefor

6 11 Borrower shall not relocate any item of the Collateral
(other than sale of inventory in the ordinary course of business)
except  (i) with prior written notice of the Lender not to be
unreasonably withheld, and (ii) if such relocation shall be within
the continental United States  If permitted to relocate Collateral
pursuant to the foregoing sentence, unless otherwise agreed in
writing by Lender, Borrower shall first (a) cause to be filed and/or
delivered to the Lender all Uniform Commercial Code financing
statements, certificates or other documents or instruments necessary
to continue in effect the perfected security interest of the Lender
in the Collateral, and (b) have given the Lender no less than
fifteen (15) days prior written notice of such relocation

6 12 Borrower shall not incur any indebtedness senior to
Lender's position without the prior written consent of Lender

SECTION 7  CONDITIONS PRECEDENT TO LOAN

The obligation of Lender to fund the Loan on each Advance Date
shall be   subject to Lender's discretion and satisfactory
completion of its due diligence and approval process, and
satisfaction by Borrower or waiver by Lender, in
Lender's reasonable discretion, of the following conditions

7 1 Document Delivery  Borrower, on prior to the Closing Date,
shall have delivered to Lender the following

> (a)  executed originals of the Agreement, the Warrant
> Agreement, and any documents reasonably required by
> Lender to effectuate the liens of Lender, with
> respect to all Collateral,

> (b)  certified copy of resolutions of Borrower's board of
> directors evidencing approval of the borrowing and
> other transactions evidenced by the Loans Documents,

> (c)  certified copies of the Certificate of Incorporation
> and the Bylaws of Borrower, as amended through the
> Closing Date,

> (d)  certificate of good standing for Borrower from its
> state of incorporation and similar certificates from
> all other jurisdictions in which it does business
> and where the failure to be qualified would have a
> Material Adverse Effect

> (e)  payment of the Facility Fee less transaction and due
> diligence expenses (not to exceed $7,500) shall be
> applied to the Facility Fee, and

16

(f)   such other documents as Lender may reasonably request

7 3 Advance Request

(a)   During Draw Period, Borrower, on or prior to each Advance Date, shall have delivered to Lender the following

     i   a minimum of five (5) business days prior to the Advance Date, written notice in the form of an Advance Request, or as otherwise specified by Lender from time to time, specifying amount of such Advance and wire transfer instructions

     ii  executed original of the Note(s), and

     iii such other documents as Lender may reasonably request

(b)   During Extended Draw Period, Borrower on or prior to each Advance Date, shall have delivered to Lender the following

     i   a minimum of five (5) business days to the Advance Date, written notice in the form of an Advance Request, or as otherwise specified by Lender from time to time, specifying amount of such Advance and wire instructions

     ii  executed original of the Note(s)

     iii a Warrant Agreement executed in accordance with Section 2 8 herein, and in a form substantially identical to the Warrant Agreement attached hereto as Exhibit C, and

     iv  such other documents as Lender may reasonably request

7 4 Perfection of Security Interests  Borrower shall have taken or caused to be taken such actions reasonably requested by Lender to grant Lender a first priority perfected security interest in the Collateral  Such actions shall include, without limitation, the delivery to Lender of all appropriate financing statements, executed by Borrower, as to the Collateral granted by Borrower for all jurisdictions as may be necessary or desirable to perfect the security interest of Lender in such Collateral

7 5 Absence of Events of Defaults  As of the Closing Date or the Advance Date, no fact or condition exists that would (or would, with the passage of time, the giving of notice, or both) constitute an Event of Default under this Agreement or any of the Loan Documents

7 6 Material Adverse Effect  As of the Closing Date or the Advance Date, no event which has had or could reasonably be expected to have a Material Adverse Effect has occurred and is continuing

SECTION 8  ASSIGNMENT BY LENDER

8 1 Borrower acknowledges and understands that Lender may sell and assign all or a part of its interest hereunder and under the Note(s) and Loan Documents to any person or entity (an "Assignee")  After such assignment the term Lender shall mean such Assignee, and such Assignee shall be vested with all rights, powers and remedies of Lender hereunder with respect to the interest so assigned, but with respect to any such interest not so transferred, the Lender shall retain all rights, powers and remedies hereby given  No such assignment by Lender shall relieve Borrower of any of its obligations hereunder  Borrower shall acknowledge such assignment or assignments as shall be designated by written notice given by Lender to Borrower  The Lender agrees that in the event of any transfer by it of the Note(s), it will endorse thereon a notation as to the portion of the principal of the Note(s) which shall have been paid at the time of such transfer and as to the date to which interest shall have been last paid thereon

SECTION 9  DEFAULT

The occurrence of any one or more of the following events (herein called "Events of Default") shall constitute a default hereunder and under the Note(s)

9 1 The Borrower defaults in the payment of any principal or interest payable under the Note(s) and such default continues for more than five (5) days after the due date thereof,

9 2 The Borrower defaults in the payment or performance of any other covenant or obligation of the Borrower hereunder or under the Note(s) or any other Loan Documents for more than ten (10) days after the Lender has given notice of such default to the Borrower,

9 3 Any representation or warranty as of the date made herein by the Borrower shall prove to have been false or misleading in any material respect,

9 4 The making of an assignment by Borrower for the benefit of its creditors or the admission by Borrower in writing of its inability to pay its debts as they become due, or the insolvency of Borrower, or the filing by Borrower of a voluntary petition in bankruptcy, or the adjudication of Borrower as a bankrupt, or the filing by Borrower of any petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future statute, law or regulation, or the filing of any answer by Borrower admitting, or the failure by Borrower to deny, the material

18

allegations of a petition filed against it for any such relief, or the seeking or consenting by Borrower to, or acquiescence by Borrower in, the appointment of any trustee, receiver or liquidator of Borrower or of all or any substantial part of the properties of Borrower, or the inability of Borrower to pay its debts when due, or the commission by Borrower of any act of bankruptcy as defined in the Federal Bankruptcy Act, as amended,

9 5 The failure by Borrower, within sixty (60) days after the commencement of any proceeding against Borrower seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, to obtain the dismissal of such proceeding or, within sixty (60) days after the appointment, without the written consent or acquiescence of Lender, of any trustee, receiver or liquidator of Borrower or of all or any substantial part of the properties of Borrower, to vacate such appointment,

9 6 The default by Borrower under any other notes or other agreement for borrowed money, lease or other agreement between Borrower and Lender, or

9 7 The occurrence of any default under any lease or other agreement or obligation of Borrower involving an amount in excess of $100,000 00 or having a Material Adverse Effect, or the entry of any judgment against Borrower involving an award in excess of $100,000 00 that would have a Material Adverse Effect, that has not been bonded or stayed on appeal within thirty (30) days

SECTION 10  REMEDIES

Upon the occurrence and continuation hereof of any one or more Events of Default, Lender, at its option, may declare the Note(s) to be accelerated and immediately due and payable, (provided, that upon the occurrence of an Event of Default of the type described in 9 4 or 9 5, the Note(s) and all other Secured Obligations shall automatically be accelerated and made due and payable without any further act) whereupon the unpaid principal of and accrued interest on such Note shall become immediately due and payable, and shall thereafter bear interest at the Default Rate and calculated in accordance with Section 2 2  Lender may exercise all rights and remedies with respect to the Collateral granted pursuant hereto for such Note(s), or otherwise available to it under applicable law, including the right to release, hold or otherwise dispose of all or any part of the Collateral and the right to utilize, process and commingle the Collateral

Upon the happening and during the continuance of any Event of Default, Lender may then, or at any time thereafter and from time to time, apply, collect, sell in one or more sales, lease or otherwise dispose of, any or all of the Collateral, in its then condition or following any commercially reasonably preparation or processing, in such order as Lender may elect, and any such sale may be made either at public or private sale at its place of business or elsewhere

19

Borrower agrees that any such public or private sale may occur upon five (5) calendar day's notice to Borrower  Lender may require Borrower to assemble the Collateral and make it available to Lender at a place designated by Lender, which is reasonably convenient to Lender and Borrower  The proceeds of any sale, disposition or other realization upon all or any part of the collateral shall be distributed by Lender in the following order of priorities

First, to Lender in an amount sufficient to pay in full Lender's reasonable costs and professionals' and advisors' fees and expenses,

Second, to Lender in an amount equal to the then unpaid amount of the Secured Obligations in such order and priority as Lender may choose in its sole discretion  and

Finally, upon payment in full of all of the Secured Obligations, to Borrower or its representatives or as a court of competent jurisdiction may direct

The Lender shall return to the Borrower any surplus collateral remaining after payment of all Secured Obligations

SECTION 11  MISCELLANEOUS

11 1 Borrower shall remain liable to Lender for any unpaid Secured Obligations, advances, costs, charges and expenses, together with interest thereon and shall pay the same immediately to Lender at Lender's offices

11 2 The powers conferred upon Lender by this Agreement are solely to protect its interest in the Collateral and shall not impose any duty upon Lender to exercise any such powers

11 3 This is a continuing Agreement and the grant of a security interest hereunder shall remain in full force and effect and all the rights, powers and remedies of Lender hereunder shall continue to exist until the Secured Obligations are paid in full as the same become due and payable  When Borrower has paid in full all Secured Obligations, Lender will, promptly but in no event later than ten (10) days, upon request of Borrower, execute a written termination Statement, reassigning to Borrower, without recourse, the Collateral and all rights conveyed hereby and return possession (if Lender has possession) of the Collateral to Borrower  The rights, powers and remedies of Lender hereunder shall be in addition to all rights, powers and remedies given by statute or rule of law and are cumulative  The exercise of any one or more of the rights, powers and remedies provided herein shall not be construed as a waiver of any other rights, powers and remedies of Lender Furthermore, regardless of whether or not the UCC is in effect in the jurisdiction where such rights, powers and remedies are asserted, Lender shall have the rights, powers and remedies of a secured party under the UCC

11 4 Upon payment in full of all Secured Obligations, the Lender shall cancel the Note(s), this Agreement and all UCC financing statements, if any, and shall promptly deliver all such canceled documents to the Borrower

11 5 GOVERNING LAW  This Agreement, the Note(s) and the other Loan Documents have been negotiated and delivered to Lender in the State of Florida and shall not become effective until accepted by Lender in the State of Florida  Payment to Lender by Borrower of the Secured Obligations is due in the State of Florida  This Agreement shall be governed by, and construed and enforced in accordance with the laws of the State of Florida excluding conflict of laws principles that would cause the application of laws of any other jurisdiction

11 6 CONSENT TO JURISDICTION AND VENUE  All judicial proceedings arising in or under or related to this Agreement, the Note or any of the other Loan Documents may be brought in any state or federal court of competent jurisdiction located in the State of Florida  By execution and delivery of this Agreement, each party hereto generally and unconditionally  (a) consents to personal jurisdiction in Cook County, State of Florida, (b) waives any objection as to jurisdiction or venue in the aforesaid courts  and (d) irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement, the Note(s) and the other Loan Documents  Service of process on any party hereto in any action arising out of or relating to this Agreement shall be effective if given in accordance with the requirements for notice set forth in Section 11 8 below and shall be deemed effective and received as set forth in Section 11 8 below  Nothing herein shall affect the right to serve process in any other manner permitted by law or shall limit the right of either party to bring proceedings in the courts of any other jurisdiction

11 7 Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under such law, such provision shall be ineffective only to the extent and duration of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement

11 8 Except as otherwise provided herein, all notices and service of process required, contemplated, or permitted to have been validly served, or hereunder shall be in writing and shall be deemed given or delivered upon the earlier of  (i) the first business day after transmission by facsimile or hand delivery or deposit with an overnight express service or overnight mail delivery service, or (ii) or three (3) calendar days after mailed, postage prepaid, in each case, and shall be addressed to the designated recipient, as follows

       (a)   If to Lender
            ------------

21

North Star Maritime, Inc
30th Street and Balboa Avenue, Bldg  No  39
City of Panama, Republic of Panama


(b)    If to Borrower
       ---------------


Pinnacle Three Corporation
17555 Collins Avenue, Apt 3702
Sunny Isles Beach, FL 33160
Tel  786-556-5757


With a Copy to
---------------


Leon Goldstein
17555 Collins Avenue, Apt 3702
Sunny Isles Beach, FL 33160


or to such other address as each party may designate for itself by
like notice

11 9 Lender and Borrower acknowledge that there are no
agreements or understandings, written or oral, between Lender and
Borrower with respect to the Loan, other than as set forth herein,
in the Note(s) and the other Loan Documents and that this Agreement,
the Note(s) and the other Loan Documents contain the entire
agreement between Lender and Borrower with respect thereto  None of
the terms of this Agreement, the Note(s) and the other Loan
Documents may be amended except by an instrument executed by each of
the parties hereto

11 10 No omission, or delay, by Lender at any time to enforce
any right or remedy reserved to it, or to require performance of any
of the terms, covenants or provisions hereof by Borrower at any time
designated, shall be a waiver of any such right or remedy to which
Lender is entitled, nor shall it in any way affect the right of
Lender to enforce such provisions thereafter

11 11 All agreements, representations and warranties contained
in this Agreement or the Note  or in any Loan Documents delivered
pursuant hereto or in connection herewith shall be for the benefit
of Lender and any Assignee and shall survive the execution and
delivery of this Agreement or the Note and the expiration or other
termination of this Agreement or the Note

11 12 This Agreement may be executed in any number of
counterparts, each of which shall be deemed an original, but all
such counterparts together shall constitute but one and the same
instrument

22

11 13 CONFIDENTIALITY  Lender acknowledges that certain items of Collateral, including, but not limited to trade secrets, source codes, customer lists and certain other items of intellectual Property, and any Financial Statements provided pursuant to Section 6 hereof, constitute proprietary and confidential information of the Borrower (the "Confidential Information')  Accordingly, lender agrees that any Confidential Information it may obtain in the course of acquiring, perfecting or foreclosing on the Collateral or otherwise provided under this Agreement, provided such Confidential Information is marked as confidential by Borrower at the time of disclosure or is oral information which is confirmed in writing and marked as confidential with thirty (30) days following disclosure, shall be received in the strictest confidence and will not be disclosed to any other person or entity in any manner whatsoever, in whole or in part, without the prior written consent of the Borrower, unless and until Lender has acquired indefeasible title thereto

11 14 This Agreement shall be binding upon, and shall inure to the benefit of, Borrower and its permitted assigns (if any)  Borrower shall not assign its obligations under this Agreement, the Note(s) or any of the other Loan Documents without Lender's express written consent and any such attempted assignment shall be void and of no effect  Any assignment by Borrower in connection with a "Merger' (as defined below) shall be subject to Lender's prior consent  Any consent granted by Lender shall be conditioned upon such surviving entity or transferee assuming Borrower's Secured Obligations hereunder pursuant to assignment documents reasonably acceptable to Lender  If Lender reasonably withholds its consent to such assignment in connection with a Merger, the outstanding principal and accrued and unpaid interest shall be prepaid in whole in accordance with Section 2 6 hereof

For purposes of this Agreement, a  Merger" shall mean any consolidation or merger of the Borrower with or into any other corporation or entity, any sale or conveyance of an or substantially all of the assets or stock of the Borrower by or to any other person or entity in which Borrower is not the surviving entity

IN WITNESS WHEREOF, the Borrower and the Lender have duly executed and delivered this Agreement as of the day and year first above written

BORROWER   PINNACLE THREE CORPORATION

By

Title      PRESidENt

Date       3 / 01 / 2007

23

BORROWER: LEON GOLDSTEIN

By _____

Date _____

LENDER   NORTH STAR MARITIME, INC

By _____

Date _____

WITNESS _____

24

EXHIBIT A
SECURED PROMISSORY NOTE

$ _____                           Date _____

                                             Due _____

        FOR VALUE RECEIVED, Pinnacle Three Corporation and Leon
Goldstein (the "Borrower") hereby promises to pay to the order of
North Star Maritime, Inc , a Panama corporation (the "Lender") at
30th Street and Balboa Avenue, Bldg  No  39, City of Panama, Republic
of Panama or such other place of payment as the holder of this
Secured Promissory Note (this "Note") may specify from time to time
in writing, in lawful money of the United States of America, the
principal amount of _____ and 00/100 Dollars ($_____)
together with interest at eighteen percent (18 0%) per annum from
the date of this Note to maturity of each installment on the
principal hereof remaining from time to time unpaid, such principal
and interest to be paid in 36 equal monthly installments of
$_____ each, commencing _____ and on the same day of
each month thereafter to and including _____, such
installments to be applied first to accrued and unpaid interest and
the balance to unpaid principal  Interest shall be computed on the
basis of a year consisting of twelve months of thirty days each

This Note is the Note referred to in, and is executed and delivered
in connection with, that certain Loan and Security Agreement of
dated as of _____, 20__ herewith by and between Borrower and
Lender (as the same may from time to time be amended, modified or
supplemented in accordance with its terms, the "Loan Agreement"),
and is entitled to the benefit and security of the Loan
Agreement and the other Loan Documents (as defined in the Loan
Agreement), to which reference is made for a statement of all of the
terms and conditions thereof  All terms defined in the Loan
Agreement shall have the same definitions when used herein, unless
otherwise defined herein

The Borrower waives presentment and demand for payment, notice of
dishonor, protest and notice of protest and any other notice as
permitted under the UCC or any applicable law

This Note has been delivered to Lender and is payable in the State
of Florida, and shall not become effective until accepted by Lender
in the State of Florida  This Note shall be governed by and
construed and enforced in accordance with, the laws of the State of
Florida, excluding any conflicts of law rules or principles that
would cause the application of the laws of any other jurisdiction


        Signatures on the following page ___

                                                                  25

EXHIBIT B
ADVANCE REQUEST

Date _____

To Lender          North Star Maritime, Inc
                   30th Street and Balboa Avenue, Bldg  No  39
                   City of Panama, Republic of Panama

Borrower hereby requests from North Star Maritime, Inc  ("Lender")
an Advance in the amount of $_____ under that Loan and
Security Agreement between Borrower and Lender dated _____, 20__
(the "Agreement")

        Please
        ------

        (a)     Issue a check payable to Borrower          _____

                                  or

        (b)     Wire Funds to Borrower's account           _____

                Bank        _____
                Address     _____
                            _____
                ABA Number  _____
                Account Number _____
                Account Name _____

Borrower hereby affirms that all Representations and Warranties of
Borrower set forth in Section 4 and all Conditions Precedent to Loan
set forth in Section 7 of the Agreement remain true and correct in
all material respects as of the date hereof

        Executed this ____ day of _____, 20__ by

                BORROWER        PINNACLE THREE CORPORATION

                BY      _____

                TITLE   _____

                PRINT   _____

27

MORTGAGE


THIS INDENTURE, made as of the 1st day of March 2007, by and between LEON GOLDSTEIN, of Florida hereinafter called "Mortgagor', and NORTH STAR MARITIME, INC of Panama, hereinafter called 'Mortgagee"


W I T N E S S E T H

AMOUNT OF LIEN  "NOTE"


WHEREAS, Mortgagor is justly indebted to Mortgagee in the sum of ONE MILLION FIVE HUNDRED THOSAND DOLLARS ($1,500,000 00) in lawful money of the United States, and has agreed to pay the same, with interest thereon, according to the terms of a certain note (the "Note") given by Mortgagor to Mortgagee, bearing even date herewith


DESCRIPTION OF PROPERTY SUBJECT TO LIEN  "PREMISES"


NOW, THEREFORE, in consideration of the premises and the sum hereinabove set forth, and to secure the payment of the Secured Indebtedness as defined herein, Mortgagor has granted, bargained, sold and conveyed, and by these presents does grant, bargain, sell and convey unto Mortgagee property situate in Miami Dade County, more particularly described in Exhibit "A" attached hereto and by this reference made a part hereof and having legal description as follows

THE PINNACLE CONDO UNIT TS-2 UNDIV 0 49231 INT IN COMMON ELEMENTS OFF REC 18334-990 OR 21267-4536 05 2003 4

TOGETHER with all buildings, structures and other improvements now or hereafter located on, above or below the surface of the property hereinbefore described, or any part and parcel thereof, and,

TOGETHER with all and singular the tenements, hereditaments, easements, riparian and littoral rights, and appurtenances thereunto belonging or in anywise appertaining, whether now owned or hereafter acquired by Mortgagor, and including all rights of ingress and egress to and from adjoining property (whether such rights now exist or subsequently arise) together with the reversion or reversions, remainder and remainders, rents, issues and profits thereof, and also all the estate, right, title, interest, claim and demand whatsoever of Mortgagor of, in and to the same and of, in and to every part and parcel thereof, and,

TOGETHER with all machinery, apparatus, equipment, fittings, fixtures, whether actually or constructively attached to said property and including all trade, domestic and ornamental fixtures, and articles of personal property of every kind and nature whatsoever (hereinafter collectively called "Equipment'), now or hereafter located in, upon or under said property or any part thereof and used or usable in connection with any present or future operation of said property and now owned or hereafter acquired by Mortgagor, and,

TOGETHER with all the common elements appurtenant to any parcel, unit or lot which is all or part of the Premises, and, ALL the foregoing encumbered by this Mortgage being collectively referred to herein as the "Premises",

TO HAVE AND TO HOLD the Premises hereby granted to the use, benefit and behalf of the Mortgagee, forever

U C C   SECURITY AGREEMENT

It is agreed that if any of the property herein mortgaged is of a nature so that a security interest therein can be perfected under the Uniform Commercial Code, this instrument shall constitute a Security Agreement and Mortgagor agrees to join with the Mortgagee in the execution of any financing statements and to execute any and all other instruments that may be required for the perfection or renewal of such security interest under the Uniform Commercial Code

EQUITY OF REDEMPTION

Conditioned, however, that if Mortgagor shall promptly pay or cause to be paid to Mortgagee, at its address listed in the Note, or at such other place which may hereafter be designated by Mortgagee, its or their successors or assigns, with interest, the principal sum of ONE MILLION FIVE HUNDRED THOSAND DOLLARS ($1,500,000 00) with final maturity, if not sooner paid, as stated in said Note unless amended or extended according to the terms of the Note executed by Mortgagor and payable to the order of Mortgagee, then these presents shall cease and be void, otherwise these presents shall remain in full force and effect

ARTICLE ONE

COVENANTS OF MORTGAGOR

Mortgagor covenants and agrees with Mortgagee as follows

1 01     Secured Indebtedness

This Mortgage is given as security for the Note and also as security for any and all other sums, indebtedness, obligations and liabilities of any and every kind arising, under the Note or this Mortgage, as amended or modified or supplemented from time to time, and any and all renewals, modifications or extensions of any or all of the foregoing (all of which are collectively referred to herein as the "Secured Indebtedness"), the entire Secured Indebtedness being equally secured with and having the same priority as any amounts owed at the date hereof

1 02     Performance of Note, Mortgage, Etc

Mortgagor shall perform, observe and comply with all provisions hereof and of the Note and shall promptly pay, in lawful money of the United States of America, to Mortgagee the

Secured Indebtedness with interest thereon as provided in the Note, this Mortgage and all other documents constituting the Secured Indebtedness

1 03     Extent Of Payment Other Than Principal And Interest

Mortgagor shall pay, when due and payable, (1) all taxes, assessments, general or special, and other charges levied on, or assessed, placed or made against the Premises, this instrument or the Secured Indebtedness or any interest of the Mortgagee in the Premises or the obligations secured hereby  (2) premiums on policies of fire and other hazard insurance covering the Premises, as required herein  (3) ground rents or other lease rentals, and (4) other sums related to the Premises or the indebtedness secured hereby, if any, payable by Mortgagor

1 04     Insurance

Mortgagor shall, at its sole cost and expense, keep the Premises insured against all hazards as is customary and reasonable for properties of similar type and nature located in Miami Dade County, Florida

1 05     Care of Property

Mortgagor shall maintain the Premises in good condition and repair and shall not commit or suffer any material waste to the Premises

1 06     Prior Mortgage

With regard to the Prior Mortgage, Mortgagor hereby agrees to

(i)  Pay promptly, when due, all installments of principal and interest and all other sums and charges made payable by the Prior Mortgage,

(ii) Promptly perform and observe all of the terms, covenants and conditions required to be performed and observed by Mortgagor under the Prior Mortgage, within the period provided in said Prior Mortgage

(iii) Promptly notify Mortgagee of any default, or notice claiming any event of default by Mortgagor in the performance or observance of any term, covenant or condition to be performed or observed by Mortgagor under any such Prior Mortgage

(iv) Mortgagor will not request nor will it accept any voluntary future advances under the Prior Mortgage without Mortgagee's prior written consent, which consent shall not be unreasonably withheld

ARTICLE TWO

DEFAULTS

2 01     Event of Default

The occurrence of any one of the following events which shall not be cured within 30 days after written notice of the occurrence of the event, if the default is monetary, or which shall not be cured within 30 days after written notice from Mortgagee, if the default is non-monetary, shall constitute an "Event of Default'

(a)  Mortgagor fails to pay the Secured Indebtedness, or any part thereof, or the taxes, insurance and other charges, as hereinbefore provided, when and as the same shall become due and payable

(b)  Any material warranty of Mortgagor herein contained, or contained in the Note, proves untrue or misleading in any material respect,

(c)  Mortgagor materially fails to keep, observe, perform, carry out and execute the covenants, agreements, obligations and conditions set out in this Mortgage, or in the Note;

(d)  Foreclosure proceedings (whether judicial or otherwise) are instituted on any mortgage or any lien of any kind secured by any portion of the Premises and affecting the priority of this Mortgage

2 02     Options Of Mortgagee Upon Event Of Default

Upon the occurrence of any Event of Default, the Mortgagee may immediately do any one or more of the following

(a)  Declare the total Secured Indebtedness, including without limitation all payments for taxes, assessments, insurance premiums, liens, costs, expenses and attorney's fees herein specified, without notice to Mortgagor (such notice being hereby expressly waived), to be due and collectible at once, by foreclosure or otherwise;

(b)  Pursue any and all remedies available under the Uniform Commercial Code, it being hereby agreed that ten (10) days' notice as to the time, date and place of any proposed sale shall be reasonable;

(c)  In the event that Mortgagee elects to accelerate the maturity of the Secured Indebtedness and declares the Secured Indebtedness to be due and payable in full at once as provided for in Paragraph 2 02(a) hereinabove, or as may be provided for in the Note, or any other provision or term of this Mortgage, then Mortgagee shall have the right to pursue all of Mortgagee's rights and remedies for the collection of such Secured Indebtedness, whether such rights and remedies are granted by this Mortgage, any other agreement, law, equity or otherwise, to include, without limitation, the institution of foreclosure proceedings against the Premises under the terms of this Mortgage and any applicable state or federal law

ARTICLE THREE

MISCELLANEOUS PROVISIONS

3 01     Prior Liens

Mortgagor shall keep the Premises free from all prior liens (except for those consented to by Mortgagee)

3 02     Notice, Demand and Request

Every provision for notice and demand or request shall be deemed fulfilled by written notice and demand or request delivered in accordance with the provisions of the Note relating to notice

### 3 03    Meaning of Words

The words "Mortgagor' and "Mortgagee" whenever used herein shall include all individuals, corporations (and if a corporation, its officers, employees or agents), trusts and any and all other persons or entities, and the respective heirs, executors, administrators, legal representatives, successors and assigns of the parties hereto, and all those holding under either of them  The pronouns used herein shall include, when appropriate, gender and both singular and plural  The word "Note" shall also include one or more notes and the grammatical construction of sentences shall conform thereto

### 3 04    Severability

If any provision of this Mortgage or any other Loan Document or the application thereof shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of the instrument in which such provision is contained, nor the application of the provision to other persons, entities or circumstances, nor any other instrument referred to hereinabove shall be affected thereby, but instead shall be enforced to the maximum extent permitted by law

### 3 05    Governing Law

The terms and provisions of this Mortgage are to be governed by the laws of the State of Florida  No payment of interest or in the nature of interest for any debt secured in part by this Mortgage shall exceed the maximum amount permitted by law  Any payment in excess of the maximum amount shall be applied or disbursed as provided in the Note in regard to such amounts which are paid by the Mortgagor or received by the Mortgagee

### 3 06    Descriptive Headings

The descriptive headings used herein are for convenience of reference only, and they are not intended to have any effect whatsoever in determining the rights or obligations of the Mortgagor or Mortgagee and they shall not be used in the interpretation or construction hereof

### 3 07    Attorney's Fees

As used in this Mortgage, attorneys' fees shall include, but not be limited to, fees incurred in all matters of collection and enforcement, construction and interpretation, before, during and after suit, trial, proceedings and appeals  Attorneys' fees shall

also include hourly charges for paralegals, law clerks and other staff members operating under the supervision of an attorney

    3 08    Exculpation

    Notwithstanding anything contained herein to the contrary, the Note which this Mortgage secures is a non-recourse Note and such Note shall be enforced against Mortgagor only to the extent of Mortgagor's interest in the Premises as described herein and to the extent of Mortgagor's interest in any personally as may be described herein

    IN WITNESS WHEREOF, the Mortgagor has caused this instrument to be duly executed as of the day and year first above written

Mortgagor                                              Mortgagee

_____                    _____
LEON GOLDSTEIN                                NORTH STAR MARITIME, INC


Witness 1                                              Witness 2

_____                    _____

**ASSIGNMENT OF CLAIMS UNDER SEPTEMBER 10, 2004 LOAN AGREEMENT**

THIS ASSIGNMENT OF CLAIMS UNDER September 10  2004 Loan Agreement ( Assignment ) is made effective this 11ᵗʰ day of August  2013  by Bonito Shipping Corp ( Assignor ) to North Star Maritime  Inc  ( Assignee )

W I T N E S S E T H

WHEREAS  the Assignor entered into a loan agreement with Pinnacle Three Corporation dated September 10  2004  and

WHEREAS  the Assignor loaned funds to Pinnacle Three Corporation pursuant to the loan agreement  and

WHEREAS  Pinnacle Three Corporation has not repaid the loaned funds and is in breach of the loan agreement  and

WHEREAS  the Assignor wishes to assign all its rights  title and interest under the loan agreement to the Assignee for the purpose of all collection actions to  be taken in connection therewith  and

WHEREAS  the Assignor has not assigned its rights under the loan agreement to any other person or entity

NOW, THEREFORE  in consideration of the sum of Ten Dollars ($10 00) and other good and valuable consideration  the receipt and sufficiency of which is hereby acknowledged  the Assignor does hereby grant  bargain  sell  assign  transfer and convey unto the Assignee  its successors and assigns  all of the Assignor s right  title and interest in and to any and all claims  rights and causes of action arising from or relating to the loan agreement

From and after the date of this Assignment  the Assignee shall assume all of the obligations of the Assignor under any of the items being assigned hereunder for the purpose of the collection actions to be taken in connection with the loan agreement

IN WITNESS WHEREOF  the Assignor and Assignee have executed this Assignment effective as of the date and year first above written

| ASSIGNOR | ASSIGNEE |
|---|---|
| OLEKSANDR YELIZAROV  on behalf of Bonito Shipping Corp | OLEKSANDR YELIZAROV  on behalf of North Star Maritime  Inc |



EXHIBIT
B

## LOAN AGREEMENT
### Dated 10th September, 2004

**Bonito Shipping Corp** , 30th Street and Balboa Avenue,  Bldg No 39, City of Panama, Panama (hereinafter referred to as the "Lenders"),as one party, and **Pinnacle Three Corp** 17555 Collins Ave App 3702, Sunny Isles, FL  33160, USA (hereinafter referred to as the "Borrowers"), as the other party,

Hereinafter jointly referred to as the "Parties" and each individually as the "Party", on this 10th day of September, 2004 have concluded this agreement (hereinafter referred to as the "Agreement") as follows

### 1    Subject of the Agreement

1 1  The Lenders will, in accordance with the terms of Agreement grant to the Borrowers a credit facility (hereinafter referred to as the "Facility") for the purchase of the real estate in the amount of

### USD 800   000,00
### (Eight hundred thousand)

(hereinafter referred to as the "Facility Amount")
**for the period of  fifteen years** from 15th of September, 2004 till 15th of September, 2019 or other term stipulated by the Agreement (hereinafter – the "Facility Term") with payment of Interest, Fees and other payments payable in accordance with terms defined herein below

### 2  Disbursement and repayment of the Facility

2 1  The Lenders disburse the Facility to the Borrowers as it will be agreed between the Parties additionally

2 2   The Borrowers will repay the Facility by the end of the period defined in clause 1 to the account  which the Lenders consider appropriate

2 3   The early (full or partial) repayment of the Facility is allowed only by proxy of the Parties and mandatory condition of 10 (ten) Business Days prior written Borrowers' notification of the Lenders

### 3 Interest

3 1   The Borrowers will pay Interest in the currency of the Facility on the amount of the outstanding Facility  Interest shall be paid on annual basis at the Interest Rate of 9% per annum by the same date the Facility was disbursed to the Borrower

3 2   The Borrowers have the option to pay the interest every three years, in that case the interest rate is to be considered 10% per annum

### 4 Representations, Warranties and Certain Covenants

4 1  Representations and Warranties  The Borrowers hereby represents and warrants, that, as of the date of the Agreement as well as at any time thereafter during the term of the Agreement



EXHIBIT
C

(a)   The Borrowers have legal capacity and capability to enter into and perform under the Agreement according to the laws of the Borrowers' residence/ citizenship

(b)   No litigation, criminal, civil or administrative proceedings are current or, to the Borrowers' knowledge, pending or threatened, which might, if adversely determined, have a material adverse effect on financial (property) condition of the Borrowers or their ability to perform their obligations under the Agreement

4 2   The Borrowers undertake
(a)   To ensure the repayment of the Facility, Interest, Fees and all other payments defined in the Agreement

(b)   To notify the Lenders of any Event of Default within 3 (three) business days upon its occurrence
4 3   The Lenders undertake

(a)   To provide the Borrowers with funds in accordance with the terms and conditions of the Agreement

(b)   To accept the payment of funds from the Borrowers or third person as fulfillment of the Borrowers' obligations hereunder

**5 Events of Default**
5 1   Each of the following events is an Event of Default (in the Agreement – "Event of Default"), whether or not caused by any reason whatsoever outside the control of the Borrowers or any other person

(a)   <u>Non-payment</u>  The Borrowers do not pay on the due date any amount payable by it under this Agreement in the currency and funds in which it is expressed to be payable

(b)   <u>Breach of other obligations</u>  The Borrowers are in breach of any provision of the Agreement

(c)   <u>Untruthful information</u>  Representation, warranty or statement made or repeated in any document presented by the Borrowers to the Lenders is incorrect in any material respect when made or deemed to be made or repeated

5 2 <u>Remedies upon default</u>  On and at any time after the occurrence of an Event of Default the Lenders upon its sole discretion may

- by written notice request from the Borrowers to remedy such Event of Default within the term defined by the Lenders in such notice,
- suspend or stop the disbursement of the Facility (Drawings),
- Terminate the Agreement,
- Demand that the outstanding amount under the Facility, together with accrued Interest and all other amounts accrued

under the Agreement be immediately due and payable, whereupon they shall become due and payable on the term defined by the Lenders;

- To apply Increased Interest Rate by notification of the Borrowers in writing. In this case Interest shall be accrued by the Lenders and paid by the Borrowers at such Increased Interest Rate;

- To enforce any of the Security Documents;

### 6. Other Conditions

6.1. Any payment of the Borrowers to the Lenders due under this Agreement shall be deemed executed duly if the Lenders have received the respective amount to the proper account according to the terms and conditions of the Agreement.

6.2. The conditions of the Agreement, rights and duties of the Parties hereunder shall be governed by and interpreted in accordance with the English laws.

6.3. Any amendments and changes hereto may only be made in writing which shall then become an integral part of the Agreement and shall be signed by the Borrowers and authorized representatives of the Lenders.

6.4. The Parties shall use every effort to settle all disputes and disagreements arising in connection with the fulfillment of the Agreement through negotiations, correspondence and mutual concessions. Should the Parties not come to an agreement the Parties shall submit the dispute for consideration of Court of relevant competence.

6.5. This Agreement shall enter into force on the date of its duly signing and shall remain in effect until the Parties have fully discharged all their obligations hereunder.

6.6. The Agreement is made in two originals, in English language one original for each of the Parties hereto. Both originals are equally authentic.

### 7. DETAILS AND SIGNATURES OF THE PARTIES

**THE LENDERS:**

Bonito Shipping Corp.
30th Street and Balboa Avenue, Bldg No.39, City of Panama, Panama

**THE BORROWERS:**

Pinnacle Three, 17555 Collins Ave. App.3702, Sunny Isles, FL. 33160, USA.

10th September, 2004